# 15-0541-cr

# United States Court of Appeals
### for the
## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

ALLAN PETERS, AKA Hiio,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 1 of 3 (Pages JA-1 to JA-300)

STEVEN D. CLYMER
ASSISTANT UNITED STATES ATTORNEY
  CHIEF, APPEALS DIVISION
UNITED STATES ATTORNEY'S OFFICE,
  NORTHERN DISTRICT OF NEW YORK
*Attorney for Appellee*
900 Federal Building
100 South Clinton Street
Syracuse, New York 13261
(315) 448-0684

LAW OFFICE OF DENNIS B. SCHLENKER
*Attorneys for Defendant-Appellant*
174 Washington Avenue
Albany, New York 12210
(518) 463-4473

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... JA-1

Indictment, dated August 14, 2013 ........................... JA-18

Motion *in Limine*, by Defendant, dated
    January 22, 2014 ................................................... JA-21

Motion *in Limine*, by Appellee, dated
    January 24, 2014 ................................................... JA-24

Jury Trial Transcript, dated January 27, 2014............ JA-36

Jury Trial Transcript, dated January 28, 2014............ JA-152

Jury Trial Transcript, dated January 29, 2014............ JA-394

Jury Trial Transcript, dated January 30, 2014............ JA-632

Appellee's Witnesses:

    Corey Spinner        Direct.......................... JA-94
                           Cross........................... JA-132

    Leonel Loya          Direct.......................... JA-154
                           Cross........................... JA-169

    Ernie Miller          Direct.......................... JA-174
                           Cross........................... JA-193
                           Redirect ...................... JA-196

    Decota D. Thompson    Direct.......................... JA-199
                           Cross........................... JA-212

ii

|  |  | Page |
|---|---|---|
| Richard Scott Norcross | Direct | JA-222 |
|  | Cross | JA-229 |
| Andrew Hermes | Direct | JA-234 |
|  | Cross | JA-281 |
|  | Redirect | JA-295 |
|  | Recross | JA-300 |
| Cornelius Joyce | Direct | JA-303 |
| James Sunday | Direct | JA-311 |
|  | Cross | JA-334 |
| Benjamin LaBaff | Direct | JA-337 |
| Alain Forget | Direct | JA-358 |
|  | Cross | JA-464 |
| Cheryl Lobdell | Direct | JA-516 |
|  | Cross | JA-577 |
|  | Redirect | JA-605 |

Government's Exhibits:

Exhibit 3 – Aerial Map of Defendant's Property ....... JA-732

Exhibits 9JA-9d – Photographs of Text Messages
between Forget and Stewart .............................. JA-733

Exhibits 12JA-12e – Photographs of Surveillance
on March 25, 2011 ............................................. JA-737

Exhibit 13 – Paperwork given to Defendant on
March 25, 2011 (a/k/a the Fake NYSP Receipt) JA-742

iii

**Page**

Exhibit 15 – Transcript of the Recorded Call
between Forget and Appellant on
March 25, 2011 ................................................. JA-743

Exhibit 17 – Transcript of Recorded Conversation
between Forget and Appellant on
March 25, 2011 ................................................. JA-744

Exhibit 19 – Photograph of Defendant ...................... JA-758

Exhibit 28 – Letter to Forget from the US
Attorney's Office, Northern District of New
York, dated January 13, 2014............................ JA-759

Exhibit 31 – Stipulation of Fact #1 ........................... JA-761

Exhibit 32 – Stipulation of Fact #2 ........................... JA-763

Exhibit 33 – Stipulation of Fact #3 ........................... JA-765

Affirmation of Brian P. Barrett, for Defendant, in
Support of Motion for Judgment of Acquittal,
dated May 15, 2014 ................................................ JA-768

Decision and Order of the Honorable Glenn T.
Suddaby, dated July 9, 2014 ................................... JA-778

Sentencing Minutes, dated February 12, 2015 .......... JA-787

Notice of Appeal, dated February 24, 2015 .............. JA-815

JA-1

APPEAL

# U.S. District Court
## Northern District of New York - Main Office (Syracuse) [LIVE - Version 6.1] (Plattsburgh)
## CRIMINAL DOCKET FOR CASE #: 8:13-cr-00316-GTS-2

Case title: USA v. Sealed Defendant #1 et al

Date Filed: 08/14/2013
Date Terminated: 02/13/2015

Assigned to: Judge Glenn T. Suddaby

**Defendant (2)**

**Allan Peters**
*TERMINATED: 02/13/2015*
*also known as*
"Hiio"
*TERMINATED: 02/13/2015*

represented by **Brian P. Barrett**
Office of Brian P. Barrett
5676 Cascade Road
Lake Placid, NY 12946
518-523-3388
Fax: 518-523-3080
Email: brian@bpbarrett.com
*TERMINATED: 09/24/2014*
*LEAD ATTORNEY*
*Designation: Retained*

**Dennis B. Schlenker**
Office of Dennis B. Schlenker
174 Washington Avenue
Albany, NY 12210
518-463-4473
Fax: 518-463-7926
Email: badger44@verizon.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**James E. Tyner**
SACCO TYNER, PLLC
38 North Ferry Street
Schenectady, NY 12305
518-374-7411
Email: jet@mjsacco.com
*TERMINATED: 04/14/2014*
*LEAD ATTORNEY*
*Designation: Retained*

**Mark E. Anderson**
Anderson, Soloski Law Firm

JA-2

P.O. Box 2723
Plattsburgh, NY 12901
518-562-8383
Fax: 518-562-8384
Email: manderson@andersonsoloski.com
*TERMINATED: 10/14/2013*
*LEAD ATTORNEY*
*Designation: Retained*

**Heather Markette Brown Maure**
Wayne County Public Defenders Office
26 Church Street
Lyons, NY 14614
574-360-6156
Email: heathermaure@gmail.com
*TERMINATED: 09/09/2013*
*Designation: CJA Appointment*

**Mark J. Sacco**
SACCO TYNER, PLLC
38 North Ferry Street
Schenectady, NY 12305
518-374-7411
Email: mjs@mjsacco.com
*TERMINATED: 04/14/2014*
*Designation: Retained*

**Pending Counts**

21:846=CP.F & 21:846=CD.F -
CONSPIRACY TO POSSESS WITH
INTENT TO DISTRIBUTE AND TO
DISTRIBUTE CONTROLLED
SUBSTANCE
(1)

**Disposition**

Term of imprisonment: 168 months;
Supervised release: 6 years. Special
Assessment: $100. No fine.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

None

**Disposition**

**Highest Offense Level (Terminated)**

None

**Complaints**

None

**Disposition**

**Plaintiff**

**USA**                                      represented by **Daniel C. Gardner**
                                             Office of United States Attorney -
                                             Plattsburgh
                                             14 Durkee Street
                                             Room 340
                                             Plattsburgh, NY 12901
                                             518-314-7800
                                             Fax: 518-314-7811
                                             Email: daniel.gardner@usdoj.gov
                                             *TERMINATED: 07/07/2014*
                                             *LEAD ATTORNEY*
                                             *Designation: Assistant US Attorney*

                                             **Douglas G.N. Collyer**
                                             Office of United States Attorney -
                                             Plattsburgh
                                             14 Durkee Street
                                             Room 340
                                             Plattsburgh, NY 12901
                                             518-314-7818
                                             Fax: 518-314-7811
                                             Email: douglas.collyer@usdoj.gov
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Gwendolyn E. Carroll**
                                             Office of the United States Attorney -
                                             Syracuse
                                             P.O. Box 7198
                                             100 South Clinton Street
                                             Syracuse, NY 13261-7198
                                             315-448-0672
                                             Fax: 315-448-0954
                                             Email: gwendolyn.e.carroll@usdoj.gov
                                             *TERMINATED: 12/02/2014*
                                             *LEAD ATTORNEY*
                                             *Designation: Assistant US Attorney*

                                             **Katherine E. Kopita**
                                             Office of United States Attorney -
                                             Plattsburgh
                                             14 Durkee Street
                                             Room 340
                                             Plattsburgh, NY 12901
                                             518-314-7800
                                             Fax: 518-314-7811
                                             Email: katherine.kopita@usdoj.gov

JA-4

*TERMINATED: 12/23/2014*
*LEAD ATTORNEY*
*Designation: Assistant US Attorney*

**Sean K. O'Dowd**
Office of the United States Attorney -
Albany Office
445 Broadway, Room 218
Albany, NY 12207
518-431-0247
Fax: 518-431-0249
Email: Sean.ODowd@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/04/2013 | 5 | Arrest Warrant Returned Executed on 9/4/2013, in case as to Allan Peters (lb, ) (Entered: 09/05/2013) |
| 09/04/2013 | 6 | REDACTED INDICTMENT as to Allan Peters. (lb, ) (Entered: 09/05/2013) |
| 09/04/2013 | | Minute Entry (FTR Recorded 4:23 4:43 pm) for proceeding held before Magistrate Judge Larry A. Kudrle: Initial Appearance as to Allan Peters, aka Hiio held on September 4, 2013. APP: AUSA Katie Kopita appears for the Government. Defendant advised of rights, maximum penalty stated and given copy of Redacted Indictment filed August 14, 2013. Indictment is unsealed as to this defendant. Defendant is questioned regarding financial situation and found eligible for a Court appointed attorney. Court reserves the right to order the defendant to pay some of the attorney fees. Arraignment and Detention Hearing scheduled for September 6, 2013 at 12:00 pm in Plattsburgh. Defendant REMANDED to custody of the U.S. Marshal. (Court Reporter lb) (lb, ) (Entered: 09/05/2013) |
| 09/04/2013 | 7 | ORDER OF DETENTION as to Allan Peters Detention Hearing set for 9/6/2013 at 12:00 PM in Plattsburgh before Magistrate Judge Larry A. Kudrle.. Signed by Magistrate Judge Larry A. Kudrle on 9/4/2013. (lb, ) (Entered: 09/05/2013) |
| 09/04/2013 | | TEXT NOTICE OF HEARING as to Allan Peters ARRAIGNMENT set for 9/6/2013 at 12:00 PM in Plattsburgh before Magistrate Judge Larry A. Kudrle. (lb, ) (Entered: 09/05/2013) |
| 09/05/2013 | 8 | CJA 20 Appointment of Attorney Heather Maure for Allan Peters. Refer to the Court's website: http://www.nynd.uscourts.gov/cja.cfm for comprehensive information relating to court appointed representation. Attorneys are reminded that CJA vouchers are to be submitted to the court no later than 45 days after the final disposition of the case, unless good cause is shown.. Signed by Magistrate Judge Larry A. Kudrle on 9/5/2013. (lb, ) (Entered: 09/05/2013) |
| 09/06/2013 | | Minute Entry (FTR Recorded 12:10 pm 12:20 pm ) for proceeding held before Magistrate Judge Larry A. Kudrle: Arraignment on Indictment Count 1 as to Allan Peters held on September 6, 2013. APP: AUSA Katie Kopita for the Government, Mark Schneider, on behalf of Heather Maure, attorney for defendant. Defense |

| | | |
|---|---|---|
| | | waives a formal reading of the Indictment and enters plea of not guilty to Count 1 of the Indictment. Criminal Pretrial Scheduling Order issued and copies given to attorneys. Detention Hearing held. Attorneys provided with copy of Pretrial Services Report. Defense requests an adjournment of the detention hearing. Detention Hearing rescheduled to September 12, 2013 at 2:30 pm(Court Reporter lb) (lb, ) (Entered: 09/09/2013) |
| 09/06/2013 | | TEXT NOTICE OF HEARING as to Allan Peters DETENTION HEARING Set for 9/12/2013 at 02:30 PM in Plattsburgh before Magistrate Judge Larry A. Kudrle. (lb, ) (Entered: 09/09/2013) |
| 09/06/2013 | 9 | CRIMINAL PRETRIAL SCHEDULING ORDER as to Allan Peters Motions to be filed by 10/4/2013. Jury Trial set for 11/4/2013 at 09:30 AM in Syracuse before Judge Glenn T. Suddaby.. Signed by Magistrate Judge Larry A. Kudrle on 9/6/2013. (lb, ) (Entered: 09/09/2013) |
| 09/09/2013 | 10 | Letter from Counsel as to Allan Peters requesting Appointment of Substitute Counsel (Maure, Heather) (Entered: 09/09/2013) |
| 09/09/2013 | | TEXT ORDER granting 10 Letter Request filed by Allan Peters requesting substitute counsel.. Signed by Magistrate Judge Larry A. Kudrle on 9/9/13. (lb, ) (Entered: 09/09/2013) |
| 09/09/2013 | 11 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Allan Peters Paul J. Evangelista appointed for Allan Peters.. Signed by Magistrate Judge Larry A. Kudrle on 9/9/2013. (lb, ) (Entered: 09/09/2013) |
| 09/09/2013 | | Attorney update in case as to Allan Peters. Attorney Heather Maure terminated. (lb, ) (Entered: 09/09/2013) |
| 09/10/2013 | 12 | NOTICE OF ATTORNEY APPEARANCE: Mark E. Anderson appearing for Allan Peters (Anderson, Mark) (Entered: 09/10/2013) |
| 09/12/2013 | | Minute Entry (FTR Recorded 3:20 pm 3:45 pm) for proceeding held before Magistrate Judge Larry A. Kudrle: Detention Hearing as to Allan Peters held on September 12, 2013. APP: AUSA Daniel Gardner for the Government, Mark Anderson, attorney for Allan Peters. Attorneys provided with copy of Pretrial Services Report. Government recommends detention. After consideration the decision of the Court is detention pending trial due to risk of flight. (Court Reporter lb) (lb, ) (Entered: 09/13/2013) |
| 09/12/2013 | 13 | ORDER OF DETENTION PENDING TRIAL as to Allan Peters. Signed by Magistrate Judge Larry A. Kudrle on 9/12/2013. (lb, ) (Entered: 09/13/2013) |
| 10/01/2013 | 14 | CJA 7 as to Allan Peters - Order Terminating Appointment of Counsel and Authorization for Distribution of Available Private Funds.Defendant directed to pay $363 for payment of compensation and ezpenses of court appointed counsel.. Signed by Magistrate Judge Larry A. Kudrle on 10/1/2013. (lb, ) (Entered: 10/02/2013) |
| 10/16/2013 | 15 | NOTICE OF ATTORNEY APPEARANCE: James E. Tyner appearing for Allan Peters (Attachments: # 1 Exhibit(s) Consent to Change Attorney form)(Tyner, James) (Entered: 10/16/2013) |
| 10/22/2013 | 16 | ORDER Approving Change of Attorney as to Allan Peters re 15 Notice of Attorney |

**JA-6**

| | | |
|---|---|---|
| | | Appearance - Defendant filed by Allan Peters. Signed by Magistrate Judge Larry A. Kudrle on 10/22/2013. (lb, ) (Entered: 10/23/2013) |
| 10/28/2013 | 17 | STIPULATION by USA to exclusion of time (Kopita, Katherine) (Entered: 10/28/2013) |
| 10/29/2013 | 18 | ORDER TO CONTINUE - Ends of Justice as to Allan Peters: Time excluded from 10/29/13 until 1/26/14. Government discovery due by 12/2/13. Defendant discovery due by 12/9/13. Motions to be filed by 12/16/13 and shall be made returnable on 1/16/14 on submit before Judge Glenn T. Suddaby. Any change of plea shall be entered by 1/13/14. All pretrial submissions as set forth in the # 9 criminal pretrial scheduling order are due by 1/20/14. Jury Trial set for 2/3/2014 at 9:00 AM in Syracuse before Judge Glenn T. Suddaby. Signed by Judge Glenn T. Suddaby on 10/29/13. (lmw) (Entered: 10/29/2013) |
| 12/06/2013 | 19 | TRIAL ORDER as to Allan Peters: Jury Trial set for 1/27/2014 at 9:00 AM in Syracuse before Judge Glenn T. Suddaby. Final Pretrial Conference set for 1/17/2014 at 11:00 AM in Syracuse before Judge Glenn T. Suddaby. Pretrial Submissions, including motions in limine, due by 1/6/2014. Responses to motions in limine due by 1/13/14. Signed by Judge Glenn T. Suddaby on 12/6/13. (lmw) (Entered: 12/06/2013) |
| 01/06/2014 | 20 | EXHIBIT LIST by USA as to Allan Peters (Gardner, Daniel) (Entered: 01/06/2014) |
| 01/06/2014 | 21 | Proposed Jury Instructions by USA as to Allan Peters (Gardner, Daniel) (Entered: 01/06/2014) |
| 01/06/2014 | 22 | Proposed Voir Dire by USA as to Allan Peters (Gardner, Daniel) (Entered: 01/06/2014) |
| 01/06/2014 | 23 | PROPOSED VERDICT FORM by USA as to Allan Peters (Gardner, Daniel) (Entered: 01/06/2014) |
| 01/06/2014 | 24 | TRIAL BRIEF by USA as to Allan Peters (Gardner, Daniel) (Entered: 01/06/2014) |
| 01/06/2014 | 25 | WITNESS LIST by USA as to Allan Peters (Gardner, Daniel) (Entered: 01/06/2014) |
| 01/07/2014 | 26 | NOTICE OF ATTORNEY APPEARANCE: Mark J. Sacco appearing for Allan Peters as Co-Counsel with/for Attorney: with James E. Tyner (Sacco, Mark) (Entered: 01/07/2014) |
| 01/07/2014 | 27 | Court Ordered Questionnaire as to Allan Peters (Sacco, Mark) (Entered: 01/07/2014) |
| 01/07/2014 | 28 | Proposed Voir Dire by Allan Peters (Sacco, Mark) (Entered: 01/07/2014) |
| 01/07/2014 | 29 | Proposed Jury Instructions by Allan Peters (Sacco, Mark) (Entered: 01/07/2014) |
| 01/07/2014 | 30 | WITNESS LIST by Allan Peters (Sacco, Mark) (Entered: 01/07/2014) |
| 01/07/2014 | 31 | TRIAL BRIEF by Allan Peters (Sacco, Mark) (Entered: 01/07/2014) |
| 01/08/2014 | | TEXT NOTICE OF HEARING as to Allan Peters: Due to a conflict with the Court's calendar, the Final Pretrial Conference is RESCHEDULED for 1/16/2014 at 02:00 PM via video conference in Syracuse/Albany/Plattsburgh before Judge Glenn T. Suddaby. Given that no motions in limine have been filed in this case, this |

| | | |
|---|---|---|
| | | final pretrial conference will take place via video conference. (lmw) (Entered: 01/08/2014) |
| 01/16/2014 | | TEXT Minute Entry for final pretrial conference held on 1/16/2014 via video conference in Syracuse/Albany/Plattsburgh before Judge Glenn T. Suddaby: CRD discusses preliminary matters while Judge is delayed in another pretrial conference. Length of trial approximately 3 to 5 days. No experts. No motions in limine. Counsel encouraged to stipulate to as many exhibits as possible. Government has issued Writs to produce inmate witnesses. Trial scheduled discussed. Voir dire discussed. Government indicates they have one additional witness and will amend witness list shortly and another witness was recently arrested and may plead Fifth Amendment on cross-examination. Judge directs counsel to submit motion in limine regarding whether witnesses can be questioned regarding recent arrest with charges still pending. APP: Daniel Gardner, Esq. for the Government; Mark Sacco, Esq. for Defendant. CRD: L. Welch. (Court Reporter: Jodi Hibbard) (lmw) (Entered: 01/16/2014) |
| 01/22/2014 | 32 | MOTION in Limine by Allan Peters. (Sacco, Mark) (Entered: 01/22/2014) |
| 01/22/2014 | 33 | EXHIBIT LIST by USA as to Allan Peters (Gardner, Daniel) (Entered: 01/22/2014) |
| 01/22/2014 | 34 | WITNESS LIST by USA as to Allan Peters (Gardner, Daniel) (Entered: 01/22/2014) |
| 01/24/2014 | 35 | RESPONSE to Motion by USA as to Allan Peters re 32 MOTION in Limine (Gardner, Daniel) (Entered: 01/24/2014) |
| 01/27/2014 | 36 | Minute Entry for Day 1 of Jury Trial held on 1/27/2014 before Judge Glenn T. Suddaby as to Allan Peters: Judge rules on motion in limine. Jury makes introductory remarks to Jury panel. Jury panel is sworn. Judge conducts Voir Dire examination. Attorneys exercise challenges for cause and peremptory challenges. Jury is selected and sworn. Opening statements by Mr. Gardner and Mr. Sacco. Government's witness: Corey Spinner. Court is adjourned until 9:00 am on January 28, 2014. APP: Daniel Gardner, AUSA; Mark Sacco, Esq. for Defendant. CRD: L. Welch. (Court Reporter: Diane Martens) (lmw) (Entered: 01/27/2014) |
| 01/28/2014 | 37 | TRANSCRIPT REQUEST by USA as to Allan Peters for proceedings held on September 4, 2013 before Judge Larry A. Kudrle. (Gardner, Daniel) (Entered: 01/28/2014) |
| 01/28/2014 | 38 | Minute Entry for Day 2 of Jury Trial held on 1/28/2014 before Judge Glenn T. Suddaby as to Allan Peters: Government witnesses: Leonel Loya, Ernie Miller, Decota Thompson, Richard Norcross, Andrew Hermes, Cornelius Joyce, James Sunday, Benjamin LaBaff and Alain Forget. Court in recess until 9:00 am on January 29, 2014. APP: Daniel Gardner, AUSA; Mark Sacco, Esq. for Defendant. CRD: L. Welch. (Court Reporter: Diane Martens) (lmw) (Entered: 01/28/2014) |
| 01/29/2014 | | TRANSCRIPT REQUEST by Daniel Gardner as to Allan Peters for proceedings held on 9/4/2013 before Judge Kudrle. (vat, ) (Entered: 01/29/2014) |
| 01/29/2014 | 39 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Allan Peters: Digital Recording held on 9/4/2013 before Judge Kudrle, Court Reporter/Transcriber: Vicky A. Theleman, Telephone number: 607-773-2644. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to |

| | | |
|---|---|---|
| | | remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/19/2014. Redacted Transcript Deadline set for 3/3/2014. Release of Transcript Restriction set for 4/29/2014. Notice of Intent to Redact due by 2/3/2014 (vat, ) (Entered: 01/29/2014) |
| 01/29/2014 | 40 | Minute Entry for Day 3 of Jury Trial held on 1/29/2014 before Judge Glenn T. Suddaby as to Allan Peters: Government witnesses: Alain Forget & Cheryl Lobdell. Government rests. Defense moves to dismiss. Motion denied. Defense rests. Jury excused for the day. Charge conference with counsel. Court is adjourned until 9:00 am on January 30, 2014. APP: Daniel Gardner, AUSA; Mark Sacco, Esq. for Defendant. CRD: L. Welch. (Court Reporter: Diane Martens) (lmw) (Entered: 01/30/2014) |
| 01/30/2014 | 41 | Minute Entry for Day 4 of Jury Trial held on 1/30/2014 before Judge Glenn T. Suddaby as to Allan Peters: Closing arguments by Mr. Gardner and Mr. Sacco. Judge charges the jury and reviews special verdict form. Courtroom Security Officers are sworn. Jury retires for deliberation. Jury returns verdict of guilty and finds defendant responsible for 1,000 kilograms or more of marijuana. Jury is polled. Exhibits returned to counsel. Court orders presentence report. Sentencing scheduled for 7/10/14 at 10:00 am in Albany. Judge advises of appeal and post-trial motion filing deadlines. APP: Daniel Gardner, AUSA; Mark Sacco, Esq. for Defendant. CRD: L. Welch. (Court Reporter: Diane Martens) (lmw) (Entered: 01/30/2014) |
| 01/30/2014 | 42 | GOVERNMENT EXHIBIT LIST completed at trial.(lmw) (Entered: 01/30/2014) |
| 01/30/2014 | 43 | JURY VERDICT as to Allan Peters (2): Jury finds the defendant Guilty on Count 1 of the Indictment and finds the defendant responsible for 1,000 kilograms or more of marijuana. (lmw) (Entered: 01/30/2014) |
| 01/30/2014 | 44 | Jury Instructions as to Allan Peters. (lmw) (Entered: 01/30/2014) |
| 01/30/2014 | 45 | GUIDELINE ORDER as to Allan Peters: Sentencing set for 7/10/2014 at 10:00 AM in Albany before Judge Glenn T. Suddaby. Government Sentencing Memo Deadline 6/19/2014. Defendant Sentencing Memo Deadline 6/19/2014. Signed by Judge Glenn T. Suddaby on 1/30/14. (lmw) (Entered: 01/30/2014) |
| 02/12/2014 | 46 | MOTION for Acquittal by Allan Peters. (Attachments: # 1 Memorandum of Law) (Sacco, Mark) (Entered: 02/12/2014) |
| 02/19/2014 | | TEXT ORDER granting # 46 Defendant's request for additional time to file supplemental memorandum of law until 3/24/14 in support of his motion for judgment of acquittal. The # 46 Motion for Acquittal as to Allan Peters is rescheduled for 5/1/2014 on submit before Judge Glenn T. Suddaby. Government's Response to Motion due by 4/14/2014. Defendant's Reply to Response to Motion due by 4/21/2014. (lmw) (Entered: 02/19/2014) |

| 03/24/2014 | 47 | Letter from Mark J. Sacco as to Allan Peters requesting Extension of time to file (Sacco, Mark) (Entered: 03/24/2014) |
|---|---|---|
| 03/27/2014 | 48 | Letter from Gwendolyn E. Carroll as to Allan Peters requesting that the Proposed Preliminary Order of Forfeiture be signed and filed and copies returned (Attachments: # 1 Proposed Order/Judgment Proposed Preliminary Order of Forfeiture)(Carroll, Gwendolyn) (Entered: 03/27/2014) |
| 03/27/2014 | 49 | NOTICE OF ATTORNEY APPEARANCE Gwendolyn E. Carroll appearing for USA *for the forfeiture aspect of the case* (Carroll, Gwendolyn) (Entered: 03/27/2014) |
| 03/31/2014 | 50 | Letter from Mark J. Sacco as to Allan Peters requesting Requesting extension of time to supplement post trial motion (Sacco, Mark) (Entered: 03/31/2014) |
| 04/01/2014 | 51 | TEXT ORDER granting # 50 Defendant's Letter Request for additional time to file supplemental memorandum of law until 4/4/14 in support of his motino for judgment of acquittal. The # 46 Motion for Acquital as to Allan Peters is rescheduled for 5/15/2014 on submit before Judge Glenn T. Suddaby. Government's Response to Motion due by 4/28/2014. Defendant's Reply to Response to Motion due by 5/5/2014. Authorized by Judge Glenn T. Suddaby on 4/1/14. (lmw) (Entered: 04/01/2014) |
| 04/02/2014 | 52 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Allan Peters: Excerpt from Jury Trial - Testimony of Corey Spinner held on January 27, 2014 before Judge Glenn T. Suddaby, Court Reporter: Diane S. Martens,Telephone number: 315-234-8545. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/23/2014. Redacted Transcript Deadline set for 5/5/2014. Release of Transcript Restriction set for 7/1/2014. Notice of Intent to Redact due by 4/7/2014 (dm2, ) (Entered: 04/02/2014) |
| 04/02/2014 | 53 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Allan Peters: Jury Trial Excerpt - Testimony of Alain Forget - Volume I held on January 28, 2014 before Judge Glenn T. Suddaby, Court Reporter: Diane S. Martens,Telephone number: 31-234-8545. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the |

| | | |
|---|---|---|
| | | web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/23/2014. Redacted Transcript Deadline set for 5/5/2014. Release of Transcript Restriction set for 7/1/2014. Notice of Intent to Redact due by 4/7/2014 (dm2, ) (Entered: 04/02/2014) |
| 04/02/2014 | 54 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Allan Peters: Jury Trial Excerpt - Testimony of Alain Forget - Volume II held on January 29, 2014 before Judge Glenn T. Suddaby, Court Reporter: Diane S. Martens,Telephone number: 315-234-8545. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/23/2014. Redacted Transcript Deadline set for 5/5/2014. Release of Transcript Restriction set for 7/1/2014. Notice of Intent to Redact due by 4/7/2014 (dm2, ) (Entered: 04/02/2014) |
| 04/02/2014 | 55 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Allan Peters: Jury Trial Excerpt - Testimony of Cheryl Lobdell held on January 29, 2014 before Judge Glenn T. Suddaby, Court Reporter: Diane S. Martens,Telephone number: 315-234-8545. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/23/2014. Redacted Transcript Deadline set for 5/5/2014. Release of Transcript Restriction set for 7/1/2014. Notice of Intent to Redact due by 4/7/2014 (dm2, ) (Entered: 04/02/2014) |
| 04/04/2014 | 56 | Letter from Mark J. Sacco as to Allan Peters requesting extension of time to supplement post trial motion (Sacco, Mark) (Entered: 04/04/2014) |
| 04/07/2014 | 57 | TEXT ORDER granting # 50 Defendant's Letter Request for additional time to file supplemental memorandum of law until 4/11/14 in support of his motion for judgment of acquittal. The # 46 Motion for Acquital as to Allan Peters is set for 5/15/2014 on submit before Judge Glenn T. Suddaby. Government's Response to Motion due by 4/28/2014. Defendant's Reply to Response to Motion due by |

| | | |
|---|---|---|
| | | 5/5/2014. Authorized by Judge Glenn T. Suddaby on 4/7/14. (lmw) (Entered: 04/07/2014) |
| 04/10/2014 | 58 | MOTION to Substitute Attorney *Brian P. Barrett, Esq. for Mark J. Sacco, Esq.* by Allan Peters. (Sacco, Mark) (Entered: 04/10/2014) |
| 04/14/2014 | 59 | ORDER granting # 58 Motion to Substitute Attorney. Brian P. Barrett for Allan Peters replacing Mark J. Sacco as to Allan Peters (2). Signed by Judge Glenn T. Suddaby on 4/14/14. (lmw) (Entered: 04/14/2014) |
| 04/14/2014 | 60 | Letter from Brian Barrett as to Allan Peters requesting addirional time to file brief in support of Rule 29 Motion (Barrett, Brian) (Entered: 04/14/2014) |
| 04/15/2014 | 61 | TEXT ORDER granting # 60 Defendant's Letter Request for an extension to file a supplemental memorandum of law until 5/15/14 in support of his motion for judgment of acquittal. The # 46 Motion for Acquittal as to Allan Peters is set for 6/19/14 on submit before Judge Glenn T. Suddaby. No personal appearance. Government's response to Motion due by 6/2/14. Defendant's reply to response to motion due by 6/9/14. **THIS IS A FINAL EXTENSION. NO FURTHER EXTENSIONS WILL BE GRANTED WITHOUT GOOD CAUSE SHOWN.** Authorized by Judge Glenn T. Suddaby on 4/15/14. (lmw) (Entered: 04/15/2014) |
| 04/18/2014 | 62 | PRELIMINARY ORDER OF FORFEITURE OF PROPERTY as to Allan Peters. Signed by Judge Glenn T. Suddaby on 4/18/14. (tab) (Entered: 04/18/2014) |
| 05/15/2014 | 63 | MEMORANDUM OF LAW/ATTORNEY AFFIRMATION filed by Allan Peters in support of # 46 Motion for Acquittal. (Attachments: # 1 Exhibit(s) A)(Barrett, Brian) Modified on 5/22/2014 to correct event (lmw). (Entered: 05/15/2014) |
| 05/20/2014 | | TEXT NOTICE OF HEARING ON # 46 Motion for Acquittal and # 63 MOTION for Directed Verdict: Motion Hearing set for 6/19/2014 on submit before Judge Glenn T. Suddaby. Response to Motion due by 6/2/2014. Reply to Response to Motion due by 6/9/2014. (lmw) (Entered: 05/20/2014) |
| 05/20/2014 | | TEXT NOTICE OF HEARING as to Allan Peters: Sentencing is RESCHEDULED for 9/9/2014 at 11:00 AM in Albany before Judge Glenn T. Suddaby. Sentencing memorandum are due by 8/19/14. (lmw) (Entered: 05/20/2014) |
| 05/30/2014 | 64 | Letter from Daniel C. Gardner as to Allan Peters requesting extension of time to file the government's response (Gardner, Daniel) (Entered: 05/30/2014) |
| 05/30/2014 | | TEXT ORDER granting # 64 Letter Request filed by USA for an extension to file its response to the # 46 Motion for Acquittal until 6/4/14. Reply to response to motion due by 6/11/14. Authorized by Judge Glenn T. Suddaby on 5/30/14. (lmw) (Entered: 05/30/2014) |
| 06/02/2014 | 65 | Letter from Brian Barrett as to Allan Peters requesting enclosing amended signature page for DKT No. 46 (Barrett, Brian) (Entered: 06/02/2014) |
| 06/03/2014 | 66 | RESPONSE in Opposition by USA as to Allan Peters re 63 MOTION for Directed Verdict (Gardner, Daniel) (Entered: 06/03/2014) |
| 06/16/2014 | 67 | PRESENTENCE INVESTIGATION REPORT - INITIAL DISCLOSURE [LODGED] as to Allan Peters. The Presentence Investigation Report in this matter is now available for review. Any objections to the report shall be served on the |

| | | |
|---|---|---|
| | | Probation Office within 14 days of this notice, by mailing a hard copy to the Probation Officer. Please contact the probation officer who prepared the report if you have any questions.[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.] (bam2, ) (Entered: 06/16/2014) |
| 07/09/2014 | 68 | DECISION AND ORDER denying 46 Motion for Acquittal as to Allan Peters (2). Signed by Judge Glenn T. Suddaby on 7/9/14. (tab) (Entered: 07/09/2014) |
| 07/15/2014 | 69 | PRESENTENCE INVESTIGATION REPORT - FINAL DISCLOSURE [LODGED] as to Allan Peters. The final version of the Presentence Investigation Report, including all revisions and the most recent Addendum is now available for review. This version of the report will be used by the Court at the time of sentencing. [This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. Any further distribution or dissemination is prohibited.] (bam2, ) (Entered: 07/15/2014) |
| 07/30/2014 | | TEXT NOTICE OF HEARING as to Allan Peters: Sentencing is RESCHEDULED for 10/2/2014 at 10:45 AM in Albany before Judge Glenn T. Suddaby. Sentencing memorandum are due by 9/11/14.(lmw) (Entered: 07/30/2014) |
| 09/11/2014 | 70 | SENTENCING MEMORANDUM by USA as to Allan Peters (Kopita, Katherine) (Entered: 09/11/2014) |
| 09/18/2014 | | TEXT NOTICE OF HEARING as to Allan Peters: CHANGE IN TIME ONLY: Sentencing is RESCHEDULED for 10/2/2014 at 10:30 AM in Albany before Judge Glenn T. Suddaby. The deadline to file sentencing memorandum has expired. Defense counsel is directed to file a sentencing memorandum immediately. (lmw) (Entered: 09/18/2014) |
| 09/22/2014 | 71 | SENTENCING MEMORANDUM by Allan Peters (Barrett, Brian) (Entered: 09/22/2014) |
| 09/24/2014 | 72 | Letter from Brian Barrett as to Allan Peters requesting Motion to Withdraw as counsel of record (Barrett, Brian) (Entered: 09/24/2014) |
| 09/24/2014 | 73 | TEXT ORDER granting # 72 Letter Request filed by Attorney Brian Barrett seeking permission to be relieved as counsel for Defendant Allan Peters due to irreconcilable differences between Mr. Barrett and the defendant. Representation by attorney Brian P. Barrett terminated. Defendant is granted 30 days to retain a new attorney. Defendant's new attorney must file a notice of attorney appearance by 10/24/14. Sentencing is rescheduled for 12/4/14 at 10:15 am in Albany, NY. Attorney Barrett is directed to serve a copy of this text order upon the defendant and file a certificate of service. Authorized by Judge Glenn T. Suddaby on 9/24/14. (lmw) (Entered: 09/24/2014) |
| 09/25/2014 | 74 | Certificate of Service of # 73 Text Order served upon Defendant Allan Peters pursuant to text Order in DKT #73 (Barrett, Brian) Modified on 9/25/2014 to correct event (lmw). (Entered: 09/25/2014) |
| 10/06/2014 | | TEXT NOTICE OF HEARING as to Allan Peters: Due to a conflict with the |

| | | Court's calendar, Sentencing is RESCHEDULED for 12/11/2014 at 10:15 AM in Albany before Judge Glenn T. Suddaby. Sentencing memorandum are due by 11/20/14. Attorney Barrett is directed to serve a copy of this text order upon the defendant notifying him of the change of sentencing date and file a certificate of service.(lmw) (Entered: 10/06/2014) |
|---|---|---|
| 10/08/2014 | 75 | AFFIDAVIT by Allan Peters (Barrett, Brian) (Entered: 10/08/2014) |
| 11/14/2014 | | TEXT NOTICE OF HEARING as to Allan Peters: Pretrial Conference to discuss attorney representation set for 11/20/2014 at 10:30 AM in Syracuse before Judge Glenn T. Suddaby. (lmw) (Entered: 11/14/2014) |
| 11/14/2014 | | TEXT NOTICE OF HEARING as to Allan Peters: Status Conference set for 11/20/2014 at 1:30 PM via video conference in Syracuse/Albany/Plattsburgh before Judge Glenn T. Suddaby. (lmw) (Entered: 11/14/2014) |
| 11/20/2014 | | TEXT Minute Entry for status conference held on 11/20/14 before Judge Glenn T. Suddaby as to Allan Peters: Judge inquires of defendant the status of retaining a new attorney. Defendant advised that it has been difficult to talk to attorneys at Rennselaer County Jail due to their attorney visitation policy. Defendant hopes to retain a new attorney within the week. Defendant wants the sentencing memorandum filed by Brian Barrett to be withdrawn. Judge advises defendant to discuss this with his attorney as to the appropriate way to withdraw it and how to request permission to file a new sentencing memo. Sentencing will be adjourned to 1/8/15 at Judge Suddaby's next sentencing date in Albany to give new counsel an opportunity to catch up. APP: Katherine Kopita, AUSA; Allan Peters, Pro Se Defendant. CRD: L. Welch. (Court Reporter: Eileen McDonough) (lmw) (Entered: 11/20/2014) |
| 11/20/2014 | | TEXT NOTICE OF HEARING as to Allan Peters: Sentencing RESCHEDULED for 1/8/2015 at 10:15 AM in Albany before Judge Glenn T. Suddaby. (lmw) (Entered: 11/20/2014) |
| 12/02/2014 | 76 | NOTICE OF ATTORNEY APPEARANCE Sean K. O'Dowd appearing for USA *for the forfeiture aspect of the case, replacing Gwendolyn E. Carroll* (O'Dowd, Sean) (Entered: 12/02/2014) |
| 12/17/2014 | 77 | FINAL PRESENTENCE INVESTIGATION REPORT (AMENDED) [LODGED] as to Allan Peters. The Presentence Investigation Report and/or Addendum have been AMENDED and supersede any previously submitted versions. This final version includes all revisions and the most recent Addendum, and will be used by the Court at the time of sentencing. **[This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.]** (bam2, ) (Entered: 12/17/2014) |
| 12/22/2014 | | TEXT NOTICE OF HEARING as to Allan Peters: Since Defendant has not yet retained an attorney, Sentencing is RESCHEDULED for 2/12/2015 at 11:00 AM in Albany before Judge Glenn T. Suddaby. Defendant is directed to file a status report with the Court by 1/9/15 as to whether he has retained a new attorney.(lmw) (Entered: 12/22/2014) |

8/12/2015                                    CM/ECF LIVE - U.S. District Court - NYND

| 12/23/2014 | 78 | NOTICE OF ATTORNEY APPEARANCE Douglas G.N. Collyer appearing for USA as substituted with/for Attorney: Katherine E. Kopita (Collyer, Douglas) (Entered: 12/23/2014) |
|---|---|---|
| 12/24/2014 | 79 | NOTICE OF ATTORNEY APPEARANCE: Dennis B. Schlenker appearing for Allan Peters (Schlenker, Dennis) (Entered: 12/24/2014) |
| 12/24/2014 | 80 | Letter from Dennis B. Schlenker, Esq. as to Allan Peters requesting Adjournment of Sentencing (Schlenker, Dennis) (Entered: 12/24/2014) |
| 01/20/2015 | | TEXT NOTICE as to Allan Peters: Defendant is scheduled to be sentenced on 2/12/15 at 11:00 am in Albany. A sentencing memorandum has already been filed on behalf of the Defendant and no further filings are necessary. However, defendant indicated in past proceedings while acting pro se that he wanted to withdraw Attorney Barrett's sentencing memorandum and file a new one. In the event that defense counsel would like to file a new sentencing memorandum, it must be filed no later than 1/29/15. (lmw) (Entered: 01/20/2015) |
| 01/21/2015 | 81 | SENTENCING MEMORANDUM by Allan Peters (Schlenker, Dennis) (Entered: 01/21/2015) |
| 02/04/2015 | 82 | SEALED DOCUMENT - not available for electronic viewing. (Attachments: # 1 sealed document) (lmw) (Entered: 02/04/2015) |
| 02/04/2015 | 83 | TEXT ORDER directing that Document # 82 be sealed until further Order of this Court. Authorized by Judge Glenn T. Suddaby on 2/4/15. (lmw) (Entered: 02/04/2015) |
| 02/05/2015 | 84 | SEALED DOCUMENT - not available for electronic viewing. (lmw) (Entered: 02/05/2015) |
| 02/05/2015 | 85 | TEXT Order directing that Document # 84 be sealed until further Order of this Court. Authorized by Judge Glenn T. Suddaby on 2/5/15. (lmw) (Entered: 02/05/2015) |
| 02/05/2015 | 86 | SEALED DOCUMENT - not available for electronic viewing. Sealed Protective Order. (lmw) (Entered: 02/05/2015) |
| 02/05/2015 | 87 | TEXT Order directing that Document # 86 be sealed until further order of this Court. Authorized by Judge Glenn T. Suddaby on 2/5/15. (lmw) (Entered: 02/05/2015) |
| 02/12/2015 | 88 | SEALED DOCUMENT - not available for electronic viewing. (lmw) (Entered: 02/12/2015) |
| 02/12/2015 | 89 | TEXT Order directing that Document # 88 be sealed until further order of this Court. Authorized by Judge Glenn T. Suddaby on 2/12/15. (lmw) (Entered: 02/12/2015) |
| 02/12/2015 | | Text Minute Entry for proceedings held before U. S. District Judge Glenn T. Suddaby:Sentencing held on 2/12/2015 for Allan Peters (2), Count(s) 1. Appearances: Douglas Collyer, AUSA, Dennis Schlenker, Esq. Steven Sheffer and Craig Penet appear on behalf of Probation. The Judge inquires regarding the review of the presentence report and objections; The Court adopts the factual information and the guideline applications contained in the Presentence Report; The defendant is sentenced on Count 1 of the Indictment to the custody of the Bureau of Prisons to |

| | | be imprisoned for a term of 168 months; followed by 6 years Supervised Release, with standard and special conditions, a $100.00 Special Assessment; No fine; Parties advised of appeal rights. Court will recommend to BOP that defendant be placed firstly in a facility that best addresses defendants addiction treatment issues and secondly that that facility be close to defendant's son and residence. Defendant Remanded. (Court Reporter Theresa Casal, CRD Cindy Mezoff)[FTR recorded Time 11:00 a.m. - 11:44 a.m.](cjm) Modified on 2/13/2015 to reflect correct amount of Supervised Release is 6 years. (lmw). (Entered: 02/12/2015) |
|---|---|---|
| 02/13/2015 | 90 | JUDGMENT as to Allan Peters (2) on Count 1: Term of imprisonment: 168 months; Supervised release: 6 years. Special Assessment: $100. No fine. Signed by Judge Glenn T. Suddaby on 2/13/15. (lmw) (Entered: 02/13/2015) |
| 02/13/2015 | 91 | STATEMENT OF REASONS [LODGED] as to Allan Peters [**This document has been electronically lodged with the Court and is viewable by ONLY the attorney for the government, the attorney for the defendant, and the presiding judge. It is not a filed document, therefore is not available for public inspection. Any further distribution or dissemination is prohibited.**] (dictplp, ) (Entered: 02/13/2015) |
| 02/17/2015 | 92 | STATUS REPORT *notifying the Court that the Preliminary Order of Forfeiture is now the Final Order of Forfeiture. A money judgment in the amount of $1,000,000.00 shall be entered against the defendant and no separate final order will be presented* by USA as to Allan Peters (O'Dowd, Sean) (Entered: 02/17/2015) |
| 02/24/2015 | 93 | NOTICE OF APPEAL by Allan Peters *with Certificate of Service of filing* re 90 Judgment Filing Fee $505, receipt number 0206-3205674. (Schlenker, Dennis) (Entered: 02/24/2015) |
| 02/24/2015 | 94 | TRANSCRIPT REQUEST by Allan Peters for proceedings held on 1/16/14; 1/27/14; 1/28/14; 1/29/14; 1/30/14; 2/12/15 before Judge Glenn T. Suddaby. (Schlenker, Dennis) (Entered: 02/24/2015) |
| 02/24/2015 | 95 | ELECTRONIC NOTICE AND CERTIFICATION as to Allan Peters sent to US Court of Appeals re 93 Notice of Appeal - Final Judgment (khr) (Entered: 02/24/2015) |
| 03/17/2015 | 96 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Allan Peters: Video Final Pretrial Conference held on 1/16/2014 before Judge Glenn T. Suddaby, Court Reporter: Jodi L. Hibbard,Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/7/2015. Redacted Transcript Deadline set for 4/17/2015. Release of Transcript Restriction set for 6/15/2015. Notice of Intent to Redact due by 3/23/2015 (jlh, ) (Entered: 03/17/2015) |

JA-16

**THIS PAGE INTENTIONALLY LEFT BLANK**

**THIS PAGE INTENTIONALLY LEFT BLANK**



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 8 :<br>CRIM. NO. 13-CR-_316_ (GTS) |
| | : | |
| | : | INDICTMENT |
| v. | : | |
| | : | Violation: 21 U.S.C. §§ 846 |
| | : | |
| | : | 1 Count |
| ALLAN PETERS, aka "Hiio," | : | County of Offense: Franklin |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

THE GRAND JURY CHARGES:

## Count 1

### (Conspiracy to possess with the intent to distribute
### and to distribute a controlled substance)

Between in or about 2005 and on or about February 25, 2011, in Franklin County in the

Northern District of New York and elsewhere, the defendant,

## ALLAN PETERS, aka "Hiio,"

and others, known and unknown, conspired to knowingly and intentionally possess with intent to

distribute and to distribute a controlled substance, in violation of Title 21, United States Code,

Sections 841(a)(1) and 846.  That violation involved 1,000 kilograms or more of a mixture or

substance containing a detectable amount of marijuana, in violation of Title 21, United States Code, Section 841(b)(1)(A).

<u>Forfeiture Allegation</u>

1.    **21 U.S.C. § 853 - Drug trafficking forfeiture:**

The allegations contained in Count 1 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Section 841, the defendants,

**ALLAN PETERS**                                    ' shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense.

A.    **Money Judgment:** A money judgment in the amount of $1,000,000.00, representing the gross proceeds of the offenses described in Counts 1 of the Indictment.

If any of the property described above, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

JA-20

Case 15-541, Document 21, 08/19/2015, 1580131, Page24 of 304

Case 8:13-cr-00316-GTS   Document 6   Filed 09/04/13   Page 3 of 3

e.    has been commingled with other property which cannot be divided

without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p).

Dated: __8|14__, 2013                              A TRUE BILL,


                                                   FOREPERSON OF THE GRAND JURY


RICHARD S. HARTUNIAN
UNITED STATES ATTORNEY

BY:    _Katherine Kopita_

Katherine E. Kopita
ASSISTANT U.S. ATTORNEY
Bar Roll No.: 517944

JA-21

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,                   **MOTION IN LIMINE**

        v.                         **13-CR-316 (GTS)**

**ALLAN PETERS,**

                Defendant.

**ALLAN PETERS,** through his attorney, Mark J. Sacco, respectfully submits:

I.    <u>**Facts**</u>:

      The Government intends to call Alain Forget as a witness in their case-in-chief. Mr. Forget is an alleged co-conspirator of Defendant and will likely testify that Defendant was a member of the conspiracy to distribute marijuana for which Defendant faces indictment. Forget was a cooperating witness of the Government until January 13, 2014. On January 13, 2014 the Government advised Forget that it has voided the cooperation agreement. The Government has not charged Forget with a violation of any Federal criminal statute for his criminal activity related to the sale of weapons.

      The Defense counsel has a duty to zealously represent his client pursuant to the Sixth Amendment of the United States Constitution.

      The Government has disclosed that Forget was arrested and indicted on December 27, 2013. Forget faces six (6) felony charges in Franklin County Court, New York for Criminal Possession of a Weapon in the Second Degree, Criminal Sale of a Firearm in the 3rd Degree (3 counts), and Criminal Possession of a Weapon in the Third Degree (2 counts). Upon information and belief, Forget sold a loaded 9mm handgun and five (5) loaded magazines to an undercover New York State Police Investigator on December 12, 2013.

      The Government has asserted that Forget will invoke his Fifth Amendment Right Against Self Incrimination if questioned about his December 12, 2013 criminal conduct.

## II.   Issues Presented:

A.   The issue presented is whether counsel can question Forget, on cross-examination, about his prior bad acts on or about December 12, 2013.

B.   If the witness denies the prior bad act, is it proper to introduce evidence under FRE 608(b) to impeach the witness?

C.   If the witness refuses to answer the question pursuant to the 5th Amendment, is it permissible to introduce evidence pursuant to FRE 404(b) to offer relevant evidence to an issue in the case?

## III.   Argument

Forget was a cooperating witness of the Government subsequent to his arrest in September, 2010.  Forget was working with Federal and State Investigators for a period of two (2) years prior to the arrest of Defendant.  As part of his agreement to cooperate with authorities, Forget was required to continue his criminal activities without impunity.  Additionally, Forget was required to produce evidence that would lead to criminal charges.

A Defendant has a right guaranteed by the Sixth Amendment to call and interrogate favorable witnesses and to cross-examine adverse witnesses.  *Faretta v. California*, 422 U.S. 806, 818 (1975).  The Court, in *Davis v. Alaska*, 415 U.S. 308, held that the Sixth Amendment allows a Defendant to cross-examine a witness in order to impeach credibility and to prove ulterior motives of the witness.

Here, Forget signed a lengthy cooperation agreement with the Government agreeing to abide by the law.  In his two year relationship with the Government, Forget developed an arrogance of criminal invincibility.  His ulterior motives were to protect his interests by satisfying the Government with untruthful information.  Should the Court not allow the Defendant to cross-examine Forget with respect to his criminal activities and prior bad acts, Defendant will be deprived of his right to present a defense.  Specifically, Defendant will be unable to advance his theory of the case that Forget has ulterior motives by cooperating while continuing his criminal activities.

Under FRE 404(b) the Defendant is permitted to introduce evidence on cross-examination of the motive and intent of Forget.  At trial, Forget would be questioned on his extensive cooperation, his criminal activity while his cooperation agreement was in effect, whether he is aware that the Federal Government can charge him with a Federal Violation with respect to the gun sale, the revocation of his cooperation agreement, and his continued cooperation after the revocation of the agreement.  Forget was served with a plea agreement termination letter on January 13, 2014.  However, on January 14, 2014, a meeting between Forget, Government Prosecutors, and Government Police Agents was conducted.  During this meeting Forget provided additional information

2

JA-23

about the case at trial.

Under FRE 608(b) the Defendant is permitted, on cross-examination, to introduce evidence of the breach of the plea agreement by Forget to show his untruthfulness. Forget signed a document agreeing to abide by the law. Instead, he sold firearms and military grade ammunition to an undercover police officer. It is clear that both the breach of the plea agreement and the criminal conduct are probative of the character for truthfulness or untruthfulness of the witness.

## IV.   Conclusion

Defendant's Sixth Amendment right to confront witnesses and present a defense will be thwarted should he be precluded from introducing evidence of Forget's criminal conduct during his cooperation with the Government.


Dated: January 22, 2014


                              Respectfully submitted,


                              LAW OFFICE OF MARK J.  SACCO, PLLC


                    By:     /s/ Mark J. Sacco_____

                              Mark J. Sacco
                              Bar Roll No.: 512118
                              Attorney for **Allan Peters**
                              38 North Ferry Street
                              Schenectady, New York 12305


3

JA-24

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Motion in Liminie |
| | : | |
| v. | : | |
| | : | |
| ALLAN PETERS, | : | Criminal No. 13-CR-316 (GTS) |
| | : | |
| Defendant. | : | |

The United States of America, by and through Richard S. Hartunian, the United States Attorney for the Northern District of New York, Daniel C. Gardner, of counsel, hereby submits this motion in liminie regarding the expected testimony of Alain Forget, Greg Darragh and Cheryl Lobdell.  The government seeks an order: (1) limiting the cross examination of Forget to matters within the scope of Federal Rule of Evidence 608; (2) limiting the cross examination of Lobdell and Forget to only those convictions that fall within the scope of Federal Rule of Evidence 609; and (3) allowing the testimony of Darragh concerning matters relevant under Federal Rule of Evidence 404(b).

1. **Cross-Examination of Forget should be limited to matters with the scope of FRE 608.**

The defendant seeks to cross examine Forget regarding a recent New York State arrest for charges related to the sale of

1

Case 15-541, Document 21, 08/19/2015, 1580131, Page29 of 304

a handgun in December 2013.  This Court should limit the cross examination to questions eliciting the facts that (a) he was arrested, (b) what he was charged with, and (c) his understanding of what effect the arrest has had on his cooperation and plea agreements.  Cross examination should not be permitted on the underlying facts of the arrest because such questions are not permissible under Fed. R. Evid. 608(b).

The Sixth Amendment guarantees the right to confront witnesses against them, including the right to challenge the credibility of those witnesses.  See United States v. Cardillo, 316 F.2d 606, 610 (2d Cir. 1963) (a "conviction will be reversed if the cross examination of government witnesses has been unreasonably limited").  Under Federal Rule of Evidence 608(b), a party may inquire, on cross examination, into specific instances of conduct, if they are probative of the witness' character for truthfulness.  The Court, however, has wide discretion to limit the scope of cross examination, so long as any limitation does not deny "the jury sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government."  United States v. Cruz, 894 F.2d 41, 44 (2d Cir. 1990); United States v. White, 692 F.3d 235, 244 (2d Cir. 2012); United States v. Flaharty, 295 F.3d 182, 191 (2d Cir. 2002).

It is appropriate for cross examination to include
questions eliciting the facts that (a) Forget was arrested, (b)
what he was charged with, and (c) his understanding of what
effect the arrest has had on his cooperation and plea
agreements.  See e.g. United States v. Morgan, 505 F.3d 332, 340
(5th Cir. 2007) (holding that defendant's pretrial release
violation rose to "a level of dishonest conduct sufficient" to
permit cross examination under Federal Rule of Evidence 608).
Forget has no valid basis to invoke the Fifth Amendment in
response to such questions.

In contrast, the details of the conduct underlying the
arrest are not a proper topic of cross examination because they
are not probative of his character for truthfulness.  See e.g.
Flaharty, 295 F.3d at 191; United States v. Miles, 207 F.3d 988,
993 (7th Cir. 2000) ("crimes such as murder, assault, and
battery may be probative of violence, but they do not normally
bear on a witness's reliability for telling the truth"); United
States v. Turner, 104 F.3d 217, 223 (8th Cir. 1997)
("[m]isconduct involving violations of narcotics laws is not an
act involving dishonesty or untruthfulness and therefore may not
be inquired into under Federal Rule of Evidence 608(b)").  As a
result, cross examination on this topic should not be permitted.
Such a limitation on cross examination would also avoid
triggering Forget's Fifth Amendment privilege.

3

For all of these reasons, this Court should limit the cross examination of Forget as requested.

2. **Cross examination of Forget and Lobdell should be limited in accordance with Federal Rule of Evidence 609.**

Under Federal Rule Evidence 609(a), a party may attack the credibility of a witness by offering evidence that the witness has been convicted of a felony. In determining admissibility of the prior felony conviction, the Court must engage in a balancing test under Federal Rule of Evidence 403 and consider the following relevant factors: (1) the nature of the conviction, (2) its bearing on veracity, (3) the age of the conviction, and (4) the propensity of the evidence to influence of the minds of the jurors improperly. United States v. Palumbo, 401 F.2d 270, 273 (2d Cir. 1968) (holding that "a trial judge may prevent such use, if he finds that a prior conviction negates credibility only slightly but creates a substantial chance of unfair prejudice"); United States v. Brown, 606 F. Supp 2nd 306, 312 (E.D.N.Y. 2009); United States v. Estrada, 430 F.3d 606, 614 (2d Cir. 2005).

A party may also impeach a witness' credibility with evidence of a non-felony conviction, but only if that conviction involves dishonesty or false statement. Fed. R. Evid. 609(a)(2). The second prong of Fed. R. Evid. 609(a) is restricted to those convictions which bear directly on the likelihood that the

witness will testify truthfully.  United States v. Hayes, 553 F.2d 824, 827 (2d Cir. 1977) (holding that Congress emphasized that the second prong was meant to refer to convictions "peculiarly probative of credibility," such as those for "perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense").

Fed. R. Evid. 609(b) also establishes time restrictions for admitting convictions.  If more than ten years have passed since the date of conviction or the date the witness was released from confinement, then the conviction is inadmissible unless the Court determines that the probative value of the conviction substantially outweighs the prejudicial effect.  Fed. R. Evid. 609(b); Payton, 159 F.3d at 57.

Finally, the "evidence" that may be presented is limited to the essential facts of the crime, which includes the name of the offense, the date of the conviction, and the sentence imposed.  Estrada, 430 F.3d at 616.

### a. Forget

Forget has the following prior convictions:

| Date of Conviction | Court | Conviction | Sentence |
|---|---|---|---|
| 5/1989 | Court of Sessions, Valleyfield, QC | Conspiracy of breaking and entering | 1 month incarceration and 2 years probation |
| 10/1989 | Court of Sessions, Valleyfield, QC | Cultivation of narcotics | 3 months incarceration |

| | | | |
|---|---|---|---|
| 10/1989 | Court of Sessions, Valleyfield, QC | Failure to comply with probation order | 3 months incarceration |
| 10/1989 | Court of Sessions, Valleyfield, QC | Conspiracy to commit an offense, theft, destruction of property | Three months incarceration |
| 10/1989 | Court of Sessions, Valleyfield, QC | Failure to comply with probation | Three months incarceration |
| 5/1992 | Valleyfield, QC | Unlawfully selling tobacco | Fine |
| 8/1992 | Valleyfield, QC | Unlawfully selling tobacco | Fine and one year probation |
| 12/1992 | Valleyfield, QC | Unlawfully selling tobacco | Six months incarceration and one year probation |
| 12/1992 | Court of Sessions, Valleyfield, QC | Failure to comply with probation order | 15 days incarceration. |
| 2/1998 | Court of Sessions, Valleyfield, QC | Conspiracy to commit an indictable offense | 729 days of incarceration, 729 days of probation |
| 2/1995 | Court of Sessions, Valleyfield, QC | Uttering threats, assault | 90 days incarceration |
| 10/1998 | Court of Sessions, Valleyfield, QC | Possession of property obtained by crime | One year supervised release |
| 1/2000 | Court of Sessions, Valleyfield, QC | Breaking and entering, assault | Six months conditional sentence and two years probation (Count 1); three months conditional sentence and three years probation |
| 1/2000 | Court of Sessions, Valleyfield, QC | Failure to comply with probation order | One month conditional sentence and |

| | | | two years unsupervised probation |
|---|---|---|---|
| 2/2001 | Court of Sessions, Valleyfield, QC | Possession of property obtained by crime (over $5,000) | Fine and two years probation |
| 2/2001 | Court of Sessions, Valleyfield, QC | Failure to comply with probation order | 90 days incarceration and two years probation |
| 2/2001 | Court of Sessions, Valleyfield, QC | Failure to comply with recognizance | 90 days incarceration and two years probation |
| 5/2006 | Malone Town Court | Assault, 3rd (misdemeanor) | Conditional discharge and order of protection |

With the exception of Forget's 2006 conviction for assault, which is a misdemeanor and does not involve dishonesty, all of his convictions (or his release from confinement) occurred more than ten years ago. As a result, the defendant must demonstrate that the probative value of the convictions substantially outweighs the prejudicial effect. Although several convictions relate to violations of probation, none of the convictions relate directly to dishonesty or false statement, and therefore have little probative value.

As such, the only conviction that the defendant may inquire into on cross examination is his most recent conviction in 2012 for conspiracy to possess with intent to distribute a 100 kilograms or more of marijuana.

7

### b. Lobdell

| Date of Conviction | Court | Conviction | Sentence |
|---|---|---|---|
| 11/1990 | Court of Session, Valleyfield, QC | Possession of narcotics | One year probation and fine |
| 6/1997 | Constable Town Court | Petit larceny | $100 fine |
| 6/1998 | Chateaugay Town Court | Forgery, 3rd | Three years probation and restitution |
| 8/2006 | Franklin County Court | Grand larceny, 3rd; falsify business records, 1st | Five years probation and restitution |

Aside from Lobdell's 2006 conviction, all of her convictions occurred more than ten years ago. As a result, the defendant must demonstrate that the probative value of the convictions substantially outweighs the prejudicial effect. Her 1990 conviction for narcotics has no probative value for truthfulness. Her 1997 conviction for petit larceny and 1998 conviction for Forgery may have limited probative value, but given the length of time since the convictions, there is a high likelihood of prejudice.

As such, the only convictions that the defendant may inquire into on cross examination is Lobdell's 2006 conviction for larceny and falsifying records and her most recent conviction for conspiracy to possess with intent to distribute more than 100 kilograms of marijuana.

8

### 2. 404(b)

The government intends to call Greg Darragh as a witness. The government anticipates Darragh will testify that he was involved in drug smuggling from 2004 until 2012 and that he worked with various drug trafficking organizations, but not the organization charged in the indictment. On at least two occasions, once in 2009 and once in 2011, he transported loads of marijuana to the defendant's mother's property on the Reservation and the defendant helped smuggle the marijuana into the United States. Darragh also used the defendant to exchange drug proceeds from Canadian currency to United States currency. While Darragh worked for a separate organization, his testimony concerning the defendant, in terms of the overall modus operandi, will be very similar the government's other cooperating witnesses.

Under Rule 404(b), the government is precluded from offering evidence of uncharged misconduct or other acts in order to prove the character of the person and that the Defendant acted in conformity therewith.[1] In order to present evidence under

---

[1] The Second Circuit has adopted an inclusionary approach to Rule 404(b), which allows admission of other act evidence for any purpose other than to demonstrate criminal propensity. United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003). The Second Circuit has also approved the admission of other acts evidence even where the acts occur after the charged conduct. United States v. Curley, 639 F.3d 50, 61 (2d Cir. 2011) ("[s]ubsequent acts are admissible under Rule 404(b)...but the temporal difference between the charged conduct and the subsequent acts may impact whether the evidence is probative").

9

404(b), the government must demonstrate that: (1) the evidence is offered for a proper purpose, (2) it is relevant to a material issue in the case, (3) the probative value is not substantially outweighed by its prejudicial effect, and (4) the Judge provides an appropriate limiting instruction. <u>United States v. Brand</u>, 467 F.3d 179, 196 (2d Cir. 2006).

Here, the government can satisfy all four requirements. First, the government is offering the evidence for a proper purpose; to prove knowledge, intent and modus operandi. <u>United States v. Gonzalez</u>, 922 F.2d 1044, 1056 (2d Cir. 1991) (holding that a determination of whether the government has offered other acts evidence for a proper purpose depends largely on the facts of the case). Darragh's testimony will also directly corroborate crucial aspects of other cooperator's testimony. <u>United States v. Scott</u>, 677 F.3d 72, 81 (2d Cir. 2012) ("[t]he corroboration must be . . . be direct and the matter corroborated significant").

Second, the proffered 404(b) evidence is very similar, if not identical to the charged conduct. When 404(b) evidence is offered to prove knowledge or intent, the government need only demonstrate a similarity or some connection to establish that a prior act is relevant to one of the elements of the offense. <u>Brand</u>, 467 F.3d at 197; <u>Garcia</u>, 291 F.3d at 136–37 (holding that "[t]he government must identify a similarity or connection

between the two acts that makes the prior act relevant to establishing knowledge of the current act"); United States v. Ramirez, 894 F.2d 565, 568 (2d Cir. 1990) ("[w]hen the defendant disavows awareness that a crime was being perpetrated, and the government bears the burden of proving the defendant's knowing possession as an element of the crime, knowledge is properly put in issue"); United States v. Pitre, 960 F.3d 1112, 1115-17 (2d Cir. 1992) (holding that prior drug transactions were admissible to demonstrate that the defendant was not just standing innocently in the middle of a narcotics transaction).

Finally, the probative value of the evidence is high because the proffered 404(b) evidence is directly tied to the charged conspiracy and involves substantially the same conduct. Conversely, there is little danger of unfair prejudice because the 404(b) evidence is no more sensational than the charged offense.  But see United States v. Shellef, 507 F.3d 82, 101 (2d Cir. 1982) (noting that other acts evidence was almost identical to charged conduct, increasing the risk that the jury would assume that the Defendant is predisposed to commit a particular type of crime).  The Court, however, may issue a limiting instruction to the jury to cure any potential prejudice.

## Conclusion

Cross examination of Forget and Lobdell should be limited under Federal Rule of Evidence 608 and 609 and Darragh's testimony is admissible under 404(b).


### Certificate of Service

I, Daniel C. Gardner, hereby certify that I served a copy of this memorandum on defense counsel by electronic filing.


January 24, 2014                         */s/ Daniel C. Gardner*
Daniel C. Gardner

12

JA-36

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------x
UNITED STATES OF AMERICA,

                  Plaintiff,

vs.                        13-CR-316

ALLAN PETERS, aka "Hiio",

                  Defendant.
---------------------------------------------------x

      Transcript of *JURY TRIAL – VOLUME I* held on

January 27, 2014, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York,

the HONORABLE GLENN T. SUDDABY, Presiding.

               A P P E A R A N C E S

For Plaintiff:     OFFICE OF THE UNITED STATES ATTORNEY
                14 Durkee Street
                Room 340
                Plattsburgh, New York 12901
                  BY:  DANIEL C. GARDNER, Esq.
                     Assistant United States Attorney

For Defendant:     MARK J. SACCO
                38 North Ferry Street
                Schenectady, New York 12305

              *Diane S. Martens, RPR, FCRR*
        *Official United States Court Reporter*
           *100 South Clinton Street*
           *Syracuse, New York 13261*
             *(315)234-854*5

2

US V. Peters – 13–CR–316

1          (Open court:)

2          THE CLERK:  United States of America versus Allan

3    Peters.

4          MR. GARDNER:  Daniel Gardner for the government,

5    your Honor.

6          MR. SACCO:  Mark Sacco for Mr. Peters.  Mr. Peters

7    is present and standing to my right.  Good morning, your

8    Honor.

9          THE COURT:  Good morning.

10         We're waiting for the jury, they should be

11   available in a little while.  The report that I have is good

12   news that most of them made it in, so it's not terrible out

13   but the traffic is terrible trying to get around, so we'll

14   move ahead as soon as we have the jurors through their

15   orientation and available to go.

16         Other than that, we have other matters that we need

17   to address before we have a jury.

18         MR. GARDNER:  Your Honor, we do have the

19   outstanding motions in limine that were filed.  Mr. Sacco

20   filed a motion last week and I responded on Friday to that

21   issue raised and other issues, as well.

22         THE COURT:  That's with regard to Mr. Alain Forget?

23         MR. SACCO:  That's correct, your Honor, and it's my

24   understanding he's going to testify tomorrow not today.

25         THE COURT:  Because I didn't see your response.  It

3

US V. Peters – 13–CR–316

1   came in Friday.

2              MR. GARDNER:  Yes.

3              THE COURT:  We're going to get it right now:

4              (Pause in proceedings.)

5              THE COURT:  Okay, Mr. Sacco, you brought the motion

6   in limine with regard to cross-examination of Mr. Forget; so

7   why don't you go ahead and put on the record what it is that

8   you want to try and elicit on cross-examination.

9              MR. SACCO:  Yes, your Honor.

10             With respect to Mr. Forget, it's in my motion that

11  he was arrested late December of 2013 and that he was in

12  possession of firearms.

13             Your Honor, I believe that he had an agreement with

14  the government not to the commit any crimes and that he

15  breached that agreement and this arrest shows a level of

16  dishonesty which would allow me to, essentially, impeach his

17  credibility.

18             I also put in my motion that the other issue that

19  it brings up is it goes to his motives.  And his motives, I

20  believe the jury will look at closely and what is he doing in

21  this courtroom.  Is he here to tell the truth or is he here

22  to advance his own interests?  And he clearly has been doing

23  that throughout his life.  His criminal history goes back to

24  1989.  There's a strong argument to be made that he's a

25  career criminal.  And I think to deprive the jury of hearing

4

US V. Peters - 13-CR-316

1    exactly who he is and what his conduct's been -- I know it's

2    not a conviction -- but what his conduct's been, you know,

3    these are intelligent people and all intelligent people want

4    to know about the history of the person they're listening to.

5              And I'm starting to spill over into the 609

6    argument, Judge, but I don't know if you want to hear that

7    right now.  The federal rule of evidence 609 which

8    Mr. Gardner raises --

9              THE COURT:  Mm-mm.

10             MR. SACCO:  -- you want me to discuss that now?

11             THE COURT:  Why don't I give Mr. Gardner an

12   opportunity to respond and then we'll go back and forth.

13             Go ahead.

14             MR. GARDNER:  So, your Honor, in terms of

15   Mr. Forget's recent arrest, his violation of pretrial release

16   conditions, what the government would intend to elicit on

17   direct examination is this the defendant was recently

18   arrested for these charges, that he has violated his pretrial

19   release conditions.  The government was intending to admit

20   into evidence a letter that was given to Mr. Forget that

21   states he is in breach of his cooperation agreement and that

22   that cooperation agreement has been terminated and that he's

23   not going to receive any recommendation from the government

24   at the time of sentencing.

25             So, through those things, I believe that all of the

5

US V. Peters – 13-CR-316

1    relevant information with regard to his bias will come out.

2    And the government concedes that that is relevant to his

3    credibility, relevant to his bias.

4          What the government believes is not relevant is the

5    underlying handgun offense.  The fact that he committed an

6    offense on pretrial release is the issue, not the fact of

7    what he sold, a handgun or not.  I think the law is pretty

8    clear that, even if there were a conviction, it really

9    doesn't matter.  Even if he had murdered someone, that goes

10   to show that he is maybe a violent person or not a good

11   person but it does not go to his credibility.

12         THE COURT:  Okay.  With regard to this issue, what

13   I'm going to allow you to do is ask about the fact that he

14   has, indeed, breached his cooperation agreement; he has

15   indeed breached his release status rules; the fact that he

16   was arrested, but we're not going to get into the underlying

17   incident.  You can ask, you know, you were arrested, you can

18   even ask what he was arrested for.  But you can't ask about

19   the underlying incident.  It has nothing to do with

20   credibility and truth-telling.

21         But the fact that he had these agreements with the

22   Court, an understanding to be released; the fact that he had

23   an agreement with the government with regard to cooperation,

24   that's all information that can be elicited.  It does affect

25   his credibility because he did have the understanding and

6
US V. Peters – 13-CR-316

1   agreements both with the government and the Court regarding

2   his behavior.  So, that all goes to his credibility and is

3   certainly allowable with regard to impeachment of that

4   witness.  Okay.

5           Next issue.

6           MR. SACCO:  Thank you, Judge.

7           Judge, the next issue goes back to the government's

8   I guess I'll call it the motion in limine to limit my

9   cross-examination of two defendants here:  Lobdell, who's a

10  woman that will testify that she was involved in this

11  conspiracy and that she was a driver at different times.  She

12  has, you know, a significant criminal history.

13          The government argues under 609 that I should be

14  limited in my cross-examination of her with respect to these

15  crimes and, largely, they argue that it's the age of the

16  crimes.  And on Page eight of the government's motion, I

17  concede that the first conviction which is from November of

18  1990, which is 24 years old, would fall under 609 and it's 10

19  years old -- it's more than 10 years old.

20          So, my argument goes to the three other crimes that

21  she has committed and pled guilty to or been convicted in a

22  court of law and those are in June of 1997, petit larceny;

23  June of 1998, forgery; and August of 2006, those are all

24  crimes of dishonesty.

25          So, in the first part of the analysis, if you were

7

US V. Peters - 13-CR-316

1    to determine are these probative of the issues of
2    credibility?  Absolutely, they're all crimes of dishonesty.
3            If the Court looks at the next prong of the
4    analysis, are they 10 years old or older?  Two of them are,
5    the 1997 and 1998.
6            However, the Court has equitable -- absolute
7    discretion whether to allow me to do this.  And what I argue
8    Judge, and the reason I think the Court should allow me to
9    get into these areas, at least the basics of whether she was
10   convicted of these types of crimes.  And I want the Court to
11   know I'm not interested in a trial within a trial.
12           But I think this jury is being asked to make a very
13   important decision here and they should know who they're
14   listening to.  Now, they won't have a clear picture as to
15   who's sitting in front of them if they don't know this.
16   Cheryl Lobdell is not a person that 50 years ago took a
17   lollipop and had a petit larceny and we're going to embarrass
18   her here.  609 -- I didn't read all the history, the
19   Congressional history of how this developed -- 609, it seems
20   to me, that it's designed for the person that is a witness --
21   not a cooperator, not a defendant, not a career criminal --
22   to protect them so they can come into court having made a
23   mistake in their past -- a long time in their past -- and
24   they don't have to be embarrassed, essentially, in front of
25   the Court or the jury.

8

US V. Peters – 13-CR-316

1    But Cheryl Lobdell has, apparently, the last 24

2    years has, you know, I would say consistently, including the

3    charge she's here for today, that would be -- this will be

4    her fifth conviction in front of this Court and she has told

5    Mr. Gardner in some of the discovery that she's essentially

6    been a one-woman crime spree.  She's been committing crimes

7    that were uncharged her whole life.  So, to scrub Cheryl

8    Lobdell of her 609 and allow this jury to think this is her

9    first offense would be unfair to the trier of fact and unfair

10   to my client.

11   I mean, in serious matters -- I think most people

12   are like this -- I consider myself a pretty normal person, I

13   want to know who I'm talking to.  If someone comes to me and

14   tries to sell me insurance, it would be important for me to

15   know if they have been convicted of fraud three or four

16   times.  I don't care if it was 20 years ago or 30 years ago.

17   In that instance it would be that important to me that I

18   would want to know and I think the court has discretion to

19   allow the jury to hear these things, even if the Court allows

20   me simply to get into the fact of the conviction and that it

21   happened.

22   I make a similar argument on Mr. Forget, your

23   Honor.  I don't think 609, in my opinion anyway, that 609 is

24   not designed to protect Mr. Forget from the truth of his

25   criminal career started in 1989 and the Court knows it stands

9

US V. Peters – 13–CR–316

1    until today –– or until December 27th.  So he has been –– I

2    think it's unquestionable that he is a career criminal.  And

3    under Mr. Gardner's doing his job as the government counsel,

4    he wants to protect his witness and I understand that.

5         But what I don't think is equitable is that a jury

6    should sit here and listen to Mr. Forget and be led to

7    believe that he has engaged in no misconduct over the last ––

8    I think it's 1989 –– I think that's 34, 35 years and he's

9    consistently has been in violation of the law, committing

10   numerous crimes.

11        Now, even if the Court allows me to get into a

12   conviction, but not the underlying facts, I think that would

13   paint a much fairer picture to the jurors because, again,

14   they are interested in who is sitting next to them telling

15   them this information about this incredibly important matter

16   and they as a trier of fact, I think, are entitled to that.

17        Now, the balancing test is:  Is it probative and is

18   it within 10 years.  The Court has discretion on the 10

19   years.  I believe it is probative and here's why, Judge.

20        Mr. Forget has got himself in a very, very

21   precarious situation and that situation is he made a deal

22   with the government on some very serious charges and is

23   facing certain prison time.  In the meantime, he decided,

24   after talking to a judge, after talking to a prosecutor and a

25   number offing agents, that it was okay for him to sell

10

US V. Peters – 13-CR-316

1    handguns.  Now, what does this tell us about Mr. Forget?  It

2    tells us that Mr. Forget will put his interests above anyone

3    else at all times.  He's been doing it for 34 years and he'll

4    do it again.

5             So, my argument, Judge, is it does go to his

6    motive.  It goes to his motive here and to deprive the jury

7    of this, of knowing at least a significant portion of his

8    criminal conduct would be unfair to them.  They can't judge

9    his credibility because if they don't know about it, it's

10   going to be hidden from them.  So I ask that the Court use

11   its discretion and equitable powers to fashion a remedy

12   that's fair to the defendant so the jury can know who they're

13   listening to.

14            Thank you, Judge.

15            THE COURT:  Okay, Mr. Gardner, go ahead.

16            MR. GARDNER:  Your Honor, I'll start with Ms.

17   Lobdell.  The government concedes that her 2006 conviction

18   for grand larceny and falsifying business records is

19   appropriate to get into under 6089.

20            The other three convictions, the earliest one, the

21   1998 is more than 15 years old.  And both the 1997 and 1998

22   conviction, they involve larceny and they may be probative of

23   credibility.  But my understanding of the facts of both of

24   those convictions, the 1997 conviction involved Ms. Lobdell

25   essentially like check kiting.  She wrote a check and didn't

11

US V. Peters – 13-CR-316

1  have the sufficient funds to cover the check and she got the

2  cash from it and it was a couple hundred dollars.  I'm not

3  downplaying that but it wasn't a substantial amount of money.

4  And the 1998 conviction is somewhat similar.  She forged a

5  couple of checks I think for a total of $350.

6          I think those are -- the government concedes

7  they're somewhat probative of credibility.  That's why 609

8  has a time limit on it.  That's why, for convictions over 10

9  years of age, the probative value has to substantially

10  outweigh the prejudicial effect.  And there's very little

11  probative value in those convictions.  The 2006 is the most

12  serious of all convictions and, again, the government

13  concedes that defense counsel would be able to ask about

14  those convictions and the fact that he can get into, you

15  know, a previous larceny, I think less ins -- or, excuse me,

16  I'm not -- the 1998 and 1997 convictions are over 15 years

17  old and the government believes that the probative value is

18  very little.

19          As to Mr. Forget, the only conviction that is

20  within the 10-year period is the 2006 conviction for assault.

21  That is a misdemeanor so that does not go to credibility.

22  And then all the other convictions or at least the majority

23  of them relate to narcotics or tobacco.

24          The government believes that the only convictions

25  that relate to credibility are the instances where Forget

12

US V. Peters – 13–CR–316

1 violated his pretrial conditions or violated his probation

2 and served additional jail time.

3 But, again, the earliest instance of that or latest

4 instance of that is in 2001, which is 13 years ago.  So the

5 probative value I think of those convictions is very little.

6 And any time you're asking about convictions that are over 10

7 years old, there is a prejudice that flows from that.  And,

8 again, the defendant is going to have an opportunity to

9 question Mr. Forget about a recent violation of probation,

10 which I think is very relevant.  But the government believes

11 the rest of his convictions are not.

12 THE COURT:  Would we be in agreement that most of

13 Mr. Forget's would be relating to smuggling on the

14 reservation?

15 MR. GARDNER:  Yes, sir.

16 THE COURT:  Tobacco smuggling?  And I see it looks

17 like the major issue with regard to numerous arrests that are

18 concededly significantly past 10 years?

19 MR. GARDNER:  That's my understanding, that's

20 correct.

21 THE COURT:  And none of them really appear to

22 represent issues with regard to truth telling or credibility?

23 MR. GARDNER:  No, sir.

24 THE COURT:  All right.  So, here's what we're going

25 to do.  I'll deal with Mr. Forget first.

13

US V. Peters - 13-CR-316

1        Mr. Sacco, here's what I'm going to allow you to

2   do.  I'm going to allow you to ask Mr. Forget about the fact

3   that he has numerous convictions over a significant period of

4   time involving smuggling on the Akwasasne reservation, both

5   in Canada and the United States.  And as long as he answers

6   that in the affirmative, I'm going to limit your

7   cross-examination to that.  And then, of course, I've already

8   given you a ruling on his most recent arrest and what you can

9   get into.

10        And I think that fairly, you know, allows the

11  fact -- you to represent the fact to this jury that he has

12  numerous convictions.  We're not going to -- because they're

13  so old and they really don't involve truth telling, I'm not

14  going to let you get into the underlying offense.  We're not

15  going to get into anything else.

16        And, Mr. Gardner, I'm going to instruct you to talk

17  to your witness about this, that I'm allowing this because

18  it's important for him to understand that not acknowledging,

19  you know, this criminal history in a general way like this,

20  would force the Court to consider allowing Mr. Sacco to get

21  into, you know, individual convictions and dates, which

22  really isn't necessary.  I do think it's fair because of, you

23  know, the continuous nature of his criminal conduct that

24  defense counsel be allowed to at least ask that and get that

25  on the record and we're going to limit it to that.

14
US V. Peters – 13–CR–316

1          MR. GARDNER:  Yes, sir.

2          THE COURT:  Okay.  Now, with regard to Ms. Lobdell,

3  there's certainly no question about the 2006 conviction of

4  grand larceny and falsifying business records, it does go to

5  credibility and truth telling and, Mr. Sacco, you'll be

6  allowed to get into that.

7          Beyond that, it's the Court's ruling that the '97

8  and '98 convictions are just too old and I don't think that

9  that's, although they do involve, certainly I don't know

10  about the '97, but certainly the '98 does involve forgery,

11  would involve truth telling but, you know, the age of that

12  conviction, I don't think that it's appropriate that I allow

13  you to get into that.  So, you can fully question about the

14  2006, no problem with that, and that will take care of those

15  matters.

16          Anything else?

17          MR. GARDNER:  Your Honor, the other thing the

18  government briefed in its motion in limine was the 404(b)

19  issue related to Mr. Greg Darragh, excuse me, Mr. Darragh's,

20  one of the government's witnesses and he was a late addition

21  to our witness list.  We didn't talk to him until just

22  recently.

23          Mr. Darragh is going to testify that on a couple of

24  occasions he had interactions with the defendant but

25  Mr. Darragh was working for a separate smuggling organization

15

US V. Peters – 13-CR-316

1    and separate I guess is a relative term.  There's a lot of

2    overlap along the Akwasasne Mohawk Indian reservation and

3    smuggling in general.  So on a couple of occasions

4    Mr. Darragh worked with the defendant to send marijuana into

5    the United States.  His testimony would be pretty limited to

6    three or four interactions with the defendant but it does

7    involve a Mr. Darragh's working for a separate group not for

8    the group that Ms. Lobdell, Forget and the other people that

9    are –– I shouldn't say the other people in the indictment ––

10   the other people in this charged conspiracy.

11          So, the government believes that it's –– it is

12   likely considered 404(b) evidence but it's relevant because

13   it's almost identical to the charge of conspiracy.  It's very

14   similar to the testimony that we'll hear from Lobdell and

15   Forget.  It's being offered to show knowledge to corroborate

16   the other witnesses and to show modus of operandi.  So the

17   government believes it's being offered for a proper purpose

18   and there's very little prejudice that would flow from it

19   because the witness –– what Mr. Darragh will testify about is

20   so similar to what we'll hear from the other witnesses that

21   there's little danger of prejudice in this case.  Thank you.

22          THE COURT:  Go ahead, Mr. Sacco.

23          MR. SACCO:  Yes, thank you, Judge.

24          Judge, my concern in this –– and it may ought to be

25   cured by a tight direct examination –– is that now the

16

US V. Peters – 13-CR-316

1   government is attempting to link my client to another

2   conspiracy where he's not indicted on that charge.  He's

3   indicted on the charges that we're here for in this court and

4   that, should Mr. Darragh testify about his other group, that

5   somehow that my client would be linked not just to

6   Mr. Darragh, which I think is the government's point, but to,

7   you know, this other -- I don't know how many people are

8   involved in this other conspiracy -- but to this other world

9   and now I'll be not only defending my client against the

10  charges but a number of unindicted charges.

11          So my concern is that that could be opened up.

12          THE COURT:  Well, I agree with your first

13  statement.  That can all be addressed and resolved by a tight

14  direct examination.  I think it is appropriate information.

15  It should be admissible for the reasons that the government

16  has offered.  But I certainly don't want to get into some

17  other conspiracy.  I don't want to get into lengthy testimony

18  of side issues here.  It has to be specific to the conduct of

19  this defendant, how it relates to the conspiracy, the charges

20  in this particular case and as long as we stay in that arena,

21  there won't be an issue.

22          And if we get outside that arena, Mr. Sacco, I

23  expect you to object and we'll deal with it.

24          MR. SACCO:  Yes, sir.

25          THE COURT:  Also, I would caution you -- it sounds

17

US V. Peters – 13-CR-316

1   like you've thought about it -- your cross-examination is

2   going to have to be done in a manner not to elicit and get

3   outside of hopefully what will be that tight direct that

4   you're hoping for.

5           MR. SACCO:  Yes, your Honor.

6           THE COURT:  Okay, all right.  Does that conclude

7   pretrial issues?

8           MR. SACCO:  It does, Judge.

9           MR. GARDNER:  Yes, your Honor.

10          THE COURT:  Where are we jury wise?

11          MR. SACCO:  Judge, can I just raise one issue.

12  Oftentimes I talk to my client -- and I talked to him in this

13  case about it -- judge, if you call us up or if I ask for a

14  side bar, that all times, of course, he has the

15  Constitutional right to come up.  But typically in this

16  setting with the jury's present, he doesn't come up with me

17  and I just want to put that on the record that I've, you

18  know, we've discussed that and that he's not going to

19  approach at side bar with me.  But if he ever wants to change

20  his mind and he feels he needs to, then he will, all right.

21          THE COURT:  Mr. Peters, do you have any issues with

22  that?  Is that what you discussed with Mr. Sacco and decided

23  to do is stay at counsel table when he approaches the bench

24  to discuss legal issues?

25          THE DEFENDANT:  Yes, sir.

18

US V. Peters - 13-CR-316

1      THE COURT:  And that's what you want to do?

2      THE DEFENDANT:  Yes, sir.

3      THE COURT:  And you'll have and I'll give you an

4  opportunity to before we start or continue with the

5  proceeding with regard to direct or cross-examination,

6  whatever's going on, to fully consult with Mr. Sacco before

7  we move on so you'll know everything that's occurred up here

8  and if you have have a question about the conversations that

9  occurred up here, you let Mr. Sacco know and what we can do

10  is, I'll dismiss the jury from the room and we can have the

11  court reporter read back what was said here.  Because the

12  court reporter's present for everything.  It's part of the

13  court's record.  So, it's all preserved, so you'll have an

14  opportunity to know and hear it, if you want to, everything

15  that's gone on.  Okay?

16      THE DEFENDANT:  All right.  Thank you very much.

17      THE COURT:  All right.  Sir, anything else?

18      MR. GARDNER:  No, sir.

19      MR. SACCO:  No, your Honor, thank you.

20      THE COURT:  I'll give you couple minutes before we

21  bring the jury in.

22      (Discussion held off the record.)

23      THE COURT:  Gentlemen, preempts in jury selection.

24  The government has six.  The defendant has ten.  So what

25  we're going to do is government is going to go two, two, and

19

US V. Peters – 13-CR-316

1   two for the first three rounds.  Defendant will get four,

2   three and three.

3              MR. SACCO:  Okay.

4              THE COURT:  I just want to make that clear because

5   I know judges do it differently.  That's the way we're going

6   to do it.

7              MR. GARDNER:  Your Honor, if, especially for the

8   first round, let's say there's three individuals that I would

9   want to strike during that first round.

10             THE COURT:  You can request to use, I'll hear you.

11             MR. GARDNER:  Okay, thanks.  Same thing for defense

12  counsel, if you feel like, geez, I got to...

13             MR. SACCO:  Once that rounds passes, the ones that

14  are sitting, there they're there forever?

15             THE COURT:  They're there.  No strikebacks.

16             MR. SACCO:  Okay.  Thank you.

17             THE COURT:  Otherwise, we'll be here for a week

18  just picking a jury.

19             (Recess taken.)

20             THE COURT:  Good morning, ladies and gentlemen and

21  welcome to federal court in the Northern District of

22  New York.  I'm glad you all made it here this morning.

23             We are starting a criminal jury trial this morning.

24  My name is Judge Glenn Suddaby and again, welcome.

25             You'll see our court reporter here to my right,

20

US V. Peters – 13–CR–316

1   your left is Diane and my courtroom deputy is Lori Welch,

2   people that you'll be seeing on a regular basis as we go

3   through this case.

4          Other people that may show up in the courtroom and

5   whisper in my ear or hand me a piece of paper are my law

6   clerks, Catherine or Michael, may be out here.

7          Other than that, you'll see our court security

8   officers.  You have John here this morning and they regularly

9   rotate through and that's a majority of the court personnel

10  that you'll be seeing here in the course of this trial.

11         As I've indicated, this is a criminal case and

12  people in this country who are charged with a crime have the

13  right to a jury trial or trial of their peers and that is why

14  you've been summoned here this morning.

15         Now, let me say this:  I'm not naive.  I understand

16  that most of you, when you received that jury summons in the

17  mail, you weren't jumping around the house skipping around

18  the house saying whippie, whippie like the kids do when they

19  get a snow day, I understand that.

20         But, please, also understand how important this

21  service is.  It's as important as your right to vote.

22  Certainly it's one of the very cherished and protected rights

23  in this country that makes our justice system and our way of

24  life different from a lot of those around the country is that

25  when you are charged by the government, you have a right to

21
US V. Peters – 13-CR-316

1   defend yourself and have people from your community hear that

2   case.  So it's a very important matter.  It's an important

3   privilege and right and I take it seriously and I hope you

4   do, too.

5          The idea that it's an inconvenience for you, I

6   understand that, and I do might utmost to keep things moving

7   and keep that inconvenience as minimal as possible.  I do

8   appreciate the fact that you're here providing this service

9   and I expect at all times that court personnel and myself are

10  going to treat you with the respect that you deserve for

11  providing that service as citizens of this country.

12         Now, what will you be doing?  You will listen to

13  evidence that's presented to you by the two parties, the

14  government and the defendant.  And at the end of that, I'm

15  going to read you some law and then you will retire and

16  you're going to have to retire to decide what the facts are.

17         Where's Mr. Sacco?

18         We're missing one of our lawyers and I didn't

19  realize he wasn't in the room.

20         (Pause in proceedings.)

21         THE COURT:  Okay.  Mr. Sacco, I apologize, I didn't

22  realize you hadn't come back in.

23         MR. SACCO:  Sorry, your Honor.

24         THE COURT:  I gave the lawyers a break because

25  we've been working this morning before you came down here and

22

US V. Peters – 13–CR–316

1    and when you came in the room, I just assumed everybody was

2    here.  I apologize.

3           We've just been getting started.  I've welcomed

4    this jury.  I told them that it's a criminal case.  I told

5    them that we're about to go through jury selection and I was

6    just explaining to them, if they were selected, what their

7    role would be in this criminal case.

8           So, that being said, the service that you'll be

9    providing will be to listen to the evidence that's presented,

10   the testimony and other exhibits, to view whatever exhibits

11   are offered and then you're going to be asked to decide the

12   facts of this case as you believe them to be what do you

13   believe to be the truth.  And we come here as a result of an

14   indictment, an indictment is nothing more than an accusation

15   that's brought by a body called a grand jury.  Government

16   presents some testimony before a grand jury and they decide

17   whether there's enough evidence to accuse somebody to say

18   that we believe there's enough evidence that you should be

19   formally charged so that you can stand trial and that's how

20   we got here this morning.

21          Now, the burden of proof in a criminal case always

22   remains with the government.  The defendant in a criminal

23   case has no burden of proof.  The defendant in any criminal

24   case doesn't have to do a thing.  They can sit there and say

25   nothing.  They can choose to testify.  They can do whatever

23

US V. Peters – 13–CR–316

1   they feel is appropriate or not do anything.  Defense counsel

2   can sit there and read the newspaper, if they want.  I don't

3   expect that's going to happen, but, you know, that's the

4   right that you have as a U.S. citizen is that you do not have

5   any type of burden of proof in a criminal case.  As I've

6   indicated, the burden of proof is on the government until the

7   very end of this case.  The defendant has no burden to prove

8   his innocence or to present any evidence or to testify.

9        Since the defendant has a right to remain silent,

10   the law prohibits you from arriving at your verdict by

11   considering that the defendant or may not have testified.

12   Can't be a consideration at all.  The government has the

13   burden of proving this case by what is called beyond a

14   reasonable doubt.  And that doesn't mean beyond all doubt.

15   It's not to an absolute certainty but to beyond a reasonable

16   doubt and I will give you charges on the law that will

17   explain that burden a little more thoroughly when we get to

18   that point.  But it does mean that the government has to

19   produce evidence, which, considered in light of all the

20   facts, leads you to believe that what the government claims

21   the defendant did is true beyond a reasonable doubt.

22        Now, as jurors, you're going to be judges of the

23   facts and it will be my responsibility as a judge in this

24   case to instruct you on the law.  You are bound, if you are

25   sworn as a juror in this case, to accept the law as I give it

24

US V. Peters – 13–CR–316

1   to you, whether you agree with it or not.  Many of us have

2   different opinions about different laws in this country and

3   that's one of the great things about being a U.S. citizen.

4   You can have those opinions.  Nobody's trying to tell you

5   what to think.  But if you're accepted as a juror in this

6   case, you will be bound to accept the law, regardless of

7   whether you agree with it or not, as I give it to you and

8   that will be part of your oath and you need to understand

9   that.

10          Now, we're about to start with jury selection.  And

11  jury selection is designed so that this Court and these

12  attorneys have a right to learn and hear a little bit about

13  who you are, your lives, where you come from, what you do for

14  a living so that they can make some decisions about whether

15  they believe you're an appropriate juror for this case.

16          And, certainly, I would say it this to you:  There

17  is nothing personal about this.  It's not meant to embarrass

18  anybody.  It's just to get an understanding of who you are so

19  that we can assure this defendant and the government that

20  they're going to have a jury that will provide a impartial

21  and fair proceedings with regard to a verdict, an eventual

22  verdict in this case.  We need to know that you can be

23  impartial and fair in making this decision and that's what

24  their job and responsibility to their clients is, is to make

25  sure they get jurors that can do that.

25
US V. Peters – 13–CR–316

1      Now, the process involves questioning.  I'll be
2  doing the majority of the questioning.  I will talk to the
3  lawyers.  I may allow them to ask some questions, depending
4  on topic and what we've covered.  I always ask the lawyers
5  about that.  But I'll do the majority of the questioning and
6  we're going to move through.
7      The lawyers have a legal responsibility and right
8  to make strikes of jurors and we go through rounds and we'll
9  get, you know, some jurors hopefully in each round until we
10  get 12 sworn jurors and probably two alternates.  I'm going
11  to go with two alternates because of the time of the year and
12  weather.  I just want to make sure, you know, people get
13  sick, people have car trouble, whatever.  We've got to have
14  jurors to step in in case something happens, okay.
15      Now, we're going to begin by having my courtroom
16  deputy administer an oath to all of you to swear to tell the
17  truth to all the questions that are put to you and then
18  you'll be called by name, by juror number which has been
19  randomly selected, and we're going to seat you and we're
20  going to start this process of questioning and going through
21  strikes with the lawyers until we have our jury.
22      Okay.  I'm going to ask you all to please stand and
23  my courtroom deputy is going to swear you in.
24      THE CLERK:  Will the jury panel please raise your
25  right hand.

26

US V. Peters – 13-CR-316

1               (Jury panel duly sworn.)

2               (Jury selection was held and the proceedings

3                continued further as follows:)

4               THE COURT:  Okay, Counsel, can you tell me is this

5      jury satisfactory for the government?

6               MR. GARDNER:  Yes, your Honor.

7               THE COURT:  Mr. Sacco, on behalf of your client?

8               MR. SACCO:  Yes, your Honor.

9               THE COURT:  We're going to swear this jury in.

10              THE CLERK:  Will the jury please stand and raise

11     your right hand.

12              (Jury duly sworn.)

13              THE CLERK:  Thank you.  You may be seated.

14              THE COURT:  I'm going to give you a preliminary

15     instruction on the law just to kind of give you an outline of

16     what we're going to be doing, both you as the jurors and the

17     lawyers and myself, as the judge, and then we'll get this

18     case started.

19              Before we do that, I'm going to give you a little

20     break.  I'm going to let our court security officer, Rita,

21     take you back into the jury room, show you the jury room and

22     where you're going to be reporting for the next few days, and

23     answer any questions you might have about your service.

24              You can bring bottles of water into the courtroom.

25     They'll be provided for you, nothing else to eat or drink,

27

US V. Peters – 13–CR–316

1    other than bottles of water.  We'll talk about other things

2    in your service, note-taking and that sort of stuff.  I'll

3    give you some instructions on that, should anybody want to do

4    that.

5            And then we'll hear opening statements from these

6    attorneys.  We'll get at least that far and then I'll see

7    where the government is, as far as their witnesses, and I'll

8    see if we're going to do any witnesses today or start fresh

9    tomorrow morning.  So we'll make that determination.

10           I'm going to give you a brief ten-minute break.  I

11   encourage you to be friendly, talk to each other, get to know

12   each other.  But there's one thing you can't do when you're

13   talking to each other:  Don't talk about this case or

14   anything to do with this case.  All right.  You don't know

15   anything about it yet, until some witnesses get called and

16   these attorneys try to give you their overview of their cases

17   from their point of view.  But, regardless, you can't ever

18   talk about the case until the end when you're going to

19   deliberate and there's a reason for that.  We don't want

20   premature discussions to lead to premature decisions in your

21   mind, okay.  So, be friendly, but don't talk about the case.

22           Don't read, listen to anything.  Sometimes there's

23   media that will come into this courtroom, reporters.  They

24   might write something.  They might put something on the

25   radio.  If you're a regular paper reader or you check the

28
US V. Peters – 13–CR–316

1    media or Syracuse.com or wherever your local media is, if

2    there's anything about this, you can't read it.  Put it

3    aside, if you see something.  If you hear something on the

4    radio, some reporter starts to talk about a federal criminal

5    case being tried in Syracuse, flip the channel, all right.

6            Again, I don't want you influenced by any media

7    reports, okay.  They're not here.  They don't know what's

8    going on.  Even if they listen to just part of one witness or

9    several witnesses, they're giving their point of view about

10   what a witness said and that is of no moment for you.  It's

11   for you and your fellow jurors to decide what testimony is.

12   So, anything like that we have to disregard.  Okay.

13           Now I'm going to give you about five, ten minutes

14   to get comfortable in the jury room and then we'll get you

15   out here and I'm going to give you that preliminary charge we

16   talked about, so go ahead

17           (Jury excused, 2:39 p.m.)

18           THE COURT:  Okay.  Counsel, that's the way I intend

19   to proceed.  After about a five-, ten-minute break, they get

20   comfortable, be prepared to give your opening statements.

21           Do you have witnesses available to start?

22           MR. GARDNER:  I do, your Honor.

23           THE COURT:  Good.  Then we'll start.  We'll get at

24   least one, maybe a couple witnesses in, depending on who they

25   are and we'll break at 4:30.

```
                                                              29
                US V. Peters - 13-CR-316
```

 1          And if the defendant needs to use the facilities or
 2   anything -- he's free to do that now -- we just want to make
 3   sure he's in his seat before we get a jury back in this
 4   courtroom, okay.
 5               MR. SACCO:  Thank you, Judge, he's all set.
 6               THE COURT:  So he's going hang out.
 7               MR. SACCO:  Yes.
 8               THE COURT:  Okay.  Very well.
 9               THE CLERK:  Court's in recess.
10               THE COURT:  Mr. Peters, if at any time, you know,
11   something like that arises where you need to use the facility
12   or whatever, please let Mr. Sacco know.  He can get to me and
13   we'll take care of you because there's leg shackles.  I don't
14   want you up and around before this jury.  I'll make sure
15   they're out of the room before we move you anywhere, okay.
16               THE DEFENDANT:  Yeah, thank you very much.
17               THE COURT:  All right, sir.
18               (Recess taken.)
19               (Open court, 2:43 p.m.:)
20               THE COURT:  Okay, counsel, we all set?
21               MR. GARDNER:  Yes, sir.
22               THE COURT:  Mr. Sacco, you all set to proceed?
23               MR. SACCO:  Yes, your Honor.
24               THE COURT:  I'm going to give them a preliminary
25   charge and then we'll let open.

30
US V. Peters – 13–CR–316

1          (Jury present.)

2          THE COURT:  The record should reflect we have the

3    ladies and gentlemen of the jury, Assistant U.S. Attorney

4    Gardner, Defense Attorney Sacco and his client.  We're going

5    to get started.  Please be seated.

6          Again, just another little tidbit for you.  When

7    you come into the courtroom, you can come right in and sit

8    down.  You'll notice that a lot of times people in the

9    courtroom are standing.  That's an old tradition that I

10   really like and I think is appropriate.  They're standing out

11   of respect for your service as jurors.  So, sometimes jurors

12   come in, they see everybody standing think, oh, we have to

13   stand, too.  No.  You come in and sit right down and when

14   we're ready to start, everybody else will sit down.  Okay.

15         A preliminary charge, I'm going to read to you some

16   legal instructions and then we're going to have opening

17   statements.

18         Before we begin the trial, I'd like to tell you

19   about what will be happening.  I want to describe how the

20   trial will be conducted and explain what we will be doing,

21   you the lawyers and the Court.  At the end of the trial, I

22   will give you more detailed guidance on how you are to go

23   about reaching your decision and now I will explain how the

24   trial will proceed and give you an overview of this case.

25         In this case, the defendant is charged with a

JA-66

31

US V. Peters – 13-CR-316

1   felony for violating Title 21, United States Code,

2   Section 841(a) and 846, conspiracy to possess with intent to

3   distribute and to distribute a controlled substance.  I will

4   give you detailed instructions on the law at the end of the

5   case and those instructions will control your deliberations

6   and your decision.

7           But, in order to help you follow the evidence, I

8   will now give you a brief briefly summary of the elements of

9   the offense that the government must prove to make its case.

10          Generally, in order to satisfy its burden of proof

11  with regard to this offense, it must be established the

12  following three elements beyond a reasonable doubt:

13          First, that the conspiracy, agreement, or

14  understanding to distribute or to possess with intent to

15  distribute marijuana, as described in the indictment, was

16  willfully formed, reached or entered into by two or more

17  persons and existed at or about the time alleged;

18          Second, that at some time during the existence or

19  life of the conspiracy, the defendant knew the purpose of the

20  agreement and then, knowingly and willfully, became a member

21  of the conspiracy;

22          Third, that the conspiracy involved the

23  distribution of or possession of, with intent to distribute,

24  marijuana.

25          What's the duty of the jury?  It will be your duty

32

US V. Peters – 13–CR–316

1   to find from the evidence what the facts are.  You, and you

2   alone, are the judges of the facts.  You will then have to

3   apply those facts to the law as the Court will give it to

4   you.  You must follow the law, whether you agree it or not.

5           Nothing the court may say or do during the course

6   of the trial is intended to indicate or should be taken by

7   you as indicating what your verdict should be.  That's your

8   province and your province alone.

9           Evidence.  Evidence from which you will find the

10  facts will consist of testimony and witnesses, documents and

11  other things received into the record as exhibits and any

12  facts the lawyers agree or agree to stipulate to or that the

13  Court may instruct you to find.

14          Certain things are not evidence and must not be

15  considered by you and I will list them for you now.

16          First of all, statements, arguments, and questions

17  by the lawyers are not evidence.

18          Objections to questions are not evidence.  Lawyers

19  have an obligation to their clients to make an objection when

20  they believe evidence being offered is improper under the

21  rules.  You should not be influenced by the objection or by

22  the Court's ruling on it.  If the objection is sustained,

23  that means the witness does not have to answer the question.

24  In that case, you must disregard the question and any

25  response that was given to the question.  If the objection is

33

US V. Peters – 13–CR–316

1  overruled, that means the witness will then be required to

2  answer the question.  In that case, you should treat the

3  answer like any other.  If you are instructed that some item

4  of evidence is received for a limited purpose only, you must

5  follow that instruction.  Testimony that the Court has

6  excluded or told you to disregard is not evidence and must

7  not be considered by you.

8       Anything you may have seen or heard outside the

9  courtroom is not evidence and must be disregarded.  You are

10 to decide the case on the evidence presented here in this

11 courtroom and this courtroom alone.

12      There are two kinds of evidence:  Direct and

13 circumstantial.  Direct evidence is direct proof of a fact,

14 such as testimony of an eyewitness.  Circumstantial evidence

15 is proof of facts from which you may infer or conclude that

16 other facts exist.  I will give you further instructions on

17 these, as well as other matters, at the end of the case; but

18 have in mind that you may consider both kinds of evidence.

19      It will be up to you to decide which witnesses to

20 believe, which witnesses not to believe and how much of any

21 witness' testimony to accept or reject.  I will give you some

22 guidelines for determining the credibility of witnesses at

23 the end of the case.

24      Now just briefly on direct and circumstantial

25 evidence.  Direct evidence is pretty clear.  It's what

34

US V. Peters – 13–CR–316

1   somebody can tell you they saw, heard, they were present for,

2   they have something that, you know, I saw this person do

3   this.  I was there at this time.

4           Circumstantial evidence, a little different.  It's

5   facts that can be reasonably inferred from information that's

6   provided and corroborated usually by other evidence.  So, an

7   example of circumstantial evidence would be, you know, this

8   time of year it warms up and the snow melts or and you may

9   see your green brown grass out there on your front lawn and

10  the next day it can be covered in white stuff.  So I'm going

11  to use this example.

12          If you go to bed some night and you look out at

13  your lawn before you go to bed and it's completely clear of

14  any snow.  It's, you know, that brown green color grass that

15  we have this time of year in central New York and you look

16  out there and you say okay and you go to bed.  You get up the

17  next morning and you look out at your front yard and it's

18  covered with a foot of snow, all right.  You did not see it

19  snow but you can reasonably infer, circumstantially based on

20  what you see out there, that some time during the night while

21  you were sleeping, it snowed.  That's circumstantial

22  evidence, a reasonable inference, okay.

23          Let's take it one step further.  Let's say you have

24  a paper boy that delivers the paper to your door between 6

25  and 6:30 in the morning.  You get up that morning.  You

35
US V. Peters – 13–CR–316

1   look out on your lawn.  You see the snow.  There's no
2   footprints in the snow, nothing in the front yard to suggest
3   that anybody's been to your door and you check and it's about
4   6 o'clock, you go check your front door, no paper, okay.  So
5   then, you go about your business, you come back 15 minutes
6   later.  You look out your front window.  You see footprints
7   across your front yard right up to your front door.  You go
8   and open your front door and there's your newspaper.
9           Now, you didn't see somebody deliver that
10  newspaper, whether it was your paper boy or somebody else.
11  But, circumstantially, it's a reasonable inference that
12  somebody delivered your paper between 6 and 6:15.  Somebody
13  came across your yard.  You can see the footprints.  You see
14  the paper.  Circumstantial evidence to establish that your
15  paper was delivered to you.
16          Now you'd have to have more proof, more evidence to
17  decide who delivered that paper.  If you had a regular paper
18  boy that was there every day, you still might not -- you
19  wouldn't be able to say it was him, unless you had some other
20  proof, maybe that he had a certain size shoe, and somebody
21  went out and compared the prints in the snow to his boot
22  print that he was wearing that day, and some other evidence
23  that you checked with the neighbor, yeah, I saw your paper
24  boy about 6:15, you know, near your yard and then maybe,
25  circumstantially, you can say, yeah, it was my paper boy that

US V. Peters – 13–CR–316

1   delivered my paper between 6:15 and 6:30, based on this other

2   circumstantial evidence that was established, direct and

3   circumstantial evidence to establish that fact.  Okay.

4           So that's what we're talking about, kind of the

5   evaluation that you'll be able to go through.  But, just

6   please keep in mind at this point that you can consider

7   either type of evidence, if you find it to be credible,

8   believable evidence that you would be willing to accept in

9   matters of importance in your every day lives.  All right.

10          Now, rules of a criminal case.  As you know, this

11  is a criminal case and there are three basic rules about a

12  criminal case that you must keep in mind.

13          First, the defendant is presumed innocent until

14  proven guilty.  The indictment against the defendant brought

15  by the government is only an accusation, nothing more.  It is

16  not proof of guilt or anything else.  The defendant,

17  therefore, starts out with a clean slate.

18          Second, the burden of proof is on the government

19  until the very end of the case.  The defendant has no burden

20  to prove his or her innocence or to present any evidence or

21  to testify or to do anything else.  We've talked about this.

22  Since the defendant has the right to remain silent, the law

23  prohibits you from arriving at your verdict by considering

24  that the defendant may not have testified.

25          Third, the government must prove the defendant's

37

US V. Peters – 13–CR–316

1   guilt beyond a reasonable doubt.  Now, what do I mean by

2   beyond a reasonable doubt?  It is not some vague,

3   speculative, imaginary or inconceivable doubt, nor is it a

4   doubt based upon emotion, sympathy or prejudice or upon what

5   some of you may consider to be an unpleasant duty.  The

6   government is not required to prove a defendant guilty beyond

7   every conceivable or every possible doubt.  But you should

8   review all of the evidence as you remember it, sift out what

9   you believe, discuss it, analyze it, compare your views of

10  the evidence with that of your fellow jurors and, if that

11  process produces in your mind some belief or conviction that

12  you would be willing to accept without further hesitation if

13  it was a matter of importance to you, then you may say that

14  you have been convinced beyond a reasonable doubt.

15         On the other hand, if, going through that same

16  process in your mind, your mind is wavering or it is so

17  uncertain that you would hesitate before acting, if it were

18  an important matter of your own, then you have not been

19  convinced beyond a reasonable doubt and your verdict must be

20  not guilty.

21         I will give you further instructions on this point

22  later.  But bear in mind that, in this respect, a criminal

23  case is different from a civil case as far as the standard of

24  proof.  In a civil case it's a preponderance of the evidence.

25  That does not apply here.  It's beyond a reasonable doubt, as

38
US V. Peters – 13-CR-316

1   I explained it to you and as I will further explain it to you

2   at the end of the case.

3          Let's talk about the course of the trial.  In a few

4   moments the trial will begin.  First, the government will

5   make an opening statement, which is simply an outline to help

6   you understand the evidence as it will come in.  And next the

7   defendant's attorney may -- but does not have to -- make an

8   opening statement.

9          Opening statements are neither evidence nor

10  argument.  They're to give you a view, an idea of what this

11  case is all about and the witnesses that they expect to call.

12  The government will then present its witnesses and counsel

13  for the defendant may cross-examine them.  Following the

14  government's case, the defendant may, if he desires or

15  wishes, present witnesses whom the government may

16  cross-examine.

17         After all the evidence is in, the attorneys will

18  present their closing arguments to summarize and interpret

19  the evidence for you and the Court will instruct you on the

20  law.  After that, you will retire to deliberate on your

21  verdict.

22         Okay.  So that's generally how we're going to

23  proceed.

24         What do we expect of you?  What's the conduct of

25  the jury?  Our law requires jurors to follow certain

                                                                    39
                    US V. Peters – 13–CR–316

1   instructions in order to help assure a just and fair trial.

2   I will now give you those instructions.

3           First of all –– and I've talked about a lot of this

4   already, but it's important that you hear it again –– do not

5   converse either among yourselves or with anyone else about

6   anything related to the case.  You may tell the people with

7   whom you live and your employer that you are a juror and give

8   them information about when you will be required to be in

9   court but you may not talk with them or anyone else about

10  anything related to the case.

11          Second, do not, at any time during the trial,

12  request, accept, agree to accept, or discuss with any person

13  the receipt or acceptance of any payment or benefit in return

14  for supplying any information concerning this trial.

15  Basically no book deals, okay.  After you're all done, if

16  somebody wants to come to you and write a book, then you're

17  free to do what you want, but not during the course of this

18  trial.

19          And, again, if anybody approaches you, I need to

20  know about it immediately.  You must promptly report directly

21  to me any incident within your knowledge involving any

22  attempt by any person to improperly influence you or any

23  other member of this jury.

24          Do not visit or view the premises or place where

25  the charged crimes allegedly occurred or any other premises

40

US V. Peters – 13-CR-316

1    or place involved in this case and you must not use internet

2    maps or Google Earth or any other program or device to search

3    for or view any location discussed in testimony.

4           Do not read, listen or view -- listen to any

5    accounts or discussions of the case reported by newspaper,

6    television, radio or internet or any other news media.

7           Do not attempt to research any fact, issue or law

8    related to this case, whether by discussion with others, by

9    research in the library or on the internet or by any other

10   means or source.  Everything you need will be given to you in

11   this courtroom.  It may not be everything you want but

12   everything you are required to hear must come in this

13   courtroom with regard to the law and everything.  So, no

14   independent research.  No type of searching for answers,

15   other than what's provided for you in this courtroom.

16          In this age of instant electronic communication and

17   research, I want to emphasize that, in addition to not

18   conversing face to face with anyone about the case, you must

19   not communicate with anyone about the case by any other means

20   including by telephone, text message, email, internet chat or

21   chat rooms, blogs or social websites such as Facebook,

22   MySpace or Twitter.  You must not provide any information

23   about the case to anyone by any means whatsoever.  And that

24   includes the posting of information about the case or what

25   you are doing in the case on any device or internet site

41

US V. Peters – 13–CR–316

1    including blogs, chat rooms, social websites or any other

2    means.

3              You must also not Google or otherwise search for

4    any information about the case or the law which applies to

5    the case or the people involved in the case, including the

6    defendant, the witnesses, the lawyers, or even me, the judge.

7    You can do any of that stuff afterwards, but not during this

8    case.

9              Now, ladies and gentlemen, I want you to understand

10   why these rules are so important.  Our law does not permit

11   jurors to converse with anyone about the case or permit

12   anyone to talk to them about the case because only jurors are

13   authorized to render a verdict and only you have been found

14   to be fair and impartial and only you have promised by your

15   oath to be fair and impartial.  No one else has been so

16   qualified.

17             Our law does not permit jurors to converse amongst

18   themselves about the case until the Court tells them to begin

19   deliberations because premature discussions can lead to

20   premature final decisions.

21             Our law also does not permit you to visit a place

22   discussed in the testimony.  First, you cannot always be sure

23   that the place is in the same condition as it was in on the

24   day or days in question.  Second, even if it were in the same

25   condition, once you go to a place discussed in the testimony

42

US V. Peters – 13–CR–316

1    to evaluate the evidence in light of what you see, you become

2    a witness, not a juror.  As a witness, you may now have an

3    erroneous view of the scene which may not be subject to

4    correction by either party and that's just not fair.

5           Finally, our law requires you not to read or listen

6    to any news accounts of the case and that you not attempt to

7    research any fact, issue or law related to the case for the

8    following reason:  Your decision must be based solely on the

9    testimony and other evidence presented in this courtroom.  It

10   would not be fair to the parties for you to base your

11   decision on some reporter's view or opinion or upon

12   information you acquire outside of this courtroom.

13          These rules are designed to guarantee a fair trial

14   and our law, accordingly, sets forth serious consequences if

15   these rules are not followed.  I trust you understand and

16   appreciate the importance of following these rules in

17   accordance with your oath and promise.  I know you will do

18   so.

19          Finally, do not form any opinion until all the

20   evidence is in.  Keep an open mind until you start your

21   deliberations at the end of the case.

22          If you wish, you may take notes.  But, if you do

23   so, please leave them in the jury room when you leave at

24   night and remember that they are for your own personal use.

25   They are not to be given or read to anyone else and, if you

43

US V. Peters – 13-CR-316

1   do take notes, please do not let note-taking distract you so

2   that you do not hear other answers by witnesses.  Notes are

3   not entitled to any greater weight than the memory or

4   impression of each juror as to what the testimony may have

5   been.  Whether you take notes or not, each of you must form

6   and express your own opinion as to the facts of the case.  If

7   you do not take notes, you should rely on your own memory of

8   what was said and not be overly influenced by the notes of

9   other jurors.

10          Quick comment about note-taking.  Before they gave

11  me this black dress, I tried a lot of cases and when I was

12  trying cases, the courts never allowed jurors to take notes

13  and there were some good reasons for that and I'm going to

14  explain them to you now.

15          First of all, we have Diane.  We have a court

16  reporter, whose responsibility is to take down everything

17  that's said in this courtroom accurately.  And she and her

18  colleagues do a great job.  Sometimes you'll hear them say,

19  if I don't do it first, to a lawyer or a witness, either slow

20  down or you're going to have repeat because I have to make

21  sure I get this right and you noticed during jury selection

22  she may have asked you to please repeat yourself, if she

23  didn't hear you.  That's because it's her responsibility to

24  make sure she has an accurate record.  So we have that to

25  rely on.

44
US V. Peters – 13-CR-316

1    Secondly, we didn't allow note taking because it
2  can be a huge distraction.  When you're going to try and
3  decide the credibility of a person, an individual that's
4  telling you something, your life's experiences tell you a few
5  things.  It's not only what a person says.  It's how they say
6  it, how they respond, their demeanor.  You observe things in
7  making that decision of whether or not to believe somebody.
8  Beyond just the mere words and I think you will all agree in
9  your life's experiences, that's what you do.  Whether you're
10 dealing with children that tell you two sides of a different
11 story when something got broken in the house or anything else
12 in trying to decide where the truth lies.  You do your
13 fact-finding and you discover things about what's said and
14 how it's said to you.  So that was another reason.  It's very
15 important for you to observe the demeanor of people as they
16 testify in making those sorts of decisions, okay.
17    Then you say, well, why is there an issue about
18 notes?  Because I think in more recent years -- and I agree
19 with this -- that some people just feel more comfortable if
20 they can jot something down.  They like having a pen and a
21 piece of paper.  It helps their memory.  Whether they write
22 everything down or just one order, they say that's how I
23 remember things.  So we want to make a contingency for those
24 types of people, with the caution that it not disrupt your
25 observation of the witnesses and not prevent you from really

45

US V. Peters – 13–CR–316

1  listening and paying attention to how a person is testifying

2  and, certainly, they're for your own personal use and nobody

3  else's, if you decide to do it.

4          Now, this isn't going to be a long trial, so, you

5  know, I think sometimes for real long trials, it may be more

6  critical than, you know, a week or less.  But it's totally

7  your decision.  If you're more comfortable with a note pad

8  and a pen, we'll get them for you and you can do that.

9  Otherwise, we're going do rely on your collective memories.

10          And, of course, if there's this some disagreement

11  in that jury room when you're deliberating about some piece

12  of testimony that was given, we can always have a read back

13  for you.  So I caution you that it may take -- we don't want

14  to reread a whole trial, obviously -- but if there is a

15  serious debate about what some testimony was, it may take

16  some time but we can get it for you and we'll read it back to

17  you.  We have the ability to do that.

18          If you do take notes, that notepad has to stay in

19  that jury room at night.  It will be locked here in this

20  courtroom and they stay here as court exhibits.  They don't

21  go home and then you can pick up your notepad in the morning

22  and come back out here if you want to use them.  Okay.

23          Does anyone have any questions?  Can I answer

24  anything for you about what we're going to do with this

25  process or about what your role or responsibilities are?

```
                                                          46
             US V. Peters - 13-CR-316
```

1        (No response.)

2        THE COURT:  If everybody's comfortable, we're going

3   to start this case now.  We're going to start with opening

4   statements.

5        Mr. Gardner, when you're ready, sir.

6        MR. GARDNER:  Yes, sir.

7        Good afternoon, ladies and gentlemen.

8        The evidence in this case will show that the

9   defendant, Mr. Allan Peters, was involved in a large scale

10  scheme to smuggle thousands of pounds of marijuana into the

11  United States and send millions of dollars of drug proceeds

12  back into Canada.

13        And the defendant wasn't just a key member of this

14  conspiracy, he was the lynchpin that made the conspiracy

15  possible.  He was the lynchpin because he had access and

16  control over this organization's gateway or door into the

17  United States.  He had access and control over the property

18  that they used to get drugs in the United States and send

19  drug proceeds back into Canada.

20        The defendant had access to his -- it's actually

21  his mother's property.  And this property is located on the

22  Akwasasne Mohawk Indian reservation and it's located in a

23  very unique place.  The Akwasasne Mohawk Indian reservation,

24  as you'll hear, is actually bisected by the international

25  border.  So half of it is in Canada and half of it is in the

47

US V. Peters – 13–CR–316

1    United States.  And this property was located just north of

2    the border and it sits right on the St. Lawrence river, so

3    it's accessible by boat.

4           And what this organization did, in coordination

5    with the defendant, is they would boat or snowmobile,

6    depending on how cold it was, hundred to 200 pound loads of

7    marijuana at a time into a canal that sits right on this

8    property.  They'd unload the marijuana to a currier and then

9    send that currier south.

10          And there's another unique thing about the

11   Akwasasne Mohawk Indian reservation.  Most of the time when

12   you're traveling on a road that goes into and out of Canada,

13   you're going to pass through a port-of-entry.  Well, that's

14   not true on the Akwasasne Mohawk Indian reservation.  You can

15   go across several roads that have no port-of-entry, have no

16   inspection process and no real law enforcement presence,

17   which is, obviously, helpful to a smuggling organization.

18          And the evidence will show that the defendant and

19   this organization did this for years and was able to import

20   thousands of pounds of marijuana into the U.S.

21          Now, ladies and gentlemen, the government has

22   charged the defendant with just one count in this case:

23   Conspiracy to possess with intent to distribute or to

24   distribute a controlled substance, a fancy way of saying

25   conspiracy to distribute marijuana.

48

US V. Peters – 13-CR-316

1        And at the close of evidence in this case, ladies

2   and gentlemen, you're going to have to resolve three basic

3   issues.  First, was there a conspiracy.  Second, did the

4   defendant knowingly participate in that conspiracy.  And then

5   there's a third issue.  If you find that he knowingly

6   participated in the conspiracy, you'll have to make a

7   determination about weight, about how much marijuana the

8   defendant is accountable for.  And I'd like to talk just for

9   a couple of minutes about each of those issues.

10        The first issue -- was there a conspiracy -- should

11   be pretty straightforward.  You're going to hear evidence

12   from law enforcement officers and you're also going to hear

13   evidence from what we call cooperating defendants or

14   cooperating witnesses.

15        And the law enforcement officers are going to

16   testify about three different seizures related -- by

17   seizures, I mean instances in which law enforcement officers

18   recovered marijuana from individuals associated with this

19   conspiracy.  Specifically, you're going to hear about a 240

20   pound marijuana seizure on May 8, 2009, from a vehicle driven

21   by Cheryl Lobdell.  On September 15th, 2010, law enforcement

22   officers seized another 240 pounds of marijuana from an

23   individual named Alain Forget.  And on March 1st, 2011,

24   Cheryl Lobdell got caught again with another hundred pound

25   load of marijuana.  So you're going to hear about these

49

US V. Peters – 13–CR–316

1  seizures and you're going to see photographs of the marijuana

2  and things of that nature.

3          But you're also going to hear from these

4  cooperating witnesses, two of which are the people that got

5  caught with marijuana, Alain Forget and Cheryl Lobdell, and

6  the third is an individual named Corey Spinner.

7          And all three of those individuals are going to

8  testify about this conspiracy because they participated in

9  it.  They're going to talk about their role in the

10  conspiracy.  They're going to talk about the overall

11  structure of this conspiracy, how the marijuana was brought

12  into the United States, how they transported the marijuana

13  across the border and how they transported it into the

14  interior of the United States.  They're going to identify

15  members of the conspiracy, including the defendant and talk

16  about their roles.

17          So that first element, does a conspiracy exist,

18  should be pretty straightforward.

19          The second element is really –– or the second issue

20  is really the issue, the central issue in this case.  And

21  that's whether or not the defendant knowingly participated in

22  this conspiracy.  And, again, you're going to hear from these

23  cooperating witnesses and they're going to testify about

24  their direct participation in this conspiracy and how they

25  interacted with the defendant during the conspiracy.

50

US V. Peters – 13–CR–316

1    But I want to talk first about what you're not

2  going to hear.  You're not going to hear these individuals

3  testify that the defendant was physically picking up the

4  marijuana and transporting it when this boat or snowmobile

5  would come to his property.  He was not unloading the

6  marijuana and loading it into a vehicle.  He was not one of

7  the curriers that transported the marijuana across the

8  border.  You're not going to hear that he was the source of

9  supply of the marijuana.  You're not going to hear that he

10  directed where the marijuana was supposed to go.

11    What you are going to hear is that the defendant

12  had access and control over this property, that he controlled

13  this gateway for this organization.  You're going to hear all

14  of the witnesses testify that they picked up loads of

15  marijuana from this property on dozens and dozens of

16  occasions over a period of years.  You're going to hear them

17  testify that the organization coordinated directly with the

18  defendant each time a load came into the United States.

19    You're going to hear evidence that the defendant

20  exchanged drug proceeds from Canadian currency into United

21  States currency.  You're going to hear from Cheryl Lobdell

22  and she's going to testify that the defendant paid her

23  directly for transporting marijuana on several occasions.

24  You're going to hear from Alain Forget and he's going to

25  testify that the defendant acted as a scout for load

51

US V. Peters - 13-CR-316

1  vehicles, meaning that he would drive ahead of the load

2  vehicle to make sure there was no law enforcement in the

3  area.

4          So you're going to hear this evidence about what

5  the defendant did in this conspiracy from people that

6  actually interacted with him while the conspiracy was going

7  on.

8          But I also want to caution you:  When you're

9  listening to these witnesses, these cooperating defendants,

10 you should look at their testimony more critically than you

11 look at any of the other witnesses in this case because

12 they're cooperating witnesses.  All of these witnesses have

13 an inherent bias.  They all hope to gain something from their

14 testimony.  For example, Corey Spinner pled guilty to an

15 offense, conspiracy to distribute drugs and he's awaiting

16 sentencing.  So he's hoping, by cooperating with the

17 government, part of which is going to be testifying in this

18 trial, that he'll receive a lesser sentence.  And the other

19 witnesses are similarly situated.

20         You're going to hear that Alain Forget cooperated

21 from the time of his arrest in September of 2010.  You're

22 also going to hear that just a couple of weeks ago, Mr.

23 Forget was arrested for selling a handgun and violated his

24 presentence release conditions.  So he was out on bail and

25 the Court told him not to commit another crime and he did.

52

US V. Peters – 13–CR–316

1    And he has been told by the U.S. Attorney's Office that he is

2    not going to receive any benefit for his testimony.  But he

3    still hopes to receive some benefit from his testimony.  He

4    still hopes to receive a lesser sentence.

5            So all these witnesses have this inherent bias and

6    when you're listening to their testimony, you should look at

7    their testimony more skeptically than you would at any of the

8    other witnesses.  But you also don't have to look at their

9    testimony in a vacuum.  There's going to be other evidence

10   presented in this case that will help corroborate what these

11   witnesses are telling you.

12           For example, you're not going to hear just from one

13   cooperating witness.  You're going to hear from three.  So

14   listen to their testimony.  Is one individual's testimony

15   consistent with another?  Do they describe this conspiracy in

16   a similar way, in a consistent manner?  If they were involved

17   in the same event, do they describe those events in a similar

18   manner?

19           You're also going to hear some other evidence.  For

20   example, you're going to hear that the vehicle that Cheryl

21   Lobdell was driving when she was caught in 2009, a 2004 Chevy

22   truck was partially paid for by the defendant with $5,000 in

23   cash and that the vehicle was ultimately put in Cheryl

24   Lobdell's name.

25           You're going to hear testimony that on March 25th,

JA-88

53

US V. Peters – 13-CR-316

1   2011, Alain Forget, now working for the DEA, met with the

2   defendant and they had a conversation in Forget's vehicle and

3   that this conversation was recorded.  And you're going to be

4   able to hear this conversation.  So you're going to be able

5   to hear the defendant in his own voice talking about this

6   conspiracy.  You're going to hear him say things like

7   "everyone is done at my mother's".  You're going to hear him

8   talk about how people are using his property without his

9   knowledge –– or without paying him and he's upset about it.

10  You're going to hear him say, "if I'm not getting paid, then

11  nobody's going to use the property".  So there's going to be

12  other evidence you're going to be able to look to determine

13  whether or not these cooperating witnesses are testifying

14  credibly.

15          And at the close of the evidence –– I'm sorry, the

16  last issue, the issue of weight, sorry.

17          If you determine that the defendant knowingly

18  participated in this conspiracy, you're going to have to make

19  a determination about how much marijuana he is accountable

20  for.  And the test is, as the judge is going to instruct you,

21  what was reasonably foreseeable to him.  So the defendant

22  doesn't actually have to have picked up each bag of

23  marijuana.  But, if it was reasonably foreseeable to him that

24  marijuana loads were being sent through his property and that

25  he knew about the scope of this conspiracy, then he's

54

US V. Peters – 13-CR-316

1   accountable for that weight.  And the government has charged

2   this conspiracy involved more than 1,000 kilograms of

3   marijuana.  So, as you're listening to the testimony, listen

4   to when the witnesses are talking about weight, they're

5   talking about how much marijuana they moved, and you have to

6   do a little math -- it's hard for lawyers -- but you have to

7   do a little math to make that determination.

8          And at the close of evidence, ladies and gentlemen,

9   the government will prove beyond a reasonable doubt that the

10   defendant facilitated the flow of thousands of kilograms of

11   marijuana through his mother's property, that this

12   organization was coordinating its smuggling efforts through

13   the defendant and this property, and that the defendant was

14   getting paid for his participation in this conspiracy.  And

15   at the close of evidence the government will ask you return a

16   verdict of guilty on the sole count in the indictment.

17          Thank you.

18          THE COURT:  Thank you, Mr. Gardner.

19          Mr. Sacco, do you choose to make an opening

20   statement?

21          MR. SACCO:  Yes, I do, your Honor.  Thank you.

22          THE COURT:  Go ahead.

23          MR. SACCO:  Good afternoon, ladies and gentlemen.

24          Mr. Gardner correctly identified to you a minute

25   ago one of the most significant parts of this case.  That is

55

US V. Peters – 13-CR-316

1   that he is going to ask you, at the close of proof, and he's

2   going to tell you the evidence shows guilt but that evidence

3   is based on the testimony of principally four witnesses.  And

4   each one of those four witnesses will sit right in the chair

5   and the judge will describe to you what that means when you

6   sit in the witness chair, that you should be scrutinized.

7   And when you scrutinize these witnesses, you will see that

8   there is a conspiracy.  There is a conspiracy in this case,

9   okay.  But it is amongst three of those witnesses.  They're

10   friends.  They have -- the proof will show that they've had

11   long-time drug dealing relationships together, that they had

12   interaction, that they would ride in the same car together.

13   It will clearly outline that they were working together.

14          Now, for a certain period of time, each of these

15   individuals was released after they were arrested.

16          Mr. Forget, the evidence will show, was arrested

17   back in 2010.  He was signed up by the Drug Enforcement

18   Administration or the border patrol and he was at large

19   during this time.  And he had a job to do.  I don't know -- I

20   don't think he was getting paid.  He was -- his currency that

21   he was interested in was not going to prison for 10 or 20

22   years.  So he had incentive to work during that time.

23          But he was at large, you know, he was going around

24   selling drugs, selling the gun, as you heard from the

25   prosecutor.  But so were the other witnesses that you're

56

US V. Peters – 13-CR-316

1   going to hear from.  They're out.  They're not in jails.

2   They have access to each other they're out.

3           In fact, Alain Forget was out, you know, out free,

4   that is, until December 27th, 2013, which is about three

5   weeks ago.  Now, he will come in here and he will tell you

6   that the government has rescinded their agreement.  So he's

7   not going to receive any benefit -- Mr. Gardner just told

8   you -- but he's hoping to receive a benefit.  So, in other

9   words, the proof will show that you Mr. Forget is coming in

10  here in an attempt to manipulate in favor of himself or he

11  has no -- he's not getting anything from testifying, the

12  proof will show.  At the end of the proof you will ask

13  yourself what that shows.

14          Now, the drug enforcement agents and other

15  government agents, including the tribal police, will also

16  testify and they'll tell you -- and you'll look at maps.

17  You'll see exactly what we're talking about.  And you will

18  learn that the border is porous between these two

19  reservations, that there's a river there, there are many

20  routes across the border and there is a lot of activity going

21  on there.  It's not just Alain Forget and Cheryl Lobdell.

22  Those are the government witnesses that are running drugs and

23  doing things across there.  There's an incredible amount of

24  activity that goes on up there and things happen when there's

25  money at stake that my client can't control; that the United

57

US V. Peters – 13–CR–316

1   States government can't control and drugs are moving back and
2   forth across that border.  Marijuana in particular is moving
3   back and forth at a rapid rate.  Whatever the path of least
4   resistance is, the proof will show, is the way that drug
5   smugglers move drugs across.
6           But Mr. Peters, the proof will show, okay, didn't
7   live at that residence.  The proof will show he wasn't there
8   when all this was going on.  Instead, the government will
9   rely on three or four desperate people who have made a career
10  of manipulating border police officers and other people, have
11  made it their career to do that and they will present them to
12  you.  And I'm telling you that the proof will show that they
13  are here strictly for their own benefit.  They will take
14  possibly a kernel of truth and they will wrap it with
15  whatever benefits them and they will try and feed it to you.
16          So when the proof finally does close, I'll stand
17  back up here again and I will go in detail after we hear what
18  comes out of their mouths and argue to you that my client,
19  Allan Peters, is not guilty, that this proof that they bring
20  before you is not proof of guilt of Mr. Peters and that he
21  didn't move thousands of pounds of marijuana across the
22  United States border -- thousands of kilograms, I'm sorry.
23  And that the real guilty parties will be in this room but
24  they won't be sitting next to me.  They will be sitting up
25  next to the judge and talking to you.  That's what the proof

58

US V. Peters – 13–CR–316

1   will show in this case.

2           So I ask that you listen, that you remember that

3   this –– every single criminal case is driven the same way, is

4   driven by facts and the rule of laws.  The facts will come

5   out through the witnesses and maybe some photographs and some

6   other things and the Judge will give you the law and he will

7   ask you to take those facts and apply them to the standards

8   he gives you (indicating).  And when you do that, the

9   standards of the proof that the people must bring and the

10  standards of how to judge credibility, when you do that, you

11  will find that Allan Peters, okay, cannot be guilty by

12  association.  Guilty because he had lived on the reservation

13  or guilty because his mother lives on a river that's one of

14  the highest drug trafficking areas in the United States.  It

15  has to be more than that.  And you'll find that these three,

16  maybe even four, witnesses, if they all testify, are

17  conveniently picking kernels of truth and trying to feed them

18  to you.

19          So, I ask that you listen and that you do your

20  duties as jurors and listen to all the testimony and when

21  this is done, I'll stand up here, I'll ask you to find my

22  client not guilty.  I'll ask you to find him not guilty not

23  just because I'm saying it, not like the witnesses.  I'll ask

24  you because when you look at the proof and you look at the

25  law, you'll come to that conclusion.  Thank you.

59

US V. Peters – 13–CR–316

1          THE COURT:  Thank you, Mr. Sacco.

2          Mr. Gardner, if you're prepared, please call your.

3          MR. GARDNER:  Yes, your Honor, the government calls

4   Corey Spinner.

5

6                    COREY SPINNER, called as a witness and

7   being duly sworn, testifies as follows:

8   DIRECT EXAMINATION BY MR. GARDNER:

9          Q     Good afternoon.  Can you please state your

10  full name.

11         A     Corey Spinner.

12         Q     And, Mr. Spinner, how old are you?

13         A     30.

14         Q     And without giving me the address, where do

15  you currently reside, the city and state?

16         A     Malone, New York.

17         Q     Can you take that microphone and just move it

18  to you and speak directly into it.

19         A     Yeah.

20         Q     Are you currently employed?

21         A     Yes.

22         Q     And where are you employed?

23         A     I'm self-employed and I also work at a

24  dealership in Malone.

25         Q     What do you do?

JA-95

60

Spinner – Direct – Gardner

1          A     For my personal business or?

2          Q     Both?

3          A     By personal business I do window tinting,

4     remote starter, stuff like that and for the other business,

5     I'm in sales.

6          Q     What's your educational background?

7          A     High school.

8          Q     Do you have any history of drug or alcohol

9     abuse?

10         A     No.

11         Q     Mr. Spinner, have you pled guilty to an

12    offense against the United States?

13         A     Yes.

14         Q     And, briefly -- we'll get into it more in a

15    minute -- but what did do you?

16         A     Transported marijuana across the border.

17         Q     And what crime did you plead guilty to, if you

18    remember?

19         A     A hundred kilos conspiracy to -- conspiracy to

20    transport and distribute.

21         Q     And have you been sentenced yet?

22         A     No.

23         Q     Do you know what the maximum potential term of

24    imprisonment is?

25         A     I think it's 20, 30 years, something like

61

Spinner – Direct – Gardner

1    that.

2              Q    Is it a mandatory minimum sentence of 5 years

3    and a maximum of 40?

4              A    Yes.

5              Q    Did you enter into a plea agreement with the

6    United States?

7              A    Um.

8              Q    When you pled guilty, did you enter into a

9    plea?

10             A    Yes.

11             Q    Did you also enter into a cooperation

12   agreement with the United States?

13             A    Yes.

14             Q    Do you have any understanding of what that

15   cooperation agreement means?

16             A    Yes, I do.

17             Q    What is it?

18             A    Basically you just tell the truth, what

19   happened, what I did.

20             MR. GARDNER:  Your Honor, may I approach the

21   witness?

22             THE COURT:  You may.

23             MR. GARDNER:  Your Honor, I'm showing the witness

24   what's been marked as Government Exhibit 26 for

25   identification.

62

Spinner – Direct – Gardner

1      Q      Mr. Spinner, do you recognize that exhibit?

2      A      Yes.

3      Q      What is it?

4      A      That's the cooperation agreement that I agreed

5  to.

6      Q      Can you turn to the last page, please?

7      A      (Witness complies.)

8      Q      Did you sign that document?

9      A      Yes.

10     Q      And who else signed it?

11     A      You did and my lawyer did.

12     Q      I'll go ahead and retrieve that document.

13            Mr. Spinner, what do you hope to gain from

14  your cooperation?

15     A      Obviously a reduction in my sentence.

16     Q      Do you know how the procedure works at

17  sentencing?

18     A      No.

19     Q      Is it fair to say you hope to receive a

20  recommendation from the government recommending to the judge

21  that you receive a lesser sentence?

22     A      Yes.

23     Q      What is your understanding about whether the

24  outcome of this trial will have any effect on whether you

25  receive that recommendation?

63

Spinner - Direct - Gardner

1          A     It will have no effect.

2          Q     What did you do to prepare for your testimony

3    here today?

4          A     Just went over some questions with you.

5          Q     Did you meet with me on more than one

6    occasion?

7          A     Yes.

8          Q     Did you review any prior testimony you had?

9          A     Yes.

10         Q     Mr. Spinner, is it fair to say that at some

11   point you became involved in smuggling marijuana?

12         A     Yes.

13         Q     Approximately when was that?

14         A     I was first approached back in 2009.

15         Q     And who approached you?

16         A     "Alan" Forget.

17         Q     Who is "Alan" Forget?

18         A     I met him through a girl that I graduated

19   with, so mutual friend.

20         MR. GARDNER:  Your Honor, I'm approaching the

21   witness and showing him what's been marked as Government

22   Exhibit 21 for identification.

23         THE COURT:  Okay.

24         Q     Mr. Spinner, do you recognize that exhibit?

25         A     Yes.

64

Spinner – Direct – Gardner

1      Q    What is it?

2      A    That's "Alan".

3      Q    Is it a photograph of "Alan" Forget?

4      A    Yes.

5      Q    Does it accurately depict Mr. Forget?

6      A    Yes.

7           MR. GARDNER:  Your Honor, the government would move

8    into evidence Government Exhibit 21.

9           THE COURT:  Any objection?

10          MR. SACCO:  No objection, your Honor.

11          THE COURT:  Exhibit 21 will be received.

12          MR. GARDNER:  Your Honor, we'll go ahead and just

13   briefly publish that for the jury.

14          THE COURT:  Certainly.

15     Q    So you said Mr. Forget approached you at some

16   point, is that right?

17     A    Yes.

18     Q    Can you describe for the jury the context of

19   that situation?

20     A    He had just approached me, asked me -- told

21   me, you know, what he was doing, that he was bringing

22   marijuana across the border, that he was going to need a

23   transporter from the border to his house and, also, he was

24   going to need drivers from his house to wherever it was

25   going.  I told him that I would be interested in taking it

65

Spinner – Direct – Gardner

1   from across the border to his house.

2           Q     But no further?

3           A     No.

4           Q     Why not?

5           A     Just long-distance travel just wasn't

6   something I wanted to do.

7           Q     Is this something you agreed to right away or

8   did you think about it?

9           A     No, he just approached me about it.  I thought

10  about it for a while.

11          Q     I think I asked you but what was the time

12  frame?

13          A     It was right around summer -- I want to say

14  summer, maybe early fall '09.

15          Q     Of 2009?

16          A     '09, yep.

17          Q     After you agreed to do this with Mr. Forget,

18  what was the next step?

19          A     He set up a meeting to meet the guys that were

20  going to be bringing it across.

21          Q     Did that meeting take place?

22          A     Yes.

23          Q     Where did it take place?

24          A     It took place on the Canadian side of the

25  reservation.

JA-101

66

Spinner – Direct – Gardner

1    Q    Now you said you were from Malone, New York,
2  is that right?
3         A    Yes.
4         Q    About how far from Malone is the reservation?
5         A    Probably about a half hour, 40 minutes.
6         Q    What reservation are you talking about
7  specifically?
8         A    The Mohawk –– Akwasasne Mohawk Saint Regis.
9         MR. GARDNER:  Your Honor, I'm showing the witness
10 what's been marked as Government Exhibit 3 for
11 identification.
12        Q    Mr. Spinner, do you recognize Government
13 Exhibit 3?
14        A    Yes.
15        Q    What is it?
16        A    It's a picture of the Saint Regis reservation.
17        Q    Is it an aerial photograph?
18        A    Yes.
19        Q    Are you familiar with that area?
20        A    Yes.
21        Q    And how are you familiar with that area?
22        A    Grew up around there.  I've been through there
23 plenty of times.
24        Q    Does it depict the international border, as
25 well?

JA-102

67

Spinner – Direct – Gardner

1    A    Yes.

2    Q    And are you familiar with that?

3    A    Yes.

4    MR. GARDNER:  Your Honor, the government would

5    offer into evidence Government Exhibit 3 for identification

6    into evidence as Government Exhibit 3.

7    THE COURT:  Any objection?

8    MR. SACCO:  No objection, your Honor.

9    THE COURT:  It will be received.

10    Q    So, Mr. Spinner, you said the location of this

11    meeting was on the reservation; is that correct?

12    A    Yes.

13    Q    Mr. Spinner, use that pen --

14    A    Okay.

15    Q    Does Government Exhibit 3 show where that

16    meeting took place?

17    A    Yes, it does.

18    Q    Can you use that pen and go ahead and indicate

19    on the Government Exhibit 3.

20    A    (Witness complies.)

21    Q    Now you pointed right here to the inset.  Is

22    that where the meeting or are you pointing at the inset?

23    A    No, that's where the meeting took place

24    (indicating).

25    Q    Okay.  The inset is pointing to a location

68

Spinner – Direct – Gardner

1  along the road there, just above it, do you understand my --
2  do you understand what I'm asking?
3         A    Yeah, yeah.  That's where the house is at the
4  end of the road but the actual meeting took place back here
5  (indicating).
6         Q    Okay.  I understand.  Can you describe how
7  you -- what route you took to get to this location?
8         A    Yeah, I would have taken Cook Road is right
9  here, followed Cook Road all the way to the River Road, which
10  is right here, and followed the River Road all the way down.
11         Q    All the way down to where?
12         A    To the end right to where I just marked the
13  first time.
14         Q    Did you know how to get to that location
15  during this initial meeting?
16         A    No, the first time, no.
17         Q    How did you get there?
18         A    I followed "Alan".
19         Q    "Alan" Forget?
20         A    Yes.
21         Q    Now, who was at this meeting?
22         A    Initially when I got there, it was just me and
23  "Alan" and then there was two guys that came across from the
24  other side in a boat.
25         Q    Who were those two individuals?

JA-104

69

Spinner – Direct – Gardner

1          A     C-man and I can't remember the name of the
2     second guy at the time.
3          Q     Who is C-man?
4          A     He's the guy that brought the marijuana from
5     the other side of the water.
6          Q     The other side being Canada?
7          A     Canada, yes.
8          MR. GARDNER:  Your Honor, I'm showing the witness
9     what's been marked as Government Exhibit 20 for
10    identification.
11         Q     Mr. Spinner, do you recognize that?
12         A     Yes.
13         Q     Who is that?
14         A     That is C-man.
15         Q     I take it that's a nickname?
16         A     Yes.
17         Q     Did you know his real name?
18         A     Not at that time, no.
19         Q     Does that photograph accurately depict what
20    C-man looks like?
21         A     Yes.
22         Q     Your Honor, the government would move into
23    evidence Government Exhibit 20.
24         THE COURT:  Any objection?
25         MR. SACCO:  No objection.

70

Spinner - Direct - Gardner


1              THE COURT:  Okay.  It will be received.

2              MR. SACCO:  Your Honor, can we have a brief side

3    bar.

4              THE COURT:  You may.

5              (Held at side bar:)

6              MR. SACCO:  Your Honor, I didn't want to just blurt

7    this out for the jury -- but the witness keeps saying "Alan"

8    and my client's name is Allan but he's not referring to my

9    client.

10             THE COURT:  You want him to be specific?

11             MR. SACCO:  Either Alain Forget, which is real his

12   name, or apparently he calls him "Alan" Forget just because

13   it's going to get really confusing.

14             THE COURT:  On the record.

15             MR. GARDNER:  Not a problem.

16             THE COURT:  He just said "Alan".

17             MR. SACCO:  But he keeps saying "Alan".

18             THE COURT:  Going forward, just clarify who he's

19   talking about.

20             MR. SACCO:  Thank you, Judge.

21             (Open court:)

22             MR. GARDNER:  May I proceed, your Honor.

23             THE COURT:  Yes.

24             Q    Mr. Spinner, you were talking about this

25   meeting and that C-man and another individual arrived at this

71
Spinner – Direct – Gardner

1    meeting.

2          A    Yes.

3          Q    How did they arrive?

4          A    By boat.

5          MR. GARDNER:  Your Honor, I'm sorry.

6          THE COURT:  Take your time.

7          (Pause in proceedings.)

8          MR. GARDNER:  Your Honor, I'm showing what's been

9    marked as Government Exhibit 4 for identification to the

10   witness.

11         Q    Mr. Spinner, do you recognize that?

12         A    Yes, I do.

13         Q    And what is it?

14         A    That's the area where we pick up and drop off.

15         Q    And is it the area that we're talking about

16   right now the location of this meeting?

17         A    Yes.

18         Q    And does it accurately depict that location?

19         A    Yes.

20         MR. GARDNER:  Your Honor, the government moves into

21   evidence Government Exhibit 4.

22         THE COURT:  And when –– if you could just elaborate

23   for the record, when you say you pick up and drop off, where

24   is that specific location?

25         THE WITNESS:  It's not here.  It's down here

JA-107

72

Spinner – Direct – Gardner

1    (indicating).

2         Q    Mr Spinner, can you describe specifically what

3    you're talking about when you're pointing at the exhibit.

4         A    Yeah, it's the inlet right before the -- it's

5    not all the way to the house where the square is.  It's

6    before there.  It's the inlet before there.

7              THE COURT:  This inlet or this waterway, is it --

8              THE WITNESS:  Yes.

9              THE COURT:  Is an area that was used to drop off

10   and pick up the marijuana?

11             THE WITNESS:  Yes.

12             THE COURT:  And that's located where, on the

13   Akwasasne Indian reservation?

14             THE WITNESS:  Yes, on the Canadian side, yes.

15             THE COURT:  That's what I was trying to get at.

16             MR. GARDNER:  Sorry, sir.

17             THE COURT:  You know, not specifically where on the

18   map.

19             Go ahead.

20             MR. GARDNER:  Your Honor, the government moves into

21   evidence Government Exhibit 4.

22             THE COURT:  Any objection?

23             MR. SACCO:  No objection, your Honor.

24             THE COURT:  It will be received.

25             Q    Maybe this will make it a little bit easier.

Spinner - Direct - Gardner

1           Mr. Spinner, can you indicate on Government

2   Exhibit 4 where this meeting took place?

3           A    (Witness marking exhibit.)

4           Q    And you indicated that C-man and the other

5   individual arrived by boat; is that correct?

6           A    Yes.

7           Q    And did they arrive at that location?

8           A    Yes.

9           Q    Let's talk about the meeting itself.  What

10  happened during the meeting?

11          A    I was introduced to C-man and the other guy

12  that was with him, not a whole lot was really talked about,

13  other than my role -- what my role in it would be to

14  transport marijuana from that location to "Alan"'s house.

15          Q    And when you say "Alan", do you mean --

16          A    "Alan" Forget.

17          Q    Forget?

18          A    Yes.

19          Q    And does "Alan" Forget go by another name?

20          A    That's all I've ever known him as is "Alan".

21          Q    Have you ever known him as Alain Forget?

22          A    I've heard that.  Like that's the Canadian --

23  if he was in Canada, that's how they would say it over there,

24  yes.

25          Q    So please continue.  So you were talking about

74

Spinner – Direct – Gardner

1    the meeting.

2            A    Yes, like I said, it was just a brief

3    introduction, and then a guy pulled up in a pickup truck.

4    They told me he was The Big Guy, that it was his property

5    that we'd be using and it was just a brief introduction to

6    him.

7            Q    Who was that individual?

8            A    It was the defendant.

9            Q    The defendant in the courtroom right now?

10           A    Yes.

11           Q    And you said that he was introduced as The Big

12   Guy?

13           A    Yes.

14           Q    And who called him that?

15           A    "Alan" and C-man.

16           Q    Mr. Forget and C-man?

17           A    Yes.

18           Q    Did the defendant say anything during this

19   meeting?

20           A    No.

21           Q    I think you touched on it a little bit but at

22   that point, what was your understanding of the defendant's

23   role in this organization, if any?

24           A    At that time I didn't know anything, other

25   than it was his property.

JA-110

75
Spinner – Direct – Gardner

1    Q    Was it described to you as his property?

2    A    Yes.

3    Q    And who described it to you that way?

4    A    It would have been "Alan".

5    Q    Forget?

6    A    Forget.

7    MR. GARDNER:  Your Honor, I'm showing the witness

8  Government Exhibit 19 for identification.

9    Q    Mr. Spinner, do you recognize that exhibit?

10   A    Yes.

11   Q    What is that?

12   A    That's The Big Guy.

13   Q    Is that a photograph of The Big Guy?

14   A    Yes.

15   Q    Does it accurately depict him?

16   A    Yes.

17   MR. GARDNER:  Your Honor, the government moves into

18  evidence Government Exhibit 19.

19   THE COURT:  Any objection?

20   MR. SACCO:  No objection, your Honor.

21   THE COURT:  For the record, when we say The Big

22  Guy, we're talking about the defendant Allan Peters, is that

23  right?

24   THE WITNESS:  Yes, yes.

25   THE COURT:  Okay.

JA-111

76
Spinner – Direct – Gardner

1      Q      After this initial meeting, how long before
2 you began working?
3      A      Initially I just –– what I initially did was
4 just scouted "Alan" out of that location, I did that once or
5 twice, scouting by meaning just going ahead of "Alan" so that
6 he knew it was safe to leave that location.
7      Q      All right.  And about how long after the
8 initial meeting did you do that?
9      A      Um.
10      Q      Was it weeks, months?
11      A      I would say a few weeks to maybe a month.  I'm
12 not a hundred percent sure on the time frame.
13      Q      You said you only did that a couple of times?
14      A      Yes.
15      Q      And where did you scout from, from what place
16 to what place?
17      A      Just from The Big Guy's property to "Alan"'s
18 house.
19      Q      And where was "Alan"'s house?
20      A      It's in Malone on the Fayette Road.
21      Q      Were you scouting for someone who was
22 transporting marijuana?
23      A      Yes, he was transporting at that time.
24      Q      Who?
25      A      "Alan" Forget.

JA-112

77
Spinner – Direct – Gardner

1      Q     And at some point did you start transporting

2   loads of marijuana yourself?

3      A     Yes.

4      Q     Approximately when was that?

5      A     Over that winter I think it only happened a

6   couple of times –– that would have been the winter of '09 ––

7   and then it didn't really start happening regularly until

8   spring or summer of 2010.

9      Q     And how frequently would you pick up a load of

10  marijuana?

11     A     Anywhere's from once a month to maybe a couple

12  times a week.

13     Q     And how much marijuana were you picking up at

14  a time?

15     A     By myself, a hundred –– hundred pounds.

16     Q     Can you approximate how many times you picked

17  up marijuana?

18     A     Probably around 15 or so.

19     Q     And at some point did you stop working for

20  this organization?

21     A     At the time that "Alan" got chased from the

22  reservation, yes.

23     Q     And when you were picking up marijuana, did

24  you ever pick up from anywhere other than –– did you ever

25  pick up marijuana from anywhere other than this location here

78
Spinner – Direct – Gardner

1    on Government Exhibit 4?

2              A    No.

3              Q    Was there a lot of variation between the

4    trips, your 15 or so trips?

5              A    No.

6              Q    Were they pretty similar?

7              A    Yes.

8              Q    I'd like to talk a little bit about what a

9    typical trip was like.  How would you know when a load of

10   marijuana was ready for you to pick it up?

11             A    I get a text message or a –– via text message

12   or in person from "Alan" Forget.

13             Q    What would Forget say?

14             A    He would say something like you ready for

15   lunch tomorrow or you ready for dinner tomorrow, breakfast,

16   stuff like that.

17             Q    What did that mean to you?

18             A    That I would have to pick up and meet him at

19   this location.

20             Q    Meet Forget at the location?

21             A    Yes.

22             Q    On Government Exhibit 4?

23             A    Yes.

24             Q    Did he have to tell you that you needed to go

25   to this location?

JA-114

79

Spinner – Direct – Gardner

1          A     No.

2          Q     And what would happen -- now you mentioned

3   that Forget would say lunch tomorrow or did you say breakfast

4   tomorrow?

5          A     No, he said like, you want to do breakfast

6   tomorrow or do you want to do lunch tomorrow, dinner, that

7   type of thing and then he would give me a time.

8          Q     An exact time?

9          A     Yes.

10          Q     Did the lunch, breakfast, dinner thing mean

11   anything?

12          A     Yeah, that just meant that a load was ready to

13   be picked up at that time.

14          Q     Morning, mid day, evening, is that what you

15   mean?

16          A     Yeah, yeah, whatever time -- whatever time it

17   was.

18          Q     All right.  So, once you had a time and a day,

19   what would you do?

20          A     I would usually go down early.  I would drive

21   down there.  Sometimes I was by myself, sometimes "Alan"

22   would be down there or "Alan" would meet me down there.

23   Sometimes I did go by myself.

24          Q     When you say down there, what do you mean?

25          A     The Big Guy's property.

JA-115

Spinner – Direct – Gardner

1          Q     And was "Alan" Forget always there?

2          A     No.

3          Q     What would happen once you arrived at the

4    defendant's property?

5          A     Like I said, usually I went down early.  If

6    nobody was there -- sometimes there would be nobody there

7    when I would get down there.  Sometimes C-man would be there

8    waiting.  If he wasn't there, then I would just sit there and

9    wait for him.

10         Q     How would C-man get there?

11         A     If it was in the summertime, it would have

12   been by boat.  Wintertime, it would have been by sled.

13         Q     And was C-man usually traveling by himself or

14   with someone?

15         A     He was traveling with someone.

16         Q     Did you know who he was traveling with?

17         A     For the most part it was a guy called X-man.

18         Q     Was that your name for him?

19         A     No, that's just what "Alan" introduced him as

20   or even C-man introduced him as.

21         Q     Did you ever learn X-man's real name?

22         A     No.

23         Q     And what would happen when X-man and C-man

24   would arrive?

25         A     It was just a short how's it going type of

JA-116

81

Spinner – Direct – Gardner

1    thing and then they would proceed to unload the marijuana out

2    of the boat or off the sled.

3             Q    I think you said earlier that you would

4    normally transport a hundred pounds?

5             A    Yes.

6             Q    Would X-man or C-man ever bring more than a

7    hundred pounds?

8             A    Yes, sometimes it would be 200.  I would take

9    a hundred and "Alan" would take a hundred.

10            Q    And how much -- let me back up.  What was the

11   marijuana packaged in?

12            A    Hockey bags.

13            Q    Mr. Spinner, if you can do your best to speak

14   up.

15            A    Yeah, that's fine.

16            Q    And how many hockey bags would it take to fill

17   a hundred pounds of marijuana?

18            A    Usually two -- two, maybe two and a half.

19            Q    What type of vehicle were you using at the

20   time?

21            A    I was using my pickup truck.

22            Q    And where would you put the bags of marijuana?

23            A    In the back seat of the pickup truck.

24            Q    And were the bags of marijuana secured in any

25   way?

82
Spinner – Direct – Gardner

1      A    In the beginning, no, they were just zipped
2  up.  Towards the end they were tagged or taped.
3      Q    What do you mean tagged?
4      A    They just had like zip tie, like a zip tie
5  kind of tag to make sure they stayed closed.
6      Q    Like a zip tie on the zippers?
7      A    Yes.
8      Q    Or you said taped?
9      A    Some, yeah, I did see where they were taped
10  sometimes.
11      Q    Like duct taped over the zipper?
12      A    Like taped together, yes.
13      Q    Once you have the marijuana bags loaded into
14  your vehicle, what did you do?
15      A    From there I proceeded to go to "Alan"'s house
16  with them.  "Alan" Forget.
17      Q    Going back to Government Exhibit 3, were there
18  various routes you could take to get from the defendant's
19  property back down into the United States?
20      A    Yes.
21      Q    Can you describe those routes?
22      A    The main route I would take would be mainly to
23  the River Road and then to the Cook Road.
24      Q    Can you use your pen and show the jury what
25  you're talking about?

JA-118

83

Spinner – Direct – Gardner

1           A    Yes.  (Witness drawing on exhibit.)

2           Q    And is this Route 37 here at the bottom?

3           A    Yes.

4           Q    And once you got down to Route 37, where would

5 you go?

6           A    I follow 37 into Bombay and then from Bombay

7 to Malone.

8           Q    Are there other routes that you could take

9 other than just this route?

10          A    Yes, if you wanted to, yes.

11          Q    But this is the main one you took?

12          A    Yes.

13          Q    Now when you crossed the international border

14 here on Cook Road, was there any port-of-entry or any

15 inspection area that you had to go through?

16          A    No.

17          Q    Did you ever get stopped by border patrol in

18 the 15 trips or so that you took?

19          A    No.

20          Q    What would you do with the bags of marijuana

21 once you got to Alain Forget's house?

22          A    I would pull around the back of his garage and

23 either place them in the garage or to the lean-to to the side

24 of the garage.

25          Q    Why did you put it there?

JA-119

84

Spinner – Direct – Gardner

1    A  That's where he instructed me to put it.

2    Q  Forget?

3    A  Yes.

4    Q  Forget, excuse me.  Do you know what happened

5 to the marijuana from there?

6    A  I did know it was going out of state but I

7 never -- I was never told where.

8    Q  Did you ever transport the marijuana from

9 Forget's house?

10    A  No.

11    Q  Who told you the marijuana was going out of

12 state?

13    A  That would be Forget, "Alan".

14    Q  Do you know if Forget was transporting the

15 marijuana out of state or if there was other individuals

16 involved?

17    A  I know he did it sometimes and then sometimes

18 he had other people do it for him.

19    Q  Is that from conversations you had with

20 Forget?

21    A  Yes.

22    Q  Did he indicate who these other people were?

23    A  He did tell me his neighbor was one helping

24 him and there was two other individuals that he told me were

25 doing it for him.

JA-120

85

Spinner – Direct – Gardner

1    Q    Did he ever mention those names?

2    A    Yes, one would have been Bill Lamaca

3 (phonetic) and the other one would have been Craig Flurry.

4    Q    Now, other than transporting the loads of

5 marijuana from the defendant's property to Forget's property,

6 did you do anything else for this organization?

7    A    Yes, sometimes the next day when the load

8 would leave "Alan"'s house, I would go down as far as the

9 checkpoint on Interstate 87.

10    Q    Why would you do that?

11    A    Just to make sure there was no roadblocks or

12 anything like that that the drivers would have to go through.

13    Q    So were you scouting like you were discussing

14 before?

15    A    Yes.

16    Q    We didn't talk about it a whole lot.  Can you

17 describe in a little more detail what the role of a scout is?

18    A    Yeah, I didn't necessarily leave from "Alan"'s

19 house, so I never knew who was driving it.  I would just

20 leave from my house.  I would tell "Alan" what time I was

21 leaving.  Usually he gave me a time to leave.  I just let him

22 know I'm leaving my house now and it was basically just to,

23 like I said before, just to check any roadblocks or anything

24 they would have to watch out for, any law enforcement, things

25 like that.

JA-121

86

Spinner – Direct – Gardner

1      Q      How many times do you think you scouted for a
2  load?
3      A      As many times as I picked up, so around 15
4  or so.
5      Q      Did you ever scout for a load that you hadn't
6  driven down to Forget's house?
7      A      No.
8      Q      I'd like to back up just for a second.  When
9  you were picking up the loads at the defendant's residence,
10 was the defendant ever present?
11     A      No.
12     Q      Was he ever there at all?
13     A      No.
14     Q      You never saw him at the property?
15     A      Maybe in passing or something like that while
16 I was waiting but other than that, I --
17     Q      So you would never talk to him directly?
18     A      No.
19     Q      Did you ever talk to either Colin -- or,
20 excuse me, C-man or Forget about the defendant?
21     A      Just once in a while they would say, we got a
22 load going out next week or in a few days, we just got to
23 check with The Big Guy to make sure it's okay.
24     Q      Do you know why they needed to check with the
25 defendant?

JA-122

87

Spinner – Direct – Gardner


1            A     I'm assuming --

2            MR. SACCO:  Objection, speculation.  He said he's

3   assuming.

4            THE COURT:  Sustained.

5            If he knows, but we can't have him assuming

6   anything.

7            MR. GARDNER:  Understood, your Honor.

8            Q     Now, were you paid for your participation in

9   this -- for your participation in this organization?

10           A     Yes.

11           Q     And who paid you?

12           A     "Alan".

13           Q     Forget?

14           A     Forget.

15           Q     How much would you get paid?

16           A     A thousand to go from the reservation to his

17  house.

18           Q     To whose house?

19           A     "Alan"'s house, Forget's house.

20           Q     And you mentioned that you also scouted

21  sometimes from Forget's house to 87?

22           A     Yes.

23           Q     How much did you get paid for that?

24           A     The same, a thousand.

25           Q     So you could make $2,000 in a trip?

JA-123

88
Spinner – Direct – Gardner

1      A    Yes.

2      Q    Do you know if Forget was being paid for his

3  participation in this organization?

4      A    Yes.

5      Q    And how do you know that?

6      A    Because I know for a fact he wouldn't be doing

7  it for free and he never discussed how much he was getting

8  paid but I know he was.

9      Q    How?

10      A    Because he told me, in conversation.

11      Q    Did he tell you who was paying him?

12      A    He didn't particularly say who was paying him

13  but he would get his money from C-man.

14      Q    Now, did you ever pick up money or transport

15  money?

16      A    There was one instance where C-man had me take

17  a package.  I was never told what was in it.  It looked like

18  it might have been money but I don't know for sure.

19      Q    Where did you pick that up from?

20      A    From, from The Big Guy's property when I

21  picked up a load.

22      Q    Who did you deliver that package to?

23      A    "Alan" Forget.

24      Q    Mr. Spinner, looking at Government Exhibit 4,

25  do you see the two buildings encompassed within that black

89
Spinner – Direct – Gardner

1   box?

2              A    Yes.

3              Q    Did you ever go to either of those two

4   buildings?

5              A    I only went to the garage one time.  Usually

6   when I picked up a load, I would ask "Alan" if he needed me

7   to scout the next day or not, he would let me know.  One day

8   I forgot to ask him.  He didn't pick up a load that day.  He

9   was just down there, and --

10             Q    Who Forget?

11             A    Forget, yes.  He was just down there with me.

12  He didn't pick up a load that day.  When we both proceeded to

13  leave, he took a left and went up to this property and then I

14  obviously was going to go to his house -- to Forget's house

15  with the load.  So I just shot up there real quick to ask him

16  if he wanted me to scout the next day or not.  So I went

17  into -- went up to where his truck was parked in front of the

18  garage and just asked him that question.

19             Q    Which of these buildings is the garage?

20             A    It would be the one on the left.

21             THE COURT:  And to be clear for the record, he's

22  indicating on Government's Exhibit C the aerial photograph,

23  is that what we're talking about?

24             MR. GARDNER:  This is Government Exhibit 4.

25             THE COURT:  4?

JA-125

90

Spinner – Direct – Gardner

1          MR. GARDNER:  Yes, your Honor.

2          THE COURT:  Where he previously marked the route

3    that he took across the border, that was on Government

4    Exhibit what?

5          MR. GARDNER:  3, your Honor.

6          THE COURT:  Government Exhibit 3, just so it's

7    clear.

8          MR. GARDNER:  Yes, sir.

9          THE COURT:  Go ahead.

10         Q    Can you describe what you saw when you went

11   into this garage?

12         A    I just peeked my head in very quick.  It was

13   very brief.  The Big Guy and "Alan" were in there.  I could

14   see them counting money but that's all I saw.

15         Q    Did you talk to either one of them?

16         A    I just asked "Alan", I said, do you want me to

17   scout tomorrow, and he said yes and that was it and I left.

18         Q    Was there any problem with you going into that

19   building, into that garage?

20         A    No.

21         Q    Did you ever talk to Forget about what they

22   were doing, counting the money?

23         A    No.

24         Q    Did Forget ever talk to you about him being

25   involved with money or anything along those lines?

91

Spinner – Direct – Gardner

1    A    The only thing he ever did say about The Big
2    Guy and money, that sometimes he would need Canadian money
3    exchanged to American and that sometimes he would have him do
4    it for him.
5    Q    Did Forget explain why the defendant would
6    exchange Canadian money into U.S. money?
7    A    No.
8    Q    Mr. Spinner, are you aware of whether Forget
9    was ever involved in a chase with law enforcement?
10    A    Yes.
11    Q    And how are you aware of that?
12    A    On the day it happened, I got a phone call --
13    I believe it was from my sister.  She had let me know that he
14    was in a high speed chase from the reservation.
15    Q    Did you ever talk to Forget about it?
16    A    Yes, about a week later I went up to his house
17    to speak with him about it.
18    Q    Why did you do that?
19    A    Just to make sure he was okay, just to see
20    what really happened because I hadn't really heard much else
21    about it.
22    Q    Did he explain to you what happened?
23    A    Yes, he said he was leaving the reservation.
24    He got chase -- he got initially pulled over by the Akwasasne
25    police.  He did pull over for a minute and then once they

JA-127

Spinner – Direct – Gardner

1    went to get out of vehicle, he said that they chased him off

2    the border.  I was supposed to be there that day to help him

3    pick up a load so I did know he was loaded.  The only reason

4    I did not go that day because it was my birthday.  I had

5    prior engagements.

6          Q    So you were supposed to have transported that

7    load of marijuana?

8          A    I was supposed to have helped him, yes.  He

9    had proceeded to tell me that he got chased by them.  He got

10   far enough ahead of them to where he got rid of the load of

11   marijuana out of his bed of his truck.  He -- he did not tell

12   me where he ditched it.  He just said that he got far enough

13   ahead that he ditched it and then later on they caught up

14   with him.  I think he went off the road or something to that

15   extent.  And then they ended up catching up with him but he

16   did not have the load on him when they caught him.

17         Q    Did you believe him?

18         A    At that time, yes.

19         Q    Did you transport any more loads of marijuana

20   after that incident?

21         A    No.

22         Q    Did you meet with Forget ever after -- after

23   that incident?

24         A    After that, after that -- after he got chased,

25   like I said, it was about a week later when I went and spoke

JA-128

93

Spinner – Direct – Gardner

1    with him and then after that, it was about a month, month and

2    a half when I got the phone call from him saying that he had

3    some good news.  He wanted to talk to me, wanted me to meet

4    him at Wal-Mart in Malone.

5           Q    Did you meet him at Wal-Mart?

6           A    Yes.

7           Q    And what happened when you got to the

8    Wal-Mart?

9           A    I went up early.  I saw some law enforcement

10   agents in the parking lot so I proceeded to leave.  Like I

11   said, it was early from the time that he had told me to be up

12   there.  Then at the time I was supposed to be meeting him

13   there, he was calling me, so I proceeded back to Wal-Mart.

14   He had ran out of gas pulling into Wal-Mart.  So he hopped

15   into my vehicle.  We went down to the store and bought a gas

16   can went and got some gas.  He was really quiet.  Didn't

17   really say too much.  I told him that I saw law enforcement

18   up in the parking lot.  He didn't seem too concerned about

19   it.

20          Q    Where did you and him go?

21          A    Then from there I brought him back to his car,

22   we went and got gas.  So I brought him back to his car and he

23   put gas in his car and he said, oh, just go park at Wal-Mart

24   and we'll go for a ride and I said, no, I'm not parking my

25   vehicle there.

JA-129

94

Spinner – Direct – Gardner

1    Q    Why didn't you want to park your vehicle at

2  Wal-Mart?

3    A    Just because the law enforcement that I saw in

4  the parking lot.

5    Q    Did you set up a new meeting location?

6    A    I told him to meet me down the road at a

7  different location, at a store.  So I had went down there.

8  Well, he put gas in his car, then he met me there.  And when

9  he pulled in, he said just, hop in with me.  We'll go for a

10  ride and go fill his car up with gas.

11        From that point, as soon as I got in his car,

12  we proceeded to go get gas, he just asked me questions like,

13  you ready to work again, you know, I have work for you if you

14  want to work, and I just told him no, that I didn't want any

15  part of it any more after seeing him get chased and all that

16  stuff, that I had just had no interest in doing it.

17    Q    Whose car were you in at this point?

18    A    "Alan"'s.

19    Q    Forget's car?

20    A    Yes.

21    Q    Continue.

22    A    So I headed down to the gas station.  He just

23  asked me if I wanted to work again and I said no.  He said,

24  well, can you do me a favor.  I need money for my lawyer.

25  Will you go down and meet C-man tomorrow at The Big Guy's

JA-130

95

                    Spinner – Direct – Gardner


1    property.  He'll have some money for me for my lawyer.

2              Q      Did he give you a time?

3              A      Yes, he said the next day.  It was either 10

4    or 11.  I can't remember exactly what time it was.  It was

5    one of the two, though.

6              Q      What did you do after you met with Forget that

7    day?

8              A      So we had talked about that.  Then he had

9    brought me back and I just had a really weird feeling come

10   over me once I got out of his vehicle and back in my truck,

11   just like something wasn't right, like maybe he was trying to

12   set me up, something like that.  I just got in the truck.

13   Took off.  I went home that night.  The next morning I woke

14   up and I was supposed to go meet C-man.  I pulled my truck in

15   my garage and found a tracking device on my truck.

16             Q      What do you mean a tracking device?

17             A      A GPS tracking device.

18             Q      How did you know it was GPS tracking device?

19             A      I took it apart and figured it out just by the

20   way it was designed that that's what it was.

21             Q      Where did you find this GPS tracking device?

22             A      Underneath my truck.

23             Q      Was it secured to your truck in some way?

24             A      It was magnetic and it also had a zip tie

25   around it.

96

Spinner – Direct – Gardner

1          Q      What did you do with it?

2          A      I proceeded to take it apart and I went and

3    threw it in the garbage at a local gas station.

4          Q      Did you have an idea of who put it there?

5          A      Obviously the government, but at that time, I

6    had really no clue who.

7          Q      You were supposed to go to the defendant's

8    residence the next day, is that right?

9          A      It was that day that I found it.

10         Q      Did you go to the defendant's residence?

11         A      Yes.

12         Q      And what happened?

13         A      I was supposed to meet C-man down there.  I

14   got down there, waited for about a half hour, 45 minutes.

15   Nobody showed up so I left.

16         Q      Were you supposed to meet back up with Forget?

17         A      Yes, after, I was -- I had went down there, I

18   was supposed to meet him back in my garage.  I didn't go to

19   my garage.  I went straight home after that.

20         Q      Did you ever talk to Forget?

21         A      A little while later he did show up asking me

22   if, you know, I had the money that I was supposed to go down

23   and get.  I said no, that nobody showed up.  I proceeded to

24   tell him about the tracking device.  He didn't really seem

25   too concerned about it.  Asked me if I still had it.  He

97

Spinner - Cross - Sacco

1    wanted to see it.  I told him that I got rid of it and he

2    just kind of seemed upset that I didn't go down and get the

3    money and he left.

4            Q    After that day did you ever go back to the

5    defendant's residence?

6            A    No.

7            Q    Did you ever transport any more marijuana?

8            A    No.

9            MR. GARDNER:  Could I have one moment, your Honor?

10           THE COURT:  You may.

11           (Discussion held off the record.)

12           MR. GARDNER:  No further questions, your Honor.

13           THE COURT:  Okay.  Mr. Sacco, cross-examination.

14           MR. SACCO:  Thank you, Judge.

15   CROSS-EXAMINATION BY MR. SACCO:

16           Q    Good afternoon, Mr. Spinner.

17                Mr. Spinner, you've been arrested, right?

18           A    Yes.

19           Q    And you got charged with a crime?

20           A    Yes.

21           Q    And you're now cooperating with the

22   government, right?

23           A    Yes.

24           Q    When did you get arrested?

25           A    I'm not sure exactly what my arrest date was.

JA-133

98

                    Spinner – Cross – Sacco

1   It would have been I think February 2011 when my actual

2   arrest date was.

3            Q    Was that as a result of this -- it's all in

4   connection with the GPS tracking device or?

5            A    No, just my involvement in the case.

6            Q    Okay.  And who put the GPS tracking device on

7   your car?

8            A    Actually I was never really told who did it.

9            Q    So "Alan" Forget didn't tell you if he did it?

10           A    No.

11           Q    When you took it apart, did it appear it was a

12   law enforcement tracking device or could you not tell?

13           A    I, I figured it was.  Like I said, there was

14   no way I knew for sure.

15           Q    Okay.  Now, when you got arrested, did you

16   turn -- did you go to the police and say I've been involved

17   in a drug trafficking conspiracy, officer, please arrest me

18   or what happened?

19           A    No, shortly -- shortly after I got rid of the

20   GPS, the tracking device, it was about a week or so later I

21   was confronted by the DEA.

22           Q    And you began working for them, right?

23           A    Yes.

24           Q    They gave you a choice, right?

25           A    Yes.

99
Spinner – Cross – Sacco

1        Q    They said we'll arrest you and we can do it

2   the hard way or the easy way, right?

3        A    Yes.

4        Q    And then you signed up, right?

5        A    Yes.

6        Q    Now as part of that, you've been cooperating,

7   right?

8        A    Yes.

9        Q    And this is probably not the only case, is

10  it -- I don't want to know names or anything -- but how many

11  other cases have you cooperated in?

12       A    None.

13       Q    Just this one?

14       A    Yes.

15       Q    Against "Alan" Forget?

16       A    Yes.

17       Q    And against Lobdell?

18       A    Ahh.

19       Q    Cheryl Lobdell, have you ever heard that name?

20       A    I've never heard that name.  I've seen it in

21  my paperwork but I have no idea who she is.

22       Q    All right.  Let's talk about Mr. Forget.

23       A    Yes.

24       Q    How long have you known him?

25       A    I mean, exact time frame, I'm not sure but I

JA-135

100

Spinner – Cross – Sacco

1  have known him for quite a while.  He married a girl that I

2  graduated with.  I went to their wedding.  That was quite a

3  few years ago.

4      Q    So you went to their wedding.  Were you in the

5  wedding or just were invited?

6      A    No, I just went to the wedding.

7      Q    Bring them a gift?

8      A    No.

9      Q    Now, when you went to the wedding, you know,

10  you've answered a lot of questions fairly specifically.  How

11  long ago was the wedding?

12      A    Like I said, I mean, it was a long time -- it

13  was before this, it was years before this.

14      Q    Is it fair to say you went to his wedding ten

15  years ago?

16      A    No, probably was more -- ten years ago would

17  have been -- I would have been 20, so I don't know -- it was

18  probably like six to eight years ago.

19      Q    You knew him before you went to his wedding,

20  right?

21      A    Yes, briefly.

22      Q    You've known him six to eight years, is that a

23  conservative estimate?

24      A    Yes.

25      Q    Now, your relationship with Mr. Forget, what

101

Spinner – Cross – Sacco

1    else, I mean, did you ever live with him?

2          A    No.

3          Q    But you were -- how would you characterize

4    your relationship with him, close personal friend?

5          A    I mean, we were friends.  I wouldn't call him

6    really close friends.  We did go -- we did attend a bike week

7    in Florida once.  Other than that, though, it was just, it

8    was just because of his wife.

9          Q    You knew his wife?

10         A    Yeah, graduated with her.

11         Q    Now, Mr. Forget, did he get -- he got you

12   involved in this whole thing, right?

13         A    Yes.

14         Q    You were then arrested by the police, right?

15         A    Yes.

16         Q    And then you gave the police Mr. Forget's

17   name, right?

18         A    I mean, obviously, I explained my involvement

19   in it, but I don't know if I necessarily gave them their

20   name.  I'm pretty sure they already knew who he was.

21         Q    Do you know if he had been signed up as an

22   informant before you or after you?

23         A    I had assumed that he was, but I -- there was

24   really no way of me knowing I was never told that he was.

25         Q    So obviously at this point Mr. Forget, he

102

Spinner – Cross – Sacco

1    knows you're an informant, you know he's an informant, right?

2          A    Yes.

3          Q    And you've known him for eight years, right?

4          A    Yes.

5          Q    Now, you have been -- ever since you met with

6    the DEA, they turned you loose, right?

7          A    Yes.

8          Q    And the idea was that you can stay -- as long

9    as you work with them, that you can stay free, right?

10         A    Yes.

11         Q    If you don't work with them, then things

12   aren't going to go your way?

13         A    No, they never said that.  They just -- I was

14   on as a confidential informant for a year.  After the year,

15   that's when I was arrested.

16         Q    So, during this year, Mr. Forget was also

17   walking around, right?

18         A    Yes.

19         Q    And you had interaction with him, right?

20         A    It was minimal, but yes.

21         Q    Well, minimal, you had interaction with him?

22         A    Yes.

23         Q    And what type of interaction?

24         A    Just I would see him from time to time, see

25   him in public places, things like that.  I never made it a

103

Spinner – Cross – Sacco

1    point to go hang out with him or go talk to him or anything

2    like that.

3            Q    What discussions did you have that you were

4    both informants?

5            A    He kept calling me a rat saying that I ratted

6    him out, stuff like that.  Other than that, not really much.

7            Q    Did you also call him a rat because he was an

8    informant?

9            A    No, that's -- I don't stoop to that level.

10           Q    But was it clear from your conversations that

11   you both knew you were informants?

12           A    We never had that discussion amongst each

13   other, no.

14           Q    Well, he was calling you a rat, right?

15           A    Yes.

16           Q    He obviously thought you were an informant?

17           A    Yes.

18           Q    And at that point did you know he was doing

19   the same thing?

20           A    I figured he was but, like I said, nobody has

21   actually came out and told me that, yes, he was.

22           Q    You both thought each other were working as

23   informants, is that fair to say?

24           A    Yes.

25           Q    And you had met during this period of time of,

104

Spinner – Cross – Sacco

1  right?

2          A    Yes.

3          Q    When was the last time you met him prior to

4  his arrest in December 27th, 2013?

5          A    Can you repeat the question?

6          Q    You are aware that he was arrested on

7  December 27th, 2013?

8          A    No, I did not know that.

9          Q    You were not aware of that?

10         A    No.

11         Q    When's the last time before walking in this

12 courtroom today that you met with Mr. Forget?

13         A    It's been well over a year.  Last time I saw

14 him it was out in public, like I said.  It was not anything

15 we arranged or anything like that.

16         Q    Where were you out in public?

17         A    It would have been at a local bar.

18         Q    Just any local bar or you remember it?

19         A    Yeah.

20         Q    Where were you?

21         A    Right in Malone at Fat Jake's.

22         Q    Fat Jake's?

23         A    Yes.

24         Q    Is that a place you go regularly?

25         A    No.

JA-140

105

Spinner – Cross – Sacco

1    Q    You don't go there very often?

2    A    No.

3    Q    How many bars are in Malone?

4    A    I don't know.  Probably like three or four.

5    Q    That's the one you met him at, right?

6    A    Yes.

7         THE COURT:  If we could, I don't want to interrupt

8    your cross-examination.  When you met, what do you mean?  I

9    mean, he's saying I saw him, you're saying met.  I'd like to

10   be clear for the record what we're talking about.

11        MR. SACCO:  Thank you.

12        Q    If we can go back to that line of questioning.

13   You were at Fat Jake's in Malone, right?

14        A    Yes.

15        Q    I don't know who said what, but did you meet

16   with Mr. Forget?

17        A    No, I did not meet with him.  I went there by

18   myself and he just happened to be there.

19        Q    And --

20        A    This was well over a year and a half ago.

21        Q    Did you engage with each other?

22        A    He did with me.  He proceeded to try to get my

23   attention.  We did have a little bit of a confrontation, but

24   then it just -- it was that.  We exchanged some words and

25   that was it.

JA-141

106

Spinner – Cross – Sacco

1      Q      I mean, not to be vulgar, I mean, was it
2  anything you can repeat, I mean, what did you say?
3      A      Like I said, he was just going on with calling
4  me a rat, said he had a bullet for me, stuff like that.  I
5  just told him, I said, you got yourself into this, you know,
6  type of thing, it wasn't me that -- where you're at right now
7  is not solely because of me.
8      Q      You have an agreement with the government,
9  right?
10      A      Yes.
11      Q      Mr. Gardner's office and the United States
12  Attorney's Office?
13      A      Yes.
14      Q      This is in addition to your agreement with the
15  DEA, right?
16      A      Yes.
17      Q      So your agreement with Mr. Gardner, I believe
18  he showed you, he had something marked as an exhibit and he
19  showed you a letter and you identified it, right?
20      A      Yes.
21      Q      And that agreement is dated April 10th, 2012,
22  is that true?
23      A      Yes.
24      Q      Now, that agreement essentially outlines that
25  you're going to cooperate with his office, right?

Spinner – Cross – Sacco


1          A    Yes.

2          Q    And in addition to that document, you also

3    signed what's called a plea agreement, correct?

4          A    Yes.

5          Q    All right.  Now, the plea agreement states

6    that you will also cooperate with him, right?

7          A    Yes.

8          Q    And that agreement specifically states that

9    you're facing a minimum of 5 years and a maximum of 40,

10    right?

11          A    Yes.

12          Q    However, if, in the sole discretion of the

13    United States Attorney's Office, you successfully cooperate,

14    you will get what's called a 5K motion, are you familiar with

15    that?

16          A    No.

17          Q    Is it your understanding if you successfully

18    cooperate, as determined by the United States Attorney's

19    Office, that you can get underneath the 5-year minimum

20    sentence?

21          A    There is a possibility of that, yes.

22          Q    And you understand that, right?

23          A    Yes.

24          Q    Is there anyone else that gets to decide

25    whether you successfully cooperate, besides the United States

108

Spinner – Cross – Sacco


1    Attorney's Office, is there any other agency or person?

2         A    No.

3         Q    Just them, right?

4         A    Yeah.

5         Q    So if they tell you you didn't successfully

6    cooperate, you don't get underneath five years, right?

7         A    Correct.

8         Q    And you understand that?

9         A    Yep.

10        Q    And you're also aware that you were charged

11   with having a hundred --

12        A    A hundred kilos.

13        Q    A hundred kilos -- is that 220 pounds?

14        A    Yeah, roughly, yeah.

15        Q    Now, you -- you have just told this jury that

16   you made how many trips?

17        A    Probably around 15.

18        Q    And that's 1500 pounds alone, isn't it?

19        A    Yep.

20        Q    But yet you only pled guilty to having

21   200 pounds, is that fair to say?

22        A    Yes.

23        Q    Now when you first started your direct

24   examination, you went over with Mr. Gardner that you've met

25   with him how many times before your testimony here today?

JA-144

109

Spinner – Cross – Sacco


1          A      Twice.

2          Q      And how many meetings did you have with the

3    DEA regarding your cooperation?

4          A      I've had a few.

5          Q      Quite a few?

6          A      Yeah.

7          Q      And where were the –– I don't need to know

8    where they were, I'll withdraw that, your Honor.

9                 And you read your prior testimony?

10         A      Yes.

11         Q      And you testified in a grand jury, right?

12         A      Yes.

13         Q      Just once or more than once?

14         A      Just once.

15         Q      When did you –– let me go back just a step

16   here.

17                When did you go –– become an agent or work,

18   when did you start working with the government, do you know

19   the day or roughly the day?

20         A      Not the exact day.  I mean, "Alan" got chased

21   mid–September.

22         Q      Of what year, sir?

23         A      Of 2010.

24         Q      Okay.

25         A      Like I said, he contacted me about a month and

JA-145

110

                    Spinner – Cross – Sacco

1    a half after that, so that –– September, October, November.

2    Then –– let's see it would have been –– it was wintertime, it

3    would have been November, December.

4              Q    Of 2010, right?

5              A    Yes.

6              Q    Now you've testified here that you went around

7    and looked into a garage and saw my client at least doing

8    something with money with someone else, right?

9              A    Yes.

10             Q    When was that?

11             A    That would have been around prior to September

12   of 2010.

13             Q    Well, okay, because you were working for the

14   government, you never went back, right?

15             A    Correct.

16             Q    That's easy to say it was sometime before you

17   started working with the government?

18             A    Yes.

19             Q    Because all of what you would have to testify

20   about in this court would have had to have happened before

21   you were working with the government, right?

22             A    Yes.

23             Q    I'm going to ask you again, when, besides

24   prior to your time you started working with the government,

25   when did it happen?

JA-146

```
                                                          111
                    Spinner - Cross - Sacco


 1            A    I don't know an exact day or time.  I just
 2    know it was prior to when "Alan" got caught.
 3            Q    It would have to be prior to that because you
 4    were arrested.  I mean, you were working with the government,
 5    so, of course, it's prior to that, but when?
 6            A    It would have been that summer of 2010.
 7            Q    Just sometime that summer?
 8            A    Yes.
 9            Q    Now, how many times did you look at the
10    photograph before your testimony, you know the photograph you
11    were pointing to?
12            A    Yes.
13            Q    How many times did you look at that?
14            A    I've looked at it a couple times.
15            Q    It was pointed out to you where the houses
16    were and everything on the property, the canal and all that?
17            A    Yes.
18            Q    When you looked at -- when you were pointing
19    to the pictures on the photograph, right, do you recall that
20    there was a pink line that you were putting on it, at least
21    it was on my screen?
22            A    Yes.
23            Q    And you were pointing to where appeared to me
24    like there was some sort of water way you were pointing to,
25    essentially a wooded area?
```

JA-147

Spinner – Cross – Sacco

1          A     Yes.

2          Q     Is that where you were involved in all these

3     things in the wooded area?

4          A     Yes.

5          Q     Was that for cover so no one could see you

6     essentially?

7          A     Yeah.

8          Q     So you could hide in there?

9          A     Yeah.

10         Q     Now, you also have testified about, you know,

11    what you were doing during this period of time, so you are

12    familiar with the roads up there, right?

13         A     Yes.

14         Q     In that area?

15         A     Yes.

16         Q     Along the entire Canadian border?

17         A     Yes.

18         Q     Of the Akwasasne and the Saint Regis, right?

19         A     Yes.

20         Q     Now there's other roads that go across, right?

21         A     Absolutely.

22         Q     There's other drug activity going on in that

23    area, too, isn't there?

24         A     I don't know.  Only from what I'm involved in

25    is what I know about.

JA-148

113

Spinner – Cross – Sacco

1          Q    Where do you live again, Malone?

2          A    Malone.

3          Q    And you were involved with "Alan" Forget,

4    right?

5          A    Yes.

6          Q    He's a good friend of yours, you went to his

7    wedding?

8          A    Yes.

9          Q    All right.  Did you ever see any other

10   activity going on, any other smuggling or boats going with

11   canvas on or anything else going down these rivers, it was

12   just it, this right there?

13         A    That's all I paid attention to.  That's all

14   that I was involved in.

15         Q    I'm not asking if you were involved in

16   anything else.  I'm asking you what else you witnessed.

17         A    When I was down there, that's all I witnessed

18   is what I saw when I was down there.

19         MR. SACCO:  Your Honor, I have no further

20   questions.  Thank you.

21         THE COURT:  Mr. Gardner, anything further for

22   Mr. Spinner?

23         MR. GARDNER:  Can I have just one moment?

24         THE COURT:  Sure.

25         (Discussion held off the record.)

Spinner – Cross – Sacco

1    MR. GARDNER:  No further questions, your Honor.

2    THE COURT:  Okay, sir, you may step down.

3    THE WITNESS:  Thank you.

4    (Witness excused, 4:25 p.m.)

5    MR. GARDNER:  Your Honor, the government would like

6  to call border patrol agent Leo Loya.

7    THE COURT:  And we're going to -- I'm glad you'd

8  like to call him.  I'd like to call him, too, but tomorrow

9  morning.

10    MR. GARDNER:  I'm sorry, sir.  I didn't know what

11  time it was.

12    THE COURT:  It's 4:25 and before we start another

13  witness, I'm going to let this jury go home, okay.

14    MR. GARDNER:  Yes, sir.

15    THE COURT:  Hopefully he'll be available tomorrow

16  morning.  Tell him I apologize for keeping him over but I'm

17  going to keep my promise to this jury and get them out of

18  here.

19    MR. GARDNER:  He's got a hotel room, sir.

20    THE COURT:  Okay.  I'm going to let you go home.

21    Please don't discuss it.  Don't read about it.

22  Don't listen to anything about it.

23    If anybody approaches you and tries to talk to you

24  about this case, I need to know about it immediately.

25    Please, I know people you live with are going to

                      Spinner – Cross – Sacco


1    want to know what's going on.  Just tell them you've been

2    selected on a jury in a criminal case and tell them your

3    schedule.  Other than that, tell them you'll tell them all

4    about when it's over with.  Other than that, you don't

5    discuss it.

6            You have a great night travel safe.  Please be in

7    that jury room before 9 o'clock.  I'm going to try and start

8    promptry at 9 o'clock.

9            And, again, Lori, what's there going to be bagels,

10   muffins?  There will be some stuff in there, all stuff that's

11   probably not real good for you but I'm sure it will taste

12   good anyway.  So we'll see you tomorrow morning.  Have a good

13   night.

14           (Jury excused, 4:26 p.m.)

15           THE COURT:  Open court.

16           THE COURT:  Okay.  Off to a good start.

17           MR. GARDNER:  Yes.

18           THE COURT:  We'll start promptly at 9 o'clock and

19   have a good night.  We'll see you tomorrow morning.  Okay.

20           MR. GARDNER:  Thanks, Judge.

21           MR. SACCO:  Okay.

22           THE CLERK:  Court's in recess.

23           (Proceedings recessed, 4:28 p.m.)

24

25

116

Spinner – Cross – Sacco

C E R T I F I C A T I O N

I, DIANE S. MARTENS, Registered Professional
Reporter, DO HEREBY CERTIFY that I attended the foregoing
proceedings, took stenographic notes of the same, that
the foregoing is a true and correct copy of same and the
whole thereof.

_____

DIANE S. MARTENS, FCRR

JA-152

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------x
UNITED STATES OF AMERICA,

                              Plaintiff,

vs.                                         13-CR-316

ALLAN PETERS, aka "Hiio",

                              Defendant.
--------------------------------------------------x

        Transcript of *JURY TRIAL – VOLUME II* held on

January 28, 2014, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York,

the HONORABLE GLENN T. SUDDABY, Presiding.

                A P P E A R A N C E S

For Plaintiff:     OFFICE OF THE UNITED STATES ATTORNEY
                   14 Durkee Street
                   Room 340
                   Plattsburgh, New York 12901
                     BY:  DANIEL C. GARDNER, Esq.
                          Assistant United States Attorney

For Defendant:     MARK J. SACCO
                   38 North Ferry Street
                   Schenectady, New York 12305

                *Diane S. Martens, RPR, FCRR*
            *Official United States Court Reporter*
                  *100 South Clinton Street*
                  *Syracuse, New York 13261*
                      *(315)234-854*5

118

US V. Peters – 13-CR-316

1          (Open court, 9:06 a.m.)

2          THE COURT:  Okay, we're in the courtroom without

3   the jury.

4          You have your next witness ready, Mr. Gardner?

5          MR. GARDNER:  Yes, your Honor.

6          THE COURT:  Mr. Sacco, are you ready to proceed?

7          MR. SACCO:  Yes, your Honor.

8          THE COURT:  Okay, let's bring the jury in.

9          (Jury present, 9:07 a.m.)

10         THE COURT:  Okay, good morning.

11         (Jurors say good morning.)

12         THE COURT:  Hopefully everybody had a good night.

13  Little frosty out there this morning.  Glad to see that you

14  made it all through.

15         We have the ladies and gentlemen of the jury,

16  government's counsel, and defense counsel and defendant.

17         So, Mr. Gardner, if you have another witness,

18  please call them.

19         MR. GARDNER:  Yes, your Honor, the U.S. calls

20  border patrol agent Leo Loya.

21

22                   LEONEL LOYA, called as a witness and

23  being duly sworn, testifies as follows:

24         MR. GARDNER:  My I proceed, your Honor?

25         THE COURT:  You may.

119

Loya – Direct – Gardner

1    DIRECT EXAMINATION BY MR. GARDNER:

2            Q    Good morning, Agent Loya.

3            A    Good morning.

4            Q    Can you state your full name?

5            A    It's Leonel Loya.

6            Q    And what is your current occupation?

7            A    U.S. border patrol agent, canine handler

8    instructor.

9            Q    How long have you worked with border patrol?

10           A    It will be 22 years in July.

11           Q    Twenty-two years?

12           A    Yes, sir.

13           Q    So, right around 1992?

14           A    Yep.

15           Q    You mentioned that you're a canine handler; is

16    that right?

17           A    Yes, sir.

18           Q    What does that mean to be a canine handler?

19           A    I went to the academy, canine facility.  I

20    picked up a, dog trained with her, certified with her, came

21    up to the Champlain station in New York and I patrol U.S.

22    Canada border with my canine, my partner.

23           Q    What is your canine partner's name?

24           A    Fuji.

25           Q    When did you become certified with Fuji?

JA-155

120

Loya - Direct - Gardner

1          A     July 2007.

2          Q     And is Fuji, F-U-J-I?

3          A     Yes.

4          Q     Can you briefly just tell the jury what your

5   canine is trained to detect?

6          A     Fuji's trained to detect, marijuana, meth,

7   ecstasy, heroin and -- ecstasy, meth, heroin, marijuana

8   and --

9          Q     Cocaine?

10         A     Cocaine, yeah.  And concealed humans, also.

11         Q     In terms of canines and when they're doing

12  their job, do they detect the actual drug or the odor?

13         A     The odor.

14         Q     I want to direct your attention to May 8th,

15  2009.  Do you recall working that day?

16         A     Yes, I do.

17         Q     And what were you doing on that day?

18         A     I was assigned to the North Hudson checkpoint

19  located on Interstate 87 southbound lane.

20         Q     And where is North Hudson, generally?

21         A     North Hudson is just north of -- south of exit

22  30, right around marker 99 on Interstate 87.

23         Q     And what does that mean to have the checkpoint

24  on Interstate 87?

25         A     It's an immigration checkpoint.  It's set up

121

Loya – Direct – Gardner

1    randomly.  It's right near ––

2              Q    You mean randomly in terms of time?

3              A    Yes.

4              Q    I'm sorry, go ahead.

5              A    It's right next to the rest area, so between

6    exit 30 and 29.  As you approach the checkpoint, about

7    2 miles before you get to the actual checkpoint, there's

8    signs that say be prepared to stop, slow down, do not change

9    lanes.  Once you get closer to the checkpoint there's cones

10   about 500 yards before you get to the primary inspection.

11             Q    And where is that is primary inspection

12   located?

13             A    Right off the interstate –– right on the

14   interstate.

15             Q    So are you stopping all traffic at that

16   checkpoint?

17             A    Yes.

18             Q    Is Interstate 87 a two-lane road or one-lane

19   road at that point?

20             A    Two lanes.

21             Q    Two lanes going south, two lanes going north?

22             A    Yes, sir.

23             Q    And are you stopping both lanes?

24             A    Yes, sir.

25             Q    What happens when a motorist arrives at the

122

Loya – Direct – Gardner

1   primary area, inspection area?

2          A     Once the motorist arrives at the primary

3   inspection area, he's questioned as to citizenship.  If the

4   agent feels that he's needs further investigation, they don't

5   have the proper documents, then they're referred to secondary

6   inspection where they're investigated further.

7          Q     And where is that secondary inspection area

8   set up?

9          A     It's right in –– right in the rest area.

10         Q     So is it just off the highway?

11         A     Just off the highway right off the rest area.

12         Q     Now, if you encounter a single driver who's a

13  United States citizen, how long would that inspection take?

14         A     A minute.

15         MR. GARDNER:  Your Honor, I'd like to show the

16  witness what's been marked as Government Exhibit 1 for

17  identification.

18         Q     Agent Loya, do you recognize that exhibit?

19         A     Yes, I do.

20         Q     And what is that exhibit?

21         A     It shows the –– our area of responsibility,

22  shows where our checkpoint is located on Interstate 87.  It

23  shows designated ports–of–entries between U.S. and Canada

24  allowing entry into the United States and it's got the town

25  of Malone highlighted.

123

Loya – Direct – Gardner

1    Q    Is it essentially a map from -- the geographic
2    area from Interstate 87 west to Massena?
3    A    Yes.
4    Q    Does that map accurately indicate that area?
5    A    Yes.
6    Q    And are you pretty familiar with that area?
7    A    Yes.
8    MR. GARDNER:  Your Honor, the government would like
9    to offer into evidence -- offer this into evidence as
10   Government Exhibit 1.
11   MR. SACCO:  No objection, your Honor.
12   THE COURT:  It will be received.
13   Q    Agent Loya, we were just talking about this a
14   little bit and the exhibit is somewhat self-explanatory.  But
15   is this the checkpoint, the immigration checkpoint you've
16   been talking about located on this map?
17   A    Yes, sir.
18   Q    Right down there where it says I87 checkpoint?
19   A    Yes.
20   Q    Is that always where that checkpoint is set
21   up?
22   A    Yes.
23   Q    And how much does the border patrol set this
24   checkpoint up?
25   A    I'd say about four or five times, maybe, a

JA-159

124

Loya – Direct – Gardner

1    year.

2            Q    And you mentioned that it was somewhat random;

3    is that right?

4            A    Yes, sir.

5            Q    And once the checkpoint is set up, how long

6    will it stay up?

7            A    Usually maybe three, four days.

8            Q    Why do you do it at random times?

9            A    I'm not sure if it has anything to do with

10   budget or just strategy, but, you know.

11           Q    What do you mean by strategy?

12           A    It's not scheduled, you know, so it's just,

13   you know, as far as I know, I just go when they tell me to

14   go.

15           Q    Okay, fair enough.  So you were assigned to

16   this checkpoint on May 8th, 2009; is that correct?

17           A    Yes, sir.

18           Q    And what was your role at the checkpoint that

19   day?

20           A    I was a canine handler, worked with my dog on

21   primary.  We had several dogs.  We usually walk on the side

22   of the road next to the cars, usually downwind.

23           Q    Why do you do that?

24           A    So the dogs can pick up the odor of the

25   narcotics inside the vehicle or concealed humans.

125

Loya – Direct – Gardner

1    Q    So if somebody's transporting drugs, you're

2  hoping to be able to detect that?

3    A    Yes, sir.

4    Q    Other than patrolling the inspection or other

5  than using your canine in an inspection area, did you do

6  anything else that day?

7    A    During my -- when I wasn't on primary, I

8  patrol the highway.  From the first sign to the primary

9  inspection there's three crossovers, they're designated for

10  authorized vehicles or plow trucks and we kind of try to

11  patrol those and make sure we don't have any vehicles turn

12  around before the checkpoint because you can't -- from

13  primary checkpoint you can't see those turnarounds.

14    Q    At some point during that day did you receive

15  information that someone had made a U turn before the

16  checkpoint?

17    A    I did.

18    Q    What information did you receive?

19    A    I was north of the checkpoint and we did

20  receive a call from Agent Matt Hayes that a concerned citizen

21  told him that a vehicle, pickup truck had turned around and

22  headed north.

23    Q    Did Agent Hayes provide you a description of

24  the vehicle?

25    A    He did.  He said it was a single cab pickup,

JA-161

126

Loya – Direct – Gardner

1   really dirty with a tonneau cover, grayish in color.

2          Q    And did you respond --

3          A    Greenish.

4          Q    -- to that information in some way?

5          A    I'm sorry, he said greenish in color.

6          Q    Oh, greenish?

7          A    Yeah.

8          Q    What did you do once you received that

9   information?

10         A    I started heading south and I saw the vehicle

11  that matched the description heading northbound.  So I got to

12  the nearest turnaround and turned around and caught up to the

13  vehicle.

14         Q    Did you activate your emergency lights and

15  conduct a stop?

16         A    I did.

17         Q    And did the vehicle yield?

18         A    Yes.

19         Q    At some point did you approach the driver or

20  approach the vehicle?

21         A    Yes.  I got behind the vehicle.  I ran the

22  plates.  New York plates, ENJ4334, came back to Cheryl

23  Lobdell in Chateaugay.  I turned on my lights.  She pulled

24  over, and I pulled up behind her.

25         Q    And at some point did you approach the driver?

JA-162

Loya – Direct – Gardner

1          A     I did.

2          Q     And were you able to identify who the driver

3     was?

4          A     It was a Cheryl Lobdell.

5          Q     Was there anybody else in the vehicle?

6          A     There was a passenger by the name of John --

7     Joseph Siscovich (phonetic).

8          Q     And did you ask for consent to conduct a

9     search of the vehicle?

10          A     I approached the vehicle.  I talked to -- she

11     was really nervous and she gave me consent to look in the

12     back of the pickup truck.

13          Q     And the bed of the pickup truck, was it open

14     or did it have a cover?

15          A     Had a tonneau cover.

16          Q     Did you look under or look into the bed of the

17     truck?

18          A     I went to the back of the vehicle.  I peeked

19     in -- opened the tailgate, peeked in and I saw some big black

20     appeared like hockey bags and I asked her what was in the

21     bags and she said that she thought it was marijuana.

22          Q     And at that point did you conduct a search of

23     the bed of the truck?

24          A     I went to my truck.  I got my dog and I told

25     her sit tight, ran the side of the vehicle.  Once I got to

128

Loya – Direct – Gardner

1    the back of the bed where the tailgate is, my dog alerted and

2    indicated and then I secured my dog and I pulled the

3    occupants out of the vehicle and I handcuffed them and told

4    them to wait inside the guardrail.

5            Q    What does that mean that your dog alerted and

6    indicated?

7            A    My dog alerted.  She -- when my dog alerts and

8    she senses the odors of marijuana or any kind of drug or

9    people, she -- her alert is she drops, she raises her ears.

10   I'll be working with her, her ears will go up, her mouth will

11   close and she'll start sniffing really hard with her nose and

12   she works her way to the source of the odor, which at the

13   time was the area of the bed of the pickup and that's the

14   alert and then her indication is either -- at this time she

15   scratched, she looked at me and she sat down.

16           Q    And you said that you removed both occupants

17   and detained them?

18           A    Yes.

19           Q    And what did you do with them ultimately?

20           A    I have a -- I have a pickup truck.  I don't

21   have any rooms for any passengers, so I handcuffed them and I

22   had them wait with me on the side of the road by the

23   guardrail and I called for transport and we had some agents

24   come over and help transport back to the primary checkpoint.

25           Q    You mentioned that you saw these black hockey

JA-164

129

Loya – Direct – Gardner

1    backs in the bed of the truck, correct?

2            A    Yes.

3            Q    Did they stay in the truck or did you remove

4    them?

5            A    No, they stayed in the truck.

6            Q    And what was done with the truck?

7            A    I called for transport.  We had several agents

8    come up, take the occupants and we had Ryan Jefferson hopped

9    in the truck and I followed him up to the checkpoint.

10           Q    That's where you had the secondary inspection

11   area set up?

12           A    Yes, sir.

13           Q    Does that rest area have a building that you

14   could use?

15           A    Yes.

16           Q    And at some point did you conduct any other

17   law enforcement agency?

18           A    I called -- I contacted the DEA task force.

19           Q    The DEA task force?

20           A    Yes, sir.

21           Q    Were you working with the task force at that

22   time?

23           A    Yes, I was.

24           Q    In what capacity were you working with the

25   DEA?

JA-165

130

Loya – Direct – Gardner

1          A     I was detailed to the DEA as a member of the
2    Adirondack drug task force.
3          Q     And were you a task force officer?
4          A     Yes.
5          MR. GARDNER:  Your Honor, I would like to show the
6    witness Government Exhibit 7A through 7G.
7          Q     Agent Loya, can you go through those
8    photographs and tell me if you recognize them.
9          A     This is the pickup truck, the 2004 Chevy
10   Silverado.
11         Q     Just go through them if you don't mind.
12         A     And these are the bags that were located in
13   the back of the pickup in the bed area.
14         Q     Was that Exhibit 7B?
15         A     Yes.
16         Q     Okay.  And how about Exhibit 7C?
17         A     This is one of the bags with the packages that
18   was in the back of the truck, 7C.
19         Q     And how about 7D?
20         A     Yeah, same thing, also, 7D and 7E was the 14
21   JK9.5 in there.
22         Q     Is it a photograph of the contents of those
23   bags?
24         A     Yes.
25         Q     And 7F, PK17 was also inside in the back of

131

Loya – Direct – Gardner

1    the truck.  And JK9.5, is that also --

2              A    7G.

3              Q    Is that also a photograph of something inside

4    the black hockey bags?

5              A    Yes.

6              Q    And what's that exhibit number?

7              A    7G.

8              Q    Do all those photographs accurately represent

9    the bags that you removed from miss Lobdell's truck?

10             A    Yes.

11             MR. GARDNER:  Your Honor, the government would like

12   to offer these exhibits into evidence as 7A through 7G.

13             THE COURT:  Any objection?

14             MR. SACCO:  No objection, your Honor.

15             THE COURT:  Okay.  They'll be received.

16             Q    Agent Loya, if we can explain these to the

17   jury a little bit.  What are we looking at here in 7A?

18             A    That's the vehicle that I pulled over at the

19   checkpoint.

20             Q    When you pulled over this vehicle, was that

21   during the day or was it during the night?

22             A    It was during the day.

23             Q    So was this paragraph taken later?

24             A    Yes.

25             Q    7B.  And what are we looking at here in 7B?

132

Loya – Direct – Gardner

1         A    Those are the bags that were in the back of

2  the Silverado.

3         Q    And who were -- were they open when you found

4  them or did you or the other agents open them?

5         A    They were closed when I found them, but we

6  opened them once we got them to the secondary inspection.  We

7  weighed them.  It was 251 pounds.  That was when we opened

8  them.

9         Q    And 7C.  What are we looking at here in 7C?

10        A    That's one of the bags that had the labels on

11  them.

12        Q    Did you put those labels on them or any law

13  enforcement agent?

14        A    No, sir.

15        Q    Were those labels on there when you guys

16  opened up the bags?

17        A    Yes.

18        Q    And 7D?  What are we looking at here?

19        A    That was one of the other bags that was also

20  labeled JK9.5.  This was already labeled when we opened the

21  bag.

22        Q    7E, what are we looking at?

23        A    7E is another bag that had a label 14 jack.

24        Q    The packages inside the hockey bags, could you

25  tell -- let me rephrase that.

133

Loya – Direct – Gardner

1          The substances that we're looking at here,

2    this green leafy substance, how was that is packaged with

3    this plastic?

4          A    It was double packaged.  It was vacuum sealed

5    and then it was packaged again.

6          Q    And 7F.

7          A    Another one of the duffle bags labeled PK17.

8          Q    And 7G?

9          A    It's another one of the other hockey bags

10   labeled jk9.5.

11         MR. GARDNER:  Your Honor, I'm showing Agent Loya

12   what's been marked as Government Exhibit 22 for

13   identification.

14         Q    Sir, do you recognize that exhibit?

15         A    Yes, I do.

16         Q    And what is it?

17         A    It's Cheryl Lobdell, the driver of the Chevy

18   Silverado.

19         Q    Is it a photograph of her?

20         A    Yes.

21         Q    Does it accurately depict Ms. Lobdell?

22         A    Yes.

23         MR. GARDNER:  Your Honor, the government would like

24   to move this into evidence as Government Exhibit 22.

25         MR. SACCO:  No objection, your Honor.

134

Loya – Direct – Gardner

1          THE COURT:  It's received.

2          Q    Is this similar to how she looked the day you

3   encountered her?

4          A    Yes.

5          MR. GARDNER:  Your Honor, if I could just have one

6   moment, please.

7          (Discussion held off the record.)

8          MR. GARDNER:  No further questions, your Honor.

9          THE COURT:  Go ahead, Mr. Sacco.

10          MR. SACCO:  Thank you, your Honor.

11   CROSS-EXAMINATION BY MR. SACCO:

12          Q    Morning, sir.

13          A    Morning.

14          Q    Now, you went to the Hudson checkpoint on

15   May 9th, right?

16          A    Correct.

17          Q    And you got a report that this pickup truck

18   had turned around?

19          A    Yes.

20          Q    And then you went to -- essentially you went

21   to investigate that, right?

22          A    Yes.

23          Q    And you found two individuals, one was Cheryl

24   Lobdell?

25          A    Yes.

135

Loya – Cross – Sacco

1    Q    And what was the name of the other person?

2    A    Joseph Siscovich.

3    Q    Joseph do you remember how to spell his last

4    name?

5    A    I do not.

6    Q    Was he have arrested also?

7    A    No.

8    Q    But Cheryl Lobdell was?

9    A    She was.  She stated that he had nothing to do

10   with it.  He was along for the ride.  He didn't know the

11   contents in the back of the truck.

12   Q    And you explained how your dog alerted and

13   clearly you found what appears to be marijuana, right?

14   A    Yes.

15   Q    Now, was there a lead vehicle that you saw or

16   identified in this trip?

17   A    A lead vehicle?

18   Q    Well, isn't it true that typically there's

19   a -- I think it's called a blocker?

20   A    Scout.

21   Q    A scout vehicle?

22   A    No.

23   Q    So you just -- you actually during your

24   investigation, you never identified any kind of scout

25   vehicle?

136

Loya – Cross – Sacco


1          A      No, sir.

2          Q      Okay.  Now, you know that my client's on trial

3     here?

4          A      Yes.

5          Q      Was he there on May 9th?

6          A      No, sir.

7          Q      2009?

8          A      No.

9          Q      And you didn't arrest him?

10         A      No, sir.

11              MR. SACCO:  Your Honor, I have no further

12    questions.  Thank you.

13              THE COURT:  Okay.

14              MR. GARDNER:  No redirect, your Honor.

15              THE COURT:  Before I let you step down, just for

16    the sake of curiosity, I have a question.

17              How does the dog alert on a concealed human, as

18    opposed to somebody in the back seat of a car sleeping.

19              THE WITNESS:  To be honest with you, it's hard to

20    explain.  My dog -- I'll have my dog on primary, you'll have

21    a driver driving, the baby sleeping in the back and somebody

22    hiding in the trunk and she'll only alert to the person in

23    the trunk.

24              THE COURT:  Can you explain the training that

25    allows him to do that.

137

Loya – Cross – Sacco

1        THE WITNESS:  I'm not sure if I'm authorized to do

2   it, but.

3        THE COURT:  Okay.  I was just curious, that's all.

4   It sounds interesting that you can find a concealed human

5   when there's other people just in the car.

6        THE WITNESS:  Yes, sir.  No, I understand.  I can't

7   really explain it, but, you know, we train and we'll have a

8   driver just as, you know, just she'll go right past the

9   driver, you know, and if there's a person hiding in the trunk

10  or the back of the bed, it's hard to explain.

11       THE COURT:  All right.

12       Either one of you can follow up.  I was just

13  curious about that and I thought maybe some of the members of

14  the jury, were, too, so I thought I'd ask.  It's not relevant

15  to anything to do with this case, other than my curiosity.

16       MR. GARDNER:  Yes, sir, no further questions.

17       THE COURT:  Thank you, sir.  You may step down.

18       (Witness excused, 9:30 a.m.)

19       MR. GARDNER:  Your Honor, at this time the

20  government would like to offer into evidence Government

21  Exhibit 31, a stipulation of fact.

22       MR. SACCO:  No objection, your Honor.

23       THE COURT:  Okay.

24       MR. GARDNER:  The government would like to publish

25  this exhibit at this time.

138

US v. Peters - 13-CR-316

1    THE COURT:  What is it?

2    MR. GARDNER:  It is a stipulation of fact.  I'd

3  like to read it to the jury.

4    May I approach, your Honor.

5    THE COURT:  You may.

6    (Discussion held off the record.)

7    MR. GARDNER:  Government Exhibit 31 reads as

8  follows:  The parties stipulate as follows on May 8, 2009,

9  Drug Enforcement Administration Special Agent Kevin Cadish

10 and task force officer Mark Borey (phonetic) took possession

11 of six hockey style bags from the High Peaks rest area and

12 transported them to the DEA building in Plattsburgh,

13 New York.  The bags and their contents were secured in the

14 DEA drug vault.

15    On May 13th, 2009, Special Agent Cadish and Agent

16 Loya removed the six bags from the drug vault.  Inside the

17 hockey bags were dozens of vacuum sealed plastic bags

18 containing suspected marijuana which weighed 114 kilograms.

19    On the same date special agent Cadish and agent

20 Loya prepared representative samples of the suspected

21 marijuana from each of the six hockey bags.  Pursuant to DEA

22 policy, special agent Cadish then packaged the representative

23 samples and sent them to the DEA Northeast Regional

24 Laboratory for chemical analysis via Fed Ex.

25    On June 3rd, 2009, forensic chemist, Diana Sanchez

139

Miller – Direct – Gardner

1    completed a chemical analysis of the representative samples

2    submitted by Special Agent Cadish to the lab and

3    scientifically concluded that the suspected marijuana was in

4    fact marijuana.

5            In conclusion, Special Agent Kevin Cadish and task

6    force officer Mark Borey took possession of six hockey style

7    bags from the High Peaks rest area which contained

8    114 kilograms of marijuana, a Schedule I controlled

9    substance.

10           Your Honor, at this time the government would like

11   to call Ernie Miller.

12

13           ERNIE MILLER, called as a witness and

14   being duly sworn, testifies as follows:

15           MR. GARDNER:  May I proceed, your Honor.

16           THE COURT:  You may.

17   DIRECT EXAMINATION BY MR. GARDNER:

18       Q    Good morning, Mr. Miller.

19       A    Good morning.

20       Q    Can you please state your full name?

21       A    Yes, it's Ernie Miller.

22       Q    Mr. Miller, what's your current occupation?

23       A    I'm the general manager at Frenchie's

24   Chevrolet in Massena.

25       Q    In Massena, New York?

140

Miller – Direct – Gardner

1          A     Yes, sir.

2          Q     Is that located in close proximity to the

3    Akwasasne Mohawk Indian reservation?

4          A     Yes, it is.

5          Q     And how long have you been working at

6    Frenchie's?

7          A     Fifteen years.

8          Q     And you said that you're currently the general

9    manager?

10         A     Yes, sir.

11         Q     How long have you been doing that?

12         A     About four years.

13         Q     Can you describe for the jury what Frenchie's

14   car dealership is?

15         A     Yeah.  We sell new Chevrolets and used cars.

16   We have a new Chevy store in Massena and we have a used car

17   store down the street.

18         Q     Does your used car store sell just Chevys or

19   all kinds of vehicles?

20         A     All kinds of vehicles, trade-ins.

21         Q     And what are your duties as the general

22   manager of Frenchie's?

23         A     Right now, I handle the sales department and

24   oversee most of the dealership.  When the dealer's not there,

25   he asks me to do his, you know, when he goes to meetings and

Miller – Direct – Gardner

1    direction, that kind of thing.

2           Q    Mr. Miller, I'd like to ask you, see that

3    microphone right in front of you, scoot up a little closer to

4    that.

5                Mr. Miller, are you familiar with the

6    defendant in this case Mr. Allan Peters?

7           A    Yes, I am.

8           Q    And how are you familiar with him?

9           A    He's bought at least three vehicles from us.

10          Q    From Frenchie's?

11          A    Yes, sir.

12          Q    So have you seen him in the Frenchie

13   dealership on multiple occasions?

14          A    Yes, sir.

15          Q    Do you know if Frenchie's has any affiliation

16   with the defendant?

17          A    I assume so.  There's a race track on the

18   reservation and we -- I know we've sponsored races there

19   before and I'm pretty -- I'm not certain but I think that

20   we've sponsored Mr. Peters.

21          Q    What kind of race track is it?

22          A    It's a dirt track, flat track.

23          Q    Now, Mr. Miller, does Frenchie's maintain

24   business records related to car sales?

25          A    Yes, we do.

JA-177

142

Miller – Direct – Gardner

1          Q     And do you keep records of cash deposits?

2          A     Yes.

3          Q     Purchase agreements?

4          A     Yes.

5          Q     Customer account records?

6          A     Yes.

7          Q     Do you keep these records in electronic form,

8     hard copies, both?

9          A     Both.

10         Q     And where are the hard copies stored?

11         A     The current, the current deals for the year

12    are stored at the store then they're moved, put under lock

13    and key.

14         Q     Where at?

15         A     At the -- right now they're at the used car

16    store.

17         Q     So a separate location?

18         A     Yes, sir.

19         Q     And how long do you maintain those records

20    for?

21         A     Whatever the law -- the law affords, they pile

22    up.  I think it's seven years.

23         Q     You think it's seven years?

24         A     I think so, yes.

25         Q     And do you have access to both the hard copies

JA-178

143

Miller – Direct – Gardner

1   and the electronic copies?

2           A    No, I do not.  The hard copies are under key.

3   I don't have access to those.

4           Q    If you asked someone at the store, could you

5   gain access to it?

6           A    Oh, absolutely, absolutely.

7           Q    You just don't have a key for it?

8           A    That's correct.

9           Q    But if you needed to get into a file, you

10  could?

11          A    Yes, sir.

12          Q    And do you keep all those records as part of

13  the regular course of business at Frenchie's?

14          A    Yes, we do.

15          MR. GARDNER:  Your Honor, I'd like to show the

16  witness what's been marked as Government Exhibit 18B.

17          Q    Sir, do you recognize that document?

18          A    Yes, I do.

19          Q    And what is it?

20          A    It's a copy of a cash receipt to Allan Peters

21  for $5,000 on October 14th, '08 for deposit on 7708B, which

22  is a stock number of a vehicle.

23          Q    And is that document something that Frenchie's

24  maintains?

25          A    Yes.

144

Miller – Direct – Gardner

1          Q     And is it something that is kept in the

2     regular course of business?

3          A     Yes, it is.

4          MR. GARDNER:  Your Honor, at this time the

5     government would like to offer into evidence -- offer this

6     into evidence as Government Exhibit 18B.

7          THE COURT:  Any objection?

8          MR. SACCO:  No objection, your Honor.

9          THE COURT:  It will be received.

10         Q     Mr. Miller, can you see the exhibit up on your

11    screen there?

12         A     Yes, I can.

13         Q     Can you describe for the jury what we're

14    looking at in Government Exhibit 18B?

15         A     Yeah, it's -- the cash receipt has got a lot

16    of information on it.  Who receipted it in, the name up

17    there, there's a control number on the receipt.  There's also

18    a customer account number next to the customer's name, and

19    then there's a reference to what vehicle it was for.

20         Q     Okay, let's talk about all those things.

21    First you already indicated but who made this cash deposit?

22         A     Allan Peters.

23         Q     And is that the defendant?

24         A     Yes, it is.

25         Q     And what was the amount of that cash deposit?

JA-180

Miller – Direct – Gardner

1           A    $5,000.

2           Q    You mentioned there is an account number.

3    What is the account number?

4           A    5117.

5           Q    And is that in relation to -- whose account is

6    that related to?

7           A    That would be Allan Peters' account.

8           Q    You also mentioned that it referenced a

9    specific vehicle; is that right?

10          A    Yes, sir.

11          Q    And where is that reference number?

12          A    Bottom left, the deposit on stock number

13   7708B.

14          Q    That number 7708B, that's a stock number?

15          A    Yes, sir, represents a vehicle.

16          Q    And then one other thing I want to go over.

17   Is there a date on here for the date that this deposit was

18   made?

19          A    Yes, October 16th, 2008.

20          Q    I'd like to talk for just a second about that

21   stock number.  First of all, were you present when Mr. Peters

22   paid this $5,000?

23          A    No, sir.

24          Q    Are you familiar with the vehicle that's being

25   referenced, stock number 7708B?

JA-181

146

Miller – Direct – Gardner

1          A     Yes, sir.

2          Q     What type of vehicle is that?

3          A     That's a 2004 Chevrolet pickup.

4          Q     Now after the defendant made this deposit, did

5    he come back at any point to talk to you about it?

6          A     Yes, he did.

7          Q     And approximately how long after this initial

8    deposit did he come back into the store?

9          A     I'm not certain on that when he came back.

10         Q     Was it weeks, months -- and, if you don't

11   know, that's fine?

12         A     Like I say, I'm not certain on the timing.

13         Q     Can you describe for the jury what the

14   defendant did when he came back in?

15         A     Yes, I can.  He decided he didn't want the

16   truck and asked me to shred the purchase agreement, which I

17   did, and then I asked him if he wanted his money back and he

18   said no, just leave it on account.

19         Q     And that would be account 5117?

20         A     Yes, sir.

21         Q     Now, you said that you shredded a purchase

22   agreement; is that correct?

23         A     Yes, sir.

24         Q     Was there a purchase agreement generated based

25   on this $5,000 deposit?

JA-182

147

Miller – Direct – Gardner

1          A      Yes, sir, there was.

2          Q      Can you describe for the jury how a purchase

3     agreement is generate at Frenchie's?

4          A      Yes.  When you come in to purchase a car, you

5     sit down with the salesperson and, you know, you decide on a

6     vehicle and then a purchase agreement is handwritten -- most

7     of the time -- and for a specific stock number, customer's

8     name and it's signed and then it goes in a file until they

9     pick the vehicle up.

10          MR. GARDNER:  Your Honor, I'd like to show the

11     witness what's been marked as Government Exhibit 18A.

12          Q      Sir, do you recognize 18A -- 18A for

13     identification, sir, do you recognize that exhibit?

14          A      Yes, I do.

15          Q      And what is it?

16          A      It's another copy of a cash receipt for

17     $9,609.28 for Cheryl Lobdell dated 20th of January, '09, for

18     stock number 7708B.

19          Q      And, again, is this a document that's

20     maintained by Frenchie's?

21          A      Yes, it is.

22          Q      And is it kept in the regular course of

23     business?

24          A      Yes, it is.

25          MR. GARDNER:  Your Honor, at this time the

JA-183

148

                    Miller – Direct – Gardner


1    government would like to offer this exhibit into evidence as

2    Government Exhibit 18A.

3              THE COURT:  Any objection?

4              MR. SACCO:  No objection, your Honor.

5              THE COURT:  It will be received.

6         Q    And again, Mr. Miller, if you could walk us

7    through this cash deposit.

8         A    It's similar to the other one.  You'll see the

9    date, the person who receipted the money.  You'll see

10   customer's name and above there, the customer account number,

11   the amount and the stock number for what it was for, 7708B.

12        Q    And you mentioned an account number.  Is there

13   an account number associated with this deposit?

14        A    Yes, there is.

15        Q    Why is that?

16        A    Right off the customer's name it's 4976991.

17        Q    And so looking at the stock number at the

18   bottom, the 7708B, is that the same stock number or same

19   vehicle that the defendant put a $5,000 cash deposit on?

20        A    Yes, it is.

21        Q    This indicates it was paid on January 19th; is

22   that right?

23        A    Yes, it does.

24        Q    And so there was about a three-month lag

25   difference in time between when Mr. -- when the defendant put

149

Miller – Direct – Gardner

1    the $5,000 deposit on and when this deposit was paid?

2            A    That's correct.

3            MR. GARDNER:  Your Honor, I'd like to show the

4    witness Government Exhibit 18C for identification.

5            THE COURT:  Okay.

6            Q    Sir, do you recognize that document?

7            A    Yes, I do.

8            Q    And what is it?

9            A    It's a copy of a purchase agreement to Cheryl

10   Lobdell on an '04 Chevy pickup dated the 16th of

11   October 2008.

12           Q    And, again, is that a document that's

13   maintained by Frenchie's?

14           A    Yes.

15           Q    And is it kept in the regular course of

16   business?

17           A    Yes, it is.

18           MR. GARDNER:  Your Honor, the government would like

19   to offer this document into evidence as Government Exhibit

20   18C.

21           MR. SACCO:  No objection, your Honor.

22           THE COURT:  It's received.

23           Q    So looking at the top of the document here,

24   Mr. Miller, can you explain to us what we're looking at in

25   Government Exhibit 18C.

JA-185

Miller – Direct – Gardner

1         A    At the top you have the customer's name,

2    information, address, and then it goes down there's

3    information about the vehicle.

4         Q    And that's a 2004 Chevy --

5         A    Yes, it is.

6         Q    -- pickup?

7         A    Yes.

8         Q    All the way to the right does it list a VIN

9    number?

10        A    Yes, it does.

11        Q    What's the VIN number?

12        A    That's the serial number on the vehicle.  The

13   vehicles have a 17 digit VIN number.  That's how they're

14   identified.

15        Q    And that's specific to that vehicle, correct?

16        A    Yes, it's specific to every vehicle.

17        Q    Can there be any two vehicles with the same

18   VIN number?

19        A    No, there cannot.

20        Q    I want to look at the pricing here on the

21   right-hand side.  Can you explain to the jury the breakdown

22   of the price?

23        A    Yes, sir.  You have a box that says total

24   selling price, then if there's a trade-in, then you have what

25   they call the cash difference there.

151
Miller – Direct – Gardner

1          Q      Okay.  So the total selling price was –– if
2    I'm reading right –– $13,486?
3          A      I think it's 466.
4          Q      Okay.  And then it says cash difference and it
5    lists out $13,466.09, is that right?
6          A      Yes, sir.
7          Q      And what does that mean, cash difference?
8          A      That's the total price of the vehicle.  If
9    there was a trade involved, naturally it will be less.
10         Q      Does that mean that cash was paid for the
11   vehicle?
12         A      No, that's the selling price.
13         Q      Okay.  And does this document list any cash
14   deposits that were made?
15         A      Yes, it does.  It lists a $5,000 deposit.
16         Q      And then is there an amount to be financed?
17         A      Yeah, the cash due at delivery 9609.28.
18         Q      And was that amount paid at delivery?
19         A      Yes.
20         Q      Is that the cash deposit receipt that we just
21   looked at in the name of Cheryl Lobdell?
22         A      Yes.
23         Q      And where did the $5,000 listed just above
24   that come from?
25         A      It came from the original deposit.

JA-187

152

Miller – Direct – Gardner

1          Q      From the defendant?

2          A      Yes.

3          Q      Now, there's a signature at the bottom and

4    Cheryl Lobdell has signed this; is that right?

5          A      That's correct.

6          Q      And the signature is listed as October 16th,

7    2008; is that correct?

8          A      Yes, sir.

9          Q      Is that accurate, did she sign it on that day?

10         A      No, sir, she didn't.

11         Q      So why does it have that date?

12         A      In our computer, when you load a deal,

13   whatever day it's loaded, that's the date that's in the

14   computer.  And on that particular day I was asked to print

15   the purchase agreement.  I just went in and printed it.

16   Didn't give much thought to the date.

17         Q      Why the October 16th, 2008 date?

18         A      Because the deal was already in the computer.

19         Q      From the defendant's original deposit of

20   $5,000?

21         A      That's correct.

22         Q      You mentioned earlier that when the defendant

23   came back in, he asked you to shred the purchase agreement,

24   is that correct?

25         A      That's correct.

JA-188

153

Miller – Direct – Gardner

1      Q     And he told you he didn't want the car any

2 more, correct?

3      A     That's correct.

4      Q     Was this car held or was it still for sale in

5 between October of 2008 and January of 2009?

6      A     I believe, I believe it was still for sale.

7      Q     It just happens to be that nobody bought it?

8      A     That's correct.

9      Q     Now, you also mentioned that typically you do

10 your purchase agreements by hand, that they're handwritten;

11 is that right?

12     A     That's correct, yes.

13     Q     But this purchase agreement was generated by a

14 computer, correct?

15     A     Yes, it was.

16     Q     Do you know why?

17     A     It could have been a time constraint.  I

18 remember being asked to print a purchase agreement.

19     Q     So if this purchase agreement includes the

20 $5,000 deposit from the defendant, how is it that you would

21 be able to apply a $5,000 deposit from one customer and put

22 it on another customer's vehicle?

23     A     Yeah, that doesn't happen in the sales

24 department or even by me or -- that happens in the office, to

25 take money from one account to another, that has to be

154

Miller – Direct – Gardner

1    directed by the customer himself.

2            Q    So Mr. Peters would have had to come back into

3    Frenchie's to authorize this?

4            A    Absolutely.

5            MR. GARDNER:  Your Honor, I would like to show the

6    witness what's been marked as Government Exhibit 18D for

7    identification.

8            THE COURT:  Okay.

9            Q    Sir, do you recognize that document?

10           A    Yes, I do.

11           Q    And what is it?

12           A    In the course of business we have what they

13   call a general journal, when things -- when money's moved, we

14   keep track of that in the dealership between accounts and

15   this is a copy of that general journal.

16           Q    Again, is this a document that is maintained

17   by Frenchie's?

18           A    Absolutely.

19           Q    And is it kept in the regular course of

20   business for Frenchie's?

21           A    Yes, it is.

22           MR. GARDNER:  Your Honor, the government would like

23   to offer this into evidence as Government Exhibit 18D.

24           MR. SACCO:  No objection, your Honor.

25           THE COURT:  It will be received.

JA-190

Miller – Direct – Gardner

1        Q     So just generally, Mr. Miller, can you

2    describe for the jury what we're looking at here?

3        A     Yeah, you see the dates on there and the

4    different blocks and the different amounts and if you look at

5    January 20th, 2009, the thing that's highlighted there.

6        Q     Looking at the far left, we see the number

7    5117; is that correct?

8        A     That's correct.

9        Q     And what is that a reference to?

10       A     That references Mr. Peters' account number.

11       Q     And then a couple of blocks over, you see

12   5,000, what does that mean?

13       A     That's the amount on his account.

14       Q     And then it says -- or can you read that

15   middle block there?

16       A     Yes, it says Allan Peters to Cheryl Lobdell.

17       Q     What is the number just to the right of that?

18       A     That's her account number.

19       Q     And so what is this, what does this line on

20   this document tell you?

21       A     $5,000 was moved from Allan Peters's account

22   to Cheryl Lobdell's account.

23       Q     Now, Mr. Miller, when someone deposits or

24   makes a cash deposit of more than $10,000, does Frenchie's

25   have any obligations?

JA-191

Miller – Direct – Gardner

1        A    Yes, we do.  There's a cash reporting rule to

2   the IRS for every transaction $10,000 or more.

3        Q    And do you know if a report was made in this

4   instance?

5        A    Yes, a report was made.

6        Q    Do you know what the name of that form is?

7        A    Yeah, it's an 8300 form to the IRS.

8        MR. GARDNER:  Your Honor, I'd like to show the

9   witness what's been marked as Government Exhibit 18E for

10  identification.

11       Q    Sir, do you recognize that document?

12       A    Yes, I do.

13       Q    And what is it?

14       A    It's a copy of the 8300 form for this

15  particular vehicle.

16       Q    And is this a document that Frenchie's kept a

17  copy of?

18       A    Oh, absolutely.

19       Q    Did this particular 8300, was it actually

20  filed with the IRS?

21       A    Yes, it was.

22       Q    And is that document maintained in the regular

23  course of business for Frenchie's?

24       A    Yes, yes, they are.

25       MR. GARDNER:  Your Honor, I would like to offer

157

Miller – Direct – Gardner

1   this into evidence as Government Exhibit 18E.

2           THE COURT:  Any objection, Mr. Sacco?

3           MR. SACCO:  No objection, your Honor.

4           THE COURT:  Received.

5           Q    Now, Mr. Miller, why was an 8300 filed in this

6   case, in this instance?

7           A    Because the transaction was over $10,000.

8           Q    In total?

9           A    Yes.

10          Q    Because you had a $5,000 -- a $5,000 deposit

11  and then you had a 9600 deposit, correct?

12          A    That's right, yes.

13          Q    And are you supposed to add the numbers

14  together?

15          A    Yes, we are.

16          Q    Now looking at this 8300, on Line 3 and 4, it

17  lists Cheryl Lobdell as the individual that made the deposit;

18  is that correct?

19          A    That's correct.

20          Q    Is that accurate based on your records?

21          A    It's partly correct.  If you look at Line 15,

22  that box should have been checked.

23          Q    Why is that?

24          A    Well, it says if this transaction was

25  conducted on behalf of more than one person, that should have

158

                Miller – Direct – Gardner


1    been checked and filled out.

2              Q    And should the defendant's name have been

3    listed on this 8300?

4              A    Yes.

5              MR. GARDNER:  Your Honor, may I have one moment,

6    please.

7              THE COURT:  You may.

8              (Discussion held off the record.)

9              MR. GARDNER:  No further questions, your Honor.

10   CROSS-EXAMINATION BY MR. SACCO:

11             Q    Good morning, sir.

12             A    Morning.

13             MR. SACCO:  Do you have those receipts up there,

14   still?

15             THE CLERK:  They're right here.

16             MR. SACCO:  Your Honor, could I approach the

17   witness, please.

18             THE COURT:  You may.

19             Q    I'm going to hand you the documents we've been

20   talking about.  I'll refer to the number of the exhibit

21   that's down here, okay.

22             A    Okay.

23             Q    Sir, if I could have you look at the little

24   yellow sticker, if you could look at 18B, it's a receipt that

25   has Allan Peters name on it, do you see that?

JA-194

159

Miller – Cross – Sacco

1          A    Yes, sir, I do.

2          Q    What's the address that you have for

3   Mr. Peters on that?

4          A    That shows 450 North Racquette River Road,

5   Massena, New York.

6          Q    Massena, New York, is that in the United

7   States or in Canada, where is that?

8          A    That's in the United States.

9          Q    And then is that the address that you have on

10  file for Mr. Peters?

11         A    Yeah, I assume so.

12         Q    Now, if you can, if you can look at 18B which

13  is the Allan Peters receipt and look at 18A which is the

14  Cheryl Lobdell receipt can you put those next to each other

15  for us?

16         A    Yes.

17         Q    All right.  On 18B, that's the Peters'

18  receipt.  The serial number -- I'm calling it the serial

19  number -- I'm talking about the receipt number is 150368, do

20  you see that?

21         A    Yes, I do.

22         Q    Now, I want you to look at the 18A, which is

23  the Cheryl Lobdell receipt?

24         A    Yes.

25         Q    That's 151860, do you see that?

160
Miller – Cross – Sacco

1          A    Yes.

2          Q    All right.  So is it fair to say that there

3    was a number of cash receipts produced between the date of

4    the Peters' receipt, which is October 16th of '08, and the

5    Lobdell receipt, which is January 20th, 2009, is that fair to

6    say?

7          A    Yes, it is.

8          Q    Because those are serialized numbers, right?

9          A    Yes.

10         Q    The next receipt after the Peters' receipt

11   would have been 150369?

12         A    I assume so.

13         Q    I'm not going to do the math right here but

14   that's seven or 800 cash receipts, is that fair to say?

15         A    Yes.

16         Q    In that roughly three-month period?

17         A    Yes.

18         Q    Is it also fair to say that your dealership

19   takes in a significant amount of cash?

20         A    Yes.

21         Q    Now, were you there the day that Ms. Lobdell

22   purchased her truck?

23         A    Yes.

24         Q    You were -- were you the salesman in charge of

25   that sale?

JA-196

161

Miller – Redirect – Gardner

1    A    No, no.

2    Q    But you were there on the floor?

3    A    Yes.

4    Q    Now, Ms. Lobdell was there, and she physically

5  purchased the truck herself, right?

6    A    Yes.

7    Q    And handed the cash to the cashier, whoever?

8    A    Yes.

9    Q    And Mr. Peters was not there, was he?

10    A    I didn't see him, no.

11    Q    Okay, thank you, Sir.

12    MR. SACCO:  Judge, I have no other questions.

13    THE COURT:  Mr. Gardner, anything further?

14    MR. GARDNER:  Yes, your Honor, I just have a couple

15  of questions.

16  REDIRECT EXAMINATION BY MR. GARDNER:

17    Q    Now there's one other thing I wanted to go

18  over with you, Mr. Miller, on this document.  Again, this is

19  the purchase agreement, correct?

20    A    Yes, it is.

21    THE COURT:  Exhibit Number.

22    MR. GARDNER:  Exhibit Number 18C, your Honor.

23    THE COURT:  Okay.

24    Q    This vehicle stock number 7708B, is that the

25  same stock number that was referenced in both cash receipts?

162

Miller – Redirect – Gardner

1          A      Yes, it is.

2          Q      Mr. Miller, looking at Government Exhibit 18A,

3    it indicates that $9,609.28 was paid on January 19th, 2009;

4    is that correct?

5          A      Yes.

6          Q      Do you recall were you there that day?

7          A      Yes, I was.

8          Q      Did Ms. Lobdell take possession of the vehicle

9    that day?

10         A      No, actually she took possession the next day.

11         Q      Okay.  On January 20th, 2009?

12         A      On the 21st is when she picked the vehicle up.

13         Q      Okay.  When did you see Ms. Lobdell?

14         A      Just briefly for one night, gave her the

15   purchase agreement, told her what she needed to do.  When you

16   buy a car, you need proof of insurance before you can get a

17   registration, so we told her what she needed to bring in.

18         Q      So you met with Ms. Lobdell?

19         A      Yes.

20         Q      And how long after that did she actually take

21   possession of the vehicle?

22         A      I believe it was the next day.

23         Q      Okay.  And you said she took possession on

24   January 21st, 2009?

25         A      Yes.

163

Miller – Redirect – Gardner

1          Q      So you saw her on January 20th, 2009?

2          A      Yes.

3          Q      Did you see her again the next day on

4    January 21st?

5          A      No, the salespeople handle deliveries.

6          Q      Well, were you there when this cash deposit

7    was made on January 19th, 2009?

8          A      Yes, I was.

9          Q      Okay.

10         A      Yes, I was.

11         MR. GARDNER:  All right.  Thank you, your Honor.

12         MR. SACCO:  Nothing further, Judge.

13         THE COURT:  Okay.  You may step down, sir.  Thank

14    you.

15         (Witness excused, 10:03 a.m.)

16         MR. GARDNER:  Your Honor, we have one witness that

17    was having a hard time getting here.  We're just checking to

18    see if he's here.

19         THE COURT:  Ladies and gentlemen of the jury,

20    everybody okay?  We'll get through this witness and then I'll

21    give you a morning break.

22

23                    DECOTA D. THOMPSON, called as a witness

24    and being duly sworn, testifies as follows:

25         MR. GARDNER:  May I proceed, your Honor.

JA-199

164

Thompson – Direct – Gardner

1              THE COURT:  You may.

2    DIRECT EXAMINATION BY MR. GARDNER:

3              Q      Good morning, Investigator Thompson?

4              A      Good morning.

5              Q      Can you please state your full name?

6              A      Decota Thompson.

7              Q      What is your current occupation?

8              A      I'm an investigator with the St. Regis Mohawk

9    Tribal Police.

10             Q      With the St. Regis Mohawk Tribal Police?

11             A      Yes, that's correct.

12             Q      How long have you been with the tribal police?

13             A      I've been a police officer since May of 2009.

14             Q      And how long have you been an investigator?

15             A      Since May of 2012.

16             Q      How many investigators are there with tribal?

17             A      Including myself, there's four.

18             Q      And do you specialize in a particular area of

19   crime or are you a general investigator?

20             A      No, because there's not many of us, we're kind

21   of general.

22             Q      What types of crimes do you investigate?

23             A      Whatever occurs.  There was a recently a fire,

24   a fatal fire and that case is mine.  Anything from drugs to

25   larcenies to car accidents, whatever.

JA-200

                    Thompson – Direct – Gardner


1          Q     Whatever comes up?

2          A     Yeah.

3          Q     Prior to becoming an investigator, what did

4    you do?

5          A     I was a patrol man.

6          Q     How long did you do that?

7          A     From 2009 to 2012.

8          MR. GARDNER:  Your Honor, the government would like

9    to show the witness Government Exhibit 2 for identification.

10         Q     Do you recognize that document, sir?

11         A     Yes, I do.

12         Q     And what is it?

13         A     It's a map of Akwasasne Indian reserve.

14         Q     And are you familiar with that area?

15         A     Yes, I am.

16         Q     And how are you familiar with that area?

17         A     I live there.

18         Q     Have you lived there your whole life?

19         A     Yes, I have.

20         Q     Is it just the Akwasasne Mohawk Indian reserve

21   or does it include some of the surrounding area?

22         A     It includes some of the surrounding area.

23         Q     And is the Akwasasne Mohawk Indian reserve

24   highlighted on that map?

25         A     Yes, it is in red.

166

Thompson – Direct – Gardner

1        Q     Does that map accurately indicate where the
2   Akwasasne Mohawk Indian reserve is located?

3        A     Yes, it does.

4        MR. GARDNER:  Your Honor, the government would like
5   to offer this into evidence at Government Exhibit 2.

6        MR. SACCO:  No objection, your Honor.

7        THE COURT:  It will be received.

8        Q     So, Investigator Thompson, can you explain a
9   little bit to the jury about what we're looking at in
10  Government Exhibit 2?

11        A     The shaded portion is the Akwasasne Mohawk
12  Indian reservation.  There's a red bar cutting through from
13  east to west (indicating).  The bottom portion is the U.S.
14  portion of the reserve and that's the part that my department
15  is responsible for.

16        Q     And what about the red area, the portion of
17  the reserve that is above the international border?

18        A     The portion above on the right includes Snye,
19  which is Quebec, the Canadian portion and Cornwall Island,
20  which is the Ontario Canadian portion.

21        Q     Investigator Thompson, you see that pen right
22  there on the side of the monitor?

23        A     Yeah.

24        Q     Can you go ahead and outline where Snye Quebec
25  Canada is.  Just go ahead and draw right on the screen.

JA-202

167

Thompson – Direct – Gardner

1          A     (Witness complies.)

2          Q     Then you also mentioned another area?

3          A     Yes, this is Cornwall Island.  This is

4   Ontario.

5          Q     And --

6          A     There's also St. Regis somewhere in here but

7   it's Quebec Canada.  It's part of the reserve because it's so

8   far out, it's hard to see.

9          Q     Exactly where it is?

10         A     Yeah.

11         THE COURT:  It's an island.

12         THE WITNESS:  It's a peninsula.

13         THE COURT:  Go ahead.

14         Q     And that area is St. Regis?

15         A     Yes, it is.

16         Q     And you mentioned -- you mentioned that you

17   work on the United States side of the reservation?

18         A     Yes.

19         Q     Is that correct?

20         A     Yes.

21         Q     Before I forget, so I don't forget, is there a

22   body of water that's running through this map?

23         A     Yes, it is.  It is the St. Lawrence River.

24         Q     Is that the large body of water running east

25   to west?

JA-203

168

Thompson – Direct – Gardner


1          A     Yes, it is.

2          Q     So you mentioned that you work on the United

3    States side of the border, excuse me?

4          A     Yes, that's correct.

5          Q     Where is your jurisdiction, where is your

6    patrol area?

7          A     You want me to draw?

8          Q     Please.

9          A     (Witness complies.)  It would be everything

10   south of the Canadian border.

11         Q     Okay.

12         A     Shaded in red.

13         Q     Thank you, sir.

14               Do you work with local law enforcement, as

15   well, other local law enforcement?

16         A     Yes.

17         Q     I want to direct your attention to

18   September 15th, 2010.  Were you working that day?

19         A     Yes, I was.

20         Q     And had you become an investigator at that

21   point?

22         A     No, I had not.

23         Q     And what was your job at that point?

24         A     I was still patrol man at that time.

25         Q     Were you in your patrol vehicle?

JA-204

169

Thompson – Direct – Gardner

1          A     Yes, I was.

2          Q     What kind of vehicle did you have?

3          A     Dodge Charger, marked police unit.

4          Q     During that day at some point did you receive

5     information about an attempted vehicle stop?

6          A     Yes, I did.

7          Q     What information did you receive?

8          A     I could hear over the radio another unit that

9     was trying to yield a vehicle that was failing to stop for

10    them, so I made my way to their general location where they

11    were.

12         Q     Investigator Thompson, can you take a look at

13    Government Exhibit 3?

14         A     Yeah.

15         Q     Are you familiar with this area?

16         A     Yes, I am.

17         Q     And what are we looking at in Government

18    Exhibit 3?

19         A     You're looking at on the bottom half the U.S.

20    portion of the reserve specifically Cook Road and State Route

21    37 and I believe that's Drum Street that continues on east

22    toward 37.

23         Q     Can you use the pen and show us where Drum

24    Street is?

25         A     (Witness complies.)

JA-205

170

Thompson – Direct – Gardner

1          Q      Thank you.  Please continue.

2          A      Can I draw on here?

3          Q      Yeah, please.

4          A      This is Cook Road right here (indicating).

5          Q      And how about above the international border?

6          A      Above the border, which is right there, that

7    would be what they call Snye, so it's the Quebec portion.

8          Q      So the area you highlighted earlier as Snye,

9    that's what we're looking at right now?

10         A      In the top half.

11         Q      All right.  You indicated that you responded

12   to a attempted vehicle stop on September 15th, 2009, correct?

13         A      Yes, I did.

14         Q      Excuse me, 2010.  Can you show on the map

15   where you responded to.

16         A      (Drawing on exhibit.)  I could hear on the

17   radio that they were trying to yield a vehicle on Cook Road,

18   so I made my way toward them.  I turned on to Cook Road here.

19   It's kind of small, so it's difficult.

20         Q      But right in that area?

21         A      Yeah, right in that area.

22         Q      Is there anything in particular located at the

23   corner of Cook Road and Route 37?

24         A      Yeah, there's a gas station called truck stop

25   number nine.

JA-206

171

Thompson – Direct – Gardner

1    Q    Struck stop number nine?

2    A    Yeah.

3    Q    When you arrived to that intersection in the

4  Cook Road what, if anything, did you observe?

5    A    When I got on to Cook Road, which would be

6  north, I could hear over the radio that the vehicle was

7  failing to stop for the other patrol unit and when I got past

8  number nine on Cook Road, I could see a dark-colored pickup

9  truck headed toward me with a police unit with lights

10  activated trying to yield it coming my way.

11    Q    And can you indicate on the map here where

12  that vehicle was located when you first saw?

13    A    (Drawing on exhibit.)

14    Q    Right there?

15    A    It's tough because it's already marked.

16    Q    You can clear that.

17    A    (Marking exhibit.)

18    Q    What did you do when you saw this vehicle

19  failing to yield?

20    A    Well, when I had heard it was failing to

21  yield, I activated my lights to make my way to their

22  location.  So when I seen the vehicle coming toward me, they

23  weren't coming at a –– they were moving pretty slow so I

24  moved toward the middle of the road –– not blocking the road

25  but making it observe that we were attempting to yield the

**JA-207**

Thompson – Direct – Gardner

1   vehicle coming at me.  The vehicle continued toward me,

2   slowly rolled by my location.  I had come to a stop and the

3   other patrol unit also rolled by following them still trying

4   to stop them.

5          Q     Okay.  And did you attempt to stop the

6   vehicle?

7          A     Well, yeah, I had my lights on for that

8   purpose.  I had to turn around at that point and, in doing

9   so, by the time I turned around, the vehicle had begin to

10  flee at a high rate of speed from the other patrol unit.

11         MR. GARDNER:  Your Honor, I'd like to show the

12  witness what's been marked as Government Exhibit 8A for

13  identification.

14         Q     Sir, do you recognize that photograph?

15         A     Yes, I do.

16         Q     And what is it a photograph of?

17         A     The pickup truck that was failing to stop for

18  the myself and the other patrol unit.

19         Q     The one that you saw on Cook Road?

20         A     Yes, it is.

21         Q     Does it accurately depict that truck as you

22  saw it that day?

23         A     Yes, it does.

24         MR. GARDNER:  Your Honor, I'd like to offer this

25  into evidence as Government Exhibit 8A.

JA-208

173

Thompson – Direct – Gardner

1          THE COURT:  Any objection?

2          MR. SACCO:  No objection, your Honor.

3          THE COURT:  Okay, it will be received.

4          Q    And I forgot to ask, Investigator Thompson,

5    approximately what time of day was this?

6          A    If I remember correctly, it was in the

7    afternoon around 2 or 3 p.m.  There was a lot of traffic on

8    the road, daytime traffic.

9          Q    So, Investigator Thompson, did you give chase

10   to this vehicle?

11         A    Yes, I did.  I could hear from the other

12   patrol unit that the vehicle turned east on State Route 37

13   and I made my way in that direction.  I then heard the other

14   patrol unit say that the vehicle turned right which would be

15   south on to state route 95 and I also made my way in that

16   direction.

17         Q    Can you show us where you went on Government

18   Exhibit 2.

19         A    (Marking exhibit.)  Again, it's really small

20   here.  So that's 37 and there's -- that's 95.  It continues

21   through Bombay actually.

22         Q    At some point did you catch up to the truck?

23         A    Yeah.  I had to pass the other patrol unit,

24   which was an SUV, a Tahoe which wasn't as quick as the

25   vehicle I was in because they were losing the pickup truck.

174

Thompson – Direct – Gardner

1    He was getting away from them.  And I caught visual of him

2    before we entered Bombay and Bombay would be here, so

3    somewhere on 95 here (indicating).

4             Q    Were you able to keep up with the truck?

5             A    Yes, I was.

6             Q    And where did the truck go?

7             A    It continued on 95 through Bombay south,

8    continued south until the town of Moira.

9             Q    What happened when it got to Moira?

10            A    When it got Moria it took a left on County

11   Route 11, I believe.  That's east on 11 toward Malone.

12            Q    Did it make it to Malone?

13            A    No, when it got to the flashing light at

14   Bangor, the small town of Bangor, it took a right on to an

15   even smaller county road.

16            Q    Were you able to keep up with the vehicle the

17   whole time?

18            A    Yes, I was the.  The vehicle would pull away

19   when it would do something dangerous, passing an area where

20   it wasn't safe or over a hill or whatnot, and then I would

21   close the gap and it would open back up, close but I would

22   keep visual of it the entire time.

23            Q    At some point did you lose --

24            A    Yeah.

25            Q    -- visual of the vehicle?

175

Thompson – Direct – Gardner

1    A    When he turned on to the smaller roads, I

2    pursued him, he blew an intersection.  I don't even know what

3    road it is.  It's a small county road and because it wasn't

4    safe for me to do so, I had to stop at the intersection to

5    make sure nobody was coming.  I continued through in the

6    direction he headed over a hill and there was a sharp

7    90-degree left handed turn.  I slowed for the turn but ended

8    up going straight into a driveway.  I couldn't see him at

9    that time.  I just, I -- my best guess was he continued on

10   the road that made the turn, so I backed up and continued on

11   the road.  It wasn't until I got to another separate road

12   that I met another police unit with lights heading the

13   opposite direction and then I realized he must have turned

14   off somewhere and so then I turned around and came back.

15         Q    At some point did you locate the vehicle

16   again?

17         A    Actually, the driveway that I slid into, the

18   vehicle was found behind the house of the driveway.  He went

19   the driveway and drove around the house and into the yard and

20   the vehicle came to a stop at the tree line in the back of

21   that house, which wasn't visible from the road.

22         Q    Did you respond to that area?

23         A    Yes, I did.  There were other police units

24   there when I got there.

25         Q    Going back to Government Exhibit 8A, where was

JA-211

Thompson – Direct – Gardner

1   this photograph taken?

2          A     Behind that house on the tree line.

3          Q     So does Government Exhibit 8A depict the

4   vehicle as you found it?

5          A     Yeah, when I arrived, yeah, there was nobody

6   in it.  The person had already fled.  One of the other

7   officers said that the vehicle was locked and he had taken

8   off on foot.

9          Q     What did you do at that point?

10         A     There was me, myself and a couple other

11  officers.  I believe one was a canine and the four of us,

12  including the dog.  I can't remember exactly how many

13  officers, but a group of us went into the woods to see if he

14  had -- if he was in the immediate area and we searched for

15  him.

16         Q     Were you able to find the driver?

17         A     No, I wasn't, not in that location.

18         Q     Did you conduct any type of search on the

19  vehicle at that time?

20         A     No, I did not.

21         Q     Why not?

22         A     One of the other officers said it had been

23  locked and the driver wasn't there at the time, so.

24         MR. GARDNER:  Could I have one moment, your Honor.

25         THE COURT:  You may.

JA-212

177

Thompson – Cross – Sacco

1        MR. GARDNER:  Your Honor, that's all the questions
2   I have.
3        THE COURT:  Any cross-examination Mr. Sacco?
4        MR. SACCO:  Just briefly, Judge.
5        THE COURT:  Okay.
6   CROSS-EXAMINATION BY MR. SACCO:
7        Q    Morning, Officer.
8        A    Morning.
9        Q    Sir, can you give this jury an idea of, you
10  know, how fast was this, this pursuit, was he going a hundred
11  and 30 or 80?
12       A    Yeah, no, it was well into the hundreds.  I
13  couldn't look as I was driving for safety reasons.
14       Q    Yep.
15       A    Both the dispatcher at my station did look
16  back later and our car radios are GPSed and it tells the
17  location and speed and it was high.
18       Q    Over a hundred miles an hour?
19       A    Yes, over a hundred miles an hour.
20       Q    And that was your car?
21       A    Yes.
22       Q    And he was going faster than you were, it
23  sounds like?
24       A    At times, yes.
25       Q    And he was going straight through

JA-213

178
                    Thompson – Cross – Sacco

1  intersections with blinking lights?

2          A    Yeah, often.

3          Q    And you indicated you slowed down for safety

4  reasons because you didn't want to smash --

5          A    I didn't want to cause a collision.

6          Q    Now, we've looked at -- you looked at a lot of

7  photographs on the overhead here.

8               Were you off of -- I think you were calling it

9  reserve land -- during your pursuit or was this whole pursuit

10 on reserve land?

11         A    The start of the pursuit was in our territory,

12 which is why we continued the pursuit, and during the pursuit

13 I was told by my supervisor to continue pursuit because no

14 other vehicle was keeping up with him, no other vehicle was

15 able to catch him.

16         Q    Now, so, as you went off of the reserve, and

17 into I guess U.S. territory at that point, when you finally

18 lost him, were you on Route 11 at that point?

19         A    No.

20         Q    What route, do you know what route you were

21 on?

22         A    No, I don't.  It was some small road.

23         Q    Small country road.  Is it fair to say that

24 the photograph that we looked at of the truck in the bushes,

25 essentially?

JA-214

179

Thompson – Cross – Sacco

1              A     Yeah.

2              Q     When you got to that intersection, he drove

3    through someone's driveway behind the house and into the

4    bushes, right?

5              A     Yes, he did.

6              Q     He did that to avoid your detection, I assume,

7    is that true or do you know?

8              A     I cannot.

9              Q     Were there skid marks past the house or --

10             A     When you -- when you continued up through the

11   driveway, you could see the tracks through the yard.

12             Q     Do you know if that was -- the person driving

13   the truck, was that their personal residence or was it

14   someone else's house?

15             A     I did not know at the time.

16             Q     Do you know now?

17             A     I don't believe that was his residence.

18             Q     And you said you didn't search the car?

19             A     No, I did not search the car.

20             Q     And you said the person driving the car fled?

21             A     Yeah, I never -- I never saw the driver

22   because I missed the turn, backed up, assumed he had

23   continued on the road because I didn't see any tracks for the

24   car and I had to turn around when I met another police unit

25   when I realized I had gone too far because they were heading

JA-215

180

Thompson – Cross – Sacco

1  in the other direction.

2          Q    Do you know if the driver was ever

3  apprehended?  Were you part of the search party?

4          A    The driver -- I was told the driver was

5  apprehended.  I wasn't part of the search party that found

6  him, no.

7          Q    Now, you described in the beginning of your

8  testimony your duties and your area of operation --

9          A    Mm-mm.

10         Q    -- which is the U.S. -- I want to call it the

11 southern side of the Canadian/U.S. boundary, correct?

12         A    What would be the U.S. portion of the

13 Akwasasne Mohawk Indian reservation.

14         Q    Are you -- is that -- are you allowed to go on

15 the Canadian side or is it?

16         A    No, we're not.

17         Q    The border between the United States and

18 Canada, we saw that red line on the photograph, do you

19 remember that?

20         A    Yes.

21         Q    Now, how many roads cross that border from the

22 United States from the Canadian side to the United States

23 side, how many ways there are to get across that border, if

24 you know?

25         A    That, that depends where you're asking.  If

JA-216

Thompson – Cross – Sacco

1   you're asking the Canadian portion being Snye or the Canadian

2   portion being St. Regis or the Canadian portion being

3   Cornwall Island because there's three separate Canadian

4   portions of the reserve.

5        Q    Are you familiar enough with the three

6   different portions to tell us, you know, how many different

7   roads there are on all three?

8        A    Yeah, so, the Cornwall Island portion has the

9   international bridge so there's one main road obviously.

10       The St. Regis portion, you travel north on

11  St. Regis Road, which is the U.S. portion, and then you cross

12  a border, which is an unmanned customs, there is no customs

13  because it's on the reserve.  There are two separate roads

14  that lead into St. Regis, one would be St. Regis Road and the

15  other would be Johnson Road.

16       And then Snye portion would have a road called

17  Snye Road or there's interchangeable names for a lot of the

18  roads for whatever reasons, I don't know, family, whoever

19  named them.  To get into Snye, there would be Snye road or

20  McDonald Road.  You could also come in off the reservation

21  and go through Chapman Road into Snye.

22       Q    Sounds to me like there's at least five ways

23  to cross the international border without having a

24  checkpoint, is that fair to say?

25       A    The Cornwall Island portion, you have to make

JA-217

182

Thompson – Cross – Sacco

1   your way through Customs because there's an international

2   bridge.  But, as far as St. Regis and Snye go, no, there is

3   no custom border to go through.

4         Q    Are there at least five roads that cross the

5   U.S./Canadian boarder that are unmanned, is that fair to say?

6         A    No, you wouldn't count Cornwall Island.

7         Q    So there's four, four?

8         A    Yeah.

9         Q    So you're telling this jury there are four

10  unmanned roads between the United States and Canada?

11        A    There's one near Snye but it's a dead end

12  road.  It does enter partially, so I guess you could call

13  that one as well, so.

14        Q    Then there is five?

15        A    Yeah.

16        Q    One ends up at a dead end road?

17        A    Yeah, that one does not go into Snye but it's

18  technically in Canada.  The other ones do travel into Snye.

19        Q    Let's talk about, for just a minute, the

20  waterways.  The St. Lawrence River runs through the

21  territory, right?

22        A    Yes, it does.

23        Q    All right.  And there's also tributaries off

24  of the St. Lawrence, right?

25        A    Yeah, there's a bunch of little branches, you

Thompson – Cross – Sacco

1   know, it's a large body of water and branches out here and

2   there, yeah.

3           Q    And you stated during your initial direct

4   examination that you investigate all types of crimes, right,

5   arson it sounds like, drug crimes, domestic disputes, that

6   sort of thing?

7           A    Yes.

8           Q    Have you in the last year investigated drug

9   crimes up there, marijuana smuggling, cocaine smuggling?

10          A    Yes.

11          Q    Anything like that?

12          A    Yes, I have.

13          Q    All right.  And during your investigations,

14  the waterways are used in connection with the roads, right,

15  when drugs travel from the north to the south?

16          A    Yes, often they are.

17          Q    The drugs come down the waterways, the St.

18  Lawrence or the tributaries and then on to land.

19          A    Yes, often.

20          Q    And then those unmanned international border,

21  whether the woods or any other way, the drugs move south, is

22  that fair to say?

23          A    Yes.

24          Q    And those five roads that we just discussed in

25  my previous question, all those roads are used, is that fair

JA-219

184

                    Thompson – Cross – Sacco

1    to say?

2           A    They could be, yes.

3           Q    Now, there's a number of houses on the

4    Canadian side that are right on the U.S./Canadian border, is

5    that fair to say?

6           A    Yes.

7           Q    And is it -- it is true that oftentimes drug

8    smugglers go behind those houses and use those houses for

9    smuggling, in your experience?

10          A    I don't understand the question.

11          Q    That's okay.  Fine.  We just -- I just asked

12   you a number of questions about --

13          MR. GARDNER:  Your Honor, I'd like to object on

14   relevancy grounds and I'm not sure where we're going with

15   this and it also seems that we have to qualify this witness

16   as an expert to maybe even get into some of this stuff.

17          THE COURT:  Well, why don't you come up here.

18          (Held at side bar:)

19          MR. SACCO:  Your Honor, my intent -- my purpose of

20   this is that the witness testified that he's a policeman on

21   the U.S./Canadian border and that he investigates all these

22   different types of crimes.  This case involves not only my

23   client allegedly committing some sort of crime, but we've

24   heard testimony about various drug smugglers coming across.

25   So far we've heard about Cheryl Lobdell and now Alain Forget

JA-220

                    Thompson – Cross – Sacco

1   and all I'm trying to ask -- and probably inartfully -- is,

2   in his experience as an investigator, are there different

3   paths that drug smugglers use and that's what I'm trying to

4   do.

5           THE COURT:  All right.  I certainly think that it's

6   relevant.  I'll give you some leeway.  It is outside the

7   scope of what he asked him about, but I think it's fair that

8   you -- he has indicated he's been an investigator for three

9   years, he's been a police officer for, what, six?

10          MR. GARDNER:  Yeah.

11          THE COURT:  Been with the tribal PD up there

12  because he said he was from 2009 to 2012 a patrol officer so

13  he has some familiarity with the area and the law enforcement

14  investigations of drug activity in that area so I'm going to

15  allow a little leeway.  I'd ask you --

16          MR. SACCO:  I'm just going to try and ask one more

17  question, Judge, a good question.

18          THE COURT:  Okay.

19          (Open court:)

20          THE COURT:  Mr. Sacco, go ahead.

21          MR. SACCO:  Thank you, sir.

22          Q    Sir, isn't it true, that when drugs are

23  smuggled north -- I'm sorry, when drugs are smuggled from the

24  Canadian side to the U.S. side, there's a number of different

25  avenues are that are used, is that fair to say?

JA-221

186

Thompson – Cross – Sacco

1          A     Yes, that's fair to say.

2               MR. SACCO:  Judge, I don't have any others

3   questions.

4               THE COURT:  Anything further, Mr. Gardner?

5               MR. GARDNER:  No redirect, your Honor.

6               THE COURT:  Okay.  Investigator, thank you.  You

7   may step down, sir.

8               THE WITNESS:  Thank you.

9               (Witness excused, 10:30 a.m.)

10              THE COURT:  Mr. Gardner, before you call your next

11  witness, I'm going to give this jury a brief morning break

12  here, about ten minutes so you have an opportunity to get

13  your witness, have him available in the courtroom and we'll

14  start up again in about ten minutes.

15              MR. GARDNER:  Yes, sir.

16              THE COURT:  Go ahead and take a break.  Please

17  don't talk about the case -- talk about anything else --

18  don't talk about this case and we'll see you in about ten

19  minutes.

20              (Jury excused, 10:32 a.m.)

21              THE COURT:  Okay, we're in recess.

22              (Recess taken 10:33 a.m.)

23              (Open court, 10:46 a.m.)

24              THE COURT:  Okay.  Mr. Gardner, are you all set

25  with your next witness?

JA-222

187

Norcross – Direct – Gardner

1          MR. GARDNER:  Yes, sir.

2          THE COURT:  Okay.  Mr. Sacco, you're all set.

3          MR. SACCO:  I'm all set.

4          THE COURT:  Mr. Peters, you're okay.  Okay.  Bring

5    the jury in, please.

6          (Jury present, 10:47 a.m.)

7          THE COURT:  Okay, everybody looks all refreshed and

8    alert and ready to go.

9          Mr. Gardner good ahead, please.

10          MR. GARDNER:  Yes, your Honor, the government calls

11    New York state police investigator Scott Norcross.

12

13                  RICHARD SCOTT NORCROSS, called as a

14    witness and being duly sworn, testifies as follows:

15    DIRECT EXAMINATION BY MR. GARDNER:

16          Q    Good morning, Investigator Norcross.

17          A    Good morning.

18          Q    Can you please state your full name.

19          A    It's Richard Scott Norcross.

20          Q    And what is your current occupation?

21          A    I'm currently employed with the New York State

22    Police as a narcotics investigator, along with the DEA as a

23    task force officer.

24          Q    How long have you been assigned to DEA?

25          A    I've been officially assigned to DEA about

JA-223

Norcross – Direct – Gardner

1    three months.  I've worked with them for about five years.

2         Q    What does it mean to be a task force officer?

3         A    Basically an official task force officer is

4    you're on loan to the DEA for a minimum of two years.  You're

5    deputized as a DEA agent and work cases along with them.

6         Q    But you mentioned you've been working with the

7    DEA for longer than that?

8         A    Yes, I have.  I assisted with them

9    unofficially for about five years.

10         Q    And your time with the New York State Police,

11    what type of crimes have you investigated?

12         A    I'm in my 18th year with the state police.  I

13    was on the road as a road trooper, tickets, normal trooper

14    activities for 11 years.  In '07 I started as an investigator

15    in the back room, what we call, investigating the larger

16    crimes, the burglaries, the rapes, the sex abuse.  In '08 I

17    started with narcotics and I've been working in narcotics

18    ever since.

19         Q    And what state police barracks are you

20    assigned to?

21         A    I'm assigned to Troop B headquarters in

22    Raybrook, New York.

23         Q    I want to direct your attention to

24    September 15, 2010.  At some point that day did you become

25    aware of a chase involving Alain Forget?

189

Norcross – Direct – Gardner

1      A      Yes.

2      Q      How did you become aware of that chase?

3      A      I was on the road in an unmarked car.  I heard

4  it come over the radio there was a vehicle pursuit coming

5  from the western side of Franklin County, specifically the

6  reservation.  I was assisting trying to help the guys from

7  the reservation police.  They weren't familiar with the area

8  and where the vehicle was turning.  I was trying to assist

9  them over the radio and what roads they were on and where he

10  was heading.  I was familiar with the vehicle, once they

11  called the description out, and the registered owner of the

12  vehicle.

13      Q      Meaning you were familiar with Mr. Forget?

14      A      Yes, Mr. Alain Forget.  I was familiar with

15  his residence and it sounded like he was attempting to get

16  back to that residence.  I proceeded to park just down the

17  road from his residence as the pursuit was ongoing.

18      Q      At some point did you join in the pursuit?

19      A      I did when I heard that he turned down a

20  certain road and I knew there was a dead end there where he

21  was and that he possibly fled from the vehicle.  That's why I

22  patrolled to the scene.  It was the Fitzpatrick Road in the

23  town of Malone.

24      Q      What did you observe when you arrived at that

25  residence?

190

Norcross – Direct – Gardner

1          A    When I arrived there, I observed tire tracks

2    going back around the house through the yard and located the

3    pickup truck that was in the pursuit, Mr. Forget's pickup

4    truck, parked in a wooded area.

5          Q    If you could go ahead and look at your monitor

6    there and look at Government Exhibit 8A, do you recognize

7    that photograph?

8          A    Yes, I do.

9          Q    What is it?

10         A    That's the vehicle that was in the pursuit

11   owned by Mr. Forget.

12         Q    And is that the -- a photo of the vehicle as

13   you found it at that residence?

14         A    Yes, it is.

15         Q    Did you conduct a search of the vehicle at

16   that time?

17         A    Not at the time, no.  The vehicle was locked,

18   both the cab and the rear.  We had the vehicle towed back to

19   our local station in Malone, when we applied for a search

20   warrant to execute a search on the vehicle and its contents.

21         Q    Once you obtained that search warrant, did you

22   and other officers conduct a search?

23         A    Yes, we did.

24         Q    Did you describe your search to the jury?

25         A    We actually got cooperation from Mr. Forget

JA-226

191

Norcross – Direct – Gardner

1 who brought troopers back to the scene and helped locate

2 where he threw his keys.  So we got the keys back in the

3 meantime, which assisted us in opening the vehicle.

4           Inside the cab part of the vehicle we found

5 numerous notes with miscellaneous phone numbers, directions

6 to a place down in Syracuse, zip ties, which are commonly

7 used to zip tie bags, and a few other personal effects

8 belonging to Mr. Forget.

9           Q     Did you conduct a search of the bed of the

10 truck?

11           A     In the bed we found six large hockey style

12 black duffle bags, all which were zipped and sealed.  Upon

13 opening them, they were all full with several vacuum sealed

14 packages of marijuana.

15           MR. GARDNER:  Your Honor, I would like to show the

16 witness what's been marked as Government Exhibit 8B through

17 8G --

18           THE COURT:  Okay.

19           MR. GARDNER:  -- for identification.

20           Q     Investigator Norcross, if you could take a

21 look at all those photographs and let me know if you

22 recognize them.

23           A     (Witness complies.)  Yes, I do.

24           Q     You recognize all of them?

25           A     Yes, I do.

JA-227

192

Norcross – Direct – Gardner

1      Q     Generally what are those photographs of?

2      A     The six hockey bags in different photos.  Some

3 are closed.  Some are opened showing what's inside the

4 plastic vacuum sealed bags of marijuana.

5      Q     And where were those photos taken?

6      A     Right in the garage of SP Malone where the

7 warrant was executed.

8      Q     And do those photos accurately depict the bags

9 and the contents of the bags as you found them on

10 September 15th, 2010?

11      A     Yes, they do.

12      MR. GARDNER:  Your Honor, I'd like to offer these

13 exhibits into evidence as government's Exhibits 8A through

14 8G.

15      THE COURT:  8B through 8B.

16      MR. SACCO:  No objection, your Honor.

17      THE COURT:  Okay, they're received.

18      Q     Investigator Norcross, could you describe for

19 the jury what we're looking at here in Exhibit 8B?

20      A     Those are the six hockey bags that we pulled

21 out of the rear compartment of Mr. Forget's truck.

22      Q     And 8C, this is 8C?

23      A     Those are the same bags, just open.

24      Q     8D?

25      A     Once again, same bags, just open showing the

JA-228

193

Norcross – Direct – Gardner

1    marijuana.

2           Q    And can you describe for the jury the

3    packaging we're looking at?

4           A    That's -- they're commonly packaged in half

5    pound to pound packages, vacuum sealed to help eliminate with

6    the odor.

7           Q    And there's markings on some of the plastic

8    bags, is that markings that you or other law enforcement put

9    there or was that there when you opened the bags?

10          A    No, that's another common thing where the

11   actual suppliers will mark different types of marijuana using

12   different codes, a lot of them have their own codes.

13          Q    8E?

14          A    Once again, the same thing, different

15   markings.

16          Q    And these are different bags, I take it?

17          A    Yes, out of probably a different hockey bag.

18          Q    And looking right to the center part of the

19   photo, do you see the blue tape on the handle there?

20          A    Yes, I do.

21          Q    And, again, is that something that law

22   enforcement officers put there?

23          A    No.

24          Q    Or is that the way it was?

25          A    No, that's something they used to seal the

Norcross – Direct – Gardner

1    bags up.

2         Q    8F?

3         A    Same thing, marijuana inside the bag.

4         Q    And 8G?

5         A    Same thing.

6         Q    And what's that word right there?

7         A    That's jack.  That's another description of

8    the type of marijuana that it would be.

9         Q    After you recovered these bags from

10   Mr. Forget's vehicle, did you contact any other law

11   enforcement agency?

12        A    The DEA was on scene.

13        Q    They were already there?

14        A    Yes, most agencies around were there, border

15   patrol, everybody engaged in the pursuit.

16        Q    There was a lot of people involved?

17        A    Yes, there was.

18        MR. GARDNER:  May I have one moment, your Honor?

19        THE COURT:  You may.

20        MR. GARDNER:  No further questions, your Honor.

21   CROSS-EXAMINATION BY MR. SACCO:

22        Q    Morning, sir.

23        A    Morning.

24        Q    Sir, you described how you got to the scene

25   behind the residence where the truck was found?

195

Norcross – Cross – Sacco

1          A     Yes.

2          Q     The truck appears, from the photos anyways,

3     that it was driven into the bushes or something, is that fair

4     to say?

5          A     Correct.  There was a small logging road that

6     the owner had put back to get to an open area.

7          Q     Did you -- were you the one that found the

8     vehicle or how did that happen?

9          A     No, I was probably the third or fourth on

10    scene.

11         Q     So when you got there, you obviously looked in

12    the truck and Mr. Forget was not there?

13         A     Correct.

14         Q     But you did indicate on your testimony that at

15    some point later he went back with, with you and got the

16    keys?

17         A     Not with me, no, he went back with another

18    agent.

19         Q     If you know, how was Mr. Forget ultimately

20    located?

21         A     Ultimately, he was located about a half mile

22    through the woods with assistance of a canine, state police

23    canine.

24         Q     Were you involved in that search for him?

25         A     No, I was not.

196

                    Norcross – Cross – Sacco


1          Q     But, in any event, he was found on foot in the

2    woods?

3          A     No, he was actually found hiding underneath an

4    abandoned vehicle.

5          Q     In the woods, though?

6          A     Just outside the wooded area, yeah.

7          Q     So when you brought Mr. Forget -- you

8    ultimately brought him back to the barracks where -- the New

9    York State Police barracks where the drugs were, also?

10         A     Yes, he was transported back there.

11         Q     And he voluntarily complied with you and gave

12   you the can keys to open the truck?

13         A     After speaking with his lawyer he did.

14         Q     Now these hockey bags, is this -- is it a

15   common way that marijuana is smuggled using hockey bags?

16         A     Yeah, it's one of the most common one.

17         Q     Is there a particular reason for that, do you

18   know?

19         A     They can carry a lot.

20         Q     Just ease --

21         A     Ease of carrying it, I would imagine.

22         Q     That address where you found -- located the

23   truck, was that Mr. Forget's own personal residence or was

24   that a private citizens?

25         A     No, it was a private citizen's residence.

197

Norcross – Cross – Sacco

1    Q    And earlier you indicated that you knew
2  Mr. Forget's home address.  Is there a particular reason for
3  that?
4    A    You know, he's lived in the area.  I grew up
5  in the area.
6    Q    Okay.
7    A    I've always known him, not on a personal level
8  but I've known him and knew of his whereabouts.
9    Q    Okay.  Now, when you were at the scene, were
10  there any other people there at the scene besides law
11  enforcement, I mean, did Mr. Forget have a passenger or did
12  you see any other individuals there?
13    A    Did not see any other individuals.
14    Q    So you didn't see Allan Peters there at that
15  scene?
16    A    No, I did not.
17    MR. SACCO:  Your Honor, I have no further
18  questions.
19    THE COURT:  Mr. Gardner, anything further?
20    MR. GARDNER:  No redirect, your Honor.
21    THE COURT:  Thank you, sir.  You can step down.
22    THE WITNESS:  Thank you.
23    (Witness excused, 11:00 a.m.)
24    MR. GARDNER:  Your Honor, at this time the
25  government would like to offer into evidence Government

198

US v. Peters – 13–CR–316

1  Exhibit 32, which is a stipulation of fact.

2        THE COURT:  Another stipulation to be read?

3        MR. GARDNER:  Yes, sir.

4        MR. SACCO:  No objection, your Honor.

5        THE COURT:  Okay.  It will be received.  Go ahead.

6        MR. GARDNER:  Government Exhibit 32 states as

7  follows:

8        The parties stipulate as follows:  On

9  September 15th, 2010, New York State Police Investigator

10 Anthony Bailey recovered six black hockey style bags from a

11 vehicle driven by Alain Forget.  Investigator Bailey secured

12 the six black hockey style bags in the drug vault at the New

13 York State barracks in Malone, New York.

14       On September 16th, 2010, New York State police

15 investigator William Bronner retrieved the six hockey bags

16 from the evidence vault and transferred possession of the

17 bags to drug enforcement administration special agent Andrew

18 Hermes.  Special agent Hermes then transported the six

19 black -- six hockey bags to the DEA building in Plattsburgh,

20 New York.

21       Special agent Hermes and Investigator Bronner

22 examined the contents of the bags which contained dozens of

23 vacuum sealed plastic bags containing suspected marijuana.

24 Investigator Bronner removed the plastic bags which weighed

25 108 kilograms.

199

US v. Peters – 13–CR–316

1    On September 16th, 2010, Special Agent Michael

2  Larribee (phonetic) prepared representative samples of the

3  suspected marijuana from each of the six hockey bags.

4  Pursuant to DEA policy, Special Agent Larribee packaged the

5  representative samples and sent them to the DEA Northeast

6  Regional laboratory for chemical analysis via FedEx.

7    On October 5th, 2010, forensic chemist, Christopher

8  Benitendo completed a chemical analysis of the representative

9  samples submitted by special agent Larribee and

10  scientifically concluded that the suspected marijuana was in

11  fact marijuana.

12    In conclusion, Investigator Bailey took

13  possession of six hockey style bags from a vehicle driven by

14  Alain Forget which contained 108 kilograms of marijuana, a

15  Schedule I controlled substance.

16    Your Honor, at this time the government would like

17  to call special agent Andrew Hermes.

18

19         ANDREW HERMES, called as a witness and

20  being duly sworn, testifies as follows:

21  DIRECT EXAMINATION BY MR. GARDNER:

22    Q    Good morning, Special Agent Hermes.

23    A    Good morning.

24    Q    Can you please state your full name.

25    A    Andrew Hermes.

JA-235

Hermes – Direct – Gardner


1          Q     And what is your current occupation?

2          A     I'm a special agent with the Drug Enforcement

3    Administration.

4          Q     How long have you been with DEA?

5          A     Since approximately August 2009.

6          Q     And where are you currently assigned?

7          A     The Plattsburgh resident office.

8          Q     Was that your first assignment with DEA?

9          A     Yes, it is.

10         Q     And do you have any prior law enforcement

11   experience before becoming a DEA agent.

12         A     I was a probation officer.

13         Q     Can you explain to the jury a little bit about

14   what your day-to-day duties are like as a DEA special agent?

15         A     We investigate obviously narcotics

16   investigations, international, domestic, a lot of time spent

17   coordinating with other agencies, conducting surveillances,

18   working with confidential informants, working undercover

19   operations, responding to border patrol checkpoints or

20   seizures and we write a lot of reports.

21         Q     A lot of reports, right?

22         A     Yes.

23         Q     Are you familiar with the defendant in this

24   case, Mr. Allan Peters?

25         A     Yes, I am.

JA-236

201

Hermes – Direct – Gardner

1          Q     And are you aware of whether there was an

2    investigation regarding the defendant?

3          A     Yes.

4          Q     What role, if any, did you have in that

5    investigation?

6          A     I was the case agent.

7          Q     Can you describe a little bit about what the

8    duties are as a case agent?

9          A     Case agent takes the lead on the case,

10   coordinates with other law enforcement agencies conducts

11   strategy with other individuals.

12         Q     Special Agent Hermes, I'd like to direct your

13   attention to September 15th, 2010.  Are you aware of a

14   marijuana seizure that occurred on that day involving Alain

15   Forget?

16         A     Yes, I am.

17         Q     And did you have any interaction with Forget

18   after that seizure?

19         A     I did.

20         Q     What was that interaction?

21         A     I responded to the state police barracks in

22   Malone, New York and conducted the interview with him.

23         Q     At some point was -- let me rephrase that.

24               At some point did you sign Mr. Forget up as a

25   confidential source?

202
                    Hermes – Direct – Gardner


1              A      Yes, I did.

2              Q      What does that mean to be a confidential

3    source?

4              A      Confidential source with DEA, you get signed

5    up.  You work closely with us.  They're kind of like our eyes

6    and ears on the street.  They tell us information.  They

7    identify, you know, other possible targets in the area.

8              Q      Are you also able to use confidential sources

9    in an active manner similar to an undercover officer?

10             A      Yes.

11             Q      I want to direct your attention to

12   October 28th, 2010.  Did you receive information from Forget

13   that day?

14             A      I did.

15             Q      And, again, was he signed up as a confidential

16   source at this point?

17             A      Yes, he was.

18             Q      And without getting into too much detail, what

19   information did Forget provide you?

20             A      He stated that there was money available to

21   pick up at a location on the reservation from a

22   co-conspirator in this case.

23             Q      Based on the information that Forget provided

24   you, did you develop some kind of operational plan?

25             A      Yes, I did.

203

Hermes – Direct – Gardner

1    Q    And can you describe what that plan was --

2    actually before that, what did you hope to accomplish?

3    A    To seize some drug proceeds, money.

4    Q    Can you describe for the jury what your

5    operational plan was?

6    A    Yes.  We wanted to identify -- well, not

7    identify.  We wanted to have Forget utilize one of his

8    co-conspirators in this case being Corey Spinner to pick up

9    the money at that location.

10    Q    Had you already identified Spinner as a target

11    of your investigation?

12    A    Yes, I did.

13    Q    And did you want to accomplish anything else

14    specifically with regard to Spinner?

15    A    Yes, we wanted to Forget and Spinner to engage

16    in conversation regarding this drug smuggling organization.

17    Q    Did you want to do anything to help you track

18    the movements of Spinner?

19    A    Yes, we did.

20    Q    What did you want to do?

21    A    What we wanted to do was we wanted to place a

22    GPS device, which is a global positioning system device, on

23    Spinner's vehicle so we could track his movements realtime as

24    it's happening.

25    Q    Did you plan to conduct surveillance of any

204

Hermes – Direct – Gardner

1  meeting between Forget and Spinner?

2          A     Yes.

3          Q     Was Forget able to set up a meeting with

4  Spinner?

5          A     Yes, he did.

6          Q     And did you conduct surveillance of that

7  meeting?

8          A     Yes, he did we did.

9          Q     When did that meeting take place?

10         A     October 28th, 2010.

11         Q     So the same day?

12         A     Correct.

13         Q     Can you describe what you observed during your

14  surveillance that day?

15         A     During the surveillance, our confidential

16  informant, Forget ran out of gasoline on State Route 11 right

17  near the Wal-Mart.  At that point he had Corey Spinner come

18  and pick him up.

19         Q     Where was the meeting location supposed to be?

20         A     It was supposed to be at Wal-Mart.

21         Q     So Spinner came to pick up Forget?

22         A     Correct.

23         Q     And what happened then?

24         A     They drove to a hardware store where they

25  purchased -- where Forget purchased a gasoline can, went down

205

Hermes – Direct – Gardner

1   the road, bought some gas and went back to the van.

2           Q    At some point did they drive to a particular

3   location?

4           A    Yes, they went to Western Auto in Malone,

5   New York.

6           Q    What happened when they arrived at the Western

7   Auto?

8           A    At that point they arrived and Corey Spinner

9   jumped in Forget's vehicle.  Corey Spinner left his vehicle

10  there.

11          Q    Did Forget and Spinner remain in the parking

12  lot or did they drive somewhere?

13          A    They departed.

14          Q    Did you continue surveillance of those

15  individuals or did you stay in the parking lot?

16          A    I stayed in the parking lot with another task

17  force officer.

18          Q    What did you do in the parking lot?

19          A    We sat in the parking lot and a GPS device was

20  placed underneath Spinner's vehicle.

21          Q    Who did that?

22          A    TFO, I believe it was Charlie Teabo

23  (phonetic).

24          Q    TFO means?

25          A    Task force officer, sorry.

JA-241

```
                                                      206
              Hermes – Direct – Gardner


 1            Q      And how are the GPS devices affixed or put on

 2    to a vehicle?

 3            A      Through magnets and, also, for extra security

 4    so we don't lose them, we use zip ties.

 5            Q      Where do you put them on the vehicle?

 6            A      It varies.  We want to put it in a location

 7    where it's obviously not easily seen.

 8            Q      Is it fair to say usually underneath the

 9    vehicle?

10            A      Correct, yes.

11            Q      The frame or something along those lines?

12            A      Correct.

13            Q      And you started to talk about it a little bit

14    but what's the point of putting a GPS device on a vehicle?

15            A      So we can track movement realtime.

16            Q      Did this tracking device work?

17            A      It did.

18            Q      At some point did it stop working?

19            A      Yes.

20            Q      When was that?

21            A      Approximately 24 hours, less than 24 hours.

22            Q      Did you observe anything else relevant during

23    your surveillance that day?

24            A      No.

25            Q      I'd like to direct your attention to the
```

207

Hermes – Direct – Gardner

1  following day, October 29th, 2010.  Did you have additional

2  contact with Forget on that day?

3          A    Yes.

4          Q    And do you recall, was it over the phone, did

5  you meet with him?

6          A    At some point we had met up.

7          Q    Do you remember where you met up?

8          A    I believe it was somewhere around Malone,

9  New York.

10          Q    And why did you meet with Forget at that time?

11          A    Based on the previous day, the money was

12  supposed to be picked up by Corey Spinner and on that -- the

13  next day, the day I was -- the current day I was meeting with

14  him, he was supposed to go to his place of business to pick

15  up the money.

16          Q    When you met with Forget, did he indicate

17  whether he had communicated with anybody else involved in

18  this organization?

19          A    Yes, he showed me test messages that he -- on

20  his, on his phone.

21          Q    What did you do with those text messages?

22          A    I took a photograph of them.

23          MR. GARDNER:  Your Honor, I'm showing the witness

24  what's been marked as Government Exhibit 9A for

25  identification.

208

Hermes – Direct – Gardner

1    Q    Special Agent Hermes, do you recognize that

2  exhibit?

3    A    Yes, I do.

4    Q    And what is it?

5    A    It's a text message.

6    Q    Is it a photograph of a text message?

7    A    Yes, it is.

8    Q    Is it the same text message or one of the text

9  messages that we were just referring to?

10    A    Yes.

11    Q    That Forget brought to you?

12    A    Correct.

13    Q    Does that photograph accurately depict the

14  text message on that you observed on October 29th, 2010?

15    A    Yes.

16    MR. GARDNER:  Your Honor, I'd like to offer this

17  into evidence as Government Exhibit 9A.

18    THE COURT:  Any objection?

19    MR. SACCO:  No, your Honor.

20    THE COURT:  Received.

21    Q    Special Agent Hermes, looking at Government

22  Exhibit 9A, can you describe to the jury what we're looking

23  at?

24    A    It's a text message that says, lunch tomorrow

25  BG.

JA-244

Hermes – Direct – Gardner

1  Q    Does it indicate the time and whose it from?

2  A    Yes, from C on October 28th at approximately

3  5:56 p.m.

4  Q    You saw this text message not on October 28

5  but on October 29th, 2010?

6  A    Yes, that's correct.

7  Q    At that time what was your understanding of

8  that text message?

9  A    There was going to be something available for

10  pickup tomorrow.

11  Q    And on October 29th, 2010, did you take steps

12  to arrange to have Forget meet with Spinner?

13  A    Yes, we did.

14  Q    And what happened?

15  A    We conducted a surveillance to Spinner's place

16  of business, Spinner's Tint and Graphics in Malone, New York.

17  Q    Is that his place of business?

18  A    Yes.

19  Q    Please continue.

20  A    Excuse me, when we got there, we observed

21  Forget pull in the driveway and park.  Spinner was not there.

22  I, I heard over the radio from other law enforcement officers

23  on this operation that Spinner had departed his house, as we

24  were going there.

25  Q    At some point did Forget meet with Spinner?

JA-245

210

Hermes – Direct – Gardner

1          A    Yes, he did.

2          Q    Do you know if Forget received any money or

3     got anything from Spinner, to the best of your knowledge?

4          A    No, I don't.

5          Q    After his meeting with -- after Forget met

6     with Spinner, did you meet with Forget?

7          A    I did.

8          Q    And did he have any money on him?

9          A    I think just the money that he had on his

10    person previous -- prior to the operation.

11         Q    Okay.

12         A    $95, $98, something like that.

13         Q    I'd like to direct your attention now to

14    February 2011.  During that time period -- I guess I should

15    say, in that time period did you receive additional

16    information from Forget?

17         A    I did.

18         Q    And did this information relate to Forget's

19    communication with another member of this organization?

20         A    Yes.

21         Q    Without getting into too much detail about

22    what Mr. Forget said, generally speaking, what was the

23    information he provided?

24         A    He informed me that there's something to pick

25    up in Syracuse.

211
Hermes – Direct – Gardner

1      Q      What do you mean by that, there's something to
2 pick up?
3      A      That there was something he was asked by this
4 guy to pick up in Syracuse and transport back.
5      Q      Did you meet with Forget?
6      A      I did.
7      Q      And did he indicate whether he was
8 communicating with this individual in person, by phone, text
9 message?
10      A      Text message.
11      Q      Did he have -- did he show you text message?
12      A      Yes, he did.
13      Q      I should have said text messages.
14      MR. GARDNER:  Your Honor, I would like to show the
15 witness what's been marked as Government Exhibit 9B and 9C
16 for identification.
17      THE COURT:  Okay.
18      Q      Special Agent Hermes, can you look at both of
19 those exhibits and tell me if you recognize them.
20      A      Yes, I do.
21      Q      And what are those photographs of?
22      A      Two photographs of text messages shown to me
23 by Forget.
24      Q      On what date?
25      A      This was on the 23rd of February.

JA-247

Hermes – Direct – Gardner

1          Q     And do those photographs accurately depict the

2     text messages that Forget showed you on February 23rd, 2011?

3          A     Yes, it does.

4          Q     Your Honor at this time the government would

5     like to move into evidence government Exhibits 9B and 9C?

6          THE COURT:  Any objection?

7          MR. SACCO:  No objection, your Honor.

8          THE COURT:  They'll be received.

9          Q     Okay, we're looking at 9B.  Can you describe

10    to the jury what this photograph depicts?

11         A     Yes, it's a text message inbox from cowboy

12    that says, no, this is to pick up in syra back to BG.

13         Q     Syra as in Syracuse?

14         A     Correct.

15         Q     And what was the date of this text message?

16         A     February 22nd, 2011.

17         Q     And if we can go to 9C and, again, can you

18    explain to the jury what we're looking at in 9C.

19         A     Again, it's an inbox text message, no, and

20    it's those hand tools, again, February 22nd, 3:28 p.m.

21         Q     Now were these the only text messages that

22    Forget had at that time?

23         A     No.

24         Q     This is just two of many?

25         A     Yes.

JA-248

213

Hermes – Direct – Gardner

1      Q    At this point what was your understanding of
2 what was happening or what Forget was being asked to do?
3      A    It was under -- it was my understanding that
4 Forget was asked to pick up hand tool -- excuse me, firearms
5 down in Syracuse, New York and transport them back to the
6 reservation.
7      Q    You believe that the reference to hand tools
8 is actually a reference to firearms?
9      A    Yes.
10     Q    Speaking of the other text messages, was there
11 information in those text messages about the location of this
12 pickup?
13     A    Yes.
14     Q    And what was the location?
15     A    It was at the Clarion Inn in Syracuse, I
16 believe it was 100 Farrell Road.
17     Q    Was there a specific room number that Forget
18 was supposed to go to?
19     A    Yes, room 249.
20     Q    And if I didn't ask this before, is Forget
21 still working as a confidential source at this point in time?
22     A    Yes, he is.
23     Q    Is there any other information relevant to the
24 pickup in those text messages?
25     A    Yes.

JA-249

214

Hermes – Direct – Gardner

1    Q    And what was that information?

2    A    It was a code word, when they knock at the

3    door, to say hi, buffey, as the code word.

4    Q    So, based on all this information, did you

5    develop an operational plan?

6    A    Yes, we did.

7    Q    And what was the goal of your operation?

8    A    Obviously the goal was to intercept these

9    weapons before they crossed the border into Canada.

10    Q    Can you describe for the jury what you did to

11    execute this operation?

12    A    Yes, I contacted Special Agent Neil Joyce in

13    the Syracuse office.  He is a DEA agent.  I contacted him

14    with this information.  Based on the weather, it was severe

15    snow, horrible conditions where we couldn't make the trip

16    from Plattsburgh to Syracuse.  But we didn't want to

17    obviously pass up this opportunity to intercept these guns.

18    Q    And this is on still on February 23rd, 2011?

19    A    Yes.

20    Q    Did you and Special Agent Joyce discuss the

21    operation and how they were going to conduct it?

22    A    Yes.  They were going to use a confidential

23    informant from this area to do the pickup.

24    Q    This area being Syracuse?

25    A    Yes.

JA-250

215

Hermes – Direct – Gardner

1      Q      Now, was Forget involved at all in the actual

2  pickup?

3      A      No, he wasn't.

4      Q      You mentioned the -- or I meant to ask you, in

5  the text messages, was there a target date for this pickup?

6      A      Yes, the 25th.

7      Q      Did the weather have any effect on that target

8  date?

9      A      It did.

10     Q      How so?

11     A      We had -- law enforcement tried to push it up

12 so we could do it on the 24th instead of the 25th.

13     Q      I don't want to go into too much detail about

14 what Special Agent Joyce told you, but were you in

15 communication with Special Agent Joyce?

16     A      Yes.

17     Q      And do you know if there was an attempt to

18 pick up the guns on February 24th?

19     A      Yes.

20     Q      Did Special Agent Joyce indicate whether that

21 attempt was successful or unsuccessful?

22     A      Yes, he said it was unsuccessful.

23     Q      In speaking with Special Agent Joyce, did he

24 indicate whether another attempt was made to pick up the guns

25 on February 25th?

216

Hermes – Direct – Gardner

1    A    Yes.

2    Q    And do you know if that was successful or not?

3    A    It was successful.

4    Q    How did you learn about the success of the

5 operation?

6    A    Special Agent Neil Joyce contacted me and told

7 me that they had successfully completed the pickup.

8    Q    After you received information that Special

9 Agent Joyce was in possession of the guns, what did you do?

10    A    At that point I contacted Forget so he could

11 let his guys know that we picked them up so he could confirm

12 that it was picked up.

13    Q    I mean, you used "he" a couple times there.

14 You had Forget do what?

15    A    We had Forget contact the co-conspirator on --

16    Q    Cowboy?

17    A    Cowboy.  To confirm that they were picked up

18 because at some point Cowboy would know we picked them up and

19 to go along with the ruse, we needed to let him know that

20 they were picked up.

21    MR. GARDNER:  Your Honor, I'd like to show the

22 witness what's been marked as Government Exhibit 9D for

23 identification.

24    Q    Special Agent Hermes, do you recognize that

25 exhibit?

JA-252

Hermes – Direct – Gardner

1          A    I do.

2          Q    What is it?

3          A    It's a picture of a text message.

4          Q    Is it -- how are you familiar with that

5    exhibit?

6          A    I met with Forget and he provided the phone

7    and I took a picture of this text message he got.

8          Q    And when did you meet with him to take that

9    picture?

10         A    On the 25th.

11         Q    Does that photograph accurately depict the

12   text message that Forget showed you on February 25th, 2011?

13         A    Yes.

14         MR. GARDNER:  Your Honor, the government would like

15   to introduce this into evidence as Government Exhibit 9D.

16         MR. SACCO:  No objection, your Honor.

17         THE COURT:  It will be received.

18         Q    All right.  Special Agent Hermes, can you

19   explain to the jury what we're looking at here in Exhibit 9D?

20         A    Yes.  It's inbox text message.  It says, gimme

21   an ETA for BG.  When you get it, I'm ready.  With the date

22   February 25th, 2011, and 3:30 p.m.

23         Q    And for all these text messages -- if I didn't

24   ask this before -- are they all from a phone that Forget was

25   in possession of?

JA-253

218

Hermes – Direct – Gardner

1          A     Yes.

2          Q     In addition to reviewing the text messages

3  that Forget provided, did you do anything else with Forget on

4  February 25th, 2011?

5          A     Yes, I did.

6          Q     What did do you?

7          A     We conducted a recorded telephone call to

8  Cowboy.

9          Q     Prior to conducting that recorded call, did

10 you have a conversation with Forget?

11         A     Yes.

12         Q     Did you provide him with any instructions on

13 what to say to Cowboy?

14         A     Yeah, we came up with kind of a game plan of

15 how we wanted to play this off.

16         Q     Can you describe to the jury what that game

17 plan was?

18         A     Yep.  That the person who picked them up was

19 stopped.  He received these guns as an inheritance, so that's

20 why they might not be registered to him and that's why he's

21 driving with guns in his car that, you know, I just received

22 these and it's an inheritance really.

23         Q     Was any of that true?

24         A     No.

25         Q     It was a totally made-up story?

JA-254

Hermes – Direct – Gardner

1          A    Yes.

2          Q    Were you present when Forget made this phone

3  call?

4          A    I did.

5          Q    And did you monitor him?

6          A    I did.

7          Q    Can you describe for the jury what was said

8  during that conversation?

9          A    During the conversation he told him –– told

10  Cowboy the story about the gun, you know, about his guy

11  getting pulled over.  He told him the exact story we came up

12  with, said he got pulled over.  It was an inheritance.  They

13  let him go but they gave him paper.  That was real important

14  that they had paperwork, which is a receipt for these –– for

15  the guns that were seized, so organizations can have proof

16  that either, you know, I guess, in any case, drugs or guns or

17  money, that they were seized by law enforcement and that the

18  actual person in possession didn't steal it.

19          Q    And Forget and Cowboy had a conversation about

20  this paper?

21          A    Yes.

22          Q    Did Cowboy indicate whether or not he wanted

23  this paper?

24          A    Yes.

25          Q    This receipt, at some point did you generate a

JA-255

220

Hermes – Direct – Gardner

1  receipt for those guns?

2      A    I did.

3      Q    Can you describe to the jury what you did?

4      A    I used a New York State Police receipt and

5  listed the guns and their serial numbers on the receipt as if

6  they were seized by the trooper.

7      Q    Were these the actual guns that were seized by

8  Special Agent Joyce?

9      A    Yes.

10     Q    Why did you use the actual guns?

11     A    The organization in Canada might have known

12  every gun that was purchased or any gun that they had and/or

13  expecting, so we wanted to make sure that we continue along

14  with this ruse and that it would be believed.

15     Q    Again, you indicated that this was a New York

16  State Police form?

17     A    Yes.

18     Q    And, again, was this total -- the form a true

19  form or was it fictitious?

20     A    It was a true form but we made it fictitious.

21     Q    Did the New York State Police have anything to

22  do with the gun seizure?

23     A    No.

24     MR. GARDNER:  Your Honor, I'd like to show Special

25  Agent Hermes what has been marked as Government Exhibit 13

221

Hermes – Direct – Gardner

1     for identification.

2             Q     Special Agent Hermes, do you recognize that

3     exhibit?

4             A     I do.

5             Q     And what is it?

6             A     It's a copy of the receipt of the guns that we

7     gave Forget.

8             Q     The receipt that we were just discussing?

9             A     Correct.

10            Q     Is that copy that you're looking at right now

11    in the same or substantially the same condition as when you

12    first generated it?

13            A     Yes.

14            Q     Is there anything different about it now than

15    when you first generated it?

16            A     Yes, after we pulled I guess the back side

17    off -- because it was a multi-ply sheet -- I wrote at the

18    bottom, this is a fake receipt generated by DEA.  This

19    receipt has no value.

20            Q     Was that written on the original copy?

21            A     (No response.)

22            Q     Maybe I misunderstood.  You seemed to imply

23    the form was in triplicate or something along those lines?

24            A     Yes.

25            Q     So was that written on the -- you said the

222

Hermes – Direct – Gardner

1  back side sheet?

2      A    It was written after we had ripped off the

3  back side as to not be on the other -- I don't know what you

4  call it -- the sheet -- I don't know how to reference it.

5      Q    That's fine.  Okay.

6      MR. GARDNER:  The government would like to offer

7  Government Exhibit -- this into evidence as Government

8  Exhibit 13.

9      THE COURT:  So it's clear for the record.

10     MR. GARDNER:  Yes, sir.

11     THE COURT:  The form that was provided to Forget to

12  give back to Cowboy didn't have that written on it?

13     THE WITNESS:  Yes, that's correct, your Honor.

14     THE COURT:  That's what you're trying to clarify.

15     THE WITNESS:  Yes, your Honor.

16     THE COURT:  So this was just for internal law

17  enforcement purposes you marked on there that this form is

18  not valid, in case somebody tried to come to an agency and

19  collect those weapons.

20     THE WITNESS:  Yes, your Honor, that's correct.

21     THE COURT:  Any objection to the offer of this

22  receipt?

23     MR. SACCO:  No objection, your Honor.

24     THE COURT:  All right.  It will be received.

25     Q    So, Special Agent Hermes, can you explain to

JA-258

223

Hermes – Direct – Gardner

1    the jury what we're looking at here at Government Exhibit 13?

2         A    Yes.  Yes, it's the receipt with the troop at

3    the top, troop D station is C net, the date is 0/25/2011,

4    with trooper James Smith.  It's a description of all the

5    hundreds and their serial numbers.

6         Q    As we scroll down here to the end, you see the

7    part with the asterisk?

8         A    Yes.

9         Q    Is that the part that you added later?

10        A    Correct.

11        Q    What was the overall purpose of generating

12   this fictitious form?

13        A    So we could wall off the seizure.

14        Q    What do you mean by wall off?

15        A    So we could seize the guns without having any

16   heat put on -- or, I'm sorry, any, yeah, I guess heat put on

17   our confidential source.  It was seized away from our area.

18   It was seized down to toward Syracuse.

19        Q    Heat meaning scrutiny?

20        A    Yes.

21        Q    What did you ultimately want to do with this

22   piece of paper?

23        A    Get it back to the organization.

24        Q    Get it back to Cowboy?

25        A    Correct.

224

Hermes – Direct – Gardner

1     Q     Did you come up with a plan to do that?

2     A     Yes, we did.

3     Q     What was your plan?

4     A     The plan was to meet with the defendant,

5  excuse me, the plan was to have Forget meet with the

6  defendant and give him the receipt to give back to Cowboy.

7           MR. GARDNER:  Your Honor, can I just have one

8  moment.

9           THE COURT:  Can we be specific about defendant, who

10 are we talking about?

11    Q     When you say defendant, what are you

12 referencing?

13    A     Mr. Peters.

14          MR. GARDNER:  Sorry, sir, can I just have one

15 moment.

16          (Discussion held off the record.)

17    Q     So you said you wanted to have Forget meet

18 with the defendant, correct?

19    A     Correct.

20    Q     How were you going to arrange that meeting?

21    A     We were going to have Forget place a recorded

22 telephone call to Mr. Peters.

23    Q     I'd like to direct your attention to

24 March 25th, 2011, did you meet with Forget on that date?

25    A     Yes, we did.

JA-260

225
                    Hermes – Direct – Gardner


1          Q     And what was the purpose of that meeting?

2          A     The purpose was to make a recorded telephone

3     call to ultimately Peters -- Mr. Peters.

4          Q     And did Mr. Forget place a recorded telephone

5     call?

6          A     He did.

7          Q     First of all, how do you record a call like

8     that?

9          A     I have a recording device with an earbud that

10    goes in the ear, at which point and then the phone goes up to

11    the same ear (indicating).

12         Q     And when Mr. Forget placed this call, did you

13    physically monitor him placing this call?

14         A     Yes.

15         MR. GARDNER:  Your Honor, I'd like to show the

16    witness what's been marked as Government Exhibit 16 for

17    identification.

18         Q     Special Agent Hermes, do you recognize that

19    exhibit?

20         A     Yes, I do.

21         Q     And what is it?

22         A     It's a CD.

23         Q     What does that CD contain?

24         A     This is CD of the meet between Alain Forget

25    and Peters.

JA-261

226

Hermes – Direct – Gardner

1      Q    Is it the recorded phone call or is it a
2   meeting?
3      A    I think it's -- I believe it's the meeting.
4           MR. GARDNER:  Can I just have one moment, your
5   Honor?
6           THE COURT:  You may.
7           MR. GARDNER:  Thanks.
8           (Pause in proceedings.)
9           MR. GARDNER:  Your Honor, I apologize.  I'm
10  wondering if we can just have a five- to ten-minute break.
11          THE COURT:  You may.
12          Ladies and gentlemen, I'm going to let you go back
13  into the jury room for just a couple minutes.  We're going to
14  bring you right back out so don't get too comfortable in
15  there.  Please don't discuss the case.
16          (Jury excused, 11:35 a.m.)
17          MR. GARDNER:  I apologize, your Honor.
18          THE COURT:  I know, you got to find the CD with the
19  phone calls as opposed to the CD of the --
20          MR. GARDNER:  They're reversed.
21          THE COURT:  Okay.
22          MR. GARDNER:  It will just take me five minutes and
23  I'll clarify it with page.
24          THE COURT:  Sure.
25          MR. GARDNER:  We'll be right back, your Honor.

JA-262

Hermes – Direct – Gardner

1          THE COURT:  All right.

2          (Recess taken.)

3          (Open court:)

4          THE COURT:  We have both lawyers, the defendant, so

5     let's bring the jury back in, please.

6          (Jury present, 11:43 a.m.)

7          THE COURT:  Okay.  The record should reflect we

8     have the ladies and gentlemen of the jury after a brief break

9     and we're going to continue with the direct examination of

10    our DEA agent.

11         Ladies and gentlemen, so you know, just for

12    planning purposes, I've just talked with the attorneys and

13    Mr. Gardner thinks he's going to be another 15, 20 minutes on

14    direct examination.  So what we'll do is we'll finish this

15    direct, in case any of your stomachs are rumbling.  I'm going

16    to let you go to lunch after that and we'll allow Mr. Sacco

17    to cross after lunch.  So we'll finish this up and then we'll

18    get you off to lunch, okay.

19         Mr. Gardner go ahead, sir.

20         MR. GARDNER:  Thank you, your Honor.

21         Your Honor, I'd like to show the witness what's

22    been marked as Government Exhibit 16 for identification.

23         Q    Special Agent Hermes, do you recognize that?

24         A    I do.

25         Q    And what is it?

JA-263

228

                    Hermes – Direct – Gardner

 1          A    It's a phone call between Alain Forget and

 2   Mr. Peters.

 3          Q    Have you listened to that call?

 4          A    Yes, I have.

 5          THE COURT:  Well, specifically, excuse me

 6   Mr. Gardner, it's a CD of a phone call.

 7          A    Specifically, it's a CD containing a recorded

 8   telephone call.

 9          Q    And you listened to that entire call?

10          A    Yes, I have.

11          Q    And do you recognize the voices that are

12   contained on that call?

13          A    I do.

14          Q    Who are the voices?

15          A    Allan Peters and Alain Forget.

16          Q    Are you familiar with the defendant's voice?

17          A    Yes.

18          Q    Is there any other voice we hear on that

19   recording?

20          A    You'll hear mine, too.

21          Q    In listening to the call, does it appear that

22   your recording equipment worked properly?

23          A    Yes.

24          Q    Are there any interruptions or gaps in the

25   call?

JA-264

229

Hermes – Direct – Gardner

1          A     No.

2               MR. GARDNER:  Your Honor, at this time the

3     government would like to offer Government Exhibit 16 into

4     evidence as Government Exhibit 16.

5               THE COURT:  Any objection?

6               MR. SACCO:  No objection, your Honor.

7               THE COURT:  It will be received.

8               MR. GARDNER:  Your Honor, I'm showing the witness

9     what's been marked as Government Exhibit 15 for

10    identification.

11         Q     Special Agent Hermes, do you recognize that

12    exhibit?

13         A     I do.

14         Q     And what is it?

15         A     It's a transcript of the recorded telephone

16    call.

17         Q     Government Exhibit 16 that we just talked

18    about?

19         A     Correct.

20         Q     And who prepared that transcript?

21         A     I did.

22         Q     And does that transcript accurately depict or

23    describe the telephone call?

24         A     Yes.

25               MR. GARDNER:  Your Honor, at this time the

230

Hermes – Direct – Gardner

1    government would like to offer into evidence Government

2    Exhibit 15 as an aide to the jury.

3              THE COURT:  Any objection?

4              MR. SACCO:  No objection, your Honor.

5              THE COURT:  It will be received.

6              MR. GARDNER:  Your Honor, the government would now

7    like to publish Government Exhibit 16 and we'd like to

8    publish it using a particular program that will show the

9    transcript, as well as show a photograph of the individual

10   speaking.  Go ahead.

11             (CD played.)

12        Q    Special Agent Hermes, based on that

13   conversation, what did you decide to do from an investigative

14   standpoint.

15        A    At that point we were going to set up

16   surveillance to watch this meet.

17        Q    And the call indicated that the meeting would

18   be at Burger King; is that right?

19        A    That's correct.

20        Q    In what city?

21        A    Malone, New York.

22        Q    And did you have a surveillance team with you

23   that day?

24        A    Yes, I did.

25        Q    Did you -- well, you already were with

231

Hermes – Direct – Gardner

1   Mr. Forget; is that right?

2          A    Yes.

3          Q    Did you provide Mr. Forget with any type of a

4   recording device?

5          A    I did.

6          Q    Can you describe that device?

7          A    Yes, it's a small little recording device,

8   (indicating) about that big, records conversations and stores

9   them on there.

10         Q    And where did you place this device on

11  Mr. Forget?

12         A    Inside the lip of his hat.

13         Q    Was it concealed?

14         A    Yes, it was.

15         Q    Did you give Mr. Forget anything before he

16  went to this meeting?

17         A    Yes.

18         Q    What did you give him?

19         A    I gave him the gun receipt.

20         Q    Government's Exhibit 13.  And just so we're

21  clear, this asterisk which says "this is a fake receipt

22  generated by the DEA.  This receipt has no value" or, no --

23  yeah, value, was that part written on there when you provided

24  this to Mr. Forget?

25         A    No, it was not.

232

Hermes – Direct – Gardner

1         Q    Did Forget have anything else with him when

2  you met with him before this meeting?

3         A    Yes, he had a cellular phone that he was also

4  going to send with Mr. Peters.

5         Q    Can you describe what you observed during the

6  surveillance?

7         A    Yes, surveillance was established around the

8  Burger King parking lot at some point I was contacted by

9  Forget and he received a phone call from Mr. Peters.

10  Mr. Peters wanted to change the meet location to the Tractor

11  Supply in Malone, New York.

12         Q    Did you conduct surveillance of Tractor

13  Supply?

14         A    Yes, we did.

15         Q    Were you following Forget or were you

16  following the defendant?

17         A    I was following Forget.

18         Q    What did you observe Forget do?

19         A    I observed Forget drive to the location and

20  drive into the parking lot.  At that point we had turned

21  around and we noticed or we observed that he was parked next

22  to a maroon Chevy pickup truck.

23         Q    What was Forget driving that day?

24         A    A minivan.

25         Q    Do you remember the color?

JA-268

                    Hermes – Direct – Gardner


 1          A     I believe it was a teal kind of color, a

 2   mint -- not mint, teal.

 3          Q     Okay.  And so you observed Forget pull in and

 4   park next to the truck?

 5          A     I observed him pull in and on my way back, I

 6   observed that he was parked next to the pickup truck.

 7          Q     Were you driving around still at that point?

 8          A     Yes.

 9          Q     At some point did you take up a fixed

10   position?

11          A     Yes, we did.

12          Q     And where was that?

13          A     In the Wal-Mart barking lot.

14          Q     Where is the Wal-Mart parking lot in relation

15   to the Tractor Supply?

16          A     Just east of the location.

17          Q     About how far away were you from the Tractor

18   Supply park parking lot?

19          A     I believe less than a hundred yards.

20          Q     Once you arrived at that location, what did

21   you observe?

22          A     I observed the vehicles parked next to each

23   other.  At that point, we had left that stationary position

24   again and drove past the Tractor Supply.  We drove back again

25   the other way and went back to our original position.  At

JA-269

234

Hermes – Direct – Gardner

1   that point I heard over the over the radio that a door was

2   opened and I observed Mr. Peters in between the van and his

3   pickup truck and then I observed Mr. Peters head into the

4   Tractor Supply.

5              Q     Why did you continue to move your location?

6              A     We wanted to get better, good photographs.

7              Q     Did you have any type of -- any surveillance

8   equipment with you that day?

9              A     Yes, I had binoculars and the TFO -- the task

10  officer with me had a camera.

11             Q     About how long did this meeting last?

12             A     Less than 20 minutes.

13             MR. GARDNER:  Your Honor, I'd like to show the

14  witness what's been marked as Government's Exhibit 12A

15  through 12E.

16             Q     Special Agent Hermes, do you recognize -- can

17  you look through each of those exhibits and tell me if you

18  recognize them.

19             A     Yes, I do.  These are photographs of the

20  surveillance that day.

21             Q     And where were those photographs taken from?

22             A     State Route 11 and from the Wal-Mart parking

23  lot.

24             Q     Were they taken from the vehicle that you were

25  in?

JA-270

235

Hermes – Direct – Gardner

1          A     Correct.

2          Q     Were you with anyone that day?

3          A     Yes, I was.

4          Q     Who were you with?

5          A     TFO Dave Teabo.

6          Q     Who actually took the photographs?

7          A     TFO Dave Teabo.

8          Q     Do those photographs accurately depict

9     Forget's vehicle, Forget, the defendant, the parking lot at

10    tractor supply?

11         A     Yes.

12         MR. GARDNER:  Your Honor, the government would like

13    to offer these into evidence as Government's Exhibit 12A

14    through 12E, I believe, 12E?

15         THE COURT:  Any objection?

16         MR. SACCO:  No objection, your Honor.

17         THE COURT:  It will be received.

18         Q     All right.  Special Agent Hermes, can

19    you describe to the jury what we're looking at here in

20    Exhibit 12A?

21         A     Yes, this is the Tractor Supply and that's

22    Mr. Peters' vehicle on the right with license plate 45977

23    Mary Andrew.

24         Q     And 12B?

25         A     Again, that's Mr. Peters' vehicle and

236

Hermes – Direct – Gardner

1   Mr. Forget's vehicle to the right.

2          Q     Go ahead and use that pen, if you can go ahead

3   and just point it out.

4          A     Which one?

5          Q     Point out Forget's vehicle.

6          A     (Indicating).

7          Q     And is there an individual seated in the

8   passenger seat there?

9          A     Right here.

10         Q     And do you know who that individual is?

11         A     Mr. Peters.

12         Q     Can we go to 12C.  And what are we looking at

13  here in 12C?

14         A     Same photograph, Forget's van right here,

15  that's Forget, that's Mr. Peters.

16         Q     And the next photograph -- or the next

17  Exhibit, 12D.  What are we looking at in 12D?

18         A     This is from the Wal-Mart parking lot.  That

19  vehicle's Mr. Peters' vehicle.  That's Mr. Forget's vehicle

20  and that's Mr. Peters.

21         Q     Is this before or after the meet?

22         A     After.

23         Q     And 12E, how about in this photograph?

24         A     Mr. Peters walking towards the Tractor Supply.

25         Q     Did he actually go into the Tractor Supply

JA-272

237

Hermes – Direct – Gardner

1  company?

2          A      Eventually, yep.

3          Q      Can you go back to 12A.  You talked about it a

4  little bit but I want to go into some more detail about this

5  vehicle we're looking at here on the right, the Chevy truck.

6                  Now, Special Agent Hermes, as a DEA agent, do

7  you have access to various databases?

8          A      Yes.

9          Q      Do you have access to the department of motor

10  vehicle's database?

11          A      Yes.

12          Q      How do you have access to that database?

13          A      Through our law enforcement database.

14          Q      And what is contained in the department of

15  motor vehicle database?

16          A      Registrations, owners, date of births,

17  addresses.

18          Q      Related to New York State registered vehicles?

19          A      Correct.

20          Q      And does the department of motor vehicles

21  collect and maintain this information?

22          A      Yes, they do.

23          Q      Are they required to by law?

24          A      Yes.

25          Q      Does the Department of Motor Vehicles maintain

JA-273

238

Hermes – Direct – Gardner

1    those records in the regular course of its business?

2              A    Yes.

3              Q    Now, we're looking at a license plate on the

4    front of this truck; is that right?

5              A    Yes.

6              Q    Were you able to obtain any information, based

7    on that license plate?

8              A    Yes.

9              Q    And how were you able to obtain that

10   information?

11             A    Through those databases.

12             Q    Through the department of motor vehicle's

13   database?

14             A    Yes.

15             Q    What did you learn about that particular

16   vehicle?

17             A    That vehicle was registered to the Allan

18   Peters.  At the time it was 3071 State Route 37.

19             Q    What do you mean, what was?

20             A    The vehicle was, it came back to his name at

21   that address.

22             Q    Oh, at that address.  Can you repeat the

23   address one more time?

24             A    3071 State Route 37, Fort Covington.

25             Q    What did you do after the meeting concluded?

JA-274

                                                                239
                     Hermes – Direct – Gardner


1          A     After the meeting concluded we departed our

2    location and met up with Forget.

3          Q     That's you and Agent Teabo?

4          A     Yes.

5          Q     Did you surveil Forget from the meeting

6    location?

7          A     We stayed until Mr. Peters entered the Tractor

8    Supply and then we had left and met up with him.

9          Q     But that day?

10         A     Yes.

11         Q     Soon after the meeting?

12         A     Yes.

13         Q     How long after the meeting?

14         A     I, I don't know exactly.

15         Q     Minutes, hours?

16         A     Oh, minutes.

17         Q     And what did you do when you met with Forget?

18         A     I retrieved the recording device and I spoke

19   to him about the meet.

20         Q     At some point did you download the contents of

21   the recording device to a CD?

22         A     Yes, I did.

23         MR. GARDNER:  Your Honor, I'd like to show the

24   witness what's been marked as Government Exhibit 14 for

25   identification.

JA-275

240

Hermes – Direct – Gardner

1      Q      Special Agent Hermes, do you recognize that

2  exhibit?

3      A      I do.

4      Q      And what is it?

5      A      It's a CD containing the recording of the meet

6  between Alain Forget and Mr. Peters.

7      Q      And have you listened to that recording?

8      A      Yes, I have.

9      Q      From beginning to end?

10      A      Yes, I have.

11      Q      And do you recognize the voices on it?

12      A      Yes.

13      Q      And who are the voices?

14      A      Mr. Peters and Alain Forget.

15      Q      In listening to that recording, did you –- did

16  it appear that the recording equipment was functioning

17  properly?

18      A      Yes.

19      Q      And were there any interruptions during the

20  recording?

21      A      No.

22      MR. GARDNER:  Your Honor, the government would like

23  to offer that into evidence as Government Exhibit 14.

24      THE COURT:  Any objection?

25      MR. SACCO:  Yes, your Honor, I'll probably have to

Hermes – Direct – Gardner

1    have a side bar.

2              THE COURT:  Yes.  Come on up.

3              (Held at side bar:)

4              MR. SACCO:  Your Honor, I guess I'm going to object

5    on the grounds of relevance to the actual telephone

6    conversation.  I know they're trying to establish a

7    relationship between the co-conspirator Mr. Forget in this

8    meeting himself but the relevance of the actual conversation

9    I don't think is necessary and, you know, it could be highly

10   prejudicial.

11             THE COURT:  Well, I'm sure it will be prejudicial.

12   All of the evidence against your client is prejudicial

13   against him.  But, as far as relevance, we've got a drug

14   conspiracy and we've got two alleged co-conspirators talking

15   about, based on the evidence we have so far, a gun receipt

16   for guns that were being moved across the border.  So there's

17   certainly relevance to the organization and the criminal

18   activity.

19             MR. GARDNER:  Your Honor, just in fairness and to

20   be clear, during this conversation Mr. Peters very clearly

21   states that he didn't know the guns were going to be moved

22   through his property.  I don't know if it's that he didn't

23   know that the load that was coming through was guns and he

24   assumed it was something else but he definitely indicates

25   surprise during the conversation.  However, they talk about

242

Hermes – Direct – Gardner

1    his property.  They talk about how he's upset people aren't

2    paying him for using it.  They talk about how, because of the

3    seizure, he says something to the event that everybody's done

4    at my mother.  So the government believes this is highly

5    relevant.

6              THE COURT:  Relevance to the property being used?

7              MR. GARDNER:  Yes, sir.

8              THE COURT:  Okay.  I'm going to allow it.

9              MR. SACCO:  Thank you, Judge.

10             THE COURT:  It will be received.

11             (Open court:)

12             THE COURT:  The Court received Government's

13   Exhibit 14.

14             MR. GARDNER:  Your Honor, I'm showing Special Agent

15   Hermes Government Exhibit 17 for identification.

16             Q    Special Agent Hermes, do you recognize

17   Government Exhibit 17?

18             A    Yes.

19             Q    And what is it?

20             A    It's the transcript of the recorded meet

21   between Allan Peters and Alain Forget.

22             Q    And who generated that, who created that

23   transcript?

24             A    I did.

25             Q    And have you reviewed that transcript and

243

Hermes – Direct – Gardner

1    compared it to the actual conversation?

2         A    Yes.

3         Q    Does it accurately describe or depict the

4    conversation between the defendant and Forget?

5         A    Yes.

6         Q    Now are there certain parts of the

7    conversation that are inaudible?

8         A    Yes.

9         Q    And are those noted on the transcript as

10   inaudible?

11        A    Yes.

12        MR. GARDNER:  Your Honor, the government would like

13   to move that into evidence as Government Exhibit 17 to aid

14   the jury.

15        THE COURT:  Any objection?

16        MR. SACCO:  Same objection, Judge.

17        THE COURT:  It's overruled.  It will be received.

18        MR. GARDNER:  Your Honor, the government does not

19   plan to publish this exhibit at this time.  I think it's more

20   appropriate to wait for Mr. Forget to be on the stand to

21   publish the exhibit.

22        THE COURT:  Okay.

23        Q    Special agent Hermes, we spoke a little bit

24   ago about your access to the DMV database; is that right?

25        A    Correct.

JA-279

244

Hermes – Direct – Gardner

1          Q      Do you recognize the vehicle in Government
2    Exhibit 7A?
3          A      Yes.
4          Q      And did you obtain any information through the
5    DMV database about this particular vehicle?
6          A      Yes, I did.
7          Q      And how did you obtain that information?
8          A      I ran it through those databases.
9          Q      Did you use the license plate that we can see
10   here in the photo?
11         A      Yes.
12         Q      What information did you obtain about that
13   vehicle?
14         A      Registered owner's name, address, VIN number.
15         MR. GARDNER:  And can you put up Government Exhibit
16   18C.
17         Q      Special Agent Hermes, did you compare the VIN
18   number from the vehicle in Government Exhibit 7A to the VIN
19   number on this purchase agreement?
20         A      Yes, I did.
21         Q      And were they the same?
22         A      Yes.
23         MR. GARDNER:  Your Honor, the government has no
24   further questions at this time.
25         THE COURT:  Okay.  As I've indicated, Mr. Sacco,

245

Hermes – Direct – Gardner

1   I'll let you cross after lunch.

2           MR. SACCO:  Yes, thank you, Judge.

3           THE COURT:  I think it's an appropriate time to

4   break.  We'll give you an hour.  Well, I have 12:06 so how

5   about if you're back in the jury room so we can start at

6   1:10.  I'll give you four extra minutes.  That ought to be

7   worth something.

8           So please don't discuss the case amongst yourself

9   or with anybody else.  If anybody approaches you and tries to

10  talk to you about this case, I need to know about it

11  immediately.  Enjoy your lunch break and we'll see you at

12  1:10.

13          (Jury excused, 12:05 p.m.)

14          THE COURT:  Okay, sir, you can step down.

15          Do we need to touch base on anything before you

16  break for lunch?

17          MR. SACCO:  I don't believe so, Judge.

18          MR. GARDNER:  No.

19          THE COURT:  We'll see you after lunch.

20          THE CLERK:  Court's in recess.

21          (Recess taken, 12:06 p.m.)

22          THE COURT:  Agent, why don't you come on right up

23  and hop back in the seat and we'll be ready to go.

24          (Open court, 1:10 p.m.)

25          THE COURT:  Both attorneys, you're all set and

246

Hermes – Cross – Sacco

1    ready to go?

2            MR. SACCO:  Yes, your Honor.

3            MR. GARDNER:  Yes, sir.

4            THE COURT:  Okay.  Bring the jury in, please.

5            (Jury present, 1:11 p.m.)

6            THE COURT:  Okay.  You can be seated.  The record

7    should reflect we have the ladies and gentlemen of the jury,

8    defendant, defense counsel and the AUSA.

9            So, hopefully you enjoyed your lunch and ready for

10   a good afternoon work and we're going to get right back to

11   it.

12           Mr. Sacco, go ahead.

13   CROSS-EXAMINATION BY MR. SACCO:

14           MR. SACCO:  Thank you.

15       Q    Good afternoon, sir.

16       A    Good afternoon.

17       Q    Now, when we broke, there was a lot of

18   discussion about this gun seizure in Syracuse; do you recall

19   that?

20       A    Yes.

21       Q    I want to start there.

22       A    Okay.

23       Q    Throughout that portion of the investigation,

24   You learned about gun seizure from Mr. Forget, right?

25       A    Correct.

247

Hermes – Cross – Sacco

1    Q    He reported to you as part of his cooperation

2    with you, right?

3    A    Yes.

4    Q    And at no time did he indicate to you that

5    Mr. Peters had any involvement in that understanding of that,

6    is that true?

7    A    Correct.

8    Q    So this was a situation that Mr. Forget had

9    set up with someone else named Cowboy apparently --

10   A    Yes.

11   Q    -- is that right?  And who is Cowboy?

12   A    He was identified as Colin Stewart.

13   Q    And has he been arrested or where is he?

14   A    He has not been arrested.

15   Q    Now, Mr. Forget started working with you

16   roughly October -- was it October 2010?

17   A    Approximate.

18   Q    He had worked with your agency up until just

19   recently December of 2014, is that fair to say?

20   A    No.

21   Q    When did he work with you guys?

22   A    He began working for us shortly after his

23   arrest and then he was deactivated -- I don't have the date

24   on hand when he was deactivated.

25   Q    So you deactivated him at some point?

248

Hermes – Cross – Sacco

1      A    Correct.

2      Q    Do you know if it was a year or two years or

3 any approximate?

4      A    I have to refer to my report.  I don't know

5 the date of his deactivation off the top of my head.

6      Q    In any event, when he was working for you

7 let's start in 2010, the October timeframe, he came to you

8 and indicated that he could get a large sum of money, right?

9      A    Correct.

10      Q    Did he indicate how much money he thought he

11 could get for you?

12      A    I believe it was 40 to 60 thousand.

13      Q    And the plan, the strategy was to involve

14 Corey Spinner in that and to have him go pick it up, right?

15      A    Right.

16      Q    But that didn't happen, right?

17      A    What part?

18      Q    Corey Spinner, did Corey Spinner ever go get

19 the money?

20      A    No, he did not.

21      Q    And that was all part of the GPS tracking

22 device to track him, you testified to that, right?

23      A    Correct.

24      Q    But, ultimately, Mr. Forget did bring you

25 $40,000, didn't he?

JA-284

249

Hermes – Cross – Sacco

1          A    Correct.

2          Q    And he got that on his own, didn't he?

3          A    Yes.

4          Q    So he was able to go to, was it -- did he get

5     it from Cowboy, if you know?

6          A    I don't recall if it's Cowboy or his son Matt.

7          Q    But he did get the $40,000 and he presented it

8     to you?

9          A    Correct.

10         Q    Did he get it from the Canadian side or the

11    U.S. side, if you know?

12         MR. GARDNER:  Objection, your Honor, I think this

13    is all stuff that's outside the scope of this witness'

14    knowledge.

15         THE COURT:  Well, he can tell us he doesn't know

16    if, he doesn't know.

17         MR. GARDNER:  Yes, sir.

18         THE COURT:  If it's not part of his activity in

19    this investigation, he can tell us that but I don't think

20    it's an inappropriate question at all.

21         So, go ahead, Mr. Sacco.

22         MR. SACCO:  Thank you, Judge.

23         Q    If you know, obviously, did -- did he get it

24    from the U.S. side or the Canadian side?

25         A    He told me the Canadian side.

JA-285

250

Hermes – Cross – Sacco

1       Q       And you had numerous interviews with
2    Mr. Forget, is that fair to say, during the period he was a
3    confidential informant for you?
4       A       Correct.
5       Q       And you worked fairly closely with him for
6    your investigation?
7       A       Yes.
8       Q       And did you also interview or work with Cheryl
9    Lobdell during this investigation?
10      A       Yes.
11      Q       And did you now, was she an actual
12   confidential informant, an official confidential informant or
13   just a source?
14      A       Can you be more specific?
15      Q       Sure.  For a confidential informant, you
16   typically -- there's paperwork involved, you give them a
17   number and that sort of thing?
18      A       Mm-mm.
19      Q       Did you do that with Cheryl Lobdell?
20      A       I did not.
21      Q       But you did talk with her and you gained
22   information, correct?
23      A       Correct.
24      Q       And Corey Spinner, he was actually signed up
25   as a confidential informant; is that right?

Hermes – Cross – Sacco

1           A      That's correct.

2           Q      Now he was unclear of when he signed up in

3    relation to Mr. Forget, but was he a confidential informant

4    after Mr. Forget signed up?

5           A      Yes, he was.

6           Q      How long after if you know?

7           A      I don't want to guess.

8           Q      Now, when you arrested Mr. Spinner -- well, at

9    what point did you arrest Mr. Spinner?

10          A      After some recorded conversations with Corey.

11          Q      And between Corey and Mr. Forget?

12          A      Correct.

13          Q      So Mr. Forget helped you arrest or gave you

14   information that allowed you to make -- have probable cause

15   to make an arrest of Mr. Spinner, is that fair to say?

16          A      Yes.

17          Q      After talking about Mr. Spinner, you signed

18   him up as a confidential informant?

19          A      Correct.

20          Q      Are you familiar with the name Greg Darragh?

21          A      Yes, I am.

22          Q      And he's also been arrested, correct?

23          A      Yes.

24          Q      And it's a -- he's been arrested on drug

25   charges, correct?

JA-287

Hermes – Cross – Sacco

1          A    Yes.

2          Q    I believe you used the word strategy or plan

3    on your direct examination when referring to how you were

4    going to reach out to Mr. Peters, is that fair to say?

5          A    (No response.)

6          Q    I can be more clear, if that --

7          A    Could you please.

8          Q    -- wasn't clear.  So you discussed on your

9    direct examination that once the fake receipt was produced,

10   you were going to have a strategy or plan to get that back to

11   Canada, right?

12         A    Correct.

13         Q    And the plan, as you described it, was to have

14   Mr. Forget reach out to Mr. Peters, right?

15         A    Correct.

16         Q    And did Mr. Peters ever call Mr. Forget and

17   say to him, I can help you with this?

18         A    Not that I'm aware of.

19         Q    It was Mr. Forget that reached out to

20   Mr. Peters and asked him to do him a favor essentially?

21         A    It was Mr. Forget who reached out to him, yes.

22         Q    Now, if I can talk about the border for just a

23   minute.  I'm going to show you a map, sir.  Do you see it on

24   your screen?

25         A    Yes, I do, sir.

JA-288

253

Hermes – Cross – Sacco

1          Q      This is Government Exhibit Number 3.  You see

2    up towards the top there, there's a small white box with an

3    arrow going to it?

4          A      Correct.

5          Q      And from your investigation, what does that

6    represent?

7          A      That's the residence of Allan Peters'

8    mother's.

9          Q      What's Mrs. Peters's name?

10         A      Marie, I believe.

11         Q      Marie, is she still alive and living there?

12         A      I don't know.

13         Q      In any event, the, this is a -- let's focus on

14   the blow up for a minute and Government Exhibit 3.  There

15   appears to be a river right in front of the residence there,

16   doesn't there, is that a waterway?

17         A      Yes, I don't know if it's a river but a

18   waterway.

19         Q      Some sort of river or stream or creek or

20   something?

21         A      Yes.

22         Q      Next to it there's a strip that goes to I'm

23   going to call it to the left of the residence and to the left

24   of that black box I'm going to call it a strip there appears

25   to be water, is that fair to say?

JA-289

254

Hermes – Cross – Sacco

1        A     Yes.

2        Q     And from being there, what is it, is that the

3   canal?

4        A     I've never been there.

5        Q     Staying with this Government's Exhibit 3,

6   there's a couple flags and then there's a white line.

7              Is that the actual physical border between the

8   United States and Canada?

9        A     Right.

10       Q     This house is located on which side?

11       A     Canadian.

12       Q     And that's the house that's been described

13  where all this illegal activity has been occurring, correct?

14       A     That's what's been described to me, yes.

15       Q     From your investigation are there any other

16  houses along, next -- on either side of Mrs. Peters's house,

17  do you know?

18       A     I, I don't have personal knowledge of that

19  area.

20       Q     Are you allowed to go on the Canadian side

21  with permission or anything?

22       A     Yes, with the right permissions, I mean.

23       Q     But as part of an investigation, you're not

24  allowed to go across?

25       A     With permission.

JA-290

255

Hermes – Cross – Sacco

1        Q    Yeah, without permission?

2        A    Yes.

3        Q    What about the Saint Regis side, which is the

4   American side, are you allowed to go on that reservation

5   without permission?

6        A    On the American side you said?

7        Q    Do you have jurisdiction over that?

8        A    Just so I understand, Saint Regis that is the

9   American part?

10        Q    Yeah, anything south of the Canadian border

11   which would be considered the American side, are you allowed

12   on there?

13        A    Yes.

14        Q    Just like you would, you can come to my house

15   and you can go to someone's house there, essentially?

16        A    Correct.

17        Q    Earlier there was testimony by the border

18   patrol officer about the ways to get across the border.  Can

19   you tell this jury how many -- how many roads or paths are

20   there across the border from Canada to the United States in

21   this area of the reserve, do you know?

22        A    I'd have to count.  I don't know off the top

23   of my head.

24        Q    Can you look, I mean, can you look?

25        A    It's kind of -- it's a zoomed out map but I

256

Hermes – Cross – Sacco

1    want to get an accurate count.  It appears four.

2         Q    Okay.

3         A    From this zoomed out map.

4         Q    Of course, that is on roadways, right?

5         A    Yes.

6         Q    That doesn't include through the woods or the

7    bushes or any other way, right?

8         A    Yes.

9         Q    Now, you know from your investigation through

10   listening to the recorded phone call and that sort of thing,

11   that Mr. Peters was a seller of cigarettes, right?

12        A    Can you rephrase that again.

13        Q    Through your investigation, and specifically

14   the phone call with Mr. Forget, you learned that Mr. Peters

15   used to sell cigarettes on the Canadian and U.S. side, is

16   that true?

17        A    Did you say in the phone call?

18        Q    Did you listen to the phone call?

19        A    I don't think it's on the phone call.

20        Q    I'm sorry, the recorded call.

21        A    (No response.)

22        Q    There was two calls I believe that we've heard

23   about in this courtroom.  One was a recorded telephone call

24   to have a meeting, you remember that, it was a short call,

25   very brief?

JA-292

257

Hermes – Cross – Sacco

1          A     Yes.

2          Q     And the other one is a –– the one that

3   occurred at Tractor Supply?

4          A     That wasn't a phone call.

5          Q     I apologize.  The recorded call.

6          A     Okay.

7          Q     The recorded call.  Or in any other way

8   through your investigation, did you come to learn that

9   Mr. Peters would sell cigarettes on the Canadian side and the

10  U.S. side?

11         A     I don't have personal knowledge but I heard he

12  was also involved in tobacco.

13         Q     And did you also hear on the call that's in

14  evidence –– the conversation that's in evidence, I

15  apologize ––

16         A     Yep.

17         Q     –– that Mr. Peters was making very serious

18  attempts to stop people from going on to his mother's

19  property?

20         A     Yes.

21         Q     Specifically he was going to drive posts at

22  the mouth of the canal, right?

23         A     Correct.

24         Q     So no one could get in there and that he

25  talked about putting some sort of device across a road so no

258

Hermes – Cross – Sacco

1    cars could come through there.  Did you hear those parts of

2    the conversation?

3            A    Yes.

4            Q    What about the part of -- the conversation

5    that's in evidence that Mr. Peters was getting calls from or

6    that people were coming on his property or his mother's

7    property without his knowledge, you heard those, too, right?

8            A    Yes.

9            Q    And did you hear the portion that Mr. Peters'

10   mother was very angry that people were day and night coming

11   with four-wheelers and boats and coming on her property

12   without her permission?

13           A    It wasn't, can you rephrase that again.

14           Q    Sure.  Do you recall the portion of the

15   recorded phone call that Mr. Peters indicates that his mother

16   is very angry that people are coming on her property?

17           A    Yes.

18           Q    Do you recall that Mr. Peters, I believe,

19   tells Mr. Forget that people were there -- there was a group

20   there with four wheelers?

21           MR. GARDNER:  Your Honor, and I don't mean to

22   interrupt.  I'd like to object.  If counsel is just going to

23   ask the witness about what was said in the conversation, we

24   can just listen to it.  It's in evidence.  If counsel wants

25   to ask him questions, you know, something more than just what

259

Hermes – Cross – Sacco

1  was said, we can actually listen to what was said.

2          THE COURT:  Well, it is in evidence and can be

3  played at any time but I'm not going to tell Mr. Sacco how to

4  conduct his cross-examination.  He can do it however he'd

5  like.

6          But, Mr. Sacco, you've been interrupted, you keep

7  saying recorded call.  I think you mean recorded

8  conversation.

9          MR. SACCO:  Yeah, just for the record, I mean

10 recorded conversation and I apologize.

11         THE COURT:  Because the call that is in evidence

12 that we've heard is very brief and there was no dialogue that

13 you've been referring to in that call.  So I think we're

14 talking about the recorded conversation that, based on this

15 witness's testimony, he had placed some type of recording

16 device in Mr. Forget's hat and he had a conversation with

17 Mr. Peters, which we have not heard yet.

18         MR. SACCO:  Yes.

19         THE COURT:  Okay.

20         MR. SACCO:  And we will hear soon, yes, Judge.

21         THE COURT:  Okay.

22         MR. SACCO:  Judge, with that, I don't have any

23 further questions.

24         THE COURT:  You're all set?

25         MR. SACCO:  Yeah, I'm all set.  Thank you.

JA-295

Hermes – Redirect – Gardner

1      THE COURT:  Mr. Gardner, anything further?

2      MR. GARDNER:  Your Honor, I would at this point

3  like to play the conversation as long as it's okay that I

4  play it again when Mr. Forget is on the stand so that he can

5  talk about the conversation.

6      THE COURT:  It's in evidence.  You can use it how

7  you'd like.  So go ahead.  Are you going to have questions

8  for the witness with regard to this, possibly?

9      MR. GARDNER:  I might possibly, yes.

10      THE COURT:  That's fine, then.  Go ahead.

11  REDIRECT EXAMINATION BY MR. GARDNER:

12      Q    Special Agent Hermes, earlier in your

13  testimony you indicated that you and Mr. Forget discussed a

14  story that Forget would pass along to Cowboy; is that right?

15      A    Yes.

16      Q    And that story involved state troopers

17  stopping Forget -- or stopping Forget's currier and that the

18  guns came from an inheritance and things of that nature; is

19  that correct?

20      A    Yes.

21      Q    Is it what we just listened to about what

22  Mr. Forget was telling the defendant consistent with that

23  story?

24      A    Yes.

25      Q    As far as you know, the story Mr. Forget just

261

Hermes - Redirect - Gardner

1    described to the defendant in this call was made up?

2              A    Yes.

3              Q    Okay.  Thank you.

4              THE COURT:  Mr. Gardner, if you could just, again,

5    and I think you've done this once already, but just clarify

6    for the jury sake, the individual referred to as Colin,

7    that's also an individual that's referred to as Cowboy?

8              MR. GARDNER:  Yes, sir.

9              THE COURT:  Okay.

10             (Audio recording played.)

11             MR. SACCO:  Your Honor, I need --

12             THE COURT:  Can we stop for a second.

13             (Audio recording stopped.)

14             THE COURT:  You have something?

15             MR. SACCO:  Can we have a side bar, please?  I

16   apologize.

17             THE COURT:  Sure, come on up.

18             (Held at side bar:)

19             MR. SACCO:  Your Honor, I don't think there's any

20   ill will here but Mr. Gardner and I had an agreement that

21   they would not say -- it would be redacted out and he did

22   redact it out in here (indicating) -- it wouldn't say that my

23   client had already gone to jail for having guns and it just

24   said it.

25             THE COURT:  You had this agreement before?

262

Hermes – Redirect – Gardner

1    MR. GARDNER:  I told him that's what I was going to

2 do.  I told him I would take it out of the transcript.  I

3 thought that that's the way it was loaded in the exhibit.

4 Ron has been out sick and we didn't get it loaded in until

5 yesterday morning.  It's my fault.  I had intended to redact

6 that out.

7    THE COURT:  There's a couple of different ways I

8 can handle it.  I don't see it as a huge deal.  I understand

9 your concern.  The one thing I will say to you:  The options

10 are to do nothing and let it lie -- and you can think about

11 it we can deal with it -- or I can give a curative

12 instruction.  Sometimes a curative instruction just

13 highlights it for the jury.  So, that's a tactical point that

14 you may want to think about with your client and let me know

15 what you want to do.  I can maybe give some sort of curative

16 instruction that doesn't bring attention to it, maybe "you

17 may hear about prior criminal activities, it is not relevant

18 unless it's part of a cross-examination", or something like

19 that.  But, again, you think about it.

20    MR. SACCO:  I know.

21    THE COURT:  You let me know and I'll listen to you

22 and we can consider it but we can do it at some other point.

23    MR. SACCO:  I don't think --

24    THE COURT:  I don't think you want me to do

25 anything right now.  Again, I think it just highlights it.

263

Hermes – Redirect – Gardner

1    You discuss it with your client.

2              MR. SACCO:  I just wanted to get it on the record.

3    I was shocked.  I was trying to figure out if I saw it or

4    not.

5              MR. GARDNER:  I apologize.

6              MR. SACCO:  Did I just hear that or see that?  I

7    also will have it redacted out so when we play it again for

8    Mr. Forget, it will --

9              THE COURT:  It will not come up again.

10             MR. SACCO:  I'll obviously have to converse with my

11   client.

12             THE COURT:  We can do it today or tomorrow or

13   whenever and I'll deal with it, based on your application,

14   okay.

15             MR. SACCO:  Okay, thanks, Judge.

16             (Open court:)

17             (Audio recording played.)

18             Q    Special Agent Hermes, defense counsel asked

19   you early on in the cross-examination if during this gun

20   pickup whether Forget had talked about the defendant or

21   mentioned the defendant as being involved, do you recall

22   that?

23             A    Yes.

24             Q    And you indicated that Forget had not

25   mentioned the defendant at all?

264

Hermes – Redirect – Gardner

1          A     Correct.

2          Q     Okay.  Looking at Exhibit 9B, and I think you

3     testified on direct examination this is one of the cell phone

4     text messages that Forget brought to you; is that correct?

5          A     Yes.

6          Q     Did he talk to you about what he understood

7     this message to mean?

8          A     Yes.

9          Q     And what did he -- what did Forget relay to

10    you about this message?

11         A     He stated that this was to pick up in Syracuse

12    and bring back to big guy, BG.

13         Q     Forget indicated BG meant big guy?

14         A     Yes.

15         Q     And did Forget indicate who the Big Guy was?

16         A     Yes.

17         Q     Who did he say it was?

18         A     Mr. Peters.

19         Q     And 9D.  And, again, looking at 9D, did

20    Mr. Forget indicate to you what the meaning of this text

21    message was?

22         A     Yes.

23         Q     What did he say?

24         A     This is Cowboy asking him gimme an ETA for BG

25    again, when you get it, I'm ready.

JA-300

265

Hermes – Recross – Sacco

1    Q  Again did he indicate who BG was?

2    A  Yeah, big guy.

3    MR. GARDNER: That's all I have, your Honor.

4    THE COURT: Okay. Mr. Sacco, any other further

5 cross-examination?

6    MR. SACCO: Just briefly, your Honor.

7    THE COURT: Go ahead, sir.

8 RECROSS-EXAMINATION BY MR. SACCO:

9    MR. SACCO: Can you bring up those text messages

10 again for me, the last two you just brought up.

11    Q  What was the date of the gun seizure, do you

12 know, off the top of your head?

13    A  The date law enforcement intercepted them?

14    Q  Yes.

15    A  February 25th, 2011.

16    Q  And the date of this email is February 22nd,

17 right?

18    A  Correct.

19    Q  Was that the day of the original, the gun

20 running or?

21    A  No.

22    Q  This is from Cowboy to who?

23    A  Forget.

24    Q  What's he telling him to pick up in Syracuse?

25    A  Yes.