# 15-0541-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ALLAN PETERS, AKA Hiio,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

**JOINT APPENDIX**
**Volume 2 of 3 (Pages JA-301 to JA-600)**

STEVEN D. CLYMER
ASSISTANT UNITED STATES ATTORNEY
    CHIEF, APPEALS DIVISION
UNITED STATES ATTORNEY'S OFFICE,
    NORTHERN DISTRICT OF NEW YORK
*Attorney for Appellee*
900 Federal Building
100 South Clinton Street
Syracuse, New York 13261
(315) 448-0684

LAW OFFICE OF DENNIS B. SCHLENKER
*Attorneys for Defendant-Appellant*
174 Washington Avenue
Albany, New York 12210
(518) 463-4473

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... JA-1

Indictment, dated August 14, 2013 .......................... JA-18

Motion *in Limine*, by Defendant, dated
    January 22, 2014.................................................... JA-21

Motion *in Limine*, by Appellee, dated
    January 24, 2014.................................................... JA-24

Jury Trial Transcript, dated January 27, 2014............ JA-36

Jury Trial Transcript, dated January 28, 2014............ JA-152

Jury Trial Transcript, dated January 29, 2014............ JA-394

Jury Trial Transcript, dated January 30, 2014............ JA-632

Appellee's Witnesses:

    Corey Spinner        Direct.......................... JA-94
                            Cross........................... JA-132

    Leonel Loya          Direct.......................... JA-154
                            Cross........................... JA-169

    Ernie Miller          Direct.......................... JA-174
                            Cross........................... JA-193
                            Redirect ...................... JA-196

    Decota D. Thompson    Direct.......................... JA-199
                            Cross........................... JA-212

ii

|  |  | Page |
|---|---|---|
| Richard Scott Norcross | Direct........................ | JA-222 |
|  | Cross......................... | JA-229 |
| Andrew Hermes | Direct........................ | JA-234 |
|  | Cross......................... | JA-281 |
|  | Redirect ..................... | JA-295 |
|  | Recross ..................... | JA-300 |
| Cornelius Joyce | Direct........................ | JA-303 |
| James Sunday | Direct........................ | JA-311 |
|  | Cross......................... | JA-334 |
| Benjamin LaBaff | Direct........................ | JA-337 |
| Alain Forget | Direct........................ | JA-358 |
|  | Cross......................... | JA-464 |
| Cheryl Lobdell | Direct........................ | JA-516 |
|  | Cross......................... | JA-577 |
|  | Redirect ..................... | JA-605 |

Government's Exhibits:

| Exhibit 3 – Aerial Map of Defendant's Property....... | JA-732 |
|---|---|
| Exhibits 9JA-9d – Photographs of Text Messages between Forget and Stewart............................... | JA-733 |
| Exhibits 12JA-12e – Photographs of Surveillance on March 25, 2011 ............................................ | JA-737 |
| Exhibit 13 – Paperwork given to Defendant on March 25, 2011 (a/k/a the Fake NYSP Receipt) | JA-742 |

iii

**Page**

Exhibit 15 – Transcript of the Recorded Call
    between Forget and Appellant on
    March 25, 2011 .................................................  JA-743

Exhibit 17 – Transcript of Recorded Conversation
    between Forget and Appellant on
    March 25, 2011 .................................................  JA-744

Exhibit 19 – Photograph of Defendant ......................  JA-758

Exhibit 28 – Letter to Forget from the US
    Attorney's Office, Northern District of New
    York, dated January 13, 2014...........................  JA-759

Exhibit 31 – Stipulation of Fact #1 ...........................  JA-761

Exhibit 32 – Stipulation of Fact #2 ...........................  JA-763

Exhibit 33 – Stipulation of Fact #3 ...........................  JA-765

Affirmation of Brian P. Barrett, for Defendant, in
    Support of Motion for Judgment of Acquittal,
    dated May 15, 2014 .................................................  JA-768

Decision and Order of the Honorable Glenn T.
    Suddaby, dated July 9, 2014 ..................................  JA-778

Sentencing Minutes, dated February 12, 2015 .........  JA-787

Notice of Appeal, dated February 24, 2015 ..............  JA-815

266

                    Hermes – Recross – Sacco


1            Q      What, guns?

2            A      Yes, hand tools.

3            Q      And bring them to Big Guy?

4            A      Yes.

5            Q      Did you listen to the phone call we just

6      listened to?

7            A      Yes.

8            Q      And my client knows nothing about it?

9            A      That's what I heard.

10           Q      That's what Forget in the conversation was.

11     So what does BG mean?

12           A      Forget told me it meant Big Guy.

13           Q      Didn't Forget also tell you that during your

14     investigation that -- well, withdraw that.

15                  Didn't you tell me on cross-examination that

16     your investigation revealed that he knew nothing about it?

17           A      Say that again.

18           Q      On my cross-examination, the first question I

19     asked you was this:  Based on your investigation and your

20     discussions with Forget, isn't it true that Mr. Peters didn't

21     know anything about this gun pickup?

22           A      Yes, based on the knowledge I had.

23           Q      But yet Forget is apparently told you that it

24     means my client did, right, he told you BG means Big Guy?

25           A      He did tell me BG means Big Guy.

267

US v. Peters – 13-CR-316

1          MR. SACCO:  I have no further questions, Judge.

2          MR. GARDNER:  No questions, your Honor.

3          THE COURT:  You may step down, sir.

4          THE WITNESS:  Thank you, your Honor.

5          (Witness excused 1:57 p.m.)

6          THE COURT:  Ladies and gentlemen of the jury,

7   everybody's okay?  Take a short break please don't talk about

8   the case and we'll have you right back out here.  Okay.  Go

9   ahead.

10          If you want to get your next witness ready and

11  available.

12          (Jury excused and recess taken at 1:58 p.m.)

13          THE COURT:  Okay.

14          We're going bring the ladies and gentlemen of the

15  jury in.  Bring them in.

16          (Jury present, 2:07 p.m.)

17          THE COURT:  Okay.  You can be seated.  The record

18  should reflect we have the ladies and gentlemen of the jury

19  back, defendant, defense counsel and the assistant United

20  States Attorney.

21          Ladies and gentlemen, I don't want you to be

22  bashful about asking if you need a break or use anything, go

23  ahead, and for me there's a selfish reason.  If you're

24  uncomfortable, it's hard to pay attention and we want you to

25  be able to pay attention.  Don't hesitate.  Just give us a

268

                    Joyce – Direct – Gardner


1    sign, whatever, and we'll give you a break when you need it.

2            Mr. Gardner.

3

4                    CORNELIUS JOYCE, called as a witness and

5    being duly sworn, testifies as follows:

6            MR. GARDNER:  May I proceed, your Honor.

7            THE COURT:  Go ahead.

8    DIRECT EXAMINATION BY MR. GARDNER:

9            Q     Good afternoon, Special Agent Joyce.

10           A     Good afternoon.

11           Q     Can you state your full name, please.

12           A     It's Cornelius Joyce.

13           Q     And you go by Neil?

14           A     Yes, I do.

15           Q     And what is your occupation?

16           A     Special agent assigned to the Drug Enforcement

17   Administration.

18           Q     How long have you been a DEA agent?

19           A     Since June of 1999.

20           Q     And where are you currently assigned?

21           A     I'm assigned to the Albany District office.

22           Q     Where also have you been assigned?

23           A     I was also assigned to the Syracuse resident

24   office.

25           Q     Do you have any -- prior to becoming a DEA

JA-304

269

                    Joyce – Direct – Gardner


1   special agent, do you have any additional law enforcement

2   experience?

3          A     Yes, I do.  Prior to that I was a police

4   officer for the city of Manchester, state of New Hampshire.

5          Q     As a DEA special agent, have you received any

6   training involving informants or surveillance?

7          A     Yes, I have.  I've completed the DEA academy

8   in Quantico, Virginia and on top of that, I received

9   additional training throughout the years on the handling of

10  confidential informants, conducting electronic surveillance,

11  methamphetamine investigations, clandestine laboratories,

12  complex conspiracies, et cetera.

13         Q     I want to direct your attention to

14  February 24th, 2011.  On that day did you receive a request

15  for assistance from Special Agent Andrew Hermes?

16         A     Yes, I did.

17         Q     And just generally speaking, what was the fate

18  of the request?

19         A     I was tasked by my supervisor to assist the

20  Plattsburgh resident office with a pickup at a legal motel in

21  the Syracuse area.

22         Q     What was the thing that you were going to

23  pickup?

24         A     I believe it was to be a bag of guns.

25         Q     Where were you assigned at the time?

JA-305

270

Joyce – Direct – Gardner

1          A     I was assigned here in Syracuse.

2          Q     Based on your conversations with Special Agent

3   Hermes did you develop an operational plan?

4          A     Yes, we did.  What we decided to do was to use

5   a confidential source, someone that we had used before in the

6   past that was reliable, we decided to use that person to send

7   him to the particular location, the hotel, to meet with an

8   individual, exchange a code phrase and pick up that bag of

9   guns.

10         Q     Had you received an exact location and that

11  code phrase from Special Agent Hermes?

12         A     Yes, I did.

13         Q     Do you recall what the location was?

14         A     It was the Clarion Inn and Suites on Farrell

15  Road in Syracuse.  It was room 249.

16         Q     And what was the phrase?

17         A     The code phrase was, hi, Buffey.

18         Q     Did you attempt to conduct the gun pickup on

19  February 24th, 2011?

20         A     Yes, we did.  That evening we used that

21  confidential source.  We met with him in our office here in

22  Syracuse.  As standard procedure we search that informant and

23  his vehicle prior to sending him to the location.  He was

24  provided with instruction as to how he was supposed to

25  perform and what his duties were.  We then surveilled him

JA-306

271

                   Joyce - Direct - Gardner

1    over to that location.  We conducted surveillance on the

2    hotel and we sent him into the hotel to try and make contact

3    with the occupant in the room 249.

4              Q    Did you provide the confidential source with a

5    transmitting device?

6              A    Yes, we did.

7              Q    And what transmitting device did you use?

8              A    We use a particular device that allows the

9    conversation to be transmitted realtime back to a receiving

10   box, which we kept in my vehicle, which allows us to hear the

11   conversation that takes place between the confidential source

12   and anyone he encounters.

13             Q    And how was the range on that transmitter?

14             A    That particular device is kind of a

15   short-range distance device.  Its success is determined based

16   upon whether it's an open parking lot or a building with many

17   walls and doors.

18             Q    And did you -- where did you meet with the CS

19   prior to attempting the pickup?

20             A    He met us at our office here in Syracuse.

21             Q    I guess I should have rephrased that.  Did you

22   meet somewhere else after that?

23             A    Yes, we did.  That evening we sent him to the

24   hotel, we followed him to the hotel.  We watched as he went

25   into the hotel and tried to make contact with the occupant of

272

Joyce – Direct – Gardner

1    that room.  He was unsuccessful.  He returned to his vehicle.

2    He contacted me via cell phone and we spoke and we decided to

3    give it a few minutes and try it again.

4            Q    So, according to the CS, nobody answered the

5    door?

6            A    Nobody answered the door.  We didn't hear him

7    having a conversation with anyone while we are monitoring the

8    device.

9            Q    And you were able to listen to his

10   conversations through the transmitter?

11           A    Yes.

12           Q    And did you hear anything inconsistent with

13   that?

14           A    No, we did not.

15           Q    Did you attempt again to go to that room later

16   that night?

17           A    Yes, we did.  We sent him back in with the

18   same instructions, same direction.  We figured just give him

19   a little bit of time to see if the person maybe come back to

20   the room.  It was after 11:00, he went back to the room there

21   was still not answer, still no contact at the door.  So we

22   sent him to the lobby where he then used the hotel host

23   phone, attempted to ring the room and there was no answer

24   when he tried to call the room, either.  So at that point we

25   decided to cancel the operation for the evening.

JA-308

Joyce – Direct – Gardner

1      Q      Did you contact Special Agent Hermes to inform

2  him about what had happened?

3      A      Yes, I did.

4      Q      Did you attempt the same operation the next

5  day on February 25th, 2011?

6      A      Yes, we did.

7      Q      Did you go through the same procedures with

8  the confidential source?

9      A      That's correct.

10      Q      Conducted a search, gave him a transmitter,

11  all of those things?

12      A      Correct.

13      Q      What happened when you went to the hotel with

14  the confidential source?

15      A      That afternoon we brought the confidential

16  source to the hotel.  We dropped him off at the hotel,

17  watched him walk in the hotel.  We could hear the

18  transmitter.  We heard him walk a ways into the building.  We

19  heard him knock on a door.  That door was answered.  He met

20  with someone.  That person provided him with -- with what we

21  believe to be the bag of guns.  We then heard the informant

22  walk out of the building.  He met with us out front, got in

23  our vehicle and we met basically across the street to see

24  what had transpired.

25      Q      Let me back you up just for a second.  Could

JA-309

274

Joyce – Direct – Gardner

1   you hear if the confidential source used the hi buffey?

2            A    Yeah, we believe he did.

3            Q    You said he came right out of the hotel

4   directly to your vehicle?

5            A    Correct.

6            Q    And what happened after -- I'm sorry, when he

7   arrived at your vehicle, did he have anything with him?

8            A    Yes, he did.  He had a blue duffle bag with

9   him.

10           Q    Did you search the contents of that duffel bag

11  at that time or later?

12           A    We drove across the street to another location

13  and we thoroughly searched that bag to confirm that it was

14  guns and to make sure that they were in a safe and unlocked

15  manner.

16           Q    Did you also search the confidential source to

17  make sure he didn't have any contraband on him?

18           A    Yes, that's correct, we did.

19           Q    Can you describe what you found inside that

20  blue duffel bag?

21           A    Sure.  Inside of that bag was 16 handguns.  As

22  I recall, there was one Smith & Wesson revolver.  It was a

23  .380 caliber handgun, a .22 caliber handgun.  There were nine

24  9 millimeter handguns, two .40 caliber handguns and two .45

25  caliber handguns.  The makes and models varied.  There were

JA-310

Joyce – Direct – Gardner

1    Smith & Wesson, Springfield Arms, Glock, Taurus (phonetic),

2    Kel-Tec and there were also assorted magazines for the

3    handguns, holsters and some cleaning supplies.

4           Q    What did you do with the firearms?

5           A    We then filled out a basically a DEA receipt,

6    some paperwork listing the guns and the serial numbers and I

7    transferred those guns over to an ATF agent for them to be

8    traced back as to where their origins came from.

9           Q    And at some point did you contact Special

10   Agent Hermes to inform him of what happened?

11          A    Yes, I did.

12          MR. GARDNER:  Can I have just one moment.

13          No additional questions, your Honor.

14          THE COURT:  Any cross?

15          MR. SACCO:  No.  No questions, your Honor.

16          THE COURT:  Thank you, sir, you may step down.

17          THE WITNESS:  Thank you.

18          (Witness excused.)

19          MR. GARDNER:  Your Honor, at this time the

20   government would call Detective Constable Jim Sunday.

21          THE COURT:  Come on up, sir.

22

23

24                   JAMES SUNDAY, called as a witness and

25   being duly sworn, testifies as follows:

JA-311

276

Sunday – Direct – Gardner

1   DIRECT EXAMINATION BY MR. GARDNER:

2          Q    Good afternoon, Detective Sunday?

3          A    Good afternoon.

4          Q    Can you please state your full name?

5          A    James Sunday.

6          Q    What's your current occupation?

7          A    Detective constable with the Akwasasne Mohawk

8   Police Service.

9          Q    Is that AMPS for short?

10         A    Yes.

11         Q    How long have you been with AMPS?

12         A    Twenty-three years.

13         Q    And other than being a detective constable

14  what else have you done for AMPS?

15         A    I was on general uniform patrol prior to that.

16         Q    As an investigator with AMPS, do you work with

17  any joint teams?

18         A    Yes, I do.  We work with the RCMP, the Ontario

19  Provincial Police, the Quebec, New York State Police, border

20  patrol, ISE, et cetera.

21         Q    And what type of crimes do you investigate as

22  a detective constable?

23         A    Our unit mostly focuses on across border

24  crimes such as smuggling of drugs, aliens and firearms.

25         Q    And just to be clear, AMPS is a Canadian law

JA-312

277

                    Sunday – Direct – Gardner


1    enforcement agency; is that correct?

2              A    That's right.

3              Q    Detective Sunday, I'm showing you Government

4    Exhibit 2.  Do you recognize this map?

5              A    Yes, I do.

6              Q    Using this map, can you describe to the jury

7    what your jurisdiction is as an AMPS detective?

8              A    Our jurisdiction is the Ontario portion of

9    Cornwall Island.  The Quebec portion of Saint Regis and Snye,

10   as well as the waterways of the St. Lawrence and islands

11   therein.

12             Q    Sorry to interrupt you.  There's a pen right

13   next to your monitor right there.  Do you see that?

14             A    Yes.

15             Q    Can you use that pen and, if you don't mind,

16   can you go ahead and outline the area that is your area of

17   operation?

18             A    Okay.  (Witness complies.)

19             Q    And Detective Sunday, you mentioned, I think

20   three different locations that you covered, is it Cornwall

21   Island, Saint Regis and Snye?

22             A    That's right.

23             Q    Can you indicate those three different areas

24   on this map?

25             A    Okay, Cornwall Island is to the left center

JA-313

278

Sunday – Direct – Gardner

1    map within the St. Lawrence River.

2              Q    Go ahead and use that pen if you don't, mind?

3              A    Okay.  That area is Cornwall Island.  This

4    area is Saint Regis Quebec.  This area is the Snye area.

5              Q    Detective Sunday, can you take a look at

6    Government Exhibit 3 and tell me if you recognize that area.

7              A    Yes, I do.

8              Q    Can you describe for the jury what we're

9    looking at in Government Exhibit 3?

10             A    This area is the Snye portion, Snye Quebec

11   portion of Akwasasne.

12             Q    And is the line running through the middle of

13   the map there the international border?

14             A    Yes, it is.

15             Q    And do you see up in the upper right-hand

16   corner there's a white box with an inset pointing to it?

17             A    Yes, I do.

18             Q    Do you recognize that area?

19             A    Yes, this is the area known as Sugarbush

20   located in the Snye area.

21             Q    And, generally, how are you familiar with the

22   Snye area?

23             A    I grew up in Snye so I know the area real

24   well.

25             MR. GARDNER:  Can you go to 4.

JA-314

279

Sunday – Direct – Gardner

1      Q      And do you recognize the area depicted on

2  Government Exhibit 4?

3      A      Yes, I do.  This is also the Sugarbush area,

4  which is the very end of River Road, Snye.

5      Q      You see the area that's outlined in the black

6  box?

7      A      Yes.

8      Q      Do you recognize that area, that residence?

9      A      Yes, I do.  That is the Marie Peters

10  residence.

11      Q      And how do you know that's Marie Peters

12  residence?

13      A      Oh, like I've said, I'm from Snye and I know

14  basically where everybody lives.

15      Q      Do you know Marie Peters?

16      A      Yes, I do.

17      Q      Have you physically been on this property?

18      A      Yes, I have.

19      MR. GARDNER:  Detective -- or, your Honor, I'm

20  showing Detective Sunday what's been marked as Government

21  Exhibit 5 for identification.

22      Q      Sir, do you recognize that exhibit?

23      A      Yes, sir, I do.

24      Q      And what is it?

25      A      It is a DVD of an aerial footage of the area

280

                Sunday – Direct – Gardner


1   we just saw, Sugarbush area.

2        Q    And are you familiar with -- have you looked

3   at the video?

4        A    Yes, I have.

5        Q    And are you familiar with that area?

6        A    Yes, I am.

7        Q    Does the video accurately depict the area?

8        A    Yes, it does.

9        MR. GARDNER:  Your Honor, the government would like

10  to offer this into evidence as Government Exhibit 5.

11       THE COURT:  Any objection?

12       MR. SACCO:  No objection, your Honor.

13       THE COURT:  It will be received.

14       MR. GARDNER:  Can you go ahead and play the clips.

15       (Video played.)

16       Q    Can you describe for the jury what we're

17  looking at in Government Exhibit 5?

18       A    Again, this is an aerial video of the Marie

19  Peters residence on --

20       Q    Can you pause it right there?

21            I'm sorry, please continue.

22       A    That is an aerial shot of the Marie Peters

23  residence in Sugarbush Snye.

24       Q    Okay.  Are you familiar with the waterway that

25  we can see in the video right there?

JA-316

Sunday – Direct – Gardner

1    A    Yes.

2    Q    What is it?

3    A    That is the Snye channel of the St. Lawrence

4    River.

5    Q    Does that connect directly to the St. Lawrence

6    River?

7    A    Yes, it does.

8    Q    And what are we looking at now?

9    A    This is a shot of the -- of a creek that comes

10   into the area just west of the Peters' house.

11   Q    Can you go ahead and use that pen again and

12   show the jury where you're talking about.

13   A    (Witness complies.)

14   Q    And how about the road that is running through

15   the middle of the video there?

16   A    This road comes east/west to the deadend part,

17   which ends up at the Marie Peters residence.

18   Q    Okay.  Go ahead and pause it real quick.

19        Is this again that creek that you were just

20   talking about?

21   A    Yes, it is.

22   (Video played.)

23   Q    Is that River Road?

24   A    Yes.

25   (Video played.)

282

Sunday – Direct – Gardner

1          Q      Are we moving west on River Road here?

2          A      Yes.

3          Q      And go ahead can you pause it right there.

4                 You see the residence in the upper left-hand

5    corner of the video?

6          A      Yes, I do.

7          Q      Is that the closest residence to the Peters'

8    property on this road, River Road, or are you aware of any

9    closer residence?

10         A      Well, there's two of them there.  I don't know

11   if you can see the other log cabin in the middle there.

12         Q      Can you go ahead and point that out.

13         A      (Witness complies.)

14         Q      Is that residence the closest residence to the

15   Marie Peters residence on River Road?

16         A      Yes, it is.

17                (Video played.)

18                MR. GARDNER:  Go ahead and pause it real quick.

19         Q      What is this area we're looking at here on the

20   bottom of the video?

21         A      The brownish area is marsh, marshland within

22   the St. Lawrence River area.

23         Q      Right there at the bottom right in the middle

24   it looks like there's a road or a trail.  Do you know what

25   that is?

JA-318

283

Sunday – Direct – Gardner


1          A      That looks like a snowmobile track for like in

2    the winter travel.

3          Q      During the winter does this area freeze over?

4          A      Yes, it does.

5          Q      Does the entire St. Lawrence River freeze

6    over?

7          A      Yes, it does.

8          Q      Enough so that you can drive snowmobiles

9    across it?

10         A      That's right.

11         Q      Larger vehicles, trucks?

12         A      Certain years, yes, but not every year.

13         THE COURT:  How about this year what's going on?

14         THE WITNESS:  This year it's pretty cold, your

15   Honor.

16         THE COURT:  Frozen over?

17         THE WITNESS:  Yes.

18         THE COURT:  Trucks?

19         THE WITNESS:  That we know of, a few maybe, yes.

20         THE COURT:  Okay.

21         Q      Thank you.  Detective Sunday, do you know the

22   defendant in this case, Mr. Allan Peters?

23         A      Yes, I do.

24         Q      And how are you familiar with him?

25         A      Well, I more or less know his other brothers

JA-319

Sunday – Direct – Gardner

1    and I know him just as being one of their brothers.

2            Q     Just from growing up in the area?

3            A     That's right.

4            Q     I want to direct your attention to

5    February 17th, 2008, were you -- do you recall working that

6    day?

7            A     Yes, I do.

8            Q     Did you conduct a surveillance operation on

9    that date?

10           A     Yes, sir.

11           Q     And what was the target of your surveillance

12   operation?

13           A     The target in this case was we had

14   information --

15           Q     I don't want to get into that.

16           A     Okay.

17           Q     But if you can just tell me what the target

18   was?

19           A     The target was the Marie Peters area.

20           Q     The residence that we were just looking at?

21           A     That's right.

22           MR. GARDNER:  Can you put up 3.

23           Q     And were you the only one conducting

24   surveillance or were there other law enforcement officers?

25           A     Myself and others on the same team, yes.

JA-320

285

Sunday – Direct – Gardner

1              Q    Can you, using Government Exhibit 3, could you
2    indicate where you set up for surveillance and where your
3    other members of the surveillance team set up, to the best of
4    your knowledge?
5              A    In that investigation we were along River Road
6    where it says -- it's French -- Chemendoux chanel (phonetic),
7    the writing, that is right along the road of River Road.  We
8    were set up along there.
9              Q    And where were you set up?
10             A    Right around where the N in chanel is.
11             Q    When we were looking at that video earlier,
12   you indicated earlier there was a log cabin.  Was it a log
13   cabin?
14             A    That's right.
15             Q    A log cabin along River Road and that that was
16   the last residence before Marie Peters residence --
17             A    Yes.
18             Q    -- is that right?
19             A    Yes.
20             Q    Where were you in relation to that?
21             A    I was probably 200 yards west of that log
22   cabin.
23             Q    So was that log cabin in your view?
24             A    The -- no it wasn't but the driveway was but
25   not the actual residence.

JA-321

286

Sunday – Direct – Gardner

1       Q      Understood.  And if you don't mind, could you
2   just use your pen there and show the jury exactly where you
3   were or approximately where you were.
4              A      (witness complies.)
5              Q      Okay.  And where are you, was there anybody on
6   the surveillance team that was further east of you, meaning
7   closer to the Peters's residence?
8              A      No, there wasn't.  I was the farthest one
9   east.
10             Q      Do you remember the approximate time of day of
11  the surveillance operation?
12             A      It was early evening between 5 and 7 p.m.
13             Q      And from your location could you see Marie
14  Peters's residence?
15             A      No, I couldn't.
16             Q      Could you see the creek or canal that we were
17  looking at on the video?
18             A      No.
19             Q      At any point during your surveillance did you
20  observe anything relevant?
21             A      We seen –– I seen a vehicle coming from the
22  area of the Peters's residence.
23             Q      On River Road?
24             A      Yes.
25             Q      Okay.

JA-322

287

Sunday – Direct – Gardner

1          A     East of my location.

2          Q     When did you first see that vehicle?

3          A     I saw it, like I said, between the hours of

4    1700 and –– well, 5 and 7 p.m. on that evening.

5          Q     I'm sorry, I didn't phrase that very well.

6    Where on the road did you first see that vehicle?

7          A     Where?

8          Q     Yes.

9          A     I saw it come around the corner.  I'd have to

10   show you on the thing there.  As it rounded the corner on

11   River Road.

12         Q     Okay.  Can you put up 4.

13               Would this help you illustrate it better?

14         A     Well, from where I was, I could not see the

15   Peters' residence but I could see traffic that would come

16   from that area.

17         Q     How so?

18         A     It is the only road going into that area.

19         Q     And at some point did the vehicle pass your

20   location or come up to your location?

21         A     Yes, it did.

22         Q     What did you do?

23         A     I notified the other members of the team and a

24   traffic stop was initiated on the vehicle.

25         Q     Did you see the traffic stop occur?

JA-323

Sunday – Direct – Gardner

1          A      Yes, I did.

2          Q      What did you do when the vehicle got up to

3   your location, did you follow it did you?

4          A      Members of our team followed the vehicle along

5   River Road up to Wade Lafrance Road and a marked police unit

6   initiated the stop on Wade Lafrance Road.

7          Q      Can you use your pen and show where the stop

8   occurred on Wade Lafrance Road?

9          A      (Marking exhibit.)

10         Q      Were you present when the stop occurred?

11         A      Yes, I was.

12         Q      Did you or another member of the surveillance

13  team identify the driver or occupants of the vehicle?

14         A      Other members of our team, yes, they did

15  identify the driver.

16         Q      How many people were in the vehicle?

17         A      Just one.

18         Q      Did and you other members of the -- of law

19  enforcement conduct a search of that vehicle?

20         A      Yes, we did.  We searched the, the bed of the

21  pickup truck.

22         Q      What type -- it was a pickup truck?

23         A      It was an extended cab pickup truck, yes.

24         Q      And you mentioned it had a tonneau cover on

25  it?

JA-324

                    Sunday – Direct – Gardner


1          A     It had, it had a hard tonneau cover on the

2    back, yes.

3          Q     How did you get into that hard tonneau cover?

4          A     We had to use a screwdriver to open the lock

5    (indicating).

6          Q     And what did you, what if anything, did you

7    see in the bed of the truck?

8          A     Once we opened the tailgate, we noticed two

9    large hockey type duffel bags with a heavy odor of marijuana

10   emitting from them.

11         Q     What did you do with the bags?

12         A     We opened the bag to confirm it was packaged

13   marijuana, green leafy substance that we believed to be

14   marijuana.

15         Q     Did you do that right there on site or did you

16   take the bag somewhere else?

17         A     Well, we did it right on site to verify what

18   it was and then we transported it.

19         Q     Where did you transport it to?

20         A     To our substation also in Snye.

21         MR. GARDNER:  Your Honor, I'd like to show the

22   witness what's been marked as Government Exhibit 6A through

23   6I.

24         Q     Detective Sunday, if you could go ahead and

25   take a look at those photos and tell me if you recognize

JA-325

290

Sunday – Direct – Gardner

1    them.

2              A    Yes, 6A is the vehicle in question.  6B is the

3    contents of the bed of the vehicle; namely, the two duffel

4    bags.  6E and F show the interior of the duffel bags which

5    contained clear packaging of green leafy substance that we

6    believed to be marijuana.  6F has a cardboard with the

7    writing on it that we believed to be the markings of the

8    packagers to say what type of marijuana or the weights or how

9    they sell it, like how they divvy it up type.  6G is the

10   contents of the green -- sorry, or the duffle bags all the

11   clear packaged bundles placed on the table of the marijuana.

12             Q    And do all those pictures accurately depict

13   the vehicle and the bags that you seized on the night of

14   February 17th, 2008?

15             A    Yes, they do.

16             MR. GARDNER:  Your Honor, the government moves to

17   enter into evidence 6A through 6I.

18             THE COURT:  Any objection?

19             MR. SACCO:  No objection, your Honor.

20             THE COURT:  They'll be received.

21             Q    Detective, we're looking at Government Exhibit

22   6A.  Can you describe to the jury what we're looking at in

23   this photograph.

24             A    It is a green GMC Chevy type pickup truck with

25   a extended cab and a hard tonneau cover covering the back.

JA-326

291

Sunday – Direct – Gardner

1          Q     6B, what are we looking at here in 6B?

2          A     6B is the same vehicle with the hard tonneau

3    cover lifted showing the two duffel bags inside.

4          Q     And 6C?

5          A     Again, the two hockey type duffel bags.

6          Q     At any point were these bags weighed?

7          A     The bags were counted all the individual bags

8    that were inside each duffel bags were counted and a few of

9    them were randomly weighed.  That's how we estimated the

10   total weight.

11         Q     You weighed a couple of bags?

12         A     And multiplied them by the number of bags.

13         Q     And based on that what weight did you get for

14   the bags?

15         A     For that particular seizure I think it was

16   either a hundred or 120 pounds.

17         Q     6D.  Is this another photograph of the bags?

18         A     Yes, it is, with our Mohawk police placard on

19   it showing, yes.

20         Q     And what are we looking at in 6E?

21         A     This shows the zipper area of one of the

22   duffel bags that is covered with a silicone type substance

23   over the zipper area.

24         Q     Did that silicone act like a glue to seal it

25   shut?

292

Sunday – Direct – Gardner

1         A     Well, in the past we have come across this
2    situation and basically what it is it's like sealed shut so
3    the people that actually transport it don't go into the bag
4    and take some out or it's also to conceal the scent of the
5    marijuana.
6         Q     You said when you initially looked in the --
7    in the bed of the truck, you noticed a heavy smell of
8    marijuana; is that correct?
9         A     Yes.
10        Q     In your experience as a detective have you
11   come across a lot of marijuana?
12        A     Yes.
13        Q     Are you pretty familiar with the smell of
14   marijuana?
15        A     Yes, I am.
16        Q     What are we looking at in 6F?
17        A     This is one of the open duffel bags, as I
18   mentioned before, has this piece of cardboard with the
19   writing on it to indicate how they calculate and package the
20   marijuana.
21        Q     And this placard that we're looking at here,
22   that's not something that you or any other law enforcement
23   officer created, correct?
24        A     No, it isn't.
25        Q     This is how you found it?

JA-328

293

Sunday – Direct – Gardner

1       A    Yes.

2       Q    Inside the bag?

3       A    That's right.

4       Q    How about 6G.  And what are we looking at in

5   6G?

6       A    This is a photo of the marijuana removed from

7   the duffel bags after it had been counted by us.

8       Q    Is this the other duffel bag?

9       A    Yes, it is.

10      Q    Is this the placard found in the second duffel

11  bag?

12      A    Yes.

13      Q    Do you know what SP, hog, JH PH, do you know

14  what those things mean?

15      A    Well, based on previous experience, it's

16  different types of marijuana.

17      Q    And how about this last photo?

18      A    This is the total of both bags all placed in

19  one area and photographed.

20      Q    Detective Sunday, I'd like to direct your

21  attention to March 1st of 2011.  Did you conduct another

22  surveillance operation on that date?

23      A    Yes, sir, I did.

24      Q    And again, who participated in that

25  surveillance?

294

Sunday – Direct – Gardner

1    A    Other members of our joint investigation team
2  of the Mohawk police.
3    Q    And what was the target of that surveillance
4  operation?
5    A    The target of this operation, again, was the
6  Marie Peters area in Sugarbush Snye.
7    Q    And can you describe, using Government Exhibit
8  3, where you were located for that surveillance operation?
9    A    Basically I was in the same area as I was in
10  the previous -- previously shown slide where I mentioned I
11  was at.  If you want, I can mark it.
12    Q    No, that's okay.  Approximately what time did
13  you conduct this surveillance operation?
14    A    This operation was between 6 p.m. and 8 p.m.
15    Q    Was it dark yet?
16    A    Yes, it was.
17    Q    And, again, was there anybody further east of
18  you on River Road or were you the last man between you and
19  the Peters' residence?
20    A    I was the last member farthest east.
21    Q    At any point during your surveillance did you
22  observe a vehicle come from Marie Peters's residence area?
23    A    Yes, I did.
24    Q    Can you tell the jury what you saw?
25    A    As I was set up in my position on River Road,

295

Sunday – Direct – Gardner

1    I observed headlights approaching from the east, namely the
2    Marie Peters area, coming towards my direction.  So I pulled
3    out before it reached me and it was behind me and I relayed
4    the information to the other team members that a vehicle was
5    going to be proceeding past their locations.
6         Q    Why did you pull out in front of the vehicle?
7         A    I pulled out so I wouldn't spook the vehicle
8    or look too suspicious.
9         Q    And with the vehicle behind you, could you see
10   what the vehicle was doing?
11        A    Well, I saw the headlights.  It was following
12   me, yes.
13        Q    Okay.  And can you describe what the vehicle
14   did?
15        A    The vehicle continued westward on to –- on
16   River Road and then it proceeded again to Wade Lafrance where
17   the previous stop was and it continued on to McDonald Road
18   which leads up to Cook Road which is on the U.S. side of
19   Akwasasne, the New York side.
20        Q    Would you mind using that pen and just
21   outlining that route.
22        A    Okay.  (Witness marking exhibit.)
23        Q    What happened or what did you do once the
24   vehicle crossed the international border?
25        A    After I relayed to the other team members, one

JA-331

296

Sunday – Direct – Gardner

1   of the other members had gotten the plate number of that

2   vehicle as it passed his location and we did query checks on

3   the plate and it was determined to be not from our area, so

4   we had hoped to initiate a stop while still on our side but

5   we didn't have the manpower to do it, so when it entered the

6   U.S. side, we relayed the information to the Saint Regis

7   Mohawk Tribal Police to have them initiate a stop.

8           Q     Did you continue to conduct your surveillance

9   of the vehicle?

10          A     Yes, we followed the vehicle on to Cook Road

11  and it went westward towards state Route 37.

12          Q     At some point did you come into contact with

13  tribal vehicles, tribal law enforcement?

14          A     Yes, we did, tribal police passed us on Cook

15  Road.  The information that we gave them I don't know if it

16  was clear enough but they didn't see the vehicle go by so

17  they passed us so we kept following that vehicle on to when

18  it got to state 37 and it went in the east direction.

19          Q     State Route 37?

20          A     Yes.

21          Q     Were you still following the vehicle when it

22  got to Route 37?

23          A     Once it got to Route 37, we didn't follow it

24  any farther.

25          Q     What type of vehicle was it that you were

JA-332

297

Sunday – Direct – Gardner

1   following from Marie Peters's residence?

2        A    It was a small sedan, beige, gold-colored, a

3   Dodge or Chrysler type vehicle.

4        MR. GARDNER:  Your Honor, I'm showing the witness

5   what's been marked as Government Exhibit 11A.

6        Q    Sir, do you recognize that exhibit?

7        A    Yes, sir.

8        Q    And what is it?

9        A    That is the vehicle that in question, it is a

10  Dodge Stratus.

11       Q    Is that the vehicle that you were following

12  the night of March 1st 2011?

13       A    Yes, it is.

14       Q    And is the license plate on that vehicle

15  visible on that photograph?

16       A    Yes, it is.

17       Q    Is it the same license plate that you saw that

18  evening?

19       A    Yes.

20       Q    Does that photograph accurately depict that

21  vehicle?

22       A    Yes, it does.

23       MR. GARDNER:  Your Honor, I'd like to offer this

24  into evidence as Government Exhibit 11A.

25       THE COURT:  Any objection?

JA-333

298

Sunday – Direct – Gardner

1          MR. SACCO:  No objection, your Honor.

2          THE COURT:  It will be received.

3          Q     So you said you discontinued your surveillance

4   once it reached Route 37?

5          A     Yes.

6          Q     Were there any other law enforcement in the

7   area at that time?

8          A     Well, the tribal police, as well as the U.S.

9   border patrol.

10          Q     Had they picked up surveillance at that point?

11          A     Yes, they did.

12          Q     Are you aware of whether or not that vehicle

13   was ultimately stopped by another law enforcement agency?

14          A     Yes, the border patrol stopped that vehicle

15   approximately 2, 3 miles east of when it left Cook Road --

16          Q     And how do you know that?

17          A     -- on State 37.  Because we -- after that, we

18   went by to see if they had stopped the vehicle to verify it

19   was, in fact, the same vehicle.

20          Q     And did you do that?

21          A     Yes.

22          Q     And was it the same vehicle?

23          A     Yes, it was.

24          Q     Detective Sunday, you indicated that you've

25   lived in Snye, Quebec, Canada all your life; is that correct?

JA-334

299

Sunday – Cross – Sacco

1          A    Yes.

2          Q    And you're very familiar with the area?

3          A    Yes, I am.

4          Q    Now, on the reservation, are there any

5     ports-of-entry?

6          A    No, there isn't.

7          Q    And when you travel across a road like Cook

8     Road, do you have to go through any type of inspection area

9     or port?

10         A    No, you don't.

11         Q    Is there any designated law enforcement

12    personnel that mans the roads that cross the international

13    border on the reservation?

14         A    No, there isn't.

15         MR. GARDNER:  Your Honor if I could just have one

16    moment.

17         No further questions, your Honor.

18         THE COURT:  Cross?

19         MR. SACCO:  Yes, your Honor briefly.

20    CROSS-EXAMINATION BY MR. SACCO:

21         Q    Good afternoon, sir.

22         A    Good afternoon.

23         Q    Now, you made a seizure, one you testified to,

24    who was driving that car, that first seizure you testified

25    to?

JA-335

300

Sunday – Cross – Sacco

1      A      The 2008 seizure?

2      Q      Yes.

3      A      That was Richard Cossifer (phonetic).

4      Q      Richard Cossifer.  Was there any -- were there

5   any passengers in the vehicle or?

6      A      No, there wasn't.

7      Q      So Mr. Peters wasn't driving that car, was he?

8      A      No, he wasn't.

9      Q      Now the second observation you made that's

10  when you followed the car all the way from the down Cook Road

11  out to 37 east?

12     A      Yes.

13     Q      Did you see who was driving that car?

14     A      It was a female operator.

15     Q      Were there any passengers in that car?

16     A      No, there wasn't.

17     Q      And did you see Mr. Peters anywhere near that

18  car that night?

19     A      No, I didn't.

20     Q      Now, when you set up, you testified to two

21  different operations out near Marie Peters's house?

22     A      Yes.

23     Q      Aside from, you know, you described in detail

24  where you were positioned and your other officers were

25  positioned.  Did you see how the marijuana came in to the,

JA-336

301

Sunday – Cross – Sacco

1    came into the Peters's area, where did it come from?

2           A    No, we didn't, but --

3           Q    So you didn't see it that night?

4           A    I did not see it come.

5           Q    So did you see it loaded into the car,

6    anything like that?

7           A    No, I didn't.

8           Q    With respect to Marie Peters, does she still

9    live in that house as far as you know?

10          A    As far as I know, yes.

11          MR. SACCO:  Judge, no further questions.

12          THE COURT:  Okay:  Mr. Gardner, anything further?

13          MR. GARDNER:  No, your Honor.

14          THE COURT:  You may step down, sir, thank you.

15          THE WITNESS:  Thank you, sir.

16          (Witness excused, 2:50 p.m.)

17          MR. GARDNER:  Your Honor, I believe we have our

18   next witness.

19          THE COURT:  Ladies and gentlemen, everybody okay?

20          (Jurors nodding yes.)

21          MR. GARDNER:  Your Honor, can I just have one

22   moment.

23          THE COURT:  You may.

24          MR. GARDNER:  Thank you, sir.

25          (Pause in proceedings.)

302

LaBaff – Direct – Gardner

1     MR. GARDNER:  Your Honor, the United States calls
2 border patrol agent Ben LaBaff.

3

4            BENJAMIN LABAFF, called as a witness and
5 being duly sworn, testifies as follows:
6 DIRECT EXAMINATION BY MR. GARDNER:
7         Q    Good afternoon, Agent LaBaff.
8         A    Good afternoon.
9         Q    Could you please state your full name.
10        A    My name is Benjamin Wayne LaBaff.
11        Q    What is your current occupation?
12        A    I'm a United States border patrol agent
13 stationed in Massena, New York.
14        Q    How long have you been a border patrol agent?
15        A    Just over five years.
16        Q    Have you been stationed in Massena the whole
17 time?
18        A    No, I've been stationed at several stations
19 down south in Fort Brown, Texas and Kingsville, Texas.
20        Q    Can you describe just briefly what your
21 day-to-day duties are like as a border patrol agent?
22        A    As A border patrol agent, my job is to patrol
23 in between designated ports-of-entry and enforce immigration
24 and nationality laws.
25        Q    Agent LaBaff, go ahead and take a look at

303
                    LaBaff – Direct – Gardner


1   Government Exhibit 2 on your monitor.  What is your area of

2   operation?

3           A    My area are area of operation is from

4   Waddington, New York to Fort Covington, New York, and this

5   area on the exhibit is specifically the Akwasasne Mohawk

6   reservation, which is within that area.

7           Q    So your area of operation was actually a

8   little --

9           A    Yes.

10          Q    -- broader than what's depicted here?

11          A    Yes.

12          Q    Generally speaking, what is the job of border

13  patrol agents along the border?

14          A    The main focus is to prevent terrorism but,

15  also, the big part of what our job is is immigration laws and

16  keeping illegal immigrants out of the U.S. but we're also

17  cross designated to enforce narcotics laws and seize

18  narcotics, if we encounter them crossing the border.

19          Q    Where do you do most of your enforcement

20  activities?

21          A    Between the designated ports of entries.

22          Q    Go ahead and if you could take a look at

23  Government Exhibit 1 at the top there.  And you see there's a

24  number of I guess little crosses, little designators there

25  with a name next to, do you see those?

                                                                    304
                    LaBaff – Direct – Gardner

1           A      Yes.

2           Q      Fort Covington, Trout River, Jamieson Line?

3           A      Yes.

4           Q      Do you know what those represent?

5           A      Those appear to represent the designated

6    port-of-entries.

7           Q      Along the border?

8           A      Yes.

9           Q      And is that the designated area where if you

10   want to come into or out of the United States, that's where

11   you go?

12          A      Yes.

13          Q      And is it fair to say that you spent most of

14   your time patrolling in between those ports of entry?

15          A      That's exactly what our mission is day to day

16   mission.

17          Q      Is most of that done through people like you

18   on the ground, driving around and near the border?

19          A      Yes.

20          Q      Do you also conduct surveillance operations

21   where you get out in the field outside of your car and --

22          A      Yes, we do foot patrol, Marine patrol, road

23   patrol, we do everything to enforce the laws on the border.

24          Q      And in between the ports of entry, do you use

25   any type of electronic equipment or anything like that to

JA-340

305

LaBaff – Direct – Gardner

1   help with your patrolling?

2           A      In certain stations there's seismic sensors

3   and cameras.

4           Q      And what's the point of those?

5           A      For when an agent can't be there on foot, it

6   allows us to have more coverage.

7           Q      I want to direct your attention to March 1st,

8   2011, were you working that day?

9           A      Yes, I was.

10          Q      And what were your –– were you patrolling in a

11  particular area, were you located in a particular area?

12          A      Yes, I was assigned the east side of the

13  Akwasasne Mohawk reservation that day on road patrol.

14          Q      Can you show the jury on Government Exhibit 2

15  where you were set up?

16          A      I was set up just south of 37 on State Route

17  95 so approximately in this area, marking exhibit.

18          Q      Just south of Route 37?

19          A      Yes.

20          Q      At some point that day, did you receive

21  information that law enforcement officers were looking for a

22  Dodge Stratus?

23          A      Yes, I did.  In my patrol vehicle we have our

24  own system through, through border patrol to communicate but,

25  also, if we work the reservation we carry a radio of the

JA-341

306

LaBaff – Direct – Gardner

1    tribal police department the Saint Regis Mohawk Tribal Police

2    department and on that day I first overheard a call for a

3    look out for a gold Dodge Stratus that was possibly coming

4    out of Snye, Quebec entering the U.S.  And, as I heard this,

5    I also then was contacted by our communications, which are

6    our dispatchers, for the same lookout for us to been the look

7    out for that vehicle.

8              Q    And did they give a location as to where this

9    vehicle might be?

10             A    Yes, they said it was in Snye, Quebec about to

11   enter the U.S. through the reservation.

12             Q    Did you respond to that area?

13             A    Yes, I did.

14             Q    Where did you respond to exactly?

15             A    I was south on 95 and I knew I wanted to get

16   closer to the area, so I moved north on 95 on to 37 and

17   parked at -- set up to watch the highway, state Route 37 in

18   the Speedway gas station.

19             Q    At some point did you see a Dodge Stratus?

20             A    Yes, I did.

21             Q    And what was the Dodge Stratus doing?

22             A    The Dodge Stratus passed my location on state

23   Route 37.

24             Q    What did you do?

25             A    I pulled out behind the vehicle.

JA-342

307

LaBaff – Direct – Gardner

1           Q     Did you conduct surveillance?

2           A     I conducted a vehicle stop and immigrations

3  stop on the vehicle because it –– through surveillance it had

4  just entered the United States via Snye, Quebec.

5           Q     Where did you conduct that stop?

6           A     On State Route 37 just east of 95.

7           Q     Were you able to identify the driver of that

8  vehicle?

9           A     Yes, through questioning the driver of that

10  vehicle was a Cheryl Lobdell.

11           Q     Was Ms. Lobdell the only individual in that

12  vehicle?

13           A     Yes, she was.

14           Q     Did you –– during this stop, did you conduct a

15  search of the vehicle?

16           A     Yes, I did.

17           Q     And what, if anything, did you discover during

18  your stop?

19           A     Since Ms. Lobdell was coming from Canada, her

20  vehicle was entitled to inspection because she didn't cross

21  through a designated port of entry and through the search and

22  through the questioning she admitted there was marijuana in

23  the trunk of the vehicle and so we searched the vehicle and

24  located bags of marijuana in the trunk.

25           Q     How many bags did you discover in the trunk?

308

LaBaff – Direct – Gardner

1        A    I believe it was two.

2        Q    What type of bags were there?

3        A    Two large duffel bags or hockey bags that were

4   black that, through prior apprehensions and seizures, that I

5   recognized to be used in smuggling marijuana or narcotics.

6        Q    Did you open up the bags right there on the

7   side of the road?

8        A    No, I didn't.

9        Q    What did you do with the bags?

10        A    For officer safety, we decided to transport

11   the vehicle, Ms. Lobdell and the narcotics back to the

12   Massena border patrol station.

13        Q    Did you follow the Dodge Stratus back to the

14   station?

15        A    Yes, I did.

16        Q    And what did you do with the Dodge Stratus

17   once it was back at the Massena border patrol station?

18        A    Once the Dodge Stratus was back at the

19   station, we secured the driver, Ms. Lobdell and we also did

20   an inventory of the car and removed the bags from the trunk.

21        Q    Did you or another officer take photographs

22   the bags in the vehicle and the bags that you recovered?

23        A    Yes.  I don't recall who took the photographs

24   but there were photographs taken.

25        MR. GARDNER:  Your Honor, I would like to show the

JA-344

309

LaBaff – Direct – Gardner

1    witness what's been marked as Government Exhibit 11B to 11E.

2              THE COURT:  Okay.

3              Q    Agent LaBaff, could you look through each of

4    those photographs and tell me if you recognize them.

5              A    Yes.  At least the first one.  Yes.  These

6    photographs are of the Dodge Stratus, the marijuana that was

7    located and taken to our station at the sallyport.

8              Q    Do all of those photographs accurately depict

9    both the Dodge Stratus, as well as the hockey bags that you

10   removed from the trunk?

11             A    Yes.

12             MR. GARDNER:  Your Honor, the government would like

13   to move into evidence Government Exhibits 11B through 11E.

14             THE COURT:  Any objection?

15             MR. SACCO:  No objection, your Honor.

16             THE COURT:  They'll be received.

17             Q    First do you recognize Exhibit 11A.

18             A    Yes, this is the Dodge Stratus that I

19   encountered Ms. Lobdell in and pulled over on state Route 37.

20             Q    And 11B.  This is a dark photograph, can you

21   describe what we're looking at here?

22             A    Yes, I recall the photograph.  There's the

23   trunk's open and you can -- there's a tag on the marijuana

24   and you can also see the glue on the zipper of the bag

25   (indicating).

JA-345

310

LaBaff – Direct – Gardner

1     Q     11C.  What are we looking at in 11C?

2     A     This is just one of the hockey bags has been

3  removed from the trunk and you can it's a dark picture

4  there's still one remaining in the trunk.

5     Q     And what are we looking at in 11D?

6     A     Same things I just described, same thing, I

7  think the flash is on.

8     Q     If you look at the black hockey bag here,

9  there's something that's running across the middle of it, do

10  you see that?

11    A     Yes, I'd.

12    Q     And what is that?

13    A     That's what I'm trying to describe.  It's

14  melted glue on the zipper so it's not easily opened.

15    Q     Was it hard to get open?

16    A     Yes.

17    Q     And how about 11E?

18    A     This is where a –– the bag was already ripped

19  and you can see the air sealed bag of marijuana or what

20  appeared to be marijuana.

21    Q     How was the –– this green leafy substance, how

22  was it packaged inside the bags?

23    A     Inside the bags, inside the hockey bags

24  they're air sealed.

25    Q     Like vacuum sealed?

JA-346

311

LaBaff – Direct – Gardner

1          A    Vacuum sealed, yes.

2          Q    After you recovered these bags from the Dodge

3   Stratus, did you contact any other law enforcement agencies?

4          A    Yes, we contacted the Frank kiln county DEA

5   task force.

6          Q    Did any members of the DEA respond?

7          A    Yes.

8          Q    Do you remember who it was?

9          A    I believe it was Agent Teabo and Agent Toledo.

10          MR. GARDNER:  Your Honor, if I could have just one

11   moment, please.

12          THE COURT:  You may.

13          (Discussion held off the record.)

14          MR. GARDNER:  Your Honor, I have no further

15   questions for this witness.

16          THE COURT:  Any cross, Mr. Sacco?

17          MR. SACCO:  No cross, your Honor.

18          THE COURT:  Okay, thank you, sir.  You can step

19   down.

20          THE WITNESS:  Thank you, sir.

21          (Witness excused, 3:00 p.m.)

22          MR. GARDNER:  Your Honor at this time government

23   would like to enter into evidence Government Exhibit 33.

24   It's another stipulation of fact.

25          THE COURT:  Any objection?

JA-347

312
                    US v. Peters – 13–CR–316

1          MR. SACCO:  No objection, your Honor.

2          THE COURT:  Go ahead.  It will be received.

3          MR. GARDNER:  Yes, sir, Government Exhibit 33 reads

4    as follows:  The parties stipulate as follows:

5          On March 1st, 2011 Drug Enforcement Administration

6    Special Agent Hermes took possession of two hockey style bags

7    from United States border patrol agent Benjamin LaBaff at the

8    border patrol station in Massena, New York.  Special Agent

9    Hermes then transported the two hockey bags to the DEA

10   building in Plattsburgh, New York and placed them in the DEA

11   vault.

12         On March 2nd, 2011, Special Agent Hermes removed

13   the two hockey bags from the DEA vault and transported the

14   hockey bags to Hyde Park, New York to effect a controlled

15   delivery.  At the conclusion of the controlled delivery,

16   Special Agent Hermes regained possession of the two hockey

17   bags and transported the bags back to the DEA building in

18   Plattsburgh, New York.  Special Agent Hermes secured the bags

19   and in the DEA drug vault.

20         On March 4th, 2011, Special Agent Hermes removed

21   the two hockey bags from the DEA drug vault and examined the

22   contents of the bags, which contained dozens of vacuum sealed

23   plastic bags containing suspected marijuana.  Special Agent

24   Hermes removed the plastic bags, which weighed 44 kilograms.

25         On the same date, Special Agent Hermes prepared

313
                    US v. Peters – 13-CR-316

1   representative samples of the suspected marijuana from both

2   of the hockey backs pursuant to DEA policy.  Special Agent

3   Hermes packaged the representative samples and sent them to

4   the DEA Northeast Regional Laboratory for chemical analysis

5   via FedEx.

6           On April 28, 2011, forensic chemist Christopher

7   Benedetto completed a chemical analysis of the representative

8   samples submitted by Special Agent Hermes and scientifically

9   concluded that the suspected marijuana was, in fact,

10  marijuana.

11          In conclusion, Special Agent Hermes took possession

12  of two hockey style bags from Agent LaBaff at the Massena

13  border patrol station which contained 44 kilograms of

14  marijuana, a Schedule I controlled substance.

15          Sorry, your Honor, our next witness is Mr. Alain

16  Forget and I believe he's available.

17          THE COURT:  Why don't you get him in the courtroom,

18  I'm going to get you up and move, all right.  I'm going to

19  give you a short five-, ten-minute brake just to make sure

20  everybody's up and moving and awake and then we'll get you

21  right back in here.  Okay.

22          (Jury excused, 3:05 p.m.)

23          THE COURT:  We're just going to take a short

24  recess.

25          MR. SACCO:  Judge, before we, you know, when you

314

US v. Peters – 13–CR–316

1   get a chance, I want to make my record, my application.  I

2   talked to my client about the issue that came up from before

3   when we had the side bar.

4          THE COURT:  With the transcript?

5          MR. SACCO:  Yeah.

6          I don't know if you want me to do it now or you

7   want me to wait?

8          THE COURT:  You can go ahead and do it now.  The

9   jury is out of the room.  We have your client and yourself

10  and the government.  Go ahead.

11         MR. SACCO:  Judge, just so the record's clear,

12  essentially what happened here is that the government put in

13  evidence.  They put in a CD and a transcript of a controlled

14  meeting between my client and Alain Forget.  I don't know

15  what exhibits they are.  I objected to both exhibits as not

16  relevant.  The Court denied my objection.

17         During when the jury was present, the government

18  played the audio of the controlled meeting and in that audio

19  was the following sentence that was redacted from the

20  transcript that was in evidence but it was still on the audio

21  portion.  I had a previous agreement with the government

22  attorney that this would not be played to the jury.

23         Here's what the relevant portion of the audio that

24  was played.  "Yeah, cuz I told him, I said, I don't want

25  nothing to do with guns.  I went to jail for that already."

US v. Peters – 13–CR–316

1    Now, I read this as the really damaging part for my
2    position and my client's position is that the jury was able
3    to hear and read on the monitor in front of them "I went to
4    jail for that already", meaning that he's gone to jail for
5    some sort of gun possession.
6        THE COURT:  But was it on the monitor, was it
7    actually in --
8        MR. GARDNER:  Yes.
9        MR. SACCO:  It was in print.  That's when I was in
10   some sort of shock and that's when I stood up and I didn't
11   really know how to interrupt.  I obviously brought that to
12   the Court's attention.  We had a side bar and we had a
13   discussion that is already on the record.
14       I've relayed that to my client and here is what my
15   position is as the attorney.  There's three options here for
16   him to consider and for me to guide him.  First is to say
17   nothing and not draw any more attention to the issue that has
18   already been drawn.
19       The second is for the Court to fashion some sort of
20   instruction advising them that they can't consider that, if
21   they saw that, et cetera.
22       The third is a mistrial, for me to make a motion
23   for a mistrial under Federal Criminal Procedure 26.2.
24       We're at a stage in the case that, you know, I had
25   to consult with my client on this, obviously it's his life,

JA-351

316

US v. Peters – 13-CR-316

1   it's his case and I'm making a motion for a mistrial.

2           The reason I'm making the motion is I think this

3   case evolved into a case that there's a lot of talk about

4   weapons and the guns and the gun seizure and all that and I

5   think it makes this all the more damaging to him and

6   prejudicial to him and with all of the discussion and

7   testimony about guns and gun trafficking, I think it's a very

8   dangerous situation that he's in with that jury now knowing

9   that he has a gun conviction.  I was given no notice under

10  404.  I know it was inadvertent so that's why I wasn't given

11  notice but under 404, I'm entitled to notice and I was given

12  no notice because it was inadvertent.  I've said that before.

13          THE COURT:  You were certainly aware that there was

14  this part of the record recording and the transcript existed.

15          MR. SACCO:  Absolutely.  And I'm not suggesting

16  that for a minute but under the plain reading of the rule,

17  we're suppose -- there's supposed to be formal notice.

18          In any event, Judge, I'm making the motion as a

19  lawyer to protect my client's interest and that's the motion.

20          THE COURT:  Mr. Gardner, you want to be heard, sir?

21          MR. GARDNER:  Your Honor, the government obviously

22  would oppose the motion.  I think I said to the Court -- I'll

23  be very frank -- it was an error.  The government had

24  communicated to defense counsel that we would not include

25  that portion of the audio, so I understand that it's an

JA-352

317

US v. Peters – 13–CR–316

1   issue.  But mistrial is obviously a drastic remedy and

2   there's things that can be done short of that.

3           It was a very short reference.  We can remove it so

4   that the jury does not hear it again.  It was not a lengthy

5   conversation about the conviction.  It didn't describe what

6   the conviction was.  And I think the -- short of a mistrial,

7   there certainly can be instructions that can be given to the

8   jury, if that's warranted, or maybe the better course of

9   action is to say nothing.  But, again, a mistrial is a very

10  drastic remedy that I don't think it necessary in this

11  situation.

12          THE COURT:  Well, first of all, I'd like to note

13  that the Court never received any pretrial motions with

14  regard to this issue and I'm assuming that's based on the

15  understanding between counsel that it would be redacted.

16          The Court views this as an innocent mistake in the

17  very limited type nature of the mentioning., it was mentioned

18  by the defendant out of his own mouth with regard to his

19  involvement with a prior gun conviction.

20          Now the thing is what to do about it.

21          I'm going to deny your motion for a mistrial.  You

22  know, it's this Court's view that that is an extreme and

23  drastic measure that would have to be a situation where

24  there's extreme prejudice against your client.  And the Court

25  doesn't view this I'm going to call it an error by the

318

US v. Peters – 13-CR-316

1   government in putting this before the jury as that type of

2   prejudicial mistake that would require this Court to grant a

3   motion for a mistrial.

4            So then we're left with this, and as I've indicated

5   previously on the record, there are some options here.  And I

6   still see it as three options, from the Court's view.

7            We can say nothing, with the idea that it would

8   bring attention to it by mentioning it again and it's going

9   to be redacted any further playing by this jury, any other

10  further testimony by witnesses and I'm assuming Mr. Forget is

11  going to testify about this conversation.  He's the next

12  witness to be called.  There will be no reference to this.

13           Secondly, I can give a curative instruction now to

14  the jury indicating and I'm happy to hear defense counsel and

15  how you would like it worded, if you want this remedy, to

16  say, you know, that you're not to consider any reference in

17  the tape or in any other recording or the narrative that was

18  drafted up from the recording, regarding any reference to any

19  prior criminal activity or convictions of Mr. Peters.  And we

20  can do that immediately.

21           Or we can let it sit for now and when I instruct

22  the jury at the end of this case, I can give an overall

23  instruction at that time indicating that any reference to any

24  prior criminal convictions and any testimony or any exhibits

25  with regard to Mr. Peters needs to be disregarded or I can

319

US v. Peters – 13-CR-316

1   give it now and then I'll do it twice, if you'd like.

2           But, again, I think those are reasonable,

3   legitimate options to deal with this issue and I don't see

4   any -- or that there is significant prejudice to your client

5   which would require granting a motion for a mistrial.

6           So, again, I will give you an opportunity to

7   discuss that with your client and we can make a decision.  I

8   can do an instruction when the jury comes back.  I can do an

9   instruction at the end of the day and follow up with another

10  one at the time of my jury charge.  But I'll certainly hear

11  you on that.

12          MR. SACCO:  Yes, your Honor.

13          And, Judge, I appreciate that.  If I could have the

14  overnight, I don't think it's anything I'm going -- I'm

15  intentionally not asking the Court to do it at this moment.

16  I know the Court's offered to and I'm not asking you to do it

17  right now.

18          THE COURT:  I would like you, for the record, to

19  consult with Mr. Peters and I want to know, that that's his

20  wish, too, that he would prefer not to have an immediate

21  curative instruction but would prefer to wait till overnight

22  and you two can discuss it so that we have that on the record

23  and we'll go from there.

24          MR. SACCO:  Okay, thanks, Judge.

25          Judge, I've had -- we've been talking about this at

JA-355

320

US v. Peters – 13–CR–316

1   this break and the last break so we've talked again about the
2   timing of this instruction, if any, and right now we're
3   asking the Court not to admonish or give an instruction and
4   we'll talk about it tonight and I'll update the court in the
5   morning, if that's all right.
6           THE COURT:  That's fine.  And I'd be happy to give
7   an instruction first thing in the morning, if that's what you
8   want to do, followed by one on a jury charge or however --
9   whatever you want to request this Court to do, I'll hear you
10  and I'll hear the government and we'll go forward.
11          But, again, I think at this point, the less we draw
12  attention to it, the better off it is.
13          MR. SACCO:  I agree.  And, however, my -- my other
14  concern is is that whoever may or may not have seen it, it's
15  my experience that whoever might have written something down
16  is going to be looking for that again.
17          THE COURT:  Mm-mm.
18          MR. SACCO:  And that can be an issue.
19          THE COURT:  And that's why I do think an
20  instruction is appropriate at some point, you need to tell me
21  when you'd like it or.
22          MR. SACCO:  Okay.
23          THE COURT:  Or else I can -- if you want me to take
24  it out of your hands, I can do that instruction today.  I can
25  do it at a, you know, at a final charge to this jury, and my

JA-356

US v. Peters – 13–CR–316

1   thought is, you know, without bringing attention to it, a

2   general type of curative instruction indicating that any

3   reference, anywhere in testimony, or in exhibits, recordings

4   or anything else to any prior criminal activity of Mr. Peters

5   or any prior convictions is not relevant and cannot be

6   considered by this jury in determining guilt or innocence of

7   this defendant, something along those lines is what I'm

8   thinking, but I'll hear you on --

9            MR. SACCO:  Okay.

10           THE COURT:  -- on a requested instruction and I'll

11   hear the government.

12           MR. SACCO:  Yes, your Honor.

13           THE COURT:  So you let me know.

14           MR. GARDNER:  Your Honor, along those fines, can I

15   have five to ten minutes so that we can make sure that it's

16   been edited out.

17           THE COURT:  Please do.

18           THE CLERK:    Court is in recess.

19           (Recess taken, 3:19 p.m.)

20           (Open court:)

21           THE COURT:  Ladies and gentlemen, I'm going to give

22   you your exercise.  I'm going to ask you to step out again a

23   for a second.  I apologize for this but it's important that I

24   need to cover something with these attorneys on the record.

25   So, if you'll just step into the jury room, you can stay

322

US v. Peters – 13-CR-316

1    lined up and I'm going to bring you right back out, little

2    practice like a drill Sergeant.

3                    (Jury excused, 3:40 p.m.)

4                    THE COURT:  For the record, I've sent the jury back

5    to the jury room because I've been advised by counsel that

6    Mr. Forget is in shackles and he's in custody and he's going

7    to need to be escorted into the courtroom, so I want to get

8    him in here in the witness seat.  If there's hand shackles, I

9    want them off, you can leave the leg shackles off, and we'll

10   move him outside the presence of the jury, okay.

11                   Are you comfortable with the hand shackles being

12   off and have him brought into the courtroom.

13                   (Discussion held off the record.)

14                   THE COURT:  For security purposes let's do that and

15   you escort him in, okay.

16                   (Pause in proceedings.)

17                   THE COURT:  Let's bring the ladies and gentlemen of

18   the jury in.

19                   (Jury present, 3:42 p.m.)

20                   THE COURT:  We're here back in the courtroom.  We

21   have the defendant, defense counsel, government attorney, and

22   Mr. Gardner and Mr. Alain Forget.

23                   MR. GARDNER:  Alain Forget, your Honor.

24                   THE COURT:  Has been called lean Forget Lane).

25

JA-358

323

US v. Peters – 13–CR–316

1                    ALAIN FORGET, called as a witness and

2     being duly sworn, testifies as follows:

3     DIRECT EXAMINATION BY MR. GARDNER:

4              Q    Good afternoon, Mr. Forget.

5              A    How are you.

6              Q    Can you please state your full name?

7              A    It's Alain D. Forget.

8              Q    Did you ever go by another first name?

9              A    No.

10             Q    Does anyone ever call you E-Lain?

11             A    My mother calls me Alain.  It's just the

12    French way.

13             Q    Just the French way of saying Allan?

14             A    Yeah.

15             Q    How old are you?

16             A    43.

17             Q    Prior to your incarceration what was the city

18    and state of your residence?

19             A    Malone, New York.

20             Q    How long have you lived in Malone?

21             A    Ten years.

22             Q    Prior to your incarceration, were you

23    employed?

24             A    Yes, sir.

25             Q    What was the nature of your employment?

JA-359

324

US v. Peters – 13-CR-316

1        A    I'm owner/operator of dump trucks and tractor

2   trailers.  I haul road construction materials as in gravel,

3   sand, blacktop, different items like that.

4        Q    What's your educational background?

5        A    Grade ten.

6        Q    Do you have any history of drug or alcohol

7   abuse?

8        A    Yes.

9        Q    Can you describe it?

10        A    Marijuana and cocaine.

11        Q    Have you used marijuana and cocaine in the

12   last few years?

13        A    I -- vaguely kind of, I was -- I have.

14        Q    Did you use marijuana and cocaine regularly in

15   the last few years?

16        A    Not regularly.  As much as two, three years

17   ago I was quite regularly.

18        Q    And what would that be, once a week, once a

19   day?

20        A    Oh, every day.

21        Q    Cocaine, marijuana, both?

22        A    Mostly marijuana.

23        Q    Mr. Forget, did you plead guilty to an offense

24   against the United States?

25        A    Yes, sir, I did.

JA-360

325

US v. Peters – 13–CR–316

1   Q    And we'll get into the specific details in a
2   moment but can you generally state what you did.
3          A    Transporting marijuana.
4          Q    Do you remember what crime you pled guilty to?
5          A    Possession to marijuana.
6          Q    Was it conspiracy to possess with intent to
7   distribute and to distribute more than a hundred kilograms of
8   marijuana?
9          A    I believe so.
10         Q    Have you been sentenced yet?
11         A    No, sir.
12         Q    Do you know what the maximum potential term of
13  your imprisonment is?
14         A    I'm not quite sure.
15         Q    Is it a mandatory minimum of 5 years and a
16  maximum of 40 years?
17         A    Oh, yes, I believe so.
18         Q    Now, Mr. Forget, is it fair to say that you've
19  had numerous convictions related to smuggling over the years?
20         A    For different things than marijuana, yes.
21         Q    But is that a fair statement?
22         A    I believe so, yes.
23         Q    Prior to your plea with the United States --
24  or prior to your plea of guilty to the conspiracy charge, did
25  you enter into a plea agreement with the United States?

JA-361

326

US v. Peters – 13–CR–316

1          A     I believe so.

2          Q     Did you also enter into a cooperation

3    agreement with the United States?

4          A     Yes, sir.

5          Q     At the time you entered into the cooperation

6    agreement, what was your understanding of that agreement?

7          A     To cooperate with the law.

8          Q     Did you hope to gain some benefit from your

9    cooperation?

10         A     I did hope.

11         Q     Mr. Forget, were you arrested on

12   December 27th, 2013?

13         A     Yes, sir.

14         Q     At that time were you charged by New York

15   State with criminal possession of a weapon in the second, two

16   counts of criminal possession of a weapon in the third

17   degree, and three counts of criminal sale of firearm in the

18   third degree?

19         A     Was I charged with it?

20         Q     Were you charged with it?

21         A     Yes, sir.

22         Q     When you pled guilty to conspiracy to possess

23   with intent to distribute a controlled substance, were you

24   incarcerated at that time or were you released on conditions?

25         A     I was released on conditions.

JA-362

327

US v. Peters - 13-CR-316

1          Q    And was one of those conditions that you not

2   commit another crime?

3          A    Yes, sir.

4          Q    And have you now violated your conditions of

5   release?

6          A    Unfortunately, yes, sir.

7          Q    And your release status was revoked, correct?

8          A    Yes, sir.

9          MR. GARDNER:  Your Honor, I'd like to show the

10  witness what's been marked as Government Exhibit 28 for

11  identification.

12          THE COURT:  Okay.

13          Q    Sir, go ahead and take a moment and I want you

14  to look at that document and when you're done looking at it,

15  let me know.

16          A    (Witness reviewing document.)  I'm finished

17  reading it.

18          Q    Do you recognize that document?

19          A    Yes, sir.

20          Q    And what is your general understanding of that

21  document?

22          A    That I -- I have no leniency of any some sort

23  pretty much.

24          Q    Let me ask you a few questions about it.  Is

25  that a letter from the United States Attorney's Office to you

JA-363

328

US v. Peters – 13-CR-316

1    care of your attorney?

2              A    Yes, sir.

3              Q    And does that letter inform you that your

4    cooperation agreement has been terminated?

5              A    Yes, sir, that I breached.

6              Q    Because of your arrest on December 27th, 2013?

7              A    Correct.

8              Q    Does that letter also indicate that the

9    government will make no recommendation at the time of your

10   sentencing, based on your cooperation?

11             A    Yes, sir.

12             Q    And you understand all of that?

13             A    I understand it.

14             MR. GARDNER:  Your Honor, I'd like to offer this

15   exhibit into evidence as Government Exhibit 28.

16             THE COURT:  Any objection?

17             MR. SACCO:  No, your Honor.

18             THE COURT:  It will be received.

19             Q    Mr. Forget, what did you do to prepare for

20   your testimony here today?

21             A    (No response.)

22             Q    Did you and I meet?

23             A    Yes.

24             Q    Did we meet on more than one occasion?

25             A    Yes.

JA-364

329

US v. Peters – 13-CR-316

1          Q    And during those meetings did we talk about

2  your testimony?

3          A    Yes.

4          Q    Did you review your -- any prior testimony

5  that you had relating to this case?

6          A    (No response.)

7          Q    Did you review your grand jury testimony?

8          A    Yes.

9          Q    Mr. Forget, are you familiar with the

10 defendant in this case, Mr. Allan Peters?

11         A    Yes, sir.

12         Q    Approximately how long have you known the

13 defendant?

14         A    I believe I first met him it was -- I want to

15 say 1991 or '92, I think it was.

16         Q    So for quite some time?

17         A    Yes.

18         Q    And I don't want to get into the specific

19 nature of your relationship in the '90s but did you know him

20 socially, were you friends with him, were you acquaintances,

21 associates?  How would you describe your relationship?

22         A    Acquaintances -- I mean, we weren't always --

23 we didn't go like hang out together.  We might have

24 snowmobiled together a couple of times.  I mean, it was more

25 on a business level, I guess.

JA-365

330

US v. Peters – 13-CR-316

1      Q      Okay.

2      A      I knew him from seeing him around our area at
3   times.

4      Q      Did you live in the same general area that he
5   did?

6      A      He lived on the reservation.  I lived close to
7   there on the Canadian side.

8      Q      Where were you living in the 1990s?

9      A      Saint-Anicet.

10     Q      Where is that?

11     A      Quebec.

12     Q      Is it close to the Akwasasne Mohawk Indian
13  reservation?

14     A      Yes.

15     Q      Is it on the north side of the St. Lawrence
16  river?

17     A      Yes.

18     Q      How long did you live in Quebec?

19     A      Up until 2001 I think it was.

20     Q      Was that when you moved to Malone, New York?

21     A      I moved to Constable.

22     Q      Constable, New York?

23     A      Yes.

24     Q      Are you a dual citizen of both Canada and the
25  United States?

JA-366

331

                    US v. Peters – 13-CR-316

1           A     Yes.

2           Q     Now you indicated earlier that you had pled

3      guilty to a drug trafficking offense; is that right?

4           A     Yes, sir.

5           Q     So at some point did you become involved in

6      drug trafficking and specifically drug smuggling?

7           A     Yes, sir.

8           Q     When did that occur, what was the general time

9      frame?

10          A     Somewhere around 2008, I believe.

11          Q     Can you describe for the jury how you became

12     involved in drug trafficking?

13          A     Basically started scouting for people, running

14     out -- scouting is going ahead, kind of being the eyes, the

15     lookout.

16          Q     Let me back you up a little bit.

17          A     Okay.

18          Q     At some point did someone approach you about

19     becoming involved in drug smuggling?

20          A     Yes, sir.

21          Q     And who was that individual?

22          A     Colin Stewart and Stefan Trepanier.

23          Q     Mr. Forget, if you could go ahead and look at

24     that monitor there at Government Exhibit 20.  Do you

25     recognize that individual?

JA-367

332

US v. Peters – 13-CR-316

1      A    Yes, I do.

2      Q    And who is that?

3      A    That's Colin Stewart.

4      MR. GARDNER:  Your Honor, I'd like to approach

5  the witness and show him what's been marked as Government

6  Exhibit 24 for identification.

7      Q    Sir, do you recognize that exhibit?

8      A    Yes, sir.

9      Q    And what is it?

10     A    It's Stefan Trepanier.

11     Q    Is it a photograph of him?

12     A    Yes.

13     Q    Does that photograph accurately depict what he

14 looks like?

15     A    Yes.

16     MR. GARDNER:  Your Honor, the government would like

17 to move this into evidence as Government Exhibit 24.

18     MR. SACCO:  No objection.

19     THE COURT:  Okay.  It will be received.

20     Q    So you indicated that these two individuals,

21 Colin Stewart and Stefan Trepanier, approached you.  What did

22 they approach you about?

23     A    He pretty much asked me if I wanted to, like,

24 be their eyes to scout their loads of marijuana.

25     Q    How did you know these two individuals?

JA-368

333
US v. Peters – 13-CR-316


1          A    I knew Stefan from living in the area in

2    Saint-Anicet.  Colin, I met him through my son -- my son and

3    his brother were friends, Colin's younger brother.

4          Q    And who is your son?

5          A    Mathieu Forget.

6          Q    Were you surprised when they approached you

7    and asked you to work with them?

8          A    Kind of, yes.

9          Q    Did you know that they were involved in drug

10   trafficking?

11         A    I mean, I knew they were involved in

12   something.  I didn't have the definite factors of it.

13         Q    When they first approached you, did you agree

14   right away, did you take time to think about it?

15         A    I kind of stuttered on it.  They just told me,

16   you know, there's nothing to it, you know, it's nothing to

17   worry about.  It's not like you have anything on you and I,

18   I -- I fell in for it.

19         Q    So you agreed?

20         A    Yeah.

21         Q    At some point did you sit down with either

22   Colin or Stefan Trepanier and discuss the specifics of what

23   you would be doing?

24         A    Yes.

25         Q    Was that over the phone, was that a meeting?

JA-369

334

US v. Peters – 13–CR–316

1          A     In person.

2          Q     And where did that take place?

3          A     I believe it was at Colin's in Quebec.

4          Q     At Colin Stewart's residence?

5          A     Yes.

6          Q     Where is his residence located?

7          A     It's in Elgin.

8          Q     In Quebec?

9          A     Quebec.

10         Q     What did Colin explain to you about what you

11   would be doing specifically?

12         A     Just kind of pretty much told me that I

13   would -- they would get to the reservation and put the

14   marijuana into vehicles and I would go out ahead of them

15   before they left, kind of like to open up the road.

16         Q     That's the scouting that you mentioned?

17         A     The scouting, opening up the road.

18         Q     What is the overall function of a scout?

19         A     Your duty is to go ahead, you know, several

20   miles or somewhat and -- excuse me.

21         Q     Do you need a glass of water?

22         A     Yeah, please.

23         Q     Go ahead.

24         (Pause in proceedings.)

25         A     Sorry.  Thank you.

JA-370

335

US v. Peters – 13–CR–316

1          Q      That's okay.  So you were talking about

2    scouting?

3          A      Yeah, you go ahead and you basically look out

4    for suspicious vehicles that might look like law enforcement.

5    If there's anything that looks in any way, you -- you let

6    them know by text or with the phone.

7          Q      You would let Colin or Stefan know?

8          A      Yes.

9          Q      Okay.

10         A      If need be, you manage to get pulled over so

11   that they don't.

12         Q      During this initial meeting with Colin and

13   Stefan, you mentioned that they said that they would get the

14   marijuana at some place on the reservation; is that right?

15         A      Yes.

16         Q      Did they indicate where on the reservation?

17         A      Yes.

18         Q      What did they say?

19         A      It was at Hiio's mother's property.

20         Q      Is that the way they described it, Hiio's

21   mother's property?

22         A      Yes.

23         Q      Who is Hiio?

24         A      Allan Peters.

25         Q      Is that the defendant?

336

US v. Peters – 13–CR–316

1         A    Yes.

2         Q    Is that another name that he goes by?

3         A    Yes.

4         Q    Do you know if he has any other nicknames or

5 any other names that he goes by other than Allan and Hiio?

6         A    A lot of people call him Big Guy.

7         Q    Do you call him Big Guy?

8         A    Yes.

9         Q    Would Colin or Stefan ever refer to him as Big

10 Guy?

11        A    Yes.

12        Q    After that initial meeting, how long was it

13 before you actually began to scout and work for Colin and

14 Stefan?

15        A    It was pretty quick.  I don't remember the

16 time frame but it was pretty soon after.

17        Q    Few weeks?

18        A    Within the next week or two, I believe.

19        Q    About how many times did you scout with a load

20 of marijuana?

21        A    Quite a few.

22        Q    Talking about five or ten, couple of dozen,

23 what do you think?

24        A    I'm sure it was over 20.

25        Q    Okay.  And was each time that you scouted

JA-372

337

US v. Peters – 13–CR–316

1   pretty similar?

2          A    Yes.

3          Q    Let's talk about I guess an average for a

4   typical trip.  If Colin and Stefan wanted you to scout, how

5   would they communicate with you?

6          A    They would send me a text message through a

7   telephone.

8          Q    And what would the text message indicate?

9          A    Pretty much if we were going to be there

10  for morning, it was, I believe, like 6 a.m. or so, 6 or

11  6:30 a.m., they would call it breakfast, we'll meet you for

12  breakfast.  They didn't do lunch very much because nobody had

13  a very good feeling about lunch.

14         Q    Why, because it was in the middle of the day?

15         A    Yeah, we like to do it with traffic, working

16  people, school buses.

17         Q    Okay.

18         A    Just blend in with the traffic.

19         Q    Would you ever scout or would a load ever go

20  out at night?

21         A    Yeah, that was called supper.

22         Q    And let's say the text message said breakfast

23  tomorrow, did that mean a specific time, a hard time?

24         A    It was always 6 or –– in between 6 and

25  6:30 a.m.

JA-373

338

US v. Peters – 13–CR–316

1     Q     And where would you go at 6 or 6:30 a.m. the

2   next morning?

3     A     To Mrs. Peters's property, Hiio's mother's

4   property.

5     Q     Mr. Forget, if you can go ahead and look at

6   that monitor and look at Government Exhibit 3.  Take a second

7   and let me know if you recognize what's depicted in

8   Government Exhibit 3.

9     A     Yeah, I recognize it.

10     Q     Is Hiio's mother -- defendant's mother's

11   property depicted on this exhibit?

12     A     Yes, sir.

13     Q     And is there a pen right up there?  If

14   you could use that pen and go ahead and draw Government

15   Exhibit 3, can you indicate where Hiio's mother's property

16   is, where the defendant's mother's property is?

17     A     The whole property?

18     Q     Sure.

19     A     (Witness marking exhibit.)

20     Q     How would you get to that property?

21     A     You come in the road, the long driveway that

22   comes off of the...

23     Q     Are you coming from Malone, New York?

24     A     Yes.

25     Q     And so what roads would you take?

                    US v. Peters – 13–CR–316


 1          A    I'd take Route 37.

 2          Q    Do you see Route 37 on this -- on this map, on

 3  Government Exhibit 3?

 4          A    Yes.

 5          Q    And where would you go from 37?

 6          A    On to a -- I believe it's Drum Street.

 7          Q    Do you see Drum Street on this -- on

 8  Government Exhibit 3?

 9          A    Yes.

10          Q    Okay.  Go ahead and use that pen and if you

11  can mark your route, please.

12          A    (Marking exhibit).  I think -- I think I'm

13  coming from this way here (indicating).

14          Q    Okay.  Is that Drum Street you're turning on

15  right now?

16          A    Yeah, that -- that's Drum Street but you'd

17  take a left on to, I don't honest -- I don't even know the

18  name of the road where you take that left on to.

19          Q    That's fine.  Please continue.

20          A    I think I went too far, sorry.

21          Q    That's okay.

22          A    (Marking exhibit.)

23          Q    Okay.  And what would happen when you would

24  arrive at the defendant's mother's property?

25          A    I would go to where the boat would come in or

JA-375

340

US v. Peters – 13–CR–316

1    the snowmobiles.

2          Q    I want you to take a look at the monitor

3    again, I'm showing you what's –– or I'm showing you

4    Government Exhibit 4.

5               Do you recognize Government Exhibit 4?

6          A    Yes, sir.

7          Q    And what is it?

8          A    It's the property of Hiio's mother's.

9          Q    And, I'm sorry, you said you would go where

10   the boats came in?

11         A    Yes.

12         Q    Is that location depicted on Government

13   Exhibit 4?

14         A    Yes.

15         Q    And where is that?

16         A    (Marking exhibit.)

17         Q    Can you describe that area right there?

18         A    It's a canal that was dug out and the boats

19   would come into there and that's where they would bring the

20   marijuana in.

21         Q    Let's talk about that a little bit.  When you

22   would arrive at this location, would Colin or whoever you

23   were meeting, would they already be there?

24         A    For the most part.

25         Q    And who would come with the loads of

JA-376

341

                    US v. Peters – 13-CR-316

1    marijuana?

2             A    It could have been Colin, Stefan.  They had

3    X-man at times come, also.

4             Q    Who's X-man?

5             A    Xavier.

6             Q    Do you know Xavier's last name?

7             A    Dauie (phonetic).

8             Q    Dauie?

9             A    Yes, sir.

10            Q    Is that a French name?

11            A    Yes, sir.

12            Q    Before I forget, did Colin have any type of

13   nickname that you know of?

14            A    Farmer, Cowboy, C-man.

15            Q    And you said that Colin or Stefan or Xavier

16   would arrive in a boat.  What type of boat are we talking

17   about?

18            A    It's kind of like a duck boat, hunting boat

19   type.

20            Q    Did they always use the same boat or did they

21   have various?

22            A    They had different boats.

23            Q    What would they do when they arrived at this

24   canal?

25            A    They'd pull up and throw the bags on land and

342

US v. Peters – 13–CR–316

1  you'd start throwing them in the vehicles.

2          Q     Now at first you're just acting as a scout; is

3  that right?

4          A     Correct.

5          Q     So is there anything -- let me back up just a

6  little bit.  I take it you drove a vehicle to this location?

7          A     Yes.

8          Q     What vehicle would you use?

9          A     My pickup or whatever I felt like taking.

10          Q     Would someone else be there that would be the

11  load vehicle, the vehicle that was actually transporting the

12  marijuana?

13          A     Yes.

14          Q     So who was that have typically?

15          A     Could have been Cheryl Lobdell, Jacques

16  Trepanier, which came with the boat, also, because he was

17  from the Canadian side.

18          Q     So Jacques Trepanier would come over on the

19  boat with Stefan or Colin?

20          A     Yes.

21          Q     Anybody else besides Jacques Trepanier and

22  Cheryl Lobdell?

23          A     As drivers out of there, Corey Spinner, also.

24          Q     Do you recognize the individual depicted on

25  Government Exhibit 22?

343

US v. Peters — 13-CR-316

1          A     Yes, sir, that's Cheryl Lobdell.

2          Q     So, other than the individual driving the load

3   vehicle and the people that came over on the boat, was there

4   anybody else that was ever present?

5          A     Hiio would be there at times.

6          Q     The defendant?

7          A     Yes, sir.

8          Q     What would the defendant do while he was

9   there?

10         A     He pretty much sat in his truck for, you know,

11  talked to Colin or Stefan or whoever was there.

12         Q     Where would defendant park his truck?

13         A     A ways from the boat.  I mean, he didn't -- if

14  the vehicles were parked say (marking exhibit), he would park

15  back a little bit like, say, here or something (marking

16  exhibit).

17         Q     Back closer to River Road?

18         A     No, I guess I went too far.  He wouldn't park

19  behind the vehicles so we had room to put the things in.

20         Q     And you said he would sit in the vehicle?

21         A     Yes, sir.

22         Q     Would Colin or Stefan or whoever came over on

23  the boat, would they ever have a conversation with defendant?

24         A     Yes, sir.

25         Q     Did you ever hear what those conversations

344

US v. Peters – 13–CR–316

1   were about?

2          A    Not really.  In general they –– when they

3   started talking there, when Colin or Stefan would go towards

4   them, you know, we'd kind of just back away and let them talk

5   whatever they're talking about.

6          Q    You said when Colin and Stefan would go toward

7   them?

8          A    Toward Hiio, sorry, toward the vehicle.

9          Q    At some point did you have an understanding of

10  what the defendant's role was, if any?

11         A    We were coming through his property.

12         Q    Did Colin ever talk about what the defendant's

13  role was or Stefan?

14         A    I mean, they also said that he scouted.

15         Q    We'll talk about that in a little bit.  Did

16  Colin or Stefan talk specifically about using the defendant's

17  property?

18         A    Yes.

19         Q    What would they say?

20         A    Just basically we're going to Hiio, Hiio's,

21  Hiio mom's.

22         Q    So going back to this typical trip, once the

23  bags were unloaded and put into the load vehicle, what would

24  happen then?

25         A    For the most part, they would have Hiio go out

345

US v. Peters – 13-CR-316

1    and go ahead of us 'cuz he seemed to be more comfortable

2    leaving before us, 'cuz he's native and you won't get

3    bothered from the police as much leaving the reservation if

4    you're a native.

5            Q    And you mentioned a couple moments ago that

6    the defendant would scout.  Is this what you mean?

7            A    Yes.

8            Q    How do you know that the defendant was

9    scouting for loads?

10           A    They had told us.

11           Q    Who?

12           A    Stefan and Colin.

13           Q    Well, what did they say?

14           A    Big Guy is going to go ahead of you.

15           Q    Would you sometimes see the defendant leave

16   this area before the load vehicle?

17           A    Yes, sir.

18           Q    Were there other occasions when you showed up

19   and the defendant wasn't there?

20           A    Oh, yeah, at times he wasn't there.

21           Q    Was that because he was already scouting or

22   because he just wasn't in the area?

23           A    Maybe just 'cuz he wasn't in the area, I

24   assume, you know, I didn't ask many questions or...

25           Q    Did you ever have any communications with the

JA-381

346

US v. Peters — 13-CR-316

1  defendant while he was scouting, like if there was a problem

2  or something like that?

3          A    No.

4          Q    Do you know what the defendant would do if

5  there was a problem?

6          A    He would get a hold of Colin.

7          Q    Were there any instances in which the

8  defendant communicated something to Colin, an issue or a

9  problem?

10         A    Yes.  The phone would ring and Colin would say

11 just hold up a few minutes, Big Guy's checking something out

12 or there was a car coming down.  I remember maybe a couple of

13 times that they said there was a Saint Regis police coming

14 down, they'd turn around and they'd just go back out so we

15 just had to wait until they were gone.

16         Q    After something like that would happen, would

17 Colin get another call in a couple minutes or a couple

18 minutes later?

19         A    Yeah, just tell us we can go.

20         Q    Do you know where the defendant would scout

21 to?

22         A    I mean, I know sometimes he went farther than

23 others.  He didn't always go as far as I've seen him, you

24 know, or I was told that he might go all the way to 87 with

25 us or something.

JA-382

347

US v. Peters – 13–CR–316

1          Q     Who would tell you that?

2          A     Colin at times if, you know, if they wanted

3    more scouts than -- just more eyes, I guess you could call

4    it.

5          Q     That brings up another issue.  So if you were

6    scouting, why would they want another person like the

7    defendant to scout?

8          A     The more eyes, the better, they'd say.

9          Q     And why would sometimes the defendant go all

10   the way to Interstate 87?

11         A     Yeah, exit -- I believe it was Exit 28 or

12   something like that that we would go to.

13         Q     How do you know that the defendant would go

14   all the way to Exit 28?

15         A     Because at times if I'd see him coming on the

16   other side of the interstate headed back north.

17         Q     You would see him driving on the interstate?

18         A     Yes.

19         Q     Did you recognize his vehicle?

20         A     The truck.

21         Q     If the defendant wasn't going to Interstate

22   87, where would he scout to?

23         A     We didn't always know because we didn't always

24   see him, to be honest with you.  Could have been as much as

25   Malone or Fort Covington, you know.

JA-383

348

US v. Peters – 13-CR-316

1          Q     I've gotten a little bit ahead of myself, so
2    I'd like to back up just for a second.
3                You mentioned that when Stefan and Colin would
4    show up on the boats and they would unload these bags of
5    marijuana; is that right?
6          A     Yes, sir.
7          Q     How do you know there was marijuana in the
8    bags?
9          A     I was pretty much told that's what was in
10   them.
11         Q     Were you told specifically that that's what
12   was in them?
13         A     Yes.
14         Q     Who told you that?
15         A     Colin and Stefan, you know, that's what they
16   were bringing into the U.S.
17         Q     Did you ever see inside the bags?
18         A     Yes, at times they'd have to open them up to
19   put them in vehicles to get them in there better.
20         Q     To fit them in a small space?
21         A     Correct.
22         Q     Can you describe for the jury what it looked
23   like inside the bags?
24         A     It was like freezer baggies, half gallon
25   freezer bags and there was Ziploc zips, rewrapped with zip --

JA-384

349

US v. Peters – 13-CR-316

1   air tight sealed bags.

2           Q     Vacuum sealed?

3           A     Yes, that's what I was looking for.

4           Q     Okay.  And would there be just a couple of

5   bags or would there be a lot of bags?

6           A     In the hockey bags?

7           Q     Yes.

8           A     There was quite a few.

9           Q     Were they ever labeled?

10          A     Yes.

11          Q     Or marked in any way?

12          A     Yes.

13          Q     How so?

14          A     They could be written something on the bag,

15  the plastic bag itself or they could label the outside of the

16  bag with different colored Ziplocs or tape, types of duct

17  tape.

18          Q     What would they write on the bags?

19          A     I've seen all kinds of things.  N39 Kush,

20  Northern Lights, just.

21          Q     Do you know what that means?

22          A     It's just different -- different grades and

23  type of marijuana.

24          Q     Now I wanted to talk just for a moment about

25  the residence.  We're looking at on Government Exhibit 4.  Do

JA-385

350

US v. Peters – 13–CR–316

1   you see the residence enclosed in that black box?

2          A    Yes, sir.

3          Q    And when you first started working with Colin

4   and Stefan, was that residence there?

5          A    No, the foundation was there but there was no

6   house.

7          Q    Were they in the process of building the

8   house?

9          A    Yes, sir.

10         Q    Do you know who was building that house?

11         A    Yes.

12         Q    Who was that?

13         A    It was Jack and another guy that he had

14  brought from Canada to build it.

15         Q    Is Jack Jacques Trepanier?

16         A    Jacques Trepanier.

17         Q    Is there a relationship between Jacques

18  Trepanier and Stefan Trepanier?

19         A    They're father and son.

20         Q    All right.  I apologize.  I had forgotten to

21  ask you about those things.

22              So let's go back to you scouting and you've

23  talked about this a little bit in terms of the defendant.

24  But if you were scouting, where are you scouting to?

25         A    I would go generally either to Exit 28 or to

351

US v. Peters – 13–CR–316

1    sometimes if they went to Glens Falls, I'd go as far as Glens

2    Falls.  Other times they went farther and they didn't need me

3    more than –– they'd say let me go at Exit 28 and I'm fine.

4              Q    And when you say Exit 28, is that Exit 28 off

5    of I87?

6              A    Yes, sir.

7              Q    Why would you go to Exit 28?

8              A    In case there was a road block at Exit 30, a

9    checkpoint for the border patrol.

10             Q    Is that a common thing for border patrol to

11   have a checkpoint at that location?

12             A    Yes, sir.

13             Q    And, again, what if you ran into a checkpoint

14   or you saw law enforcement out on, you know, even Route 37,

15   what is it that you were supposed to do as a scout?

16             A    Make –– try and get the word to the driver or

17   get yourself pulled over somehow so the attention's on

18   yourself and not them.

19             Q    How would you communicate to –– let's say

20   Jacques Trepanier is driving the load vehicle.  How would you

21   communicate with him?

22             A    If you had to text him but they would, you

23   know, as funny as it is, you never knew his number to be able

24   to text him, if there was a problem, now that you think of

25   it, you were never able to contact the driver.

JA-387

352

US v. Peters – 13–CR–316

1           Q      Were you able to contact Colin?

2           A      Yes.

3           Q      And if you contacted Colin, could he relay

4  your information to the driver?

5           A      Yes.  My basic thing was if I was to get –– if

6  there was a roadblock, I would try and get turned around as

7  quick as I could to head back north to stop them.

8           Q      Did you ever scout for vehicles that were

9  traveling north and not south?

10          A      Yes, sir.

11          Q      And describe that for the jury, where would

12 you start ––

13          A      Glens Falls.

14          Q      Where would you ––

15          A      Glens Falls.

16          Q      And why would you start there?

17          A      'Cuz that's where they made a switch with a

18 buyer and the seller and the –– the person that would pay for

19 the marijuana would be there and the person delivering would

20 meet them there.

21          Q      Okay.  And why would you need to scout for

22 someone going back north?

23          A      If they were bringing money back.

24          Q      How often did you do that?

25          A      Probably half a dozen times at least.

JA-388

353

US v. Peters – 13-CR-316

1          Q     And where would -- the person transporting the
2     money, where would they go to?
3          A     To the reservation, to this property, Hiio's
4     mother's.
5          Q     Defendant's mother's property?
6          A     Yes.
7          Q     Did you ever have an incident or an instance
8     where you felt like you needed to get pulled over by law
9     enforcement?
10         A     Yes, sir.
11         Q     Can you describe that, please?
12         A     I was traveling southbound following Jack in a
13    pickup truck with a tonneau cover and there was an officer --
14    I don't remember exactly which area it was at but it was on
15    87, north, northbound -- sorry, traveling northbound and
16    there was a state trooper in the middle in, like, where they
17    pull the U-turns.  And I noticed him looking at Jack like
18    eyeballing him and he turned his wheels as he was ready to
19    pull out but I was coming.  So I saw that he -- excuse me --
20    he was going to go after Jack, so -- excuse me -- the windows
21    were pretty dark in my truck for that purpose that I could
22    draw attention.  So I kind of swerved right out of my lane
23    across the center lane and swerved back quickly and I rolled
24    my window up really fast and it got his attention and he
25    pulled me over.

354
                    US v. Peters – 13–CR–316

1          Q     Okay.  What happened to Jacques Trepanier?

2          A     He kept going.

3          Q     Do you know if he made it to the defendant's

4    mother's residence?

5          A     Yes.

6          Q     How do you know that?

7          A     Because he got there and he was –– he was

8    there when I got there.

9          Q     You went up and met later?

10         A     Yes.

11         Q     Did you talk to Colin or Stefan about what

12   happened?

13         A     Yeah, Jack kind of –– Jack was really happy

14   about it and told them, you know, he saved my butt, the

15   trooper was going to pull me over.

16         Q     Do you know what Jack was transporting that

17   day?

18         A     A lot of money.

19         Q     Do you know how much money?

20         A     They said it was about $980,000.

21         Q     Who said that?

22         A     Colin and Stefan.

23         Q     Did you receive anything, any benefit,

24   anything extra from Colin or Stefan?

25         A     Yeah, a big thousand dollars, thank you, pat

355
US v. Peters – 13-CR-316

1  on the back.

2          Q    Another thing that I should have asked a

3  little bit earlier.

4               So you said normally that Colin and Stefan

5  would show up on boats, correct?

6          A    Correct.

7          Q    What would happen during the winter?

8          A    Well, the lake would freeze over and they'd

9  come over by snowmobiles.

10         Q    The lake?

11         A    The St. Lawrence, St. Francis, the same, the

12  water --

13         Q    Okay.

14         A    -- would freeze over.

15         Q    The St. Lawrence River?

16         A    Yes.

17         Q    Would you -- when the St. Lawrence river froze

18  over, can you drive across it with snowmobiles?

19         A    Oh, yeah.

20              MR. GARDNER:  Now at this point, your Honor, this

21  is probably a good place to stop.

22              THE COURT:  It's a real good place to stop.  It's

23  about 4:28, almost 4:29, so we'll do that.

24              Ladies and gentlemen of the jury, I'm going to

25  break for the day and get you out of here by 4:30, as

356
US v. Peters – 13–CR–316

1   promised.

2           Please don't talk about it with anybody.  If

3   anybody approaches you and tries to talk to you about this

4   case, I need to know about it immediately.  Do not listen or

5   read anything about this case, should anything be reported in

6   the media.  Have a good night.  Travel safe.  We'll see you

7   in the morning.

8           Please be in the jury room I'll do my best to

9   endeavor to get started about 9 o'clock, okay.  Have a great

10  night.

11          (Jury excused, 4:29 p.m.)

12          THE COURT:  Okay.  Well, we're going to take our

13  break for the day.  I'm going to ask counsel just be here

14  about five, ten minutes early.  Make sure Mr. Forget is here

15  so we can get him on the stand before we bring the jury in

16  the room.

17          And I'm saying five, ten minutes early so if,

18  Mr. Sacco, once you've had an opportunity to discuss this

19  with your client the issue that's still outstanding with

20  regard to a curative instruction for the jury, we can talk

21  about that before the jury comes in, okay.

22          MR. SACCO:  Sounds good, Judge, thanks.

23          THE COURT:  Have a good night.  We'll see you

24  tomorrow.

25          MR. GARDNER:  Thank you, your Honor.

JA-392

357

US v. Peters – 13-CR-316

1          THE CLERK:  Court's in recess.

2          (Recess taken, 4:29 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA-393

```
                                                              358
                US v. Peters – 13–CR–316

 1

 2

 3                   C E R T I F I C A T I O N

 4

 5

 6             I, DIANE S. MARTENS, Registered Professional

 7    Reporter, DO HEREBY CERTIFY that I attended the foregoing

 8    proceedings, took stenographic notes of the same, that

 9    the foregoing is a true and correct copy of same and the

10    whole thereof.

11

12

13

14

15

16

17

18

19                           _____

20                           DIANE S. MARTENS, FCRR

21

22

23

24

25
```

JA-394

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------x
UNITED STATES OF AMERICA,

                              Plaintiff,

vs.                                          13-CR-316

ALLAN PETERS, aka "Hiio",

                              Defendant.
--------------------------------------------------x

        Transcript of *JURY TRIAL - VOLUME III* held on

January 29, 2014, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York,

the HONORABLE GLENN T. SUDDABY, Presiding.

                A P P E A R A N C E S

For Plaintiff:     OFFICE OF THE UNITED STATES ATTORNEY
                   14 Durkee Street
                   Room 340
                   Plattsburgh, New York 12901
                     BY:  DANIEL C. GARDNER, Esq.
                          Assistant United States Attorney

For Defendant:     MARK J. SACCO
                   38 North Ferry Street
                   Schenectady, New York 12305

                *Diane S. Martens, RPR, FCRR*
            *Official United States Court Reporter*
                 *100 South Clinton Street*
                  *Syracuse, New York 13261*
                      *(315)234-854*5

359
                    US V. Peters – 13–CR–316

1           (Open court, 9:05 a.m.:)

2           THE COURT:  Good morning, we're in the courtroom

3    without the jury.  Mr. Sacco, you were going to consult with

4    your client, Mr. Peters, and discuss a potential curative

5    instruction or what you wanted to do with regard to this

6    recording that was played yesterday.

7           MR. SACCO:  Yes, your Honor.  I've thought about

8    it.  I've talked to Mr. Peters about it.  I think the best

9    course is to do something in your final instructions about

10   any kind of information they may have received that –– I

11   haven't formulated perfectly, but I don't –– my request that

12   it not be anything specific about jail time or anything to

13   draw attention to it, obviously more of a generic instruction

14   that the evidence can be used for whatever the purpose is and

15   it would be along the lines of any prior bad acts.  It's

16   difficult to formulate right here on my feet, Judge.

17          THE COURT:  I understand.  I'm not asking you to do

18   that.  I understand what you're requesting and that's what

19   I'll do.  I think it's an appropriate way to handle it,

20   probably the best way to handle it.  I've already had one of

21   my clerks draft up some language.  At some point probably

22   today we'll have a charge conference, so I'll let you take a

23   look at that language.  You can submit something.  Government

24   can, obviously, give their input on what they think is

25   appropriate and we'll deal with it in that fashion.

360
US V. Peters – 13-CR-316

1          MR. SACCO:  Okay.

2          THE COURT:  We're waiting for one juror.

3   Apparently there was an accident on 690 and they got caught

4   in traffic, so they should be here at any point.  As soon as

5   we have that juror, we'll start.

6          (Pause in proceedings.)

7          THE COURT:  Okay.  We have our entire jury.

8          You all ready to start?

9          MR. GARDNER:  Yes, sir.

10          MR. SACCO:  Yes, your Honor.

11          THE COURT:  Okay.  Let's bring them in.

12          (Jury present, 9:11 a.m.)

13          THE COURT:  Okay, good morning, ladies and

14   gentlemen, good.

15          (Jurors say good morning.)

16          THE COURT:  Good to see you all.  Hope you had a

17   good night.  We have a nice, bright, sunny day.  It's going

18   to be sunny all day so that's good, at least for the

19   disposition of everybody, I hope.

20          Yesterday when we concluded, Mr. Gardner was on

21   direct examination.  We're going to pick up where we left off

22   and we're going to continue with the direct examination of

23   Mr. Forget.

24          Go ahead.

25          MR. GARDNER:  Thank you, your Honor.

JA-397

361

US V. Peters - 13-CR-316

1    CONTINUED DIRECT EXAMINATION BY MR. GARDNER:

2              Q    Morning, Mr. Forget.

3              A    Good morning, sir.

4              Q    When we were talking yesterday afternoon, I

5    believe we had concluded talking about how you were working

6    as a scout for Colin Stewart and Stefan Trepanier, is that

7    correct?

8              A    Yes, sir.

9              Q    Now, at some point while you were working for

10   Colin and Stefan, did you start to transport loads of

11   marijuana yourself?

12             A    Yes.

13             Q    Approximately when was that or how long after

14   you started working with them did that occur?

15             A    Probably about in -- I want to say 2009.

16             Q    And was there anything that precipitated that

17   change, caused that change?

18             A    Yeah, there were a couple of different issues,

19   I believe.

20             Q    Were those issues communicated to you?

21             A    Basically one of their drivers had gotten shut

22   off, they cut him off -- they cut her off.

23             Q    Which driver?

24             A    Cheryl Lobdell.

25             Q    Why did they cut off Lobdell?

JA-398

US V. Peters – 13–CR–316

1    A    I didn't quite get everything, but from what I

2  understood that they had thought that she had been

3  apprehended from the police and they didn't trust her.

4    Q    And you think this happened sometime in 2009?

5    A    I don't remember exactly when, honestly.

6    Q    So can you describe for the jury what

7  happened.  Did Colin or Stefan approach you and ask you to

8  start transporting loads or was it something else?

9    A    There was –– I know Stefan and Colin had had

10  their I guess issues and they ended up not working together

11  any more and that's when Colin decided to put his own team

12  together.

13    Q    Okay.

14    A    And he asked me to basically start bringing it

15  out.

16    Q    So you're saying there was some kind of rift

17  between Colin and Stefan?

18    A    Correct.

19    Q    Do you know what caused that rift?

20    A    From what I understood, loads being lost,

21  conflicts between them, money, marijuana.

22    Q    You said loads being lost, did you mean

23  marijuana loads?

24    A    Yes, sir.

25    Q    And you said that Colin wanted to form his own

363

US V. Peters – 13-CR-316

1   team, is that what you said?

2            A    Correct.

3            Q    Did you have any role in that?

4            A    At that point I had -- he asked me to get

5   drivers, recruit drivers to be able to continue over the

6   road.

7            Q    Drivers for the United States?

8            A    Yes.

9            Q    When you say drivers, do you mean curriers?

10           A    Yes.

11           Q    Were you able to recruit or find --

12           A    Yes.

13           Q    -- other drivers?

14           A    Yes.

15           Q    Specifically who did you find?

16           A    Of course, Corey Spinner.  There was Bill

17  Lamaka (phonetic), Chris Searson (phonetic) and also we had

18  several times or more Craig Flurry.

19           Q    Who was the name you mentioned right before

20  Craig Flurry?

21           A    Chris Searson.

22           Q    How did you know Chris?

23           A    He's my neighbor.

24           MR. GARDNER:  Your Honor, I would like to show the

25  witness what's been marked as Government Exhibit 25 for

JA-400

364

US V. Peters – 13–CR–316

1  identification.

2          Q    Mr. Forget, do you recognize that exhibit?

3          A    Yes, sir, that's Corey Spinner.

4          Q    And is that a photograph of him?

5          A    Yes.

6          Q    Is that -- does that photograph accurately

7  depict what Mr. Spinner looks like?

8          A    Absolutely.

9          MR. GARDNER:  Your Honor, the government would like

10  to offer this into evidence as Government Exhibit 25.

11          THE COURT:  Any objection?

12          MR. SACCO:  No objection, your Honor.

13          THE COURT:  Okay.  It will be received.

14          Q    So, Mr. Forget, can you describe for the jury

15  how the -- well, let me ask a different question.

16                When Colin and Stefan split and Colin asked

17  you to form or recruit guys, did it change the way that the

18  organization functioned at all?

19          A    No.

20          Q    Did it change the way -- the manner in which

21  the marijuana was coming into the United States?

22          A    No, sir.

23          Q    Were you continuing to use defendant's

24  mother's property?

25          A    Yes, sir.

365

US V. Peters – 13-CR-316

1    Q   And were you continuing to transport the loads
2  from the defendant's mother's property all the way to their
3  ultimate destination?
4    A   No, the –– at times it could be that way, but
5  most of the time we would bring them to my –– my property.
6    Q   Where was your property located?
7    A   Malone, New York.
8    Q   Who made that decision?
9    A   They asked me if I, if it would be safe to
10  bring it there.  And I said, yeah, we should be all right to
11  do that.
12    Q   So what was the point of only bringing it from
13  the defendant's mother's property down to your property?
14    A   Cause it ––
15    Q   Why not just bring it all the way is I guess
16  is what I'm asking?
17    A   Because it was –– they'd want to sometimes
18  divide it up into different vehicles, not all in the same ––
19  they'd say the same eggs in the same basket, basically.  And
20  myself or Corey Spinner would bring it to my place, to my
21  property and from that point we would put it in the other
22  vehicles.
23    Q   Using the other drivers you just mentioned?
24    A   Yes, sir.
25    Q   Craig Flurry and Chris?

JA-402

366

US V. Peters – 13-CR-316

1          A      Searson.

2          Q      And Bill Lamaka?

3          A      Yes, sir.

4          Q      And what quantity of marijuana were you guys

5    transporting?

6          A      It was 100 to 200 pounds.

7          Q      Per trip?

8          A      Yes, sir.

9          Q      And you mentioned that both you and Spinner

10   were going to the defendant's mother's residence; is that

11   right?

12         A      Yes, sir.

13         Q      I believe we talked about it yesterday, but,

14   again, did the operation work similarly to when you were

15   scouting that you would go to the -- looking at Government

16   Exhibit 4, once the switch happened from working with Colin

17   and Stefan to just Colin, did you continue to pick up the

18   marijuana in the same manner that had been done before?

19         A      Yes, sir.

20         Q      Just go ahead, if you can, for a moment

21   explain to the jury how they would work using Government

22   Exhibit 4.

23         A      Well, they would come in through the St.

24   Lawrence through here to here and it would come out at the

25   end where I stopped, loaded in the vehicles and then brought

JA-403

367

US V. Peters – 13–CR–316

1    out here, so on.

2              Q    And who is they?

3              A    The people from Canada.  Colin would come down

4    the river to the property and then from the property on to

5    land would be the drivers, Corey Spinner and myself or.

6              Q    Was Colin still transporting the marijuana on

7    the boat?

8              A    Yes, sir.

9              Q    Would anyone ever come with Colin?

10             A    Yes, sir.

11             Q    Who?

12             A    There was Xavier Dauie.  There was another

13   gentleman I -- at times, not often.  I'd see him more on the

14   snowmobiles.  I just -- I don't remember his name.  Canadian

15   fella.  There was -- like before that, it was Stefan but when

16   they split up, it was Colin and his boat man.

17             Q    You mentioned earlier that you worked with

18   Jacques Trepanier; is that correct?

19             A    Yeah.

20             Q    And I believe you mentioned that Jacques and

21   Stefan were related in some way?

22             A    Yes, sir.

23             Q    What was that relationship?

24             A    Father and son.

25             Q    When Colin and Stefan split, did you continue

JA-404

US V. Peters – 13–CR–316

1  to work with Jacques Trepanier?

2          A    No, sir, Jacques Trepanier was with Colin and

3  Stefan and I –– sorry, I didn't –– when they would be

4  together, Jack would also come in the boat and transport from

5  the land off into the U.S.

6          Q    Now you mentioned after this split occurred,

7  you were transporting either 100 to 200 pounds of marijuana;

8  is that right?

9          A    Yes, sir.

10         Q    Before the split when it sounds like you were

11  just working as a scout, is that right?

12         A    Yes, sir.

13         Q    Did you know the amounts of marijuana that was

14  being property transported?

15         A    It was quite a bit more.

16         Q    What was the most amount of marijuana that

17  would come in?

18         A    They had said like 480 pounds per load.

19         Q    Who said that?

20         A    Colin and Stefan.

21         Q    Why were they transporting so much more

22  before?

23         A    They would put it in pickup trucks with

24  tonneau covers.

25         Q    How much marijuana could you fit in a regular

JA-405

369

US V. Peters - 13-CR-316

1   pickup truck with a tonneau cover?

2            A     Close to 500 pounds, I believe.

3            Q     Would they use just one vehicle or two

4   vehicles?

5            A     No, there was two and three.

6            Q     And I think you mentioned before, but who were

7   the individuals driving those loads before?

8            A     Jacques Trepanier and Cheryl Lobdell.

9            Q     So why was there a change after Colin and

10  Stefan split, why did it go from four or 500 pounds down to a

11  hundred to 200 pounds?

12           A     I believe losing so much they didn't want to

13  continue risking because pickup trucks were getting more

14  noticeable, I believe.

15           Q     So if a hundred pound load -- Colin was

16  bringing down a hundred pound load, who would transport that

17  load?

18           A     From through us, you mean?

19           Q     Yes.

20           A     Myself or Corey Spinner off the reservation

21  And from there Chris Searson or Bill Lamaka.

22           Q     What about if a 200-pound load came down,

23  would either you or Spinner transport it yourself?

24           A     Sometimes we would split it.

25           Q     Meaning?

JA-406

US V. Peters – 13–CR–316

1          A     He would take half and I would take half.

2          Q     Were there times that you transported loads

3    without Spinner being there?

4          A     Yes.

5          Q     Were there times that Spinner would transport

6    loads without you being there?

7          A     At times.

8          Q     And for all of the loads that you transported,

9    whether you were physically transporting it yourself or

10   acting as a scout, did you pick up loads of marijuana

11   anywhere other than the defendant's mother's residence?

12         A     No, sir.

13         Q     So let's talk a little bit about how often you

14   would transport loads of marijuana.  You said you started

15   sometime in 2009, I think you said?

16         A     I believe so.

17         Q     And did you stop transporting loads of

18   marijuana on the day of your arrest?

19         A     Absolutely.

20         Q     And when was that?

21         A     September 15th of 2010.

22         Q     So, in that time period, that year, year and a

23   half, how frequently would you go to pick up loads of

24   marijuana?

25         A     Usually every week.  It happened at times

JA-407

371

US V. Peters – 13–CR–316

1   where you –– where you couldn't in between the thawing or the

2   melting of the river.

3           Q    Was it fair to say there was dead areas where

4   you couldn't get boats across the river or couldn't ––

5           A    Yes.

6           Q    –– take snowmobiles across the river?

7           A    Yes.

8           Q    But you think on average you would go once a

9   week?

10          A    One to three times a week, maybe at times.

11          Q    When you were busy?

12          A    Yes.

13          Q    When was the busiest times of the year?

14          A    The summer and the fall.

15          Q    During the winter would the frequency slow

16  down?

17          A    I wouldn't –– they still tried to do as much

18  as they could I guess in a way to put it, at least a couple

19  times a week.

20          Q    Would you ever transport anything less than a

21  hundred pounds?

22          A    It has happened, 50 pounds or, you know, but

23  they didn't, they –– they tried to stick to their hundred

24  pounds.

25          Q    Now you mentioned yesterday that when you were

JA-408

372
US V. Peters – 13-CR-316

1  scouting, that the defendant would sometimes scout as well;

2  is that right?

3          A    Correct.

4          Q    Once you started to transport loads, would the

5  defendant still scout on occasion?

6          A    Occasionally.

7          Q    And since you were just bringing it down to

8  your residence, did that change the way the defendant

9  scouted?

10         A    Yes, he didn't have to go as far.  He'd go to

11  Malone, if anything.

12         Q    Once you delivered the -- let me rephrase

13  that.

14              Once you or Spinner delivered the load to your

15  residence, what would you do with it?

16         A    We'd go in behind the garage, way out back and

17  basically take it out and put it in the cars that were ready

18  to go.

19         Q    Were your drivers usually ready to go?

20         A    Yes.

21         Q    Okay.  Were you putting it in your driver's

22  cars or did you have a car for them to use?

23         A    No, their driver's cars.

24         Q    And where would the drivers take the marijuana

25  from there?

JA-409

373

US V. Peters – 13-CR-316

1      A    They'd basically go -- if they came to load up

2    in the evening, they'd go to their house, to their residence

3    and they'd leave early in the morning from there.

4      Q    Oh, okay.  So they might take it from your

5    house to their house?

6      A    Correct.

7      Q    Did you know what the ultimate destination was

8    for these loads of marijuana?

9      A    They, they could be anywheres through New York

10   City, Boston, Pennsylvania, Vermont, Rhode Island.  They'd go

11   all over but Colin would give me a piece of paper that would

12   go with, say, Chris's load and I'd just give him that piece

13   of paper.  There would be a number on it and they would

14   contact them.

15     Q    It would just have a number on it?

16     A    Yes.

17     Q    Would the drivers have any idea of the general

18   direction that they were going?

19     A    Yes.  It would say on the piece of paper

20   basically where they had to go, New York City or Boston or.

21     Q    Would that piece of paper have a specific

22   address on it?

23     A    No.

24     Q    Okay.  So what was the purpose of the number?

25     A    To once they got within, I believe it was like

JA-410

374

US V. Peters – 13-CR-316

1    an hour of their destination of basically the city where they

2    were going to, then they would phone that number that was on

3    that piece of paper and they would tell them where to go and

4    they would basically just put it in their GPS and meet them.

5            Q    Would they contact you or be more specific --

6    would your drivers contact you once they had dropped off the

7    load?

8            A    Yes.

9            Q    Do you know if your drivers ever picked up

10   money to bring back north?

11           A    Not that I know of, that wasn't a part of

12   our...

13           Q    Did you have to pay these drivers?

14           A    Yes.

15           Q    How much did you pay them?

16           A    $3,000 per trip.

17           Q    And I take it you were still getting paid?

18           A    Yes.

19           Q    How much did you get paid?

20           A    About 1500, sometimes 2,000.

21           Q    Now, when you were picking up loads of

22   marijuana from the defendant's mother's residence, would you

23   often see him there -- would you see the defendant at the

24   property when you were picking up loads of marijuana?

25           A    Yes, sir.

JA-411

375

US V. Peters – 13-CR-316

1          Q     And generally what was the defendant doing?

2          A     He'd either be coming through the yard if we

3    were down by the water or if he was there already or he would

4    come over to see us or up to his mother's residence,

5    basically.

6          Q     I think we talked about it a little bit

7    yesterday but would the defendant speak to or have

8    conversations with Colin?

9          A     Yes.

10         Q     Do you know what the nature of those

11   conversations were?

12         A     Never -- like I said yesterday, when they,

13   when they would -- Colin would go over to him, basically we

14   were talking, just shooting the breeze with him, we would

15   basically just step away and let them do their talking

16   privately.

17         Q     Did you ever have conversations with the

18   defendant?

19         A     Yes.

20         Q     I think you mentioned before you had known him

21   for at least a few years?

22         A     Yes.

23         Q     Would you have some social conversations?

24         A     Oh, yeah.

25         Q     Did you ever talk with him about, about

376

US V. Peters – 13–CR–316

1   business?

2           A     (No response.)

3           Q     This business?

4           A     He would just basically, if anything, would

5   ask me what's going on, waiting for Colin or something like

6   that.  At times I guess he didn't seem to know that they were

7   coming in or something, you know.

8           Q     Did the defendant ever talk about Colin using

9   this property?

10          A     Yes.

11          Q     What did he say?

12          A     Just that he kind of wanted to know when

13  people were coming in and off the property.  He'd get upset

14  about it if he didn't know.

15          Q     If he didn't know Colin was coming?

16          A     Yes.

17          Q     Why did that upset him, did he say?

18          A     Just that he didn't -- he wanted to know what

19  was going on through there, you know.  He didn't want people

20  that had no permission to be there coming in and off the

21  property.

22          Q     Did he ever talk about having problems with

23  other people using this property without his permission?

24          A     Yes.

25          Q     Can you describe that?

JA-413

377

US V. Peters – 13-CR-316

1       A    Just that he knew that people were coming in

2   and off the property and that he was going to end up putting

3   a gate up so that, you know, he could lock it down more

4   secure.

5       Q    Where did he want to put a gate up, did he

6   say?

7       A    Yes.

8       Q    Where?

9       A    Right out at the end of the driveway.

10      Q    Looking at Government Exhibit 3, can you

11  locate on Government Exhibit 3 where this gate would be?

12      A    (Marking exhibit.)  I'm not 100 percent sure

13  looking at this.  It's kind of difficult but I'll do it to

14  the best of my knowledge.  Somewhere in there, I think

15  (marking exhibit).

16      Q    Now was there a gate already erected or was

17  the defendant talking about putting up a gate?

18      A    I believe there was a gate, a big steel --

19  you'd swing it over.

20      Q    So what was the defendant talking about,

21  locking that gate?

22      A    Correct.

23      Q    When you came in to the defendant's mother's

24  property, was that gate ever closed that you can remember?

25      A    To tell you the truth, I don't -- I don't

JA-414

378
                    US V. Peters – 13–CR–316

1    think so.

2              Q    Now, you mentioned that Colin was paying you;

3    is that correct?

4              A    Correct.

5              Q    And you said that Colin was paying you around

6    1500 to 2,000?

7              A    Yes.

8              Q    And what was that for?

9              A    For my role of recruiting the drivers and

10   taking it out.

11             Q    And you said that you would pay your drivers

12   3,000 per trip?

13             A    Yes.

14             Q    Where did that 3,000 come from?

15             A    Just basically like $30 for each pound.

16             Q    I guess what I'm asking is, if Colin's giving

17   you 1500 to 2,000 and you're paying your drivers 3,000,

18   you're not making any money?

19             A    They were taking the most of the risk going so

20   much farther.

21             Q    I guess I'm not phrasing this quite right.

22                  Did Colin give you 4500 to $5,000?

23             A    Yes.

24             Q    And you kept 1500 to $2,000?

25             A    Yes.

JA-415

379

US V. Peters – 13-CR-316

1    Q    And you would give the other $3,000 to your

2  driver?

3    A    Yes.

4    Q    Okay.

5    A    Also, if -- with Spinner's role, Spinner would

6  get 1500, also.  So it was more or less like six to $7,000 to

7  take the stuff out, like $70 a pound, I think it was.

8    Q    Was that something you and Colin had agreed

9  upon?

10    A    Basically kind of what they gave me.

11    Q    Would Colin pay you in United States currency

12  or Canadian currency?

13    A    For the most part it was American funds.

14    Q    Would he sometimes pay you in Canadian

15  currency?

16    A    On a couple of different occasions he did.

17    Q    And when he paid you in Canadian currency, did

18  you have to take steps to exchange that currency?

19    A    Yeah, I was kind of upset with him because I

20  didn't, I said, you know, what am I supposed to do with this.

21  I can't pay the people in Canadian funds and then I -- I

22  asked the Big Guy if he could exchange it for me.

23    Q    The Big Guy being the defendant?

24    A    Yes.

25    Q    And what did he say?

US V. Peters – 13–CR–316

1        A    Sure.  He said he could do that.

2        Q    Would he do that for you right away?

3        A    I would give him the bag and he'd go up to his

4   mother's property and come back with the money or just go up

5   there with him.

6        Q    I want to talk about a couple things there.

7   You said that you would give him the bag.  What was the bag?

8        A    Bag with a money in it.

9        Q    How would -- can you describe how Colin would

10  pay you?

11       A    In a paper bag or plastic bag or some sort.

12       Q    With cash, I take it?

13       A    Yes, sir.

14       Q    And was the cash just loose in that paper or

15  plastic bag?

16       A    No, it was bundled in like thousand dollar

17  piles.

18       Q    Did it have bank wrappers on it or just rubber

19  bands?

20       A    No, just rubber bands.

21       Q    And would Colin pay you after each trip?

22       A    No.

23       Q    Did you have a running bill with Colin that he

24  owed you money?

25       A    Yes, sir.

JA-417

381
            US V. Peters – 13-CR-316


1          Q    You said sometimes you would just hand the
2    Canadian currency to the defendant and he would walk up to
3    the residence?
4          A    Yeah, we'd go up with his vehicle.
5          Q    Mr. Forget, if you could look at Government
6    Exhibit 4, do you see the residence that you were talking
7    about in this exhibit?
8          A    Yes, sir.
9          Q    Can you point to it with that pen, please?
10         A    The home is that one.
11         Q    Okay.
12         A    His -- his garage is the one across from the
13   home (marking exhibit).
14         Q    And did you ever go to the residence, the
15   building on the right there?
16         A    The home?
17         Q    Mm-mm.
18         A    Never been inside.
19         Q    Had you ever been in that garage?
20         A    Yes.
21         Q    How many times do you think?
22         A    Several times, three, four times.
23         Q    Was it always to have the defendant exchange
24   the Canadian currency into U.S. currency?
25         A    No, at times I could be coming to the property

JA-418

382

US V. Peters – 13-CR-316

1   for supper and I'd go –– if they weren't there yet and I was

2   early or something, I'd go up see if he was there just to

3   talk with him or something and tell him they were coming in.

4           Q    And on those occasions when you followed him

5   up to the garage when he was exchanging the Canadian currency

6   for U.S. currency, can you describe what would happen?

7           A    He'd go inside and count the money and give me

8   the American funds out of a box.

9           Q    Would the defendant count the money?

10          A    Yeah.

11          Q    Would you count it together or would he just

12  count it?

13          A    He'd count it.

14          Q    Would he do that by hand or did he have money

15  counters?

16          A    He had a money counter.

17          Q    And what was in that garage?

18          A    Table, fridge, flat screen TV, tools, could

19  have been a race car in there, motors.

20          Q    You mentioned that you saw the defendant and

21  Colin interacting from time to time; is that right?

22          A    Yes, sir.

23          Q    Did you ever see Colin hand the defendant

24  anything like a package?

25          A    Yes, sir.

JA-419

383

US V. Peters – 13–CR–316

1          Q     How often would you see that?

2          A     I've seen it at some different occasions.  I

3    didn't see it every time I'm sure but I've seen it happen at

4    different occasions.

5          Q     And what type of package would Colin hand the

6    defendant?

7          A     A paper bag or a plastic bag or something.

8          Q     Was it very similar to the packages of money

9    that Colin would give you?

10         A     Yes.

11         Q     Did Colin or the defendant ever tell you what

12   was in that bag?

13         A     No.

14         Q     When Colin would hand the defendant that bag,

15   did Colin make any statements or say anything?

16         A     No, just basically here.

17         Q     He didn't indicate what it was for or anything

18   like that?

19         A     He might have said this is for last time or

20   something like that.

21         Q     Do you know if the defendant ever exchanged

22   currency for Colin?

23         A     No, I don't know that.

24         Q     Do you know whether the defendant ever

25   purchased or sold marijuana himself?

JA-420

384

                US V. Peters - 13-CR-316

1          A    I've never seen him do it.

2          Q    Did you ever have any conversations with

3    anyone else in this group about the defendant acquiring

4    marijuana?

5          A    Yes.

6          Q    And who was that?

7          A    Xavier Dauie.

8          Q    And I can't remember if I asked you yesterday,

9    did Xavier have a nickname?

10         A    X-man.

11         Q    What did Xavier or X-man say about his

12   relationship with the defendant?

13         A    He had -- I had heard him say at different

14   times, you know, he had to get up and see the Big Guy, bring

15   him some pretty stuff, speaking of high grade marijuana or

16   something like that.

17         Q    He would use the term "pretty stuff"?

18         A    Yes.

19         Q    And you understood that to be high grade

20   marijuana?

21         A    Yes.

22         Q    Did you ever see Xavier give the defendant

23   anything?

24         A    Yes.

25         Q    Can you describe that, please?

JA-421

385

US V. Peters – 13-CR-316

1          A     Bag.

2          Q     What kind of bag?

3          A     Duffel bag basically and they'd go in the

4    garage.  I -- I wasn't clearly stupid.  I pretty much knew

5    what it had to be.  After him basically telling me that he

6    had to, you know, go see him.

7          Q     Give him the pretty stuff?

8          A     Right.

9          Q     You mentioned that you and the other drivers

10   would often drive trucks; is that right?

11         A     Yes, sir.

12         Q     Were there specific vehicles that the

13   organization had that you and the other drivers used or did

14   everybody use their own vehicles?

15         A     Well, at the beginning they used an old, old

16   Ford truck with a cap on the top to take the marijuana from

17   there off the reservation and then they would use regular

18   pickup trucks with just a tonneaus cover to transport it the

19   rest of the way.

20         Q     Were you familiar with some of the vehicles

21   that this group used?

22         A     Yes, sir.

23         Q     Can you describe some of the vehicles?

24         A     There was the older Ford pickup with the old

25   camper top.  There was a gray or silver Ford F150, just a --

JA-422

386

US V. Peters – 13-CR-316

1    just a single cab with a tonneaus cover, I believe it was

2    four wheel drive.  I think they were all four wheel drive, to

3    be honest with you.  There was a -- at one time there was a

4    Ford F150 King Cab red with a tonneaus cover.

5              Q    Who used that vehicle?

6              A    Cheryl or Jack had used it.

7              Q    Please continue.

8              A    And then there was a tan four wheel drive.  It

9    was a Chevrolet pickup truck with a tonneaus cover, also.

10             Q    Who used that vehicle?

11             A    Cheryl.

12             Q    Was that vehicle registered in Cheryl's name?

13             A    Her brother's.

14             Q    Do you know how that vehicle was purchased?

15             A    Yes, sir.

16             Q    How?

17             A    They asked me to try and find them a vehicle

18   to transport the marijuana and I found it in Malone at a car

19   dealer.

20             Q    Who asked you to do that?

21             A    Colin.

22             Q    What car dealership did you use?

23             A    I believe it was Sullivan's.

24             Q    Did you have to use your own money?

25             A    No, I just basically told them how much it was

387

US V. Peters – 13-CR-316

1   and they'd give me the money to go get it.

2          Q     How much money or how much did that vehicle

3   cost?

4          A     I don't remember 100 percent.  It -- I want to

5   believe it was seven to $10,000, possibly.

6          Q     So they gave you somewhere -- Colin gave you

7   somewhere between seven and $10,000 in cash?

8          A     Correct.

9          Q     Did you ever use that vehicle?

10         A     No.

11         Q     Any other vehicles that you can recall?

12         A     There was a dark-colored Chevy or GMC, also

13  with a tonneaus cover on it.

14         Q     And who was it registered under that vehicle,

15  if you know?

16         A     I don't know.

17         Q     Do you know how that vehicle was purchased?

18         A     From what Colin and Stefan had told me, when

19  they had bought that vehicle, that they had the defendant

20  purchase it.

21         Q     That's what Colin and Stefan told you?

22         A     Correct.

23         Q     Did they mention where the defendant got the

24  vehicle from?

25         A     In Massena, I think it was Frenchie's I think

JA-424

388

US V. Peters – 13-CR-316

1   it was.

2           MR. GARDNER:  Your Honor can I just have a moment,

3   I actually have quite a bit more, but I just.

4           THE COURT:  Okay.

5           (Discussion held off the record.)

6       Q    Mr. Forget, there's one -- I want to go back

7   for just a minute before I move on to other things.

8               We were talking earlier about Jacques

9   Trepanier and how he was one of the drivers for this

10  organization; is that right?

11      A    Yes, sir.

12      Q    And I believe you indicated that he would come

13  with Colin or Stefan across the St. Lawrence by boat; is that

14  correct?

15      A    Correct.

16      Q    Or snowmobile in the winter?

17      A    Correct.

18      Q    And then you said that he would -- Jacques

19  Trepanier would then transport a load of marijuana?

20      A    Correct.

21      Q    So if he came across by boat or snowmobile,

22  what would he use to transport the load of marijuana?

23      A    One -- one of the trucks.

24      Q    Was there a vehicle waiting for him?

25      A    Yes.

JA-425

389

US V. Peters – 13-CR-316

1          Q      How would that vehicle get to the defendant's
2    mother's property?
3          A      The driver would return it there.
4          Q      Explain that a little more.
5          A      The driver could either return it there or get
6    a ride back from myself, if anything.
7          Q      Let me make sure I understand.  So if Jacques
8    Trepanier made a trip on one occasion and came back, would he
9    leave his vehicle at the defendant's mother's property?
10         A      At times, yes, it could stay there.
11         Q      And then other times you might give him a
12   lift?
13         A      Yes.
14         Q      Okay.
15         A      Till they stopped using the old Ford truck.
16   Most of the times the trucks with the tonneaus covers did not
17   leave.  They did not go to the reservation.  Then when they
18   stopped using the old truck, they would basically take it off
19   the reservation with the trucks and the tonneaus covers.
20         Q      Other than delivering to the final destination
21   like New York City or Boston or something like that, and
22   delivering to your residence, did you or members of the group
23   deliver to any other residence in the area?
24         A      Yes.
25         Q      Where?

JA-426

US V. Peters – 13-CR-316

1    A    He's passed away now but his name was George

2 King.

3    Q    And where was George King's residence?

4    A    Just out of Malone off the Moody Road.

5    Q    And why would you or the other drivers deliver

6 to George King's residence?

7    A    Because there would be different people that

8 would go pick it up there, as well as they would take the

9 trucks with the marijuana from there to their destinations.

10    Q    Okay.  Would your drivers like Bill Lamaka and

11 Chris Searson go and pick up loads from George King's place?

12    A    No, they were never a part of anyone from

13 there.  I don't remember what year it was when George passed

14 away but he was getting to the point he was so sick that they

15 just -- they stopped going there.

16    Q    Did they use his residence like a stash house?

17    A    Yes.

18    Q    And were there -- I take it there were

19 separate drivers that would pick up from there?

20    A    Yes.

21    Q    Did you know who those drivers were?

22    A    Never.

23    Q    Why not?

24    A    They were guys from different cities, I just

25 never seen them.

JA-427

391
                    US V. Peters – 13-CR-316


 1          Q     Did you yourself deliver any loads to George
 2   King's house?
 3          A     I always just scouted when it was at George
 4   King's property.
 5          Q     All right.  I'd like to direct your attention
 6   to September 15th, 2010, do you recall that day?
 7          A     Unfortunately, yes.
 8          Q     Did you pick up a load of marijuana on that
 9   day?
10          A     Yes, sir.
11          Q     And why did you pick up that load of
12   marijuana?
13          A     At the property that we're speaking of on the
14   exhibit.
15          Q     The defendant's mother's property?
16          A     Correct.
17          Q     And when you picked up that load of marijuana,
18   did you have a scout that day?
19          A     No.
20          Q     Was the defendant present at his mother's
21   property that day?
22          A     No.
23          Q     Do you remember why you didn't have a scout or
24   why the defendant wasn't at the property?
25          A     Spinner was supposed to go and do that and I

JA-428

392

US V. Peters – 13–CR–316

1   was going to scout and he told me that he couldn't do it,

2   something came up and I had –– I had told Colin I didn't have

3   a good feeling that day, just something in my stomach was

4   tearing me apart and I didn't want to do it and he just kind

5   of cussed at me a bit and he says you're going to do it,

6   that's all there is to it.  They're waiting on it and it's

7   got to go.

8           Q    And do you remember why the defendant wasn't

9   at the property that day?

10          A    There was another gentleman there and I asked

11  him, I said, where's Hiio at and he didn't know.  He said, I

12  don't know, I haven't seen him all day.

13          Q    Do you remember why Spinner didn't go?

14          A    He just told me that something had came up and

15  he couldn't do it but it wasn't like him to do that.

16          Q    What happened after you pick up the load and

17  you left the defendant's mother's property?

18          A    I was driving.  I felt like throwing up

19  because I was so nervous.  I just knew something wasn't right

20  and I was leaving and I was going to get gas, which I would

21  never do leaving.  I would always get gas before and I took a

22  different route and the police took after me.

23          Q    You said you stopped to get gas, where was

24  that?

25          A    I was going to ––

JA-429

393

US V. Peters – 13–CR–316

1          Q    Well, if you can go ahead and on Government
2    Exhibit 3, can you show us what route you normally took from
3    the defendant's mother's property?
4          A    (Marking exhibit.)
5          Q    And when you're crossing the border there,
6    have you ever encountered law enforcement officers at that
7    location?
8          A    No, no, sir.
9          Q    All right.  Now, can you show the jury using
10   Government Exhibit 3, the route you took on September 15th,
11   2010?
12         A    (Marking exhibit.)
13         Q    You mentioned at some point you encountered
14   law enforcement officers?
15         A    Can you erase this at all?  They were sitting
16   right there.
17         Q    Right at the end of Cook Road?
18         A    Right in the corner.
19         Q    And do you know what's located on the
20   intersection of Cook Road and Route 37?
21         A    It's a gas station.
22         Q    Do you know what the name of that gas station
23   is?
24         A    Truck stop number nine.
25         Q    Was that where you were going to stop to get

JA-430

394

                    US V. Peters – 13–CR–316

1    gas?

2            A    I wasn't sure what I was doing.  I was so

3    nervous.

4            Q    What happened when you encountered those law

5    enforcement officers?

6            A    I went, I was –– I went to pull over.  I was

7    going to pull over and then there was another law –– police

8    car coming straight at me and, as I was pulling over, he was

9    going to cut me off and I just –– I panicked and I just took

10   off.

11           Q    Is it fair to say you led police on a high

12   speed chase?

13           A    Unfortunately, yes, it is.

14           Q    Is it fair to say that you drove in excess of

15   a hundred miles an hour that day?

16           A    Yes, sir.

17           Q    It was incredibly dangerous, wasn't it?

18           A    Pretty stupid.

19           Q    You're very lucky you didn't injure or kill

20   someone?

21           A    Yes.

22           Q    Can you describe how the chase ended?

23           A    I ditched my truck.  I was practically running

24   out of gas and I took off running through the woods and then

25   they foot chased me and ––

JA-431

395

US V. Peters – 13–CR–316

1      Q     Where did you ditch your truck?

2      A     Off the Limekiln Road in Malone.

3      Q     In the woods?

4      A     Yes, in the woods behind a residence, an old

5  house or barn it was.

6      Q     What were you trying to accomplish?

7      A     Just to get away.  I was so scared.

8      Q     The vehicle you were driving, was it your

9  vehicle?

10      A     Yes, sir.

11      Q     It was registered in your name?

12      A     Correct.

13      Q     And you said you took off running in the

14  woods?

15      A     Correct.

16      Q     Were you trying to get to a particular

17  location?

18      A     I was trying to -- I didn't really know what

19  to do and then I kind of knew where I was at, and I was going

20  for the river.

21      Q     Why were you going for the river?

22      A     'Cuz I just knew at that point I had -- sorry.

23  I had called my wife and pretty much told her I loved her and

24  all that and the police were after me and my lawyer told me

25  to give myself up and my wife wasn't sure she had -- she was

396

US V. Peters – 13–CR–316

1  at work and they have a scanner there and she heard that

2  there was -- she thought there was gun shots, so she didn't

3  know if they were shooting at me or what.  Anyways, I was

4  trying to get to the river figuring that by that time they

5  had the dogs after me and I could escape the scent with the

6  water.

7          Q    Did you make it to the river?

8          A    Close but, no, I didn't.  There was too many

9  police cars out on the road every where and I couldn't get

10 through the fields to the water and I just hid under a

11 police -- under an old truck and the police came out.

12         Q    You mentioned that when you picked up a load,

13 you would get a piece of paper with a destination and a phone

14 number is that correct?

15         A    Correct.

16         Q    Did you have that piece of paper with you that

17 day.

18         A    I did until I started running through the

19 woods and I was so scared just I tore it up into pieces and I

20 shoved it down in the mud in the swamp.

21         Q    Mr. Forget, do you recognize Government

22 Exhibit 8A?

23         A    Yes, sir.

24         Q    And what is it?

25         A    That's my truck.

JA-433

397

US V. Peters - 13-CR-316

1        Q    Is this where you ditched it in the woods?

2        A    Yes, sir.

3        Q    Do you recognize Exhibit 8B?

4        A    I believe they're the bags that were put into

5   my truck.

6        Q    Do you recognize Government Exhibit 8C?

7        A    I didn't open them, so, I mean, but it's

8   obviously marijuana in the bags.

9        Q    Now, if you can see on the left, left-hand

10  part of the photograph there appears to be like a red tag on

11  the handle of that bag, can you see that?

12       A    Yes, sir.

13       Q    Do you know what that means?

14       A    That was for different destinations to where

15  the marijuana was going.

16       Q    Did you know what the red meant versus

17  something else?

18       A    Yeah, it would -- they would tell me like this

19  piece of paper is for the red bags or say blue tape, this

20  piece of paper was for the blue bags.

21       Q    Do you recognize what's in 8D?

22       A    Marijuana.

23       Q    Do you see the writing on that package right

24  there, 100 PKG.

25       A    Yes, sir.

JA-434

398

US V. Peters – 13–CR–316

1    Q    Did you ever see writing like that on the
2  marijuana packages?
3    A    No, sir.
4    Q    Do you know what that means?
5    A    I'm assuming 100 packages.
6    Q    And looking at 8C, you can see on the package
7  it's written BB?
8    A    Yes, sir.
9    Q    Do you know what that means?
10   A    There was at times different letters on them.
11  I don't know if it was who it belonged to or if it was a
12  brand of marijuana, I'm not -- I'm not quite sure.
13   Q    Also in this photograph in the top right-hand
14  corner, you can see blue tape around the handle?
15   A    Correct.
16   Q    Is that what you were talking about earlier?
17   A    Yes, sir.
18   Q    So in this particular load, was there one
19  destination for the red tape, one destination for the blue
20  tape?
21   A    That's correct, sir.
22   Q    Are you familiar with brands of marijuana?
23   A    Some of them, yes.
24   Q    You mentioned that you used marijuana for
25  years, correct?

JA-435

                                                                    399
                    US V. Peters – 13–CR–316


1              A     Yes, sir.

2              Q     Are you familiar with the different prices for

3     marijuana, like?

4              A     Yes, sir.

5              Q     Prices per pound?

6              A     Yes.

7              Q     Can you describe that a little bit for the

8     jury?

9              A     Well, if you –– if you purchased the outdoor

10    grown marijuana is cheaper than the indoor grown marijuana,

11    which they call the high grade.

12             Q     Is the difference between indoor and outdoor

13    simply that one is grown out in the field and one is grown

14    inside a building?

15             A     No.  Excuse me.

16             Q     Outdoor is grown out in the field and indoor

17    is grown inside of a building?

18             A     Yes, yes, I'm sorry.

19             Q     Are you familiar at all with how the marijuana

20    is grown indoors?

21             A     There's all different ways.  I believe there's

22    either with water or under lights.  They all have to be under

23    lights but some are with water, some are in dirt and they're

24    just more, more potent, I guess you would say.

25             Q     And I think you indicated that the indoor

JA-436

400
US V. Peters – 13-CR-316

1    marijuana was a higher grade?

2              A    Higher cost, higher grade, higher cost.

3              Q    Let's start with the outdoor marijuana.  Are

4    you familiar generally with the pricing for outdoor

5    marijuana?

6              A    I was at the time I mean.

7              Q    Actually, that's what I want you to focus on.

8              A    Right.  Right.  Could be anywheres from 1500

9    to 2,000 per pound.

10             Q    Per pound and how about for indoor marijuana?

11             A    Indoor marijuana I've heard people getting as

12   much as three to $4,000 a pound.  It depends how far you go

13   with it.

14             Q    What about the marijuana Colin was in

15   possession of and selling?

16             A    There again, all different prices.  The

17   outdoor and the indoor, and I -- I had seen some of it and

18   some looked quite -- you can tell when it looks -- the

19   quality is there.

20             Q    Did you ever talk about pricing with Colin

21   specifically?

22             A    (No response.)

23             Q    Like how much he was getting per pound?

24             A    No, he didn't discuss that with us -- or me.

25             Q    So after your arrest on September 15th, 2010,

JA-437

401
US V. Peters – 13–CR–316

1    did you agree to cooperate with law enforcement officers?

2             A    Yes, sir.

3             Q    At some point after that date did Colin

4    Stewart attempt to contact you?

5             A    Yes, sir.

6             Q    How did he contact can you?

7             A    He -- a gentleman I know of in Canada, Hubert

8    Rushlough had brought a bag with telephones to my residence.

9             Q    Did you talk to Hubert when he brought this

10   bag of phones?

11            A    He had basically told me that he brought

12   something -- that he had dropped something off from Colin.

13   Colin had gave him the money and he went and purchased them.

14            Q    When Hubert brought you these phones, did they

15   have any information preprogrammed into it?

16            A    You basically had to set them up to -- for the

17   line to be active.

18            Q    So when Hubert brought you the phones, they

19   didn't even have an active -- they had not been activated

20   yet?

21            A    No.

22            Q    Did Colin Stewart contact you on those phones?

23            A    Yes, sir.

24            Q    And did you communicate with him through voice

25   calls or text messages?

JA-438

                                                                402
                    US V. Peters – 13–CR–316

1          A     Text messages.

2          Q     What was the general nature of your

3     conversation with Colin through text messages at first?

4          A     Basically you could say like work tomorrow or

5     breakfast at the Big Guy's.

6          Q     I'm sorry, I was -- I wasn't very clear so

7     we're talking about after your arrest on September 15th,

8     2010?

9          A     Right.

10         Q     You were cooperating with law enforcement,

11    correct?

12         A     Right.

13         Q     Who were you working with specifically in law

14    enforcement?

15         A     Agent Hermes.

16         Q     And my question was at some point did Colin

17    reach out for you over the phones that Hubert dropped off?

18         A     Yes, sir.

19         Q     After your arrest?

20         A     Yes, sir.

21         Q     So what was the general nature of those text

22    messages?

23         A     They want -- he wanted, they were -- he was

24    trying to find out about paperwork on the marijuana and I

25    didn't have any and then he want -- he wanted to meet with me

403

US V. Peters – 13–CR–316

1   and try to start work.

2           Q    Okay.  Why didn't you have any, what do you

3   mean by paperwork?

4           A    From the marijuana, from my police chase, the

5   marijuana.

6           Q    Like what kind of paperwork?

7           A    Kind of saying what they confiscated from me

8   in general I guess.

9           Q    Do you know like law enforcement reports?

10          A    Correct.

11          Q    And why would Colin want those?

12          A    To show the people above him what had

13  happened, that I didn't steal the marijuana or try and get

14  away with it without -- without paying for it or something

15  like that.

16          Q    Is it fair to say that the law enforcement

17  report would prove that you hadn't stolen it?

18          A    Absolutely.

19          Q    Did you tell Colin Stewart what exactly had

20  happened on September 15th, 2010?

21          A    Not exactly.

22          Q    Do you recall what you told him?

23          A    Yes.

24          Q    What was that?

25          A    I just told him that there was -- there was a

404
US V. Peters – 13-CR-316

1    chase and that I managed to get away at different occasions

2    and I ditched the marijuana, got rid of it.  And then I

3    ditched my truck and I took off running and that they caught

4    me but they didn't have nothing on me.

5          Q    Why did you tell Colin Stewart that, why not

6    just tell him the truth, that the police seized the

7    marijuana?

8          A    Because I was petrified of him.

9          Q    I want to direct your attention to October 27,

10   2010.  Were you contacted by Colin Stewart around that time

11   period?

12         A    Yes, sir.

13         Q    Or I guess specifically on that day?

14         A    Yes, sir.

15         Q    Again how did Colin contact you?

16         A    Through text message, sir.

17         Q    Did you set up a meeting with Colin Stewart?

18         A    Corey Spinner was destined to go to the

19   defendant's property to pick up money for me which I had --

20   they had promised me if ever anything happened, that they

21   would pay for my lawyer, take care of my family, my bills,

22   debts, anyhow, and that I told them I needed money for a

23   lawyer.

24         Q    Let me back you up just a little bit.  At some

25   point in that time period, whether it was October 27th or,

405

                    US V. Peters – 13-CR-316


1    you know, a day or two before or after, did you go and meet

2    with Colin Stewart?  Did you have a face-to-face meeting with

3    him?

4            A    Yes.

5            Q    Where was that meeting?

6            A    I believe it was at his house.

7            Q    Did you talk to Special Agent Hermes about

8    this meeting?

9            A    Yes.

10           Q    I'm sorry, you said his house.  Where is his

11   house?

12           A    Elgin, Quebec.

13           Q    Is that E-L-G-I-N?

14           A    Correct.

15           Q    And what did Special Agent Hermes tell you

16   about this meeting?

17           A    Well, I was trying to get the money to which I

18   had -- I told Colin I needed the money for a lawyer but I

19   agreed on just turning it over to law enforcement and I

20   wanted to get it for them and he was trying to tell me just

21   let's -- let's try and get it through the reservation and

22   have Colin bring it to you.  And I just -- I just wanted to

23   do right and he told me I can't protect you over there.

24   There's nothing -- I can't tell you to not go and I can't

25   tell you to go.  But I can't protect you there.  So you're on

JA-442

                                                                    406
                    US V. Peters - 13-CR-316

 1    your own.

 2              Q    So what happened at your meeting with Colin at

 3    his residence in Elgin, Quebec?

 4              A    We just kind of talked again about the chase,

 5    what had happened and I was just quite nervous just being

 6    there.

 7              Q    Did -- did Colin give you money at that time?

 8              A    No, sir.

 9              Q    Did you make any arrangements with Colin to

10    get money at a later date?

11              A    Yes, sir.

12              Q    Can you describe that, please?

13              A    That he was going to go up by boat on the

14    reservation to the defendant's property and hand the money

15    over.  I was going to have Corey Spinner go and get it for

16    me.

17              Q    After that did you make arrangements with

18    Spinner for him to go meet with Colin and pick up the money?

19              A    Yes, sir.

20              Q    And when did that occur?

21              A    I believe like right within a day or so.

22              Q    Did you meet with Spinner?

23              A    Yes, sir.

24              Q    And what happened when you met with Spinner?

25              A    We went for a ride.  We pretty much talked

JA-443

407

US V. Peters – 13-CR-316

1    about how to do it and where he could go and I told him that,

2    you know, I'd let you know -- actually I told him I would --

3    I believe I told him, I'll let you know what time to go down

4    to the Big Guy's property and meet with Colin and get the

5    money and just bring it back to me so that I can pay my

6    lawyer.

7              Q    Did you tell him what day it would happen?

8              A    I believe so.

9              Q    Do you remember how close in time the pickup

10   was supposed to be?

11             A    It was close within the time that I had spoke

12   to Colin because Colin had sent me a text message that he

13   would -- that he had organized a dropoff date and time.

14             Q    I want to talk about that text message but

15   before I forget:  When you were talking to Colin, did you ask

16   for a certain amount of money?

17             A    I asked, yeah, I asked him for -- 'cuz he owed

18   me like $60,000 and I told him, I said, I need it for my

19   lawyer and he said, you're not getting that.

20             Q    Why do you say he owed you $60,000?

21             A    Because he wouldn't pay me all the time and I

22   didn't need that kind of money at all times and I just left

23   it there.

24             Q    Colin would hold on to your money?

25             A    Yes.

408
                    US V. Peters – 13–CR–316


1          Q     Mr. Forget, can you please look at Government
2     Exhibit 9A.  Do you recognize that exhibit?
3          A     Yes, sir.
4          Q     What is it?
5          A     It's a text message from Colin.
6          Q     To who?
7          A     Myself.
8          Q     Is that your cell phone we're looking at in
9     Government Exhibit 9A?
10         A     Yes, sir.
11         Q     Is that one of the cell phones that you
12    referenced earlier that Hubert Rushlough?
13         A     Rushlough.
14         Q     Rushlough brought you?
15         A     Correct, sir.
16         Q     Can you see the content of the message there?
17         A     It says from C which is Colin, lunch tomorrow,
18    Big Guy's, BG.
19         Q     BG means?
20         A     Big Guy.
21         Q     What did the entire message mean, "lunch
22    tomorrow bg"
23         A     It meant for Corey Spinner to be there at noon
24    time, that he would bring the money.
25         Q     That Colin would bring the money?

JA-445

409

US V. Peters – 13-CR-316

1          A      Yes, sir.

2          Q      To your knowledge did Colin ever bring Spinner

3    the money?

4          A      No, Spinner decided that he wasn't going.

5          Q      At some point later, did you get any money

6    from Colin?

7          A      Yes, sir.

8          Q      Can you describe -- well, first of all, when

9    did that happen?

10          A      I don't remember exactly what day it was.  It

11    was shortly after that this had fell through.

12          Q      So this text message was on October 28th,

13    2010, about how long after that do you think you received the

14    money from Colin?

15          A      My attorney has the specific date.  And I'm

16    sure you do.  I don't want to tell you a date.  I don't

17    remember the date.

18          Q      Was it weeks later, months later?

19          A      It wasn't very long.

20          Q      That's fine.  Do you remember how you got the

21    money?

22          A      Yes.

23          Q      Okay.  Can you describe that, please?

24          A      He contacted my son and gave him the money,

25    give this to your father, he needs this for his lawyer.

JA-446

410

US V. Peters – 13–CR–316

1          Q      Who is your son, again?

2          A      Mathieu Forget.

3          Q      How did Mathieu give you the money?

4          A      (No response.)

5          Q      I'm sorry, was it in Canada or the United

6    States?

7          A      Yes, it was in Quebec.

8          Q      Does your son live in Canada?

9          A      Yes, sir.

10          Q      Did you go see him at his house?

11          A      Yes, sir.

12          MR. GARDNER:  Your Honor, I'd like to show the

13    witness what's been marked as Government Exhibit 23 for

14    identification.  Do you recognize that exhibit?

15          A      Yes.

16          Q      What is it?

17          A      It's my son.

18          Q      It's a photograph of Mathieu Forget?

19          A      Yeah.

20          MR. GARDNER:  The government would like to move

21    this into evidence as Government Exhibit 23.

22          THE COURT:  Any objection?

23          MR. SACCO:  No objection.

24          THE COURT:  Okay, it's received.

25          Q      And how much money did Colin give to Matt to

JA-447

411
US V. Peters - 13-CR-316

1   give to you?

2           A    40,000.

3           Q    Did you bring that money back into the United

4   States?

5           A    Yes, sir.

6           Q    How did you do that?

7           A    Then again, I had somewhat briefed officer --

8   Agent Hermes on bringing it and he said, no, don't do that

9   and I just -- I kind of went on my own because I just wanted

10  to make things right and keep up my word that I was going to

11  give the government the money.  So I had went over with a

12  dump truck.  I had some work done on a dump truck on the

13  front springs and I tucked the money in -- I pulled the top

14  down inside between the truck and I tucked a bag of money up

15  in there.

16          Q    Did you drive it back through the

17  port-of-entry?

18          A    Yes, sir, Trout River.

19          Q    What did you do with the money once you got

20  into the United States?

21          A    Well, I got home and I took it out and I went

22  to my lawyer's office I believe it was the next morning and

23  I -- I said I need to see you and I walked in and I told him

24  I said you need to call the agents and have them come here

25  right away, please.

JA-448

412

US V. Peters – 13-CR-316

1          Q      And did you give the money to the DEA or did

2    your lawyer do that?

3          A      I gave it to my lawyer and he gave it over to

4    them and I just signed the paper basically that they had

5    received it.

6          Q      I want to direct your attention to February of

7    2011.  Do you recall receiving additional text messages from

8    Colin Stewart in February of 2011?

9          A      Yes.

10          Q      What is the general nature of these text

11    messages?

12          A      Well, we had spoken previously about bringing

13    marijuana or some kind of illegal product to make money that

14    he needed money and I needed money and I didn't have enough

15    for my attorney and I just I -- I had to make that money to

16    pay my attorney.

17          Q      Is this your meeting that you referenced in

18    the October-November 2010 time frame or did you go back and

19    see Colin later?

20          A      We had spoke about it then but we had talked

21    about it afterwards, also.

22          Q      In person or over the phone?

23          A      In person.

24          Q      So did you go back to Canada and meet with

25    Colin?

449
                                                                413
                    US V. Peters – 13–CR–316

1          A    Yes, sir.  That's when I had asked him how

2    come that he would only give me that $40,000 and he said that

3    people above him were holding us accountable for the whole

4    entire price of the marijuana and that we had to come up with

5    it and that was it.  He said I kind of had to keep them

6    cooled off and I gave them some money.

7          Q    After that meeting with Colin, did you

8    exchange text messages with him?

9          A    Yes, sir.

10         Q    Mr. Forget, can you please look at Government

11   Exhibit 9B and tell me if you recognize it.

12         A    Yes, sir.

13         Q    And what is this?

14         A    It's from Cowboy, Colin.

15         Q    To who?

16         A    To myself, sorry.

17         Q    This looks like a different phone than we were

18   looking at earlier.  Is this still your phone?

19         A    Yes.

20         Q    I think you mentioned that Hubert brought

21   multiple phones to you?

22         A    Yes.

23         Q    Can you go ahead and read the content of the

24   message?

25         A    It says no, this is to pick up in SYRA, which

JA-450

```
                                                          414
              US V. Peters - 13-CR-316


1   would be Syracuse, back 2 BG, at Big Guy's, the defendant.
2           Q    And the date of this text message was
3   February 22nd?
4           A    Correct.
5           Q    Did you understand the content of this text
6   message?
7           A    Yes, whatever was being picked up had to be
8   brought from Syracuse, New York back to Akwasasne.
9           Q    When you originally received this text
10  message, did you know what you were picking up in Syracuse or
11  what Colin wanted you to pick up in Syracuse?
12          A    Yes, sir.
13          Q    What was that?
14          A    He told me it was ten handguns.
15          Q    Mr. Forget, go ahead and look at Government
16  Exhibit 9C and, again, could you read the content of that
17  text message.
18          A    It says no.  Because I had questioned him
19  about marijuana and no meant for my question obviously that
20  it was not for marijuana and it's those hand tools, which
21  means -- which I kind of figured it was guns.
22          Q    Now, did you communicate this information in
23  these text messages to Special Agent Hermes?
24          A    Absolutely.
25          Q    We've only looked at a couple of text messages
```

JA-451

415

US V. Peters – 13-CR-316

1    here, but did you receive others from Colin Stewart?

2         A    Yes, sir.

3         Q    Is it fair to say you received many from him?

4         A    Yes, sir.

5         Q    Did you provide those text messages to Special

6    Agent Hermes?

7         A    100 percent.

8         Q    How did you do that?

9         A    I would meet with -- I would call him and tell

10   him I've got -- I have to see you and we would meet up and we

11   would take the text messages.

12        Q    Are you aware of whether the DEA attempted to

13   conduct this pick up in Syracuse?

14        A    Yes, sir.

15        Q    How were you aware of that?

16        A    Through off -- sorry, through Agent Hermes.

17        Q    Did you participate at all in the pickup or

18   the operation?

19        A    No, sir.

20        Q    At some point did Special Agent Hermes tell

21   you that the operation was successful in that they had, in

22   fact, picked up guns in Syracuse?

23        A    Yes, sir.

24        Q    Mr. Forget, can you go ahead and take a look

25   at Government Exhibit 9D.

JA-452

                                                                416
                US V. Peters – 13–CR–316

1           A    Yes.

2           Q    And if you can read that text message?

3           A    It says gimme an ETA, estimated time of

4    arrival, for BG, Big Guy, when you get it, I'm ready.

5           Q    And what did that mean to you?

6           A    That means he wanted to know what time that

7    the guns were going to arrive at the defendant's mother's

8    property and that he was ready to go and pick them up any

9    time.

10          Q    At some point after you received this text

11   message, did you contact Stewart?

12          A    Yes.

13          Q    Did you contact Colin?

14          A    Yes.

15          Q    And what was the purpose of contacting Colin?

16          A    Basically I had to go along with the way Agent

17   Hermes said that the pickup was going to go and that I had to

18   tell him that my driver was intercepted.

19          Q    And I should have clarified.  Did you call him

20   by phone?

21          A    I tried and he wouldn't answer and he wouldn't

22   answer, because he did not and then I –– I started sending

23   him nasty text messages like pick up your phone and he did.

24          Q    So you finally spoke to him over the phone?

25          A    Yes, sir.

JA-453

417

US V. Peters – 13-CR-316

1          Q     And did you and Special Agent Hermes discuss
2    what you would say to Colin?

3          A     Yes, sir.

4          Q     And just, generally speaking, what was it that
5    you were supposed to say to Colin?

6          A     That my driver –– the pickup went fine,
7    everything was good and that he left and he started noticing
8    vehicles following him and that he –– he got pulled over and
9    that they basically –– he gave hem a story that his uncle or
10   something had passed away and that was his inheritance and
11   his –– I think it was his aunt or something that gave him all
12   the guns and that he had applied for a permit and the state
13   police basically told him that if this all checks out, that
14   you'll get your handguns back and you'll be fine.

15         Q     And did you actually communicate that to
16   Colin?

17         A     (No response.)

18         Q     During the phone call?

19         A     Yes, I believe so, yes.  Yes, I did.

20         Q     Mr. Forget, can you take a look at Government
21   Exhibit 13 and let me know if you recognize that.

22         A     Yes, I do.

23         Q     And what is it?

24         A     It's a receipt for the guns that were
25   confiscated.

JA-454

418
US V. Peters – 13-CR-316

1      Q      And how did you come into contact with this

2  receipt?

3      A      Agent Hermes gave it to me.

4      Q      And why did he give it to you?

5      A      Because I had to produce something to Colin

6  because I was in over my head again.

7      Q      You wanted to give this paperwork to Colin?

8      A      Yes.

9      Q      Did you suggest a way to do that to Special

10  Agent Hermes or did you guys have a conversation about the

11  best way to do that?

12      A      I don't 100 percent recall if I had said that

13  my driver -- yes, my driver had dropped -- he had texted me

14  or talked to me that he was getting out of town and that

15  he -- my wife found this in the mail box and gave it to me

16  and I basically told Colin kind of rolled out the story that

17  this was in my mail box and the guy's vanished, he left town.

18      Q      All right.  And I guess my question was:  Did

19  you and Special Agent Hermes discuss the best way to get this

20  receipt, Government Exhibit 13 to Colin?

21      A      Yes, sir.

22      Q      What did you come up with?

23      A      To get the defendant to bring it to him.

24      Q      At some point did you contact the defendant by

25  phone?

JA-455

419

US V. Peters – 13–CR–316

1           A     Yes, sir.

2           Q     And what was the purpose of calling the

3    defendant?

4           A     To meet up with him to give him this receipt

5    to get to Colin Stewart.

6           Q     When you made that call, were you with Special

7    Agent Hermes?

8           A     Yes, sir.

9           Q     During the call did you set up a meeting with

10   the defendant?

11          A     Yes, sir.

12          Q     And where was that meeting supposed to take

13   place?

14          A     In Malone.

15          Q     At anywhere in particular?

16          A     I believe we had set on Burger King parking

17   lot.

18          Q     Prior to going to the meeting, did you meet

19   with or were you already with Special Agent Hermes?

20          A     Yes, sir.

21          Q     Did Special Agent Hermes provide you with any

22   type of recording equipment?

23          A     Yes, sir.

24          Q     Do you remember what that was?

25          A     I don't remember if it was a lighter or –– a

420

US V. Peters – 13-CR-316

1    pen or a lighter.  I don't –- I don't 100 percent remember,
2    being truthful.
3          Q    Is it fair to say that Special Agent Hermes
4    gave you recording devices on several occasions?
5          A    Yes, sir.
6          Q    Did you have more than one recorded meeting
7    with Corey Spinner?
8          A    I believe so, yes, sir.
9          Q    So you mentioned the meeting was at the
10   Tractor Supply –- or at the Burger King, excuse me?
11         A    Yes.
12         Q    What type of vehicle were you driving that
13   day?
14         A    I think it might have been my wife's van.
15         Q    Do you remember the color of that van?
16         A    Green.
17         Q    At some point did you go to the Burger King
18   parking lot?
19         A    Yes, sir.
20         Q    And did you have a meeting with the defendant
21   there?
22         A    Yes, sir.
23         Q    At the Burger King parking lot?
24         A    It was either Burger King or Tractor Supply.
25   I think it might have –- it might have been Tractor Supply.

421

US V. Peters – 13-CR-316

1    Yes, it was Tractor Supply.

2            Q    And did you meet with the defendant?

3            A    Yes, sir.

4            Q    Where did that meeting take place?

5            A    In the vehicle.

6            Q    Whose vehicle?

7            A    My vehicle.

8            MR. GARDNER:  Your Honor, at this time the

9    government would like to publish Government Exhibit 14, the

10   recording of the meeting.

11           THE COURT:  Okay.

12           Q    Mr. Forget, I want you to listen to the

13   meeting -- or listen to this conversation and at various

14   times I'm going to pause the type and we'll talk about it.

15           A    Yes, sir.

16           (Exhibit 14 played.)

17           Q    Just real quick, Mr. Forget, do you recognize

18   the voices on this recording?

19           A    Yes, sir.

20           Q    And who are the voices?

21           A    Myself and the defendant.

22           (Exhibit 14 played.)

23           Q    Mr. Forget, it's somewhat self-explanatory but

24   did you have some kind of accident?

25           A    Pretty bad one.

JA-458

422

US V. Peters – 13-CR-316

1      Q      What type of accident?

2      A      Snowmobile.

3      (Exhibit 14 played.)

4      Q      Mr. Forget, the defendant refers to the

5  farmer.  Do you know who he's talking about?

6      A      Colin Stewart (farmer).

7      (Exhibit 14 played)

8      Q      Mr. Forget, what are you talking about here?

9      A      About the claiming?

10     Q      Mm-mm.

11     A      About the marijuana.

12     Q      The marijuana that was seized?

13     A      From September 15th.

14     Q      2010.

15     (Exhibit played.)

16     Q      Mr. Forget, we just heard the defendant say,

17  this is, this is his paper and you responded, yeah, that's

18  paper for him.

19            Do you know what you and the defendant are

20  discussing?

21     A      The receipt for the weapons.

22     Q      Government Exhibit 13 that we were looking at

23  earlier?

24     A      Yes, sir.

25     Q      Did you give him that receipt?

JA-459

423

US V. Peters – 13-CR-316

1          A     Yes, sir.

2          Q     And at the conclusion of the meeting, did the

3     defendant take it with him?

4          A     Yes, sir.

5          Q     Is there anything else you gave the defendant

6     that day?

7          A     A phone.

8          Q     A cell phone?

9          A     Yes, sir.

10         Q     And why did you give him that?

11         A     So that he can give it to Colin or get it to

12    Colin.

13         Q     Okay.

14         (Exhibit played.)

15         Q     Mr. Forget, why did you suggest taking the

16    battery out of the phone?

17         A     I was always just paranoia so they couldn't

18    track it or something.

19         Q     Mr. Forget, first of all, the defendant

20    references Matt.  Do you know who he's talking about?

21         A     My son.

22         Q     And he also states that everybody's done at my

23    mother's.

24               Did you know what he meant by that?

25         A     That nobody's going to go in and out of there

424
                    US V. Peters – 13–CR–316


1    any more whatsoever.

2           Q    Mr. Forget, a little earlier in the

3    conversation –– I'll withdraw that.

4                You just mentioned Hubert?

5           A    Correct.

6           Q    Who is Hubert?

7           A    Hubert Rushlough.

8           Q    Mr. Forget, do you know what the defendant's

9    talking about when he's referencing King's and Adam's?

10          A    Different marinas.

11          Q    Where?

12          A    On, on the reservation past his mother's

13   property.

14          Q    Marinas.  So they're on a body of water?

15          A    Yes, sir.

16          Q    Are they on the St. Lawrence River?

17          A    Yes, sir.

18          Q    Why are you and the defendant talking about

19   these marinas?

20          A    Because there's other people moving marijuana

21   and different things to those marinas.

22          Q    Are they smuggling spots?

23          A    Yes, sir.

24          (Exhibit played.)

25          Q    Mr. Forget, the defendant for the second time

JA-461

425

US V. Peters – 13-CR-316

1   referenced a dispatcher at tribal police.  Do you know who

2   that individual is that he's referencing?

3           A    No.

4           Q    Did you ever hear the defendant talk about a

5   friend at the tribal police?

6           A    Yes.

7           Q    What did he say about that individual?

8           A    Just that he knew somebody that was in the

9   police, the law enforcement on the reservation.

10          Q    Did the defendant indicate whether this

11  individual was providing him information?

12          A    Basically would tell him if he was being

13  watched or if there was heat on the reservation.

14          (Exhibit played.)

15          Q    Mr. Forget, do you know what the defendant's

16  talking about in that last part of the conversation?

17          A    Going to block off the canal coming into his

18  mother's.

19          Q    Which canal?

20          A    The canal that comes off of the St. Lawrence

21  river.

22          Q    The one that you used to pick up loads of

23  marijuana?

24          A    Yes.

25          Q    Mr. Forget, the defendant just referenced X.

JA-462

426

US V. Peters – 13–CR–316

1   Do you know who he's talking about?

2          A    Xavier Dauie.

3          Q    Earlier in the conversation he used the name

4   Xavier.  Is he also referring to Xavier Dauie?

5          A    Yes, sir.

6          Q    And that's the individual you indicated often

7   came down with Colin by boat transporting the marijuana

8   loads?

9          A    That's correct, sir.

10         (Exhibit played.)

11         THE COURT:  Mr. Gardner.

12         MR. GARDNER:  Yes, sir.

13         THE COURT:  I think we're going to take a break.

14         MR. GARDNER:  I have just two more questions, your

15  Honor.  I'm happy to break.  Whatever you like.

16         THE COURT:  All right.  Finish your questions, then

17  we're going to give the jury a break.

18         Q    Mr. Forget, if you can take a look at

19  Government Exhibit 12C.  Do you recognize that, that

20  photograph?

21         A    Yes, sir.

22         Q    What that a photograph of?

23         A    My wife's van with myself and the defendant

24  sitting in there.

25         Q    And, Mr. Forget, please look at Government

427

US V. Peters – 13–CR–316

1  Exhibit 12B.  Do you recognize this photograph?

2          A    Yes, sir.

3          Q    And what is it?

4          A    The defendant.

5          MR. GARDNER:  If I can just have one moment, your

6  Honor.

7          THE COURT:  Sure.

8          (Discussion held off the record.)

9          MR. GARDNER:  That's all the questions the

10  government has, your Honor.

11          THE COURT:  Very well.

12          Ladies and gentlemen, we're going to take about a

13  ten-minute break, mid-morning break get up and stretch.

14  Please don't talk about the case and we'll have you back out

15  here in just a few minutes.  Thank you.

16          (Jury excused, 10:55 a.m.)

17          THE COURT:  Okay, let's look to start about five

18  after, okay.

19          MR. SACCO:  Yes, sir.

20          MR. GARDNER:  Yes, sir.

21          THE CLERK:  Clerk court's in recess.

22          (Recess taken, 10:55 a.m.)

23          (Open court, 11:08 a.m.)

24          THE COURT:  Mr. Sacco, you ready?

25          MR. SACCO:  Ready, Judge.

JA-464

428

US V. Peters – 13-CR-316

1          THE COURT:  Okay, bring them in.

2          (Jury present, 11:08 a.m.)

3          THE COURT:  Okay.  The record should reflect we

4    have the ladies and gentlemen of the jury looking refreshed

5    and perky and we're going to move on to cross-examination by

6    Mr. Sacco.

7          Go ahead, sir.

8          MR. SACCO:  Thank you, Judge.

9    CROSS-EXAMINATION BY MR. SACCO:

10         Q     Morning sir.

11         A     Good morning, sir.

12         Q     Mr. Forget, you testified on your direct

13   examination that you started working with Colin Stewart in

14   2008 or 2009?

15         A     It was around '08.

16         Q     And when did you recruit Corey Spinner to

17   start working for you or for Mr. Stewart?

18         A     Pretty much in 2008, as well.

19         Q     And you initially stated your initial role was

20   as a blocker, right?

21         A     Yes, a scouter.

22         Q     Scouter, blocker.  So who recruited you for

23   that role as a scouter or scout?

24         A     Colin Stewart and Stefan Trepanier.

25         Q     And you met Colin Stewart through your son,

```
                                                              429
                  US V. Peters - 13-CR-316
```

  1    right?

  2             A     Correct.

  3             Q     And your son is friends with Colin Stewart, is

  4    that fair to say?

  5             A     He's friends with his younger brother.

  6             Q     How old's Colin Stewart?  I couldn't tell by

  7    the photograph.

  8             A     He's younger than me.  I'm not sure.  He's got

  9    to be in his mid-, late 30s.

 10             Q     And how old's your son?

 11             A     28.

 12             Q     Do you know how old Colin Stewart's younger

 13    brother is?

 14             A     My son's age.

 15             Q     Around 28.  So how exactly did it happen?  Did

 16    Colin Stewart just come up to you and say I need your help

 17    or?

 18             A     No, he knew through -- he knew that I lived in

 19    the U.S. and he approached my son to have him get a hold of

 20    me to come to Quebec to talk to him because Colin does not go

 21    into the U.S.

 22             Q     So he'll just take the boat as far as the St.

 23    Lawrence?

 24             A     Correct.

 25             Q     And then go back up?

US V. Peters – 13-CR-316

1        A    Yes, sir.

2        Q    And obviously you agreed to assist him in his

3   enterprise, right?

4        A    Correct.

5        Q    Now -- and you and Colin had an agreement that

6   you would be paid for it, right?

7        A    Correct.

8        Q    And was that based on the weight of the

9   shipment of marijuana or?

10       A    Scouting was -- scouting they started me at a

11  thousand dollars to scout and I took it.  I mean it's --

12       Q    It was a flat rate?

13       A    Yes, sir.

14       Q    So the first time, do you remember when your

15  first scouting mission was?

16       A    To the pinpoint date, not really.  But it was

17  scouting out of there -- the defendant's mother's property to

18  the King's residence.

19       Q    And that was the first time you did it and you

20  got a thousand dollars?

21       A    Yes, sir.

22       Q    Now at what point did you need Corey Spinner's

23  help in this activity?

24       A    They wanted more, more -- more eyes.  They

25  said the better the more eyes.  And I told them, I said I

JA-467

US V. Peters - 13-CR-316

1   know a guy that would do it.  I knew he was working elsewhere

2   and whatnot, also, and so I asked him and he said sure.

3           Q     What do you mean working?

4           A     Scouting for other people.

5           Q     That's Corey Spinner?

6           A     Yes, sir.

7           Q     So he had experience?

8           A     Yes, sir.

9           Q     And you approached Corey Spinner or Corey

10  Spinner approached you?

11          A     No, I approached him.

12          Q     And did you pay him or did Colin Stewart pay

13  him?

14          A     I did.

15          Q     So you were -- were you, for lack of a better

16  term, a supervisor over Spinner?

17          A     Just the middle man.

18          Q     So you recruited Corey Spinner and he also

19  agreed to do this, right?

20          A     Yes, sir.

21          Q     And that was early on in your participation in

22  the organization?

23          A     Yes, sir.

24          Q     So that would put us at somewhere in the time

25  frame of 2008 to 2009; is that right?

432

US V. Peters – 13-CR-316

1           A     Correct.

2           Q     Was it typical that and you Mr. Spinner would

3     work together on these scouting missions?

4           A     Yes.

5           Q     Okay.  And just so that we have a time frame

6     here, if you started somewhere in 2008 to 2009, when were you

7     ultimately arrested and started working with the DEA?

8           A     2010.

9           Q     All right.  So, that period of time is between

10    a year, two years, year and a half to two years, is that what

11    we're talking about?

12          A     That's about right, sir.

13          Q     And from 2010 after your arrest until today,

14    you haven't engaged in any of this transporting of marijuana

15    activity, is that correct?

16          A     None whatsoever.

17          Q     So, now, your relationship with Corey Spinner,

18    do you know him?

19          A     Yes, sir.

20          Q     Outside of your activity as a scout, do you

21    know him?

22          A     Yes, sir.

23          Q     And what's your relationship with him?

24          A     We were friends.  I met him through my wife.

25    My wife went to school with him.

JA-469

433

US V. Peters – 13-CR-316

1    Q    And did you go to his house for dinner or did
2    you do anything significant with him?
3    A    We've done -- we've done different things
4    together, snowmobiling, go out to eat, motorcycle rides.
5    Q    Okay.
6    A    He was a friend, an acquaintance.
7    Q    And were your wives friends?
8    A    (No response.)
9    Q    His wife?
10   A    When he had the same girlfriend, I guess, if
11   they knew each other, they'd --
12   Q    So he's not married?
13   A    No, he's not married.
14   Q    And did he go to your wedding?
15   A    Yes, sir.
16   Q    Now, I want to talk a little bit about -- you
17   mentioned on your direct examination that you had marijuana
18   and cocaine use in your past, is that fair to say?
19   A    Yes, sir.
20   Q    Now, we're really focused here on 2008 and '9
21   and your arrest?
22   A    Yes, sir.
23   Q    Now, during that period of time, what was your
24   drug use?  What were your habits during that period of time?
25   A    I had had cocaine, use of cocaine a few times

JA-470

434

US V. Peters - 13-CR-316

1    before, but my main habit was marijuana.

2            Q     During the time that you were transporting

3    marijuana for this organization, your main habit was

4    marijuana, is that what I understand you to say?

5            A     Absolutely.

6            Q     What about cocaine, were you using cocaine

7    during that period of time?

8            A     No, sir.

9            Q     When you say using marijuana, is it a

10   significant amount, were you smoking it constantly or every

11   day or what was your use?

12           A     Every day and when I would leave the

13   defendant's property, I would -- they would always be smoking

14   there, Colin and the guys that came over from Canada.  And it

15   just kind of like I was -- I was so nervous that it kind of

16   helped take the edge off so I did before I left.

17           Q     And did there come a time after you were

18   arrested did you stop smoking or were you still smoking when

19   you were working with the DEA?

20           A     No, yesterday also -- I was asked a question

21   yesterday, I was so nervous that I kind of like -- I think I

22   answered something wrong -- wrongfully.

23                 From my arrest in 2010, I -- I had to report

24   for drug, random testing and with my occupation, I'm in a

25   random drug test, also.  I did not smoke or use drugs.  I

JA-471

435

US V. Peters – 13-CR-316

1  drank alcohol but before my arrest I was definitely a heavy

2  marijuana smoker.

3        Q    So you were following the rules --

4        A    Absolutely.

5        Q    -- of your release?

6        A    One hundred percent.

7        Q    Of your agreement with the government?

8        A    Yes, sir.

9        Q    Where did you get your -- I'll withdraw that.

10       A    I've never failed a drug test or a random drug

11  test for my business, not whatsoever.

12       Q    You have your a CDL driver?

13       A    Yes, sir, tractor-trailer and I'm not out

14  there to hurt anyone or get in an accident and be pulled away

15  because I had drugs in my system, by all means.

16       Q    You want to be safe on the reads, right,

17  obviously there's other people on the roads?

18       A    100 percent.  I know there's mothers, fathers

19  and children out there and I'm a father myself.  I made a

20  mistake September 15th, and ...

21       Q    All right.  Now, your employment, you have a

22  business -- some sort of excavating business or trucking

23  business?

24       A    Trucking, sir.

25       Q    You drive, what, 18-wheelers or dump trucks?

436

US V. Peters – 13-CR-316

1         A     Both.

2         Q     You own on those?

3         A     Yes, sir.

4         Q     How many 18-wheelers do you own?

5         A     Two.

6         Q     You said you lived in Malone, New York, right?

7         A     That's correct, sir.

8         Q     And you're originally -- were you born in the

9    United States or are you --

10        A     Yes, sir.

11        Q     -- Canadian?

12        A     I was born in Malone.

13        Q     But you have dual citizenship?

14        A     That's correct.  My mother and father are

15   Canadian citizens.

16        Q     So you were familiar with Quebec and the

17   Canadian side; is that right?

18        A     That's correct.

19        Q     Which made you an asset to Colin Stewart; is

20   that right?

21        A     Exactly.

22        Q     In fact, you mentioned that you would go see

23   him in -- I forget the name -- Elgin?

24        A     Elgin.

25        Q     Elgin, that's where he lives?

JA-473

437

US V. Peters – 13–CR–316

1          A     Yes, sir.

2          Q     Are you from that town originally, your

3     parents from that town?

4          A     My mother's from Huntington area.

5          Q     Is that near Elgin?

6          A     Yes.

7          Q     Now you mentioned that when you would go to

8     the canal site there near Mrs. Peters's residence, would

9     Corey Spinner start there with you to scout?

10         A     Yes, sir.

11         Q     So you would both have your whatever -- truck

12    or car or whatever you were going to use, you would go there

13    together to start the operation, right?

14         A     Correct.

15         Q     Now, aside from your drug use that you've

16    talked about in your direct examination, Mr. Gardner asked

17    you a question regarding your previous criminal history.  Do

18    you remember that?

19         A     Yes, sir.

20         Q     Is it fair to say that you have numerous

21    convictions over a significant period of time in both Canada

22    and the U.S. dealing with the smuggling of drugs and tobacco?

23         A     I wouldn't say it's fair to say in the U.S.

24    but I would say in Canada I've had tobacco and cigarettes,

25    yes.

JA-474

438

US V. Peters – 13-CR-316

1          Q     On numerous occasions, right?

2          A     Several occasions in Quebec.

3          Q     Prior to your working for Colin Stewart, did

4     you know him?

5          A     No, sir.  I knew of him, never met him.

6          Q     What about Mr. Trepanier?

7          A     I knew Mr. Trepanier from living in

8     Saint-Anicet area.

9          Q     Prior to 2008-2009, how long had you known

10    Mr. Trepanier?

11         A     Maybe ten years, but never associated but I

12    knew who he was, knew of him.  If I'd see him, I'd say hello

13    and basically the same thing.  We never had any communicating

14    relationship.

15         Q     For instance, did you know each other's names?

16         A     Yes.

17         Q     Or did you know his name?

18         A     Yes.

19         Q     All right.  Sir, I want to get into your

20    agreement with the government now.  On September 15th,

21    2010 --

22         A     Ten.

23         Q     -- you made an agreement with the Drug

24    Enforcement Agency, right?

25         A     Yes, sir.

JA-475

439

US V. Peters – 13-CR-316

1          Q     And that agreement was that you would provide

2    them information and work with them, correct?

3          A     Correct, sir.

4          Q     And you understood that the level of your

5    cooperation and the quality of your cooperation would dictate

6    how well your case ended up, is that fair to say?

7          A     Yes, sir.

8          Q     And that was made clear to you?

9          A     Yes, sir.

10          Q     And that you were -- you also understood that

11   you were going to be asked to do things and gather

12   information for them, correct?

13          A     Yes, sir.

14          Q     And that you set about doing that?

15          A     Yes, sir.

16          Q     So, in September of 2010, you testified that

17   you started -- you identified Corey Spinner as the person

18   that was working with you, right?

19          A     Correct.

20          Q     And you met with Mr. Spinner?

21          A     Yes, sir.

22          Q     And you taped -- did you tape him during

23   meetings?

24          A     Yes, sir.

25          Q     Did you place the GPS device on his car or did

JA-476

US V. Peters – 13–CR–316

1    the government, did someone else do it?

2            A    Someone else did it.

3            Q    So you then met with Mr. Spinner and you were

4    trying to get him to go pick up the money for you, right?

5            A    Correct.

6            Q    And the money was supposed to be coming from

7    Colin Stewart?

8            A    Yes, sir.

9            Q    And in order to convince Mr. Stewart to do

10   this, you had to come up with a story, a cover story, right?

11           A    That's right.

12           Q    And it had to be an elaborate cover story for

13   you to convince him to do that, is that fair to say?

14           A    Correct.

15           Q    And did Mr. Stewart -- or, sorry, did

16   Mr. Spinner, did he go and attempt to pick up the proceeds

17   for you the money?

18           A    I believe not.  He just -- what he told me is

19   that he felt paranoid and that he started looking over his

20   truck and he found a GPS.

21           Q    So he never went to the canal, as far as you

22   know --

23           A    No, sir.

24           Q    -- to pick up the money?  If you know, was

25   Colin Stewart waiting there for him with a big duffel bag

JA-477

441

US V. Peters – 13-CR-316

1  full of money, he was supposed to be there?

2          A    I don't believe –– I can't answer that.  I

3  don't know if he was there.

4          Q    Let me ask you this:  Did Colin Stewart text

5  you and say where's your guy, I'm here, I'm waiting, I'm in

6  the boat?

7          A    I can't recall that, sir.

8          Q    Because the plan was for Colin Stewart to come

9  in and meet Corey Spinner, right?

10          A    Yes, sir.  I believe, if anything, I might

11  have reached out to him and told him that he wasn't going,

12  that he had –– that we had to sort out another plan, if

13  anything.

14          Q    But are you just guessing or do you know?

15          A    I'm not 100 percent sure.  This is what I

16  would have done in a normal situation is what I'm saying.

17          Q    I'm not interested in what you would have done

18  in a normal situation.  I'm interested in what you did.

19          A    That's fine.

20          Q    So Corey Spinner eventually was also arrested,

21  right?

22          A    Yes, sir.

23          Q    Are you aware of that?

24          A    Yes, sir.

25          Q    And he also began working for the Drug

JA-478

442

US V. Peters – 13-CR-316

1   Enforcement Administration, correct?

2           A    Yes, sir.

3           Q    And you were aware of that?

4           A    Yes, sir.

5           Q    And he was aware that you were working for

6   them, right?

7           A    Yes, sir.

8           Q    And they were aware of that, you were both

9   aware of that because you had discussions about that, right?

10          A    Yes, sir.

11          Q    And just so the jury knows, what kind of --

12  what would you talk about with respect to your cooperation?

13          A    I didn't talk about my cooperation with him.

14          Q    How did he know you were cooperating?

15          A    He assumed that I was because of the GPS on

16  his truck after we had spoke and they found the GPS on his

17  truck.  So he assumed that I was working setting him up.

18          Q    And did you, did he -- okay.  When that

19  happened, did he confront you on that?

20          A    Yes, sir.

21          Q    And what did you -- did you tell him, he was a

22  rat?

23          A    I basically told him, they must be watching

24  you, why are you thinking they're watching me.  I was trying

25  to basically say that it wasn't coming from me.

JA-479

443

US V. Peters – 13–CR–316

1          Q     But nonetheless, you both knew you both were

2   working as informants?

3          A     He assumed I was and I assumed he was.  Never

4   specifically admitted to it.

5          Q     All right.  And ultimately, you pled guilty in

6   federal court, right?

7          A     Yes, sir.

8          Q     For your role?

9          A     Yes, sir.

10         Q     And you pled guilty to possessing a hundred

11  kilograms, right?

12         A     Correct.

13         Q     Which is about 200 pounds?

14         A     Correct.

15         Q     And were you originally charged with something

16  greater than that or was that the plea agreement?

17         A     That was what I was charged with.

18         Q     Because here in court, you have testified that

19  you possessed more than a hundred kilograms on any given day

20  you were some smuggling, right?

21         A     Can you repeat that, sir.

22         Q     Sure.  In court you've testified that you had

23  smuggled much more than a hundred kilograms, haven't you?

24         A     Through the time, yes.

25         Q     And what you pled guilty to was conspiracy to

JA-480

444

US V. Peters – 13-CR-316

1    distribute just a hundred kilograms; is that right?

2            A    Correct.

3            Q    And it's your understanding that your

4    potential penalty for this amount is a minimum of 5 years,

5    right?

6            A    Correct.

7            Q    And a maximum of 40 years --

8            A    Yes, sir.

9            Q    -- right?  And you also testified -- and I

10   believe it's in evidence -- that the government has rescinded

11   their agreement with you, right?

12           A    Yes, sir.

13           Q    Because initially they had agreed that if you

14   would cooperate with them, that they would make a motion to

15   the court that you get less than five years, right?

16           A    That's correct.

17           Q    That was the original plan?

18           A    It was the hope.

19           Q    Well, that was why you were cooperating,

20   correct?

21           A    That was, yes.

22           Q    I mean, you weren't cooperating for fun, were

23   you?

24           A    No, sir.

25           Q    You were cooperating because you wanted a

JA-481

445

US V. Peters – 13-CR-316

1  benefit, right?

2      A    Yes, sir.

3      Q    And just recently in January of this year, the

4  government gave you a letter and they said that they are no

5  longer going to honor the agreement that you had, right?

6      A    Yes, sir.

7      Q    And that they will not make a motion to the

8  court that you get under five years, is that right?

9      A    That's correct.

10      Q    And the reason that they are not going to

11  honor their agreement -- and listen closely, please -- is

12  because you were arrested for possessing certain firearms,

13  right?

14      A    On the advice of my attorney, I decline to

15  answer that question that it may incriminate me.

16      THE COURT:  Well, I want you to listen carefully to

17  his question, Mr. Forget.  He's not asking if you committed a

18  crime.  He's asking you if you were arrested for a certain

19  crime and that I believe you can answer.

20      THE WITNESS:  Yes, sir.

21      THE COURT:  So ask the question again.

22      And you listen carefully and then you can decide

23  whether you want to or if you need to exercise your Fifth

24  Amendment right.  I don't believe that you do under this

25  circumstance, but listen carefully.

JA-482

446

US V. Peters – 13–CR–316

1      Q     I'm only –– and I'll go slow, Judge, if I can,
2  do it piece by piece.
3            I want to ask you not about any underlying
4  facts, okay, I don't want to ask you anything like that.
5      A     Yes, sir.
6      Q     Mr. Gardner on his direct examination asked
7  you if you were arrested and charged with certain gun
8  offenses, do you recall that?
9      A     A gun offense, yes, sir.
10     Q     And specifically –– and it's in the record ––
11 he asked you simply if you had been arrested and charged with
12 I believe it was seven gun offenses?
13     A     No.  It was, but –– I was arrested.
14     Q     Okay.  And you were charged, right?
15     A     Yes.
16     Q     And after you were arrested and charged, the
17 government sent you a letter and said they would no longer
18 honor their agreement with you, is that fair to say?
19     A     Unfortunately, yes.
20     Q     And, however, they are not going to void the
21 entire agreement, are they?
22     A     To my understanding, yes, it is.
23     Q     Well, they're not going to recommend to the
24 judge you get under five years, right?
25     A     No.

JA-483

447

US V. Peters – 13–CR–316

1    Q    So, are they going to prosecute you for -- are
2  they going to withdraw the whole plea agreement?
3    A    I believe they have.
4    Q    So are you back to square one?
5    A    It seems that way, sir.
6    Q    But you're still going to be sentenced, right?
7    A    Yes, sir.
8    Q    They're just not going to make a
9  recommendation that you be sentenced under five years?
10   A    That's my understanding, sir.
11   Q    Are they going to bring any other charges
12  against you?
13   A    I don't believe so.
14   Q    For this crime that you were arrested for,
15  where are you being charged, in what court, is it federal
16  court, is it state court, where are those charges actually
17  pending?
18   A    Do I have to answer this?
19       THE COURT:  Counsel, why don't you come up here.
20       MR. SACCO:  Yeah.
21       (Held at side bar:)
22       THE COURT:  Mr. Sacco, we're in an area that's a
23  little touchy.  I agree with you that this is a question he
24  can answer but I'm interested in what's the relevance of what
25  court.  Why do we need to know that?  Why is it important for

JA-484

448

US V. Peters - 13-CR-316

1  your cross-examination.

2          MR. SACCO:  Because I believe, Judge, it's his hope

3  that how well he does -- I mean, he obviously still is here

4  trying to get a benefit, whether they're going to give it to

5  him or not, and he's got an open case and it's his hope that,

6  you know, the better he does here, it will help and I'll ask

7  him this, better he does, it will help him.

8          THE COURT:  Then ask him that.

9          MR. SACCO:  Okay.

10         THE COURT:  I don't think where --

11         MR. SACCO:  It's pending matters.

12         THE COURT:  -- where it's pending matters.  Just

13 say are you hoping to get some benefit with regard to that

14 case.

15         MR. SACCO:  Okay.

16         THE COURT:  Just ask him straight out I think would

17 be more appropriate.  He's obviously very nervous about being

18 questioned about that arrest because it's still pending.

19         MR. SACCO:  All right.  I'll clean it up.

20         THE COURT:  Thank you.

21         (Open court:)

22         THE COURT:  Okay, Mr. Sacco, when you're ready,

23 sir.

24         MR. SACCO:  Okay, thank you, judge.

25         Q    Mr. Forget, is it fair to say that you hope by

JA-485

449

US V. Peters – 13–CR–316

1  your testimony here in this court that you hope to get some

2  sort of benefit down the line, right, that's your hope?

3      A    That would be my hope, but it doesn't mean

4  it's going to happen.

5      Q    I understand that, but that's your motivation

6  for testifying, right?

7      A    I made an agreement with the government, and

8  I'm sticking to it.

9      Q    Now, I want to talk about the –– what led up

10 to your arrest on September 15th, 2010, okay.  Now you've

11 testified in this court that you picked up a load of

12 marijuana and you were very nervous about it, right?

13     A    Yes, sir.

14     Q    And you picked it up on this little canal

15 outside of Maria Peters's property and who was there for the

16 pickup, Colin Stewart?

17     A    Yes, sir.

18     Q    Was Trepanier there, too?

19     A    No, they weren't working together any more at

20 that time.

21     Q    This is in 2010, right?

22     A    Yes, sir.

23     Q    My client wasn't there?

24     A    No, sir.

25     Q    And Corey Spinner had canceled on you, right?

JA-486

450

US V. Peters – 13-CR-316

1          A     Yes, sir.

2          Q     So you were going on at this all by yourself?

3          A     Yes, sir.

4          Q     And it was just you and Colin Stewart, right,

5    he dropped it off?

6          A     Him with Xavier.

7          Q     Okay, X-man was there.  And you load it into

8    your truck, right?

9          A     We all did.

10         Q     Were you smoking marijuana cigarettes when you

11   were at the canal side there or no?

12         A     Yeah, I was shaking like a leaf.  I didn't

13   want to do it and he told me that it had to be done, whether

14   you like it or not you're going to do it, it's got to go and

15   that's all there is to it.

16         Q     How old are you, how old were you at the time?

17         A     39.

18         Q     At the time, so what are you, 40?

19         A     43.

20         Q     Forty-three now.  So you're there and you're

21   smoking marijuana, right?

22         A     Yes, sir.

23         Q     Trying to get ready for this trip?

24         A     Trying to.

25         Q     And you're almost out of gas, right?

451
                    US V. Peters – 13–CR–316


1              A    Yes, sir.

2              Q    So you start driving and you see the border

3   patrol –– I'm sorry, you see the Mohawk police, right?

4              A    Yes, sir.

5              Q    And you panicked, right?

6              A    Yes, sir.

7              Q    When you say you panicked, you had a choice to

8   make, you could stop, right?

9              A    Yes, sir.

10             Q    And not go on a high speed chase or you can go

11  on a high speed chase, those were your choices, right?

12             A    Yes, sir.

13             Q    And you chose to flee, right?

14             A    Yes, sir.

15             Q    So you start going down 37, I believe

16  eastbound, is that fair to say?

17             A    I believe so.

18             Q    And you went on this high speed chase.  What

19  is the maximum rate of speed you reached, were you looking at

20  your speedometer?

21             A    No, sir.

22             Q    Well over a hundred, is that fair to say?

23             A    I was a hundred miles an hour plus at times.

24             Q    As fast as your truck would go, right?

25             A    I guess, yes.

452

US V. Peters – 13–CR–316


1          Q      And when you did this, were you passing cars?

2          A      At times.

3          Q      And did you run red lights and blinking yellow

4    lights and all that sort of thing?

5          A      There was no red lights where I was at.

6          Q      So you didn't pass any signals, as far as you

7    remember?

8          A      No, no yellow stop signs -- no yellow lights

9    or traffic lights the route I went.

10          Q      And you were high on marijuana at this time

11    also, right?

12          A      Yes, sir.

13          Q      Which would have some, okay.  So as you, how

14    long did this chase last, if you remember?

15          A      I don't remember.  Twenty minutes maybe.

16          Q      And at different times did you -- you evaded

17    the police and then they would catch up to you essentially,

18    is that how it was working out for you?

19          A      Yes, sir.

20          Q      And then at some point you decided you were

21    running out of gas, right?

22          A      Yes, sir.

23          Q      And your choices were to pull over and wait

24    for the police to catch up to you, correct?

25          A      Correct.

JA-489

453
US V. Peters – 13–CR–316

1        Q    Or find some sort of way to get out of the
2   situation you were in, right?
3        A    My plan was to try and get enough distance to
4   find somewhere to actually ditch it, to not have it in my
5   truck whatsoever because I had been told before that if I got
6   caught, I would have some serious consequences with them.
7        Q    Okay.  Still, I mean, you're 39 years old,
8   right, at the time?
9        A    (Nodding affirmatively.)
10        Q    And you had a choice to make, right?
11        A    Yes, sir.
12        Q    And when you got to the intersection and I
13   don't know what the roads are, you decided that instead of
14   pulling over, that you would drive behind someone's house
15   over their lawn and drive into the woods, right?
16        A    It's not exactly what I planned on, but that's
17   the way it happened.
18        Q    Well, because you saw, you had an opportunity?
19        A    Saw a driveway, I tried hiding behind the
20   house in the barn.
21        Q    Because that was an opportunity for you to
22   evade the police?
23        A    Correct.
24        Q    And that was someone's house but you had to do
25   what you had to do, right?

JA-490

454

US V. Peters - 13-CR-316

1           A    Yes, sir.

2           Q    So you drove past their house, over their lawn

3    and was there anyone in the backyard or was there --

4           A    No.

5           Q    Was it a -- it was a house, though, right?

6           A    It was an old house.  I didn't even know if it

7    was vacant it was that old.

8           Q    But, again, you're high and you're running

9    from the police, right?

10          A    Yes, but I won't doing a hundred miles an hour

11   through their yard, if that's what you're getting at.

12          Q    I'm not.  I'm not.  But, in any event, that

13   was your choice to do that, right?

14          A    That was my last window that I could see.

15          Q    To get away?

16          A    Correct.

17          Q    To get out from under the responsibility of

18   what you had in the back of the truck, right?

19          A    Correct.

20          Q    So you drive behind this house, did you see

21   any people in the way of you or did anybody?

22          A    No vehicles in the yard whatsoever, no people,

23   no animals, nothing.

24          Q    Okay.  So you drove the truck into the bushes

25   and that was to conceal the truck the best you could, right?

JA-491

455

US V. Peters – 13–CR–316

1          A     Yes.

2          Q     Under the circumstances?

3          A     Yes.

4          Q     And you got out of the truck, right?

5          A     Yes, sir.

6          Q     And you locked it, right, did you hit the

7     button to lock it?

8          A     I believe I did.

9          Q     So you were thinking at least in that, you

10    know, it was a lot of stress going on but you had the

11    wherewithal to think to lock your truck before you left it,

12    right?

13         A     Yes, sir.

14         Q     And then you hid the keys somewhere, didn't

15    you?

16         A     Yes, sir.

17         Q     Because why did you do that?

18         A     Out of panic.

19         Q     Well, you did that because you --

20         A     I didn't want them on me.

21         Q     Because that's evidence that you were driving

22    the truck, right?

23         A     Right.

24         Q     But you took the time to think that through at

25    this moment, right?

JA-492

456

US V. Peters – 13–CR–316

1          A      Yes, sir.

2          Q      And you hid the keys.  Where did you hide the

3    keys?

4          A      Under a truck.

5          Q      Under a truck?

6          A      Mm–mm, yes, sir.

7          Q      The truck you drove in there or a different

8    truck?

9          A      No, different truck.

10         Q      Was it a junk truck or?

11         A      It was just an old truck parked in the field

12   where I was running through.

13         Q      So you hid the keys and you took off running

14   through the woods, right?

15         A      No, I took off running through the woods,

16   through the swamp, marsh, woods again and then I came out

17   into the field and that's where I could hear the officers and

18   I could hear a dog coming and there was cars all over the

19   place and I ran to this truck that I saw and I hid underneath

20   it and that's where I hid my keys.

21         Q      And the plan was to get to the river, you said

22   on your direct examination, right?

23         A      Yes, sir.

24         Q      And that was because, what, you heard dogs in

25   the woods?

JA-493

457

US V. Peters – 13-CR-316

1          A     Correct.

2          Q     And how far do you figure you traveled through

3    the woods in total, if you know?

4          A     I'm sure it was well over a mile, I believe.

5          Q     And then your last attempt to conceal yourself

6    was to hide under the truck?

7          A     Yes.

8          Q     You weren't running to the police to give

9    yourself up, were you?

10         A     No, sir.

11         Q     And as you were laying underneath the truck,

12   you thought to yourself what else can I do to distance myself

13   from the truck, right?

14         A     I pretty much at that point figured that I was

15   done for.  The dog was going to sniff me out, which he did.

16         Q     Isn't that at the point that you hid the keys

17   when you were underneath the truck?

18         A     Yes.

19         Q     So when you were laying under the truck you

20   didn't want to get caught with the keys because the keys

21   would connect you to the truck, right?

22         A     I didn't want to get caught, period.

23         Q     In terms of why you hid the keys, you hid the

24   keys because you didn't want to get caught with them, right?

25         A     They were still on me and I took them out when

JA-494

458

US V. Peters – 13-CR-316

1    I saw them coming, didn't want them on me.

2         Q    So you weren't connected to the truck, right?

3         A    Yes, sir.

4         Q    So you were thinking this whole time –– as

5    your options got less and less you were thinking, how do I

6    minimize my situation, right?

7         A    Thinking in a frightened way, I guess you

8    could say.

9         Q    You're frightened now, too, right?

10        A    I'm nervous.

11        Q    Now, when you were released from, when you

12   pled guilty in federal court, you were released under

13   conditions, right?

14        A    Yes, sir.

15        Q    And they were –– you were being monitored by a

16   probation officer, right?

17        A    Yes, sir.

18        Q    And you breached those conditions, didn't you?

19        A    Just recently.

20        Q    This event we talked about with the high speed

21   chase –– I'll withdraw that.

22             Now, you said earlier that you had a number of

23   situations, prior situations in Canada for tobacco smuggling,

24   right?

25        A    Yes, sir.

JA-495

459
                US V. Peters – 13–CR–316


1          Q     Now, isn't it true that you –– that Mr. Peters
2    would sell tobacco?
3          A     Yes, sir.
4          Q     And a lot of tobacco, right?
5          A     Yes, sir.
6          Q     And at one point you said, you said in your
7    grand jury testimony that he has on his property trailers
8    full of tobacco, right?
9          A     Yes, sir.
10         Q     And you've seen those, right?
11         A     Yes, sir.
12         Q     So you know that he often sells tobacco,
13   cigarettes basically, and loose tobacco sometimes, right?
14         A     Correct.
15         Q     And the sale of tobacco, as you discussed with
16   Mr. Peters in your recorded conversation, can be lucrative,
17   can't it?
18         A     (No response.)
19         Q     $290 a pound?
20         A     I'm not aware of the tobacco prices, if –– any
21   more of any of that sort.
22         Q     Okay.  Well, you were talking to him on that
23   call about tobacco, weren't you?  You heard him?
24         A     Right, correct.  He said he was moving
25   cigarettes and people were calling him for tobacco.

JA-496

460

US V. Peters - 13-CR-316

1        Q    And you used to smuggle tobacco yourself?

2        A    Right.

3        Q    And it's a lucrative trade, isn't it?

4        A    Lucrative, I'm sorry, I don't --

5        Q    Could you make money at it?

6        A    Sometimes you can and other times it can be

7 rough, rough deals, but you can make money at it, I guess.

8        Q    And on the reservation, there's tobacco,

9 people making cigarettes on the reservation, right?

10       A    Yes, sir.

11       Q    You're aware of that?

12       A    Yes, sir.

13       Q    Now, you worked with Colin Stewart, I don't

14 know, approximately two years, right?

15       A    Yes, sir.

16       Q    And you would be in pretty regular

17 communication with Colin Stewart during this two-year period?

18       A    For the most part.

19       Q    I mean, you were his main person that would

20 either block in the beginning or at the end, you were

21 essentially responsible for his shipments, right, on the U.S.

22 side?

23       A    I was the middle man.

24       Q    Well, didn't you testify in your direct that

25 all of Colin Stewart's marijuana ended up at your personal

JA-497

461

US V. Peters – 13–CR–316

1   residence?

2           A    Not all.

3           Q    The majority of it?

4           A    A lot of it.

5           Q    Okay.  So you were his main U.S. transporter,

6   is that fair to say?

7           A    I don't know how to answer that question.  I

8   guess there were other people involved in the

9   transportating -- in the transportation, so I wouldn't call

10  myself the main transporter.

11          Q    You were paying the folks that were taking

12  this marijuana down to its final destination, right?

13          A    Correct.

14          Q    Colin was giving you the money to pay them,

15  right?

16          A    Correct.

17          Q    And Colin -- all of the marijuana coming over

18  here from Colin Stewart was ending up at your house, is that

19  fair to say -- or virtually all of it?

20          A    A majority of it.

21          Q    Sir, isn't it true that Allan Peters was never

22  at that unloading and the canal and all that when you guys --

23  when you were doing this with Colin and with Corey Spinner?

24  He wasn't there.  He wasn't there unloading the marijuana and

25  talking with Colin Stewart, isn't that true?

JA-498

462

US V. Peters – 13-CR-316

1          A    No.

2          Q    But you and Corey Spinner were there majority

3    of the time, right?

4          A    (No response.)

5          Q    You and Corey Spinner would be unloading the

6    vessel, whatever it is the boat, right?

7          A    Correct.

8          Q    Colin Stewart would be helping or he'd be in

9    the boat with X-man, right?

10         A    Correct.

11         Q    And Allan Peters was never there, was he?

12         A    Yes, he was there.

13         Q    With you and Corey?

14         A    Yes.

15         Q    Okay.  Now, you wore a recorder, right, for

16   the drug enforcement agency?

17         A    Yes.

18         Q    And we've heard that call in this court,

19   right?

20         A    Yes, sir.

21         Q    Now, when you decided to call up Mr. Peters,

22   you first had to come up with an elaborate story to tell him,

23   right?

24         A    Correct.

25         Q    And you had to formulate that in your head,

JA-499

US V. Peters – 13–CR–316

1   correct?

2              A    No, because I was with Agent Hermes.

3              Q    Well, you had to convince another human being

4    of something that didn't actually exist and wasn't actually

5    true, right?

6              A    Correct.

7              Q    So you had to think about how to do that,

8    didn't you?

9              A    He was the brains.

10             Q    Who was, Agent Hermes?

11             A    Agent Hermes, it went the way he wanted it to

12   go.

13             Q    At the end of the day you still had to

14   convince another human being of something that wasn't true,

15   isn't that fair to say?

16             A    I did what I was told to do.

17             Q    So you met, you called up Mr. Peters and you

18   said meet me, right?

19             A    Yes, sir.

20             Q    And you had your story, right?

21             A    Yes, sir.

22             Q    And you relayed that to him in graph -- in

23   detail, right?

24             A    Yes, sir.

25             Q    And as we listen to the call, the majority of

JA-500

US V. Peters - 13-CR-316

1    the call is your words.  If we added up all the words,

2    probably a high percentage of the call are your words -- not

3    the call -- a high percentage of the conversation is you

4    talking to him, right?

5           A    Yes, sir, I was told to basically just be cool

6    about it and just small talk and then talk about the plan to

7    get the paperwork to Canada.

8           Q    Now, when Mr. Peters tells you that he's going

9    to drive four by four -- treated six by sixes in the ground

10   to block the canal, what did that indicate to you?

11          A    That he wanted to block the property off.

12          Q    And not let anyone into the canal?

13          A    Which canal are we talking about, though, the

14   canal that leads to where we used to bring the marijuana or

15   the canal that leads to his mother's house?

16          Q    The canal that leads to where people were

17   bringing marijuana.  That's what he was going to block off?

18          A    Okay, I understand.

19          Q    Okay.  And you, right, that's what you

20   understood him to mean?

21          A    Yes, sir.

22          Q    Okay.  And he also said he made some sort of

23   device that would trip if someone drove into the driveway of

24   the area, right, he told you that?

25          A    Yes, sir.

JA-501

465

US V. Peters – 13–CR–316


1          Q      He also told you that people were going in

2    there probably -- including you that weren't supposed to be

3    there?

4          A      He never included me.

5          Q      Didn't he?

6          A      I did not go there, if I was not supposed to

7    be there.

8          Q      And then there was a further conversation

9    about different locations in that same area where marijuana's

10   coming in, right?

11         A      Correct.

12         Q      I think one was King's and one was Chico's, is

13   that fair to say?

14         A      Yes, sir.

15         Q      And how close are those to this canal, in this

16   area that we've been talking about?

17         A      How far are they from there?

18         Q      Yeah, Chico's and King's?

19         A      Probably a few miles or more down the river.

20         Q      Down the St. Lawrence?

21         A      At least a few miles more, I would say.

22         Q      But still on the reservation, right?

23         A      Correct.

24         Q      Now, Colin, you said you're very afraid of

25   Colin, right?

JA-502

466

US V. Peters – 13-CR-316

1          A    Yes, sir.

2          Q    But you worked with him for, what is it, two

3     years or more, roughly two years?

4          A    Yes, sir.

5          Q    At any point when you were working for him and

6     were afraid of him, did you call up Mr. Hermes or any other

7     federal agent and tell them what's going on up there?

8          A    What's going on where?

9          Q    Well, did you report the criminal activity

10    that you were engaged in with Mr. Stewart?

11         A    At the time?

12         Q    Yeah.

13         A    No.  I was threatened.  I tried to get away

14    and I was threatened.  I wasn't backing away.

15         Q    Now, for these guns that were recovered in

16    Syracuse, do you recall the conversation with Mr. Peters, the

17    recorded conversation?

18         A    Yes, sir.

19         Q    Now, he knew nothing about that you and Colin

20    Stewart made a plan to go to Syracuse to pick up guns, isn't

21    that true?

22         A    I assumed he knew nothing about it when we

23    spoke to each other but I didn't know if Colin had talked to

24    him or not about it.

25         Q    But Colin contacted you to pick up the

467

US V. Peters – 13–CR–316

1  handguns, correct?

2          A    Correct.

3          Q    Do you know if he contacted Corey Spinner?

4          A    No.

5          Q    To ask him to pick up the handguns?

6          A    I don't know if he did or not.  I don't

7  believe he did.

8          Q    He contacted Alain Forget, right?

9          A    Correct.

10          Q    To do this very important task of trying to

11  smuggle handguns out of the United States, right?

12          A    Yes, sir.

13          Q    He relied on you, this was an important thing

14  to do isn't it, get these guns?

15          A    Yes, sir.

16          Q    Now, Mr. Forget, you also had to -- well, I'll

17  withdraw that.

18              Colin Stewart is higher up in this

19  organization than you are, right?

20          A    Yes.

21          Q    Is he one of the big -- big players in this

22  whole thing?

23          A    It's not somebody you'd want to meet in a dark

24  ally.

25          Q    And he's been doing it for a significant

JA-504

468

US V. Peters – 13–CR–316

1   period of time, is that fair to say?

2           A    Yes, sir.

3           Q    At least since 2008 with you, right?

4           A    Before that and he was doing it before he was

5   with me.

6           Q    So in this business you have to I guess use

7   your instincts right?

8           A    Yes, sir.

9           Q    You have to be able to read people, right?

10          A    Yes, sir.

11          Q    You have to know when you're being lied to,

12  right?

13          A    Right.

14          Q    This isn't exactly a business where there's

15  UPC codes on the product and there's a lot of control.  Once

16  the marijuana starts moving and it's in someone's hands,

17  you're at their mercy, right?

18          A    Correct.

19          Q    I mean, you could steal the marijuana, you

20  could take half the marijuana, right?

21          A    If you dare to.

22          Q    So, someone like Colin Stewart who you know

23  personally, is very except skeptical when here's a story,

24  right, you're going to have to convince him of the truth of

25  something, is that fair to say?

469

US V. Peters – 13-CR-316

1           A     I would say.

2           Q     Especially handguns, right?

3           A     Yes, sir.

4           Q     When these handguns were lost to the

5    authorities, that was a big event, wasn't it?

6           A     Yes, sir.

7           Q     Made everyone nervous, didn't it?

8           A     (No response.)

9           Q     It certainly made Colin Stewart nervous,

10   didn't it?

11          A     I'm sure it did.  There was only supposed to

12   be 10 there.  Ended up to be 16 or 17 of them and I'm sure --

13   I was -- I'm sure he was very nervous and I was -- you can

14   ask Agent Hermes -- I was, as well, petrified as I was

15   relieved to get those guns off the street.

16          Q     Why because you were afraid they might --

17          A     I'm not a killer.  I don't want people getting

18   killed over that.

19          Q     So --

20          A     They weren't going for target practicing, I

21   can tell you that.

22          Q     You were nervous that someone might be in

23   danger because an illegal handgun --

24          A     100 percent.

25          Q     -- might not fall in the right hands, is that

JA-506

470

US V. Peters – 13-CR-316

1    your testimony?

2          A    They weren't -- they weren't going in the

3    right hands of law-abiding citizens by all means.

4          Q    So, is it your position that you're against

5    handguns falling into the wrong hands, is that your general

6    position?

7          A    Yes, sir.

8          Q    And that's why you told Agent Hermes about it,

9    right?

10         A    Yes, sir.

11         Q    So, Colin Stewart, a major drug trafficker who

12   is a very dangerous man, according to you, right?

13         A    He's got pretty good connections, I can tell

14   you.

15         Q    Okay.  You have -- you had to convince him of

16   the truthfulness of this fictitious event, right?

17         A    Yes, sir.

18         Q    And you were able to do it, weren't you?

19         A    With the help of Agent Hermes.

20         Q    Your son, Matt Forget, right?

21         A    Yes, sir.

22         Q    Is it your testimony that he ultimately

23   brought you -- got you the cash?

24         A    Yes, sir.

25         Q    How old's your son?

JA-507

471

US V. Peters – 13–CR–316

1              A    28.

2              Q    And you needed him to get you the cash, right,

3    you needed --

4              A    Colin was getting it to him so I needed to get

5    it from him.

6              Q    However you had to do it, you did it.  If you

7    needed involve your son, you involved your son, right?

8    Because you needed it to get the government off your back,

9    right?

10             A    I could have maybe found another way but --

11             Q    But it was easiest to use your son, you knew

12   him, you knew he wouldn't steal it from you, right?

13             A    Right.

14             Q    How often would you see Mr. Peters -- I'll

15   withdraw that.

16                  You've testified that you saw -- you either

17   know Mr. Peters used to scout or you saw him scout, right?

18             A    I saw him.  And also when he was down on the

19   property, he would basically tell Colin I'm going to go out

20   and check things out for you or Colin would ask, could you go

21   ahead a little bit and make sure everything's good for us.

22             Q    Well, earlier you testified that you would

23   either have small talk or any time you would hear him talking

24   to Colin, you would back away and didn't hear anything they

25   were saying?

JA-508

472

US V. Peters – 13–CR–316

1          A      Correct.

2          Q      And now you're saying you overheard these

3    conversations?

4          A      No, they were basically right in front of us,

5    as we were all getting ready to leave.  And you --

6          Q      Was Corey Spinner there for the majority of

7    these conversations?

8          A      He was there at times.  I mean, there was --

9          Q      Well, he --

10         A      There was some times that he wasn't there, as

11   well.

12         Q      He was your right-hand man, right, you brought

13   him in?

14         A      (No response.)

15         Q      You testified earlier that he would be there

16   the majority of the time and he started almost in the

17   beginning with you, right?

18         A      He was there.

19         Q      Sir, isn't it true that Mr. Peters did not

20   drive or block?

21         A      (No response.)

22         Q      He was not a blocker or a scout for any of

23   this marijuana smuggling?

24         A      He did scout.

25         Q      You have any dates for that or any particular

JA-509

473

US V. Peters – 13–CR–316

1    events or anything like that?

2            A    Do you honestly think that I wrote this down

3    in an agenda?

4            Q    I didn't think you wrote it down, sir, but you

5    have a good memory, don't you?

6            A    Of certain things, yes.

7            Q    Things that will benefit you, right?

8            A    Not necessarily.

9            Q    You told us one story about -- I'm sorry.  You

10   testified on direct examination that you -- that someone was

11   coming back with a million dollars, you believe, right?

12           A    Yes, sir.

13           Q    Cash.  And that you were blocking for them,

14   right?

15           A    Yes, sir.

16           Q    All right.  And let's just go back to the role

17   of a blocker for a minute, okay.  A blocker is supposed to go

18   out in advance, right?

19           A    Correct.

20           Q    And, in fact, you call it a scout, don't you?

21           A    A blocker, scout, however you want to call it.

22           Q    And a scout is a term that means scout ahead,

23   right?

24           A    Correct.

25           Q    Look, be my eyes and ears, right?

JA-510

474

US V. Peters – 13-CR-316

1          A     Yes, sir.

2          Q     Now, it was your testimony on your direct

3   examination that you were scouting for someone that had a

4   million dollars in cash in their car, right?

5          A     Yes, sir.

6          Q     And that you were coming up the Thruway, I-87,

7   I believe, right?

8          A     Yes, sir.

9          Q     And that you look over, did you look out your

10  driver's side window and see the police officer?

11         A     I mean, I was behind the truck from a distance

12  so I -- I noticed him.

13         Q     Behind what truck?

14         A     Behind Jack.

15         Q     You were scouting from behind?

16         A     Yes, that's where he wanted me.

17         Q     So that's not really scouting then?

18         A     Yes, it is.  If he takes off after the guy in

19  front of me, I can make sure he's going to pull me over, if

20  it means ditching my truck off in the woods causing an

21  accident for myself.

22         Q     Is that something that you would do?

23         A     That's what I was told to do and you would do

24  what they tell you to do.

25         Q     Cause an accident?

JA-511

475

                    US V. Peters – 13-CR-316

1          A     On my own part, not anyone else's harm.  Throw

2   myself off the road in a ditch, whatever it took to get the

3   attention off the guy in front of me.

4          Q     So you were scouting from behind in this

5   instance?

6          A     That's where Jacques wanted me.

7          Q     So Jacques having a million dollars of cash in

8   his car and had no idea if there was a roadblock ahead of

9   him, is that your testimony?

10         A     There was never roadblocks going north.

11         Q     Or police activity, anything like that?

12         A     He wasn't so much worried about that.  Going

13  north everybody was just more relaxed than anything.

14         Q     And the reason you put yourself behind him --

15  well, in any event -- and you were right behind him so there

16  was -- right?

17         A     I was behind within a reasonable distance by

18  law.

19         Q     Well, on your direct examination you testified

20  that you actually saw the trooper eyeballing Jack, you

21  remember that?

22         A     Yes, sir.

23         Q     At what point did you see him eyeballing jack?

24         A     When his wheels of his car kind of turned to

25  the left and he's -- he's ready to go and you could see him.

JA-512

476

US V. Peters – 13-CR-316

1    I could see his –– his face looking at the truck.  The truck

2    caught his attention.  If I would have been in front of the

3    truck, I would have been having to get myself pulled over but

4    would he have pulled me over, he might have pulled Jack over.

5            Q    Okay.  Well, so in any event, you took action,

6    right?

7            A    I did.

8            Q    And you swerved erratically?

9            A    Not erratically.  I just came over the line,

10   which is all an officer needs for probable cause to pull you

11   over, and I looked right at him and I rolled my window up

12   really quick and they were tinted black.

13           Q    So you used that because you were manipulating

14   the officer in that instance, right, you were tricking him

15   into believing that you were doing something that you

16   weren't, right?

17           A    Correct.

18           Q    And when was that, how long ago was that?

19           A    There again, I don't have an exact date but

20   that's when Jacques was driving the trucks and they had given

21   out trucks at one point in time and Jacques wasn't coming

22   over as much.

23           Q    So when you, after you –– and you were

24   successful, right, a trained police officer, you tricked him

25   into pulling you over, right?

JA-513

477

US V. Peters – 13–CR–316

1          A     Yes, sir.

2          Q     And did he give you a ticket?

3          A     No, sir.

4          Q     He let you go after all that?

5          A     Yes, sir.

6          Q     And was Jack able to scoot on by and get out

7    of there?

8          A     Jack was ahead of me.  He just kept on sailing

9    down the road as he was.

10          Q     You saved the day, right?

11          A     Yes, sir.

12          Q     Mr. Forget, you will say anything you have to

13   to protect your own interests, won't you?

14          A     I will answer what you ask me to answer in a

15   truthful way.

16          Q     As long as it helps you, right?

17          A     There's no help for me at this point.  You've

18   read my rejection from the probation.  It doesn't matter.

19          Q     Were you arrested on December 27th?

20          A     Yes, sir.

21          Q     Is that a separate case from this one or is

22   that the same case?

23          A     I decline to answer that question.

24          MR. SACCO:  Your Honor, I have no further

25   questions.

JA-514

478

US V. Peters - 13-CR-316

1    THE COURT:  Okay.  Mr. Gardner, are you going to

2  have anything further?

3    MR. GARDNER:  Can I just have one moment, your

4  Honor.

5    THE COURT:  Sure.

6    (Discussion held off the record.)

7    MR. GARDNER:  No further questions, your Honor.

8    THE COURT:  Okay.  Ladies and gentlemen, I'm going

9  to let you go to lunch.  It's 12:13.  So, if you want to be

10  back -- I'm going to be very generous again -- I'm going to

11  give you 1:15.  It just turned to 12:14 on my little thing

12  here, so.

13    Please don't talk about the case.  If anybody

14  approaches you, tries to talk to you about this case, I need

15  to know about it immediately.

16    Enjoy your lunch.  We'll see you at 1:15.

17    (Jury excused, 12:14 p.m.)

18    THE COURT:  All set.  You can step down, sir.

19    (Witness excused, 12:15 p.m.)

20    THE COURT:  Mr. Gardner, do you have an idea of

21  witnesses for the rest of the day here?

22    MR. GARDNER:  Your Honor, I think the government

23  will just have Ms. Lobdell and then it's likely the

24  government would rest.

25    THE COURT:  Okay.  Just so you can --

JA-515

479

US V. Peters – 13-CR-316

1    MR. SACCO:  Over the lunch break we're going to

2    strategize, Judge, and I'll let you know.

3        THE COURT:  That's why I'm asking him because I

4    want you to be prepared to do what you have to do to be

5    ready, should you decide you want to go forward with

6    something this afternoon.

7        MR. SACCO:  In the event, Judge -- maybe something

8    to think about over lunch -- when they close, I'll make my

9    Rule 29 and, then -- I know the jury has to go out for that,

10   but if we're not going to do much, I don't know if it makes

11   sense -- how do you want me to rest in what order?  I'm going

12   to make my Rule 29 and then, if I'm not going to put on a

13   case, let's say, whether we want to bring them back for me to

14   rest or how you want to handle it.

15       THE COURT:  Oh, we'll handle that.  It's not a big

16   deal.  We'll figure that out.  Don't worry about that.

17       MR. SACCO:  Okay.

18       THE COURT:  You just consult with Mr. Peters and

19   decide what you want to do and we'll go from there.

20       MR. SACCO:  Yeah.

21       THE COURT:  Depending on what happens, I think we

22   can anticipate maybe doing a charge conference at the end of

23   the day so that we can be prepared for tomorrow.  We'll see

24   what time it is.  But I think I'll give you overnight to

25   prepare for your summations and get ready, depending on where

480

US V. Peters – 13-CR-316

1   we are.

2              MR. SACCO:  Okay, thank you, sir.

3              THE COURT:  Enjoy your lunch.

4              THE CLERK:  Court's in recess.

5              (Lunch recess taken, 12:15 p.m.)

6              (Open court, 1:15 p.m.)

7              THE COURT:  Okay, Counsel, we're all set, ready to

8   go?

9              MR. GARDNER:  We are, your Honor.

10             MR. SACCO:  Yes, your Honor.

11             THE COURT:  Bring the jury in, please.

12             (Jury present, 1:15 p.m.)

13             THE COURT:  The record should reflect we have all

14  the ladies and gentlemen of the jury.  Hope you enjoyed your

15  lunch.

16             Mr. Gardner, you're calling your next witness?

17             MR. GARDNER:  Yes, your Honor, the government calls

18  Cheryl Lobdell.

19

20                  CHERYL LOBDELL, called as a witness and

21  being duly sworn, testifies as follows:

22  DIRECT EXAMINATION BY MR. GARDNER:

23             Q    Good afternoon, Ms. Lobdell.

24                  Can you please state your full name.

25             A    Cheryl Lobdell.

481

Lobdell – Direct – Gardner

1    Q    And, Ms. Lobdell, how old are you?

2    A    Forty-seven.

3    Q    And prior to your incarceration, what was the

4    city and state of your residence?

5    A    Chateaugay, New York.

6    Q    How long have you lived in Chateaugay?

7    A    Over 12 years, basically my whole life.  I

8    just took ten years and lived in Canada.

9    Q    When was that ten-year period?

10   A    From '86 until around '96.

11   Q    And prior to '86 you lived in Chateaugay?

12   A    Yes, I did.

13   Q    Prior to your incarceration, were you

14   employed?

15   A    No, I was not.

16   Q    What did you do for money?

17   A    I'm disabled.

18   Q    Did you receive some kind of disability?

19   A    Disability SSI.

20   Q    And what's your educational background?

21   A    High school graduate.

22   Q    Do you have a history of drug and alcohol

23   abuse?

24   A    Yes, I do.

25   Q    I should have said drug or -- which one is it?

482

Lobdell – Direct – Gardner

1    A    Both.

2    Q    Both?

3    A    Alcohol and drug.

4    Q    Can you describe that for the jury, please?

5    A    Well, I started drinking when I was 10 years

6  old and I continued drinking throughout my life and then I

7  got into cocaine in my 20s and I battled with that most of my

8  adult life.  I have been clean now since June 25th, 2012.

9    Q    And is cocaine your drug of choice?

10    A    Yes, it is.

11    Q    Did you abuse any other drugs, other than

12  cocaine?

13    A    No.  Well, I tried marijuana once in high

14  school and I tried acid, nothing -- cocaine was the only.

15    Q    Would you say that -- I assume because you

16  felt like -- let me rephrase that.

17         How much do you use cocaine?

18    A    There was part of my life where I was using it

19  just about every day just to cope with every day living, 'cuz

20  I didn't know any other way to deal with anything.  So, I

21  turned to the cocaine and the alcohol.

22    Q    And when was that?  Is that in your 20s?  Was

23  that more recently?

24    A    Throughout my life.

25    Q    Ms. Lobdell, did you plead guilty to an

JA-519

483

Lobdell – Direct – Gardner

1    offense against the United States?

2              A    Yes, I did.

3              Q    And we'll get into the details of what you did

4    but can you generally state what you did.

5              A    Yes.  I was picking up marijuana at the point

6    A and drop it off at point B.

7              Q    And do you remember what specific crime you

8    pled guilty to?

9              A    Conspiracy to traffic and distribute.

10             Q    Marijuana?

11             A    Marijuana.

12             Q    More than a hundred kilograms of marijuana?

13             A    Yes.

14             Q    And did you enter into a plea agreement with

15   the government?

16             A    Yes, I did.

17             Q    At the time that you pled guilty, did you also

18   enter into a cooperation agreement?

19             A    Yes, I did.

20             Q    Do you recall what your understanding of the

21   cooperation agreement was?

22             A    That I would cooperate in any way that I could

23   of anything that I did know or had any idea of, to come forth

24   and tell the truth on it.

25             Q    And did you hope to or expect to receive some

484

Lobdell – Direct – Gardner

1   kind of benefit for your cooperation with the government?

2          A    I did but I didn't know what.

3          Q    Is it fair to say you hoped to receive a

4   lesser sentence --

5          A    Yes.

6          Q    -- at some point?

7          A    Because I was planning on not going to prison.

8          Q    After you pled guilty, were you released on

9   conditions?

10          A    Yes.

11          Q    Meaning the Court set a list of conditions

12   that you had to abide by while you remained out of custody?

13          A    Yes.

14          Q    And at some point did you violate those

15   conditions?

16          A    Yes, I did.

17          Q    Can you describe what you did?

18          A    I was back using cocaine.

19          Q    So at some point you tested positive for

20   cocaine?

21          A    Yes, I did.

22          Q    Was it on more than one occasion?

23          A    Yes, it was.

24          Q    And at some point did you have a diluted urine

25   sample?

JA-521

485

Lobdell – Direct – Gardner

1          A     Yes, I did.

2          Q     Do you recall how you tried to -- how you did

3    dilute that sample?

4          A     Yes, I drank -- that was over 64 ounces of

5    Gatorade®.

6          Q     Ms. Lobdell, have you been sentenced?

7          A     Yes, I have.

8          Q     And do you recall what your sentence was?

9          A     Thirty-three months, six months halfway house,

10   four years probation after.

11         Q     And are you in the process of serving that

12   sentence right now?

13         A     Yes, I am.

14         Q     Do you recall approximately when you were

15   sentenced?

16         A     June -- January 10th, 2013.

17         Q     So just a little over a year ago?

18         A     Yes, sir.

19         Q     At the time of sentencing did the government

20   make a recommendation to the judge to have your sentence

21   reduced?

22         A     Yes.

23         Q     And, as far as you know, did the Court take

24   that into consideration when you were sentenced?

25         A     Yes, I believe so.

486

Lobdell – Direct – Gardner

1       Q      At the time, what were the maximum penalties
2  you were facing?
3       A      I do not know myself.
4       Q      Did you have a mandatory minimum sentence of
5  five years?
6       A      Yes, I do believe so.
7       Q      So you were sentenced below that mandatory
8  minimum?
9       A      Yes.
10      Q      And, as far as you know, were you sentenced
11 below the mandatory minimum because of the government's
12 recommendation?
13      A      I believe so, yes.
14      Q      In 2006 were you convicted of grand larceny
15 and falsifying business records?
16      A      Yes, I was.
17      Q      Where was that charge?
18      A      Chateaugay, New York.  Kulja Food Mart.
19      Q      And do you recall what the sentence was?
20      A      Five years probation.
21      Q      Did you have to pay a fine or restitution?
22      A      I paid restitution back.
23      Q      At this point in time, Ms. Lobdell, do you
24 expect to receive any additional benefits from your
25 cooperation?

JA-523

487

Lobdell – Direct – Gardner

1      A    No.

2      Q    Do you expect that your sentence will be

3  reduced any further?

4      A    No.

5      Q    Ms. Lobdell, what did you do to prepare for

6  your testimony here today?

7      A    I met with you twice.  You just asked me a

8  couple questions and I just answered them and that was it.

9      Q    And did you review your grand jury testimony?

10     A    Yes, I did.

11     Q    Ms. Lobdell, you indicated that you pled

12  guilty to being involved in a drug conspiracy, correct?

13     A    Yes.

14     Q    Approximately when did you first become

15  involved in this drug conspiracy?

16     A    Back in the '90s.

17     Q    Do you remember, mid-'90s, early '90s?

18     A    Early '90s.

19     Q    And can you describe for the jury how that

20  came about, how you became involved in the conspiracy?

21     A    I had met a gentleman and we started dating

22  and I was working at a bar that was owned by one of his

23  friends and he was running marijuana and asked me to go

24  ahead, be like a scout, a runner up ahead to let them know if

25  there was any police up ahead or any roadblocks.

JA-524

488

                    Lobdell – Direct – Gardner


1          Q    I want to talk about that in a little bit more

2   detail.  Who was this individual?

3          A    Roger St. Onge.

4          Q    And you said you had a romantic relationship

5   with Mr. St. Onge?

6          A    Yes, I did.

7          Q    And you mentioned that you were living in

8   Canada at this time, right?

9          A    Yes, I was.

10         Q    Where exactly in Canada?

11         A    Around like Huntington/Saint-Anicet area.

12         Q    Where is that in relationship to the Akwasasne

13  Mohawk Indian reservation?

14         A    Saint-Anicet is approximately maybe a half

15  hour from the -- going by boat from the reservation.

16         Q    So is it on the north side of the St.

17  Lawrence?

18         A    No, it is on the south side.

19         Q    Okay.  And were you working at that time?

20         A    Yes, I was.

21         Q    Where were you working?

22         A    Pourvoirie Bernard Hart.

23         Q    And what is that?

24         A    It's a bar.  They have like the bar.  They

25  also have minnows for fishing.  They rent out boats for

JA-525

489

Lobdell – Direct – Gardner

1   fishing.

2            Q    Do you know, I'm sorry.  I'm jumping ahead.

3   What was your job at that bar?

4            A    Barmaid.

5            Q    You were a bartender, you served drinks?

6            A    Yes.

7            Q    Do you know who owned the bar?

8            A    Claude Marchand and Clement Chalboise.

9            Q    Did your boyfriend, Roger St. Onge, did he

10  have any relationship with Claude Marchand?

11           A    They were friends and he worked for Claude.

12           Q    Worked for Claude in what way?

13           A    Whatever was asked of him he did, I guess.

14           Q    Well, you mentioned that Roger St. Onge was

15  involved in marijuana trafficking I believe?

16           A    Yes.

17           Q    Did Claude and Roger work together in that

18  business?

19           A    Yes.

20           Q    You said Roger worked for Claude?

21           A    Yes.

22           Q    Now, before we get into the details of how you

23  became involved with the drug conspiracy, do you know the

24  defendant in this case, Mr. Allan Peters?

25           A    Yes, I do.

JA-526

490

Lobdell – Direct – Gardner

1        Q      And approximately how long have you known

2   Mr. Peters?

3        A      Since the early '90s.

4        Q      Did you ever see him at that bar?

5        A      Yes.

6        Q      And do you know him as Allan Peters or do you

7   know him by any other name?

8        A      Allan Peters and also Hiio.

9        Q      Hiio.  Do you know of any nickname that the

10  defendant has gone by or that people refer to him as?

11       A      Um, he had one that was in my phone, The Big

12  Guy.

13       Q      So you stated that at some point Roger St.

14  Onge approached you and asked you to work; is that correct?

15       A      Yes.

16       Q      And I think you said work as a scout?

17       A      Yes.

18       Q      Can you describe that conversation a little

19  bit, how did that happen?

20       A      Basically just sitting at home -- I can't

21  remember exactly if it was at home or at the bar and he was

22  going on a run and informed me that I would go up ahead and

23  what road I had to take and where I had to call from.

24       Q      Were you surprised when Roger St. Onge asked

25  you to do this?

491

Lobdell – Direct – Gardner

1          A    Yes.

2          Q    How come?

3          A    Because I -- I was still new to everybody in

4 the area, and not comfortable.

5          Q    Did you know that St. Onge and Marchand were

6 involved in drug smuggling?

7          A    Yes.

8          Q    How did you know that?

9          A    From the talk sitting at the table with them.

10         Q    They would talk about it?

11         A    Yes.

12         Q    And I know you indicated a little bit earlier

13 but what time frame are we talking about?

14         A    Early '90s.

15         Q    Early '90s.  So, did either St. Onge or

16 Marchand talk to you about what you would have to do, what it

17 means to be a scout, what routes to take, things like that?

18         A    Yes.

19         Q    Can you describe what they told you?

20         A    Yes, Roger had me go one time with him and he

21 explained exactly what road I had to take, going down 87 and

22 then going 9, Route 22, go down as far as Ticonderoga or Lake

23 George to make sure you bypass 87.  There was checkpoints.

24         Q    And did they describe where you would be

25 scouting from, where your start point was?

JA-528

492

Lobdell – Direct – Gardner

1          A     Yes.

2          Q     And where was that?

3          A     We started on the reservation.

4          Q     Any particular place on the reservation?

5          A     At the beginning it was just on 37 and then we

6     went down to Hiio's mother's place.

7          Q     The defendant's mother's property?

8          A     Yes.

9          Q     Ms. Lobdell, can you go ahead and look on the

10    monitor and look at Government Exhibit 3.

11         A     Yes.

12         Q     And let me know if you recognize that.

13         A     Yes, I do.

14         Q     Do you recognize the area that's being

15    depicted in Government Exhibit 3?

16         A     Yes, I do.

17         Q     What is it?

18         A     It's the route -- like Route 37 is where I

19    come to and then I connect to come out on the reservation or

20    I go in and you go down on 43 to go right in to go along the

21    Snye and to Hiio's mother's place where the canal is that we

22    would go to get loaded.

23         Q     Do you see there's a pen right up there?

24         A     Yep.

25         Q     If you can go ahead and first indicate where

JA-529

493

Lobdell – Direct – Gardner

1    the defendant's mother's residence is.

2            A    Over here.  (Marking exhibit.)

3            Q    You mentioned you took a particular route to

4    get there.  Can you go ahead and use that pen and show us

5    what route you took to get there?

6            A    There's a couple different ways.  At the

7    beginning we would just go along the Snye and then out like

8    this.  Back to 37.

9            Q    We can clear that.  Hold on one second.

10           Go ahead.

11           A    Then you could also go down, come up, and go

12   like this and this here you could either go this way or you

13   could go down like this, back to 37, or you can go back this

14   way and come out here.  So you have a couple different

15   routes.

16           Q    Are these the routes that Roger St. Onge and

17   Marchand explained to you?

18           A    They started -- they always went the other way

19   and then I was told about these afterwards.

20           Q    When you were scouting, was there a lot of

21   variation between one trip to or another or were they all

22   pretty similar?

23           A    They were all about the same.

24           Q    Let's talk just about, I guess, an average or

25   a typical scouting trip.  What would you do or how would you

JA-530

494

Lobdell – Direct – Gardner

1  know that Marchand or St. Onge wanted you to scout?

2          A    They would just call and say, well, we're

3  going to head out today to go shopping or do something.

4          Q    They would say we're going to go out shopping?

5          A    Yeah, if I wanted to go shopping.

6          Q    What did that mean to you?

7          A    To me that I was going out scouting for the

8  day.

9          Q    Is that like a code word?

10          A    Yes.

11          Q    And if they told you that you were going to go

12  shopping, would they say that day or the next day?

13          A    It would depend.  It usually would be next

14  day, the next morning.

15          Q    Would they give you a specific time?

16          A    Yes, they would.

17          Q    And would they tell you where that you would

18  start scouting from, would they tell you where to meet?

19          A    Yes.  At the beginning.

20          Q    And where was that location?

21          A    It started off at Hiio's mother's place.

22          Q    So what would happen when you would arrive at

23  the defendant's mother's residence?

24          A    When I went there a couple times for him, I

25  would sit at the corner by a gate.

JA-531

495

Lobdell – Direct – Gardner

1      Q      Looking back at Government Exhibit 3, do you
2    think you could show us where that gate is?
3           A      It's right about right there.
4           Q      Right near that dogleg?
5           A      Yes.
6           Q      Why would you wait by the gate?
7           A      That's where I was told to wait and then I
8    would get notified somehow, either somebody would drive by
9    and like wave and say, okay, go, or.
10          Q      Who would drive by?
11          A      Hiio did a couple times.
12          Q      Anybody else?
13          A      No, they call on the phone and just text over
14   and say take off.
15          Q      So either the defendant would drive by and
16   tell you to go --
17          A      Mm-mm.
18          Q      -- or --
19          A      Get a text or phone call to say take off.
20          Q      From St. Onge or Marchand?
21          A      Yes.
22          Q      You mentioned that gate there.  Was that gate
23   ever locked?
24          A      Yes, it was one time I remember.
25          Q      What did you do?

496

Lobdell – Direct – Gardner


1          A     I called Roger and said that the gate's
2     locked, I can't go up there and he says, hang on, he says,
3     I'll get a hold of Hiio and then you can go back.
4          Q     Now at that location when you're at that gate,
5     can you see the defendant's mother's property?
6          A     Not from the gate, no, you cannot.
7          Q     Did you see how the marijuana was coming down
8     to the property at that time?
9          A     I would just see when I'd go and back up to --
10    there's a little canal that I would go to and they'd bring it
11    in either on boats in the summertime or snow sleds in the
12    wintertime.
13         Q     Is that in the future or was that when you
14    first started and you were just scouting?
15         A     Oh, in the future.
16         Q     All right.
17         A     When I first scouted, no, I did not.
18         Q     And before I forget, you referred to this area
19    as the defendant's mother's property.  Why did you think it
20    was defendant's mother's property?
21         A     That's what I was told.
22         Q     Who told you that?
23         A     That's what Hiio said.  That's what Roger had
24    said.
25         Q     The --

497

Lobdell – Direct – Gardner

1      A     It was my mother's ––

2      Q     –– the defendant told you ––

3      A     –– house.  It's at the end of the Snye.

4      Q     And when you were first scouting and waiting

5   at the gate here, who was driving the load vehicle, the

6   vehicle with the marijuana in it?

7      A     Roger St. Onge.

8      Q     How did you know there was marijuana in the

9   vehicle?

10     A     Because he told me.

11     Q     St. Onge did?

12     A     Yes.

13     Q     Was St. Onge pretty open when he had

14  conversations with you?

15     A     Yes, with me, not over a phone or anything but

16  direct.

17     Q     Face to face?

18     A     Yes.

19     Q     So once you got the signal, either from the

20  defendant or from Marchand or St. Onge to go ahead, what

21  would you do?

22     A     I would take off.  When I leave the res and I

23  go down 37 to Malone and then I'd stop and phone back, let

24  them know the coast was clear.  And from Malone, I'd take off

25  to Plattsburgh and I'd phone again and I say, okay, continue

498

Lobdell – Direct – Gardner

1   on.  And Plattsburgh, I'd go down a little farther to –– I
2   can't remember the little towns in between but I had to stop
3   every so often to get to a phone and call them.
4           Q    Who would you call?
5           A    Roger St. Onge.
6           Q    Did you always call from those particular
7   points that you just mentioned?
8           A    Yes.
9           Q    Why is that?
10          A    Just to doublecheck to make sure there is no
11  roadblocks or anything like that.
12          Q    I guess my question was more:  Why did you
13  call from those particular locations?
14          A    I was told.
15          Q    Okay.  That's what I'm asking.  Who told you
16  that?
17          A    Roger St. Onge.
18          Q    How far would you go down Interstate 87?
19          A    Either Ticonderoga or down to Lake George.
20          Q    Why would you turn around at that point?
21          A    Because after that, they figured there'd be no
22  roadblocks or anything up –– that's as far as they needed a
23  scout was down to there.
24          Q    Was there a roadblock or a checkpoint that
25  they were worried about?

499

Lobdell – Direct – Gardner


1          A    Yes, High Peaks.

2          Q    The High Peaks checkpoint?

3          A    Yes.

4          Q    Are you familiar with that checkpoint?

5          A    Yes.

6          Q    We'll talk about that in a minute.

7               In that time period in the early '90s,

8    mid-'90s, how often would you work as a scout?

9          A    It depended.  I didn't go, you know, a lot.  A

10   few times a year I'd go.

11         Q    By a few times a year, you mean three, four

12   times?

13         A    Yes.

14         Q    At some point did you start transporting loads

15   of marijuana yourself?

16         A    Yes.

17         Q    Can you describe to the jury how that -- how

18   that happened?

19         A    It was around 2000, when I was first

20   approached about it and Roger St. Onge had picked me up and

21   had me ride with him and he said, oh, it's time that you can

22   take over and do it.  And so I rode with him in like the lead

23   vehicle with the loaded vehicle until we got down to Glens

24   Falls and then he says, next time I call, I'll have you --

25   you can start doing it and then he says, I don't have to come

JA-536

500

                    Lobdell – Direct – Gardner

1  down to the states any more.

2          Q      So he rode with you one time?

3          A      Yes.

4          Q      And showed you where to go kind of thing?

5          A      Just showed me the route to go down.  He made

6  the delivery himself, but he took me as far as, like, Lake

7  George and then I got in with somebody else and they brought

8  me back home.

9          Q      And I should have asked you just a moment ago.

10  When you were scouting, were you being paid?

11         A      Yes.

12         Q      And how much would you get paid?

13         A      $500.

14         Q      Per trip?

15         A      Yes.

16         Q      And when you started to transport loads

17  yourself, did that pay increase at all?

18         A      Yes.

19         Q      To what?

20         A      2500.

21         Q      Was that a flat rate?

22         A      Yes, it was going to be 5,000 but I never got

23  5,000.  It was only 2500 that I would get.

24         Q      And you mentioned that Roger didn't want to

25  come into the states any more, why is that?

JA-537

501

Lobdell – Direct – Gardner

1      A    He didn't like it.  And the only way he could

2  come into the states was through Snye because he can not

3  drive through the border.

4      Q    Why is that, he had some --

5      A    I -- there is something.  I don't know if

6  there was a charge or what, but he wasn't allowed in the

7  states.

8      Q    In the year 2000 when you started to take over

9  these trips, were you and Roger still in a romantic

10  relationship?

11      A    Off and on.

12      Q    Were there times during this period that you

13  didn't work much?

14      A    Yes.

15      Q    Do you remember those time periods?

16      A    Right after I first started up until around

17  2005 I started back in again.  We only did a couple loads

18  from that time.

19      Q    You mean from the early '90s up until 2005?

20      A    Yes.

21      Q    Is that what you mean?

22      A    (Witness nodding.)

23      Q    Okay.  Is it fair to say that the work was

24  sporadic during that time period?

25      A    Yes, it was.

502

Lobdell – Direct – Gardner

1     Q     What happened in 2005?

2     A     They asked me to go back to work.

3     Q     Who asked?

4     A     Roger St. Onge called first.

5     Q     Now, do you know an individual named Colin

6  Stewart?

7     A     Yes, I do.

8     Q     And who is Colin Stewart?

9     A     He approached me also to work for him, him and

10  Stefan.

11     Q     Ms. Lobdell, can you go ahead and look at

12  Government Exhibit 20 and let me know if you recognize that

13  individual.

14     A     Yes, that is Colin Stewart.

15     Q     And you mentioned Colin and another person

16  approached you.  Who was the other person?

17     A     Stefan Trepanier.

18     Q     Ms. Lobdell, can you look at Government

19  Exhibit 24 and let me know if you recognize that individual.

20     A     Yes, that is Stefan.

21     Q     So what happened when Colin and Stefan

22  approached you?

23     A     I started running for them.  They would just

24  call and tell me what time to be at Hiio's and I'd go, back

25  up, they'd load, they'd give me a number or --

JA-539

503

Lobdell – Direct – Gardner

1          Q     Let me slow you down just a little bit.

2                So, was there a relationship between Colin and

3    Stefan and St. Onge and Marchand?

4          A     They were all friends and Stefan was like

5    Claude's son because, like, Claude had raised him but he

6    wasn't his real father.

7          Q     Who was his real father?

8          A     Jacques Trepanier.

9          Q     So they were friends and associates.  Were

10   they working together in the marijuana business?

11         A     Yes, because they would be at the bar together

12   and they would talk.

13         Q     Because you indicated that Marchand and

14   St. Onge approached you and then you indicated that Colin and

15   Stefan had approached you?

16         A     Yes, because it was okay to work for them

17   through Roger.  I always had to get the okay through Roger.

18         Q     And did you get the okay?

19         A     Yes.

20         Q     In 2005 were you still in a romantic

21   relationship with St. Onge?

22         A     Not really.  We still talked and, you know,

23   talked once about getting together again, but we were just

24   always friends after.

25         Q     So what was Colin Stewart's role in this

504

Lobdell – Direct – Gardner

1    organization?

2              A    For me, he was setting up bringing the

3    product, you know, the marijuana over and telling me where to

4    go.

5              Q    And what about Stefan?

6              A    He was the same.

7              Q    Did Stefan and Colin work with any other

8    people?  You've mentioned Jacques?

9              A    Yes.  He would be there at times and they'd

10   load up the vehicle and Jacques would drive it also.

11             Q    Let's talk about that.  When Colin and Stefan

12   asked you to work, did they want you to work as a scout or

13   work transporting the load vehicle?

14             A    Transporting.

15             Q    And, again, when you were transporting the

16   loads for Colin and Stefan, was it a -- was there a lot of

17   variation between one trip to the next?

18             A    No, they were all basically around the same

19   size until later on and then this changed to a larger size.

20             Q    I didn't phrase that question very well.  Was

21   there a lot of difference between the events of what would

22   happen --

23             A    No.

24             Q    -- from one trip to the next?

25             A    No.

JA-541

505

Lobdell – Direct – Gardner

1       Q      Typically if Colin and Stefan wanted you to
2  transport a load, how would they let you know?
3       A      They would just text me.
4       Q      What would they text you?
5       A      Just text and just let me, you know, if I
6  wanted to meet in the morning or something and I'd say yes.
7       Q      I'm sorry, say that one more.
8       A      They'd ask if I wanted to meet in the morning
9  and I'd say yes and then they'd have a time and they'd show
10  up.
11       Q      Would they give you a hard time for when you
12  were supposed to show up?
13       A      If I didn't, yes.
14       Q      Okay.
15       A      But I made sure I'd be there.
16       Q      Would they tell you where they wanted you to
17  meet?
18       A      I just -- no, because I knew with Stefan
19  calling, I'd just go to Hiio's mother's place.  I'd just go
20  right there.
21       Q      So what would happen when you would arrive at
22  Hiio's mother's place -- the defendant's mother's place,
23  excuse me?
24       A      I'd pull up.  I'd go along the canal and I'd
25  back up and I'd sit there with the car.  Sometimes they'd

JA-542

506

Lobdell – Direct – Gardner

1    already be there and other times they would pull in and I
2    would just sit and they would load it up.
3              Q    Sorry.  I want to slow you down just a little
4    bit.
5              We're looking at Government Exhibit 4.  Do you
6    recognize this area?
7              A    Yes.
8              Q    And what is it?
9              A    This is at the end of the Snye, Hiio's
10   mother's place up here in the square.
11             Q    In the black square?
12             A    Yes.
13             Q    And now you just were describing how you would
14   meet Colin and Stefan, correct?
15             A    Yes.
16             Q    Where would that meeting take place?
17             A    That would be on the canal right here.
18             Q    And how would Stefan and Colin arrive at that
19   location?
20             A    Either by boat or by snow sled, depending on
21   the time of year it was.
22             Q    In the winter was it accessible by a
23   snowmobile?
24             A    Yes, when the river had froze.
25             Q    And who would be on the boat or the

507

Lobdell – Direct – Gardner

1  snowmobile?

2        A    You'd have Colin, Stefan, once in a while

3  Roger showed up, Marchand showed up.  There would be a couple

4  of other guys but I did not know them.

5        Q    You didn't know everybody that was involved?

6        A    No, I did not.

7        Q    You mentioned that sometimes when you would

8  arrive at this location, they would already be there --

9        A    Yes.

10        Q    -- and sometimes they wouldn't?

11        A    Yes.

12        Q    If they weren't there already, what would you

13  do?

14        A    I'd just sit there and wait.

15        Q    What would happen when Colin and whoever

16  showed up on the boat with the load of marijuana?

17        A    They'd get out and they'd load up the vehicle.

18  Hiio would show up and they would talk.

19        Q    Who would talk?

20        A    Hiio, Stefan.

21        Q    And what would --

22        A    Colin.

23        Q    What would Colin and Stefan and the defendant

24  talk about?

25        A    They'd talk about the day.  They would talk

JA-544

508

Lobdell – Direct – Gardner

1   about other things that they had going on of helping each

2   other out.  Sometimes they'd ask to exchange money for them.

3          Q    All right.  Well, let's talk about all those

4   things.

5               You said that they would talk about what was

6   going on that day, is that what you said?

7          A    Yes.

8          Q    What do you mean by that?

9          A    Well, if at times if we'd come back or not.

10  Sometimes when we would leave, we may have to return back

11  through his mother's place, if we had to bring cash back.  So

12  they would let him know if somebody would be coming back

13  through or not and just if there's other people coming

14  through or if they're coming in the next day or two again.

15         Q    Why would Stefan and Colin tell the defendant

16  about this?

17         A    Myself, I just assumed because he was checking

18  everything that was coming through.

19         Q    What was your overall understanding of the

20  defendant's role in this organization, if any?

21         A    He was there at the spot to transport the

22  marijuana across the border.

23         Q    So let's talk a little bit about what Colin

24  and Stefan brought across.  You indicated there were loads of

25  marijuana?

509

Lobdell – Direct – Gardner

1           A     Yes.

2           Q     Can you describe how the marijuana was

3    packaged?

4           A     Yes, they were in sealed bags.  They were all

5    vacuum sealed and they were put in hockey bags.

6           Q     Hockey bags?

7           A     Yes.

8           Q     Did you ever look inside those hockey bags?

9           A     No, because at times they were sealed with

10   little locks and then at times they would have on the zipper

11   of them there would be like wax or something melted on top so

12   you could not open them.  But you could see because there was

13   holes in the hockey bags that you could see the green right

14   through it (indicating).

15          Q     Were you familiar what marijuana looked like?

16          A     Yes.

17          Q     And how's that?

18          A     Because, well, Roger St. Onge smoked it all

19   the time and it was, you know, always around.

20          Q     These hockey bags, did they have any

21   particular odor?

22          A     Oh, yes.

23          Q     What kind of odor?

24          A     It smelled like a skunk at times, very strong.

25          Q     Are you familiar with the smell of marijuana?

510

Lobdell – Direct – Gardner

1      A    Yes, I am.

2      Q    Was it similar to that?

3      A    Yes, it is -- was.

4      Q    Now you said that the defendant was there

5   sometimes; is that right?

6      A    Yes.

7      Q    And that he would talk to Colin and Stefan?

8      A    Yes.

9      Q    Where would the defendant be exactly?

10      A    He'd be sitting in his truck most of the time.

11   When he pull up, he'd just sit there in his truck and talk.

12      Q    Right at the boat landing or somewhere else?

13      A    Oh, yes.  He'd pull right up to the boat

14   landing like by my car or whatever vehicles were there.

15      Q    Once your vehicle was loaded up, what would

16   happen from there?

17      A    Then I'd wait.  Hiio would take off first and

18   he would scout up to 37 or up to the diner on the corner of

19   37 and 122 and he would call back to either Stefan or Colin

20   or Matt Forget used to be there, also, and say, yes or no if

21   it was okay to go and then they say okay, take off and so

22   then I would leave.

23      Q    How do you know the defendant was scouting?

24      A    Because they told me we have to wait until

25   Hiio's calls back before you can leave.  He's just checking

JA-547

511

Lobdell – Direct – Gardner

1   the route for you.

2           Q    Who would tell you that?

3           A    Stefan or Colin, whoever was standing at that

4   time that day with me.

5           Q    And you mentioned that he would go to 37 or

6   another location?

7           A    Yeah.  Sometimes he would go down Route 37 all

8   the way to the corner of 122 and 37.  There was a little

9   diner there.

10          Q    How do you know he went to that diner?

11          A    Because he had told me before that he only

12  goes that far and I've gone through before and seen his truck

13  there.

14          Q    Who told you that?

15          A    Hiio told me that.

16          Q    The defendant?

17          A    Yes.  That's as far as that he goes.

18          Q    You indicated that Colin and Stefan would be

19  in communication with the defendant while he was scouting; is

20  that right?

21          A    Yes.

22          Q    Are you aware of any instances where the

23  defendant reported a problem that stopped you or held you up

24  from going?

25          A    No.

JA-548

512

Lobdell – Direct – Gardner

1    Q    The coast is usually clear?

2    A    Yes, it was.

3    Q    Now, where were you delivering these loads of

4  marijuana to?

5    A    Albany, New York City, Boston, Connecticut,

6  Vermont.

7    Q    All over?

8    A    Yes, sir.

9    Q    How would you know where to go?

10   A    When I'd get there in the morning, they would

11 give me a piece of paper.

12   Q    Who would give you a piece of paper?

13   A    Either Roger St. Onge or Stefan or Colin or

14 Matt.

15   Q    Who's Matt?

16   A    Matt Forget.  He was there, also, at the end.

17   Q    Ms. Lobdell, do you recognize the individual

18 depicted in Government Exhibit 23?

19   A    Yes, I do.  That is Matt Forget.

20   Q    And you indicated he was there at the end, I

21 think is what you said?

22   A    Yes, because he started coming and bringing

23 the marijuana up, also.

24   Q    We were talking about the destination that you

25 were going to and you said you would get a little piece of

513

Lobdell – Direct – Gardner

1   paper, right?

2           A     Yes.

3           Q     What was on that piece of paper?

4           A     It was an address or a phone number and then I

5   would just take off and go.

6           Q     An exact address?

7           A     Sometimes, yes, it was.

8           Q     Well, if it wasn't an exact address, what

9   would it be?

10          A     A phone number.

11          Q     Just a phone number?

12          A     Just a phone number and I'd call and then

13  they'd say, okay, meet me at such a place and then I would

14  follow them to where they wanted it dropped off.

15          Q     If you had just a phone number, how would you

16  know which direction to drive in?

17          A     Because we always came down 87 towards Albany

18  and they would say, you know, when you hit Albany, give the

19  number a call and then they would tell you where to go from

20  there.

21          Q     You indicated earlier that you would also

22  transport money back to the defendant's mother's property; is

23  that correct?

24          A     Yes.

25          Q     Can you describe for the jury how that came

JA-550

514

Lobdell – Direct – Gardner

1    about?

2              A    Just when I'd go and drop a load off, they

3    would say, you have to take this back up with you.

4              Q    Who would say?

5              A    Whomever it was that I would drop off the

6    marijuana to.

7              Q    The person receiving the load of marijuana?

8              A    Yes.  And it would be packaged in bundles and

9    then vacuum sealed and be put in like a bag or a box or

10   something and handed to me.

11             Q    Would you be aware of the quantity of money

12   that you were transporting back?

13             A    Not normally.  There's one time when they told

14   me, you know, well, there was -- he was on a phone, the

15   gentleman that I dropped off to was on the phone telling him

16   that she's leaving and she's bringing 75.

17             Q    What did that mean to you?

18             A    75,000.

19             Q    Are there any other instances where you were

20   aware of how much money you were transporting?

21             A    There was a time that these people counted out

22   money and I was watching it but I -- I didn't pay any

23   attention because my job was just one point to the next.  And

24   they're counting it out and it was a large sum, close to a

25   million dollars.

JA-551

515

Lobdell – Direct – Gardner

1    Q    And who were these people that were counting
2  out the money?
3    A    They were down in New Jersey.
4    Q    Were they people that you had delivered a load
5  of marijuana to?
6    A    Yes.
7    Q    And what did that approximate a million
8  dollars, what did that represent?
9    A    The product, what they had and more product to
10 come in.
11   Q    Was it payment for the marijuana?
12   A    Yes.
13   Q    If you picked up money from these customers,
14 what would you do with it?
15   A    I'd take it right back and I'd meet them and
16 give it right back to them.
17   Q    Meet who?
18   A    Whomever I had gone down for, Roger, Matt,
19 Stefan, Colin.
20   Q    Where would you meet them?
21   A    At the spot at Hiio's mother's place on the
22 canal.
23   Q    They would come back across the river by boat
24 or snowmobile?
25   A    Yes.

JA-552

516

Lobdell – Direct – Gardner

1    Q    Did you get paid any extra for transporting

2  the currency back?

3    A    No.

4    Q    You mentioned the glue on the bags of

5  marijuana.  Was there any -- something similar for the money

6  to prevent tampering?

7    A    Yes.  They would have it taped off and they'd

8  sign it with their name or another way so you can tell if a

9  seal was broken or not.

10    Q    Who would sign it with their name?

11    A    The person that I delivered the product to.

12    Q    You mentioned a little earlier that the

13  defendant would sometimes exchange money for Colin or Stefan

14  or someone like that; is that right?

15    A    Yes.

16    Q    How often would that occur?

17    A    I don't know how many times but it was often

18  that they would ask him to exchange it.

19    Q    Can you describe for the jury how that

20  conversation would go?

21    A    Well, they -- I know one time that they went

22  to him and they'd ask if they could -- if he could exchange

23  some Canadian money to American so then he could give some

24  money to myself and then keep some for hisself for his pay.

25    Q    You used a lot of hes in there.

JA-553

517
Lobdell – Direct – Gardner


1          A    Oh.

2          Q    And can you restate that and use the people's

3    names?

4          A    Sorry.

5          Q    That's okay.

6          A    Either Colin or Stefan would ask Hiio if he

7    would exchange -- if Hiio could exchange some money from the

8    Canadian into American and then give that money to myself for

9    my pay and then the other money is part of his pay.

10         Q    Whose pay?

11         A    Hiio's.

12         Q    And you observed this conversation?

13         A    Yes.

14         Q    Would that happen or did that just happen one

15   time or often?

16         A    No, that was a couple times.

17         Q    So what would the defendant do when Colin,

18   Stefan or St. Onge would give him money to exchange?

19         A    He'd take the money and he says, oh, give me a

20   day or so and I'll let you know when the money's ready.

21         Q    What would happen in a day or so?

22         A    The one time it's like they told me Hiio's

23   ready and they said I could just text him and he'd meet me

24   and he'd give me the money.

25         Q    So the defendant would give you the money

JA-554

518

Lobdell - Direct - Gardner

1  directly?

2          A    Yes.

3          Q    And what was that money for?

4          A    For payment of trips that I had taken.

5          Q    How often did the defendant give you payment

6  for your --

7          A    It was --

8          Q    -- your transporting marijuana?

9          A    It was only a couple times that he paid me

10 himself.

11         Q    Do you remember where you would meet him to

12 get the money?

13         A    One time it was at the little diner at the

14 corner of 122 -- Route 122 and Route 37.  We met there once.

15         Q    The place you indicated the defendant would

16 scout to sometimes?

17         A    Yes.

18         Q    Now you said defendant would say "I need a day

19 or two to exchange some money"; is that right?

20         A    Yes.

21         Q    Was the defendant ever able to exchange the

22 money right then and there?

23         A    Not to my knowledge.  I don't know how long it

24 took.

25         Q    Do you know how the defendant exchanged the

519
                    Lobdell - Direct - Gardner


1    money, either from I guess I should ask -- I'm sorry, let me

2    rephrase that question.

3                 Was the defendant exchanging the money from

4    Canadian to U.S. currency or from U.S. currency to Canadian

5    currency?

6         A    It was always -- most not always.  I cannot

7    say always because there was a time when I know that it went

8    from American to Canadian but it usually went from Canadian

9    to American.

10        Q    And was that money that Colin and Stefan had

11   brought down from Canada or was it money that you had brought

12   from a customer?

13        A    They usually brought it down.  There was

14   sometimes, though, that when I brought money back, they would

15   open it and give us money right out of it.

16        Q    Okay.

17        A    They as in Colin or Stefan or Roger St. Onge.

18        Q    Let's talk about that a little bit.  Sometimes

19   you would bring back money and they would -- Colin or Stefan

20   would open up the money?

21        A    Yes.

22        Q    And what would happen?

23        A    They would give me some and if Hiio was there

24   at the time, they would give him some, too.

25        Q    Was there any conversation about why they were

520

Lobdell - Direct - Gardner

1  giving him money?

2      A    That was just his cut for coming through.

3      Q    His cut for coming through, you mean coming

4  through the property?

5      A    Yes.

6      Q    Let me go back just for a moment.  When -- on

7  those few occasions when the defendant paid you for

8  transporting a load of marijuana, you said that you would

9  contact him.

10     A    Yes.

11     Q    Was that by phone, by text, in person?

12     A    By text.

13     Q    And when you contacted him by text, was the

14  defendant aware that he was supposed to pay you?

15     A    Yes.

16     Q    How did you know how to contact the defendant?

17     A    They just had it preprogrammed in a phone they

18  gave me.  Like Roger St. Onge gave me a BlackBerry, I believe

19  it was, and they had it programmed in that.

20     Q    They had the defendant's number programmed

21  into it?

22     A    Yes, they did.

23     Q    Did Colin or Stefan ever pay you for anything

24  other than transporting the marijuana?

25     A    No.

JA-557

521

Lobdell – Direct – Gardner

1    Q    Did you ever need money for expenses?

2    A    Yes.

3    Q    Did they give you money for expenses?

4    A    Yes, if I'd ask for it because I needed money

5 for my gas and that to go down.

6    Q    So we've talked kind of generally about what

7 you did.  But I'd like to talk a little bit more specific

8 about the time periods which you did it.

9         And I'd like to focus on the time period after

10 2005.

11    A    Mm-mm.

12    Q    Am I right in understanding, from what you

13 said earlier, that 2005 was about the time that you came back

14 into the organization and that Colin and Stefan were a part

15 of the organization?

16    A    Yes.

17    Q    Once you came back into the organization in

18 2005, how much would you go to the defendant's mother's

19 property to pick up a load of marijuana?

20    A    It depended on -- there was times that we

21 could go four or five trips in a month and then we might not

22 go for a few months.

23    Q    Was there a reason why you might take a couple

24 of months off?

25    A    Well, I know in the fall or beginning of

JA-558

522

Lobdell - Direct - Gardner

1   winter we'd have to take time off because of the river

2   freezing and then we'd have to wait for it to thaw out again

3   and just getting -- it's just lining everything up.

4          Q    We're going to talk about it in a moment, but

5   were you stopped by law enforcement in May of 2009 with a

6   load of marijuana?

7          A    Yes, I was.

8          Q    So between 2005 and 2009 when you were caught,

9   can you average how many times you would pick up a load of

10  marijuana from the defendant's mother's property?

11         A    I'd say average maybe 20 times a year.

12         Q    You said sometimes as much as five times a

13  month?

14         A    Yes.

15         Q    Let's talk a little bit about the amount of

16  marijuana, which I think you alluded to earlier.  How much --

17  and, again, I would like to focus on that 2005 time period,

18  to 2009 -- what was the typical load that you would pick up

19  from the defendant's mother's property?

20         A    It was over 80 pounds but they tried to keep

21  it under a hundred pounds.

22         Q    Why would they try and keep it under a hundred

23  pounds?

24         A    From what I was told, there was a certain

25  guideline so if you did get stopped.

```
                                                                523
                    Lobdell - Direct - Gardner


   1              Q    At some point did that change?  At any point
   2    did you start transporting more?
   3              A    Yes.
   4              Q    Okay.
   5              A    They went up to -- went from a car to a pickup
   6    truck so then we could haul more.
   7              Q    Once you made the change to the pickup truck,
   8    what was an average load that you would transport?
   9              A    I believe -- I don't know exactly myself,
  10    because I didn't know how many pounds -- but I believe it was
  11    at least 250 pounds.
  12              Q    Okay.  Is that what you would take pretty much
  13    every single time or was that a big load?
  14              A    No, that started being a general load.
  15              Q    For all of these loads that you transported
  16    from 2005 to 2009, was there any instance where you picked up
  17    a load from somewhere other than defendant's mother's
  18    property?
  19              A    Yes.
  20              Q    Okay.  About how many times did you pick up a
  21    load somewhere else?
  22              A    Three or four times.
  23              Q    So out of the 80 to a hundred times that you
  24    picked up a load, just three or four times you went somewhere
  25    else?
```

JA-560

524

Lobdell – Direct – Gardner

1          A    Yes.

2          Q    Do you recall where you went?

3          A    Yes, Adams Marina.

4          Q    Where is Adams Marina located?

5          A    Just right down the road where I had pointed

6    on the map on the screen.

7          Q    We can put up Government Exhibit 3.

8          A    Right there.

9          Q    And you picked up there about three or four

10   times?

11         A    Yes.

12         Q    When you picked up from Adams Marina, was the

13   defendant ever there?

14         A    No.

15         Q    Was someone else there?

16         A    The people that worked there.

17         Q    Let's talk about that a little bit.  I don't

18   want to assume.

19              So did Colin and Stefan deliver the load to

20   Adams Marina?

21         A    Yes.

22         Q    By boat or by snowmobile?

23         A    Yes, or Roger St. Onge.

24         Q    Other than Colin or Stefan and you, was there

25   anybody else at Adams Marina when that transaction took

JA-561

525

Lobdell – Direct – Gardner

1    place?

2          A    No.

3          Q    You mentioned the people that worked there?

4          A    There was a restaurant off to the side and

5    there was people in the restaurant.

6          Q    Okay.  Ms. Lobdell, do you recognize the

7    individual depicted in Government Exhibit 21?

8          A    Yes, I do.  That's "Alan" Forget.

9          Q    How do you know Forget?

10         A    I met him in Canada when I was bartending and

11   then he moved to the United States and then I moved back to

12   the states and met him again and we were friends and then we

13   were approached together because he was working with Stefan

14   and Colin, also, and had asked me if I wanted to also

15   transport marijuana from Hiio's residence to his residence.

16         Q    All right.  So, at some point you became aware

17   that Forget was working with Colin and Stefan?

18         A    Yes.

19         Q    But you knew him before that?

20         A    Yes.

21         Q    And you knew him socially?

22         A    Yes.

23         Q    Do you remember the approximate time frame in

24   which you learned that Forget was also working with Colin and

25   Stefan?

526

Lobdell – Direct – Gardner

1      A     That was around like 2006-2007.

2      Q     Okay.

3      A     Yeah.

4      Q     And how did you come to learn that Forget was

5  working with Colin and Stefan?

6      A     I seen him at Hiio's place and then I'd also

7  seen him at a residence of George King where they were also

8  transporting marijuana to his house and using his house as a

9  safe house.

10     Q     When you saw Forget at the defendant's

11 mother's property, what was -- what was going on?

12     A     They were loading vehicles, you know, other

13 people, like, were loading vehicles.  He was having

14 discussions with Hiio and Colin and Stefan.  They were all

15 talking.

16     Q     Forget was?

17     A     Yes.

18     Q     Do you know what they were talking about?

19     A     Not all the time, no, I did not.

20     Q     When the two of you -- Forget and you -- were

21 at the defendant's mother's property, were you both picking

22 up loads of marijuana to transport?

23     A     I was.  He was setting up, lining up to have

24 others.  He didn't take it the times I was there.  He went in

25 front of me.

JA-563

527

Lobdell – Direct – Gardner

1    Q    Did he scout for you?

2    A    Yes.

3    Q    And you mentioned that sometimes you would

4  also pick up loads at George King's residence?

5    A    Yes.

6    Q    Or did you say you transported loads?

7    A    They transported them there, too.

8    Q    Well, let me ask you:  Did you ever pick up a

9  load at George King's residence to transport?

10    A    Yes.

11    Q    You indicated that, I believe, it was Colin or

12  Stefan asked you if you wanted to transport loads to Forget's

13  residence or from Forget's residence?

14    A    "Alan" had asked me to.

15    Q    What did "Alan" ask you?

16    A    If I wanted to make some extra money.  He was

17  going to give me $500 to bring marijuana from Hiio's house to

18  his place on the other side of Malone.

19    Q    Was that in addition to the trips you were

20  already making for Colin and Stefan?

21    A    Yes.

22    Q    How many times do you think you did that?

23    A    I only did that a couple of times.

24    Q    Why is that?

25    A    I don't know because I was doing other --

JA-564

528

Lobdell – Direct – Gardner

1    other runs and he had other people that were doing it.

2           Q    Do you know who else he had doing it?

3           A    I'm not sure of everybody.

4           Q    We talked about this just a little bit

5    already, but at some point were you caught transporting a

6    load of marijuana by law enforcement?

7           A    Yes, I was.

8           Q    Do you remember when that was, the first time?

9           A    In 2009.

10          Q    Was it in May of 2009?

11          A    Yes, it was.

12          Q    Do you remember how much marijuana you were

13   transporting that day?

14          A    I don't know.  All I know is that it was a

15   pickup load and I believe I had six hockey bags.

16          Q    Where did you pick up those six hockey bags?

17          A    At Hiio's residence, his mother's.

18          Q    Did you have a scout working that day?

19          A    No.

20          Q    Why not?

21          A    I -- I had one when I went out of the

22   reservation and after that I didn't.

23          Q    Who scouted for you out of the reservation?

24          A    Hiio did that morning.

25          Q    Say that one more time.

529

Lobdell – Direct – Gardner


1          A     Hiio did that morning.

2          Q     And what happened after you got off the

3    reservation?

4          A     I got down -- made it to 87 and I came on the

5    roadblock.

6          Q     The checkpoint on I 87?

7          A     (Witness nodding.)

8          Q     Is that the one you were talking about earlier

9    at North Hudson?

10         A     Yes.

11         Q     Sorry, you called it High Peaks?

12         A     High Peaks.

13         Q     This is a dark photograph, but can you look at

14   Government Exhibit 7A and tell me if you can recognize that.

15         A     Yes, that was my truck.

16         Q     And was that the truck you were driving in

17   May 2009 when you were stopped at the checkpoint?

18         A     Yes, it was.

19         Q     Do you recognize Government Exhibit 7B?

20         A     Yes.

21         Q     What is it?

22         A     That's what was in the back end of my pickup

23   truck.

24         Q     Now, after law enforcement officers seized the

25   truck and seized the marijuana, what happened to you?

JA-566

530

Lobdell – Direct – Gardner

| | | |
|---|---|---|
| 1 | A | I went home. |
| 2 | Q | You were released? |
| 3 | A | Yes. |
| 4 | Q | You weren't charged with anything that day? |
| 5 | A | No. |
| 6 | Q | Were you supposed to be cooperating with law |
| 7 | enforcement? | |
| 8 | A | Yes. |
| 9 | Q | Had you agreed to cooperate with law |
| 10 | enforcement? | |
| 11 | A | Yes. |
| 12 | Q | Did you help law enforcement that day? |
| 13 | A | Not on that day, no. |
| 14 | Q | Is it fair to say that you did not fully |
| 15 | cooperate? | |
| 16 | A | Yes, it is. |
| 17 | Q | After you were caught in May of 2009, did you |
| 18 | make any attempts to get paid for transporting that load? | |
| 19 | A | Yes. |
| 20 | Q | Can you describe that for the jury? |
| 21 | A | I was calling and texting people and asking |
| 22 | for my pay. | |
| 23 | Q | Who did you call and text? |
| 24 | A | I had text Roger St. Onge, Matt Forget, Colin, |
| 25 | Stefan, Jacques, anybody number that I had so I could... And | |

JA-567

531

Lobdell – Direct – Gardner

1   I also –– that day there, the day I left on the Friday, as
2   soon as I got home, I called Hiio and asked if he had my pay
3   and he said, yes, we can meet at the diner and I met him that
4   Friday after I got stopped.
5           Q    Was that pay for the load that was caught or
6   for a previous load?
7           A    Previous loads.
8           Q    So did the defendant already have that money
9   to pay you?
10          A    Yes, he did.
11          Q    How was that –– how was that already arranged?
12          A    I was told that morning that by the time I got
13  done with this job, that Hiio would have some money for me.
14          Q    Who told you that?
15          A    I talked to Hiio that morning and he said when
16  I got back and just text him and we'd meet and he'd give me
17  the money.
18          Q    Was it your standard $2,500 that you normally
19  got paid?
20          A    I think that day I ended up with 5,000 because
21  there was a couple trips in there and there was still money
22  that was out there.
23          Q    You were owed money?
24          A    Yes.
25          Q    And that payment was not just for one prior

532

Lobdell – Direct – Gardner

1    trip but more than one?

2         A    Yes.

3         Q    The vehicle we were just looking at in

4    Government Exhibit 7A, was that vehicle registered in your

5    name?

6         A    Yes, it was.

7         Q    Do you recall who purchased that vehicle?

8         A    Yes.

9         Q    Who was that?

10        A    Hiio.

11        Q    Can you describe for the jury how you know

12   that?

13        A    Because the vehicle I was driving was acting

14   up and it wasn't roadworthy and we were all down at Hiio's

15   place talking, Colin, Stefan, myself and Hiio.  And we were

16   talking about they asked before if I would put a truck in my

17   name and I said yes and Hiio says, well, I have a truck that

18   I've already bought and she can put it in her name.  And so

19   we made an arrangement.  I would meet Hiio in Massena at the

20   dealership and put the vehicle in my name.

21        Q    Do you remember the name of that dealership?

22        A    Frenchie's.

23        Q    Did you go to Frenchie's?

24        A    Yes, I did.

25        Q    What happened -- did the defendant go with

533
Lobdell - Direct - Gardner

1  you?

2      A   We met at Frenchie's and we went in together

3  and we went into an office and I can't -- I do not remember

4  the gentleman's name, the salesman.  But we walked in and

5  they talked and he goes -- the salesman went, oh, he says, I

6  see you found somebody for the truck and Hiio said yes.  And

7  then he finished and he handed him some money and he said now

8  it's paid off and then Hiio said, now, I'd like the papers

9  shredded because I don't want any paper trail.  And the two

10  of them walked over to the shredding machine and they put

11  some papers through the machine, and then he says now

12  everything's all right, you just have to put the plates and

13  that and then he said yes.  And he goes, well, thank you very

14  much.  He says any time you need a vehicle, you know, just

15  let me know and I'll help you out any way I can.  And then

16  Hiio left and the gentleman finished doing some paperwork and

17  I had a truck.

18      Q   Did you take possession of the truck that day?

19      A   Yes, I did.

20      Q   You're pretty sure it was that day that you

21  paid for it?

22      A   Yes.

23      Q   Now, were you caught again by law enforcement

24  transporting another load of marijuana?

25      A   Yes, I was.

JA-570

534

Lobdell - Direct - Gardner

1          Q     And when was that?

2          A     That was in February two thousand --

3   February 2011, I believe it was or March 2011.

4          Q     February or March 2011?

5          A     Yes.

6          Q     After you were caught in May of 2009, did you

7   continue to work for this organization?

8          A     No.

9          Q     Did you want to continue to work for the

10  organization?

11         A     I wanted to get out but I also wanted help.

12         Q     What do you mean help?

13         A     This -- I wanted to get out of the business

14  but I -- it was hard at times because I would get scared but

15  I also knew that I had said that I would try to help the

16  government and I let my fears overtake and I got back in

17  contact and I --

18         Q     With who?

19         A     Matt Forget.

20         Q     And did you ask Matt Forget to get back into

21  the organization, start working again?

22         A     Yes, I did.

23         Q     Now, since you were caught in 2009, was Matt

24  Forget open to the idea of you working again?

25         A     At first no.

JA-571

535

Lobdell – Direct – Gardner

1    Q    And why is that?

2    A    Because I believe everybody had believed that

3  I had got busted.

4    Q    Why wouldn't they have believed that you got

5  busted.  I didn't phrase that very well.  You were caught

6  redhanded, right?

7    A    Yes.

8    Q    Did people in the organization not know that

9  you were caught redhanded?

10   A    Yes, they did not know.

11   Q    Why is that?

12   A    Because I told them that I didn't get busted.

13   Q    What did you tell them?

14   A    The day that I got busted, they knew I was

15  stopped by the police and I said no, everything was okay, and

16  when -- that was on a Friday and on Monday when the load was

17  taken down, my vehicle was busted with the marijuana in it,

18  and I was on the side and they thought I took a bus back

19  home.

20   Q    You said when the marijuana in my truck was

21  taken down, what did you mean by that?

22   A    They -- I showed them -- and I took the load

23  with the authorities to where it was going to be dropped off

24  that day.

25   Q    So a little bit earlier I asked you if you

536

Lobdell – Direct – Gardner

1  cooperated on the day that you stopped at the checkpoint?

2      A    Yeah, I said no.  I misunderstood because on

3  the Friday that I got stopped, I did not help that day.  We

4  put it off until Monday.  That was my mistake, I'm sorry.

5      Q    No.  I should have asked the question

6  different.  Why don't we talk about that a little bit.

7      After you were stopped at the checkpoint in

8  2009 --

9      A    Yes.

10      Q    -- did you cooperate with law enforcement

11  officers?

12      A    Yes, I did.

13      Q    Did you participate in what's called a

14  controlled delivery?

15      A    Yes, I did.

16      Q    Just briefly -- I don't want to get into a

17  whole lot of detail -- what did you do for law enforcement

18  officers around that time?

19      A    I told them where I was going to take this

20  delivery and I rode down with them, like, they escorted me

21  down.  And then I told them where I was to meet the gentleman

22  and how he was going to pick up my truck and go to his house

23  to unload or wherever, I don't know exactly what house, I

24  cannot assume that.  He took my vehicle to go on the load and

25  then they followed him and they busted him and it was around

JA-573

537

Lobdell – Direct – Gardner

1   5, 5:30 in the afternoon and I sat right in the one spot

2   waiting until they came back when they got all done at 11:30,

3   12 o'clock at night.

4           Q    And then you indicated you made up a story

5   that you communicated back to the organization?

6           A    Yes.

7           Q    Okay.  And who did you communicate that to?

8           A    I sent a letter to Roger St. Onge.  I gave him

9   a paper stating that the truck was seized on that occasion

10  not in my possession.

11          Q    So, now, going back to 2011, you indicated

12  that you had talked to Matt Forget about getting back into

13  the organization; is that right?

14          A    Yes.

15          Q    And you indicated that he was suspicious of

16  you; is that right?

17          A    Yes.

18          Q    At some point did Matt Forget agree to allow

19  you to transport loads of marijuana?

20          A    Yes, he did.

21          Q    And approximately how many times did you

22  transport a load that Matt Forget coordinated?

23          A    Three times.  The third time is when I got

24  busted again.

25          Q    In March of 2011?

JA-574

538

Lobdell – Direct – Gardner

1    A    Yes.

2    Q    I think you mentioned just a little while ago

3    that Matt Forget toward the end would be on the boat with

4    Colin or someone else; is that right?

5    A    Yes.

6    Q    Do you remember approximately when Matt Forget

7    got involved in this organization?

8    A    I don't remember the exact time frame now.  I

9    know it was towards the end.  I mean, he -- he started

10   earlier as just a scout.

11   Q    Okay.

12   A    He was a scout for me.  But when he

13   actually -- I don't remember exact time when he started

14   bringing the marijuana up himself.  I don't remember that for

15   sure.

16   Q    When you approached Matt Forget about getting

17   back into the organization --

18   A    Yeah.

19   Q    -- did you have a sense of who Matt was

20   working with?

21   A    Yes, Colin and Stefan.

22   Q    So you still believed Matt was working with

23   Colin?

24   A    Yes.

25   Q    You said you picked up three loads; is that

JA-575

539

Lobdell – Direct – Gardner

1    right?

2             A    Yes, I did.

3             Q    Where did you pick up those loads of

4    marijuana?

5             A    At Hiio's mother's place.

6             Q    Even though Matt was coordinating these loads,

7    it was still the same procedure?

8             A    Yes, it was.

9             Q    Did Matt Forget bring those loads down

10   himself?

11            A    Yes.

12            Q    By boat or snowmobile?

13            A    Yes.

14            Q    When you went to pick up the load that you

15   were caught with in March of 2011, was Matt Forget there?

16            A    Yes, he was.

17            Q    Did he have a scout for you?

18            A    No.  And I had asked for one and he said no.

19   He says we can't get anybody because they can't leave the

20   house and he looked up -- the lights were on over at Hiio's

21   mother's house -- he said they have stuff up there that they

22   can't leave alone.

23            Q    So you went without a scout?

24            A    Yes, I did.

25            Q    And where were you stopped by law enforcement?

JA-576

540

Lobdell – Direct – Gardner

1          A     On Route 37.

2          Q     Ms. Lobdell, can you take a look at Government

3    Exhibit 11A and tell me if you recognize that.

4          A     Yes, that was the vehicle I was driving.

5          Q     The night you were stopped in March of 2011?

6          A     Yes.

7          Q     It's not a great picture there, Ms. Lobdell,

8    but looking at Government Exhibit 11B, do you recognize what

9    we're looking at?

10         A     Yes, they're duffel bags.

11         Q     And are they the duffel bags of marijuana that

12   you were transporting that night?

13         A     Yes.

14         Q     Here's a better picture, Ms. Lobdell.  Can you

15   take a look at Government Exhibit 11D and tell me if you

16   recognize that photo.

17         A     Yes.

18         Q     And what is it?

19         A     Those were the hockey bags with the, like,

20   plastic melted on the zipper so you can't --

21         Q     That we were talking about earlier?

22         A     Yes.

23         MR. GARDNER:  Your Honor, may I have one moment,

24   please.

25         THE COURT:  Yes.

JA-577

541

Lobdell – Direct – Gardner

1           (Discussion held off the record.)

2           MR. GARDNER:  Your Honor, no additional questions

3    at this time.

4           THE COURT:  I think we're going to take a short

5    break before you start your cross, give everybody a chance to

6    move a little bit, give you a short break.

7           Please don't talk about the case and we'll have you

8    back out here in five minutes.

9           (Jury excused, recess taken, 2:25 p.m.)

10          (Open court, 2:37 p.m.)

11          THE COURT:  All set, ready to go?

12          MR. SACCO:  Yes, your Honor.

13          MR. GARDNER:  Yes, sir.

14          THE COURT:  Okay.  Let's bring the jury in, please.

15          (Jury present, 2:37 p.m.)

16          THE COURT:  Okay.  We have all the ladies and

17   gentlemen of the jury.

18          And, Mr. Sacco, cross-examination, if you would

19   like, sir.

20          MR. SACCO:  Thank you, Judge.

21   CROSS-EXAMINATION BY MR. SACCO:

22          Q    Good afternoon, ma'am.

23          A    Good afternoon.

24          Q    Now, you indicated on your direct examination

25   that you started in this business in 1990; is that right?

JA-578

542

                    Lobdell – Cross – Sacco

1          A    Early 1990s, yes, it is.

2          Q    Are you 47 now here today?

3          A    Yes.

4          Q    So that means how hold were you when you

5   started -- I should start with that?

6          A    In my early 20s, mid-20s.

7          Q    And you grew up in the north country?

8          A    Yes, sir.

9          Q    Chateaugay?

10         A    Yes.

11         Q    And you indicated that at an early age you

12  started having substance abuse problems, right?

13         A    Yes, I did.

14         Q    And you've had those problems from the time

15  you were 10 years old until I believe June 25th, 2012?

16         A    Yes, sir.

17         Q    And you also indicated that you started doing

18  cocaine, I believe, in your 20s?

19         A    Yes, sir.

20         Q    Is it fair to say you did -- you were doing

21  cocaine from your 20s until June 25th, 2012?

22         A    Yes.

23         Q    Pretty much straight through?

24         A    Yes, there was a couple years break, but, yes.

25         Q    So that's a significant period of time, is

543

Lobdell - Cross - Sacco

1   that fair to say?

2           A    Yes.

3           Q    Now, you -- in 2006, all right, you were

4   convicted of grand larceny and falsifying a business record,

5   do you remember that?

6           A    Yes, I do.

7           Q    And you received 5 years of probation for

8   that?

9           A    Yes, I did.

10          Q    And during that 5 years of probation, I mean,

11  you had to report to a probation officer, right?

12          A    Yes, I did.

13          Q    Which would have been meant going and talking

14  to them about what you were doing, what kind of job you had,

15  correct?

16          A    Yes.

17          Q    Probably taking -- did you have to give

18  drug -- samples?

19          A    Yes, I did.

20          Q    To make sure that you were clean and all that?

21          A    Yes.

22          Q    And they would be able to come to your house

23  and look to see what you were doing, right?

24          A    Yes.

25          Q    And their job was to keep you on the straight

JA-580

544

                    Lobdell - Cross - Sacco


1   and narrow, for lack of a better term, right?

2           A    Yes.

3           Q    During that whole five-year period you were

4   transporting marijuana, right?

5           A    Part of it, yes, I was.

6           Q    So let's get into what happened, grand larceny

7   third degree and falsifying a business record.  Is this --

8   what happened?

9           A    I was the manager at a gas station food mart,

10  and crying out for help.  I did the books and I just

11  blatantly made out the deposit slips, put one there, signed

12  that I put it in the bank, which I did not, and that was --

13  that was what I did.

14          Q    So you stole cash from the business owner?

15          A    Yes, I did.

16          Q    And you didn't own the business, right, I

17  assume?

18          A    No, I did not.

19          Q    And you were the manager at the time?

20          A    Yes, I was.

21          Q    And so the falsifying the business record was

22  the phony deposit slip?

23          A    I signed a deposit slip and sent it in and the

24  slip that I signed at the store itself saying that I

25  deposited it was the false one, yes, it was.

JA-581

545

Lobdell – Cross – Sacco

1    Q  And how much cash was this?

2    A  $5,000.

3    Q  And this was a convenient mart so that's a

4 significant portion of their income, I assume?

5    A  Yeah.  It was a very good store, still

6 running.

7    Q  So you went on five years of probation for

8 this offense, right?

9    A  Yes.

10    Q  So you were on probation from 2006 until 2011

11 is five years?

12    A  I was released early.

13    Q  So when you say released early, were you

14 released before you were arrested in 2009?

15    A  No, I was not, right afterwards I was.

16    Q  Right after you were arrested you got released

17 from probation?

18    A  Yes.

19    Q  So did your probation officer become aware

20 that you were just arrested by the police for smuggling 200

21 pounds of marijuana?

22    A  No.

23    Q  And did you -- I mean, as your obligations as

24 a probationer, did you report that to her?

25    A  No, I did not report that to him.

JA-582

546

Lobdell – Cross – Sacco

1      Q    Did you report to him that you were using
2  cocaine regularly during that period of time?
3      A    At that period of time I was not using it
4  regularly and I was in an outpatient treatment from 2006
5  until 2007.
6      Q    But during the same period of time you were --
7  you testified that you were working with Mr. St. Onge and
8  Mr. Colin Stewart and various others smuggling --
9      A    Yes, we were --
10     Q    -- drugs?
11     A    -- doing some trips.  Yes, I was.
12     Q    Can I ask you, as a result of your cooperation
13  with the law enforcement, is that why you were released early
14  on probation?
15     A    No.  Prior to me getting arrested I had
16  already put in the paperwork to be released early from
17  probation.
18     Q    And your arrest was never reported to any
19  agency, right?
20     A    No, sir.
21     Q    All right.  So -- and so you're here today --
22  you got arrested again in 2011, right?
23     A    Yes, sir.
24     Q    And you entered into a cooperation agreement
25  with the government, right?

JA-583

547

                    Lobdell – Cross – Sacco


1          A    Yes, I did.

2          Q    Before I get to that, let me ask you this:  In

3     2009, you were arrested.  Was it drug enforcement agents or

4     who worked with you?

5          A    I believe it was the drug enforcement agent.

6          Q    And you actually took a step and you went down

7     to the Capitol region, Albany area and you made a controlled

8     delivery for them, right?

9          A    It was in New York City.

10         Q    New York City, okay.  And you obviously sat

11    down with them, right, you were interviewed by them?

12         A    Yes.

13         Q    You had to answer questions about, you know,

14    what kind of drug activity you were involved in, right?

15         A    Yes.

16         Q    Did you forget to tell them all the things

17    you've told this jury in the courtroom today?

18         A    No, sir.

19         Q    You told them about the –– about this

20    marijuana ring and all these issues that were going on in

21    2009?

22         A    Yes, I did.

23         Q    So, in 2009, how long did you work with the

24    DEA?

25         A    I was working with them constantly trying to

548

Lobdell – Cross – Sacco

1   report when I could.  If they needed any questions –– had

2   questions for me, they would call.  I would answer them.

3        Q     And how long did that go on for?

4        A     Until I came to jail.

5        Q     So when you were working for them, were you

6   also working for the organization?

7        A     Yes, I did.

8        Q     Did you tell them about that?

9        A     No, I did not.

10        Q     So you were working for both law enforcement

11   and this Mr. St. Onge, Mr. Stewart and so on, right?

12        A     Yes.

13        Q     At the same time?

14        A     Yes, sir.

15        Q     And after you got arrested in 2011, the

16   government signed you up as a cooperator, right?

17        A     Yes, sir.

18        Q     And in exchange for that cooperation, they

19   were going to tell the Court that you should get a lesser

20   sentence, right?

21        A     Yes, sir.

22        Q     And you made an agreement with them, didn't

23   you?

24        A     Yes, I did, sir.

25        Q     Now, at the time that they offered you that

JA-585

549

Lobdell - Cross - Sacco

1  agreement, do they know you were working both for yourself

2  and for the DEA at the same time, were they aware of that at

3  this point?

4      A    Yes, I was up front and I told them when I got

5  stopped.

6      Q    Oh, you told the police officer that stopped

7  you that you were working for the DEA?

8      A    Oh, no.

9      Q    Well, explain it then.  What did you do?

10     A    When I got stopped and I was arrested again,

11  then when I got questioned afterwards, it was the same

12  gentlemen before.

13     Q    So he knew who you were?

14     A    Yes.

15     Q    So you were given --

16     THE COURT:  Mr. Sacco, I don't want to interrupt

17  but when you say the same gentlemen as before, you mean the

18  same DEA agent that you had?

19     THE WITNESS:  I'm not sure myself exactly if it was

20  DEA or if it was from the border patrol but I recognized some

21  of the same gentlemen that were questioning me.

22     Q    So in any event --

23     MR. SACCO:  Judge, do you want me just to follow up

24  on that?

25     THE COURT:  Please, I just want that to be clear

JA-586

550

Lobdell – Cross – Sacco

1    what she was talking about.

2           Q    So in 2009 you were arrested but you were

3    never --

4           A    Yes.

5           Q    -- you were never charged, right?

6           A    Correct, sir.

7           Q    In 2011 you were also arrested and this time

8    you were charged, right?

9           A    Yes, sir.

10          Q    Both of those times it was the same

11   individuals that you were dealing with?

12          A    Yes.

13          MR. SACCO:  Is that good enough?

14          THE COURT:  Thank you.

15          Q    So, now, you said something on your direct

16   examination that, in exchange for your testimony, you hoped

17   not to go to prison.  What did you mean by that?

18          A    I was trying to avoid going to prison.  I was

19   hoping for house arrest, anything but going to prison.

20          Q    When would -- now when you say that, obviously

21   you're in prison now, right?

22          A    Yes, sir.

23          Q    So, when were you hoping not to go to prison,

24   I mean, when you started your cooperation?

25          A    Yes, sir.

JA-587

551

Lobdell – Cross – Sacco

1      Q      And, in fact, after you were arrested in 2011,
2  you were released, right, the Court released you?
3      A      Yes, sir.
4      Q      And you had some problems during your release,
5  is that fair to say?
6      A      Yes, I did.
7      Q      And those problems were you were trying to
8  dilute your urine samples --
9      A      Yes.
10      Q      -- from your probation officer?  And I think
11  you testified on direct that you drank a 64 ounce bottle of
12  Gatorade®, right?
13      A      Yes, sir.
14      Q      Why did you do that?
15      A      Because when I originally went in, I had been
16  clean and then I went off the wagon and I tested dirty and
17  then I was good for a couple weeks and then I fell off again
18  and I did a diluted sample.  Somebody explained to me how I
19  could do it, it would come back diluted.  And I did it one
20  time and afterward I did it the same way because I figured if
21  I did it the same way, they wouldn't tell the difference.
22  And then when I used in June, I came clean and just said I
23  used.
24      Q      So --
25      A      Because I needed help.

552

Lobdell – Cross – Sacco

1    Q    Someone gave you this idea how you could
2  circumvent the testing system, right?
3    A    Yes, sir.
4    Q    And you in your 40s decided you would do that,
5  right?
6    A    Yes, sir.
7    Q    No one made you do it, right, you did it on
8  your own?
9    A    Yes, sir, I made my choices.
10    Q    So on January 10th, 2013 you were given a
11  sentence of 33 months?
12    A    Yes, sir.
13    Q    And I think some post-release supervision
14  after that, right?
15    A    Yes, sir.
16    Q    And you were facing, when you started, a
17  minimum of five years --
18    A    Yes, sir.
19    Q    -- right?  Which is 60 months and a maximum, I
20  believe, of 40 years, right?
21    A    Yes, sir.
22    Q    Now, if we could, I want to just go through
23  some of these events and try and pinpoint some time periods,
24  is that okay?
25    A    Yes, sir.

JA-589

553
                    Lobdell – Cross – Sacco


1          Q    Now you said you started working in the early
2    '90s and you did a few runs, right?
3          A    Scouting, yes.
4          Q    That was -- at this point that was over 20
5    years ago, right?
6          A    Yes, sir.
7          Q    And during the bulk of that period of time you
8    were using cocaine regularly, right?
9          A    Yes, on the weekends.
10         Q    And, so, for instance, you said on your direct
11   that you went to I think the Kings dock, to Adams dock, is
12   that true?
13         A    Adams Marina.
14         Q    Adams Marina?
15         A    Yes, sir.
16         Q    Did you say something about George King, also?
17         A    Yes, that was in 2000, like after 2005.
18         Q    After 2005?
19         A    Yes.
20         Q    Any time you can get closer than that, just
21   after 2005?
22         A    To George King?
23         Q    Yeah.
24         A    It was all in that time, from 2005-2006.
25         Q    Well, how many times did you go to George

JA-590

554

                    Lobdell - Cross - Sacco

 1   King's?

 2          A    I went to George King's different times

 3   because he was a friend, also.

 4          Q    And George King is a marijuana smuggler?

 5          A    No, sir, he was asked to use his house as a

 6   safe house.

 7          Q    All right.  So how many times did you go to

 8   George King's and when did you go to George King's?

 9          A    Let's see, well, 2007-2008, I was there quite

10   often.

11          Q    Okay.

12          A    I can't say.

13          Q    When you say --

14          A    At least three, four times a month I would be

15   over there.

16          Q    Okay.  And 2007 and 2008, is that --

17          A    Yes, sir.

18          Q    So how many times a month?

19          A    At least four times.

20          Q    So four -- four times 12 months is 48 times;

21   is that fair?

22          A    Yes.

23          Q    And then two years, so that's 99 times at

24   George King's, is that fair to say?

25          A    Yes.

JA-591

555
Lobdell – Cross – Sacco

1    Q    Over a two-year period?

2    A    Yes.

3    Q    And that's in 2007 and 2008?

4    A    Yes.

5    Q    And that's during this is -- this is at least

6    part of that time you were on probation, right?

7    A    Yes, sir.

8    Q    And what about the other, the marina, were you

9    friends with those folks, too, over there?

10   A    I knew them from the bar.

11   Q    And how many times did you go and smuggle

12   drugs from that marina?

13   A    I was only there maybe two, three times.

14   Q    When was that?

15   A    I'm -- I'm trying to remember the exact year

16   on it.  And I'm -- I can't quite recall the exact year on

17   that.

18   Q    So you know you were there, you just don't

19   know when you were there, is that fair?

20   A    Yes, sir.

21   Q    Now we've heard discussion about Alain Forget?

22   A    Yes, sir.

23   Q    Am I pronouncing that right, Alain Forget?

24   A    Yeah, Alain Forget.

25   Q    And do you know him?

JA-592

556

Lobdell – Cross – Sacco

1          A    Yes, sir.

2          Q    And how long have you known him?

3          A    Since the early '90s.

4          Q    So you've known him for a very long time?

5          A    Yes.

6          Q    Twenty something years, is that fair to say?

7          A    Yes.

8          Q    And your relationship with him, was it outside

9    of this drug or marijuana smuggling or transporting or is it

10   just limited to the marijuana transporting?

11         A    Both.

12         Q    The relationship outside of the marijuana

13   transporting, give me an idea -- give the jury a sense of

14   what that relationship was like.

15         A    We were friends -- it started back in the

16   '90s.  We were friends.  We might have a couple drinks, play

17   some pool.  Then in -- well, we were working together and

18   then I'd say in 2008, I slept with him once.

19         Q    Okay.  So you had a romantic relationship in

20   2008?

21         A    Yes.  One-time fling.

22         Q    So, Mr. -- is his son Matt Forget, are they

23   related?

24         A    Yes.

25         Q    That's his son, right?

JA-593

557
Lobdell – Cross – Sacco

1          A    Yes, it is.

2          Q    And you worked with Matt, too, you've

3    testified?

4          A    Yes, I did.

5          Q    And Mr. St. Onge, we've heard that name in

6    here, right?

7          A    Yes, sir.

8          Q    And Mr. Marchand?

9          A    Yes, sir.

10          Q    And the Trepaniers -- there are two

11    Trepaniers, correct?

12          A    Yes, sir.

13          Q    And you worked for them also, right, at --

14          A    Yes.

15          Q    -- at various points?

16          A    Yes, sir.

17          Q    So, from your memory, how many different

18    organizations have you worked for or did you work for?

19          A    For myself they were all working together so

20    it was one organization.

21          Q    What about Mr. Alain Forget, didn't he do

22    things on his own, also?

23          A    Yes, through them.  They were all there at the

24    same time, though.

25          Q    But he also had his own operation, right?

JA-594

558
Lobdell – Cross – Sacco

1          A     Yes.

2          Q     And you worked for him, also?

3          A     One time, yes.

4          Q     And he had his own operation.  Where did you

5    take the marijuana that time?

6          A     I went to Florida.

7          Q     And did he go with you?

8          A     Yes, he did.

9          Q     So you and Mr. Forget had your own thing and

10   you went down to Florida, right?

11         A     Yes.

12         Q     And for that, Alain Forget paid you how much?

13         A     $5,000.

14         Q     And you drove for him, is that what you did?

15         A     Yes, I did.

16         Q     Now, when you talked to law enforcement during

17   2009 and you stated that, you told them all about these

18   activities that had been going on, right?

19         A     Yes, sir.

20         Q     Did they ever send you up to do any kind of

21   controlled purchase?

22         A     No, sir.

23         Q     They decided they didn't want to do that at

24   that time?

25         A     I never purchased anything.  I was just called

JA-595

559

Lobdell - Cross - Sacco

1  and told to pick up and drop off, so I didn't --

2        Q    All of these trips that you were making, were

3  you calling them and telling them I'm on my way down, you

4  know, bust me?

5        A    I'm sorry, I don't understand.

6        Q    In 2009 you got arrested, right?

7        A    Yes, sir.

8        Q    And you were working with law enforcement,

9  right?

10       A    After that, yes.

11       Q    And you made a number of trips after 2009,

12 didn't you?

13       A    I did two trips by myself and a third trip I

14 was busted.

15       Q    On the first two trips by yourself, though,

16 did you call them and say I'm on my way with 200 pounds of

17 marijuana?

18       A    No, sir.

19       Q    But you were required to, weren't you?

20       A    Yes, sir.

21       Q    And you chose not to, right?

22       A    Yes, I did.

23       Q    Because you wanted the money, right?

24       A    No, sir.

25       Q    You were getting paid for it, weren't you?

JA-596

560

Lobdell - Cross - Sacco

1          A     Yes, sir.

2          Q     And how much were you going to get paid?

3          A     2,500.

4          Q     So those two trips were worth $5,000 to you?

5          A     Yes, sir.

6          Q     And so you had a choice and call law

7    enforcement and get $0 or take the 5,000?

8          A     Yes, sir.

9          Q     And you chose the 5,000?

10         A     Yes, sir.

11         Q     Because that was in your best interest?

12         A     My safety was my best interest.

13         Q     You testified about a number of times that you

14   went to my client's -- my client's mother's residence in this

15   small canal that we've been talking about, do you recall

16   that?

17         A     Yes, sir.

18         Q     Now, you've also testified that you were at

19   another dock down the St. Lawrence a number of times, right,

20   George King's?

21         A     George King's was not a dock.  That was a

22   house in Malone.

23         Q     I'm sorry, well, at George King's residence,

24   right?

25         A     Yes, sir.

561

Lobdell – Cross – Sacco

1          Q     You used to go to "Alan" Forget's residence,
2     also, right?
3          A     Yes, sir.
4          Q     Well, with respect to my client, you indicated
5     that he paid you, right?
6          A     Yes, he did, sir.
7          Q     You also indicated that you were paid
8     sometimes when money would come back?
9          A     Yes, sir.
10         Q     And that you would cut the money open, right?
11         A     They did, sir, yes.
12         Q     Right in front of you?
13         A     Yes, sir.
14         Q     Did they use a knife or just like a straight
15    edge or how would they cut it open?
16         A     They usually had a knife or just rip it open
17    (indicating).
18         Q     And he would, what, just take some hundred
19    dollars bills out and pay you directly right there?
20         A     Yes, sir.  They would take a stack and count
21    out and hand it to me.
22         Q     Was this right before it was put on the boat
23    to go north?
24         A     Yes, sir.
25         Q     Now you testified in the Grand Jury on May --

JA-598

562

Lobdell – Cross – Sacco

1    sorry, April 18th, 2012, do you recall going to the Grand

2    Jury?

3            A    Yes, sir.

4            Q    Do you recall raising your right hand and

5    going under oath?

6            A    Yes, sir.

7            Q    And you swore to tell the truth, right?

8            A    Yes, sir.

9            Q    Do you recall -- this is Page 30, Line 7,

10   through Line 10.  Do you recall being asked this question and

11   giving this answer?

12               Question, "When you brought back money, did

13   they ever pay you right out of the money that you brought

14   back or was it always separate?"

15               Answer, "It was always separate, and I always

16   wondered why."

17               Do you recall being asked that question and

18   giving that answer?

19           A    No, I do not, sir.

20           Q    Do you know why you weren't charged in 2009?

21           A    No, I do not, sir.

22           Q    With respect to my client, you said that he

23   paid you directly, right?

24           A    Yes, he did.

25           Q    Can you tell me a date and a time or a date,

563

Lobdell – Cross – Sacco

1   even?

2         A    I was arrested -- I was stopped on May 9th,

3   2009.  That was a Friday.  I returned back to my house around

4   6:00 and I believe it was around 7 or so that evening that I

5   met Hiio in the corner of the little restaurant diner on the

6   corner of 122 and 37.  We met in the corner -- I went back

7   like this.  He pulled in like that.  We were face to face and

8   he handed me the money and I said, well, I said, yes, I was

9   stopped today.  They looked at the truck and said, oh, we're

10  looking for a green truck, it's not yours and I was released.

11        Q    Now, did he call you or text you, how did he

12  contact you?

13        A    I text him and he text back and told me what

14  time to meet him.

15        Q    At this point you had just, I mean, hours

16  earlier, made your agreement with law enforcement to

17  cooperate with them, right?

18        A    Yes, sir.

19        Q    Did you call up the investigating agent and

20  show him this text on your phone or ask him to meet you

21  there, you were ready to help them?

22        A    Yes, sir.

23        Q    You called him up and told him that you

24  were --

25        A    No, sir.

JA-600

564

Lobdell – Cross – Sacco

1       Q       But you just left him hours earlier, right?

2       A       Yes, sir.

3       Q       Do you still have these text messages or any?

4       A       No, sir, I turned the phone over.

5       Q       To who?

6       A       The –– on the Monday when they did the

7   controlled delivery, I turned the phone to them, whomever it

8   was in that.

9       Q       Did they give you any kind of a receipt for it

10  or anything?

11      A       No, sir.

12      Q       Just handed him the phone and that was it?

13      A       Yes, sir.

14      Q       So there's a date and time that you can tell

15  me and you were just –– did you have the marijuana in the

16  back of your truck at that point when you met Mr. Peters?

17      A       No, sir.

18      Q       Where was it?

19      A       They had it.

20      Q       What did ––

21      A       It was ––

22      Q       What did you tell the organization, then,

23  where was the marijuana?

24      A       I told the organization that I had it safe.

25      Q       Just you didn't tell them where it was,