# 15-0541-cr

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

ALLAN PETERS, AKA Hiio,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 3 of 3 (Pages JA-601 to JA-816)

STEVEN D. CLYMER
ASSISTANT UNITED STATES ATTORNEY
  CHIEF, APPEALS DIVISION
UNITED STATES ATTORNEY'S OFFICE,
  NORTHERN DISTRICT OF NEW YORK
*Attorney for Appellee*
900 Federal Building
100 South Clinton Street
Syracuse, New York 13261
(315) 448-0684

LAW OFFICE OF DENNIS B. SCHLENKER
*Attorneys for Defendant-Appellant*
174 Washington Avenue
Albany, New York 12210
(518) 463-4473

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... JA-1

Indictment, dated August 14, 2013 ........................... JA-18

Motion *in Limine*, by Defendant, dated
    January 22, 2014.................................................... JA-21

Motion *in Limine*, by Appellee, dated
    January 24, 2014.................................................... JA-24

Jury Trial Transcript, dated January 27, 2014............ JA-36

Jury Trial Transcript, dated January 28, 2014............ JA-152

Jury Trial Transcript, dated January 29, 2014............ JA-394

Jury Trial Transcript, dated January 30, 2014............ JA-632

Appellee's Witnesses:

    Corey Spinner          Direct......................... JA-94
                               Cross.......................... JA-132

    Leonel Loya           Direct......................... JA-154
                               Cross.......................... JA-169

    Ernie Miller           Direct......................... JA-174
                               Cross.......................... JA-193
                               Redirect ...................... JA-196

    Decota D. Thompson    Direct......................... JA-199
                               Cross.......................... JA-212

ii

|  |  | **Page** |
|---|---|---|
| Richard Scott Norcross | Direct | JA-222 |
|  | Cross | JA-229 |
| Andrew Hermes | Direct | JA-234 |
|  | Cross | JA-281 |
|  | Redirect | JA-295 |
|  | Recross | JA-300 |
| Cornelius Joyce | Direct | JA-303 |
| James Sunday | Direct | JA-311 |
|  | Cross | JA-334 |
| Benjamin LaBaff | Direct | JA-337 |
| Alain Forget | Direct | JA-358 |
|  | Cross | JA-464 |
| Cheryl Lobdell | Direct | JA-516 |
|  | Cross | JA-577 |
|  | Redirect | JA-605 |

Government's Exhibits:

Exhibit 3 – Aerial Map of Defendant's Property ....... JA-732

Exhibits 9JA-9d – Photographs of Text Messages
    between Forget and Stewart ............................... JA-733

Exhibits 12JA-12e – Photographs of Surveillance
    on March 25, 2011 ............................................. JA-737

Exhibit 13 – Paperwork given to Defendant on
    March 25, 2011 (a/k/a the Fake NYSP Receipt)  JA-742

iii

**Page**

Exhibit 15 – Transcript of the Recorded Call
    between Forget and Appellant on
    March 25, 2011 ................................................ JA-743

Exhibit 17 – Transcript of Recorded Conversation
    between Forget and Appellant on
    March 25, 2011 ................................................ JA-744

Exhibit 19 – Photograph of Defendant ...................... JA-758

Exhibit 28 – Letter to Forget from the US
    Attorney's Office, Northern District of New
    York, dated January 13, 2014............................ JA-759

Exhibit 31 – Stipulation of Fact #1 ........................... JA-761

Exhibit 32 – Stipulation of Fact #2 ........................... JA-763

Exhibit 33 – Stipulation of Fact #3 ........................... JA-765

Affirmation of Brian P. Barrett, for Defendant, in
    Support of Motion for Judgment of Acquittal,
    dated May 15, 2014 ................................. JA-768

Decision and Order of the Honorable Glenn T.
    Suddaby, dated July 9, 2014 .................................. JA-778

Sentencing Minutes, dated February 12, 2015 .......... JA-787

Notice of Appeal, dated February 24, 2015 .............. JA-815

JA-601

565

Lobdell – Cross – Sacco

1  though?

2          A     No, sir.

3          Q     That you stashed it somewhere?

4          A     Yes, sir.

5          Q     And there was no issue with that, they didn't

6  have any issue with that?

7          A     No, sir, they didn't question me.

8          Q     But they clearly must have known from their

9  customer that this 200 pounds of marijuana didn't arrive?

10         A     Yes, they did because I told them that it was

11 too hot to go down and I would try again on Saturday and that

12 I stashed the marijuana.

13         Q     Now, you also testified to, well, Corey

14 Spinner was an individual that was involved, right, you used

15 to see Corey Spinner?

16         A     I saw him one time.

17         Q     One time?

18         A     Yes, sir.

19         Q     How much did you see Allan Forget at the dock

20 at the canal?

21         A     I can't remember how many times, sir.

22         Q     A lot or?

23         A     Yes, sir.

24         Q     But you would -- well, from 2008-'9 time

25 period until you were busted, you wouldn't Alain Forget --

566

Lobdell – Cross – Sacco

1  I'm sorry, you wouldn't see Corey Spinner very much, is that

2  your testimony?

3          A    Yes, I did not see him.

4          Q    Now, these other times that you've testified

5  that my client has paid you, when did that happen,

6  specifically?  Do you know any dates, specific dates?

7          A    I don't know the specific dates on any of the

8  others.  The others stood in my mind because I knew exactly

9  where I was that day and what had happened and all events.

10          Q    And during this time period you were again

11  using cocaine regularly, right?

12          A    No, it wasn't regularly.  I was using, yes, I

13  was and it may be once or twice during the month.

14          Q    And what sort of effect does cocaine have on

15  you?

16          A    On myself, it just calms my nerves down for

17  myself.

18          Q    Okay.  And were you also drinking during this

19  period of time?

20          A    Yes, off and on.  If I would drink, it would

21  be on the weekend.

22          Q    Now, Ms. Lobdell, is it fair to say that this

23  was a tumultuous time in your life?

24          A    My whole life, yes.

25          Q    And that, at least since 2006, you have done

567

Lobdell – Cross – Sacco

1    things that solely serve your interests, is that fair to say?

2             A    I don't know if I'd say to serve my interests.

3    I was trying to make right choices with the wrong state of

4    mind.

5             Q    Well, what made you steal the $5,000 from the

6    business?

7             A    I was trying to reach out for help to get out

8    of this organization, to get away.

9             Q    And then when you finally met the police in

10   2009, did you do that?

11            A    Yes, I did.

12            Q    Did you get help?

13            A    Yes, I did reach out to them and tell them

14   what was going on and they agreed to help me.

15            Q    And then as a result of that, you went back?

16            A    Yes, I chose to go back and not say anything,

17   due to the fact of I wanted to cooperate.  I wanted to get

18   out but I was also scared and I chose to let them believe

19   that I didn't get busted and that I was still okay, that I

20   did not burnt -- get burnt to run their jobs so I could set

21   up and work with the government.

22            Q    Well, isn't it true that they told you that

23   you could work when you wanted to and that if you weren't

24   able to work, that they would just find someone else?

25            A    They had made that remark, yes.

568

Lobdell – Cross – Sacco

1          THE COURT:  Now, again, who's they, who are we

2    talking about?

3          Q     Who told you that?

4          A     Stefan had told he that before.  Colin had,

5    but, however, Roger and them when I would say no on going to

6    a run, they were, no, you have to do this.

7          Q     But at this point Roger St. Onge -- you were

8    working mainly with Matt Forget and Colin Stewart, right,

9    St. Onge wasn't in the picture any more?

10         A     Not on the front burner, no.

11         Q     So they specifically told you, don't worry

12   about it, if you can't do it, we'll find someone else, right?

13         A     Yes, sir.

14         Q     And you still did it?  Right?

15         A     Yes, sir.

16         Q     So it was not about your fear or getting

17   sucked back into the organization, it was your choice, is

18   that fair to say?

19         A     Yes, it was my choice but the fear was in

20   there, sir.

21         Q     And now that you've demonstrated to the

22   government that you would work with them and then against

23   them, you have fear on the witness stand, don't you?

24         A     There is a little bit, yes, I do, sir.

25         Q     What could happen if you don't say what you

JA-605

569

Lobdell – Redirect – Gardner

1   need to say, is that fair to say?

2          A    Well, the only thing that I am scared about is

3   what's going to happen when I get back on the outside, sir.

4          MR. SACCO:  Your Honor, I have no further

5   questions.  Thank you.

6          MR. GARDNER:  Can I have just a moment.

7          THE COURT:  Yeah, go ahead, take your time.

8          (Discussion held off the record.)

9          MR. GARDNER:  Your Honor, I have just a couple of

10  questions.

11         THE COURT:  Go right ahead.

12  REDIRECT EXAMINATION BY MR. GARDNER:

13         Q    Ms. Lobdell, we talked on direct examination

14  about "Alan" Forget?

15         A    Yes, sir.

16         Q    And you indicated that you worked with him; is

17  that correct?

18         A    Yes, sir.

19         Q    How much would you see him at the defendant's

20  residence -- or defendant's mother's property?

21         A    "Alan" Forget, I'm trying to think of the

22  exact numbers.  He was there often but not all the time with

23  them.

24         Q    And you said you saw Corey Spinner one time?

25         A    Yes, one time.

570

Lobdell – Redirect – Gardner

1          Q     What was Spinner doing?

2          A     I was sent to his place for him to remove

3    tinting off a window of a truck and put a tonneau cover on

4    top of it.

5          Q     Is that that hard cover on the back of a

6    truck?

7          A     Yes, it is.

8          Q     So you went to his place of business?

9          A     Yes, sir.

10          Q     Did you ever run into Spinner in this drug

11    trafficking organization?

12          A     No.

13          Q     And we also talked on -- you spoke about on

14    direct and cross-examination about times when the defendant

15    paid you directly, correct?

16          A     Yes.

17          Q     And I know we talked about the May 2009

18    incident where he paid you after you were caught by border

19    patrol, is that correct?

20          A     Yes, it is.

21          Q     And how many other times do you think the

22    defendant paid you directly?

23          A     I think only maybe two or three.

24          Q     Do you remember -- I understand you're having

25    trouble remembering the approximate times that that happened.

JA-607

571

Lobdell – Redirect – Gardner

1  Do you remember the locations that those transactions
2  happened?
3          A    One time was met him at his mother's house at
4  the inlet there.
5          Q    And what happened on that occasion?
6          A    I just pulled up there and hand it over and
7  that was it.
8          Q    Was it at the canal?
9          A    Yes.
10         Q    Or was it --
11         A    The canal.
12         Q    Were you transporting a load that day?
13         A    No.
14         Q    Or did you make a special trip?
15         A    Special trip.
16         Q    Can you remember any other instances the
17  locations when the defendant paid you?
18         A    No, I know -- I'm trying to remember now one
19  time and I can't -- I don't remember this one time I know
20  when he came to the house if he brought me cigarettes and the
21  pay or -- you know, but I remember him coming directly to my
22  house one time but I can't remember if he brought me my pay
23  or just the cigarettes for me.
24             MR. GARDNER:  That's all the questions I have, your
25  Honor.

572

Lobdell – Redirect – Gardner

1          THE COURT:  Any cross on that?

2          MR. SACCO:  Nothing further, Judge.

3          THE COURT:  Ladies and gentlemen, I'm going to give

4    you a quick break and we'll get you back out here, okay.

5    Please don't talk about the case.

6          (Jury excused 3:15 p.m.)

7          THE COURT:  Okay, you can step down.

8          THE WITNESS:  Thank you very much.

9          (Witness excused, 3:16 p.m.)

10          THE COURT:  Okay.

11          MR. GARDNER:  Your Honor, I think the government is

12    prepared to rest at this point.

13          THE COURT:  Mr. Gardner, where are we going from

14    here?

15          And we'll let you do that in front of the jury.

16          But before we bring the jury back, Mr. Sacco, have

17    you and your client made some decisions about whether or not

18    you're going to go forward with a case?

19          MR. SACCO:  Yes, your Honor.  We've talked

20    specifically about his right to testify in his own defense,

21    as every defendant has, and he's elected not to do that.  He

22    can confirm that with you, if you want.  We also are not

23    putting on any other proof.

24          THE COURT:  You're not going to call any other

25    witnesses?

573
US v. Peters – 13-CR-316

1      MR. SACCO:  No, your Honor.

2      THE COURT:  Then we're going to be prepared to wrap

3  this case up.  What I think I'm going to do, then, I'm going

4  to let you both rest in front of the jury.  I'll bring them

5  back.  Let the government rest.

6      I'll ask you in front of the jury if you and the

7  defendant have decided whether or not you want to put a case

8  on and we'll let you indicate that you have decided not to go

9  forward and then I'm going to excuse this jury for the day.

10     And I'll hand you some proposed charges.  We'll go

11 through those.  Your client can stay here for that, if you'd

12 like -- that's his choice -- or we can let him go back,

13 whatever he wants to do.  But he has a right to be here, if

14 he wants to be here for that and then I'll let you sum up in

15 the morning.

16     MR. SACCO:  As a matter of procedure, I know I have

17 to make my Rule 29 at the close of their proof.  So, as a

18 matter of procedure, if they rest, then I rest, the Court's

19 still going to allow me to make my Rule 29?

20     THE COURT:  Actually, we can do it now, if you

21 want.  You both indicated your intention to rest.  The

22 government's going to do that.  We're just going to do that

23 formality of doing it before this jury.

24     Let's do this first, before you rest, Mr. Sacco:

25 Mr. Peters, sir, have you discussed your right to testify

574

US v. Peters – 13–CR–316

1  with Mr. Sacco and have you made a decision, sir?

2          (Discussion held off the record.)

3          THE DEFENDANT:  Yes, I did.

4          THE COURT:  And, sir, what is that decision, what

5  do you want to do?

6          THE DEFENDANT:  No.

7          THE COURT:  You don't want to testify, is that what

8  you're telling me?

9          THE DEFENDANT:  No, I don't want to testify.

10          THE COURT:  Thank you, sir.  I just wanted to get

11  that on the record.  It's important that you tell me that.

12          THE DEFENDANT:  Okay.

13          THE COURT:  Because that is your right that nobody

14  can take away from you.  So, I need to hear it from you,

15  okay, and I thank you.

16          So that being done, government's indicated they're

17  going to rest.  Defense is going to rest.

18          Mr. Sacco, why don't we go ahead and let's here

19  your motion argument now why the while the jury's out of the

20  room.

21          MR. SACCO:  Okay, thank you, Judge.

22          Pursuant to Federal Rule of Criminal Procedure 29,

23  I'm making a motion for judgment of acquittal in that the

24  court, of course, has heard all of the government's evidence

25  and the evidence is not sufficient to sustain a conviction.

575

US v. Peters – 13-CR-316

1      Specifically, your Honor, the government has failed
2  to prove my client is a member of this conspiracy and,
3  further, that he possessed, with the intent to distribute or
4  distributed, any marijuana in this case.  I understand the
5  proof, as it's come in, is that all these other folks around
6  the dock or canal and other places have actively engaged in
7  the conspiracy.  But my argument, your Honor, is that my
8  client was not a member of that conspiracy and that he
9  himself did not distribute or attempt to distribute any
10  marijuana.
11      Thank you.
12      THE COURT:  Okay.  Mr. Gardner, you want to be
13  heard, sir?
14      MR. GARDNER:  Just briefly, your Honor.  The
15  government obviously opposes this motion.
16      The government has presented quite a bit of
17  evidence in this case but I'll focus on the three cooperating
18  witnesses.  The government believes that all three
19  cooperating witnesses satisfy the government's proof in this
20  case.  All three witnesses provided direct evidence of, not
21  just the conspiracy, but the defendant's participation in the
22  conspiracy, particularly Lobdell and Forget.  Looking at the
23  evidence in the light most favorable to the government, both
24  witnesses testified that the defendant was in control of his
25  mother's property; that this organization was shipping

576

US v. Peters – 13–CR–316

1   marijuana through that property on a regular basis; that the
2   defendant was present during transactions; that the defendant
3   was being paid by the organization for use of the property;
4   that the defendant acted as a scout for the organization and
5   based on all that, the government believes that there's more
6   than sufficient proof to satisfy the government's burden,
7   your Honor.
8          THE COURT:  Thank you.
9          I'm going to deny the motion.  The Court is
10  required to look at the government's proof in the light most
11  favorable, considering the charge in question, and the Court
12  believes there is a sufficient question of fact for this jury
13  to decide this case.  So I'm going to allow this jury to
14  decide this case and I'm going to deny this Rule 29 motion.
15         Anything else?
16         MR. SACCO:  No, your Honor.  We are prepared, if
17  they rest, we'll follow up and have our charge conference.
18         THE COURT:  Then I'm going to bring this jury out
19  here.  We'll do that, go through those formalities, then I'll
20  excuse them for the day.  I will give you a copy of the
21  proposed charge.  I'll give you some time to look that over
22  and discuss it with your client and then we'll do a charge
23  conference.
24         And, he can, after you've reviewed the charge with
25  him, again, he can either stay for the actual charge

JA-613

577

US v. Peters – 13-CR-316

1  conference or he can head on back.  It's up to him and you,

2  okay.

3          MR. SACCO:  Okay, Judge, thanks.

4          THE COURT:  Bring the jury in.

5          (Jury present, 3:23 p.m.)

6          THE COURT:  Okay.  The record should reflect we

7  have the ladies and gentlemen of the jury.  We're back in the

8  courtroom.

9          Mr. Gardner, is the government going to call any

10  more witnesses?

11          MR. GARDNER:  No, your Honor, the government rests.

12          THE COURT:  Okay, very well.  The government has

13  rested their case.

14          Mr. Sacco, what's the defendant's pleasure with

15  regard to going forward?

16          MR. SACCO:  Your Honor, the defense also rests.

17          THE COURT:  Very well.  Okay.

18          Ladies and gentlemen, the proof in this case is

19  going to be closed.  All right.  And the next step, if you

20  remember from my preliminary instructions, is going to be

21  we're going to hear closing arguments from both the

22  government and the defense and then I'll give you a charge on

23  the law and that's when you'll start your deliberations when

24  those things have been completed.

25          So, here's what we're going to do.  It's almost

JA-614

578

US v. Peters – 13-CR-316

1   3:30 and I need to review my legal charge with these

2   attorneys.  So, what I think I'm going to do is I'm going to

3   send you home, okay, for the day a little bit early.  Ask you

4   to be here at 9 o'clock tomorrow morning for summations and

5   then the charge in this case and then you can start

6   deliberating and we'll have, you know, most of the day

7   tomorrow for you to take whatever time you need to decide

8   this case after it's all done.

9          Now it's very important, all right, the proof is

10  closed, all right.  But this case is not over.  There's two

11  very important steps.  We want to hear the closing arguments

12  for your consideration of these attorneys and I have to

13  instruct you on the law and how you're supposed to look at

14  this proof and what the elements and standards are for you to

15  make some determinations, okay.  So, I don't want you coming

16  to any conclusions yet, all right, just because the proof is

17  closed.

18         And I certainly don't want you talking to anybody

19  about this case.  More important -- it's always important but

20  it's very important now because there's a tendency to say,

21  okay, we've heard all the witnesses and we're going to start

22  making some decisions.  Just wait until tomorrow morning.

23         And, again, if anybody tries to talk to you about

24  this case, I need to know about it immediately.  I don't

25  think there's been any media coverage about this case, but if

JA-615

579

US v. Peters – 13–CR–316

1   there is, please don't read or listen to anything.  Put it

2   aside or shut it off until this case is over with and then

3   you can, you know, read it afterwards or listen to anything

4   that you'd like.

5            Any questions about any of that?

6            (Jurors nodding no.)

7            THE COURT:  Okay.  Well, hopefully we'll have

8   another sunny day tomorrow.  It's supposed to be gradually

9   warming up so it will hopefully make your morning a little

10  easier.  Have a good restful night and we will see you

11  tomorrow morning, okay.  Travel safe.

12           (Jury excused, 3:25 p.m.)

13           THE COURT:  I'm going to pass out or have my

14  courtroom deputy give you the charge but, as she's doing

15  that, I also want to put something else on the record and

16  we've discussed it and that's a specific charge regarding the

17  recorded conversation between Mr. Peters and Mr. Forget and

18  the agreement between the parties ahead of time that there's

19  a part of that recording where Mr. Peters, the defendant in

20  this case, indicated that he had a prior conviction for some

21  sort of a gun violation.  And the government and defense had

22  agreed that that would be redacted out.  And both parties

23  agreed through an inadvertent error, that that portion of the

24  recording was played and the jury heard it and, as a result

25  of that, the defendant made a motion for a mistrial yesterday

580

US v. Peters – 13–CR–316

1   based on the government's inadvertent presentation to the

2   jury of that portion of the recorded conversation.

3         I denied that motion on the basis that a mistrial

4   is an extreme remedy and it was not warranted under the

5   circumstances here.

6         Instead, I advised counsel that I would give a

7   curative instruction either immediately or sometime

8   thereafter with my charge to the jury that would be

9   sufficient to eliminate any prejudice or potential prejudice

10   to the defendant.

11         In that regard, I was going to charge this jury

12   anyway that they were only to consider the defendant's

13   involvement in any potential weapons activity for the limited

14   purpose of background information and the defendant's state

15   of mind.  In addition, I was going to add that any evidence

16   that the defendant may have been convicted of another crime

17   may not be considered.

18         Now, in this regard, I want to add that the

19   introduction of evidence of a prior conviction is admissible

20   under Rule 404(b) as it may be relevant to the defendant's

21   intent, preparation, plan, knowledge or absence of mistake

22   and the fact that the Federal Rules of Evidence allow the

23   admission of such evidence further belies any argument of

24   prejudice to this defendant.

25         Nonetheless, because this was not addressed with

JA-617

581

US v. Peters – 13-CR-316

1   the Court pretrial and there was an agreement between the

2   parties, the Court does intend to instruct the jury and give

3   them a curative instruction with regard to this inadvertent

4   playing of the defendant admitting that he had some sort of a

5   weapons conviction.

6           That being said, defense counsel advised the Court

7   this morning that it was the defendant's preference to have

8   that done as a part of the jury charge at the end of the case

9   because it would not -- and I agree with counsel's decision

10  on this and the defendant's decision -- that it draws less

11  attention to this.

12          And it should be noted that the recording was

13  played again during the testimony of Mr. Forget and that

14  portion of it where the defendant had made the admission

15  about some sort of weapons conviction was deleted from there.

16  So now the jury has seen it once and seen the same recording

17  recorded conversation again where it was not included.

18          So the last thing I want to do is draw any

19  attention to it and I think that's the desire of defense

20  counsel and this defendant.

21          So I'm going to include it in a section where I was

22  going to talk about evidence of uncharged conduct, which I

23  felt was necessary to be given in this case anyway, based on

24  the fact that some of the proof in this case that's been

25  offered by the government has talked about the property that

582

US v. Peters - 13-CR-316

1    they allege the defendant was controlling during the course

2    of this conspiracy and some other criminal activity that was

3    taking place there, that they've indicated through the

4    testimony of cooperating witnesses that this defendant had

5    knowledge of but are not part of this indictment.

6              And the government has offered that evidence to

7    establish what I've previously indicated that the

8    defendant -- establishes the defendant's intent his knowledge

9    and absence of mistake of what was going on here with regard

10   to this conspiracy.  And, therefore, it would be admissible

11   evidence for the jury to consider.  But they can only

12   consider it for those limited purposes and not to draw some

13   inference about this defendant's propensity to commit crime

14   or that it suggests that because he did something

15   previously -- or allegedly did something previously -- that

16   he, therefore, acted in accordance therewith in committing

17   the crimes charged.

18             So, if you want to look to the section of the

19   charge where we talk about uncharged conduct, I cover this

20   and then specifically at the end of that charge and I'm just

21   going to read the last paragraph.

22             Are you with me?

23             MR. SACCO:  The last paragraph on Page 15, Judge?

24             THE COURT:  Actually, the last paragraph of that

25   section on Page 16 is where I've added the language to

JA-619

583

US v. Peters – 13–CR–316

1    specifically address this issue.  And, again, I'm going to
2    address it without trying to draw too much attention to it.
3    But I explain about the uncharged conduct and in the last
4    paragraph how they're to consider that.
5            And then the last paragraph says, these are the
6    sole purposes for which you may consider evidence of prior
7    relationship between the defendant and the government's
8    witnesses, evidence that other conduct -- of other conduct
9    may not be considered by you for any other purpose;
10   specifically, you may not use this evidence to conclude that
11   because the defendant committed the acts involved in the
12   other conduct, he must also have committed the acts charged
13   in the indictment, nor may you consider any evidence that the
14   defendant may have been convicted of any other crime.  Any
15   prior criminal conduct or conviction of the defendant which
16   you may have been -- which may have been mentioned or
17   presented through any evidence is not relevant.  It may not
18   be considered by you.
19           Once again, I stress that the defendant is not on
20   trial for committing any acts that are not alleged in the
21   indictment.
22           Okay.  And, hopefully, I believe that will
23   adequately cover this situation.
24           MR. SACCO:  Judge, can I make a comment or request?
25           THE COURT:  You may.  That's why we're doing this.

JA-620

584

US v. Peters – 13-CR-316

1       MR. SACCO:  I don't think in this case there's any

2  evidence of a prior conviction of my client depending on how

3  you look at what happened here.

4       THE COURT:  You mean how you interpret his

5  statements on that recorded conversation?

6       MR. SACCO:  Yeah, yeah.

7       THE COURT:  Okay.

8       MR. SACCO:  It's my request -- and I don't know if

9  it's a problem or not with anyone else.  I'm happy with what

10  you've done here and I'll talk about this with my client if

11  you take out the word conviction.  I think it's covered and I

12  don't think --

13       THE COURT:  Any prior criminal conduct?

14       MR. SACCO:  Just take out "or conviction".  So it

15  would read any prior criminal conduct of the defendant which

16  may have been mentioned.  Because I think that adequately

17  covers the issue we have.

18       THE COURT:  Okay.

19       MR. SACCO:  And that word conviction, I'm just

20  afraid will inflame the thoughts potentially.

21       THE COURT:  Mr. Gardner, you want to be heard with

22  regard to his request?

23       MR. GARDNER:  No objection, your Honor.

24       THE COURT:  Okay.  Mr. Peters, just so we're clear,

25  you made the comment in your conversation with Mr. Forget.

JA-621

585

US v. Peters - 13-CR-316

1    Do you have a prior conviction for a weapons count or were

2    you arrested, what happened, and you consult with your

3    attorney about this.  You don't have to answer my question.

4    I just want to get this straight and make sure you're

5    comfortable with what I'm charging this jury.

6              MR. SACCO:  He does, Judge.  It's an old

7    conviction.

8              THE COURT:  An old conviction, okay.  But you

9    still, despite that fact, that was clear to me, by the way

10   you said that, I, you know, I've been -- I don't exactly know

11   what his words were at this point but it's clear to me that

12   he had prior conviction for weapons.

13             MR. SACCO:  He basically said I already went to

14   jail for that.

15             THE COURT:  There you go.

16             MR. SACCO:  So, did he go to jail and he was

17   acquitted?  It's not necessarily -- those words don't

18   necessarily equate to a conviction and so that's why I ask

19   that you take that word out.

20             THE COURT:  And, Mr. Peters, you agree with that?

21             THE DEFENDANT:  Yes.

22             THE COURT:  I'm going to take conviction out and

23   we'll just do it any prior criminal alleged criminal conduct.

24             MR. SACCO:  Because I even in my defense have

25   raised this issue of cigarette smuggling which they could

JA-622

586

US v. Peters – 13–CR–316

1   conceive as, you know, criminal conduct.

2          THE COURT:  Sure.  Sure.

3          MR. SACCO:  So.

4          THE COURT:  If the jury understands that that's

5   criminal conduct.  I'm not sure that they do.

6          MR. SACCO:  Yeah.

7          THE COURT:  But I understand your argument.  We'll

8   take that out and then does that –– with that being granted,

9   does that address your concern and will this curative

10  instruction be sufficient from you and your client's view?

11         MR. SACCO:  Yes, your Honor.

12         THE COURT:  That's what we're going to do then.

13  And now I'm going to step off the bench and I'm going to give

14  you gentlemen an opportunity to take some time to review this

15  proposed charge without me sitting here waiting and looking

16  at you and take your time and review it.

17         And, Mr. Sacco, you can review it with your client.

18  And, again, when I come back on the bench, if he wants to

19  stay for the charge conference, he can or if he prefers to be

20  taken back by the Marshals, that's his decision, okay.

21         MR. SACCO:  Okay, thank you, Judge.

22         THE CLERK:  Court's in recess.

23         (Recess taken.)

24         (Open court:)

25         THE COURT:  We're back on the record.  We're in the

JA-623

587

US v. Peters – 13-CR-316

1   courtroom.  The jury has been excused for the day and we're

2   here to complete our charge conference before summations and

3   jury charge tomorrow morning.

4          So, I find the most expeditious way is to go

5   through the sections and you just tell me if -- I'll ask you

6   if there's any questions or objections to each section as we

7   go through and you can let me know if there are any issues.

8          So, starting with the introduction, role of the

9   Court and the jury and role of the attorneys, government as a

10  party, are there any requests or objections with regard to

11  that initial section?

12         MR. SACCO:  No, your Honor.

13         MR. GARDNER:  No, sir.

14         THE COURT:  And the second section, nature of

15  evidence and it's broken down into four subsections:

16  Testimony, exhibits, stipulations of facts -- obviously, the

17  stipulations of fact are important in this case because there

18  were several -- direct and circumstantial evidence;

19  indictment is not evidence; and potential punishment not

20  evidence.

21         Are there any requests for objections with regard

22  to that section from government?

23         MR. GARDNER:  No, sir.

24         MR. SACCO:  No, your Honor.

25         THE COURT:  Okay.  Evaluation of evidence, which is

JA-624

588

US v. Peters – 13–CR–316

1    section III.  It's broken down into Sections A through L and

2    I'll list them.

3             Verdict based on evidence, not on sympathy.  B is

4    improper considerations of race, religion, national origin,

5    sex or age.  C is quality not the quantity of the evidence.

6    D is credibility of witnesses.  E is impeachment by prior

7    inconsistent statement.  F is failure of the defendant to

8    testify.  G is accomplice testimony and there's two sections:

9    Nature of the accomplice testimony in general and the purpose

10   for which the testimony was introduced.  H is evidence of

11   uncharged conduct and that is the section where I'm going to

12   add the language with the specific instruction with regard to

13   the inadvertent playing of the recorded conversation, that

14   section.  I is use of undercover agents and informants.  And

15   J is evidence obtained through searches and wiretaps.  K is

16   transcripts of audio recordings and text messages.  And L is

17   variance of dates –– immaterial.

18            Are there any requests for objections to anything

19   that section?

20            For the government?

21            MR. GARDNER:  No, your Honor.

22            MR. SACCO:  Judge, the only thing I would like to

23   maybe clarify, Page 17 letter J.  I don't think we had any

24   wiretaps.  The only reason I'm bringing that up is because

25   that may confuse some of them.  We had the recorded phone

589

US v. Peters – 13-CR-316

1    calls, but sometimes people get wrapped around the concept of

2    wiretaps and I don't think we had an actual wiretap.  So, I

3    don't know if that's something significant or not.  It says

4    in the part that I saw that may be an issue, if defendant and

5    others -- says something here about but what the consent and

6    authorization of the Court, these so called wiretaps were

7    obtained lawfully, but we didn't have any wiretaps.  I don't

8    know if we can take that out.

9         THE COURT:  Mr. Gardner, you want to be heard?

10        MR. GARDNER:  I have no objection to that, your

11   Honor.

12        THE COURT:  All right.  So what I'm looking at --

13   just to make sure we're talking about the same thing -- the

14   second paragraph down from the top, in addition the

15   government has offered evidence in the form of recordings,

16   telephone calls and text messages between defendants and

17   others or between the accomplice witnesses, which were

18   obtained without the knowledge of the parties to the

19   conversations but with the consent and authorization of the

20   Court.

21        And then it says, these so-called wiretaps were

22   lawfully obtained.  The use of this procedure to gather

23   evidence is perfectly lawful and the government is entitled

24   to use such wiretaps in this case.

25        So what do we want?  We want to say these

590

US v. Peters – 13-CR-316

1  recordings?

2       MR. GARDNER:  We can say recordings, intercepted

3  communications, recordings actually.

4       THE COURT:  Yeah, these recordings were lawfully

5  obtained and the use of this procedure to gather this

6  evidence is perfectly lawful and the government is entitled

7  to use such recordings in this case, okay.

8       MR. SACCO:  Yeah, I agree.

9       MR. GARDNER:  Your Honor, before we go on, may we

10  go backwards?

11       THE COURT:  Hang on a second.  Let me make my notes

12  with regard to that so we have it.

13       Mr. Sacco, does that address your concern?

14       MR. SACCO:  Yes, your Honor.

15       THE COURT:  Okay.  Now where are we going back to?

16       MR. GARDNER:  Page 5.  I apologize.

17       THE COURT:  All right.

18       MR. GARDNER:  It's a minor thing.  When the Court

19  is discussing the stipulations of fact, will you let them

20  know or remind the jury that we do have three stipulations of

21  fact in this case just so they understand they have some

22  context.

23       THE COURT:  Yeah.

24       MR. SACCO:  No objection, Judge.

25       THE COURT:  I think -- and I'll hear you, Mr.

591

US v. Peters – 13-CR-316

1   Sacco -- I think it may be important to emphasize with these
2   stipulations of facts that there's been no experts to testify
3   about the fact that this was, indeed, marijuana, was tested
4   and confirmed to be marijuana.
5        I don't want the -- I think the stipulations are
6   pretty clear about that.  I'll hear either one of you or both
7   of you with regard to this.  You want me to say anything else
8   that, you know, that that's sufficient with regard to
9   establish the fact that, you know, the substance in question
10  that was being smuggled in this case was indeed marijuana?
11       MR. SACCO:  Well, I would say I think it's okay to
12  remind them about the stipulations and they can certainly
13  read and use those.
14       The question -- I think the confusion, if we do
15  anything else, could be there's a lot of other testimony
16  about marijuana in this case and what's been proven in
17  court --
18       THE COURT:  Are just the stipulations.
19       MR. SACCO:  Yeah.
20       THE COURT:  Yeah.
21       MR. SACCO:  So that's what I think.
22       THE COURT:  I'll leave it alone.  I'll remind them
23  that there's three stipulations and I think it's pretty clear
24  in there in each one of them you indicated it was tested, it
25  was confirmed.  So we'll leave it alone.

JA-628

592

US v. Peters – 13–CR–316

1          MR. GARDNER:  Yes.

2          THE COURT:  So you're talking about right in the

3  second paragraph?

4          MR. GARDNER:  Yes, sir.

5          THE COURT:  The parties entered into three distinct

6  separate stipulations of fact.

7          MR. GARDNER:  Yes, sir.

8          THE COURT:  Concerning in each case the

9  confiscation and testing of marijuana?

10          MR. GARDNER:  Yes, that would be great, sir.

11          THE COURT:  All right.  Well, then, was there

12  anything else in section III?

13          MR. SACCO:  No, your Honor.

14          MR. GARDNER:  No, sir.

15          THE COURT:  Then we'll go to Section IV, which is

16  the burden of proof.  It's pretty straightforward, you know,

17  if there's any requests or objections in that section.

18          Mr. Gardner, it's Page 18.

19          MR. GARDNER:  No, your Honor.

20          MR. SACCO:  No, your Honor.

21          THE COURT:  Okay.  We'll move on to the substantive

22  law which starts on Page 20 and we have Count one --

23  conspiracy to distribute or possess with intent to distribute

24  a controlled substance.  And from there we have subsections

25  describing the elements, the first element, second element,

JA-629

593

US v. Peters – 13-CR-316

1    third element and the last section is the quantity of

2    marijuana involved.

3            Any requests or objections with regard to that

4    section?  For the government, Mr. Gardner?

5            MR. GARDNER:  No, sir.

6            MR. SACCO:  No, your Honor.

7            THE COURT:  Last section is the conclusion.

8    Anything about the conclusion, any requests or objections for

9    the government?

10           MR. GARDNER:  No, sir.

11           THE COURT:  Mr. Sacco?

12           MR. SACCO:  No, your Honor, no it's fine.

13           THE COURT:  Then let's get on to the special

14   verdict form.  I think you were provided that as well, right?

15           MR. SACCO:  Yes, your Honor.

16           THE COURT:  It's a one-page verdict form.  There's

17   only one count here.  It lists that count and it just has a

18   blank for guilty or not guilty and then it indicates, if the

19   answer to number one is guilty then proceed to Question 2.

20           And Question 2 has to do with quantity and it

21   breaks out 1000 kilograms or more, 100 kilograms or more but

22   less than 1000, and less than 100 kilograms, should they find

23   the defendant guilty, what is he responsible for and what's

24   been proven beyond a reasonable doubt.

25           Any issues with that for the government?

594

US v. Peters – 13–CR–316

1          MR. GARDNER:  No, sir.

2          THE COURT:  With this verdict form?

3          MR. SACCO:  No, your Honor.

4          THE COURT:  I've reviewed it with my client.  He's

5    looked at it.  Right?

6          THE DEFENDANT:  Yes.

7          MR. SACCO:  No problem.

8          THE COURT:  I think we're all set for the day.

9    Have a good night and we'll see you first thing.  We'll start

10   with summations at 9 o'clock.

11         MR. SACCO:  Yes, sir.

12         MR. GARDNER:  Sounds good.

13         THE COURT:  Thank you.

14         THE CLERK:  Court's in recess.

15         (Proceedings recessed, 4:28 p.m.)

16

17

18

19

20

21

22

23

24

25

595

US v. Peters – 13–CR–316

C E R T I F I C A T I O N

        I, DIANE S. MARTENS, Registered Professional
Reporter, DO HEREBY CERTIFY that I attended the foregoing
proceedings, took stenographic notes of the same, that
the foregoing is a true and correct copy of same and the
whole thereof.

                                    _____

                                    DIANE S. MARTENS, FCRR

JA-632

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
UNITED STATES OF AMERICA,

                        Plaintiff,

vs.                                    13-CR-316

ALLAN PETERS, aka "Hiio",

                        Defendant.
----------------------------------------------------x

        Transcript of *JURY TRIAL – VOLUME IV* held on

January 30, 2014, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York,

the HONORABLE GLENN T. SUDDABY, Presiding.

                A P P E A R A N C E S

For Plaintiff:      OFFICE OF THE UNITED STATES ATTORNEY
                    14 Durkee Street
                    Room 340
                    Plattsburgh, New York 12901
                      BY:  DANIEL C. GARDNER, Esq.
                           Assistant United States Attorney

For Defendant:      MARK J. SACCO
                    38 North Ferry Street
                    Schenectady, New York 12305


                *Diane S. Martens, RPR, FCRR*
            *Official United States Court Reporter*
                 *100 South Clinton Street*
                 *Syracuse, New York 13261*
                      *(315)234-854*5

JA-633

597

US V. Peters – 13-CR-316

1           (Open court:)

2           THE COURT:  Okay.  We're in the courtroom without

3    the jury.

4           Mr. Gardner, what are you going to do with regard

5    to closings, are you going to go reserve some time?

6           MR. GARDNER:  I'd like to reserve some time for

7    rebuttal, your Honor.

8           THE COURT:  Okay, just curious what you had in

9    mind, that's all.

10          Is everybody ready?

11          MR. GARDNER:  Yes, sir.

12          MR. SACCO:  Yes, your Honor.

13          THE COURT:  Please bring them in.

14          (Jury present.)

15          THE COURT:  Ladies and gentlemen, good morning.

16          (Jurors say good morning.)

17          THE COURT:  Hope your travel wasn't too bad.  Nice

18   and quiet out there again this morning.  Sunshine, love to

19   see it.  So we're at the point where we're going to hear

20   closing arguments and then I'm going to give you the charge

21   on the law.

22          Mr. Gardner, sir, when you're ready.

23          MR. GARDNER:  Thank you, sir.

24          Good morning, ladies and gentlemen.

25          (Jurors say good morning.)

JA-634

598
                    US V. Peters – 13–CR–316

1        MR. GARDNER:  There's an old saying in real estate,
2    that real estate is all about location, location, location.
3    Well, the same thing is true in international drug smuggling.
4    It's all about location, location, location, and that's why
5    the defendant and this property were so vital to this
6    conspiracy and its overall success.  This conspiracy would
7    not have existed and would not have functioned so well if the
8    defendant was not involved and helped to facilitate that.
9        So, ladies and gentlemen, the challenge for
10   international drug smuggling organizations, the challenge for
11   someone like Colin Stewart is he has access to hundreds and
12   thousands of pounds of marijuana up in Canada.  He has
13   curriers in the United States that are willing to take those
14   drugs to various locations throughout the northeast United
15   States.
16       The problem is the border.  The border is a natural
17   choke point and it is littered with law enforcement from
18   California to Maine and when you're transporting hundreds and
19   thousands of pounds of marijuana, hundreds of pounds at a
20   time, you can't go to a port-of-entry.  You can't load up
21   your truck with these giant bags of stinky, smelly marijuana
22   and go through a port-of-entry and think that you're not
23   going to get caught half the time or more.  That's not good
24   business and that's not the way that they work.
25       And in between the ports of entry you have border

US V. Peters - 13-CR-316

1   patrol patrolling all the roads, patrolling on foot,

2   patrolling in the air and on the water.  They put sensors out

3   in between the ports of entries and cameras so if you try and

4   sneak through the woods, you might have your picture taken;

5   you might trip a sensor; you might run into a border patrol

6   agent who's patrolling out there.  That's risky.

7           So that's where defendant comes in.  That's why

8   that property and the defendant are so critical and vital to

9   this organization.  And the defendant and this organization

10  took full advantage of that property and its unique location

11  right near the border.

12          So this organization, all they had to do was

13  transport the marijuana across that river either by boat or

14  on snowmobile, get it to this property, load it up, put it in

15  the currier's cars and then they're just a couple of miles

16  from the border.  But unlike pretty much every where else,

17  they could drive this marijuana across the border without

18  going through a port of entry without risking going through

19  the woods, sneaking through the woods getting their picture

20  taken or running into border patrol.  They just drove it

21  across the international border.  They bypassed this massive

22  choke point all across the United States by using this

23  property and using its unique location on the reservation.

24          Drug trafficking organizations, drug smuggling

25  organizations need someone like the defendant and this

US V. Peters – 13–CR–316

1  organization needed the defendant to make this organization

2  work.

3          And it worked very well, ladies and gentlemen.

4  They were incredibly successful, especially between the

5  period of time of 2005 until 2011.  I think Ms. Lobdell

6  testified between '05 and '09 she made something between 80

7  and a hundred runs transporting loads of marijuana.  That's

8  big money for this organization.

9          During opening statements I talked about the fact

10 that there was three basic issues that you would have to

11 resolve at the close of evidence in this case.  Was there a

12 conspiracy?  Did the defendant knowingly participate in that

13 conspiracy?  And if he did, then there's this issue of

14 weight, how much marijuana is he accountable for.

15         And you heard a lot of evidence from different

16 people but, just as we talked about during opening

17 statements, the crux of this case is those three cooperating

18 witnesses, Lobdell, Spinner and Forget.  They provided the

19 bulk of the evidence in this case and, as we talked about in

20 opening statements, their testimony should be looked at more

21 critically than any of the other witnesses that you heard

22 from because they're cooperating witnesses because they hope

23 to gain something from their testimony.  Even Mr. Forget

24 who's been told he's not getting anything for his

25 cooperation, he probably still hopes and wants to receive

601

US V. Peters - 13-CR-316

1    some benefit for the work that he did with DEA and for

2    cooperating.

3              But it's a double-edged sword, ladies and

4    gentlemen.  Those cooperating witnesses have a bias, but they

5    are also individuals that participated in this conspiracy

6    with the defendant.  So they had direct contact with the

7    defendant and the testimony they provided is direct evidence

8    of the defendant's involvement in this conspiracy they're

9    like eyewitnesses.  They just happen to be people who

10   committed crimes to become eyewitnesses.

11             And what do they tell us?  Well, all three

12   individuals testified that -- aside from I think Lobdell said

13   three loads she went to Adams Marina -- but every single load

14   of marijuana they picked up from the defendant's mother's

15   property.  They testified that the organization would bring

16   the marijuana down by boat, that they would unload right at

17   that canal that they would then load it up into their

18   vehicles and off they went.  They delivered to a bunch of

19   different locations in the United States or they would

20   deliver it to Forget's house or this guy George King's house.

21             They talked about the frequency of their trips.  I

22   think Spinner said he made a total of 15 trips, all right,

23   talked about how Lobdell said she made between 80 and a

24   hundred trips and Forget, during that two-year period, he

25   talked about moving loads at least once a week, but as much

602

US V. Peters – 13-CR-316

1    as two or three times a week.  So, obviously this was a
2    substantial organization that was moving a substantial amount
3    of marijuana.
4           They talked about the weights involved, that they
5    would transport no less than a hundred pounds and they would
6    transport up to 200 and 240 pounds.  And you heard from
7    Lobdell that she would also, after she delivered the loads of
8    marijuana, she would pick up money from the customers and
9    then take that back to the defendant's mother's property.
10          But they also talked specifically about the
11   defendant.  You heard from Forget and Lobdell that when Colin
12   and Stefan would come down and deliver a load of marijuana,
13   they would meet with the defendant.  They would talk about
14   when is –– the defendant would want to know when the next
15   load is coming through, is there anybody coming back, he
16   would want to know about the logistics of the organization
17   and what was happening.
18          Both Lobdell and Forget talked about how the
19   defendant would exchange drug proceeds, that he would take
20   drug proceeds from Colin or someone else and take it and
21   exchange it from Canadian currency to U.S. currency so that
22   curriers like Lobdell and Forget could be paid by the
23   organization and defendant himself.
24          You heard Lobdell and Forget testify that Colin was
25   paying the defendant, that Colin Stewart and Stefan was

603

US V. Peters – 13–CR–316

1   paying the defendant for use of this property.  Lobdell saw
2   that very directly.  She stated that when she would bring
3   currency back from the customers, these drug proceeds, that
4   when they got to this landing on the defendant's mother's
5   property, that sometimes Colin would cut that open and say
6   here this is some cash for you, Lobdell, and this is some
7   cash for you, Mr. Peters (indicating).
8           Forget described something similar.  He said that
9   he often saw Colin hand the defendant a paper bag or a
10  plastic bag and say, here, this is for last week.  And he
11  also talked about that that's exactly how he got paid, that
12  Stewart would hand him a paper bag or a plastic bag and that
13  would contain bundles of cash.
14          Both Lobdell and Forget testified that the
15  defendant often scouted for the organization, driving ahead
16  of the load vehicle to make sure things were all clear, he
17  would scout down to Route 37 just off the reservation.  He
18  would scout out further to this diner that Lobdell talked
19  about or he would go all the way out to 87 to check that
20  immigration checkpoint on I87.  And, if there were any issues
21  or problems, he would call back, he would let Colin know,
22  tell them to hold up, can't go yet, Big Guy said don't go
23  yet.
24          And what they testified about and what, when you
25  look at the whole of their testimony, ladies and gentlemen,

JA-640

604

US V. Peters – 13-CR-316

1   it shows that the defendant was in control of this property,

2   that he didn't just have access to his mother's property but

3   he was controlling that property and he used that property to

4   open up this door, this gateway for the organization and that

5   the organization was paying him to keep that gateway open.

6           But we didn't just hear from the cooperating

7   witnesses in this case, ladies and gentlemen.  We also heard

8   a lot of evidence that corroborates what they're talking

9   about.  It's that -- it goes back to that double-edged sword.

10  They have a bias and we need to look at their testimony

11  critically but they also are providing direct evidence of

12  this conspiracy.

13          And if you credit their testimony, ladies and

14  gentlemen, if you find their testimony believable, then the

15  government has satisfied every element in this case because

16  they testified as to each element of this offense, that there

17  was a conspiracy, that the defendant participated in it, and

18  that the there was a certain amount of weight involved in the

19  conspiracy.  So, if you credit their testimony, ladies and

20  gentlemen, the government has proven its case beyond a

21  reasonable doubt.

22          So then the question is:  Are they credible and can

23  you believe them.  And when you look at all the other

24  evidence in this case, ladies and gentlemen, that

25  corroborates their testimony.  They did testify credibly, and

JA-641

605

US V. Peters – 13-CR-316

1   I want to talk about some of that evidence.  And we'll kind

2   of start small and then I'd like to work up, work up to the

3   bigger issues in the case.

4          First of all, ladies and gentlemen, you heard each

5   of the witnesses testify that there was a conspiracy here

6   and, when you listen to each of the three cooperating

7   witnesses's testimony, they were very consistent.  They all

8   described this conspiracy in a very consistent and detailed

9   manner.  When they talked about picking up loads at the

10  canal; when they talked about how they transported loads,

11  what vehicles they used, all of that was very detailed and

12  consistent.

13         But they also identified individuals in this

14  conspiracy.  They talked about Colin Stewart and Stefan

15  Trepanier.  Spinner and Forget talked about this guy X Man

16  and Forget identified him as Xavier Dauie.  They talked about

17  the runners that worked for Forget, Bill Lamaka and his

18  neighbor Chris Searson.  They talked about the defendant,

19  obviously.  So they all talked about and identified similar

20  people in this conspiracy.  And the way they described it,

21  what Colin's role was, what the defendant's role was, what

22  the other runners in the organization, they were very

23  consistent and very detailed.

24         And they obviously also talked about transporting

25  marijuana.  I don't want to breeze over that because that's

606

US V. Peters - 13-CR-316

1    the most important part about this conspiracy.  It is a

2    conspiracy to distribute marijuana and you heard all of them

3    testify that that's what they did.  They transported loads of

4    marijuana and we know that they transported loads of

5    marijuana because two of those three cooperators got caught

6    transporting loads of marijuana.  You have the Lobdell

7    seizure on May 8th, 2009.  You have Forget's seizure on

8    September 14th, 2010, and then Lobdell getting caught again

9    on March 1st, 2011.  So, when these witnesses testified that

10   that's what they did, they transported marijuana, we know

11   that's what they did.  They got caught doing it.

12          They also testified about this property, the

13   defendant's mother's property.  I think Spinner testified

14   that he thought it was just the defendant's property.  I

15   think that's how he described it.  But Lobdell and Forget

16   described it as the defendant's mother's property.  And we

17   have independent evidence that that's exactly what it was.

18   You heard from detective Jim Sunday, the AMPS officer who

19   came in and testified.  He testified about the fact that he

20   grew up in the Snye, that he knows the defendant, he knows

21   Marie Peters and he knows Marie Peters lives at that

22   residence.  So when you hear the witnesses testify that

23   that's what that property was, you have independent evidence

24   to look at to corroborate that.  And certainly that

25   corroborates the fact that the defendant had access to that

607

US V. Peters – 13-CR-316

1  property and that he would be able to control it because it's

2  his mother's property.

3  Each of the witnesses talked about weight in this

4  case, which is also an important thing that I don't want to

5  just overlook because that is a potential issue that you will

6  have to resolve in this case. They testified about how much

7  marijuana they were transporting. They testified that they

8  typically would transport a hundred pound loads but it could

9  be as much as 240 pound loads. We have independent

10  corroboration of that.

11  Lobdell was caught initially with 250 pounds.

12  Forget was caught with 240 pounds and Lobdell was caught with

13  100 pounds of marijuana. So, again, you have independent

14  corroboration of what these witnesses are telling you.

15  You heard Forget testify that when Colin would

16  communicate with him and when Colin wanted him to pick up a

17  load of marijuana, he would send him a text message and said

18  supper tomorrow, lunch tomorrow, breakfast tomorrow and that

19  meant that he had to show up at that particular time the next

20  day at the defendant's residence.

21  You saw that after Forget was cooperating with the

22  DEA and he was trying to get this money from Colin Stewart,

23  this $40,000 that he ultimately gave to the DEA, he was

24  trying to get Corey Spinner to go pick up at the defendant's

25  mother's property and he received a text message from Colin

608

US V. Peters – 13–CR–316

1    and that text message said lunch tomorrow, BG.  That's

2    exactly what Forget told you the process was.  He would get a

3    text just like that would tell him to go to the defendant's

4    mother's property at a particular time and it included that

5    abbreviation, BG, which Forget testified meant Big Guy.  You

6    heard all the witnesses testify the Big Guy is the defendant.

7    All right.

8            Now, ladies and gentlemen, each of these witnesses

9    described this drug smuggling organization, but what this

10   really is, is this is a business venture.  That's what this

11   is about.  It's not about drugs, it's not or it's not about

12   the drugs themselves.  It's about a business opportunity.

13   This is an organization looking to make money.  And it's big

14   business.  There's a lot of money to be made here.  You heard

15   Lobdell testify that she once transported back a million

16   dollars on one single occasion.  Forget testified that the

17   time he swerved around and caught the law enforcement

18   officers attention, Jacques Trepanier was sending a million

19   dollars back to Canada through the defendant's property.

20   This is big business.

21           And all of these individuals are in a business

22   venture together and we heard a lot of evidence that

23   corroborates that these individuals are in league with each

24   other.  And we heard a lot of that from this recorded

25   conversation that took place on March 1st -- excuse me,

JA-645

609

US V. Peters – 13–CR–316

1    March 25th, 2011.  This is where Forget meets surreptitiously

2    with the defendant in his van and they have this recorded

3    conversation.  I want to just take a moment and just talk

4    about that particular piece of evidence before I get to the

5    substance.

6           That recorded conversation is really a unique piece

7    of evidence.  So, throughout this trial you had to listen to

8    cooperating witnesses recall events and memories and things

9    like that and we're talking about events that occurred five,

10   six, some even 20 years ago in Lobdell's case.  That's a

11   long, a long time that has passed.  Sometimes it can be hard

12   to remember specific details and events.  But that's why that

13   recording is so important because, one, it's not coming from

14   a cooperating witness.  It's coming from the defendant

15   (indicating).  That's his words in his own voice talking

16   about this conspiracy.  And it's at a time when the

17   conspiracy is still on going.  So it's a very reliable piece

18   of evidence where the defendant is talking about the

19   conspiracy as the conspiracy is happening, not five years

20   later from a witness.  So it's very helpful piece of

21   evidence.

22          And during that conversation, you hear Forget and

23   the defendant talking about different people.  Two of the

24   people they talk about is Colin –– the defendant first refers

25   to him as the farmer –– but then he uses him as later on

610

US V. Peters — 13—CR—316

1    they're talking about Colin Stewart and the defendant makes

2    reference to him and Forget says "Colin?" and the defendant

3    says yeah.  So they're talking about Colin and who's Colin?

4    Colin Stewart, the person that all these witnesses have

5    talked about.

6         And then later on in the conversation, the

7    defendant brings up X and Xavier.  Well, you've heard from

8    all three of our —— excuse me, you've heard from Forget and

9    Spinner that X Man is Xavier Dauie, that's who Forget

10   identified him as, an important member of this conspiracy,

11   someone that would come down on the boat with these loads of

12   marijuana.  The defendant is talking about people, part of

13   this organization, part of this business venture.

14        The defendant even references and talks about how

15   Xavier, X Man, was just at his residence, just at his

16   mother's residence and that he saw activity on the property.

17   And in that recording I think one of the other interesting

18   things about that recording is the tenor of the conversation.

19   First of all, it's clear the defendant knows Forget.  So,

20   when Forget testifies that they've known each other for many,

21   many years, that's pretty clear from that conversation.  And

22   the tenor of that conversation is two —— I don't know that I

23   would say buddies —— but two people that are very familiar

24   with each other sitting down and having a conversation.

25        And it's not always what the defendant says during

US V. Peters – 13-CR-316

1    that conversation that's helpful.  Some of what Forget is

2    saying is also helpful, too.  Forget, during that

3    conversation after he gets talking about his gruesome injury,

4    he talks about working with Colin and wanting to run weed and

5    trying to figure out how they can make money and the

6    defendant doesn't respond by saying what are you talking

7    about, running weed, what are you talking about?  He knows

8    what's going on.  He's talking to his compatriot.  He's

9    talking to someone that he's worked with for a long time,

10   that he knows who he is and he knows exactly who he's talking

11   about when he's talking about Colin or X Man.

12              Then we also heard testimony from Ernie Miller from

13   Frenchie's Chevrolet and he talked about this vehicle that

14   the defendant put a $5,000 cash deposit down and you also

15   heard from Cheryl Lobdell and this transaction I think is

16   helpful in several different ways.  So you heard Cheryl

17   testify –– Cheryl Lobdell testify that there was a meeting

18   and one time they talked at the boat landing and the

19   defendant was there and Cheryl and Colin and Stefan and they

20   all talked about how Lobdell needed a new vehicle, something

21   a little bit more reliable.

22              And the defendant volunteered, hey, I've got a

23   vehicle all ready to go.  I've got it all picked out.  We

24   know that's true.  Ernie Miller testified that the defendant

25   came in in October of 2008, put a deposit down on the vehicle

612

US V. Peters – 13-CR-316

1   and had it all picked out.  Then he wanted the paperwork

2   shredded.  You also heard Lobdell testify that when she came

3   in to get the vehicle, the defendant wanted any paperwork

4   with his name on it shredded.  Why?  Somewhat obvious -- but

5   he doesn't want that vehicle to come back to him because he

6   knows what that vehicle is going to be used for.  He knows

7   that vehicle is going to be used to transport marijuana and

8   if it ever gets stopped, he doesn't want it coming back to

9   him so he wants the paperwork shredded.  When Lobdell tells

10  you -- or testified that the defendant is the one that paid

11  for that vehicle, that's the paperwork to prove it.  He did.

12  He put down at least $5,000 in cash for that vehicle.

13          But it also is helpful, not just to show that the

14  defendant is buying vehicles or helping to buy vehicles for

15  this organization but, again, it shows an association.  So,

16  when Ms. Lobdell sits up there and testifies that she's known

17  the defendant for many years, obviously she does.  The

18  defendant's helping her buy a vehicle.  But it's more than

19  that because it's not as if they're just friends.  Friends

20  don't put $5,000 down on a vehicle for you to drive or

21  someone else to drive a vehicle.  Business partners do.  The

22  defendant has a vested interest in the defendant -- the

23  defendant has a vested interest in Lobdell doing her job.

24  She needs a better vehicle so she can transport marijuana

25  because that means everybody gets paid.  If Lobdell's driving

613

US V. Peters — 13–CR–316

1   around in a vehicle that doesn't work and it breaks down and

2   a load of marijuana gets seized, that affects this business

3   venture, this organization and the better Lobdell can do, the

4   better the organization does, the more money the organization

5   is making and the more money the defendant will make, as

6   well.  He's a part of this business venture and he has a

7   vested interest.  That's why he's putting $5,000 down on the

8   truck.

9           So, ladies and gentlemen, you also heard all the

10   witnesses testify that they were picking up loads at the

11   defendant's mother's property and you have information that

12   corroborates that, as well.  You heard from detective Jim

13   Sunday that on two occasions he observed a vehicle coming

14   from Marie Peters' property and that vehicle ultimately was

15   stopped with marijuana -- the one seizure in 2008, but

16   obviously the much more important one is March 1st, 2011.

17           On March 1st, 2011, Jim Sunday sets up just outside

18   of the Peters' residence.  It's the last residence on River

19   Road and he watches Lobdell's vehicle, the headlights coming

20   from that property, watches it go down Cook Road and is

21   ultimately stopped by the border patrol.  What does it

22   have in it?  It has a hundred pounds of marijuana.  So when

23   Ms. Lobdell and Forget are testifying that that's where they

24   picked up the loads of marijuana, it's clear that that's

25   what's happening.  Jim Sunday provides direct independent

614

US V. Peters – 13-CR-316

1   evidence that that is exactly what's going on.

2           And we also heard evidence about this gun pickup

3   down in Syracuse.  And the guns are not relevant when you

4   listen to that recorded conversation between Forget and the

5   defendant.  It's clear the defendant does not condone -- does

6   not want guns coming to his property.  That's not why the

7   government offered this evidence.  It's relevant because

8   these witnesses have testified that this property is where

9   the organization moves everything through.  Marijuana coming

10  south, money going back up north, people going back up north.

11  Jacques Trepanier would come down on a boat, go deliver a

12  load and then he would be sent back up into Canada through

13  the defendant's property.  Roger St. Onge wasn't allowed to

14  come through the United States.  He couldn't go through a

15  port-of-entry.  So the organization would use his piece of

16  property to send him down, deliver a load and then he could

17  get back up north through this property.  I'm sure you're

18  getting sick of me saying this.  It is a gateway.  It is a

19  door.

20          And then this pickup corroborates that and the

21  defendant might not have known that these guns were coming

22  back up, but it's clear Colin wants these guns to go through

23  the defendant's property.  He specifically references back to

24  BG and give me an ETA for BG, BG being Big Guy that everybody

25  has identified as the defendant.  And that makes sense, that

615

US V. Peters – 13-CR-316

1  coincides with exactly what these witnesses have testified

2  to.

3          The even more important part of that transaction is

4  it ultimately led to Government Exhibit 13, which is that

5  fake gun seizure report that Special Agent Hermes generated

6  and the point of that was to get that back to Colin to show

7  the organization that Forget didn't steal the weapons and,

8  you know, they were seized by law enforcement, so that law

9  enforcement could continue to use him as a confidential

10  source.

11          So what did Forget do?  Got on the phone, called

12  the defendant and set up a meeting so that he could send that

13  paperwork back to Colin.  Again, this shows an association

14  between the defendant and Colin.  Shows this relationship,

15  but it also shows that this is exactly how this organization

16  works.

17          Go ahead.  This is part of the recorded

18  conversation.

19          (Audio recording played.)

20          MR. GARDNER:  So, again, you have independent

21  corroboration that when Forget tells you that I need to get

22  something back to Colin, cell phone, whatever it is, he sends

23  it through -- you can send it through the defendant's

24  property.  The defendant took possession of that paperwork

25  and he took it back to Colin.

616

US V. Peters – 13–CR–316

1        You also heard testimony –– and I talked about it a

2   little bit already –– from Lobdell and Forget that they would

3   often see Colin or Stefan meeting with the defendant and

4   having conversations with them about, you know, when's the

5   next load going, basically coordinating logistics of the

6   organization.

7        And, ladies and gentlemen, that's really the crux,

8   the crucial part of this case is does the defendant have

9   knowledge that this organization's moving all this marijuana

10  through his property and is he involved in this organization.

11       And I want to listen to a couple more clips from

12  this recorded meeting.

13       Go ahead.

14       (Audio recording played).

15       MR. GARDNER:  So, ladies and gentlemen, there's a

16  lot of information in that clip.

17       First of all, the defendant starts off by talking

18  about Matt, who is Matt Forget, Forget's son, who Lobdell

19  talked about and, to a lesser extent, Forget talked about.

20  And he says Matt is moving something for somebody else,

21  meaning Matt is moving marijuana for somebody else and he's

22  supposed to bring that marijuana to the defendant's property

23  and the defendant needs to tell him he's done.  He's done at

24  my mother's and that certainly implies it not just that

25  relationship between Matt Forget and the defendant, but it

617

US V. Peters – 13-CR-316

1    also implies that Forget was bringing loads through the

2    defendant's property and now he needs to tell him, you can't

3    do it any more, it needs to stop.

4         And he needs it to stop because the defendant's --

5    he's scared at this point.  This is March 25th, 2011.

6    Twenty-four days earlier Jim Sunday's sitting outside of this

7    property that the defendant is controlling and watches a load

8    of marijuana come out and she gets busted.  And he's

9    apparently got a friend at tribal police who's providing him

10   sounds like very detailed information about law enforcement

11   activity in the area.  He's scared.  He knows law enforcement

12   is watching his property closely.

13        And why is he scared?  Why does he care?  Because

14   he's involved in this conspiracy, because he's moving

15   marijuana across his property.  If he is not involved in this

16   conspiracy, what does he care if law enforcement officers are

17   watching his property?  What does it matter to him?  It

18   matters because he's involved in an illegal conspiracy to

19   transport marijuana into the U.S.

20        (Audio recording played.)

21        MR. GARDNER:  Again, ladies and gentlemen, he's

22   scared.  And what he says is, I don't want even nothing going

23   on at my mom's no more.  No more, implying that there was

24   things going on that he obviously knows about up until that

25   point and now he wants it stopped because he's worried that

JA-654

618

US V. Peters – 13-CR-316

1   law enforcement are going to catch him.

2           Moving on just a little bit, ladies and

3   gentlemen –– and I'm getting close to the end –– you've heard

4   testimony, also, that the defendant was getting paid by this

5   organization and I talked about it a little bit before.

6   Lobdell saw it directly.  She saw Colin handing him cash.

7   Forget saw something very similar just in a bag.

8           And, first of all –– I want to play a clip in a

9   second –– but it's common sense that the defendant would be

10  getting paid.  Everybody in this organization from the bottom

11  on up is getting paid.  This is big business and even the

12  lowly currier like Corey Spinner is getting paid a lot.  He's

13  getting paid a thousand dollars to transport a load of

14  marijuana from the defendant's mother's property to Forget's

15  house and then he gets another thousand dollars to drive out

16  to I87.  It's $2,000 for a few hours of work, five, six hours

17  of work.  That's huge money and Corey Spinner is at the

18  bottom of this organization.  Everybody in this organization

19  is getting paid, including the defendant.  That's common

20  sense.  That's how good businesses work.  And this is a good

21  business.  This is well run.  This isn't some ad hoc, you

22  know, guy who comes upon a load of marijuana and just needs

23  to get it into the United States one time.  This is a

24  well–run, well–functioning business.  And a good business

25  isn't going to take the chance that their primary gateway

US V. Peters – 13–CR–316

1  into the United States, the lynchpin to their entire

2  organization isn't on board.

3          What I mean by that, ladies and gentlemen, is that,

4  of course, the defendant knows what's going on and, of

5  course, they're paying him because they're not going to --

6  this organization isn't going to leave this to chance.  We're

7  talking about millions of dollars and they're not just

8  going -- they're not going to just hope that their primary --

9  their only way -- into the United States is going to be

10 closed.  They have schedules.  They have customers waiting

11 for product.  They have to be able to move back and forth

12 routinely and the best way to insure that is to pay the door

13 man and make sure the door is always open.  The door man,

14 obviously is the defendant.

15         Oh.  I don't have a clip but also the defendant

16 says it better, better than I could, and he's actually

17 talking about cigarettes at the time.  But in the recording

18 he says it better than I can, he says, I'm not doing nothing

19 for free.  Nobody does anything for free.  The defendant's

20 involved.  He's getting paid and that's really just common

21 sense.

22         (Audio recording played.)

23         MR. GARDNER:  The defendant says quite a bit there.

24 But he wants to block off this canal because people are

25 sneaking in and they're dropping off loads and using his

620

US V. Peters – 13–CR–316

1   property and he's upset about this but he's not upset because
2   he has some kind of moral opposition to smuggling.  He's
3   upset because he's not getting paid.  He's upset because
4   people are using this property without his permission.  He's
5   the one controlling and in charge of this property and if
6   you're going to use that property, you better be going
7   through him or he's going to sink logs or whatever into the
8   canal and he's going to set up boobie traps so that if you
9   try and come in and use his property without permission,
10  you're going to have problems.
11          And just like Forget says in the middle of that
12  conversation, he says, you don't want people sneaking through
13  the property, you want them going through you -- I'm
14  paraphrasing a little bit -- and then the defendant quotes
15  his mom -- I think this is apropos -- his mom says, if
16  they're not getting paid, nobody should be using the
17  property.  That's exactly what the defendant thinks.
18          But Colin and Stefan do pay.  They're good business
19  men.  They're paying the defendant to keep that doorway open.
20  All those other people -- I'm sure there are people using his
21  property that he doesn't want but it's not Colin and Stefan.
22  They pay.  They've been good business partners over the
23  years.
24          All right.  So, ladies and gentlemen, if you find
25  that the defendant knowingly participated in this conspiracy,

JA-657

US V. Peters – 13-CR-316

1   you'll also have to address this issue of weight.  How much

2   marijuana is the defendant accountable for?  And, as the

3   judge is going to instruct you, it's what is reasonably

4   foreseeable to the defendant.  So it doesn't mean how many

5   times did the defendant pick up a bag of marijuana and move

6   it.  All it means is if it was reasonably foreseeable, the

7   defendant understood this conspiracy involved X amount of

8   weight, then the defendant is accountable for that.

9           And the government has charged the defendant and

10  charged this conspiracy as involving more than a thousand

11  kilograms.  We've spoken in this case mostly about pounds so

12  it's a little confusing.  A kilogram is 2.2 pounds.  So, a

13  thousand kilograms is 2,200 pounds.  And most of the

14  witnesses when they spoke, they spoke about pounds instead of

15  kilograms.  So I know that's a little confusing.  But I

16  wanted to break this down just a little bit.

17          So, even if we just look at the seized drugs in

18  this case, if we just look at Lobdell's two seizures and

19  Forget's two seizures, you're talking about 590 pounds or

20  264 kilograms.  So we're about a quarter of the way to that

21  thousand kilograms and that's just three seizures.  That's

22  just three instances where this organization failed and their

23  load got picked up.

24          Lobdell testified -- let's break it down a little

25  bit.  Spinner testified he made at least 15 trips.  That's

622

US V. Peters – 13–CR–316

1   1500 pounds, in addition to the seized drugs.  And then

2   Forget testified before he even started transporting loads,

3   he counted at least 20 different times and then his –– so

4   that's 20 more loads of at least a hundred pounds.  So

5   another 2,000 pounds.

6           Then he testified that he started transporting

7   loads and he would go a couple times a week or at least once

8   a week, sometimes up to two to three times a week for over a

9   two–year period.  So let's say he just drove once a week for

10  two years.  That's 24 more trips, another 2,400 pounds of

11  marijuana.  At this point we're far above the thousand kilos,

12  far above that 2,200 pounds amount.

13          And then Lobdell testified that between '05 and

14  '09, she made 80 to a hundred trips each at a hundred pounds.

15  Now we're just getting, you know, 8,000 pounds of marijuana

16  just from –– just from Lobdell.  And they all testified that

17  every single load, except for those three from Lobdell, came

18  from the defendant's property.

19          So the government believes that the defendant knows

20  about all these loads.  He's talking to Colin and Stefan

21  about what's coming through the property.  He's getting paid

22  by the load.  All of this is reasonably foreseeable to him.

23  And this is just three of the curriers.  There are other

24  curriers working Jacques Trepanier, the curriers moving stuff

25  to George King.  These are just three of the curriers.  So,

US V. Peters – 13-CR-316

1  in terms of the weight, the government believes that it's

2  well above a thousand kilograms.

3          Ladies and gentlemen, what this case boils down to

4  is that the defendant took full advantage of the unique

5  nature of this property, of his situation.  He created this

6  gateway.  He opened up this door and this organization paid

7  him to keep it open.  He facilitated the flow of thousands

8  and thousands of pounds of marijuana into the United States

9  and this organization does not function without the

10  defendant's involvement.  He is the lynchpin that makes this

11  conspiracy, this organization possible.

12          Ladies and gentlemen, I ask you to consider all the

13  evidence in the case, look through all the evidence, the

14  testimony, the recordings, the different exhibits, consider

15  all of it and then the government would ask you return a

16  verdict of guilty on the sole count in the indictment.

17          Thank you.

18          THE COURT:  Mr. Sacco, when you're ready, sir.

19          MR. SACCO:  Thank you, Judge.

20          Your Honor, ladies and gentlemen.

21          And thank you for listening to the proof and

22  listening to the arguments on behalf of my client.

23          As you might imagine, the defense has a much

24  different view of the evidence.  If you remember Mr. Forget

25  and what he said in this case, my client was involved with

624

US V. Peters – 13-CR-316

1  cigarettes, that he had trailers on his property stuffed with

2  cigarettes and tobacco and if you recall the conversation

3  with Mr. -- between Mr. Forget and Mr. Peters, there's a

4  lengthy part of that conversation where it's clear to me that

5  Forget is trying to guide the conversation to get my client

6  to say certain things and then my client starts talking about

7  cigarettes and Forget says cigarettes, huh, because Forget's

8  there for a reason to try and get some sort of confession or

9  some sort of information from my client.

10        And my client, without -- in the safety of this car

11  talks about exactly what he does.  He sells cigarettes.  He's

12  a tobacco guy.  He knows Forget, because Forget told you, in

13  his lengthy criminal history interest Canada that he was also

14  a cigarette person.  So, there's a long passage in here and,

15  if you recall, and you'll have this in the evidence room,

16  where my client talks about an Italian gentleman calling him

17  from Canada and they're quoting prices, $125 to $225.  And

18  the Italian gentleman -- my client hangs up on him because

19  he's trying to low ball him essentially.  So he's selling

20  tobacco and cigarettes just like Forget used to.

21        Now, with respect to the property -- and that's

22  where I think the government's argument and the government's

23  proof and myself deviate here and that they're convinced or

24  they believe their evidence -- they're convinced by their

25  evidence that my client was somehow a marijuana dealer.

625

US V. Peters – 13–CR–316

1      Well, they said in their opening and the witnesses

2   said -- well, they said a lot of things -- but some of the

3   things they said was that he did not sell marijuana.  He did

4   not drive marijuana himself.  He did not participate in many

5   of the things that they were doing.  Now, I have -- there's

6   some contention on whether he was a blocker and he was a

7   scout and I'll get into that in a minute.  But, what was he

8   doing?  It was his mother's property not his property.  He

9   had tobacco there.  He was clearly selling tobacco.  But not

10  what they've charged him.  They're not charging him with

11  trying to sell tobacco.  They're charging him with conspiring

12  with other individuals from Canada and other places to

13  possess and distribute marijuana.

14      So the question is, one of the questions here is:

15  What did he -- what was he doing on that property?  What role

16  did he have, if any, in this alleged conspiracy?  One of the

17  most important things to consider is, what evidence do you

18  have that's not biased?  What evidence do you have that is

19  not from the mouth of someone that has something to gain from

20  this?  I cross-examined the three witnesses and all three of

21  those witnesses stated what their -- what they had to gain

22  from this.  It was Corey Spinner.  There was Alain Forget.

23  And there was Cheryl Lobdell.  And I'll get to that in a

24  minute.

25      But what other evidence do you have to look at and

626

US V. Peters – 13-CR-316

1    to scrutinize closely to determine what exactly was going on

2    here?  And I suggest to you that the most important piece of

3    evidence that you have in the case is the transcript, the

4    transcript that there's no -- at least for my client, doesn't

5    have any interest in -- Mr. Forget does -- but the transcript

6    is a piece of evidence that is not driven by self-interest.

7    Everyone on this stand, their testimony, in my opinion, was

8    driven by self-interest, they were trying to help themselves.

9           Now, why is that so important?  The Judge will read

10   to you what credibility means and what you need to do to

11   assess the credibility of the various witnesses and I'm going

12   to go through each witness one by one.

13          Corey Spinner, he's in big trouble.  He is

14   cooperating with the government.  He's pled guilty to a

15   federal crime.  He's facing between 5 years and 40 years in

16   federal prison.  That's his plea agreement.  If the

17   government, in their sole discretion, is convinced that he

18   cooperated fully, they have the power and the authority to

19   make that different for him.  Period.  No question about

20   that.  He can get -- he can get a reduction in his sentence,

21   if they recommend it, and they're the only ones that can

22   recommend it.  So, Corey Spinner, of course, was nervous.

23   When he's up there, he's thinking am I digging myself a

24   deeper hole or am I helping myself.  That's exactly what he's

25   thinking and he has absolute self-interest in the outcome of

US V. Peters – 13-CR-316

1   this case.  So Corey Spinner testified and he essentially

2   said that he saw my client there one time.  I believe -- and

3   you can look at the record and it can be read back to you --

4   but I think he said he saw my client there one time.  And he

5   went in and he saw my client with I believe Colin Stewart and

6   it appeared as though they were changing some money in the

7   garage, okay.

8          Mr. Forget told you, among other things, that he

9   was there regularly with Colin Stewart.  In fact, he would --

10  starting in 2008-2009 time frame that he recruited -- I'm

11  sorry, Corey Spinner.  And he was there.  He was his

12  right-hand person and I tried to suggest to Mr. Forget that

13  Mr. Forget was Corey Spinner's supervisor.  And he didn't

14  quite say he was his supervisor.  But I think that's a fair

15  reading of it.  Forget was Corey Spinner's supervisor.  And

16  they were there together all the time picking up marijuana

17  for Colin Stewart and for various other people.

18         So, Spinner says that my client -- he saw my client

19  one time out of all the times he was there.  Forget says that

20  he saw hit/miss various times and Cheryl Lobdell says that

21  she saw him quite often there that he, in fact, paid her at

22  various times.

23         Obviously those are inconsistent, those three

24  positions by those three witnesses are inconsistent.  And you

25  have to ask yourself why.  Corey Spinner probably has the --

628

US V. Peters – 13-CR-316

1    he doesn't know very much, right, or he didn't testify to

2    very much.  But he's in a very pretty good position.

3         Alain Forget has the most to lose because he is

4    hoping that he will be able to convince the government that

5    he's valuable or get the government's assistance in going

6    forward and getting a better deal.  So he is going to -- he

7    has more motive to fabricate than any other witness.

8         And Cheryl Lobdell is a person that obviously has

9    problems -- is obviously very nervous about her situation.

10   She's in the middle of her jail time.  She's working with the

11   government.  She agreed to cooperate with the government and

12   she does not want that to change.  So she will say many

13   different things.  She also during this period of time was

14   going through some very difficult drug problems and abuse

15   problems and her memory, I would say, is suspect, to say the

16   least.  She did cocaine for over 20 years.  She was a

17   alcoholic.  And I would say that you should consider that,

18   her testimony and how accurate and what sort of detail she

19   remembers things and who she is.

20        Because Cheryl Lobdell is a person, you know, you

21   may have never encountered a person like Cheryl Lobdell in

22   your every day lives.  It's kind of unique to a criminal case

23   where her interests are always above your interests, whatever

24   suits her and whatever works for her is what she's going to

25   do.  And how do we know that?  Because she was working at a

629

US V. Peters – 13-CR-316

1    convenience store and she decided, instead of putting the

2    money in the bank, she was going to write a phony deposit

3    slip and just take it for yourself.  You have to ask

4    yourself:  Do you know anyone in your lives who has done that

5    or would do that?  Would you do that yourself?  And then

6    Cheryl Lobdell -- that's one window into who she is and what

7    her personality is and what her ability to tell truthful

8    things is.

9            Another window is when she got caught with drugs

10   and she agreed to work with the police and she made an

11   agreement.  I mean, that's pretty serious.  Imagine

12   yourselves, you get caught and you sit down with the police

13   officer and the police officer says listen I'll let you go

14   but you have to help me in order -- you have to help me.  And

15   then instead of actually helping the police, she works both

16   sides.  Now ask yourself, could you do that or would you do

17   that?  And if you -- once you make your decision, you then

18   have to ask yourself, what does that say about the person

19   who's providing me with what is supposed to be very important

20   information.  She'll work both sides for her own benefit.

21           And then, lastly, when she -- and there were some

22   other things about Cheryl Lobdell.  Number one, she was

23   reporting to her probation officer during this whole time.

24   So the obvious inference is that these she's, you know,

25   supposedly working with the police.  She's continuing to sell

630

US V. Peters - 13-CR-316

1    drugs or transport drugs.  She's lying to her probation

2    officer about that the whole time like it's not a big deal,

3    just, just, just life.  It's just what she's going to do.

4            So, I wonder when someone take the stand, what does

5    all that disappear?  Does that part of their soul and their

6    person just disappear because they're sitting here or is that

7    who they are and what they do?  And is that important when

8    you're thinking about wow, is she making this up or is it

9    another crime she was involved in and she's just kind of

10   superimposing it on the facts here because that will help

11   her?

12           And, you know, when I say that, I have a basis to

13   say that.  She told you, in addition to the things that she

14   allegedly did in the presence of my client, that she over a

15   two-year period she also made 99 runs from someone named

16   George king's place, right.  99 runs in a two-year span.

17   It's in the record and you can look at it.  So, if she made

18   99 runs -- I think it was from '07 to '08, 2007 to 2008, I

19   mean, she's got a vast amount of experience.  She's had a

20   vast amount of situations that she knows this business inside

21   and out.  And how easy is it for her to take a common every

22   day situation and just superimpose it on to whatever she

23   wants to?  If something's routine, okay, then it's really

24   easy to testify about.  Because you just say I don't know

25   when it happened.  I just know it happened.  Because she's

631

US V. Peters – 13-CR-316

1    been smuggling drugs for 20 years and she knows exactly how

2    it works.  So it's really easy for someone like Cheryl

3    Lobdell who steals cash and tricks the police and tries to

4    trick the probation department to just use generic every day

5    knowledge and testify about it.  Simple.

6          And that's why in my mind -- and hopefully in

7    yours -- it's important to actually have some detail because

8    when you -- when someone has to give detail in their

9    testimony, you can actually evaluate the testimony, right.  I

10   mean, it's specific.  It's a specific event at a specific

11   time that gives you the ability to evaluate whether it's got

12   any substance to it, whether it's true or not.

13         And I submit that Cheryl Lobdell's testimony is

14   generic testimony without any of those hallmarks of truth,

15   without any of those -- she's talking about generic events

16   that she's been doing her whole life, right.  Think about it.

17   She gets back, she gets paid at the canal and someone slices

18   open a bag of cash for, I don't know -- I don't know how much

19   money she said was in there but a lot of money in the woods

20   they're going to slice open a bag of cash and pay her and

21   that somehow it was my client.  Now, I don't know if that

22   ever happened to her in her 20 years.  Maybe it did somewhere

23   along the line.  But I tell you this, it wasn't my client.

24   It wasn't outside that canal.

25         What other things did she say back up to the canal

632

US V. Peters - 13-CR-316

1    I'm sure she backed up to that canal.  I'm sure she backed up

2    to George kings's house.  I'm sure she backed up to that

3    little marina that she was talking about, Adams Marina.  I'm

4    sure she did all of this.  But the question is:  Was my

5    client there when she was doing it are not?  And so when you

6    get that sort of generic testimony, it's not credible.

7         Now, Mr. Forget, he actually talked to Mr. Peters

8    in the car and there's some very important things that I want

9    to bring to your attention that were said during that

10   conversation.

11        I already talked to you about the issue that it's

12   clear from this discussion between these two that my client

13   sells tobacco and cigarettes.  It's just there's no question

14   about that and Mr. Forget confirmed that.  But that was his

15   word, so I want something more than that and so I want the

16   transcript where he actually says it.  And they talk about

17   the pricing and it's between 200 -- somewheres around $225 a

18   pound, which is a good amount of money.  And you know from

19   Mr. Forget's previous experience by getting arrested by the

20   Canadians that, apparently, the Canadians don't like people

21   taking tobacco up into Canada and he has gotten arrested for

22   it.  And so, if you understand that my client is actually

23   selling tobacco and not selling marijuana, that's important.

24   And I think the proof supports that.

25        Now, with respect to the property, Mr. Forget said

633

US V. Peters - 13-CR-316

1    many, many things.  Of course, similar to Ms. Lobdell, there

2    wasn't a lot of detail in any of it.  He just said generic

3    things because he's been either smuggling cigarettes or

4    smuggling marijuana or whatever else for 20 years.  I mean,

5    he's a pro.  He's seen every situation.  It is very easy for

6    him to mold facts I call it, right, it's very simple for him,

7    in his experience, to mold facts.

8           And what he said was that he used to come to the

9    canal, meet with Colin Stewart and take this stuff to his

10   house.  And then take it other places from there.  What we

11   know from Cheryl Lobdell is that he also was doing this on

12   his own.  He also had his own business that he was presumably

13   doing this.  Mr. Forget is an interesting person.  He, like

14   Cheryl Lobdell, clearly puts his interests above all else.

15   There's no reason -- I'll withdraw that.

16          When he went on that high speed chase with the

17   police, I mean all of those questions I asked him about that,

18   the reason I asked him those questions is to show that he's a

19   survivor.  I mean, he -- he is a person that's so -- this is

20   so engrained in him that he looks at everything he sees, he

21   sees opportunity in.  He's driving.  He's weaving in and out,

22   probably almost killing many people.  That's okay, though,

23   because it's his interests not theirs that's important.

24   After he does that, I can just picture him getting to this

25   intersection and thinking where do I go.  It's like -- you

634

US V. Peters – 13-CR-316

1   ever try to catch a mouse and the mouse is all they do is
2   survey the floor and look for a hole to get into to get away
3   from.
4          So he gets to this intersection and we would think
5   I'm not going to try up past someone's house where their kids
6   could be playing or there could be something going on in the
7   backyard and drive my car into the woods.  But that didn't
8   occur to him.  What occurred to him is what can I do to get
9   myself out of the situation.  So, like any person like
10  Mr. Forget, he drives right up behind the house I'm sure at a
11  high rate of speed.  He puts the truck into the bushes and
12  thinking what do I do, what do I do, hiding, hiding the
13  truck, he locks the truck.  I mean, a lot of people that were
14  being chased by the police for ten miles on a high speed
15  chase would probably just bail out and run.  But he knows.
16  He locks the truck.  He locks the truck because he's still
17  hoping he's going to get away with it.  He didn't want anyone
18  else stealing his marijuana.  Takes the keys with some so
19  nobody can take the truck, all the time thinking, thinking,
20  thinking about what he's going to do.  Then he runs through
21  the woods.
22         Then when he's finally caught, when he hears the
23  dog, he hides the keys.  He's still thinking about the
24  marijuana to the end because, in his mind, he's not quite
25  sure they know where it is.  Maybe I'll go back later for it

635

US V. Peters – 13–CR–316

1   and that's what he's thinking.  So, if that's not the best

2   example of who Alain Forget is, I don't know what is.

3          And then, of course, he testified.  And why I --

4   you know, he is going to do whatever he has to do, whether

5   it's true or not true or whether it's embellished or not

6   embellished, to get through.

7          Now why does all this matter?  Because the judge

8   will tell you that in a situation like you're in, judging of

9   another person on a very, very serious matter, you should

10  scrutinize the evidence and you should scrutinize the

11  witnesses.  And I submit to you that these witnesses are not

12  credible and they're not credible because they have too much

13  to gain from this.  And because they've shown you throughout

14  their lives that they are not people that you would believe

15  in a very serious matter.

16         Now what's a very serious matter, babysitting your

17  kids, some sort of advice you might need on a life-changing

18  event, and there's a million more examples of something very

19  serious.

20         And this is a very serious matter for my client and

21  the government has offered you these three people as

22  witnesses and as evidence against him.  Now would you believe

23  anything out of their mouth in any other serious matter, if

24  you knew what you know about them now?  For me, if someone

25  came to me and said I want, I want to sell you insurance,

636

US V. Peters - 13-CR-316

1    sir, I was like all right, let's talk about your history a

2    little bit and then I find out that the person's been

3    convicted of fraud three times let's say, I'd throw him out

4    of my house.  I'd throw him off the porch.  I'm not going to

5    listen to one thing they say, you know why?  Because they

6    don't rate it.  Because they don't rate it.  And that is

7    credibility.

8         Some small or more minor examples of blatant what I

9    believe lying to you under oath in this courtroom was Cheryl

10   Lobdell talked about this interaction at Frenchie's and she

11   was certain that my client was there and she was certain that

12   he handed some manager a stack of cash and I think you heard

13   from the general manager here that Cheryl Lobdell was in

14   there by herself and that she paid for this vehicle and the

15   only thing that happened is that that $5,000 was transferred

16   and someone said it must have been my client that did it,

17   although there was not proof of that.  It was just said.

18   That's the only way it could have happened and she said that

19   because it makes for a better story.  That's it.  It makes

20   it, it's better for her, it's better for the government's

21   case.

22        One other thing is she said and I read her grand

23   jury testimony back to her and she said she didn't remember

24   saying that.  She clearly said -- and this is actually more,

25   this is fairly, I believe this to be important -- she said

637
US V. Peters – 13-CR-316

1   that when some money came back –– and, of course, there's no

2   date, time, we don't know if it happened in 1985 or 2011 but

3   it happened in her, that when money was brought back, it was

4   cut open.  I asked her if she recalled telling the grand jury

5   that that never happened.  So, if you swear to tell the truth

6   and you're talking to people and you say something completely

7   different, that's important.

8          Now, Mr. Gardner mentioned on these seizures, that

9   in 2009 there was a seizure and I don't believe there's any

10  testimony from any credible source in this case that my

11  client was at the docks or the canal or was blocking when

12  that happened.  I don't know, you know, he might have been in

13  Australia.

14         And the same thing in 2011.  I think this one I

15  believe was the one with the investigator who was watching

16  and I asked him some questions on my cross-examination and he

17  said he didn't see anyone else there.  He didn't see Allan

18  Peters there.  I asked the border patrol agents who stopped

19  Ms. Lobdell down at the check point.  They never saw my

20  client there.  There's no evidence in this case, except for

21  words, that my client ever was a scout or a blocker.  Listen,

22  the Mohawk police are there every day on that reservation and

23  there's no testimony from them who lived there and who are

24  there every day and apparently personally know my client that

25  he was driving around blocking for this.  So where does it

JA-674

638

US V. Peters – 13-CR-316

1   come from?  Where does that proof come from?  That proof

2   comes from the three people who have a lot to gain and who

3   have –– who have proven to you and shown themselves to you to

4   be deviant people who don't tell the truth and put their

5   interests above others.

6          And the reason that's so important to the

7   government is because it shows this act of my client leaving

8   Canada, coming into the United States, I mean because that's

9   the conspiracy, right, the conspiracy is to commit a crime in

10  the United States, not in Canada.  So, they want him moving

11  and their proof of it is their three witnesses' words and

12  nothing else.  And what's better is their three witnesses

13  can't tell you any date or time.  One thing Cheryl Lobdell

14  could say was that she met my client after getting stopped by

15  the police to get paid at a diner.  I promise you that's a

16  diner Cheryl Lobdell goes to herself.  She was probably a

17  waitress there or something and knows exactly where it is and

18  that's a great way to –– that's a great liar's trick, take a

19  fact, something that's familiar, you know it's easy to talk

20  about and wrap it up with something else and I submit to you

21  that's exactly what she did.

22         Now, each one of these folks –– I want to talk

23  about weight for just a minute.  Each one of these witnesses

24  had a plea agreement and they all apparently were involved in

25  this massive criminal conspiracy and all of them pled guilty

639

US V. Peters – 13–CR–316

1   to 100 kilograms or more but less than 1,000 kilograms, all

2   of them.

3          Now, the government has shown you, through three

4   stipulations, approximately 200 -- or 264 kilograms of seized

5   marijuana.  But, yet, they want to bring a charge against my

6   client that he moved over a thousand or more kilograms of

7   seized marijuana and they asked you to consider essentially

8   the evidence of these three witnesses who just say that's

9   what we were doing, you know, sometimes it was 80, sometimes

10  it was a hundred, and sometimes Mr. Peters was there and most

11  of the times he wasn't.

12         So, the question is, how much -- how can you hold

13  my client accountable for all of the acts of these people,

14  when there has been no proof in this case or no sufficient

15  proof or no persuasive proof that what these people were

16  doing, okay, either happened at his mother's property as

17  opposed to King's and these other properties right around

18  there or that he had any knowledge about it?

19         Now, if you'll bear with me just for a minute, I

20  want to jump back to the transcript, okay, which I, again,

21  view to be the best proof in the case.

22         You have to ask yourself why my client is going to

23  drive posts and stakes in this place to not allow people to

24  pass, if he's such a business man and this is such a

25  lucrative endeavor for him?  Why is he going to stop everyone

US V. Peters – 13–CR–316

1   from coming in there?  I mean, if you drive posts in there

2   and I think the gist of the conversation is that someone's

3   going to run into it with a boat and have a surprise of their

4   life, why would you block the canal completely?  That's what

5   he's saying he's going to do.  And it's obvious from this

6   that there's a lot of activity there, and it's out of control

7   what's going on there.

8           And what's further is, if he's going to set up this

9   device at the driveway side of this area to obviously do

10  something to a car, right, there's a device that he describes

11  in this where it would go off and scare the person or damage

12  the car or whatever because people are going into his

13  driveway.  So why would he do that, if he wanted to engage in

14  this, in this business?  To block, apparently this canal is

15  it.  I mean, this is the most important thing to this drug

16  organization.

17          Well, I suggest that it's not and that King's, and

18  Adams Marina and all these other places on the St. Lawrence

19  where Colin Stewart and all these people bring this stuff in,

20  okay, is where these witnesses were running drugs from.  Now,

21  were they going into that canal at times?  Sure, I bet they

22  were.  Were they going in at King's?  Were they going in at

23  Adams marina?  Sure.  Were they going in wherever they could?

24  Sure.

25          Now, did Mr. Peters know Colin Stewart?  Yes.  Did

641

US V. Peters – 13–CR–316

1   he know some of these other players in this ring?  Yes.  But

2   was he involved in the conspiracy or not, that's one of the

3   questions.

4           Now, mere association because he knew these people

5   because he lives up on this –– on the border because all

6   these activities are going on, you're going to know people.

7   He's running cigarettes.  He's going to know people.  But is

8   he involved in this conspiracy to move all this marijuana?

9   No, he's not.

10          And the only way that you –– the only proof that

11  the government has offered you with respect to that is from

12  three witnesses, three witnesses who, whose interests have

13  overcome their ability to tell the truth.

14          So, ladies and gentlemen, I ask that you consider

15  the evidence in this case.  I ask that you read the

16  transcript very, very closely.  There's a lot of information

17  in it.  And when you read that, read the transcript and

18  whether you consider or disregard the words that came out of

19  the mouth of these witnesses, you have to make certain

20  determinations.  One of the determinations is the quantity of

21  marijuana involved and the law, the judge will read it to

22  you, you must make a determination as to the amount of

23  marijuana he knew or reasonably could have foreseen being

24  involved in the conspiracy.

25          One way that I suggest this to resolve this issue

642

US V. Peters – 13–CR–316

1   is that if you're not there and you're not on the phones or

2   there's no evidence of phone calls, there's no evidence of

3   text messages or anything else, then what should you

4   reasonably have known was coming through your mother's

5   property when you weren't there?  How much marijuana?  That's

6   an issue you have to resolve.

7         Now, the government has given you a general

8   proposition that everything that happened from 2005 to 2011

9   he knew about or should have known about and he must be held

10  accountable for that.  There's been very little proof, aside

11  from the general testimony, again, with no detail of where my

12  client was or his knowledge.

13        So I ask you to closely scrutinize all the

14  evidence, the testimony of these witnesses.  I've outlined

15  what I believe to be their issues with credibility because

16  this is a criminal case.  It's a very important case and it

17  has very, very specific rules and the judge will read you

18  those rules.  And those rules must be adhered to and the

19  rules say that if the government doesn't prove their case

20  beyond a reasonable doubt, then you can't convict a person.

21  Because that's the way our country works and that's the way

22  the system is safeguarded against people like this lying and

23  telling stories and causing other people to become convicted

24  of a crime, a very serious crime.

25        The nature and quality of the evidence in the case

643

US V. Peters – 13–CR–316

1  is very, very important.  And the nature and the quality of

2  the evidence of this case, it may suggest something but does

3  it prove something?  Does it prove that my client was

4  involved with all these people or does it prove that mere

5  association is not enough to convict a person?  Mere

6  association, mere knowing, mere in the wrong place at the

7  wrong time is not enough to convict someone.

8           If you know bad people and they're doing bad

9  things, that's not enough to convict someone.  You can't just

10 throw up people like this to say whatever they have to say

11 and convict someone.  The law doesn't allow it.  So at the

12 end of this, my summation and the government's going to come

13 back up here, I ask that you closely scrutinize this

14 transcript and look at the words and that you disregard the

15 unreliable testimony of these people.  You wouldn't use their

16 testimony in any other important decision in your life and

17 you know that.  Don't use it here when my client's life is at

18 risk and I'm asking you to come back with a verdict of not

19 guilty.  Thank you.

20           THE COURT:  Mr. Gardner, do you have any rebuttal?

21           MR. GARDNER:  Briefly, your Honor.

22           Ladies and gentlemen, I'm not going to take up a

23 lot of time.  I just want to talk about a couple things

24 briefly.

25           Obviously defense counsel spent a lot of time

644

US V. Peters - 13-CR-316

1    talking about the credibility of these witnesses and I think

2    the government has said from its opening statements that the

3    credibility of those witnesses was a very important part of

4    this case and that you should look at their testimony

5    skeptically.

6         But defense counsel said a couple of things which I

7    thought was interesting, that these witnesses have too much

8    to gain from their testimony.  I believe he said Forget, in

9    particular, has more motive to fabricate than any of the

10   other witnesses, which is not really true in this case.  It's

11   kind of an unusual situation.  Lobdell's already been

12   sentenced.  She's already been sentenced to 33 months.  She

13   said on the stand she doesn't expect to get anything more

14   from her cooperation.  So it's not the typical situation like

15   Corey Spinner, who I would say has the most to gain from his

16   testimony.  He has not been sentenced yet.

17        And then Mr. Forget -- this is Government Exhibit

18   28 -- and if you can go to the second page, Ron -- this is

19   the letter that the government sent to Mr. Forget just a

20   couple weeks ago because he was arrested for selling a

21   firearm and you can go ahead and read this in its entirely.

22   But I would just look at that second paragraph or first full

23   paragraph.  The letter says you violated your conditions of

24   release and then it says, "as a result, the U.S. Attorney's

25   office has determined that you have breached both your plea

645

US V. Peters – 13–CR–316

1   and cooperation agreements.  The United States Attorney

2   office has decided to void your cooperation agreement.  In

3   addition, at the time of sentencing, the government will make

4   no motion for a downward departure, meaning the government's

5   not going recommend that Forget get anything for his

6   cooperation.  And he knows that.  I think it was the last

7   thing he said on the stand.  He doesn't expect anything from

8   his testimony.

9          Now, are these people good people?  No.  No,

10  they're not good people, none of them, even Corey Spinner,

11  they're drug dealers.  Lobdell stole money.  Forget is a

12  terrible person.  He led police on a high speed chase and I

13  meant it when I asked him, he could have killed people.

14         And the test, ladies and gentlemen, isn't as

15  defense counsel suggests that would you hire them to be your

16  babysitter –– I don't think that's exactly what he said,

17  that's not the issue.  Of course you wouldn't have them be

18  your babysitter.

19         But I would encourage you not to look at their

20  testimony in a vacuum and not to assume just because they're

21  not very good people doesn't mean that what she said isn't

22  absolutely accurate.  And really look at all of the evidence

23  in the case.  You don't have to parse out and say, well, let

24  me look at Lobdell's testimony and see if I believe it

25  because she stole $5,000 in 2006.  That's not the way it

646

US V. Peters – 13-CR-316

1    works.  Look at everything.  Look at the entire case.  And I
2    just want to point out a couple things quickly and then I'll
3    sit back down.
4            Defense counsel talked about George King quite a
5    bit and I think it's very confusing the way that he was
6    describing.  There's King's marina that's discussed on the
7    transcript.  That is not George King's residence.  Lobdell
8    and Forget both said they transported loads to George King's
9    residence, which is in Malone.  It's not a marina.  So, the
10   only time that any of those three witnesses picked up
11   anywhere other than the defendant's mother's property was
12   three times that Lobdell picked up at Adams Marina.
13           So, this whole thing about George King -- I don't
14   want to say it's a nonissue -- but that's not another marina
15   that this organization was using.  George King's residence --
16   and Lobdell said it very clearly -- is a residence in Malone.
17   And, please, you don't have to take my word for it.  You can
18   go back and look at the transcripts.
19           Defense counsel also talked about the fact that
20   Lobdell said that she went to Frenchie's with the defendant
21   and that that was inconsistent with Mr. Miller's testimony.
22   Mr. Miller said that Ms. Lobdell came in at three different
23   occasions.  She paid the money on the 19th.  She came in for
24   instructions about what to do about the car on 20th and on
25   the 21st she took possession of the vehicle.  He also

647

US V. Peters – 13-CR-316

1  testified that he's not the salesman.  So I don't know that

2  he was there the entire time and there's no reason to think

3  that Lobdell did not testify credibly.  We have the

4  defendant -- the cash receipt from the defendant showing he's

5  involved in this transaction.  Mr. Miller talked about how

6  when he came back in and said I don't want that car right now

7  but I need you to shred the paperwork.  That's what's

8  important about that testimony, that's what's the important

9  part of that testimony.

10       Defense counsel was talking about the March 1st

11  2011 seizure that detective Jim Sunday was -- observed

12  Lobdell's vehicle come from Marie Peters' residence and I

13  think he tried to imply that Jim Sunday could see the docks

14  and see the canal and he didn't see the defendant.  It's not

15  what he said.  He actually specifically said he could not see

16  the residence and he could not see the water or the canal

17  from his location.  He saw the head lights coming from that

18  area and then pass his location.  Actually, I think he pulled

19  out in front of them.

20       And I agree with defense counsel, the recorded

21  conversation that defense counsel quoted the transcript I

22  think is the most important piece of evidence in this case.

23  It's the defendant talking about this conspiracy in his own

24  words while this conspiracy is going on and he did talk about

25  cigarettes, okay.  He also smuggles cigarettes.  I'm not sure

648

US V. Peters – 13-CR-316

1    what that has to do with this case.  He isn't charged with

2    smuggling cigarettes.  He's charged with being involved in a

3    conspiracy to possess, with intent to distribute, marijuana.

4    And that conspiracy, it doesn't matter that he was partly in

5    Canada for that conspiracy.  It doesn't matter if he ever

6    even crossed the border.  It doesn't matter that he ever

7    picked up a bag of marijuana.  All that matters is that there

8    was a conspiracy to commit these illegal acts and the

9    defendant did something to further that conspiracy.  And

10   that's what you heard from these witnesses, that he did a

11   bunch of things, but the most important thing is that he kept

12   this doorway open and that this organization was paying him

13   for that service and that's what his role in this conspiracy

14   is.

15           And just one other, one other point quickly,

16   defense counsel implied that there was inconsistencies in the

17   testimony between the three cooperating witnesses and defense

18   talked a lot about wanting dates and times.  I think that

19   is -- you all have common sense, you all have a understanding

20   of the ways of the world.  If I asked you each an important

21   event that occurred five or six years ago, would you be able

22   to tell me the date and time and that's what defense counsel

23   wants with these witnesses.  They provided detailed testimony

24   about what they did.  Did they pin it down to an exact date?

25   No.

JA-685

649

US V. Peters – 13-CR-316

1          And the other thing defense counsel talked about

2     was that he was implying that Corey Spinner and Forget and

3     Lobdell were always at the canal together at the same time,

4     that they couldn't have had any interactions with the

5     defendant unless all three of them were there.  That's not

6     really what the testimony was; in fact, that's not what the

7     testimony was at all.

8          Lobdell was a part of this organization since the

9     early '90s and she really became a part of the organization

10    2005.  Several years before Forget became involved, Forget

11    said that he scouted 20 different times before he recruited

12    Corey Spinner into this organization.  So they had many, many

13    interactions with the defendant and before Corey Spinner ever

14    became involved again.

15         Ladies and gentlemen, please look at all the

16    evidence in the case and evaluate their testimony.  Their

17    testimony is not without corroboration and that's why I spent

18    so much time going through all the other evidence in the

19    case.  That's why we took the time to present something other

20    than just Forget or just Lobdell.

21         And, again, the government would ask that you

22    return a verdict of guilty on the sole count in the

23    indictment.

24         THE COURT:  Okay, ladies and gentlemen, that

25    includes the proof and the arguments in the case.  I'm going

650
                US V. Peters – 13–CR–316

1   to charge you on the law.

2           But before I do that, it's almost 10:40.  I'm going

3   to give you a break, go into the jury room and stretch.

4           Have you ordered your lunch?  That's been done,

5   good.  So we'll take a short, five–, ten minute break.  Let

6   you stretch, wake up a little bit, get recharged and come

7   back out here and I'll give you the most exciting part of the

8   case and that's the law that I'm going to read to you, okay.

9           Go ahead.  Don't discuss the case yet, please.

10          (Jury excused.)

11          THE COURT:  Okay.  Brief recess, use the facilities

12  and please come right back whatever you do and we'll get the

13  jury charged.

14          THE CLERK:  Court's in recess.

15          (Recess taken, 10:35 a.m.)

16          (Open court, 10:50 a.m.:)

17          THE COURT:  We're going to bring the jury in.

18  Okay.  The record should reflect we have the ladies and

19  gentlemen of the jury, the defendant, defense counsel, and

20  the assistant United States Attorney.

21          Ladies and gentlemen, we're at the point of trial

22  where I'm going to charge you on the law and I have 31 pages

23  of legal instructions to read to you.  I don't want that to

24  make you nervous.  I want you to relax and just listen, okay,

25  and I'm going to tell you why.

JA-687

651

US V. Peters – 13–CR–316

1      I have a copy for each one of you of this to send

2   in to you, should you have any questions about what I've said

3   or what I've read.  And this jury instruction has a table of

4   contents so you can find things quickly, if there is some

5   question about some instruction that I've given to you.  So

6   it should be very straight forward and so just relax and

7   listen.  All right.

8           As I've indicated, there's a table of contents and

9   then we're going to get right to the roles of the Court and

10  the jury.

11          Now that you've heard all the evidence and the

12  arguments of counsel, it is my duty to instruct you on the

13  law applicable to this case.  Your duty, as jurors, is to

14  determine the facts of this case on the basis of admitted

15  evidence.  Once you have determined the facts, you must

16  follow the law as I state it and apply the law to the facts

17  as you find them.  You are not to consider one instruction

18  alone as stating the law but you are to consider the

19  instructions as a whole.  If an attorney has stated a legal

20  principle different from any that I state to you in my

21  instructions, it is my instructions that you must follow.

22          You should not concern yourself with the wisdom of

23  any rule of law.  You are bound to accept and apply the law

24  as I give it to you, whether or not you agree with it.

25          In deciding the facts and applying the law of this

JA-688

652

US V. Peters – 13–CR–316

1   case, you must not be swayed by feelings of bias, prejudice,

2   sympathy toward any party.  The government and the defendant,

3   as well as the general public, expect you to carefully and

4   impartially consider all the evidence in this case, follow

5   the law as stated by the Court, and reach a decision

6   regardless of the consequences.

7           Nothing I say in these instruction is to be taken

8   as an indication that I have any opinion about the facts of

9   the case or what that opinion may be.  It is not my function

10  to determine the facts.  That's your function.

11          The role of the attorneys.  The function of

12  attorneys is to call your attention to those facts that are

13  most helpful to their side of the case what.  The attorneys

14  say, however, is not binding on you and in the final

15  analysis, your recollection and interpretation of the

16  evidence controls your decision.

17          Let me further elaborate on the role of attorneys.

18          Our courts operate on an adversary system in which

19  we hope that the truth will emerge through the competing

20  presentations of the adverse parties.  It is the role of the

21  attorneys to press as hard as they can for their respective

22  positions.  In fulfilling that role, they have not only the

23  right, but the obligation, to make objections to the

24  introduction of evidence they feel is improper.

25          The application of the rules of evidence is not

653
US V. Peters – 13–CR–316

1    always clear and attorneys often disagree.  It has been my

2    job as the judge to resolve these disputes.  It is important

3    for you to realize, however, that my rulings on evidentiary

4    matters have nothing to do with the ultimate merits of the

5    case and are not to be considered as points scored for one

6    side or the other.

7            Similarly, one cannot help becoming involved with

8    the personalities and styles of the attorneys.  However, it's

9    important for you, as jurors, to recognize that this is not a

10   contest between attorneys.  You are to decide this case

11   solely based on the evidence.  Remember, statements and

12   characterizations of the evidence by the attorneys are not

13   evidence.  Insofar as you find their opening and/or closing

14   arguments helpful, take advantage of them.  But keep in mind

15   that it is your memory and your evaluation of the evidence in

16   this case that counts.

17           In addition, you must not infer from anything I

18   have said during this trial that I hold any views for or

19   against either the government or the defendant.  In any

20   event, any opinion I might have is irrelevant to your

21   decision.

22           The government as a party.  You are to perform the

23   duty in finding the facts without bias or prejudice as to any

24   party.  You are to perform your final duty in an attitude of

25   complete fairness and impartiality.  The case is important to

JA-690

654

US V. Peters – 13–CR–316

1 the government because the enforcement of criminal laws is a

2 matter of prime concern to the community. It is equally

3 important to the defendant who is charged with a serious

4 crime.

5 The fact that the prosecution is brought in the

6 name of the United States of America entitles the government

7 to no greater consideration than that afforded to any other

8 party of a litigation. By the same token, it is entitled to

9 no less consideration. All parties, whether government or

10 individuals, stand as equals at the bar of justice. The

11 question before you can never be will government win or lose

12 the case. The government always wins when justice is done,

13 regardless of whether the verdict is guilty or not guilty.

14 Let's talk about the nature of evidence.

15 Testimony, exhibits and stipulations of fact. As I

16 stated earlier, your duty is to determine the facts, based on

17 the evidence I have –– evidence that has been admitted in

18 this case.

19 The term evidence includes the sworn testimony of

20 witnesses, both on direct examination and cross–examination;

21 the exhibits received into evidence regardless of who have

22 may have produced them; and, three, any facts to which the

23 attorneys have agreed or stipulated to.

24 Regarding the first form of evidence; that is sworn

25 testimony.

JA-691

655

US V. Peters – 13-CR-316

1    Arguments and statements of the attorneys,

2  questions to witnesses, and material excluded by my rulings

3  are not evidence.  For example, at times during the trial, a

4  lawyer on cross-examination may have incorporated into a

5  question a statement that assumes certain facts to be true

6  and asked the witness if that statement was true.  If the

7  witness denied the truth of the statement and if there is no

8  evidence in the record providing that the assumed fact is

9  true, then you may not consider the fact to be true simply

10  because it was contained in the lawyer's question.

11    Similarly, at times during the trial I sustained

12  objections to questions and either prevented a witness from

13  answering or ordered an answer stricken from the record.  You

14  may not draw inferences from unanswered questions and you may

15  not consider any responses that I ordered stricken from the

16  record.

17    Regarding the second form of evidence; that is

18  exhibits.  Exhibits that have been marked for identification

19  but not received may not be considered by you as evidence.

20  Only those exhibits received may be considered as evidence

21  and those will be provided to you.

22    Regarding the third form of evidence and that is

23  stipulations.  The parties here have entered into three such

24  stipulations of fact regarding the confiscation and testing

25  of marijuana.

JA-692

656

US V. Peters – 13-CR-316

1   You may accept a stipulation or stipulations as

2   evidence and regard that fact or those facts as proved, that

3   they've been proven.  However, you are not required to do

4   this, since you are the sole judges of the fact.  It's up to

5   you to decide.

6   You consider the evidence in light of your own

7   common sense and experience and you may draw reasonable

8   inferences from the evidence.  However, you are to base your

9   verdict only on the evidence received in the case.  Anything

10  you may have seen or heard about this case outside the

11  courtroom is not evidence and must be entirely disregarded.

12  Direct and circumstantial evidence.  As I explained

13  to you during my preliminary instructions at the start of the

14  trial, the law recognizes two types of evidence, direct and

15  circumstantial.  Now that the trial is over, a more elaborate

16  instruction on the subject is appropriate.

17  Direct evidence is evidence that proves a disputed

18  fact directly.  For example, when a witness testifies to what

19  he or she saw, heard or observed, that is called direct

20  evidence.

21  Circumstantial evidence is evidence that tends to

22  prove a disputed fact by proof of other facts.  I will give

23  you an example other than that snow example that I gave you

24  during my preliminary instructions.  Suppose that when you

25  came into the courthouse today the sun was shining and it is

657

US V. Peters – 13–CR–316

1   and it was a nice day but the courtroom blinds were drawn and

2   you cannot look outside.  Then later, as you were sitting

3   here, someone walked in with a dripping wet umbrella and soon

4   after, somebody else walked in with a dripping wet rain coat.

5   Now, on our assumed facts, you can't look outside the

6   courtroom and you cannot see whether or not it's raining so

7   you have no direct evidence of that fact.  But, on the

8   combination of the facts about the umbrella and the rain

9   coat, it would reasonable for you to infer that it's begun to

10  rain outside.

11          That is all there is to circumstantial evidence.

12  Using your reason and experience, you infer from established

13  facts the existence or the nonexistence of some other fact.

14  Please note, however, that it is not a matter of speculation

15  or guess.  It is a matter of logical inference, all right.

16  It makes sense.  Your common sense is so important when

17  you're deciding the facts of the case.  Things in your every

18  day ordinary life and common sense, vital in your

19  considerations.

20          The law makes no distinction between

21  circumstantial, direct -- direct and circumstantial evidence.

22  Circumstantial evidence is of no less value than direct

23  evidence and you may consider either or both and may give

24  them such weight as you conclude is warranted.

25          An indictment is not evidence.  As I explained to

US V. Peters – 13–CR–316

1   you during my preliminary instructions and during jury

2   selection, the defendant has been charged with a crime about

3   which I will further instruct you shortly.  The instrument

4   through which they –– those charges have been brought is

5   called an indictment.  The indictment is not evidence.

6   Rather, it is merely an accusation describing the charge made

7   against the defendant.  As a result, it may not be considered

8   by you as any evidence of guilt of the defendant.

9           Potential punishment is not evidence.  Similarly,

10  the question of possible punishment of the defendant should

11  be of no concern to you and you should not, in any sense,

12  enter into –– or let it enter into or influence your

13  deliberations.  The duty of imposing a sentence rests

14  exclusively upon the Court.  Your function is to weigh the

15  evidence in the case and determine whether or not the

16  defendant is guilty beyond a reasonable doubt, solely on the

17  basis of such evidence.  Under your oath as jurors, you

18  cannot allow consideration of the punishment which may be

19  imposed upon the defendant, if he is convicted, to influence

20  your verdict in any way, or, in any sense, enter into your

21  deliberations.  And I want to emphasize that.  There's been a

22  lot of testimony in this case about some of these cooperating

23  witnesses and what sentences they were facing, what they may

24  be looking at.  It's no consideration of yours with regard to

25  this defendant in deciding what the facts are of this case in

659

US V. Peters – 13–CR–316

1    reaching your ultimate decision in a verdict in this case.

2    Should never enter into your discussion, that is the sole

3    function of this court.

4              Evaluation of evidence.

5              Verdict based on evidence not sympathy.  Under your

6    oath as jurors you are not to be swayed by sympathy.  You are

7    to be guided by the evidence in this case.  The crucial hard

8    core question that you must ask yourself as you sift through

9    the evidence is this:  Has the government proven the guilt of

10   the defendant beyond a reasonable doubt.

11             It is for you alone to decide whether the

12   government has proven that the defendant is guilty of the

13   crime charged solely on the basis of the evidence and subject

14   to the law as I charge you.  It must be clear to you that,

15   once you -- it must be clear to you that, once you let fear

16   or prejudice or bias or sympathy interfere with your

17   thinking, there is a risk that you will not arrive at a true

18   and just verdict.  Those emotions, those things have no place

19   in your deliberations or your decision.

20             If you have a reasonable doubt as to the guilt of

21   the defendant, then you should not hesitate for any reason to

22   render a verdict of acquittal.  But, on the other hand,

23   should you find that the government has met its burden of

24   proving the guilt of the defendant beyond a reasonable doubt,

25   then you should not hesitate, because of sympathy or any

660

US V. Peters – 13–CR–316

1   other reason, to render a verdict of guilty.

2           Improper considerations:  Race, religion, national

3   origin, sex or age.

4           Your verdict must be based solely on the evidence

5   developed at trial or the lack of evidence.  It would be

6   improper for you to consider, in reaching your decision as to

7   whether the government sustained its burden of proof, any

8   personal feelings you may have about a defendant's race,

9   religion, national origin, sex or age.  All persons are

10  entitled to the presumption of innocence and the government

11  has the burden of proof, as I will discuss in a moment.

12          It would be equally improper for you to allow any

13  feelings you might have about the nature of the crime charged

14  to interfere with your decision–making process.

15          To repeat, your verdict must be based exclusively

16  upon the evidence or the lack of evidence in this case that's

17  been presented in this courtroom and on nothing else.  Those

18  are issues that we talked about right from the very start of

19  this case in jury selection.

20          Quality not the quantity of the evidence.  The fact

21  that one party has introduced more evidence than the other

22  does not mean that you should find facts in favor of the side

23  offering more evidence.  It is quality of the evidence that

24  governs not the quantity.  As a matter of fact, the defendant

25  in a criminal case is under no obligation to present any

JA-697

661

US V. Peters – 13–CR–316

1    evidence, which we also have discussed in the beginning of

2    this case.

3            All right.  Let's talk about credibility of

4    witnesses.

5            You have had the opportunity to observe all the

6    witnesses.  It is now your job to decide how believable each

7    witness was in his or her testimony.  You are the sole judges

8    of the credibility of each witness and of the importance of

9    his or her testimony.

10            In evaluating the witness' testimony you should use

11   all the tests for truthfulness that you would use in

12   determining matters of importance to you in your every day

13   life.  You should consider any bias or hostility the witness

14   may have shown for or against any party, as well as the

15   interest the witness may have in the outcome of the case.

16   You should consider the following:  One, the opportunity the

17   witness had to see, hear and know the things about which he

18   or she testified; two, the accuracy of the witness' memory;

19   three, his or her candor or lack of candor; four, the

20   reasonableness and probability of the witness' testimony;

21   five, the testimony's consistency or lack of consistency;

22   and, six, its corroboration or lack of corroboration with

23   other credible testimony.

24            In other words, what you must try to do in deciding

25   credibility is to size up the witness in light of his or her

JA-698

662

US V. Peters – 13–CR–316

1 demeanor, the explanations given, and all the other evidence

2 in the case.  Always remember that you should use your common

3 sense and your good judgment and your own life experiences.

4 The existence or non-existence of a fact is not

5 determined by the number of witnesses called.  Again, your

6 concern is not with the quantity, but the quality of the

7 evidence.

8 Impeachment by prior inconsistent statement.

9 You have heard counsel argue that the witnesses

10 made statements on earlier occasions that counsel maintains

11 are inconsistent with those witnesses' trial testimony.

12 Evidence of prior inconsistent statement is not to be

13 considered by you as affirmative evidence.  However, any

14 evidence of a prior inconsistent statement may be considered

15 by you for the more limited purpose of helping you decide

16 whether to believe the trial testimony of the witness you

17 find to have contradicted himself or herself.  If you find

18 that the witness made an earlier statement that conflicts

19 with his or her trial testimony, you may consider that fact

20 in deciding how much of his or her trial testimony, if any,

21 to believe.

22 In making this determination, you may consider the

23 following:  Whether the witness purposely made a false

24 statement or whether it was an innocent mistake; whether the

25 inconsistency concerns an important fact or whether it had to

663

US V. Peters – 13–CR–316

1 do with a minor detail; whether the witness had an

2 explanation for the inconsistency and whether the explanation

3 appealed to your common sense.

4          It is exclusively your duty, based on all the

5 evidence and your own good judgment, to determine whether the

6 prior statement was inconsistent and, if so, how much, if

7 any, weight should be given to the inconsistent statement in

8 determining whether to believe all or part of the witness'

9 testimony.

10          Failure of the defendant to testify.

11          In a criminal case, the defendant cannot be

12 required to testify.  In this case, the defendant did not

13 testify.  Under our Constitution, he has an absolute right

14 not to testify.  The fact that he did not testify must not be

15 discussed or considered by you in any way in deliberating and

16 arriving at your verdict.  No inference of any kind may be

17 drawn from the fact that the defendant decided to exercise

18 his privilege under the Constitution not to testify.

19          The law never imposes upon a defendant in a

20 criminal case the burden or duty of calling any witness or

21 producing any evidence.  Rather, the government has the

22 burden of proof to prove this case beyond a reasonable doubt.

23 The defendant does not have the burden of proof to prove he

24 is innocent.

25          Let's talk about accomplice testimony.  And we had

JA-700

664

US V. Peters – 13–CR–316

1   at least three witnesses in this nature.

2           You have also heard the testimony of accomplice

3   witnesses.  The Court would like to point out two things with

4   regard to this testimony.  First, it is up to you to

5   determine the credibility of this testimony.  In making this

6   determination, I urge you to keep in mind that, in the

7   prosecution of crime, the government is frequently called

8   upon to use persons who have been accomplices.  Often it has

9   no choice.  After all, the government must rely upon

10  witnesses to the transactions, whomever they are; otherwise,

11  in many instances, it would be difficult to detect and

12  prosecute wrongdoers.  This is particularly so in cases where

13  a conspiracy is involved.  Frequently, it happens that only

14  those on the inside of the venture can give evidence which is

15  material and important to the case.

16          The law lays down several rules that govern your

17  treatment of accomplice testimony.  In the first place, it is

18  no concern of yours or mine why the government chose not to

19  charge a certain person or to treat others with leniency.

20  The decision of who should be prosecuted and to what degree

21  is a matter which the Constitution and statutes of the United

22  States delegates solely to the Attorney General of the United

23  States and the United States Attorneys, who, acting under his

24  authority, carry out his Constitutional mandate.  The

25  Constitution and statutes of the United States do not give

665

US V. Peters – 13–CR–316

1   you or me any authority to supervise the exercise of this
2   responsibility.  Further, if you come to the conclusion that
3   an accomplice witness has given reliable testimony, you are
4   required to act upon it exactly as you would act on any other
5   testimony you find to be reliable, even though you may
6   thoroughly dislike the witness who provided the testimony.
7           However, it is also the case that accomplice
8   testimony is of such a nature that it must be scrutinized
9   with great care and viewed with particular caution when you
10  decide how much of the testimony to believe.  There is no
11  requirement that the testimony of an accomplice be
12  corroborated or supported by other evidence.  A conviction
13  may rest upon the testimony of an accomplice alone, if you
14  believe it.  Therefore, in considering the testimony of an
15  accomplice, you should ask yourself whether these so-called
16  accomplices would benefit more by lying or by telling the
17  truth.  In addition, ask yourselves, was there their
18  testimony made up in any way because they believed or hoped
19  that they would somehow receive favorable treatment by
20  testifying falsely or did they believe –– excuse me, or did
21  they believe that their interests would be best served by
22  testifying truthfully.  If you believe that the witness was
23  motivated by hopes of personal gain, was the motivation one
24  which would cause him or her to lie or was it one which would
25  cause him or her to tell the truth?  Did this motivation

JA-702

666

US V. Peters – 13–CR–316

1   color his or her testimony?  Ultimately, it is your job to

2   determine the credibility of these and all the other

3   witnesses and you should look at all the evidence in deciding

4   what credence and what weight, if any, you want to the give

5   to these witnesses.

6          And, again, I emphasize, your common sense and you

7   every day life's experiences in deciding what you believe and

8   what you don't believe and looking at the entirety of the

9   evidence, okay.  You look at all the witnesses in that light

10  in deciding what to believe and not to believe.

11         Purpose for which the testimony was introduced.

12         Second, regardless to the degree which you find the

13  accomplice witness's credible or incredible, it is important

14  to keep in mind that the testimony of certain prior bad acts

15  that they spoke of -- that is, incidents of illegal activity

16  involving a defendant -- was not introduced to prove that the

17  defendant's character or to prove that the conduct with which

18  the defendant is charged was in conformity with another

19  individual's past behavior.  Instead, the evidence of these

20  prior acts was introduced merely for the purpose of

21  attempting to prove the defendant's intent and knowledge

22  pertaining to the crime with which he was charged.

23         To be clear, these prior bad acts and the

24  accomplice witnesses -- that the accomplice witnesses

25  provided testimony about were not alleged in the indictment.

JA-703

667

US V. Peters – 13–CR–316

1    And going along with this I'm going to talk about

2   evidence of uncharged conduct, which you heard.  There's one

3   charge here that you need to decide but there's been a lot of

4   testimony about activity that was not included in the

5   indictment.

6    So, the government has offered evidence tending to

7   show the existence of other criminal relationships between

8   the defendant and a witness who has testified for the

9   government.  Specifically, you have heard in this trial

10  concerning allegations that, during the course of the

11  conspiracy, there was an attempt to smuggle guns into Canada

12  using the defendant's property, which the government contends

13  is the same manner in which marijuana was smuggled into the

14  United States from Canada.

15    In that connection, let me remind you that the

16  defendant is not on trial for committing any acts that are

17  not alleged in the indictment.  Accordingly, you may not

18  consider this evidence of the other conduct as a substitute

19  for proof that the defendant committed the crime charged in

20  the indictment.  Nor may you consider this evidence as proof

21  that defendant has a criminal personality or bad character.

22  The evidence of the other conduct was received into evidence

23  for a much more limited purpose and you may consider it for

24  that limited purpose.

25    More specifically, evidence of this other conduct

JA-704

668

US V. Peters – 13–CR–316

1    was received into evidence for the purpose of helping you

2    understand the background, history and nature of the

3    relationship between the defendant and the government's

4    witnesses.  In addition, evidence of this other conduct was

5    received into evidence as relevant to establish the

6    defendant's state of mind in carrying out acts charged in the

7    indictment.  For example, if you determine that the defendant

8    committed the acts charged in the indictment, as well as the

9    acts involved until other conduct, then you may, but you need

10   not draw an inference that, in doing the acts charged in the

11   indictment, the defendant acted knowingly and intentionally

12   and not because of some mistake, accident or other innocent

13   reasons.

14         These are the sole purposes for which you may

15   consider evidence of prior relationship between the defendant

16   and the government's witnesses.  Evidence that other --

17   evidence of other conduct may not be considered by you for

18   any other purpose.  Specifically, you may not use as evidence

19   to conclude that, because the defendant committed the facts

20   involved in the other conduct, he must also have committed

21   the acts charged indictment.  Nor may you consider any

22   evidence that the defendant may have engaged in any prior

23   criminal conduct.  Any prior criminal conduct of the

24   defendant which may have been mentioned or presented through

25   any evidence is not relevant and may not be considered by

669

US V. Peters – 13–CR–316

1   you.  Once again, I stress that the defendant is not on trial

2   for committing any acts that are not alleged in the

3   indictment.  Okay.

4          So that other conduct evidence is offered for a

5   very limited purpose to show intent, lack of mistake, all of

6   the things that I have mentioned and that's the way that that

7   needs to be evaluated.

8          Use of undercover agents and informants.

9          You have heard testimony that an informant was used

10  by the government to investigate alleged unlawful testimony.

11  There is nothing improper with the government using this

12  technique.  Indeed, certain types of activity would be

13  extremely difficult to detect without the use of informants.

14  Whether or not you approve the use of informants to detect

15  unlawful activities, it is not to enter into your

16  deliberations in any way.

17         Evidence obtained through searches.

18         During the trial you have heard testimony that law

19  enforcement officers obtained certain pieces of evidence by

20  conducting searches and you are instructed, as a matter of

21  law, that the evidence obtained in these searches is a proper

22  form of evidence and may be considered by you, just as you

23  consider any other evidence.

24         In addition, the government has offered evidence in

25  the form of recordings of telephone calls and text messages

670

US V. Peters – 13-CR-316

1   between the defendant and others or between the accomplice

2   witnesses which were obtained without the knowledge of one of

3   the parties to the conversation.  The recordings were

4   lawfully obtained.  The use of this procedure to gather

5   evidence is perfectly lawful and the government is entitled

6   to use such recordings in this case.

7           Transcripts of audio recordings and text messages.

8           In addition, with regard to the audio recordings,

9   certain typewritten transcripts were provided to you.  These

10  transcripts which purport to identify the speakers engaged in

11  oral conversations were provided to you for the limited and

12  secondary purpose of aiding you in following the content of

13  the conversations as you listened to the audio recordings and

14  aiding you in identifying the speakers.

15          However, you are specifically instructed that,

16  whether the transcripts correctly or incorrectly reflect the

17  content of the conversations or the identity of the speakers,

18  is entirely for you to determine based on your own evaluation

19  of the testimony you have heard concerning the preparation of

20  the transcripts and from your own examinations of transcripts

21  in relation to your hearing of the audio recordings

22  themselves.  If you've noticed a difference between what you

23  heard on the recordings and what you read in the transcripts,

24  you must rely on what you heard, not on what you read.

25  Similarly, if you could not hear or understand certain parts

671

US V. Peters – 13-CR-316

1   of the recordings, you must ignore the transcripts as far as

2   those parts are concerned.  All right.  In other words, it

3   always goes back to that very initial basic rule:  It's your

4   interpretation and finding of the evidence that matters,

5   okay.

6           Variance in dates –- immaterial.

7           You will note that the indictment charges that the

8   offense alleged was committed between "in or about" a certain

9   year "on or about" a certain date.  The government does not

10  have to prove with certainty the exact date of the alleged

11  offense.  It is sufficient if the government proves beyond a

12  reasonable doubt that the offense was committed on dates

13  reasonably near the dates alleged.

14          Let's talk about the burden of proof.

15          Now, before discussing the alleged crime charged

16  here, I want to remind you that the indictment here is a mere

17  accusation.  It is not evidence and you are to draw no

18  inference of guilt from the mere fact the defendant has been

19  charged.  As a result, in reaching your determination of

20  whether the government has proved the defendant guilty beyond

21  a reasonable doubt, you may consider only the evidence

22  introduced or lack of evidence.

23          Defendant has no burden of proof whatsoever in this

24  case.  He is under no obligation to produce any witnesses.

25  He is presumed to be innocent and the presumption of

672

US V. Peters – 13–CR–316

1    innocence continues through the trial and during your

2    deliberations.  The presumption of innocence is overcome,

3    when, and only when, the government establishes the guilt of

4    the defendant by proving each element of the offense you are

5    considering beyond a reasonable doubt.

6         Now, what do I mean by beyond a reasonable doubt?

7    It is not some vague or speculative doubt.  As the phrase

8    implies, a reasonable doubt is a doubt that is based upon

9    reason, a reason that appears in the evidence or in the lack

10   of evidence.  The government is not required to prove a

11   defendant guilty beyond every conceivable or every possible

12   doubt.  Nor is government required to prove the defendant

13   guilty to an absolute mathematical certainty, because, of

14   course, in human affairs, that is usually impossible.  But,

15   you should review all the evidence as you remember it, sift

16   out what you believe, discuss it, analyze it, compare your

17   views of the evidence with that of your fellow jurors, and,

18   if that process produces in your mind some belief or

19   conviction that you would be willing to accept without

20   further hesitation, then you may say that you have been

21   convinced beyond a reasonable doubt.

22        On the other hand, if going through that same

23   process in your mind, your mind is wavering or is so

24   uncertain that you would hesitate before acting, if it were

25   an important matter of your own, then you have not been

673

US V. Peters – 13–CR–316

1    convinced beyond a reasonable doubt.

2            We're going to talk now about the substantive law.

3            Count 1 of the indictment charges the defendant in

4    this case with conspiracy to knowingly distribute or to

5    knowingly possess with intent to distribute, a controlled

6    substance, in violation of Title 21, United States Code,

7    Section 846 and 841(a)(1).  As I stated earlier, in order for

8    you to find that the defendant is it guilty on this count,

9    the government must prove beyond a reasonable doubt each of

10   that count's elements, which I will now discuss with you.

11           Count 1, conspiracy to knowingly distribute or to

12   knowingly possess with intent to distribute, a controlled

13   substance.  Title 21, United States Code, Section 846

14   provides as follows:  "Any person who attempts or conspires

15   to commit any offense defined in this subchapter shall be

16   subject to the same penalties as those prescribed for the

17   offense, the commission of which is the object of the attempt

18   or conspiracy".  Among the offenses defined in this

19   subchapter, and referenced in Count 1 of the indictment, is

20   the knowing distribution, or knowing possession with intent

21   to distribute, a controlled substance, in violation of

22   Title 21, United States Code, Section 841(a)(1).

23           The target crime in the Count 1 conspiracy is the

24   distribution of or possession with the intent to distribute

25   marijuana.  Marijuana is a controlled substance, as that

JA-710

674

US V. Peters – 13–CR–316

1  phrase is used in these instructions, the indictment and the

2  statute.

3       As a result, in order to satisfy its burden of

4  proof with regards to Count 1, the government must establish

5  each of the following three elements beyond a reasonable

6  doubt:

7       First, that the conspiracy, agreement or

8  understanding to distribute or to possess with intent to

9  distribute marijuana as described in the indictment was

10  willfully formed, reached or entered into by two or more

11  persons and existed at or about the time alleged;

12       Second, that at some time during the existence or

13  life of the conspiracy, the defendant knew the purpose of the

14  agreement and then knowingly and willfully became a member of

15  the conspiracy;

16       And, three, that the conspiracy involved the

17  distribution of or possession with intent to distribute

18  marijuana.  Those three elements.

19       Having briefly described these three elements, I

20  will now discuss the law regarding conspiracy generally and I

21  will discuss the elements in more detail.

22       Let's talk about the first element.

23       To prove the first element, the existence of the

24  conspiracy, the government must prove that two or more

25  members positively or tacitly came to an understanding to

675

US V. Peters - 13-CR-316

1   accomplish the unlawful objective alleged in the indictment.

2   This would mean that the defendant and others agreed or came

3   to an understanding to knowingly and intentionally distribute

4   or possess with intent to distribute marijuana.

5          Mere similarity of conduct among various persons

6   and the fact that they may have associated with each other,

7   assembled together and discussed common aims and interests

8   does not necessarily establish that a conspiracy existed.

9   However, the evidence in the case need not show that the

10  members entered into any formal or express agreement or that

11  they directly by spoken words or in writing stated between

12  themselves what their object or purpose was to be or the

13  details thereof or the means by which the object or purpose

14  was to be accomplished.  It is not necessary to show that

15  each member of the conspiracy, a so-called co-conspirator was

16  aware of all the conspiracy details.  Nor must it be shown

17  that each participant in the conspiracy had contact with all

18  the other participants joined in the conspiracy at the same

19  time or knew who all the participants were or what the other

20  participants were doing or why.  Moreover, a defendant may be

21  convicted as a co-conspirator, even though he may have played

22  only a minor part in the conspiracy.

23         What the government must proof beyond a reasonable

24  doubt, in order to establish proof that a conspiracy existed,

25  is that the members in some way or manner or through some

676

US V. Peters – 13–CR–316

1  method positively or silently came to a mutual understanding

2  to attempt to perform a common and unlawful plan, which, as

3  to Count 1, is the distribution or possession with intent to

4  distribute marijuana.

5       In determining whether a conspiracy existed, you

6  may consider all the evidence about the conduct, acts,

7  statements of the alleged conspirators.  You should consider

8  not only what was said or done, but also how it was said or

9  done.  Because a conspiracy by its very nature is

10  characterized by secrecy, you infer its existence from the

11  circumstances of this case and conduct of the parties

12  involved, as you find those circumstances and conduct to be

13  from your evaluation of the evidence.  Okay, as you view

14  everything.

15       If you find that the defendant was aware to a high

16  probability that a conspiracy existed to distribute or to

17  possess with intent to distribute marijuana, and that he

18  acted with deliberate disregard of the facts, you may find

19  that he acted knowingly.  However, if you find that he

20  actually believed that the actions he was taking were

21  legitimate, you may not find him guilty of the charged

22  conspiracy.

23       In this connection, if you find that the defendant

24  did not act with the reckless intent but, instead, acted in

25  good faith belief that he was doing nothing wrong, then that

677

US V. Peters – 13–CR–316

1   is a defense to each charge of the conspiracy in this case.

2   An honest mistake in judgment is not a crime.  The burden of

3   establishing a lack of good faith and criminal intent rests

4   on the prosecution or the government.  A defendant is under

5   no burden to prove his good faith.  Rather, the prosecution

6   must prove that the defendant acted knowingly and willfully

7   beyond a reasonable doubt.

8          Second element.

9          I now turn to the second element -- that is that

10  the defendant willfully became a member of the conspiracy.

11         One may become a member of a conspiracy without

12  having full knowledge of all the details of the conspiracy.

13  On the other hand, a person who has no knowledge of a

14  conspiracy but who happens to act in a way that furthers some

15  object or purpose of the conspiracy does not there by become

16  a conspirator.

17         Before you may find the defendant became a member

18  of the marijuana conspiracy charged in Count 1, the evidence

19  must show beyond a reasonable doubt that he willfully

20  participated in the unlawful plan with the intent to advance

21  or further some object or purpose of the conspiracy.  Before

22  you can find that he acted intentionally, you must be

23  satisfied beyond a reasonable doubt that he acted

24  deliberately and purposely.  That is, his acts must have been

25  the product of his conscious objective rather than the

678

US V. Peters – 13-CR-316

1   product of a mistake or accident.

2          Please recall that to act or participate willfully

3   means to act or participate voluntarily and intentionally and

4   with the specific intent to do something the law forbids or

5   with the specific intent to fail to do something the law

6   requires to be done.

7          If a defendant, with an understanding of the

8   unlawful character of the plan, knowingly encourages, advises

9   or assists for the purposes of furthering the plan, or

10  scheme, he there becomes -- thereby becomes a willful

11  participant, a conspirator.

12         In determining whether the defendant willfully

13  became a member of the conspiracy, you should consider his

14  acts and statements only -- you shall consider his acts and

15  statement only.  This is in contrast to the instruction I

16  gave you on proof of the first element -- existence of the

17  conspiracy -- which permits you consider the acts and

18  statements of all the alleged conspirators in determining the

19  existence of the conspiracy.  Merely associating with others

20  and discussing common goals, mere similarity of conduct

21  between or among such persons, merely being present at the

22  place a crime takes place or is discussed or even knowing

23  about criminal conduct does not of itself make someone a

24  member of a conspiracy as a conspirator.

25         However, the extent of a defendant's participation

JA-715

679

US V. Peters – 13–CR–316

1    has no bearing on the issue of his guilt.  A conspirator's

2    liability is not measured by the extent or duration of his

3    participation.  Indeed, each member may perform separate and

4    distinct acts and may perform them at different times.  Some

5    conspirators play major roles, while others play minor roles

6    in the scheme.  An equal role is not what the law requires.

7            In determining whether a defendant knowingly and

8    intentionally formed or joined the charged conspiracy, you

9    should consider all the evidence including whether the amount

10   of marijuana involved in transactions and the circumstances

11   surrounding such transactions support the conclusion that the

12   marijuana was intended for resale, whether there was

13   prolonged cooperation between the parties, and whether there

14   was a level of mutual trust or standardized dealings.  While

15   no single factor is controlling, you should consider all the

16   evidence in deciding whether the facts support the inference

17   that the transactions were entered into with an awareness of

18   the charged conspiracy and whether there are facts from which

19   you can infer an ongoing relationship with the charged

20   conspiracy.

21           The third element.

22           The indictment charges that the defendant conspired

23   to distribute or possess with intent to distribute marijuana.

24   The knowing and intentional distribution of marijuana

25   violates the law and the knowing and intentional possession

JA-716

680

US V. Peters – 13–CR–316

1   of marijuana with intent to distribute it violates the law.

2        The word "distribute" means to deliver marijuana.

3   "Deliver" is defined as the actual constructive or attempted

4   transfer of marijuana.  Simply stated, the words "distribute"

5   and "deliver" mean to pass on or to hand over to another or

6   to cause to be passed on or handed over to another or to try

7   to pass on or hand over to another marijuana.

8        Distribution does not require a sale.  Activities

9   in furtherance of the ultimate sale, such as vouching for the

10  quality of the marijuana, negotiating for or receiving the

11  price, or supplying or delivering the marijuana may

12  constitute distribution.  In short, distribution requires a

13  concrete involvement in the transfer of the marijuana.

14       In summary, if you find beyond a reasonable doubt

15  that the conspiracy involved the distribution of marijuana or

16  possession with intent to distribute marijuana, then the

17  third element has been proven.

18       Quantity of the marijuana involved.

19       If you determine that the alleged conspiracy to

20  distribute or possess with intent to distribute marijuana

21  existed and that the defendant was a member of the

22  conspiracy, you must determine the total amount of the

23  marijuana involved in the conspiracy.  In this regard, the

24  government must proof beyond a reasonable doubt the quantity

25  of the marijuana involved.

681

US V. Peters – 13–CR–316

1    The government bears the burden of proving beyond a

2  reasonable doubt that the conspirators intended to possess

3  with intent to distribute, or to distribute, the amount of

4  illegal drugs charged in the indictment or some lesser

5  amount.  The amount of marijuana involved in the conspiracy

6  includes not only the quantity that the members of the

7  conspiracy actually distributed or possessed with intent to

8  distribute, but also the quantity that they conspired or

9  agreed to distribute or possess with intent to distribute.

10  In other words, you should consider the quantity that the

11  members of the conspiracy intended to distribute.  An

12  agreement to distribute or to possess with intent to

13  distribute a specific amount of an illegal drug, evidences an

14  intent to distribute it.

15    Once you have determined the total quantity of

16  marijuana, if any, involved in the conspiracy, you must

17  decide the quantity attributable to the defendant.  In

18  essence, you must make a determination as to the amount of

19  marijuana he knew or reasonably could have foreseen as being

20  involved in the conspiracy.

21    A defendant is responsible for not only his own

22  actions but also for those of his co-conspirators, if those

23  actions were known or were reasonable foreseeable to him, if

24  they were in furtherance of the conspiracy.  If you have

25  found, beyond a reasonable doubt, the defendant was a

JA-718

682

US V. Peters – 13–CR–316

1 participant in the conspiracy charged in the indictment, he

2 may be liable for any drug quantities his co-conspirators

3 conspired to distribute or possess with intent to distribute.

4 Before holding defendant liable for agreements made

5 or acts done by his co-conspirators, however, you must also

6 find that such agreements or acts were known or were

7 reasonably foreseeable to him. In other words, they must

8 fall within the scope of the agreement between he and the

9 other co-conspirators.

10 Your determination as to the quantity of marijuana

11 attributable to the defendant should, therefore, include any

12 amount you find beyond a reasonable doubt that he himself

13 conspired to distribute or possess with intent to distribute.

14 It should also include any known or reasonably foreseeable

15 amount that you find beyond a reasonable doubt that the

16 defendant and his co-conspirators, in furtherance of the

17 conspiracy, conspired to distribute or possess with intent to

18 distribute.

19 I will provide a verdict sheet with three ranges of

20 drug amounts that you may consider if you find defendant

21 guilty of Count 1.

22 Now, in conclusion.

23 I have now outlined the rules of law applicable to

24 this case and the process by which you should weigh the

25 evidence and determine the facts. In a few minutes, you will

683

US V. Peters – 13–CR–316

1   retire to the jury room for your deliberations.  Your first
2   order of business in the jury room will be to elect a
3   foreperson.  The foreperson's responsibility is to insure
4   that deliberations proceed in an orderly manner.  This does
5   not mean that the foreperson's vote is entitled to any
6   greater weight than the vote of any other juror.
7        When you are in the jury room, listen to each other
8   and discuss the evidence and the issues.  You will have at
9   your disposal all of the exhibits that have been received
10  into evidence.  It is the duty of each of you as jurors to
11  consult with each other.  You must deliberate with a view to
12  reaching an agreement, but only if you can do so without
13  violating your individual judgment and conscience.  Your job
14  as jurors is to reach a fair conclusion from the law and the
15  evidence.  The defendant, the government and the Court are
16  relying on you to give full and conscientious consideration
17  to the issues and the evidence before you.
18       In order to return a verdict, it is necessary that
19  each juror agree.  Your verdict must be unanimous.
20       As you know, I've permitted you to take notes
21  during the trial.  As I explained during my preliminary
22  instructions to you, those notes are simply an aid to your
23  memory because the notes may be inaccurate or incomplete.
24  They may not be given any greater weight or influence than
25  the recollections of other jurors about the facts or the

684

US V. Peters – 13–CR–316

1   conclusions to be drawn from the facts in determining the

2   outcome of this case.  You may base your determination on the

3   facts and, ultimately, your verdict on the court record,

4   rather than on any juror's notes.

5           Having said that, if, in the course of your

6   deliberations, your recollection of any part of the testimony

7   should fail or if you should find yourself in doubt

8   concerning my instructions, it is your privilege to return to

9   this courtroom to have the testimony read to you or my

10  instructions further explained.  Please remember that it is

11  not always easy to locate what portion of the testimony you

12  might want.  So be specific as you possibly can in requiring

13  the portion or portions of the testimony that you may want in

14  requesting those portions.  In addition, I caution you that

15  reading back of testimony may take some time and effort.  You

16  should, therefore, make a conscientious effort to resolve any

17  questions as to the testimony through your collective

18  recollections first.

19          Should you desire to communicate with the Court

20  during your deliberations, please put your message or

21  question in writing.  The foreperson should sign the note and

22  pass it to the Marshal who will bring it to my attention.  I

23  will then respond, either in writing or orally, by having you

24  return to the courtroom.  However, do not tell me or anyone

25  else how the jury stands on the issue of defendant's guilt

685

US V. Peters – 13–CR–316

1   until a unanimous verdict is reached.  In other words, if

2   you're voting in there, any note or something that comes out

3   should have no numbers or any indication of where people

4   stand or what that vote might be until you've reached a your

5   unanimous verdict.

6          As far as any notes, whoever has the best

7   handwriting -- wouldn't be me -- but whoever in there.  The

8   foreperson just needs to sign it, put the date and the time

9   that the note's being sent out and there's forms that we will

10  give you for this stuff.

11         During your deliberations do not hesitate to

12  re-examine your views and change your mind.  Do not, however,

13  surrender your honest convictions because of the opinion of a

14  fellow juror or for the purposes of returning a verdict --

15  just for returning a verdict.  Remember, you are not

16  partisans.  You are judges, judges of the facts.  Your duty

17  is to seek the truth from the evidence presented to you while

18  holding the government to its burden of proof.

19         Once you have reached a unanimous verdict, your

20  foreperson should fill in the verdict form, date it, sign it

21  and inform the Marshal that a verdict has been reached.  A

22  verdict form has been prepared for you and I will now review

23  it with you.  And it's very straightforward and simple.

24  You'll be provided with this, as well.

25         It says, it has the caption of the case and it

US V. Peters - 13-CR-316

1  says: "As to Count 1 of the indictment (charging the

2  defendant with conspiracy to knowingly distribute, or to

3  possess with the intent to distribute, a controlled

4  substance, in violation of 21, U.S.C., Section 846), how do

5  you find the defendant?  Guilty or not guilty?

6        If your answer is guilty, proceed to question two.

7  If your answer is nothing, you have finished your

8  deliberations.

9        Question two, "If and only if you find the

10  defendant guilty of participating in the conspiracy charged

11  in Count 1, what do you find the quantity of marijuana to be

12  (for which you find that he is responsible with regard to

13  that count) beyond a reasonable doubt?  And it has a thousand

14  kilograms or more?  Yes or no.  A hundred kilograms or more

15  but less than a thousand kilograms?  Yes or no.  Less than a

16  hundred kilograms?  Yes or no.

17        And it just has a place, the date or the date and

18  you put the foreperson to sign the verdict form and that's

19  it.

20        And that's going to conclude my instructions can I

21  answer any questions for anybody at this point?

22        (Jurors nodding no.)

23        THE COURT:  This will all be sent in for you.  All

24  right we're going to swear in some court security officers,

25  please.  We're going to need somebody for the alternates, as

687

US V. Peters – 13–CR–316

1  well.

2          (Marshals duly sworn.)

3          THE COURT:  Okay.  Ladies and gentlemen, we're

4  going to have the 12 jurors retire to the jury room to start

5  your deliberations.  The two alternates will be taken to

6  another location where you'll be kept for a period of time

7  until we decide that either there's –– we don't need your

8  service any longer or that until there's a verdict.  Usually

9  we keep you around until there's a verdict, just in case.

10  That way you get to know what happens, too.  But you'll be

11  kept in a separate room and you won't be able to participate

12  in these deliberations, unless and until it should become

13  necessary.  Okay.

14          That being said, you can return to the jury room

15  and start your deliberations and enjoy your lunch.

16          (Jury excused to deliberate, 11:43 a.m.)

17          THE COURT:  Okay, the jury has retired to start

18  their deliberations.  Are there any objections or requests

19  for with regards to the charge for the government?

20          MR. GARDNER:  No, sir.

21          THE COURT:  For the defense, Mr. Sacco?

22          MR. SACCO:  No, your Honor.

23          THE COURT:  Okay, very well.  I'm going to ask you

24  if you're going to be away from the immediate area of the

25  courtroom off this floor, that you leave a cell number, a way

688
                    US V. Peters – 13–CR–316

1   that we can get you as quickly as possible with my courtroom

2   deputy Lori so that we can receive -- get you back here for

3   any notes that we may receive expeditiously.

4           That being said, once you do that, I want to thank

5   counsel in this case.  You're gentlemen.  You proceeded as

6   gentlemen.  You stipulated where you could.  The Court

7   appreciates the way that you've tried this case.  Your

8   performance in the case I thought was outstanding, both of

9   you, and, certainly, your demeanor and courtesies to this

10  Court are very much appreciated.  Thank you, whatever

11  happens.

12          MR. GARDNER:  Thank you.

13          MR. SACCO:  Thank you, sir.

14          (Recess, 11:47 a.m.)

15          (Open court, 2:32 p.m.)

16          THE COURT:  Okay.  The record should reflect we're

17  in the courtroom without the jury.  We've received a note

18  that the jury has reached a verdict.  So we're going to bring

19  this jury in and we're going to take that verdict.  When

20  they're ready.

21          (Jury present, 2:33 p.m.)

22          THE COURT:  Okay, ladies and gentlemen, we've

23  received your note that you've reached a verdict.  I'm going

24  to ask the foreperson if you'll please stand and I'm going to

25  have my clerk take the verdict.

JA-725

689

US V. Peters – 13-CR-316

1    THE CLERK:  In the case of United States of America

2  versus Allan Peters, 8:13-CR-316, number one, as to Count 1

3  of the indictment charging defendant with conspiracy to

4  knowingly distribute or to possess with intent to distribute

5  a controlled substance, in violation of Title 21, United

6  States Code, Section 846, how do you find the defendant?

7  Guilty or not guilty?

8    THE FOREPERSON:  Guilty.

9    THE COURT:  Number two, if, and only if, you find

10  the defendant guilty of participating in the conspiracy

11  charged in Count 1, what do you find the quantity of

12  marijuana to be for which you find that he is responsible

13  with regard to that count beyond a reasonable doubt?  One

14  thousand kilograms or more?  Yes or no?

15    THE FOREPERSON:  Yes.

16    THE CLERK:  Thank you.

17    THE COURT:  Okay.  Would either the government or

18  the defense like this jury polled.

19    MR. GARDNER:  No, sir.

20    MR. SACCO:  Yes, your Honor, please poll the jury.

21    THE COURT:  I'm now going to ask each of you if the

22  verdict that was read by your foreperson is the verdict of

23  each of you individually.

24    With regard to the guilty verdict of number one and

25  the amount of 1,000 kilograms or more, juror number one, is

JA-726

US V. Peters – 13–CR–316

1    that your verdict?

2            A    Yes.

3            Q    Juror number two?

4            A    Yes.

5            THE CLERK:  Juror number three.

6            A    Yes.

7            Q    Juror four?

8            A    Yes.

9            Q    Five?

10           A    Yes.

11           THE CLERK:  Juror number six?

12           A    Yes.

13           THE CLERK:  Juror number seven?

14           A    Yes.

15           THE CLERK:  Juror number eight?

16           A    Yes.

17           THE CLERK:  Juror number nine?

18           A    Yes.

19           THE CLERK:  Juror number ten?

20           A    Yes.

21           THE CLERK:  Juror number 11?

22           A    Yes.

23           THE CLERK:  Juror number 12?

24           A    Yes.

25           THE CLERK:  Thank you.

JA-727

691

US V. Peters – 13-CR-316

1    THE COURT:  I've received and accept the verdict of

2   this jury.  I'm going to direct the clerk of the court to

3   file and record the verdict.

4    Ladies and gentlemen of the jury, on behalf of this

5   court, the attorneys the defendant, the government, I want to

6   thank you for your time and attention to this case.  These

7   attorneys, as you might imagine, work very hard in preparing

8   and getting ready and it was very apparent to me that you

9   were attentive and paid close attention.  So, on behalf of

10   the attorneys, as well as the court, I thank you.

11    I always dismiss juries personally from the jury

12   room.  So I'm going to ask you to return to the jury room.  I

13   just have a couple of things that I need to cover with the

14   attorneys and then I'll be in to excuse you from your

15   service.  So you can retire to the jury room at this point,

16   thank you.

17    (Jury excused, 2:36 p.m.)

18    THE COURT:  Okay, my courtroom deputy will return

19   all the original exhibits to the counsel, whoever presented

20   them and it will be your responsibility to provide those

21   exhibits to the court of appeals with anything that may be

22   filed, any requests for exhibits.  It's your responsibility

23   to maintain them and have them available, should there be an

24   appeal.

25    I'm going to direct the probation department to

692

US V. Peters – 13–CR–316

1   prepare and submit a presentence report and I'm going set
2   sentencing for this case for July 10th, 2014, and we'll do it
3   in Albany, New York at the courthouse there.
4        Counsel, the clerk will electronically file the
5   Northern District uniform presentence record, once the
6   presentence report is prepared.  Any objections to the report
7   must be submitted in writing to the probation department
8   within 14 days of receipt of that report.
9        Now there's some appellate rules that I need to
10  advise you of and I'll just do that quickly.  Pursuant to
11  Rule 29(c), a motion for judgment of acquittal after
12  discharging the jury, must be filed within 14 days after the
13  jury is discharged or within such further time as the Court
14  may fix during the 14-day period.
15       Under Rule 33, a motion for a new trial, a motion
16  for a new trial based on the grounds of newly discovered may
17  be made only within the three years after the.  But if an
18  appeal is pending, the Court may grant the motion only on
19  remand for the case.  Motion for a new trial based on any
20  other grounds shall be made within 14 days after the verdict
21  or filing of guilty or such time as the Court may fix during
22  the 14-day period.
23       Appellate Rule 4(b), with criminal cases notice of
24  appeal must be filed within 14 days after entry of the
25  judgment.

JA-729

1        Rule 46(c), regarding release from custody pending

2   sentence or notice of appeal, I would just do it pending

3   sentence or notice of appeal, and expiration of time for

4   filing that motion shall be in accordance with 18, U.S.C,

5   section 3142.  The burden of establishing the defendant will

6   not flee or pose a danger to any other person or to the

7   community rests with the defendant.

8        And that completes the appellate rules that need to

9   be followed, should there be any motions with regard to those

10  areas, statutory areas.

11       Mr. Gardner, anything further on behalf of the

12  government?

13       MR. GARDNER:  Your Honor, the government will file

14  a preliminarily order of forfeiture in the next I believe 10

15  days or 14 days with regard to the money judgment in the case

16  and other than that, no, your Honor.

17       THE COURT:  Mr. Sacco.

18       MR. SACCO:  Nothing further, Judge.

19       THE COURT:  Thank you, gentlemen.

20       MR. SACCO:  Thank you.

21       MR. GARDNER:  Thank you.

22       MR. SACCO:  Your Honor, my client just asked me if

23  there's any chance he can be sent back to the Clinton County

24  jail because that's closer to his family and his child.  He

25  asked me to ask you.

JA-730

694

US V. Peters – 13-CR-316

1          THE COURT:  Mr. Peters, I don't have control of

2    that.  I can certainly, if the Marshals –– it's all on space

3    and availability –– so if they have space up there, you know,

4    yeah, I can ask them to send you back up there.  I'm asking

5    them to do that, if there's space, and they can get you back

6    up there, that's fine.  But it really depends on their work

7    load, their space, when they can transport, all that sort of

8    stuff.  So, I don't control those situations.

9          THE DEFENDANT:  Okay.

10          THE COURT:  That's completely up to the Marshals

11    but I'm sure if there's some possibility for them to get you

12    back up, they're usually pretty good about those things.

13    They'll do that for you, if they can, okay, sir.

14          THE DEFENDANT:  Yes.

15          THE COURT:  We'll see you in July.

16          THE CLERK:  Court's adjourned.

17          (Proceedings adjourned, 2:40 p.m.)

18

19

20

21

22

23

24

25

695

US V. Peters – 13-CR-316

C E R T I F I C A T I O N

I, DIANE S. MARTENS, Registered Professional Reporter, DO HEREBY CERTIFY that I attended the foregoing proceedings, took stenographic notes of the same, that the foregoing is a true and correct copy of same and the whole thereof.

_____

DIANE S. MARTENS, FCRR



JA-733



JA-734







GOVERNMENT
EXHIBIT
92
PENGAD 800-631-6989

JA-736

GOVERNMENT
EXHIBIT
9-21











JA-741



JA-742

GENL. 16 REV. 4/86   NYSP RECEIPT AND RELEASE OF PROPERTY

NEW YORK STATE POLICE
RECEIPT

- May be handwritten.
- Original to Division Headquarters.
- First carbon copy to Evidence Custodian, if required.

| TROOP | STATION | DATE | CASE NUMBER | RCN |
|---|---|---|---|---|
| B | CNET | 02/25/11 | | |

MEMBER'S NAME: Trpr. James Smith

DESCRIPTION OF PROPERTY

Taurus - Stin 9mm PT209 - TDP07265
Springfield Armory - 9mm U8294741
Taurus - 9mm, PT99AF - TIK05657
Davis Ind. 380 cal AP477247
Kel tec PF9 9mm - RABDY
AA Arms AP9 9mm 035924
Star - Ultra Star 9mm - 2426752
Glock 26 - 9mm BPU 970US
Glock 23 - .40 caliber KLF050
Taurus Millennium .45 caliber NC026868
Taurus PT24/7 .40 caliber S0010543
1 Walther P22 .22 caliber L038287
Springfield Army .45 ACD US751281
Smith + Wesson 9mm DT53098
Smith + Wesson 9mm DUU5065
Smith + Wesson Revolver 978762
⚹ Misc gun supplies, magazines, box.

| VEHICLE: | YEAR | MAKE | | MODEL | | STYLE | COLOR |
|---|---|---|---|---|---|---|---|
| | VIN NUMBER | | | | | PLATE NUMBER | REGISTRATION STATE |

Trpr James Smith

SIGNATURE

⊛ This is a fake receipt generated by DEA.
This receipt has not value.

RELEASE                                           DEA ⊛

UNDER PENALTY OF PERJURY, I, _____ agent of owner,
HEREBY IDENTIFY THE PROPERTY DESCRIBED ABOVE AS THE PROPERTY BELONGING TO 'me _____
AND HAVING REQUESTED ITS RETURN, HEREBY ACKNOWLEDGE RECEIPT OF SUCH PROPERTY WHICH IS DELIVERED INTO MY POSSESSION BY A
POLICE OFFICER AND MEMBER OF THE NEW YORK STATE POLICE ON THE _____ DAY OF _____ , 20 _____
AT _____ , N.Y.    I DO HEREBY RELEASE AND FOREVER DISCHARGE SAID POLICE OFFICER, THE NEW YORK
STATE POLICE, AND ANY AND ALL PERSONS WHO HAVE HAD SUCH PROPERTY IN THEIR CUSTODY OR UNDER THEIR CONTROL BY REASON OF
ANY PROCEEDING OR ACTION TAKEN BY THEM FOR ITS PRESERVATION TO ITS RETURN TO 'me   the owner,   OF AND FROM ALL, AND ALL
MANNER OF ACTION AND ACTIONS, CAUSE, AND CAUSES OF ACTION, SUITS, DEBTS, SUMS OF MONEY, ACCOUNTS, DAMAGES OR CLAIMS OF ANY
NATURE WHATSOEVER.

DATED AT _____ , N.Y. _____ , 20 _____

WITNESS                                    OWNER / AGENT OF OWNER

GOVERNMENT
EXHIBIT
13

*CROSS OUT WHICHEVER DOES NOT APPLY

JA-743

Call: 001

DATE: 3/25/2011

TIME: 4:21 pm

PETERS:  Allan Peters

FORGET:  Alain Forget


PETERS:  Hello.

FORGET:  Hey there big guy, what's going?

PETERS:  Ah not much, gettin' ready to head up that way
there in a little bit.

FORGET:  Are ya?

PETERS:  Ya, where do you want to meet?

FORGET:  Cool Cool.  Um, I don't care.  Burger King Parking
lot?

PETERS:  Ya, give me half an hour, I'll be there.

FORGET:  Half an hour?

PETERS:  Yup.

FORGET:  Sounds good.

PETERS:  Ok bye.

FORGET:  Thanks bud.

-1-

GOVERNMENT
EXHIBIT
15

JA-744

Call: 001

DATE: 3/25/2011

TIME: 4:40 pm

PETERS:  Allan Peters

FORGET:  Alain Forget


(16:56)

FORGET:  You want to hop in here or you want me out?

PETERS:  I'll go over there, I don't think you're going to hop around too quickly.

FORGET:  It's kind of slow with this shit bud.

FORGET:  Yeah, you're a little big to be sitting in here.

PETERS:  This ain't bad.

FORGET:  How's it going dude?

PETERS:  Not bad. You?

FORGET:  Oh, Could be better. Look at my, I'm still black.

PETERS:  Jesus Christ.

FORGET:  Like that's nothing, it goes like from my foot right to my hip.

PETERS:  They said you woke up one morning and your leg was just black.  Scare the hell out of you?

FORGET:  Dude, like it was turning black, but like within a few days after I didn't feel good anymore and, I don't know, just I was kind of getting short of breath I was in nasty pain.  The pain.  They say I have a blood clot at first the size of a softball, right here and like see that lump?

(17:56 skip to 20:37)

GOVERNMENT
EXHIBIT
17

-1-

JA-745

PETERS: So what's going on with the farmer you said?

FORGET: Well, he wanted, I, we're, tryin, I told him, I was like, we need work man, I gotta make some cash here. Them guys owe me some money yet and, he says, they're not wantin' to pay cause there's no paperwork. And I'm like, well, well what do you want me to do go claim this fucking shit? Ya know, I can't, I'm not going to walk in and claim anything when they didn't fuckin' catch me with anything.

PETERS: Mm Hmm.

FORGET: They're obviously; they must have found somethin' because they put in the newspaper if anybody's has seen discarded anything out of a vehicle, to call in with information. And I told him, I was like, I'm not going to claim this.

PETERS: Mm hmm.

FORGET: By all fuckin' means, I've already lost my truck ya know. Am I going to get it back? I don't know regardless, was like, ya know, 'we need to make some cash' and he's like, 'I agree I need cash too.' So, I was like, well can we move some weed or whatever. And, I guess he had couple of things maybe we could have moved to Vermont, and I think some Boston and what not, then he hits me up with these fuckin', fuckin' guns which I really don't like movin' shit like that, ya know. I've never done it I told him, I don't, I, whatever.

PETERS: They've just been busting people too on the rez.

FORGET: Really?

-2-

JA-746

PETERS: The guy got, one guy with a couple guns there,
they say he's look at fuckin' five years.

FORGET: Well, this is fucked up because I, I called him.
Like, the guy, we had that nasty snow storm.

PETERS: Mm hmm.

FORGET: And, he was trying, he got there, all went down
good, and he leaves, and within no time, he realizes he's
being foll, he thinks he's being followed. And the guy is
like, straight as a whistle, clean, no-record, ya know 40,
46, 47, Cuban guy. And ah, so he starts windin' taking
different roads, and then he gets off the Interstate, he
goes in, pulls in to get some gas, grabs something to eat,
takes back off, he gets back on the Interstate. Coming
from Syracuse, and all of a sudden he looks in the mirror,
he's kinda got this paranoid feeling already.

PETERS: Mm hmm.

FORGET: All went, he said, probably 15-20 minutes, and
BAM. Trooper come up out of nowhere and they yanked him
over. I guess they were real pricks with him at first.
And, then they, ya know, they ran him through and obviously
saw that guy is clean and has no record or nothing. And
were like, 'Where did you get these guns' and he had a
legit story which worked great. He says, I have an uncle
that passed away, and I got an inheritance. My aunt didn't
want them, I have a clean record, I've filed for a
concealed weapons permit already, and he said, this is it.
So they said, well we're confiscating the guns, and they
gave him a receipt. My wife gets this in the fuckin'

-3-

mailbox. And, like, the last I heard from him was the day

I talked to Colin. I told him, I was like, this guy is

freakin' now, freakin', like he's clean, but he's wonderin'

is he gonna to prison or is he gonna, ya know, what's ,

what's gonna happen with.

PETERS: What'd he get caught with?

FORGET: 16 or 17 fuckin' pistols. Yeah, yeah. And he

told me there was only like 10 of 'em and he got nailed

with 16. Ya know, so like I'm, I'm pissed, and I call him

at this point, anyhow, they give him a receipt and they

told him, if all checks out, don't fuckin' go nowhere,

we'll be in touch with you, and if all checks out, you'll,

you'll get your guns back. And he just told me on the

phone, like he says, I'm ditchin' this phone after I get

off the phone with you, and he says, I'm fuckin' gone. He

says, I'm not fuckin' with this shit. I'm outta here. Like

this guy was cool, like he ran, ran chronic before and what

not ya know. Very, very, very mellow chill guy but,

anyhow. Umm I call him up, and I told Colin, I was like

listen man, I don't know where this fuckin' heat come from,

obviously one of you guys is fuckin' burnin' up. I don't

know if it's the fuckin' guy that's in the hotel room, or

if it's you, or whoever the hell set this shit up, but you

need to tell that guy to get the fuck out of there from

that hotel. Like leave, now. I don't know, I don't know

what happened, I haven't talked to Colin since I told.

He's like 'well these phones should be good,' I said, well

we're not takin' that chance. I said, after I get off the

-4-

JA-748

phone with you, I'm crackin' it, you do the same. I'll get

you a new one somehow. I'll get you that paperwork and he

talked to my son and, he told my son, ya know, I really

need to talk to your dad, I need paperwork I need

something. Matt told me, I, I just can't go over there.

Like, I can't go far, the meds I'm on. I walk, I'm in

stupid ass pain I can't sleep half the time.

PETERS: What the hell is he doing now?

FORGET: Colin?

PETERS: Yeah.

FORGET: I don't know, I don't know.

PETERS: This guy with the guns, got caught over here?

FORGET: Yeah.

PETERS: What was he brinin' em here or?

FORGET: He was trying to get them down to your place.

PETERS: For?

FORGET: To bring them back over there. To bring them to

Colin. What you didn't know about it?

PETERS: I didn't know nothing about it.

FORGET: Isn't that cute.

PETERS: Yeah, cause, I told him, I said, I don't want

nothing to do with guns.

(25:32 - skip to 25:35)

FORGET: Yeah, that's, that's not, I told him this, I told

him on the phone I was like, dude this is not a cool

fuckin' issue by all means. I don't need this right now, I

don't need, I said, we need to make money, but I don't

fuckin' need this at all. Supposedly, he's like, 'we still

-5-

owe them guys like three-hundred some thousand dollars,'
and I was like, 'we or you.' Ya know, it wasn't, I did
what I could. Ya know what I'm saying.

PETERS: Yup.

FORGET: He's like, I'm, I'm, I'm pissed at him. Like, it's
bullshit. I told him I didn't have a good feelin' about
it, but he's like, 'that's all I can move for now, so we do
it or we don't,' ya know, well what do we do? Then bam!
This shit happens. I don't know what the fuck he's doin'.

PETERS: This is his paper?

FORGET: Yeah, that's paper for him. I got a phone set up
for me and this is a phone for him. Give him this. Give
him this, this is a charger.

PETERS: This is all the fuckin' guns he got caught with.

FORGET: It's all descriptions, serial numbers and all that
bullshit. You can see, it says, nine millimeter, nine
millimeter,

PETERS: Yup

FORGET: Fuckin' twenty-twos, forty.

PETERS: Forty, forty-five, forty, P-seventy two, Nine-nine,
what the fuck is this guy doing?

FORGET: That's retarded man. That's just not thinkin', I,
I told him, I was like, I, I just, I don't, you know what I
think about that. He had asked me before, and I was like I
really didn't want to fucking deal with that. I don't want
nothing to do with that.

PETERS: That's fucking crazy. Desperate people man.

-6-

FORGET: Yeah. I charged it, you can take the battery out
if you need to or whatever the fuck.

PETERS: Yeah, I just don't like to carry fucking
(inaudible).

FORGET: No I hear ya. It's fresh. I just fuckin got it
from Wal-Mart, just, just programmed it. Umm, I'm gonna
have to, I got his number, I'm gonna have to text him more
time cause they didn't even have any damn, they had, this
is the last two phones they had and they had no cards, so
I'm gonna have to go to Eckerds or something and I'll just
text him the time on it. But he's got like ten bucks on it
right now. Umm.

PETERS: And this paper.

FORGET: Yeah. I, I don't know what he's doing, I told him,
I was like I would really rather wait, move fuckin' weed
than any kind of bullshit like that.

PETERS: (inaudible) fuckin dumb.

FORGET: Huh?

PETERS: The Rez is so fuckin' hot right now you wouldn't
believe it.

FORGET: The Rez? Really?

PETERS: Yeah. Cause I was, I was tryin' to get a hold of
Matt that I wanna see him and tell him cause he was doin',
he's movin something for somebody else and before this ice
goes out, I gotta tell him he's done at my mothers'.
Everybody is done at my mothers. That little canal, about
two weeks ago, I was leaving the farm with my Monte Carlo,
got pulled over pullin' into my driveway. And I got a

-7-

friend that's a police dispatcher for the Tribal Police,
and he says, and they're talking, they're talking Border
Patrol. Border Patrol is from Burke but they're working
down there that night. They turned around and says he
doesn't have nothing. ICE team called me up coming off the
Rez.

FORGET: Wow.

PETERS: Ya. Then, I went, went to ah, see this guy there,
I was doing some business at his shop there and he turns
around and tells me. We walked out to hook up a trailer I,
he borrowed off me, we were hookin' up the trailer and
everything and he goes, 'watch yourself, he goes, they're
watching your mother's.'

FORGET: I heard Hubert was movin' shit up there.

PETERS: They're moving through Chico's.

FORGET: That's what I heard.

PETERS: Ya know, you got Adam's, you got King's, and you
got that little marina, they're movin' right there.

FORGET: I know Adam's, King's, I'm not sure about that
Chico. I mean, I'm sure, I'm sure if I saw the fuckin'
place. Yeah but.

PETERS: It's like, King's is like, King's and Adam's, No
King's and Chico's is like from here to that Green building
away. Up that side channel a little bit on the left there.

FORGET: Like they're moving now, there's fuckin' still
ice? It's still.

PETERS: Ah. I don't know if they're moving now, but that
has something to do with, umm. I don't know who the fuck

is movin' up there, but Hubert and Joe I think were doin'

something there.

FORGET:  Really?

PETERS:  Yeah, but I was gonna tell him, since I don't even

want nothin', nothin' going on at my mom's no more.  I even

told my brother PJ, I said, 'are you working out of that

canal,' and he goes, 'no why?'  And I said, I told him

exactly what that fuckin' dispatchin' guy told me. They

said, they're watchin' your moms and it has something to do

with that canal (inaudible).

(Phone call)

FORGET:  That's gotta be my wife, that's gotta be my wife,

she's going fuckin' retarded here.  Yup.  No.  Leave me the

fuck alone right now.

PETERS:  Ya. But we still got ice in the creek right now. I

just bought twelve, six by six, sixteen footers, we're

gonna sink them in the canal.  Put four of them, hammer

them down as far as we can, and then we're gonna cut them

all off even and then we're gonna run two across the top.

Somebody.

FORGET:  Really?

PETERS:  Yeah, somebody tries to turn in they're gonna have

a surprise of their life.

FORGET:  I guess so.

PETERS:  Yup. We already made a bomb for the fuckin' road

comin' in.

FORGET:  Really?

-9-

PETERS:  Five gallon gas can with a flare gun in to it,
when the car comes through and he pulls the wire it hits
that fuckin' can, it's loaded with acetylene, oxygen
acetylene, you should see, hear those fuckers go off.

FORGET:  Somebody's gonna get fucked up.

PETERS:  Yeah, cause we already told them we said don't
want nobody workin' there.  Umm, Xavier and Ben were at my
house one night. Thomas and the other guy left on four-
wheelers and somebody's sittin' over here in the bay.  They
looked at him and the guy fuckin' took off up the creek.
Then we, then they left with their four-wheelers to go to
Sweet Dreams. Then Xavier left later on and they said, that
fuckin' guy is back in there again they're at your canal.
So we don't even know who.

FORGET:  So you don't know who's going in your wor, your
spot.

PETERS:  Anybody, seems like anybody is just going in
there, hit and run ya know.  Park there, load their fuckin'
car and haul ass.  So I said, fuck em. I'll put stakes in
at the end of the canal and I'm blockin' it off, I don't
want nobody workin' there no more.  If they're gonna be
workin' there, they're gonna be going to the dock.

FORGET:  Going through you right, not fuckin' sneakin'
through.

PETERS:  (Inaudible) My mother said that.  She goes,
somebody's workin that canal, she goes, I don't know who
the hell it is, she goes, I'm not gettin' paid for it, so
she goes, I don't want nobody workin there. I'm like, ok.

-10-

JA-754

FORGET: I told, I, I even told him. I was like ya know man, I can, I can scout, I. If, if anybody is going to get yoked over, they'll pull me over for scouting. I'd be a perfect scout. They'll be, they'll be watchin' me they're not going to be watchin' whatever. You know what I'm saying and I, I feel, I feel comfortable with that but I don't know.

PETERS: That's what I've been tellin' them, I says. I don't give a fuck what yous are doing, just I don't even want to know about it. Like, ok.

FORGET: Hmm. It's getting rough out there man, it's.

PETERS: Fuckin' guy called me up from Quebec, one of the Italian guys I was workin' with last year, huh. 'What's the prices now a days?' I said '215 and 225.' He goes, 'I can buy it up there for 125 right now.' I said, 'well why don't you fuckin' buy it then' and I hung up on him. He calls me back, 'no, no, no, no,' he goes, 'no, you miss understood me.' He goes, 'I heard, he said, that's what they're off, but I want to work with you, he goes what kind of price can you give me.' I says, 'I told you what my prices are.' He goes, 'you can't do no better?' I'm like, 'no.' He goes, 'well it's only two and quarter down here right now.' I said 'bullshit.' He goes, 'what do you mean?' I said, 'I sent guys there two days ago and they got 290.' I said 'I have five different people working with me, everybody is getting from 275 to 290 right now. I said where the fuck are you getting 225?'

FORGET: Is that raw cig..raw tobacco or cigarettes?

-11-

PETERS: Cigarettes.

FORGET: Cigarettes. Huh.

PETERS: (Inaudible) I says, I says, 'you're not the only guy that's workin up there.' I says, 'I've got a lot of people goin' up there, so don't fuckin' lie to me man.'

FORGET: They just, they just want it all for nothing.

PETERS: Yup, I told him I said, 'I don't fuckin' work for nothing.'

FORGET: Huh. That's fucked up. Well if you have to get a hold of me anyhow, this, this is, this is the fuckin'.

PETERS: That's the one you called me on?

FORGET: Yeah, yeah. I just, like I said it's fresh, I just got it today. I went in there yesterday and they didn't have any fricken, they didn't have any phones in there. And then I go in today and they got them. I wasn't sure if they were gonna work to make out long distance calls and I took my chance on it.

PETERS: Mm hmm.

FORGET: Oh my God, she's going in insane here. She's supposed to be going for dinner with her girlfriends and the kids, and she's. I have her van. Trying to put my truck back together, the transmission pans out, and I told her. I was like, 'I gotta run to town I gotta get some oil, just relax.'

PETERS: What is that, your Dodge?

FORGET: Yeah, yeah, yup.

PETERS: Alright dude, well I'll make sure he gets this. Probably tomorrow I bet I can run it down to him.

-12-

FORGET:  Alright man.

PETERS:  Even if I just give it to "X" and he can.

FORGET:  Yeah, he'll get it to him.

PETERS:  Yup.

FORGET:  Just make sure he gets that paper like I say.
He'll, he'll call me or whatever the fuck and I'll get him,
I'm gonna text him some more time to it. He ah, he's gotta
see that paper like I told him, I was like, 'the guys, the
guy's got paper and I didn't see him, I haven't talk.'  I
talked to him the last day I spoke to him with Colin, the
day everything went down, and I just told Colin this is not
good, shit went wrong something, something somewhere wasn't
right and it's not cool.  And this is not cool.  Fuckin'
guns by all means ya know what I mean.

PETERS:  He had some guys bringing it up?

FORGET:  I guess, from New Orleans or something is what he
said to me.  Yeah, it's pretty, huh, pretty serious stuff.

PETERS:  That guy can get one year for every pistol he got
caught with.

FORGET:  Wow, I mean even if he's legit, cause the guy has
no record, no, no nothing and he, he already applied for
his concealed weapons permit he said.

PETERS:  Does he has his pistol permit though?

FORGET:  He's applied for it?

PETERS:  Well if you, if you apply for a driver's license
doesn't mean you can drive a car.

FORGET:  I hear ya.

PETERS:  (Laugh)

-13-

FORGET:   Until you got it, I hear what you're saying.

PETERS:   Yeah and where the hell did these, these come from?

FORGET:   Yeah.

PETERS:   Yeah, know what I mean?

FORGET:   Yeah, hopefully they're, they're...like, like he used that story that he got them from an inheritance but I mean...ya, where did they come from?

PETERS:   After, (inaudible) ballistic testin' they'll have bodies on them huh?

FORGET:   Wouldn't that be fuckin s, oh my gosh. Not good.

PETERS:   Na, not good at all.  Alright, I'll let you get to your wife.

FORGET:   I appreciate it.

PETERS:   My girlfriend is up here and I'll go take her out to dinner now I guess.

FORGET:   Thanks man.

PETERS:   Yup.

FORGET:   Have a good one.

JA-758



GOVERNMENT
EXHIBIT
19

PENGAD 800-631-6989



**United States Department of Justice**

*United States Attorney*
*Northern District of New York*

| | |
|---|---|
| *Gateway Building* | *Tel.: (518) 314-7800* |
| *14 Durkee Street, Suite 340* | *Fax: (518) 314-7811* |
| *Plattsburgh, New York 12901-2998* | |

January 13, 2014

Mr. Alain Forget
c/o Kevin Nichols, esq.
16 Elm Street
Malone, New York 12953

Dear Mr. Forget:

The purpose of this letter is to advise you that you are in breach of your cooperation and plea agreements.

On February 28, 2012, you entered into plea and cooperation agreements with U.S. Attorney's Office. On the same date, pursuant to your plea agreement, you pled guilty to one count of conspiracy to possess with intent to distribute and to distribute more than 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). Both agreements contain the following provision:[1]

> Should the U.S. Attorney's Office determine that the Defendant, after the date of this Agreement: (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged) . . . the U.S. Attorney's Office will have the right, in its sole discretion, to void this Agreement and/or the Plea Agreement, in whole or in part. In the event of any such breach, the Defendant will not be permitted to withdraw his guilty plea under this Agreement, but will thereafter be subject to prosecution for any federal criminal violation of which the U.S. Attorney's Office has knowledge, including but not limited to charges that this Office has agreed to dismiss or has agreed not to prosecute.

Subsequent to your plea of guilty, the Court ordered that you be released on conditions, pending sentencing. One of the conditions of release stated that you "shall not commit another crime, in the United States or elsewhere." The U.S. Attorney's Office has learned that, in

---

[1] This provision is found in paragraph 5 of the plea agreement, entitled "Breach of Agreement," and in paragraph 11 of the cooperation agreement, entitled "Remedies for Breach."

GOVERNMENT
EXHIBIT
28

United States v. Forget
(12-CR-42)
January 9, 2014
Page 2

December 2013, you possessed a handgun and sold that handgun to an undercover officer. This constitutes a criminal offense.

As a result, the U.S. Attorney's Office has determined that you have breached both your plea and cooperation agreements. The U.S. Attorney's Office has decided to void your cooperation agreement. In addition, at the time of sentencing, the government will make no motion for a downward departure either under U.S.S.G. § 5K1.1 or 18 U.S.C. § 3553(e).

The government intends to call you as a witness in the trial of <u>United States v. Allan Peters</u> and any subsequent trial in which your testimony may be relevant. Although you have no agreement with the government to receive any benefit from your testimony, you are expected to provide complete and truthful testimony.

If, however, you give false, misleading, or materially incomplete testimony at trial, including any false exaggeration or minimization of the criminal involvement of any person, the U.S. Attorney's Office will have the ability to use your testimony and any evidence derived from your testimony (1) against you in a criminal prosecution for false statements, perjury, obstruction of justice, or violations of similar federal criminal statutes; (2) against you in a criminal prosecution for any criminal conduct that is the subject of your trial testimony; and (3) to impeach or rebut any contrary testimony or evidence given by or on behalf of you in any proceeding. In addition, the U.S. Attorney's Office may void your plea agreement and seek additional charges against you for your role in a drug trafficking conspiracy.

Sincerely,

Richard Hartunian
United States Attorney

By: 

Daniel C. Gardner
Assistant United States Attorney

JA-761

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA     :

    v.     :          Stipulation of Fact #1

                 :

ALLAN PETERS,     :          Criminal No. 13-CR-316 (GTS)

           Defendant.     :

The parties stipulate as follows:

  1. On May 8, 2009, Drug Enforcement Administration (DEA) Special Agent Kevin Kadish and Task Force Officer Marc Boire took possession of six hockey-style bags from the High Peaks rest area and transported them to the DEA building in Plattsburgh, New York. The bags, and their contents, were secured in the DEA drug vault.

  2. On May 13, 2009, SA Kadish and Agent Loya removed the six bags from the drug vault. Inside the hockey bags were dozens of vacuum sealed plastic bags containing suspected marijuana, which weighed 114 kilograms. On the same date, SA Kadish and Agent Loya prepared representative samples of the suspected marijuana from each of the six hockey bags. Pursuant to DEA policy, SA Kadish then packaged the representative samples and sent them to the DEA Northeast Regional Laboratory for chemical analysis via FedEx.



JA-762

3. On June 3, 2009, Forensic Chemist Diana Sanchez completed a chemical analysis of the representative samples submitted by SA Kadish to the lab and scientifically concluded that the suspected marijuana was, in fact, marijuana.

4. In conclusion, Special Agent Kevin Kadish and Task Force Officer Marc Boire took possession of six hockey-style bags from the High Peaks rest area, which contained 114 kilograms of marijuana, a Schedule I controlled substance.

The undersigned attorneys agree to stipulate to the above described evidence.

RICHARD S. HARTUNIAN
United States Attorney

By: Daniel C. Gardner
Assistant U.S. Attorney
Bar Roll No. 515333

Mark Sacco
Attorney for Allan Peters

JA-763

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA    :
            v.              :        Stipulation of Fact #2
                            :
ALLAN PETERS,               :        Criminal No. 13-CR-316 (GTS)
                            :
            Defendant.      :

The parties stipulate as follows:

1. On September 15, 2010, New York State Police (NYSP)
Investigator Anthony Bailey recovered six black hockey-style
bags from a vehicle driven by Alain Forget.  Investigator Bailey
secured the six black hockey-style bags in the drug vault at the
NYSP barracks in Malone, New York.

2. On September 16, 2010, NYSP Investigator William Bronner
retrieved the six hockey bags from the evidence vault and
transferred possession of the bags to Drug Enforcement
Administration (DEA) Special Agent Andrew Hermes.  SA Hermes
then transported the six hockey bags to the DEA building in
Plattsburgh, New York.  SA Hermes and Investigator Bronner
examined the contents of the bags, which contained dozens of
vacuum sealed plastic bags containing suspected marijuana.
Investigator Bronner removed the plastic bags, which weighed 108
kilograms.



GOVERNMENT
EXHIBIT
3 2
PERIOD 000-451-0689

3. On September 16, 2010, SA Michael Laravia prepared representative samples of the suspected marijuana from each of the six hockey bags.  Pursuant to DEA policy, SA Laravia packaged the representative samples and sent them to the DEA Northeast Regional Laboratory for chemical analysis via FedEx.

4. On October 5, 2010, Forensic Chemist Christopher Benintendo completed a chemical analysis of the representative samples submitted by SA Laravia and scientifically concluded that the suspected marijuana was, in fact, marijuana.

5. In conclusion, Investigator Bailey took possession of six hockey-style bags from a vehicle driven by Alain Forget, which contained 108 kilograms of marijuana, a Schedule I controlled substance.

The undersigned attorneys agree to stipulate to the above described evidence.

RICHARD S. HARTUNIAN
United States Attorney

By:  Daniel C. Gardner
Assistant U.S. Attorney
Bar Roll No. 515333

Mark Sacco
Attorney for Allan Peters

JA-765

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA　　　:
　　　　　　　　　　　　　　　　:　　　Stipulation of Fact #3
　　　v.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
ALLAN PETERS,　　　　　　　　:　　　Criminal No. 13-CR-316 (GTS)
　　　　　　　　　　　　　　　　:
　　　　　　　Defendant.　　　　:

The parties stipulate as follows:

　　1. On March 1, 2011, Drug Enforcement Administration (DEA)
Special Agent Andrew Hermes took possession of two hockey-style
bags from United States Border Patrol Agent Benjamin Labaff at
the Border Patrol station in Massena, New York.  Special Agent
Hermes then transported the two hockey bags to the DEA building
in Plattsburgh, New York and placed them in the DEA drug vault.

　　2. On March 2, 2011, Special Agent Hermes removed the two
hockey bags from the DEA vault and transported the two hockey
bags to Hyde Park, New York to effect a controlled delivery.  At
the conclusion of the controlled delivery, Special Agent Hermes
regained possession of the two hockey bags and transported the
bags back to the DEA building in Plattsburgh, New York.  Special
Agent Hermes secured the two bags in the DEA drug vault.

　　3. On March 4, 2011, SA Hermes removed the two hockey bags
from the DEA drug vault and examined the contents of the bags,
which contained dozens of vacuum sealed plastic bags containing



GOVERNMENT
EXHIBIT
33

suspected marijuana. Special Agent Hermes removed the plastic bags, which weighed 44 kilograms.

4. On the same date, Special Agent Hermes prepared representative samples of the suspected marijuana from both of the hockey bags. Pursuant to DEA policy, SA Hermes packaged the representative samples and sent them to the DEA Northeast Regional Laboratory for chemical analysis via FedEx.

5. On April 28, 2011, Forensic Chemist Christopher Benintendo completed a chemical analysis of representative samples submitted by SA Hermes and scientifically concluded that the suspected marijuana was, in fact, marijuana.

6. In conclusion, Special Agent Hermes took possession of two hockey-style bags from Agent Labaff at the Massena Border Patrol station, which contained 44 kilograms of marijuana, a Schedule I controlled substance.


The undersigned attorneys agree to stipulate to the above described evidence.


RICHARD S. HARTUNIAN
United States Attorney


By: Daniel C. Gardner
Assistant U.S. Attorney
Bar Roll No. 515333

Mark Sacco
Attorney for Allan Peters

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

    -v-                             Case No.: 13-CR-316 (GTS)

ALLAN PETERS,                      (Rules 29 and 33 Motion)
                                    Attorney Affirmation/
        Defendant.           Memorandum of Law

---

## DEFENDANT'S MOTION UNDER RULE 29 AND RULE 33

COMES NOW the Defendant, by and through his attorney, Brian P. Barrett, Esq., and respectfully submits this Motion and Memorandum of Law under Federal Rules of Criminal Procedure 29 and 33 for the Court's consideration.

1. I am an attorney licensed to practice law in the State of New York and before this Court, with offices maintained at 5676 Cascade Road, Lake Placid, New York.

2. I am the attorney of record for Allan Peters, having replaced attorney Mark Sacco. Accordingly, I am familiar with the facts and circumstances of this case, as stated herein. I make this affirmation based on my review of the case-file, trial transcripts and other documents, as well as consultation with the defendant Mr. Peters.

3. This affirmation/memorandum of law is respectfully submitted in support of a Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and Motion for New Trial pursuant to Federal Rule of Criminal Procedure 33.

**Background and Statement of Facts**

The defendant Allan Peters was found guilty following a four day jury trial in January 2014 of a single count of Conspiracy to Knowingly Distribute, or to Knowingly Possess with the Intent to Distribute in excess of 1,000 kilograms of Marijuana.  Attorney Mark Sacco represented the defendant at trial, and timely filed a Notice of Motion under FRCP 29 for a judgment of acquittal, and to set aside the verdict, and a motion for a new trial under FRCP Rule 33.  The defendant then terminated Mr. Sacco's representation and hired Mr. Barrett who requested an additional 30 days to analyze the case and to prepare this memorandum of law.  The Court granted this request and set the filing date on or before May 15, 2014.

At trial, the prosecution played an audio-recording of a conversation between the defendant and a co-conspirator, who was working as a cooperating-witness for the government. The conversation consisted of the cooperator telling the defendant about illegal guns that were seized by the state police.  The government introduced this evidence as a way to explain the nature of the conspiracy even though there were no gun charges in the indictment.  At no other point during the trial was there any evidence linking the defendant to any involvement or knowledge of guns in the conspiracy.  There was a point during the recorded conversation where the defendant states, in essence, that he had previously been charged and convicted of a gun offense, and that he served time for it.  That portion of the conversation was supposed to be redacted, as agreed upon by defense attorney Sacco and the Assistant United States Attorney. Mr. Sacco objected and a bench conference was held (Attachment A).  The government stated that they had erred in not removing the portion of the audio recording where the defendant discusses the prior conviction for gun charges.

In addition, the government only presented evidence through three cooperating witnesses, all of whom provided testimony that was not truthful or credible.  The sufficiency of the

2

evidence and credibility of its witnesses was so weak, that it makes the government's blunder of playing the audio portion of the defendant stating that he had previously served time for a gun charge, even more prejudicial to the defendant's right to a fair trial.

**Law and Argument**

Standard of Review

Rule 29

In deciding a motion brought under rule 29 of the Federal Rules of Criminal Procedure the ultimate question for the court is, "whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir.2004) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

"[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." United States v. Jackson, 335 F.3d 170, 180 (2d Cir.2003). A defendant's burden on such a motion is not insurmountable, a judgment of acquittal will be granted if no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. United States v. Cassese, 428 F.3d 92, 98 (2d Cir.2005). The court must not be myopic in its analysis. Instead, it must consider the totality of the evidence, each piece in conjunction with the others. See United States v. Ozby, 2007 WL 656049 (N.D.N.Y. J. Sharpe) *citing*, United States v. Cassese, 428 F.3d 92, 98-99 (2d Cir.2005), *citing*, United States v. Glenn, 312 F.3d 58, 69 (2d Cir.2002). See also United States v. Cassese, 428 F.3d 92 (2nd Cir. 2005)(Judgment of acquittal affirmed where element of the offense not proven beyond a reasonable doubt); United States v.

3

Jones, 393 F.3d 107 (2nd Cir. 2004)(remanding with instructions to enter judgment of acquittal where insufficient evidence that defendant was involved in the charged conspiracy).

### Rule 33

Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). This rule

> by its terms gives the trial court broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice. The district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury. Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment. An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.
>
> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.

United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir.2001)(internal quotation marks and citations omitted).

The Second Circuit has affirmed district court decisions that have granted defendants new trials based upon the weight of the evidence. In United States v. Autori, 212 F.3d 105, 121(2d Cir. 2000), the court found that a new trial was properly granted, even though the evidence was legally sufficient, where "the credibility of the principle witness was weak" and "the soundness of the verdict is highly doubtful." In United States v. Robinson, 430 F. 3d 537 (2d Cir. 2005), the court affirmed the granting of the defendant's new trial motion where the credibility of the

4

government's identification witness was impeached by his prior failure to identify the defendant on two occasions. See, Robinson, 430 F.3d at 543.

In exercising the broad discretion conferred under Rule 33, a court may weigh the evidence and assess the credibility of witnesses. The rule confers broad discretion upon a trial court to set aside a jury verdict and order a new trial in order to avert a perceived miscarriage of justice. See United States v. Sanchez, 969 F.2d 1409 (2nd Cir. 1992). A defendant seeking a new trial bears the burden of demonstrating the "essential unfairness of the [original] trial." United States ex rel. Darcy v. Handy, 351 U.S. 454, 462 (1956). In adjudicating a Rule 33 motion, a court is entitled to weigh the evidence and, in so doing, to evaluate the credibility of witnesses. See Sanchez, 969 F.3d at 1413.

The Trial

The government called three principle cooperating witnesses: Cheryl Lobdell, Corey Spinner, and Alain Forget. All three witnesses were involved in the alleged conspiracy and were motivated to testify against the defendant by the assurances of the government that they would receive reduced sentences for their testimony. None of the three witnesses were credible, and no reasonable jury could have concluded, based on the evidence presented through their testimony, that the defendant was guilty beyond a reasonable doubt.

Cheryl Lobdell

Cheryl Lobdell is a life-long alcoholic and drug addict who is serving a 33 month sentence for her involvement in the alleged conspiracy. (Lobdell Tr. at 2-3). She has been involved with drug smuggling for more than 20 years. (Lobdell Tr. at 74). Lobdell testified that she expected to receive a benefit from the government in exchange for her testimony, (Lobdell

5

Tr. at page 5), and that while under a cooperation agreement with the government used cocaine in violation of the agreement. She attempted to deceive the pretrial services office my purposely diluting her urine prior to a drug screen, and ultimately tested positive for cocaine use. (Lobdell Tr. at 6). Despite her dishonesty and problems while cooperating with the government, Lobdell received a significant reduction in sentence, 27 months under the mandatory minimum of 60 (Lobdell Tr. at 7 and 65).

Lobdell testified that she had previously been convicted of grand larceny and falsifying business records. (Lobdell Tr. at 8). She was sentenced to five years of state probation for this offense, and while on probation continued to deceive the probation department by continuing to do drugs and smuggle marijuana. (Lobdell Tr. at 67). Lobdell confirmed on cross-examination, that she continued to try to deceive probation by diluting drug screens by drinking enormous amounts of Gatorade. (Lobdell Tr. at 72). Lobdell was still on state probation at the time of her arrest for the current federal charge, but did not inform her state probation officer of this fact, another act of deception. (Lobdell TR. at 68). She was released from state probation by an unwitting probation department. Her dishonesty served her well. (Lobdell Tr. at 65-68). Lobdell, while working as an informant for the DEA deceived her handling agents by continuing to smuggle marijuana without their knowledge. (Lobdell Tr. at 69).

The extent of Lobdell's knowledge of the defendant's involvement surrounded her claims that the defendant paid her on two or three occasions. However, she could not give even approximate dates or times that this occurred—except one alleged occasion following her arrest in 2009. Nor did she have any text-messages that she claims were exchanged between her and the defendant. She testified that she handed over her cell phone to the government presumably for forensic analysis. However, the government did not introduce any evidence of these text

6

Case 15-541, Document 23, 08/10/2015, 1580139, Page178 of 220

messages at trial. (Lobdell Tr. 83-86). Lobdell's testimony was not credible both for its content and because of the fact of who she is as a person: a drug addicted alcoholic who lied to the government, lied to her state probation officer, and previously stole from her employer. No reasonable jury could have found the defendant guilty beyond a reasonable doubt, and we respectfully urge this Court to grant the defendant's motion for judgment of acquittal.

<u>Corey Spinner</u>

Corey Spinner was also seeking a benefit from the government in an effort to get below the 5 year mandatory minimum sentence for trafficking 100 kilograms of marijuana. Spinner was a driver/courier for the smuggling organization, and was recruited by Allain Forget. (Spinner Tr. 7-8). Spinner testified that he would drive to the defendant's mother's property when prompted by Forget in order to pick up a load of marijuana. He testified that he never saw the defendant at the property; that he was paid by Forget, not the defendant, and that he never had a conversation with the defendant. (Spinner Tr. at 28-29). Spinner did not testify that he ever witnessed the defendant handle marijuana, or direct others to do so in any manner. In fact Spinner did not have any personal knowledge of the defendant's involvement in the alleged conspiracy. What he did know, was that Alain Forget was the leader of the marijuana conspiracy. No reasonable jury, based on the testimony of Cheryl Lobdell and Corey Spinner, could have convicted the defendant of the charges beyond a reasonable doubt.

<u>Alain Forget</u>

Alain Forget also sought a benefit from the government in turn for his testimony against the defendant. (Forget Tr. at 120). Forget testified that he was a scout for couriers, and that he would pick-up loads of marijuana from the defendant's mothers house (Forget Tr. at 41), and

7

that he was a drug user during these times. (Forget Tr. at 126). According to Forget, a man named Collin would be present and have private conversations with the defendant. Forget never heard the nature of these conversations, and never spoke directly with the defendant during these times. (Forget TR. at 51). Forget also testified that he had never seen the defendant purchase or sell marijuana. (Forget Tr. at 51). At least one portion of Forget's testimony regarding the defendant's alleged involvement in the smuggling operation, came in the form of hearsay evidence. Forget testified about an individual named Xavier a/k/a X-man and what X-man told him about the defendant. (Forget Tr. at 60). Forget in essence had no first-hand knowledge that the defendant was involved in marijuana smuggling.

On cross-examination, Forget acknowledged that there were significant cigarette/tobacco smuggling operations in place in the same area, and how he had recorded conversations with the defendant regarding how lucrative cigarette smuggling can be. (Forget Tr. at 135-136) and (Government Exhibit 17). Moreover, Mr. Sacco elicited testimony of how Forget was masterful at deceiving other people. The defendant (Forget TR. at 139-140); Colin (146-147); State Police Patrols (152-153).

Lobdell, Spinner, and Forget's non-credible testimony taken together in aggregate was insufficient for a reasonably jury to find the defendant guilty beyond a reasonable doubt. Based on their non-credible testimony, coupled with the fact that there were no seizures linked to the defendant, no forensic evidence presented by the government linking the defendant to the conspiracy, and no other credible evidence presented, this Court should grant the defendant's motion for a judgment of acquittal under Rule 29.

## FRE 404(b)

Federal Rule of Evidence 404(b) prohibits the government from introducing "other crimes, wrongs, or acts" to prove the character of a person in order to show "action in conformity therewith. Permitting the introduction of "other crimes" evidence poses the danger that the jury will view it as reflecting on the defendant's character and reach a verdict because it has concluded that the party is a bad person deserving of punishment. See United States v. Germosen, 139 F.3d 120, 128 (2nd Cir. 1998); United States v. Downing, 297 F.3d 52, 58 (2nd Cir. 2002); United States v. Linares, 367 F.3d 941, 945-46 (D.C. Cir. 2004). Moreover, the government must provide notice, upon request of defense counsel, of the general nature of any other crimes evidence it intends to introduce at trial for any purpose. FRE 404(b)(11).

The government whether inadvertently or not, played an audio recording (Government Exhibit 14) where the defendant states that he was, previous to the instant charge, convicted of a gun offense and served time for it. A transcript of the audio recording—Government Exhibit 17—shows the recorded conversation except with the section where the defendant discusses his previous conviction is removed. But the actual recording was played for the jury, and not edited or redacted. Mr. Sacco objected and a side-bar conference was held.

This evidence heard by the jury clearly falls under Rule 404(b)'s prohibition against admitting prior bad acts. The only thought in a juror's mind could be that the defendant is a bad guy—he was previously involved with illegal guns, he's an ex-con—and therefore, that he was likely involved in this conspiracy to smuggle and distribute marijuana. If a juror was "on-the-fence" as to whether the defendant was guilty—which is certainly plausible given the government's weak case—the defendant's own words that he was previously convicted of gun charges would change that juror's mind. The introduction of the audio evidence was highly

9

prejudicial, and its introduction prevented the defendant from getting a fair trial.  As a result a manifest justice has occurred and the only remedy would be a new trial.

### Conclusion

Based on the forgoing, we respectfully request that the Court grant the defendant's motion for a judgment of acquittal under Rule 29, or in the alternative to order a new trial under Rule 33.

Dated: Lake Placid, New York
      May 15, 2014

                        Law Office of Brian P. Barrett

                        */s/ Brian P. Barrett*

                        Brian P. Barrett
                        Bar Roll No. 514001
                        Attorney for Allen Peters
                        5676 Cascade Road
                        Lake Placid, New York 12946
                        Telephone (518)523-3388
                        Facsimile (518)523-3380
                        E-mail: brian@bpbarrett.com

To:    Lawrence Baerman, Clerk, U.S. District Court
       United States Courthouse
       James T. Foley Courthouse
       Albany, New York 12207
       Via Electronic Filing Only

       Daniel C. Gardner, Esq.
       Assistant United Sates Attorney
       Via Electronic Filing Only

       Allen Peters

JA-778

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.                                                                    8:13-CR-0316
                                                                      (GTS)
ALLAN PETERS,

                                    Defendant.
_____

APPEARANCES:                                          OF COUNSEL:

HON. RICHARD S. HARTUNIAN                  DANIEL C. GARDNER, ESQ.
United States Attorney for the                    Assistant United States Attorney
   Northern District of New York
   Counsel for the Government
14 Durkee Street, Room 340
Plattsburgh, NY 12901

LAW OFFICE OF BRIAN P. BARRETT, ESQ.      BRIAN P. BARRETT, ESQ.
   Counsel for Defendant Ross
307 South Clinton Street, Suite 300
Syracuse, NY 13202-1250

HON. GLENN T. SUDDABY, United States District Judge

**DECISION and ORDER**

  Currently before the Court, in this criminal proceeding against Allan Peters (Defendant)

is a post-trial motion by Defendant to set aside the verdict and enter acquittal, or, in the

alternative, for a new trial. (*See* Dkt. Nos. 46, 63.) The Government has opposed Defendant's

motion. (*See* Dkt. No. 66.) For the reasons set forth below, Defendant's motion is denied.

I.  **RELEVANT BACKGROUND**

  The sole count of the Indictment in this action against Defendant charged him with

conspiracy to possess with the intent to distribute and to distribute one thousand kilograms or

more of marijuana, a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (Dkt.

No. 6.)

On January 27, 2014, a jury trial was commenced before this Court.  On January 30, 2014, the jury returned a unanimous verdict of guilty.

On February 12, 2014, Defendant filed a motion for acquittal pursuant to Fed. R. Crim. P. 29(c) or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33.  (*See* Dkt. No. 46.) With permission of the Court, Defendant later filed a memorandum of law and attorney affirmation in support of his motion.  (*See* Dkt. No. 63.)

Because the parties have submitted post-trial briefs that demonstrate an accurate understanding of the relevant facts of this case, the Court will not provide a detailed description of those facts in this Decision and Order, which is intended primarily for the review of the parties.  Rather, the Court will refer to those facts only when necessary in its analysis of Defendant's motion.

## II.   GOVERNING LEGAL STANDARDS

### A.   Motion for a Judgment of Acquittal

In asserting a motion challenging a conviction based on insufficient evidence pursuant to Rule 29(c), "[i]t is well established that a defendant . . . bears 'a heavy burden.'"  *United States v. Lohm*, 90-CR-0301, 1993 WL 488635, at *3 (N.D.N.Y. Nov. 26, 1993) (Munson, J.) (quoting *United States v. Soto*, 959 F.2d 1181, 1185 (2d Cir. 1992)).  "[D]efendant must demonstrate that there was no evidence from which a reasonable mind might fairly conclude guilt beyond a reasonable doubt."  *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (internal quotations omitted).  "When analyzing this type of motion, the court will review the evidence in the light most favorable to the prosecution and draw all reasonable inferences in its favor."  *Lohm*, 1993 WL 488635, at *3 (citing *United States v. Medina*, 944 F.2d 60, 66 (2d Cir. 1991), *cert. denied*, 112 S. Ct. 1508 (1992)).  "If the reviewing court finds, on the evidence in the

2

record, 'that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,' the jury's verdict must be upheld." *Id.* (quoting *United States v. Gordils*, 982 F.2d 64, 70 [2d Cir. 1992]). "In other words the court will not independently engage in weighing the evidence or assessing credibility, but rather will uphold the jury's verdict so long as the evidence, whether direct or circumstantial, when viewed as a whole fairly supports that verdict." *Id.* (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942). "Finally, if the jury had a full opportunity to assess credibility, weigh the evidence, and draw justifiable inferences in reaching its verdict, 'the evidence need not eliminate every hypothesis of innocence' in order to support the conviction." *Id.* (quoting *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir.), *cert. denied*, 113 S. Ct. 608 (1992) (citations omitted).

**B.    Motion for a New Trial**

"It is well settled that when a jury returns a verdict contrary to the weight of the evidence, the trial court has broad discretion under Rule 33 to set aside the jury's verdict and order a new trial to avoid a miscarriage of justice." *Lohm*, 1993 WL 488635, at *8 (citing *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992), and *United States v. Lombardozzi*, 343 F.2d 127, 128 (2d Cir.), *cert. denied*, 381 U.S. 938 (1965)). "To warrant such a result, '[t]he evidence must preponderate heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand.'" *Lohm*, 1993 WL 488635, at *8 (quoting *United States v. Delano*, 825 F. Supp. 534, 544 (W.D.N.Y. 1993)) (other citation omitted). "Within the rubric of Rule 33, the trial court's authority to examine the evidence is much broader than on a motion challenging the sufficiency of the evidence." *Id.* "The court is empowered to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *Id.* (quoting *Sanchez*, 969 F.2d at 1413).

3

Having said that, trial courts "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir. 1982), *cert. denied*, 459 U.S. 1174 (1983). "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez*, 969 F.2d at 1414 (citing *United States v. Kuzniar*, 881 F.2d 466, 470 [7th Cir. 1989]). "Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." *Id*. (citations omitted). "But the trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial." *Id*. (citation omitted). Rather, "[t]he test is whether it would be a manifest injustice to let the guilty verdict stand." *Id*. (internal quotation marks and citations omitted).

## III.   DISCUSSION

### A.   The Parties' Briefing on Defendant's Motion

In support of his motion for acquittal, Defendant argues that the guilty verdict was against the weight of the evidence because the vague testimony of cooperating witnesses Corey Spinner, Cheryl Lobdell and Alain Forget did not prove beyond a reasonable doubt that Defendant knew or that it was reasonably foreseeable that his co-conspirators possessed or distributed one thousand kilograms or more of marijuana. In the alternative, Defendant seeks a new trial, arguing that the Government's inadvertent introduction of evidence of Defendant's prior gun conviction violated Rules 403 and 404(b) of the Federal Rules of Evidence resulting in unfair prejudice to Defendant. Defendant further argues that the Government's error in this regard was even more prejudicial to him due to the insufficiency of the evidence, including the incredible testimony of the cooperating witnesses.

4

The Government argues that (1) Defendant is unable to meet his burden under Rule 29 because (a) he has failed to show that the testimony of the cooperating witnesses was incredible as a matter of law, and (b) the cooperating witnesses' testimony established all elements of the offence; and (2) Defendant is unable to meet his burden under Rule 33 because (a) Defendant's recorded statement was admissible under Fed. R. Evid. 404(b) as background information, (b) even if the statement was not admissible, the Government's inadvertent offering of the statement was harmless based on the strength of the Government's case, the lack of the statement's relevance to a critical aspect of the case, the brief nature of the statement, and the Court's limiting instruction, and (c) there are no exceptional circumstances that warrant intrusion upon the jury's credibility assessment.

**B.     Rule 29(c) Motion for Acquittal**

Generally, for the reasons stated in the Government's response, Defendant's Rule 29(c) motion is denied. (*See* Dkt. No. 66, at 4-9.) The Court would only add the following brief analysis.

The Court of Appeals for the Second Circuit has noted, regarding challenges to credibility in support of a motion for acquittal,

> "[T]he proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury," *United States v. Roman*, 870 F.2d 65, 71 (2d Cir.1989) (quotation marks omitted), not in a motion for a judgment of acquittal. We have explained that even the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not "incredible on its face," *United States v. Florez*, 447 F.3d 145, 155 (2d Cir.2006), or does not "def[y] physical realities," *United States v. Coté*, 544 F.3d 88, 101 (2d Cir.2008) (quotation marks omitted).

*United States v. Truman*, 688 F. 3d 129, 139 (2d Cir. 2012). In that same case, the Court vacated a lower court's finding that a witness's testimony was incredible as a matter of law where the

5

JA-783

lower court cited, among other things, the witness's role as an accomplice testifying under a cooperation agreement, his breach of that agreement, and his criminal history and history of drug and alcohol abuse. *See id.*, at 139-140. In vacating, the Court noted that, although the cited factors impaired the witness's credibility, they did not render it incredible as a matter of law. The Court further noted that such factors "are relevant to the weight the jury should accord to the evidence, and do not . . .justify the grant of a judgment of acquittal." *Id.* (quoting *Coté*, 544 F.3d at 100).

Similarly, here, the jury heard the testimony of the cooperating witness on both direct and cross examination and the Court's instructions regarding credibility determinations. Accordingly, the Court will not invade the jury's determination in this regard.

Moreover, as the Government noted in its response papers, the cooperating witnesses provided testimonial evidence sufficient for any rational juror to find each element of the offense beyond a reasonable doubt. (*See* Dkt. No. 66 at 7-9.)

For these reasons, Defendant's motion for acquittal is denied.

**C.      Rule 33 Motion for a New Trial**

Generally, for the reasons stated in the Government's response, Defendant's Rule 33 motion is denied. (*See* Dkt. No. 66, at 9-17.) The Court would only add the following brief analysis.

During the initial playing of a recording of a conversation between Alain Forget and Defendant, the Government inadvertently included the following statement by Defendant: "Yeah, cause I told him, I said, I don't want anything to do with guns. I went to jail for that already." The statement was omitted from every subsequent playing of the recording for the jury as well as the transcript of the recording. Moreover, the Court gave a detailed limiting

6

instruction to the jury, explaining that they may not consider the evidence of Defendant's gun

conviction as a substitution for evidence of the indicted offense or as evidence of Defendant's

bad character. Further, the Court instructed the jury that they may only consider such evidence

for the limited the purpose of the background, history and nature of the relationship between the

Defendant and the cooperating witnesses and Defendant's state of mind.[1]

---

[1]   The text of the limiting instruction is, in sum and substance, as follows:

The Government has offered evidence tending to show the existence of other criminal relationships between the Defendant and a witness who has testified for the Government. Specifically, you have heard evidence in this trial concerning allegations that during the course of the conspiracy, there was an attempt to smuggle guns into Canada using the Defendant's property, which, the Government contends, is the same manner in which marijuana was smuggled into the United States from Canada.

In that connection, let me remind you that the Defendant is not on trial for committing any acts that are not alleged in the Indictment. Accordingly, you may not consider this evidence of the other conduct as a substitute for proof that the Defendant committed the crime charged in the Indictment. Nor may you consider this evidence as proof that the Defendant has a criminal personality or bad character. The evidence of the other conduct was received into evidence for a much more limited purpose and you may consider it only for that limited purpose.

More specifically, evidence of this other conduct was received into evidence for the purpose of helping you to understand the background, history and nature of the relationship between the Defendant and the Government's witnesses. In addition, evidence of this other conduct was received into evidence as relevant to establish the Defendant's state of mind in carrying out the acts charged in the Indictment. For example, if you determine that the Defendant committed the acts charged in the Indictment as well as the acts involved in the other conduct, then you may, but you need not draw an inference that, in doing the acts charged in the Indictment, the Defendant acted knowingly and intentionally and not because of some mistake, accident or other innocent reasons.

JA-785

To be sure, Rule 404(b) of the Federal Rules of Evidence permits the admission of evidence of a crime, wrong or other act in order to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." Fed. R. Evid. 404(b). The Court, in denying Defendant's motion for a mistrial, first explained that a mistrial is an extreme remedy, which is not warranted under the circumstances of this case. The Court further explained that the fact that Fed. R. Evid. 404(b) allows the admission of background evidence belies Defendant's assertion of prejudice.

Given the overwhelming evidence of Defendant's guilt, the single, brief reference to Defendant's prior gun conviction and the Court's detailed limiting instruction to the jury, Defendant cannot meet his burden to show that the guilty verdict was contrary to the weight of the evidence or that exceptional circumstances exist warranting a new trial.

For these reasons, Defendant's Rule 33 motion for a new trial is denied.

---

These are the sole purposes for which you may consider evidence of the prior relationship between the Defendant and the Government's witness. Evidence of that other conduct may not be considered by you for any other purpose. Specifically, you may not use this evidence to conclude that, because the Defendant committed the acts involved in the other conduct, he must also have committed the acts charged in the Indictment. Nor may you consider any evidence that the Defendant may have been convicted of any other crime. Any prior criminal conduct or conviction of the Defendant which may have been mentioned or presented through any evidence is not relevant and may not be considered by you. Once again, I stress that the Defendant is not on trial for committing any acts that are not alleged in the Indictment.

JA-786

**ACCORDINGLY** it is

**ORDERED** that Defendant's motion for acquittal and/or a new trial (Dkt. No. 46) is

<u>**DENIED**</u>.

Dated:      July 9, 2014
            Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

JA-787

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF NEW YORK

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                                     )    CASE NO.: 8:13-CR-316
                                      )
6         VS.                         )
                                      )
7    ALLAN PETERS,                    )
                       Defendant.     )
8    _____)

9

10                  **TRANSCRIPT OF PROCEEDINGS**
                 **BEFORE THE HON. GLENN T. SUDDABY**
11                **THURSDAY, FEBRUARY 12, 2015**
                       **ALBANY, NEW YORK**

12

13

14   **FOR THE GOVERNMENT:**
            Office of the United States Attorney
15          By:  Douglas G.N. Collyer, AUSA
            14 Durkee Street, Room 340
16          Plattsburgh, New York  12901

17

18   **FOR THE DEFENDANT:**
            Dennis B. Schlenker, Esq.
19          174 Washington Avenue
            Albany, New York  12210

20

21

22

23                **THERESA J. CASAL, RPR, CRR, CSR**
                  Federal Official Court Reporter
24                   445 Broadway, Room 509
                    Albany, New York  12207

25

                  *THERESA J. CASAL, RPR, CRR*
            *UNITED STATES DISTRICT COURT - NDNY*

JA-788

*USA v. Peters - 13-CR-316*

 1                   (Court commenced at 11:10 AM.)

 2              THE CLERK:  United States of America versus Allan

 3   Peters, docket 13-CR-316.  Could we have appearances for the

 4   record, please?

 5              MR. COLLYER:  Douglas Collyer from the Government.

 6   Good morning, your Honor.

 7              THE COURT:  Good morning.

 8              MR. SCHLENKER:  Good morning, Judge.  Dennis B.

 9   Schlenker for the defendant, Allan Peters.

10              THE COURT:  Good morning, Mr. Schlenker.  We are

11   here for sentencing.  Are counsel both ready to proceed?

12              MR. COLLYER:  Yes, sir.

13              THE COURT:  You are here for Miss Kopita, I take

14   it?

15              MR. COLLYER:  I've taken away the case as a whole.

16              THE COURT:  You have?

17              MR. COLLYER:  Yes.

18              THE COURT:  Good to see you, Mr. Collyer.

19              MR. SCHLENKER:  And defendant is ready as well,

20   your Honor.

21              THE COURT:  Okay, very well.  Counsel, have you

22   received the presentence report, which was dated June 16th

23   of 2014, the addendum dated July 14th of 2014, and the

24   second addendum, which was dated December 16th of 2014?

25   Government receive those?

                    *THERESA J. CASAL, RPR, CRR*
                *UNITED STATES DISTRICT COURT - NDNY*

JA-789

*USA v. Peters - 13-CR-316*

1    MR. COLLYER:  Yes, your Honor, I received each of

2  those documents, I've had time to review them and I do not

3  have any new objections.

4    THE COURT:  Okay.  And Mr. Schlenker.

5    MR. SCHLENKER:  Yes, your Honor.  I reviewed the

6  documents, my client has had full opportunity to review the

7  documents and to consult with me regarding the import of

8  those.

9    THE COURT:  Is that right, Mr. Peters, ya had an

10  opportunity to go over these documents with your attorney?

11    THE DEFENDANT:  Yes, I have.

12    THE COURT:  Okay, very well.  Counsel, any

13  objections to the facts as stated in the presentence report

14  for the Government?

15    MR. COLLYER:  No, sir.

16    THE COURT:  Mr. Schlenker?

17    MR. SCHLENKER:  Only that, your Honor, as my

18  sentencing memorandum set forth, defendant proceeded to

19  trial and takes no position with respect to the factual

20  allegations, which were largely provided by the Government

21  and agents in the matter of the preparation of the PSIR.

22  Not to incur the amity of the Court, but Mr. Peters, as he

23  sits here, still asserts his innocence in this case.

24    THE COURT:  Okay.  And, of course, he didn't

25  comment for the Probation Officer in the preparation of the

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*USA v. Peters - 13-CR-316*

1  report.

2          MR. SCHLENKER:  That's correct, he did not.  We

3  have an objection issue later on, but he did not give any

4  statements or --

5          THE COURT:  I noted that.

6          MR. SCHLENKER:  I think it was wise that he

7  didn't.

8          THE COURT:  It was on advice of counsel I saw --

9          MR. SCHLENKER:  Thank you.

10          THE COURT:  -- so that's all fine.  Any objections

11  to the offense level calculations for the Government?

12          MR. COLLYER:  No, your Honor.

13          THE COURT:  Mr. Schlenker?

14          MR. SCHLENKER:  No, your Honor.

15          THE COURT:  And how about to the criminal history

16  computation, Government?

17          MR. COLLYER:  No, your Honor.

18          THE COURT:  Mr. Schlenker?

19          MR. SCHLENKER:  No, your Honor.  We agreed that it

20  was level II, criminal history category II.

21          THE COURT:  Very well.  Mr. Collyer, go ahead,

22  sir, on behalf of the Government.

23          MR. COLLYER:  Thank you, your Honor.  Your Honor,

24  the defendant played an indispensable role in this drug

25  trafficking organization.  He supplied land that was located

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*USA v. Peters — 13-CR-316*

1    on the waterfront with a small canal located at the end of a

2    dead-end road on the reservation where it was virtually

3    impossible for law enforcement to operate any effective

4    surveillance or interception.  And this control over the

5    organization's hub was vital to its operation.  And although

6    this vital role could have been relatively hands off, the

7    defendant also played an active role in the organization's

8    operation.  He acted as a currency exchange, he took in and

9    dispensed cash payments on behalf of the organization, he

10   was present for nearly all of the smuggling activities, he

11   procured at least one vehicle that was used for smuggling

12   activities and he operated, on occasion, as a scout for

13   loads of marijuana being smuggled into the United States

14   sometimes as far as Interstate 87.  So not only did he

15   provide infrastructure, but he actively participated in the

16   activities.

17          In 1998, the defendant was convicted of conspiracy

18   to possess and distribute machine guns, involved in a

19   conspiracy to illegally acquire machine guns, convert them

20   from semi-automatic to fully automatic, deface the

21   identification information and then sell them, for which he

22   was sentenced to 60 months' incarceration.

23          Given his instant conviction, it's clear that his

24   prior sentence was inadequate to deter him from criminal

25   conduct or from participating in criminal enterprises and

*USA v. Peters - 13-CR-316*

1   it's equally clear that there exists still a need to protect

2   the public from this defendant.

3           The Government additionally relies on the

4   submissions previously filed with the Court in requesting

5   the Court mete a sentence within the appropriate guidelines.

6   Thank you.

7           THE COURT:  Okay.  Mr. Collyer, we can do this one

8   of two ways:  I can just give Mr. Schlenker an opportunity

9   to respond at this point and then address your request for

10  an enhancement at that time, or I can allow ya to do it now.

11  What would you like to do, sir?

12          MR. COLLYER:  I have no preference, your Honor,

13  however the Court would like to proceed.

14          THE COURT:  Counsel, do you want to address that

15  after you make your initial remarks or do it all at once?

16          MR. SCHLENKER:  Let's do it all at once, Judge.

17          THE COURT:  Okay.  The Government made its

18  submission asking for an upward enhancement based on an

19  obstruction of justice.

20          MR. COLLYER:  That's correct, your Honor.

21          THE COURT:  Why don't you just -- I have your

22  submission, it's been reviewed, why don't you go ahead and

23  make your record with regard to that, sir.

24          MR. COLLYER:  Thank you, your Honor.  As -- what

25  is not disputed is that the defendant did, in fact, write

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*USA v. Peters - 13-CR-316*

1  that letter and send that letter to an inmate who was being

2  held with a co-conspirator and cooperating witness.  It's

3  also not disputed that that co-conspirator was able to

4  obtain a copy of that letter and that's how we were able to

5  obtain it through his counsel.  We raise two points for the

6  obstruction:  The first is the letter itself, which the

7  Court has, contains language, albeit somewhat ambiguous, but

8  language that could be interpreted as a threat against the

9  physical safety of a co-conspirator, and therefore, under

10 the case law I provided to the Court, would be appropriate

11 for the two-level obstruction enhancement.  Secondarily,

12 that obstruction charge or obstruction enhancement is

13 requested as there are other co-conspirators in Canada to

14 whom we submit that letter was sent and that the prosecution

15 against those individuals would require this cooperating

16 defendant's continued cooperation.  Additionally, because of

17 the details and the specific subject matter that was sent,

18 that being the cooperation agreement and a seven-page

19 proffer statement of that cooperating defendant with

20 specific details about the organization being sent there,

21 that put those individuals on notice that they were the

22 subject of at least investigation, at most an indictment,

23 possibly wanted, and pursuant to other case law submitted in

24 our request, that secondarily and independently could

25 operate as a means to enhance the sentence.  However, when

*USA v. Peters - 13-CR-316*

1  you consider both arguments together, I would say it's

2  clear.

3          With respect to counsel's submission with respect

4  to mainly two arguments, the first being that some of those

5  documents were public record, I would draw the Court's

6  attention to the *Jackson* case, which we submitted in our

7  papers, where, again, those documents that were sent were

8  public record, but the Second Circuit said that's

9  inconsequential.  What's important is the documents being

10  affirmatively sent to people who otherwise would not have

11  gotten them.

12          Counsel's second point raised is to the specific

13  intent.  As the Court's aware, the Government can never

14  outwardly prove someone's mens rea, you must rely on

15  circumstantial evidence, and we've submitted case law that

16  the Court can rely on circumstantial evidence and all the

17  reasonable circumstances drawn from that evidence in whether

18  to give an enhancement or not.  I would submit that the

19  Court and everyone is aware that the defendant sent the

20  letter and we know the content of the letter, we have the

21  letter, and that the reasonable inferences from that letter,

22  from the content and from the actions of sending it, show

23  the defendant was acting with specific intent; namely, he

24  sent this letter to multiple other individuals and to the

25  inmate at the jail.  You simply don't accidentally mail

*USA v. Peters - 13-CR-316*

1   something multiple times.  Additionally, what's sent in the

2   letter is specifically what he sent, that being the

3   cooperation agreement and the proffer statement and

4   contained in the letter is an offer to do that again.  So we

5   have repeated actions of those documents being dispensed and

6   an offer to do it again.  It specifically shows that there

7   is specific intent to obstruct either the continued

8   cooperation or to alert individuals of the investigation or

9   both.  And however it is cut, it would be appropriate for

10  the two-level adjustment.

11          THE COURT:  Mr. Collyer, what's the status of the

12  case against the co-defendants in Canada?  There's specific

13  reference to these documents being sent to individuals in

14  Canada.  What is the status of the case against them?

15          MR. COLLYER:  There are individuals who have been

16  indicted, who are wanted.

17          THE COURT:  They're wanted, so have extradition

18  proceedings been started, to your knowledge?

19          MR. COLLYER:  Started, preliminarily, yes.

20          THE COURT:  They have started?

21          MR. COLLYER:  Yes, sir.

22          THE COURT:  Okay.  Thank you, Counsel.

23  Mr. Schlenker, on behalf of your client, go ahead, sir.

24          MR. SCHLENKER:  Yes, thank you, Judge.  Judge,

25  first let me thank you for your considerations.  I know that

JA-796

*USA v. Peters - 13-CR-316*

1  the sentencing in this matter has been delayed on at least

2  two occasions, your Honor has been more than fair in

3  resolving the issues of counsel, so I've stepped into the

4  breach so to speak and I want to thank you on behalf of

5  Mr. Peters.

6          THE COURT:  I appreciate ya bein' here.  Has been

7  awhile and I'm glad, you know, we're finally at this point.

8  It took awhile, but...

9          MR. SCHLENKER:  Thank you, Judge.  Judge,

10 Mr. Peters is 43 years of age.  His criminal history

11 category speaks for itself, criminal history category II.  I

12 never thought that in practice before, whether it be federal

13 or state, that I would be asking for a sentence of ten years

14 before a judge.  This is neither the place nor the time to

15 make any statements regarding policy considerations.  I've

16 read other counsels' briefs in marijuana cases, they're

17 arguing it shouldn't be a Schedule I controlled substance,

18 it's legal in Colorado, Washington, a myriad of states.

19 You're an Article III judge, you don't set policy and I well

20 understand that and you're not gonna hear that in this case.

21 But it is a marijuana case.  Ten years for a 43-year-old man

22 is a lot of time and we tend, by the numbers and by the

23 Sentencing Guidelines, somewhat to diminish our sensitivity

24 to the amount of time that is.  My argument in the

25 sentencing memorandum is essentially that you should

*USA v. Peters - 13-CR-316*

1  sentence Mr. Peters to ten years, the statutory mandatory

2  minimum, which, under the guideline level, given the effect

3  of the most recent revision, would have placed that into the

4  middle of the guideline, 108 to 135 months.  That would be

5  level 30.  There -- in this respect, that's what the PSIR

6  sets forth, a level 30, with exception of the enhancement

7  that the Government now seeks.  And I would argue that upon

8  all of the facts of this case, upon all of the

9  circumstances, the history, this is not an argument that

10  Native Americans, people in that -- who have lived in that

11  culture, born and raised, should get any special break, but

12  we do give consideration due to socioeconomic background,

13  history.  And your Honor being in Syracuse, you have a lot

14  of cases of Native Americans who come before you.  It's

15  tragic as to what has happened in this country.  But ten

16  years -- I don't know what "no greater than necessary,"

17  3553(a), we are every day reading new cases, attempting to

18  impart what that means in the context.  Ten years is a lot

19  of time, your Honor, speaking in the vernacular; more than

20  that, I respectfully submit, would be greater than necessary

21  upon the facts of this case.

22       He was not -- I've read some portions of the

23  testimony in the case, I don't have a complete record.  Your

24  Honor sat through the trial, your Honor probably is in the

25  best position, it was a relatively short, brief trial, four

*USA v. Peters - 13-CR-316*

1    days.  Your Honor, I'm certain, recalls the facts and

2    circumstances of the case.  Mr. Peters was not the prime

3    mover in that conspiracy.  I defer and make no comment as to

4    the recitation of what the facts were or are.  This case

5    inevitably is going up on appeal.  I respect the jury's

6    verdict.  I may not agree with it, Mr. Peters may not agree

7    with it, but I respect the jury's verdict and I have no

8    further comment to make with regard to the facts of this

9    case.

10           I would like, I think -- the substance of my

11   comments should be devoted to the 3C1.1 enhancement.  I

12   would like to point out first, as I've done -- and when I

13   learned of this, and Mr. Peters learned of this, we

14   cooperated with the Court, there was a consent to the

15   protective order.  There had never been a protective order

16   in this case and never been anything filed under seal.  As

17   your Honor -- and as I discussed the issue with counsel, I

18   was not the lawyer, we lawyers, and your Honor was -- as

19   former U.S. Attorney and so forth, we provide our clients,

20   because it's our ethical obligation, as the Second Circuit

21   has told us, to provide our clients with information

22   concerning the crimes to which they're being charged, and

23   lawyers provide their clients in accordance with the rules

24   of the particular facility or in accordance with their

25   ethical considerations with documents that relate to the

*USA v. Peters - 13-CR-316*

1    case.  I would never provide a client a document where there

2    was a protective order or it was under some form of seal.

3    That gets worked out with the Court in providing information

4    and I've been involved in several cases of that nature.

5              In this instance, the Government's own trial

6    brief, which was provided, set forth -- we didn't mention

7    his name, I don't mention the gentleman's name in the

8    transcript, the co-defendant, if you will, or the

9    cooperating witness, I'll refer to him as the cooperating

10   witness, his name was set forth, his name is set forth in

11   docket entries on PACER electronically filed.  The

12   Government, at no time, placed any of Mr. Peters' lawyers on

13   notice at the time that this was information that should not

14   be disseminated.  And in regular course, Mr. Peters received

15   this information and, in fact, talked to me about it.  I

16   might say Mr. Peters is wholly unaware of any case involving

17   people in Canada.  He thought his trial was the end of it,

18   that this is the end of this case.  Additionally, we have

19   docket entries that recite the name of this individual.  We

20   also have the provision of discovery by the Government,

21   which was not under seal or not under any restriction or

22   protective order, that provided the proffer agreement, as

23   well as the cooperation agreement, before, in advance of

24   trial, and that was reviewed by my client.  There's no way,

25   Judge, when you focus upon the issues of intent, bad faith,

*USA v. Peters - 13-CR-316*

1  mens rea, culpability, that one would assume that this was a

2  document that was restricted.  I would agree it's probably

3  not wise, and we have discussed this, it's not wise to be

4  communicating with people in other jails.  Like going to a

5  place where you shouldn't be, a lot of things can happen,

6  and probably they're all bad.  But he had no idea -- and the

7  Government itself admits there's an inherent ambiguity.  I

8  sat down and I read that letter a hundred times because it

9  really troubled me.  I'm not sure what was intended here.

10 And as you will note from my submission, I cited the Rule of

11 Lenity, I don't often do that, and I looked at -- it's the

12 statute -- we lawyers get it wrong.  It's the statutory

13 ambiguity as applied to the facts at hand, but it also

14 implicates the ambiguity of the conduct that the law is

15 trying to -- and we go back and forth.  It's kind of a

16 philosophical conundrum, if you will.

17           The Government, after the trial in January, and

18 I'm not taking the Government to task here, but they issued

19 a press release which was ostensibly picked up by The Malone

20 Tribune, the local paper that is interested when people in

21 the north country get arrested and charged, they cover it

22 more fully even than the local papers here and possibly even

23 in Syracuse.  And they got all over this story, they -- and

24 there was also a DEA, a specific -- there was a DOJ press

25 release regarding Mr. Peters' conviction and there was a DEA

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*USA v. Peters - 13-CR-316*

1  press release concerning Mr. Peters' conviction, and the

2  article recites -- and to understand the article, there's

3  some ambiguity there, but they went into the court filings

4  or the court records and they were able to obtain those

5  records which Mr. Peters had and the name of this

6  cooperating witness was clearly set forth in the public

7  media through no fault of his.  And if your Honor wished to

8  engage in a hearing, which I don't think is necessary,

9  because I'm making this representation in good faith as a

10  proffer, he received a copy of the clipping from this inmate

11  who he had resided with earlier on in Clinton County and he

12  was now down in Rensselaer County as a result of the trial

13  and conviction.  So he then responds, and there's no denial

14  of the letter.

15          But if ya look at 3C1.1, I think the *Schuberger*

16  (phonetic) case, which is relied on, is distinguishable.  In

17  this case, you have to give the benefit of the doubt -- they

18  say in terms of the inferences and so forth, the case law

19  cites you give the benefit of the doubt to Mr. Peters.

20  Mr. Peters told me when the motion for -- he didn't know

21  about this motion for protective order that was filed, first

22  thing he said was I didn't want to violate anything,

23  here's -- I have the paperwork that he has, which I'm

24  willing to give to the Government.  He no longer has it, he

25  had it, it was provided by former counsel.

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*USA v. Peters - 13-CR-316*

1    There's a big difference in sentence and that's

2  why I guess I'm taking the time to discuss this in this

3  fashion with you, your Honor, from a guideline sentence of

4  108 to 135, and I'm asking to sentence him according to the

5  mandatory minimum of ten years, 120, in the middle. We go

6  up to 135 to 168, so that, potentially, given the facts and

7  circumstances of the enhancement the Government asks for, he

8  can receive virtually four years more as a sentence because

9  of what happened with respect to this cooperating witness.

10  And I think the word -- and I thank Mr. Collyer, he uses the

11  word and concedes that there is ambiguity here. This is not

12  a threat made against the cooperating witness directly. I

13  don't construe it necessarily as a threat; I'm not sure what

14  it means in terms of the language. Mr. Peters is not a PhD

15  in English, doesn't teach English, and we would have to go

16  through what was intended, no one knows, but the benefit of

17  the doubt goes to him. It's kind of a tie, tie goes to the

18  runner at first base. But I don't think it even gets close

19  to that. There's no suggestion that this man ever attempted

20  to contact the cooperating witness, sent anything directly.

21  In fact, the clipping, as I pointed out, was sent by the

22  inmate in Clinton down to him and then his letter attached

23  that when he sent it back to the inmate for whatever reason.

24    On this basis, your Honor, I think applying all

25  the rules of equity, and consistent with case law, I would

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*USA v. Peters - 13-CR-316*

1  go back to my original submission to your Honor that

2  Mr. Peters should be sentenced to the statutory minimum of

3  ten years.  That is more than enough for this case.  Thank

4  you.

5           THE COURT:  Thank you, Mr. Schlenker.  Mr. Peters,

6  would you like to be heard, sir, before I impose sentence?

7           MR. SCHLENKER:  Stand up.

8           THE DEFENDANT:  No, I'm good.

9           THE COURT:  Okay.  You don't have anything you

10  want to tell me today?

11           THE DEFENDANT:  No.

12           THE COURT:  Okay, sir.  Thank you.

13           THE DEFENDANT:  You're welcome.

14           THE COURT:  All right.  Well, there are a number

15  of things that need to be addressed with regard to this

16  sentencing before I sentence Mr. Peters.  Initially,

17  Mr. Schlenker, I'd like to address your argument with regard

18  to the marijuana.  It's quite clear, as you point out, as an

19  Article III judge I don't make the law, I have a

20  responsibility to enforce the laws that are before us and

21  that are on the books.  But I will say this to ya:  It's

22  quite clear from this defendant's history, regardless of

23  what the commodity is, he was taking advantage of location,

24  location, location and what was coming back and forth across

25  that border.  This case, to me, is about smuggling and it is

*USA v. Peters - 13-CR-316*

1    regardless of what the commodity is, whether it's drugs or,

2    as he did in the past, his history, guns, machine guns, and

3    God knows what else he facilitated in coming back and forth

4    through that Native American territory across that

5    international border.  It's quite clear from the proof in

6    the trial that there were guns anticipated being smuggled

7    during the pendency of the investigation that was going on

8    into this drug conspiracy.  So, it's Mr. Peters' continued

9    activity that is of most concern to this Court.  Despite

10   being convicted and sentenced for the gun smuggling effort,

11   he did a period of incarceration in federal custody, it did

12   not deter him.  He got out, he was on supervised release, he

13   violated his supervised release, both in Canada and the

14   United States, and his dual citizenship and access through

15   the St. Lawrence River and that international border, he has

16   been a principal cog in the wheel of illegal smuggling

17   across the U.S./Canadian border for a number of years and

18   certainly that needs to be addressed.

19        With regard to the requested obstruction of

20   justice enhancement, the Court would note that I'm gonna

21   credit the arguments made by the Government, but I would

22   also like to make a record.  The Court has an obligation to

23   make these findings by a preponderance of the evidence.  And

24   while you can say there's ambiguity in the language of the

25   letter that was sent by Mr. Peters, the Court has an

*USA v. Peters - 13-CR-316*

1    obligation to look at the circumstances, the timing, the

2    surroundings of what's going on at that time and the people

3    that this letter was sent to. Now, Mr. Schlenker, you

4    indicate that your client had no idea or has no idea that

5    there may be a case pending against individuals in Canada.

6    But certainly he was doing business with these individuals,

7    he knows that they were involved in this conspiracy, he

8    dealt with them, he took their money. He, you know, brought

9    money back to them when drugs were delivered and payoffs

10    were made. He, you know, facilitated this back and forth

11    with these individuals in Canada, so there's no doubt that

12    he knows that they were involved in criminal activity. And

13    the fact that he sends this information to those individuals

14    in Canada and notes that in the letter, that the individual,

15    the cooperating witness, one of -- there were more than one,

16    but this cooperating witness may be returning to Canada at

17    some time and the reference that the friends in Canada may

18    have some fun with that individual, the inference to the

19    Court, given all the circumstances, is clear, certainly by a

20    preponderance of the evidence, of what he's suggesting and

21    what he's trying do.

22        The second thing I would indicate, the fact that

23    it's sent to a jail where the cooperating witness is being

24    housed, and the proffer agreement and everything else,

25    regardless of what may have been public or not public,

*USA v. Peters - 13-CR-316*

1    certainly all that information was not public or in the

2    public venue of the media, so that fact, that it's sent to

3    that -- another inmate in the jail where this cooperating

4    witness is being held, when you take that into consideration

5    once again, those facts fill in the blanks and when you

6    remove that ambiguity that we're talking about and the

7    language that he used, I want to make that clear for the

8    record, the Court is prepared to impose sentence.

9           The Court has reviewed and considered all the

10   pertinent information, including, but not limited to, the

11   presentence investigation report, the addendum, submissions

12   by counsel, and the Sentencing Guidelines manual, as well as

13   the factors outlined in 18 USC Section 3553(a). The Court

14   adopts the factual information and the guideline

15   applications contained in the presentence investigation

16   report. The original presentence investigation report sets

17   forth a total offense level of 32, a criminal history

18   category of II, and a guideline imprisonment range of 135 to

19   168 months.

20          Based upon the changes to the Sentencing

21   Guidelines regarding drug offenses, which went into effect

22   on November 1, 2014, the offense is reduced by two levels.

23   Therefore, as set forth in the revised presentence

24   investigation report, the Court finds the total offense

25   level is 30, the criminal history category is II and the

*USA v. Peters - 13-CR-316*

1    guideline imprisonment range is 108 to 135 months.  However,

2    as the statutorily authorized minimum sentence of ten years

3    is greater than the minimum of the guideline range, the

4    guideline range becomes 120 to 135 months, pursuant to

5    Section 5G1.1(c)(2) of the Sentencing Guidelines.

6         The Court has reviewed the submissions of counsel

7    regarding the Government's motion for an upward adjustment

8    for obstruction -- obstructing or impeding the

9    administration of justice.  Upon review of the evidence and

10   the argument presented here, the Court grants the

11   Government's motion and finds the two-level enhancement,

12   pursuant to 3C1.1 of the Sentencing Guidelines, is

13   appropriate and the Court makes this finding by a

14   preponderance of the evidence and, again, in accordance with

15   the submissions of both the Government and defense counsel.

16        The Court finds application note 4(a), which

17   states threatening, intimidating or otherwise unlawfully

18   influencing a co-defendant, witness or juror, directly or

19   indirectly, or attempting to do so, applies to defendant's

20   conduct in this case.  Therefore, the Court finds the total

21   offense level is 32, the criminal history category is II,

22   and the guideline imprisonment range is 135 to 168 months.

23        Upon your trial conviction on Count I of the

24   indictment, it is the judgment of the Court that you are

25   hereby committed to the custody of the Bureau of Prisons for

*USA v. Peters - 13-CR-316*

1   a period of 168 months.  Based on the defendant's prior

2   criminal history, his disregard for the laws of the United

3   States and Canada, a high end sentence is imposed in this

4   case.  There is very little doubt in the Court's mind that

5   this defendant has continuously participated in this

6   criminal activity in the Native American Territory of

7   Akwesasne, has used his position of owning real estate in a

8   prime spot for smuggling to his criminal advantage for a

9   number of years.

10          Upon your release from imprisonment, you shall be

11  placed on supervised release for a term of six years.  While

12  on supervised release, you shall not commit another federal,

13  state or local crime, you shall comply with the standard

14  conditions that have been adopted by this Court, as well as

15  the following special conditions, which the Court finds are

16  necessary and justified in this case based on the nature of

17  the instant offense, as well as the history and

18  characteristics of this defendant as outlined in detail in

19  the presentence investigation report:

20          First, you shall refrain from the use of alcohol

21  and be subject to alcohol testing and treatment while under

22  supervision.  And the Court would note that while on

23  supervised release from his first federal conviction for the

24  machine gun smuggling across the border that this defendant

25  had alcohol abuse problems and arrests in Canada while on

*USA v. Peters - 13-CR-316*

1    supervised release.

2          Two, you shall participate in a program for

3    substance abuse, which shall include testing for use of

4    controlled substances, controlled substance analogues and

5    alcohol.  This may include outpatient treatment as

6    recommended by the treatment provider based upon your risk

7    and needs.  You may also be required to participate in an

8    inpatient treatment upon recommendation of the treatment

9    provider and upon approval of the Court.  The Probation

10   Office shall approve the location, frequency and duration of

11   outpatient treatment.  You shall abide by the rules of any

12   treatment program, which may include abstaining from the use

13   of any alcohol.  You shall contribute to the cost of any

14   evaluation and/or treatment in an amount to be determined by

15   the Probation Officer based on your ability to pay and the

16   availability of third-party payments.

17          The Court directs that you shall reside in the

18   Northern District of New York.  The Court approves your

19   travel to the Canadian side of the Akwesasne St. Regis

20   Mohawk Native American Reservation for purposes of medical,

21   educational or other treatment or government-related

22   appointments or programs as approved by the United States

23   Probation Office.  And I emphasize, Mr. Peters, that any

24   travel across that international border, whether it's within

25   the Akwesasne St. Regis Mohawk American Reservation or not,

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*USA v. Peters - 13-CR-316*

1    needs to be approved by your Probation Officer.  He will

2    grant you approval to do that for certain specific reasons

3    that I've listed -- medical, educational, other treatment if

4    you're in some sort of rehabilitation treatment, or

5    government-related deployments -- but there has to be a

6    request and there has to be approval to do that.

7         You shall not commit another crime in the United

8    States or elsewhere, including any criminal violation of the

9    law of any province, state, county, town, city, village or

10   subdivision of a country or of any recognized tribe.

11        The Court finds that based on your financial

12   resources, projected earnings and other income, as well as

13   your financial obligations, that you do not have the ability

14   to pay a fine.  Therefore, no fine is imposed.

15        You shall pay to the Clerk of the Court a special

16   assessment of $100, which is due and payable immediately.

17        The defendant shall consent to an entry of

18   forfeiture to the items outlined in the preliminary order of

19   forfeiture.

20        Both parties have a right to appeal this sentence,

21   and you're advised to consult with your attorney to

22   determine whether or not an appeal is warranted.  Any appeal

23   must be filed within 14 days of the date of the judgment

24   being filed in this case.  There is no waiver of appeal in

25   this case.

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*USA v. Peters - 13-CR-316*

1    You are remanded to the custody of the United

2 States Marshals in accordance with the terms of this

3 sentence.

4    MR. SCHLENKER:  I have one request, your Honor?

5    THE COURT:  Yes, Mr. Schlenker, go ahead.

6    MR. SCHLENKER:  To the extent that it has weight,

7 Mr. Peters has a young child who lives in the north country.

8 We have facilities, BOP facilities, in the State of New

9 York, and, as I said, to the extent that it carries any

10 weight, I would request that a judicial recommendation be

11 made that Mr. Peters be incarcerated at a location which is

12 as close as possible to home, subject, of course, to BOP

13 requirements and rules and procedures.

14    THE COURT:  As you're aware, Mr. Schlenker, I can

15 make the recommendation, doesn't mean it'll be heeded.

16 He'll be, you know, categorized and placed in a facility

17 they find appropriate.  They do, when they can, entertain

18 judicial requests, and Mr. Peters, is that your request, you

19 want to be as close as ya can to the north country?

20    THE DEFENDANT:  Yes, sir.  Raybrook would be nice,

21 if it's possible.

22    THE COURT:  Okay.  Well, I'm gonna say this for

23 the record:  I think it's most important that you be placed

24 in a facility with appropriate programs for alcohol, drug

25 counseling, rehabilitation, and I want ya to be in the best

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

*USA v. Peters - 13-CR-316*

1  program possible for that.  I'll say that on the record.

2  Secondly, if that coincides or they find that it's -- you

3  know, the program is just as good at Raybrook as it is

4  someplace else, I'm gonna request secondarily that you be

5  placed in a facility as close as possible to your home so

6  that you can have visitation from family and friends and

7  certainly your son.  So I'll put that on the record and make

8  the request, but my first priority is treatment for you,

9  sir, to make sure that when you do come out -- you're gonna

10  be in for a period of time, I urge you learn a trade, they

11  have all sorts of things, do something so that when you come

12  out, you can step away from this world that you've been

13  engulfed in up there on that border for a number of years

14  and do something productive for your community.  Maybe help

15  do something for your son and his future, to show him, you

16  know, that people can change and there's a different way to

17  life.  You can lead, certainly, in demonstrating that to

18  him.  There's a long history up there, I know you're aware

19  of it, I'm aware of it, and I really do wish you the best to

20  be able to step away from that, 'cause if you don't take

21  advantage of some of these programs, I don't know what

22  you're gonna do when you get out.  So I hope ya take

23  advantage of some of those programs, learn a trade, so when

24  you come out, you can do something and give back to the

25  community, do something worthwhile.  I wish you the best of

JA-813

*USA v. Peters - 13-CR-316*

1  luck.

2          Anything further from the Government?

3          MR. COLLYER:  No, sir, thank you.

4          THE COURT:  All right.

5          MR. SCHLENKER:  Thank you.

6          THE COURT:  Mr. Schlenker, thank you.

7                  (This matter adjourned at 11:36 AM.)

8                  - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT - NDNY*

JA-814

CERTIFICATION OF OFFICIAL REPORTER

1
2
3
4          I, THERESA J. CASAL, RPR, CRR, CSR, Official
5     Realtime Court Reporter, in and for the United States
6     District Court for the Northern District of New York, do
7     hereby certify that pursuant to Section 753, Title 28,
8     United States Code, that the foregoing is a true and correct
9     transcript of the stenographically reported proceedings held
10    in the above-entitled matter and that the transcript page
11    format is in conformance with the regulations of the
12    Judicial Conference of the United States.

13
14          Dated this 11th day of March, 2015.

15
16    /s/ THERESA J. CASAL
17    THERESA J. CASAL, RPR, CRR, CSR
18    FEDERAL OFFICIAL COURT REPORTER
19
20
21
22
23
24
25

*THERESA J. CASAL, RPR, CRR*
*UNITED STATES DISTRICT COURT – NDNY*

JA-815

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**UNITED STATES OF AMERICA,**

     **-against-**       **NOTICE OF APPEAL**

**ALLAN PETERS,**        *8:13-CR-316-002(GTS)*

        **Defendant.**

   Notice is hereby given that Allan Peters, Defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Second Circuit from the final Judgment entered in this action on February 13, 2015 and from that Final Order of Forfeiture entered in this action on February 17, 2015.

Dated:  February 24, 2015    DENNIS B. SCHLENKER, ESQ.
            Attorney for Defendant

            Dennis B. Schlenker
            (Bar Roll No.  102545)
            174 Washington Avenue
            Albany, New York 12210
            (518) 463-4473
            Fax: (518) 463-7926
            E-mail: badger44@verizon.net

Case 15-541, Document 22, 08/10/2015, 1580139, Page220 of 220

JA-816

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 24, 2015, a true and correct copy of the foregoing "Notice of Appeal" was filed electronically and a check in the amount of $505.00 was mailed to the US District Court, Northern District of New York, 445 Broadway, Albany, NY 12207 as and for the filing fee for this Notice of Appeal.  Notice of this filing will be sent to all parties of record by operation of this Court's electronic filing system.

Dated:        February 24, 2015

Dennis B. Schlenker, Esq.
Attorney for Defendant
Bar Roll No.: 102545